**F I L E D**
CLERK, U.S. DISTRICT COURT

12/07/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>ROBERT HUNTER BIDEN,<br><br>          Defendant. | No. 2:23-cr-00599-MCS<br><br>I N D I C T M E N T<br><br>[26 U.S.C. § 7201: evasion of assessment; 26 U.S.C. § 7203: failure to file and pay taxes; 26 U.S.C. § 7206: false or fraudulent tax return] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.   Defendant ROBERT HUNTER BIDEN (hereafter "the Defendant") was a Georgetown- and Yale-educated lawyer, lobbyist, consultant, and businessperson and, beginning in April 2018, a resident of Los Angeles, California.

2.   At times relevant to this Indictment, the Defendant served on the board of a Ukrainian industrial conglomerate and a Chinese private equity fund. He negotiated and executed contracts and agreements for business and legal services that paid millions of

dollars of compensation to him and/or his domestic corporations, Owasco, PC and Owasco, LLC.

3.   In addition to his business interests, the Defendant was an employee of a multi-national law firm working in an "of counsel" capacity from 2009 through at least 2017.

4.   The Defendant engaged in a four-year scheme to not pay at least $1.4 million in self-assessed federal taxes he owed for tax years 2016 through 2019, from in or about January 2017 through in or about October 15, 2020, and to evade the assessment of taxes for tax year 2018 when he filed false returns in or about February 2020.  In furtherance of that scheme, the Defendant:

a.   subverted the payroll and tax withholding process of his own company, Owasco, PC by withdrawing millions from Owasco, PC outside of the payroll and tax withholding process that it was designed to perform;

b.   spent millions of dollars on an extravagant lifestyle rather than paying his tax bills;

c.   in 2018, stopped paying his outstanding and overdue taxes for tax year 2015;

d.   willfully failed to pay his 2016, 2017, 2018, and 2019 taxes on time, despite having access to funds to pay some or all of these taxes;

e.   willfully failed to file his 2017 and 2018 tax returns on time; and

f.   when he did finally file his 2018 returns, included false business deductions in order to evade assessment of taxes to reduce the substantial tax liabilities he faced as of February 2020.

A. The Defendant made millions of dollars in income from 2016-2020.

5.   Between 2016 and October 15, 2020, the Defendant individually received more than $7 million in total gross income. This included in excess of $1.5 million in 2016, $2.3 million in 2017, $2.1 million in 2018, $1 million in 2019 and approximately $188,000 from January through October 15, 2020.  In addition, from January through October 15, 2020, the Defendant received approximately $1.2 million in financial support to fund his extravagant lifestyle.

i. *Burisma Holdings Limited*

6.   In or around April 2014, the Defendant joined the board of directors of Burisma Holdings Limited ("Burisma"), a Ukranian industrial conglomerate. Burisma agreed to pay the Defendant an annual salary of approximately $1,000,000, to be paid in monthly disbursements. In March 2017, Burisma reduced his compensation to approximately $500,000 a year but he continued to serve on the board of directors until in or around April 2019. As a result, he received a total of approximately $1,002,016 in 2016, $630,556 in 2017, $491,939 in 2018, and $160,207 in 2019.

ii. *The Romanian Contract*

7.   In the fall of 2015, the Defendant entered into an oral agreement with Business Associate 1 purportedly to help a Romanian businessperson, G.P., contest bribery charges he was facing in his home country. G.P. paid an entity associated with Business Associate 1, through G.P.'s Romanian business. Between November 2015 and May

2017, Business Associate 1's entity received approximately
$3,101,258, which was split roughly into thirds between the
Defendant, Business Associate 1, and Business Associate 2.

*iii. CEFC China Energy Co Ltd.*

8.   In the late fall of 2015, the Defendant, Business Associate
1, and Business Associate 2 began to investigate potential
infrastructure projects with individuals associated with CEFC China
Energy Co Ltd. (CEFC), a Chinese energy conglomerate.

9.   In or around December of that year, the Defendant met in
Washington, D.C., with individuals associated with CEFC.  During the
next two years the Defendant, Business Associate 1, and Business
Associate 2 continued to meet with individuals associated with CEFC,
including in February 2017, with CEFC's then-Chairman (hereafter "the
Chairman").

10.   On or about March 1, 2017, State Energy HK, a Hong Kong
entity associated with CEFC, paid approximately $3 million to
Business Associate 1's entity for sourcing deals and for identifying
other potential ventures. The Defendant had an oral agreement with
Business Associate 1 to receive one-third of those funds, or a
million dollars.  The Defendant, in turn, directed a portion of those
million dollars to Business Associate 3.

11.   After the State Energy HK payment, the Defendant, Business
Associate 1, and Business Associate 2 began negotiating a joint
venture with individuals associated with CEFC, which they called
SinoHawk.

12.   Over the summer of 2017, the Defendant cut out his SinoHawk
business partners and separately negotiated a venture with
individuals associated with CEFC called Hudson West III ("HWIII").

4

13.   On or about August 2, 2017, the Defendant executed, on behalf of Owasco, PC the operating agreement for HWIII. HWIII was funded with an initial $5,000,000 capital contribution from an entity that was not owned or controlled by the Defendant. The contract further named the Defendant as a "manager" of HWIII and specified that he would receive "compensation" of $100,000 per month and a one-time retainer fee of $500,000. Owasco, PC paid no capital contribution for its ownership share of HWIII.

14.   Shortly after execution of the contract, on or about August 8, 2017, HWIII transferred approximately $400,000 to Owasco, PC. Thereafter, Owasco, PC received monthly transfers of approximately $165,000. In total, HWIII made seven transfers to Owasco, PC in 2017 totaling approximately $1.445 million. The Defendant then transferred approximately $555,000 of these funds from Owasco, PC's Wells Fargo Account to Business Associate 3. In 2018, HWIII made another 15 transfers to Owasco, PC, totaling approximately $2.1 million, and the Defendant transferred approximately $843,999 of these funds to Business Associate 3.

                    *iv.   Skaneateles*

15.   On or about September 21, 2017, the Defendant received a transfer of approximately $666,572 from Skaneateles, which was a partnership owned 75 percent by the Defendant and 25 percent by Business Associate 4. The Defendant and Business Associate 4 had a variety of business interests and investments.

                    *v.   "Global"*

16.   "Global" was a venture capital firm founded and operated by a "Trial Attorney." The Defendant and Business Associate 4 received equity in Global in exchange for introducing Trial Attorney to their

contacts in China and India. On or about March 21, 2019, the
Defendant received a distribution of approximately $619,000 from
Global via Skaneateles.

      *vi.  Financial Support from Personal Friend*

17.  From January through October 15, 2020, an entertainment
lawyer (hereafter "Personal Friend") provided the Defendant with
substantial financial support including approximately $200,000 to
rent a lavish house on a canal in Venice, California; $11,000 in
payments for his Porsche; and other individual items. In total, the
Defendant had Personal Friend pay over $1.2 million to third parties
for the Defendant's benefit from January through October 15, 2020.

      *vii. Beautiful Things*

18.  In 2019, the Defendant began writing a non-fiction memoir
where he described his substance abuse and addiction issues that was
ultimately titled *Beautiful Things*.  On November 25, 2019, the
Defendant signed a contract with a publishing house.  From January
through October 15, 2020, the Defendant received approximately
$140,625 paid into his wife's bank account related to the book.

  B. The Defendant had a legal obligation to file and pay taxes.

19.  The U.S. income tax system (hereafter "the U.S. system")
imposes a tax base on income on individuals and corporations.  The
tax is taxable income, as defined, times a specified tax rate.  The
U.S. system allows reduction of taxable income for both business and
some nonbusiness expenditures, called deductions.  Business
deductions must be both necessary and ordinary.

20.  The U.S. system is based on self-assessment. That means
that taxpayers must declare and pay tax without being told the amount
that is due by the taxing authority.

21.  The U.S. system is also pay-as-you-go, meaning that taxes must either be withheld from wages and paid over to the U.S. Treasury in the year in which income is earned, which is the case with most taxpayers, or be paid quarterly to the U.S. Treasury on an estimated basis, again during the year in which the income that is taxed is earned.  When taxes are filed in the following year, any withholdings or estimated tax payments are applied against what a taxpayer owes, resulting either in a refund or an amount due to the U.S. Treasury.

22.  The U.S. system relies on the honesty and integrity of individual taxpayers.  While the Internal Revenue Service ("IRS") audits some tax returns each year, as a practical matter it can only audit a tiny fraction of taxpayers.

23.  Tax returns are typically due on April 15 of the calendar year following the tax year.  A taxpayer may request and receive an extension to file his return, which generally makes the due date October 15.  Taxpayers are required to pay any taxes owed on April 15, regardless of whether they file a return on that date.  In other words, an extension to file a return does not entitle a taxpayer to delay paying taxes—those are still due on or about April 15.

24.  Form 1040, U.S. Individual Income Tax Return, is the standard IRS form that individual taxpayers use to file their annual income tax returns. The form contains sections that require taxpayers to disclose their taxable income for the year to determine whether additional taxes are due and owing or whether the filer will receive a tax refund.

25.  Form 1120, U.S. Corporation Income Tax Return, is the standard IRS form that domestic corporations, also referred to as "C Corporations," use to file their annual income tax returns.  C

Corporations report their income, gains, losses, deductions, and credits on Form 1120 and use it to determine their income tax liability.  Owasco, PC of which the Defendant was the 100 percent owner, was a C Corporation that had to file a U.S. Corporate Income Tax Return, on Form 1120, and pay taxes on its income.

26.  The Defendant had a legal obligation to pay taxes on all his income, including income earned in Ukraine from his service on Burisma's Board, fees generated by deal-making with the Chinese private equity fund, as well as income derived from his work as a lawyer and other sources.

C. The Defendant owed substantial individual income taxes in tax years 2016, 2017, 2018, and 2019.

27.  The following is a summary of the self-assessed taxes that the Defendant reported he owed on his Forms 1040 and failed to timely pay:

| TAX YEAR | RETURN DUE DATE | DATE RETURN FILED | GROSS TOTAL INCOME | REPORTED TAXABLE INCOME | SELF-ASSESSED TAX DUE AT TIME OF FILING |
|---|---|---|---|---|---|
| **2016** | 10/16/2017 | 6/12/2020 | $1,580,283 | $1,276,499 | $45,661 |
| **2017** | 10/15/2018 | 2/18/2020 | $2,376,436 | $1,956,003 | $581,713 |
| **2018** | 10/15/2019 | 2/18/2020 | $2,187,286 | $1,688,495 | $620,901 |
| **2019** | 10/15/2020 | 10/15/2020 | $1,045,850 | $843,577 | $197,372 |

D. The Defendant knew he had to file and pay taxes.

28.  Because of his varied income streams and to facilitate the withholding and payments of taxes to the IRS, the Defendant formed Owasco, PC, a C Corporation, in or about 2006. Owasco, PC's sole purpose was to ensure that there were sufficient withholdings from

all the streams of the Defendant's income to pay his taxes.  Instead of receiving income directly into his personal bank account, the Defendant directed third parties to pay Owasco, PC, which had its own bank account, any income owed to him.  Owasco, PC then used a payroll service to pay the Defendant a salary out of the income it received.  The payroll service made tax withholdings on behalf of the Defendant, which it paid over to the IRS, and the Defendant also made quarterly payments and payments with extensions to the IRS, all in anticipation of when the Defendant filed his individual income tax return.  Because the Defendant's income varied from year to year, the Defendant, in consultation with his Washington, D.C.-based accountant (hereafter "D.C. Accountant") and Business Associate 4, periodically adjusted his tax withholdings to ensure that he did not generate additional tax liabilities.

29.   The Defendant and Business Associate 4 also created a standalone bank account that they referred to as a "tax account," into which the Defendant deposited funds to pay taxes if he owed anything beyond the withholdings made by Owasco, PC.

30.   This arrangement meant that the Defendant had to file an individual income tax return, on IRS Form 1040, where he reported the income he earned from Owasco, PC and other sources, and could pay taxes on that income using the withholdings Owasco, PC had made, and funds from his tax account.  The Defendant also had to file a separate corporate income tax return for Owasco, PC on IRS Form 1120, and could pay any taxes it owed from Owasco, PC's bank account.  This structure generally functioned effectively until 2017 when the Defendant, as detailed below, subverted it.

1          31.   Irrespective of the Owasco, PC structure and his standalone

2    "tax account," the Defendant knew he had to file individual and

3    corporate income tax returns and pay tax on the income that he earned

4    in 2016, 2017, 2018, and 2019.  He had done so for tax years 2014 and

5    2015, the two years preceding his scheme to not pay taxes.

6               a.   The Defendant timely filed, after requesting an

7    extension, his 2014 individual income tax return on IRS Form 1040 on

8    October 9, 2015.  The Defendant reported owing $239,076 in taxes, and

9    having already paid $246,996 to the IRS, the Defendant claimed he was

10   entitled to a refund of $7,920.  The Defendant did not report his

11   income from Burisma on his 2014 Form 1040.  All the money the

12   Defendant received from Burisma in 2014 went to a company, hereafter

13   "ABC", and was deposited into its bank account.  ABC and its bank

14   account were owned and controlled by a business partner of the

15   Defendant's, Business Associate 5.  Business Associate 5 was also a

16   member of Burisma's Board of Directors.  The Defendant received

17   transfers of funds from the ABC bank account and funds from the ABC

18   bank account were used to make investments on the Defendant's behalf.

19   Because he owned ABC, Business Associate 5 paid taxes on income that

20   he and the Defendant received from Burisma. Starting in November

21   2015, the Defendant directed his Burisma Board fees to an Owasco, PC

22   bank account that he controlled.

23              b.   The Defendant timely filed, after requesting an

24   extension, his 2015 individual income tax return on IRS Form 1040 on

25   October 17, 2016.  The Defendant reported owing $820,801 in taxes and

26   having withheld $644,781, he owed the IRS $176,550.  For tax year

27   2015, the Defendant declared income he received from Burisma on his

28   Form 1040.

32.   From at least January 2017 through April 2017, Business Associate 4 and Personal Assistant 1 provided the Defendant with periodic updates regarding his cashflow and outstanding liabilities, including his various income tax liabilities.

33.   From April 2017 to September 2017, Personal Assistant 1 sent the Defendant, a "weekly bill update" detailing his IRS liabilities and other outstanding bills.

34.   The Defendant controlled his finances and directed Business Associate 4 and Personal Assistant 1 to pay certain bills and not others.  The Defendant routinely chose to pay personal expenses and not pay his outstanding tax liabilities.

35.   Further, beginning in or around May 2017, the Defendant began to make periodic $10,000 payments to the IRS towards his outstanding 2015 individual income tax liability. Between May 2017 and March 2018, he made seven such payments totaling $70,000 but made no further payments after March 2018. At that time, he still owed $106,020 for tax year 2015.

36.   The Defendant used the services of D.C. Accountant from January 1, 2017, until D.C. Accountant's death in or about June 2019. In November 2019, the Defendant engaged the services of an accounting firm in Los Angeles, California (hereafter the "CA Accountants").

E. Rather than pay his taxes, the Defendant spent millions of
   dollars on an extravagant lifestyle.

37.   The Defendant spent millions of dollars on an extravagant lifestyle at the same time he chose not to pay his taxes.  The Defendant spent approximately $1 million in 2016, $1.4 million in 2017, $1.8 million in 2018, and $600,000 in 2019. From January through October 15, 2020, the Defendant received more than $1.2

million in financial support that was used to pay various personal expenses but not any of his federal individual income tax liabilities for 2016-2019.  Between 2016 and October 15, 2020, the Defendant spent this money on drugs, escorts and girlfriends, luxury hotels and rental properties, exotic cars, clothing, and other items of a personal nature, in short, everything but his taxes.

[this space intentionally left blank]

38.   The following is a summary of the approximate expenditures that the Defendant made instead of paying his taxes:

| Summary of Approx. Expenses Made from Owasco, PC and the Defendant's Bank Accounts (2016 to 2019) | | | | | |
|---|---|---|---|---|---|
| Description | 2016 | 2017 | 2018 | 2019 | Grand Total |
| ATM / Cash Withdrawal | $200,922 | $503,614 | $772,548 | $186,920 | **$1,664,004** |
| Payments – Various Women | $4,400 | $138,837 | $383,548 | $156,427 | **$683,212** |
| Clothing & Accessories | $78,580 | $113,905 | $151,459 | $53,586 | **$397,530** |
| Tuition/ Education/ Extracurricular | $117,281 | $94,497 | $93,213 | $4,286 | **$309,277** |
| Health, Beauty, Pharmacy | $54,789 | $110,239 | $46,347 | $26,121 | **$237,496** |
| Misc. Retail Purchases | $51,629 | $75,941 | $78,135 | $30,929 | **$236,634** |
| Food, Groceries, Restaurants | $67,281 | $73,219 | $40,590 | $33,833 | **$214,923** |
| Insurance | $41,808 | $47,060 | $90,535 | $24,412 | **$203,815** |
| Loan / Mortgage Payments | $144,396 | $43,647 | $500 | $3,330 | **$191,873** |
| Adult Entertainment | $4,411 | $56,846 | $100,330 | $27,373 | **$188,960** |
| Legal & Accounting Fees | $33,379 | $103,745 | $9,745 | $700 | **$147,566** |
| Telephone / Utilities | $37,319 | $29,623 | $22,977 | $28,521 | **$118,440** |
| Rehab (Drug & Alcohol) | $7,600 | $28,600 | $35,669 | | **$71,869** |
| Wells Fargo Advisors - Roth IRA | $53,000 | | | | **$53,000** |
| Credit Card Payments | $7,464 | $18,479 | $12,000 | $20,599 | **$58,542** |
| Home Improvement / Maintenance | $33,168 | $3,574 | $5,763 | $351 | **$42,856** |
| Home Help / Cleaning / Childcare | $22,855 | $16,946 | | | **$39,801** |
| Entertainment | $8,172 | $6,148 | $7,500 | $2,625 | **$24,445** |
| Sports / Recreation | $22,387 | $8 | $1,172 | | **$23,567** |
| **Grand Total** | **$990,841** | **$1,464,928** | **$1,852,031** | **$600,013** | **$4,907,813** |

F. The Defendant late filed his taxes when facing contempt charges in two civil lawsuits.

39.  In 2019 and early 2020, the Defendant became embroiled in two civil lawsuits. As part of the lawsuits, he had to produce financial records, including his tax returns. These lawsuits forced the Defendant to file his outstanding tax returns for 2017 and 2018.

40.  Beginning in May 2019, Person 1 brought a paternity and child-support action in Arkansas state court against the Defendant. In June 2019, the Defendant's ex-wife brought a motion to enforce a marital separation agreement between herself and the Defendant in the Superior Court of the District of Columbia ("D.C. Superior Court") because the Defendant had stopped making spousal support payments and refused to provide financial records, including his tax returns, that were necessary to calculate the amount of spousal support he owed, per his agreement with his ex-wife.

41.  In 2019, the Defendant continually stonewalled the production of financial records through which Person 1 and the Defendant's ex-wife and the courts sought to ascertain the Defendant's financial situation and ability to pay.

42.  The demands for the Defendant's tax returns steadily increased, escalating in November 2019.  That month the Defendant hired the CA Accountants to prepare his late and unfiled individual income tax returns and Owasco, PC's corporate returns for the 2017 and 2018 tax years.

43.  Subsequently, an Arkansas court issued an order that the Defendant had until January 16, 2020, to produce his individual income tax returns for 2017 and 2018. The D.C. Superior Court likewise ordered the Defendant to produce the same returns by January

14

17, 2020. The Defendant missed both deadlines, prompting counsel in the Arkansas case and in the D.C. Superior Court case to move for contempt.  If the Defendant were found to be in contempt, either court could incarcerate the Defendant for his failure to comply with court orders.

44.  On January 21, 2020, the Arkansas court issued an order that the Defendant appear and show cause why he should not be held in contempt. After the Defendant entered into a temporary child support agreement with Person 1, the court continued the hearing on the motion for contempt and gave the Defendant until March 1, 2020, to provide the missing records, including his 2017 and 2018 individual income tax returns.

45.  On or about February 18, 2020, the Defendant late filed his 2017 Form 1040. On the 2017 Form 1040, the Defendant reported $1,956,003 in taxable income and $581,713 in tax due and owing.  The Defendant chose not to pay any of his outstanding 2017 tax liability when he late filed his 2017 Form 1040 in February 2020.

46.  That same day, the Defendant also late filed his 2018 Form 1040.  On the 2018 Form 1040, the Defendant reported $1,688,495 in taxable income for 2018 and $620,901 in tax due and owing.  The Defendant again chose not to pay any of his outstanding 2018 tax liability when he late filed his 2018 Form 1040 in February 2020.

47.  On June 12, 2020, the Defendant late filed his 2016 Form 1040. On the 2016 Form 1040, the Defendant reported $1,276,499 in taxable income for 2016 and $45,661 in tax due and owing. The Defendant chose not to pay any of his outstanding 2016 tax liability when he late filed his 2016 Form 1040 in June 2020.

G. **The Defendant had the funds to pay his taxes in 2017, 2018, 2019, and 2020.**

48.   As described in more detail below, in each year in which he failed to pay his taxes, the Defendant had sufficient funds available to him to pay some or all of his outstanding taxes when they were due.  But he chose not to pay them.  Notably, in 2020, well after he had regained his sobriety, and when he finally filed his outstanding 2016, 2017, and 2018 Forms 1040, the Defendant did not direct any payments toward his tax liabilities for each of those years.  At the same time, the Defendant spent large sums to maintain his lifestyle from January through October 15, 2020. In that period, he received financial support from Personal Friend totaling approximately $1.2 million.  The financial support included hundreds of thousands of dollars in payments for, among other things, housing, media relations, accountants, lawyers, and his Porsche. For example, the Defendant spent $17,500 each month, totaling approximately $200,000 from January through October 15, 2020, on a lavish house on a canal in Venice Beach, California. Thus, the Defendant's practice of tax non-compliance in the 2017 and 2018 tax years — where the IRS stood as the last creditor to be paid — persisted into later tax years.

COUNT ONE

[26 U.S.C. § 7203: failure to pay 2016 Form 1040]

49.   The Grand Jury re-alleges paragraphs 1 through 48 of this Indictment here.

A. The Defendant earned a substantial income in 2016.

50.   Over the course of 2016, the Defendant earned approximately $1,580,283 in gross income from the sources identified above.

B. The Defendant had a legal obligation to file a U.S. Individual Income Tax Return for 2016.

51.   For tax year 2016, anyone under 65, filing jointly with their spouse, or individually, and who made more than $20,700, or $10,350, respectively, had to file a federal tax return by April 18, 2017, unless granted an extension to October 16, 2017.

C. The Defendant did not timely file a U.S. Individual Income Tax Return for 2016.

52.   The Defendant filed a request for an extension in 2017 which meant that his 2016 Form 1040 was due no later than October 16, 2017.  The Defendant did not timely file his 2016 Form 1040 by that date.

D. The Defendant knew he had to file and pay taxes for 2016.

53.   On or about April 21, 2016, Defendant made an estimated tax payment of $30,000 towards his 2016 individual income tax liability.

54.   In 2017, Business Associate 4 and Personal Assistant 1 frequently apprised the Defendant that he owed taxes for the 2016 tax year. For example, on April 15, 2017, Business Associate 4 forwarded the Defendant an email from D.C. Accountant, which stated, "Looks like Owasco will owe about $52,000 and Hunter (individually) will owe about $26,000." The taxes the Defendant owed individually were in

17

addition to the $30,000 estimated payment he had made the previous year.  On or about April 15, 2017, an extension was filed but no further payment was made.

55.  In October 2017, D.C. Accountant used information provided by Business Associate 4 and Personal Assistant 1 to prepare a Form 1040 for the Defendant and a Form 1120 for Owasco, PC. The Form 1040 indicated that the Defendant owed taxes in addition to what he had already paid.  Business Associate 4 reviewed the prepared returns and left them for the Defendant at his office. Business Associate 4 then emailed the Defendant advising him as much. The Defendant was responsible for signing and mailing his returns.

56.  On or about November 27, 2017, the Defendant sent the following email to Business Associate 4 and Personal Assistant 1:

> Also I just saw last week the unmarked envelope in. The office e (sic) requiring signatures for my taxes. I wish someone had told me- but its my fault for to (sic) thinking of that or for having ignored an email im sure Ione (sic) of you sent saying there is a large envelope in the office sitting b (sic) the door which requires 50 signatures including [ex-wife's] . . .

57.  The Defendant brought the 2016 Form 1040 to his ex-wife and asked her to sign it.  She said she would, after reviewing the return with her accountant.  She did so and sent the signed return to the Defendant the next day.

58.  On March 9, 2018, the Defendant's ex-wife texted him that she had discovered their unfiled 2016 tax returns in the trunk of his car. The Defendant responded telling her, "The taxes are filed those were copies with [Personal Assistant 1]'s notes."  The tax returns had not been filed.  The Defendant's ex-wife responded telling him

they were not copies because they still had checks attached to them and were originals.

59.   On or about July 18, 2018, the IRS received a late filed 2016 Form 1120 for Owasco, PC.  The Defendant did not submit an individual income tax return when he mailed the corporate one.

E. The Defendant owed taxes for 2016, which he did not timely pay.

60.   The Defendant owed individual income taxes for 2016 which were due on or before April 18, 2017.

61.   The Defendant knew he had to pay taxes for the 2016 tax year in 2017 because on or about April 21, 2016, he made a payment of $30,000 towards his 2016 tax liability and on or about April 18, 2017, the D.C. Accountant told him he owed an additional $26,000.

62.   In 2019, as described above, the Defendant retained the CA Accountants.  The CA Accountants contacted the IRS on January 22, 2020, and learned that the Defendant had not filed an individual income tax return for 2016. They then prepared a Form 1040 for the Defendant, which he reviewed and late filed on June 12, 2020. In that return, the Defendant self-assessed that he owed an additional $45,661 in taxes. He did not pay the $45,661 when he filed in June 2020.

F. The Defendant had the funds available to pay his taxes when they were due.

63.   When the Defendant finally filed his 2016 Form 1040, on June 12, 2020, he had funds available to pay some or all of his taxes owed for 2016 but chose not to do so.

G. Rather than pay his taxes, the Defendant spent millions of dollars on an extravagant lifestyle.

64.   From January to June of 2020, the Defendant spent approximately $187,000 on personal expenses rather than pay the $45,661 he owed when he finally filed his 2016 Form 1040 in June of 2020.  The Defendant also received more than $500,000 in financial support from Personal Friend during this period that he used to fund his lifestyle and did not use any of those funds to pay any of his outstanding taxes for 2016.

The Charge

65.   During the calendar year 2016, the Defendant ROBERT HUNTER BIDEN had and received taxable income of $1,276,499, on which taxable income there was owing to the United States of America an income tax of $45,661.  He was required by law to pay, on or before April 18, 2017, that income tax to the Internal Revenue Service. Well knowing all of the foregoing, he did willfully fail, on June 12, 2020, in the Central District of California and elsewhere, to pay the income tax due to the Internal Revenue Service Center at San Francisco, California, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, including the Internal Revenue Service office in Los Angeles, California.

In violation of Title 26, United States Code, Section 7203.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT TWO

[26 U.S.C. § 7203: failure to pay 2017 Form 1040]

66.   The Grand Jury re-alleges paragraphs 1 through 48 of this Indictment here.

A. The Defendant earned a substantial income in 2017.

67.   Over the course of 2017, the Defendant earned approximately $2,376,436 in gross income from the sources identified above.

B. The Defendant had a legal obligation to file a U.S. Individual Income Tax Return for 2017.

68.   For tax year 2017, anyone under 65, filing jointly with their spouse, or individually, and who made more than $20,800 or $10,400, respectively, had to file a federal tax return by April 17, 2018, unless granted an extension to October 15, 2018.

C. The Defendant did not timely file a U.S. Individual Income Tax Return for 2017.

69.   The Defendant did not timely file his 2017 Form 1040 by October 15, 2018, when it was due.

D. The Defendant knew he had to file and pay taxes for 2017.

70.   Beginning in early 2017, the Defendant withdrew and transferred funds from Owasco, PC's corporate accounts for his personal benefit. He transferred these funds outside of Owasco, PC's established payroll system, which meant that taxes were not withheld from these transfers. When Business Associate 4 discovered that the Defendant was subverting the established payroll and tax withholding process, Business Associate 4 met with and advised the Defendant that he was not withholding enough money in taxes and that he would have a large tax liability due at the end of the year unless he allocated sufficient withholdings.

71.  From September 1 to December 31, 2017, at the Defendant's direction, Owasco, PC made approximately $590,719 in direct payments to the Defendant or indirect payments to third parties for his benefit.

72.  On or about April 16, 2018, the day before his 2017 taxes were due, D.C. Accountant emailed the Defendant's personal assistant at that time, hereafter "Personal Assistant 2" and advised that the Defendant "owes a lot of money" for the 2017 tax year and inquired if the Defendant had cash available for tax payments as "he really should pay as much as he can." In response, Personal Assistant 2 set up a call between the Defendant and D.C. Accountant for the next day. After that call, D.C. Accountant filed an extension on the Defendant's behalf making his tax filings, although not his tax payments, due on October 15, 2018.

73.  For the 2017 tax year, D.C. Accountant prepared the Defendant's individual and corporate income tax returns and repeatedly attempted to provide them to the Defendant throughout the fall of 2018.

74.  On or about October 12, 2018, D.C. Accountant emailed the Defendant advising him that he owed approximately $600,000 in individual income taxes and an additional $204,000 in corporate income taxes on behalf of Owasco, PC. D.C. Accountant further reminded the Defendant that the tax returns were due and encouraged him to file.

75.  On or about October 13, 2018, instead of responding to D.C. Accountant, the Defendant texted his ex-wife that he could not make his alimony payment because "the wire came back due to insufficient funds--/you know tuitions alimony **taxes** rent. Jesus." (emphasis

added).  The Defendant had not paid his 2017 taxes when he sent that text.

76.  On or about October 23, 2018, D.C. Accountant emailed the Defendant again advising him that his 2017 Form 1040 and Owasco, PC's 2017 Form 1120 were due on October 15 and were late. D.C. Accountant urged the Defendant "to get them filed as soon as possible since late filing and late payment penalties will continue to accrue."

77.  On or about November 8, 2018, D.C. Accountant emailed the Defendant again advising him that his "2017 tax returns are still unfiled" and requesting an address where he could send the prepared returns for the Defendant to sign and file.

78.  On or about November 9, 2018, D.C. Accountant emailed the Defendant reminding him again that "You need to get 2017 filed so we can try to work out a payment schedule."

79.  On or about December 10, 2018, the Defendant texted his ex-wife, "I have no money [ex-wife]. I'm waiting on a few things. When I can **pay the taxes, I will pay the taxes**. I'm (sic) the meantime I'm struggling to pay your alimony and all girls expenses." (emphasis added).

80.  On or about November 16, 2018, the Defendant texted Personal Assistant 2 and asked her to send him "all auto pay expenses and payroll breakdown please." In response, on or about November 27, Personal Assistant 2 advised the Defendant that D.C. Accountant was "trying to reach you re: taxes" and she then sent him a breakdown detailing that he had approximately $87,000 in monthly expenses, not including payments for outstanding taxes. The Defendant subsequently directed Personal Assistant 2 to pay some of his personal expenses, including his boat loan payment, but not his taxes.

81.  On or about November 26, 2018, Personal Assistant 2 forwarded him an email from his ex-wife.  In the forwarded email, the Defendant's ex-wife told the personal assistant, "[the Defendant] needs to send [D.C. Accountant] an email confirmation that he approves sharing his tax returns with me and my accountant—that's what we agreed to in the divorce settlement."

82.  On or about December 20, 2018, the Defendant's ex-wife texted him and requested that the Defendant authorize D.C. Accountant to share the Defendant's 2017 tax return with her, as the Defendant was required to provide under the parties' Marital Separation Agreement. In response, the Defendant told her that, "My tax returns aren't completed. [D.C. Accountant] is going off information from [Business Associate 4] that is not accurate at all. I don't understand. I will call him now." He later sent a follow-up text claiming, "I have no prepared tax returns to send you now."

83.  On or about February 19, 2019, D.C. Accountant emailed the Defendant and the Defendant's attorney and reminded both that the "2017 tax returns are complete and ready to file. Would you like me to have copies sent to you electronically?"

E. The Defendant owed taxes for 2017, which he did not pay.

84.  The Defendant had a duty to pay $581,713 he owed in self-assessed individual income taxes for 2017 on April 17, 2018, which he chose not to do.

85.  To avoid being held in contempt of court in two separate civil proceedings, the Defendant late filed his 2017 Form 1040 on February 18, 2020.  In his 2017 Form 1040, the Defendant self-assessed owing $581,713 in taxes.  His CA Accountants specifically discussed with him the amounts he owed for his taxes.  The Defendant

nonetheless chose not to make any payments when he filed on February 18, 2020.

F. The Defendant had the funds available to pay his individual income taxes when they were due.

86. In April 2018, the Defendant had over $1 million available in his individual and corporate bank accounts. Notwithstanding these available funds, the Defendant chose not to pay his outstanding 2017 individual income tax liability of $581,713 when it was due.

G. Rather than pay his taxes, the Defendant spent millions of dollars on an extravagant lifestyle.

87. In 2018, the Defendant spent more than $1.8 million on personal expenses rather than pay his individual income taxes for 2017 even though they were due in April 2018.

88. In 2019, the year prior to the filing of his 2017 Form 1040 in February 2020, the Defendant spent more than approximately $600,000 on personal expenses rather than pay any of the $581,713 he owed when he finally filed his 2017 Form 1040.

<u>The Charge</u>

89. During the calendar year 2017, the Defendant ROBERT HUNTER BIDEN had and received taxable income of $1,956,003, on which taxable income there was owing to the United States of America an income tax of $581,713. He was required by law to pay, on or before April 17, 2018, that income tax to the Internal Revenue Service Center, at San Francisco, California, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, including the Internal Revenue Service office in Los Angeles, California. Well knowing all of the foregoing, he did willfully fail on April 17,

2018, and on February 18, 2020, in the Central District of California and elsewhere, to pay the income tax due.

In violation of Title 26, United States Code, Section 7203.

COUNT THREE

[26 U.S.C. § 7203: failure to file 2017 Form 1040]

90.   The Grand Jury re-alleges paragraphs 1 through 48 and 67 through 88 of this Indictment here.

91.   During the calendar year 2017, the Defendant ROBERT HUNTER BIDEN had received gross income in excess of $2.3 million. By reason of such gross income, he was required by law, following the close of the calendar year 2017 and on or before October 15, 2018, to make an income tax return to the Internal Revenue Service, stating specifically the items of his gross income and any deductions and credits to which he was entitled. Knowing and believing all of the foregoing, he did willfully fail, on or about October 15, 2018, in the Central District of California and elsewhere, to make an income tax return.

In violation of Title 26, United States Code, Section 7203.

COUNT FOUR

[26 U.S.C. § 7203: failure to pay 2018 Form 1040]

92.   The Grand Jury re-alleges paragraphs 1 through 48 of this Indictment here.

A. The Defendant earned a substantial income in 2018.

93.   Over the course of 2018, the Defendant earned approximately $2,187,286 in gross income from the sources identified above.

B. The Defendant had a legal obligation to file a U.S. Individual Income Tax Return in 2018.

94.   For tax year 2018, anyone under 65, filing individually, and who made more than $12,000, had to file a federal tax return by April 15, 2019, unless granted an extension to October 15, 2019.

C. The Defendant did not timely file a U.S. Individual Income Tax Return for 2018.

95.   The Defendant did not timely file his 2018 Form 1040 by October 15, 2019, when it was due.

D. The Defendant knew he had to file and pay taxes for 2018.

96.   On January 24, 2019, D.C. Accountant emailed the Defendant and the Defendant's attorney advising, "The 2018 tax return for Owasco, PC is due to be filed on April 15, 2019."

97.   Between April 13 and April 15, 2019, the Defendant, D.C. Accountant, and the Defendant's attorney corresponded regarding the need for the Defendant to file a U.S. Individual Income Tax Return or tax extension for the 2018 tax year and to pay taxes. Ultimately, an extension was filed making the tax filings, but not the tax payments, due on October 15, 2019.

28

E. The Defendant owed taxes for 2018, which he did not pay.

98.   The Defendant owed $620,901 in individual income taxes for 2018 due by April 15, 2019, which he chose not to pay.

99.   To avoid being held in contempt of court in two separate civil proceedings, the Defendant late filed his 2018 Form 1040 on February 18, 2020. In his tax return for 2018, he self-assessed owing $620,901 in taxes.  His CA Accountant specifically discussed with him the amount of taxes that he owed, and he chose not to make any payments when he filed.

F. The Defendant had the funds available to pay his individual income taxes when they were due.

100. Roughly contemporaneous with the arrest of P.H., an individual associated with CEFC, on or about November 2, 2017, HWIII received a $1,000,000 deposit. At the Defendant's direction, on or about March 22, 2018, the funds were transferred to Owasco, LLC. The memo line of this transfer indicated it was for "[P.H.] Representation." To justify the transfer, HWIII was provided with a letter stating that the funds were a retainer for the Defendant's representation of P.H., who was under criminal investigation in the United States.

101. Separate and apart from this million-dollar payment, around the time that his 2018 individual income tax was required to be paid, the Defendant received substantial amounts of money which could have satisfied his entire tax liability of $620,901, including:

        a.   March 6, 2019: $50,000 from Trial Attorney;

        b.   March 20, 2019: $10,000 from Skaneateles;

        c.   March 21, 2019: $618,681 from Skaneateles (related to Global);

d.   March 21, 2019: $40,150 from Burisma; and

e.   April 24, 2019: $39,923 from Burisma.

102. From January through October 15, 2020, the Defendant received the benefit of Personal Friend paying more than $1.2 million of the Defendant's personal expenses but the Defendant did not direct any of those funds towards his outstanding 2018 federal individual income taxes.

G. Rather than pay his taxes, the Defendant spent millions of dollars on an extravagant lifestyle.

103. The Defendant continued to earn handsomely and to spend wildly in 2018.  The Defendant's expenditures increased as his income increased. In 2018, the Defendant spent more than $1.8 million, including approximately $772,000 in cash withdrawals, approximately $383,000 in payments to women, approximately $151,000 in clothing and accessories, approximately $78,000 in miscellaneous retail purchases and other payments.  The Defendant did not use any of these funds to pay his taxes in 2018.

104. In 2019, the year when his 2018 taxes were due, the Defendant spent approximately $600,000 on personal expenses rather than pay any of the $620,901 he owed when he finally filed his 2018 Form 1040.

The Charge

105. During the calendar year 2018, the Defendant ROBERT HUNTER BIDEN, had and received taxable income in excess of $1.6 million, on which taxable income there was owing to the United States of America an income tax of $620,901. He was required by law to pay, on or before April 15, 2019, that income tax to the Internal Revenue Service Center, at San Francisco, California, or to another Internal

Revenue Service office permitted by the Commissioner of Internal Revenue including the Internal Revenue Service office in Los Angeles, California. Well knowing all of the foregoing, he did willfully fail on April 15, 2019, and on February 18, 2020, in the Central District of California and elsewhere, to pay the income tax due.

In violation of Title 26, United States Code, Section 7203.

COUNT FIVE

[26 U.S.C. § 7203: failure to file 2018 Form 1040]

106. The Grand Jury re-alleges paragraphs 1 through 48 and 93 through 104 of this Indictment here.

107. During the calendar year 2018, the Defendant ROBERT HUNTER BIDEN, had and received gross income in excess of $2.1 million.  By reason of such gross income, he was required by law, following the close of calendar year 2018, and on or before October 15, 2019, to make an income tax return to the Internal Revenue Service, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  Knowing and believing all of the foregoing, he did willfully fail, on or about October 15, 2019, in the Central District of California and elsewhere, to make an income tax return.

In violation of Title 26, United States Code, Section 7203.

COUNT SIX

[26 U.S.C. § 7201: evasion of assessment for 2018 Form 1040]

108. The Grand Jury re-alleges paragraphs 1 through 48 and 93 through 104 of this Indictment here.

A. The Defendant finally filed his 2018 Form 1040 in 2020 in order to avoid being held in contempt of court in two civil proceedings.

109. As described above, in 2019 and 2020, the Defendant finally prepared and filed his income tax returns for 2018 in order to avoid being held in contempt of court in two civil proceedings.

B. The Defendant hired accountants in California to complete his 2018 returns.

110. In or around November 2019, the Defendant hired the CA Accountants to prepare his individual income tax returns and corporate income tax returns for Owasco, PC for 2017 and 2018.

111. While D.C. Accountant had already created financial and accounting records in connection with the 2017 tax returns, no similar records existed for 2018. Therefore, the CA Accountants used available bank and credit card statements to create various schedules, including schedules for different categories of expenses, and a general ledger for Owasco, PC. A bookkeeper initially classified each expense. The CA Accountants then requested that the Defendant review and confirm the accuracy of the prepared schedules and ledger.

112. The CA Accountants also identified records for the Defendant that they did not have. These included details for wire transfers from Owasco, PC's Wells Fargo account to accounts at JP Morgan Chase that were owned by others and statements for a Wells

Fargo business line of credit ending in 7350 (hereafter "business line of credit").

113. On or about January 28, 2020, the CA Accountants requested that the Defendant sign a representation letter. The Defendant signed this letter in which he promised that he had made available "all the records and information regarding my income . . . and deductions as necessary for you to prepare the returns." The Defendant further confirmed his understanding that the CA Accountants were "relying on [him] to provide complete and accurate information," and that he was responsible for the final "accuracy and completeness for the tax returns."

C. The Defendant claimed extensive business travel in 2018 when he had none.

114. In working with the CA Accountants to prepare the returns, the Defendant claimed business expenses, including approximately $388,810 in business-related travel, despite having done little to no business in that year.  At the same time the Defendant was making those representations to the CA Accountants, the Defendant was working on his memoir, which was not published until after he filed his 2018 returns and which he did not share with them.  Unbeknownst to the CA Accountants, in his memoir, the Defendant described 2018 as being dominated by crack cocaine use "twenty-four hours a day, smoking every fifteen minutes, seven days a week." In fact, the Defendant never told the CA Accountants about his extensive drug and alcohol abuse in 2018 which might have prompted greater scrutiny of his claims of hundreds of thousands of dollars in business expenses.

115. Rather than conducting business, and generating business expenses, the Defendant wrote in his memoir that after he arrived in

California in April 2018, for the next "four or five months," he surrounded himself with and paid for an entourage of:

> . . . thieves, junkies, petty dealers, over-the-hill strippers, con artists, and assorted hangers-on, who then invited their friends and associates and most recent hookups. They latched on to me and didn't let go, all with my approval. I never slept. There was no clock. Day bled into night and night into day.

116. And the Defendant specifically described his stays in various luxury hotels in California and private rentals, and expenses related to them, in this way:

> I stayed in one place until I tired of it, or until it tired of me, and then moved on, my merry band of crooks, creeps, and outcasts soon to follow. Availability drove some of the moves; impulsiveness drove others. A sample itinerary: I left the Chateau [Marmont] the first time for an Airbnb in Malibu. When I couldn't reserve it for longer than a week, I returned to West Hollywood and the Jeremy hotel. There were then stays at the Sunset Tower, Sixty Beverly Hills, and the Hollywood Roosevelt. Then another Airbnb in Malibu and an Airbnb in the Hollywood Hills. Then back to the Chateau. Then the NoMad downtown, the Standard on Sunset. A return to the Sixty, a return to Malibu . . .
> An ant trail of dealers and their sidekicks rolled in and out, day and night. They pulled up in late-series Mercedes-Benzes, decked out in oversized Raiders or Lakers jerseys and flashing fake Rolexes. Their stripper girlfriends invited their girlfriends, who invited their boyfriends. They'd drink up the entire minibar, call room service for filet mignon and a bottle of Dom Pérignon. One of the women even ordered an additional filet for her purse-sized dog.

Notably, the Defendant did not write that he conducted any business in any of these luxury hotels nor did he describe any of the

1  individuals who visited him there as doing so for any business

2  purpose.

3      D. The Defendant failed to identify all personal expenses paid

4         using corporate funds.

5      117. On January 28, 2020, the Defendant met with the CA

6  Accountants in person at their office for more than three hours.

7  During this meeting the Defendant reviewed the General Ledger and

8  various schedules for Owasco, PC including a purported "Office

9  Expense" schedule and a purported "Professional and Outside Service"

10 schedule to confirm their accuracy.

11     118. The General Ledger that the Defendant reviewed included

12 thousands of dollars of personal expenses at luxury hotels, many of

13 which were specifically identified in the Defendant's memoir, as

14 described above.  The Defendant never disclosed to the CA Accountants

15 that his time spent in California in 2018 was not for business

16 purposes.  For example, the General Ledger contained:

17          a.   $1,716 for a stay at the Borgata in Atlantic City, New

18 Jersey, in February 2018;

19          b.   $2,996 for flights on Virgin America to Los Angeles

20 for the Defendant in April 2018;

21          c.   $1,727 related to the rental of a Lamborghini that he

22 drove when he first moved to California in April 2018;

23          d.   $43,693 for stays at the Chateau Marmont Hotel in

24 Los Angeles, California, in April and May 2018;

25          e.   $463 so that his then-girlfriend could ship boxes

26 containing clothing to California in April 2018;

27          f.   $7,215 for Airbnb rentals for his then-girlfriend, in

28 Los Angeles, California, in May and June 2018;

g.    $2,200 paid to the Nomad Hotel in Los Angeles in July 2018; and

h.    $8,996 paid to John Hancock for the Defendant's personal life insurance in October 2018.

119. The General Ledger the Defendant reviewed also contained $11,555 in rent payments for his daughter's apartment in New York City that were characterized as "Travel, Trans. & Other."  The Defendant failed to inform the CA Accountants that he had used the Owasco, PC account to make these rent payments.

120. While he reviewed the schedules for "Office Expenses" and "Professional and Outside Services," the Defendant affirmatively identified, with a yellow highlighter, personal expenses that should not be deducted as business expenses.

121. While the Defendant identified personal expenses on the "Office Expense" Schedule, including ones as small as a $15 payment to a tattoo parlor and a $35.56 payment to a bookstore, he did not identify the following personal expenses:

a.    A $1,500 Venmo payment on August 14, 2018.  That payment was to an exotic dancer, at a strip club.  The Defendant described the payment in the Venmo transaction as for "artwork." The exotic dancer had not sold him any artwork.

b.    A $975 payment to "Crutch Card" on September 21, 2018; this was for the benefit of the Defendant's then-girlfriend and was unrelated to any business activity of the Defendant's.

c.    A $438 payment on May 15, 2018, to "Shinola."  Shinola was a clothing store where the Defendant purchased personal items.

   d.   Payments totaling $11,500 for an escort paid by the Defendant to spend two nights with him.

   e.   $2,312.50 paid to P&P Matters, Inc., and an additional check to P&P Matters, Inc., in the amount of $3,450, a test prep service for his daughter.

   f.   $499.61 paid to Sermoneta Gloves for expensive personal items for himself and this then-girlfriend.

122. The "Professional and Outside Service" schedule included a $30,000 payment to Columbia University for the Defendant's daughter's law school tuition.  While the Defendant identified other personal expenses on the Professional and Outside Services Schedule as personal expenditures, he did not identify this one, which was, in fact, the largest line item on the Professional and Outside Services schedule.

E. The Defendant falsely claimed that money paid to women with whom he had personal relationships was wages, reducing his tax burden.

123. During that January 28, 2020 meeting, the Defendant was also shown a Profit and Loss statement for Owasco, PC that included $86,000 in wages to purported employees of Owasco, PC.  The Defendant knew this was a false deduction but failed to inform the CA Accountants.  He knew it was false because despite being engaged in little to no business activity, the Defendant directed Personal Assistant 2 in 2018 to place on payroll and provide health care benefits to three women with whom he had romantic or sexual relationships and a fourth woman who was related to one of those women.  These payroll expenses were treated as business expenses on Owasco, PC's Form 1120, reducing the amount of income to the

38

Defendant and, as a result, his individual income tax liability.  The women that received wages included:

a.   Person 1, described above as bringing a paternity suit against the Defendant, who had been engaged in a romantic relationship with the Defendant from 2017 to 2018.  The Defendant placed Person 1 on payroll shortly after she moved to Arkansas while she was pregnant with his child.  Person 1 did not perform any work after being formally placed on payroll in spring 2018 and had no work-related communication with the Defendant after she was placed on payroll. Person 1 received $22,500 in wages which the Defendant falsely claimed as a business deduction reducing the income to him from Owasco, PC and his individual income taxes.  Later, in November 2018, the Defendant had the following text exchange with Personal Assistant 2 regarding Person 1:

> THE DEFENDANT: [T]ake [Person 1] off payroll I thought you said she decidedly dint (sic) want to work and didn't need health insurance anyway. Remember that conversation?

> PERSONAL ASSISTANT 2: No. I do not remember that conversation. I remember a conversation where I was disappointed that you wanted to pay her the same rate as me. But I am over that. Maybe she told you that but I wasn't involved.

> THE DEFENDANT: regardless [] thats (sic) was if she was working a 40 hour week full time for me. I haven't talked to [Person 1] in 7 months???????

b.   Person 2 is someone with whom the Defendant had a romantic relationship and who did no work, nor was she expected to do any work for Owasco, PC. The Defendant placed Person 2 on payroll in Spring 2018 in order to provide her with health insurance.  In addition

39

to health insurance, Person 2 received $11,000 in wages, which the Defendant falsely claimed as a business deduction reducing the income to him from Owasco, PC and his individual income taxes.

c.   The Defendant placed Person 3 on payroll in spring 2018. Person 3 was a family member of Person 2's. Person 3 received $11,000 in wages which the Defendant falsely claimed as a business deduction reducing the income to him from Owasco, PC and his individual income taxes.  Prior to being placed on payroll, Person 3 had assisted the Defendant with personal errands and some light clerical work. After being placed on payroll, Person 3 did not perform any work-related services.

d.   The Defendant placed Person 4 on payroll in summer 2018. Person 4 had a sexual relationship with the Defendant and acted as a "West Coast" personal assistant, running errands, and performing other personal tasks.  Person 4 received $13,000 in wages which the Defendant falsely claimed as a business deduction reducing the income to him from Owasco, PC and his individual income taxes.  By November 2018, although the Defendant continued to pay Person 4 through payroll, he had limited to no contact with her. This prompted Person 4 to email Personal Assistant 2 in January 2019 to inquire about her employment status and to state that the Defendant "has not responded to me or reached out to me for some months now."

\

1     F. <u>The Defendant falsely identified personal expenses as business</u>

2        <u>deductions paid out of his individual accounts</u>.

3     124. In the same January 28, 2020 meeting referenced above the

4 CA Accountants also provided the Defendant with copies of bank

5 statements for his individual account at Wells Fargo ending in 4929

6 and an Owasco, LLC account at Wells Fargo ending in 1553 and asked

7 him to identify any corporate expenses to be deducted on Owasco, PC's

8 Form 1120.  The Defendant then circled certain expenses by hand.

9 Many of the expenses the Defendant circled were not, as he knew,

10 business expenses.  Instead, they were personal expenses generated

11 during what he described in his memoir as a "bacchanal" in 2018.  For

12 example,

13        a.   The Defendant circled $1,248 in payments for airline

14 tickets as a business expense for an exotic dancer to fly from Los

15 Angeles to New York in September 2018;

16        b.   The Defendant circled $3,852 as a business expense for

17 the rental of a Lamborghini that he drove when he first moved to

18 California in April 2018 until his Porsche was shipped from the East

19 Coast;

20        c.   Similarly, the Defendant circled hotel stays claiming

21 they were business expenses, including approximately:

22           i.   $4,478 paid to the Chateau Marmont in Los

23 Angeles, California, in April and May 2018;

24           ii.  $11,133 paid to the Hollywood Roosevelt in Los

25 Angeles, California, in May 2018;

26           iii. $11,169 paid to the Sixty Beverly Hills in June

27 and July 2018;

28

1            iv.  $9,494 paid to the Kimpton La Peer Hotel in

2  Beverly Hill, California in July and October 2018;

3            v.    $4,004 paid to the London West Hotel, in

4  Beverly Hills, California in July 2018;

5            vi.  $4,347 paid to Caesars Palace in Las Vegas in

6  August 2018;

7            vii. $7,761 paid to the Jeremy Hotel in Hollywood in

8  May 2018;

9            viii.    $1,023 paid to the District Hotel in

10 Washington, D.C. in May and June 2018;

11           ix.  $739 paid to 1 Hotel Park in New York City in

12 January 2018; and

13           x.   $2,861 paid to the Roxy Hotel in New York City in

14 June and December 2018.

15 A number of these were the very same hotels that the Defendant

16 identified, by name, in his memoir as the locations of his months-

17 long drug and alcohol binge.

18     125. The Defendant also circled a $275 dinner he had with his

19 then-girlfriend on April 12, 2018, at Nobu.

20     126. In total, the Defendant identified over 100 supposed travel

21 expenditures, worth nearly $134,000 from his Wells Fargo individual

22 account ending in 4929 and the Wells Fargo Owasco, LLC account ending

23 in 1553. Approximately 78 of the "travel" expenditures worth $112,000

24 were made between April and September 2018.  The Defendant used these

25 hotels as personal residences since he chose not to have one at the

26 time.  Further there was no business purpose to staying at luxury

27 hotels in Atlantic City, New York City and Los Angeles.  Rather, as

28

he described in his memoir, they were used to meet up with his then-girlfriend and for constant partying.

127. The Defendant also circled multiple direct payments to Person 3, totaling $18,400 from his personal Wells Fargo bank account and $10,000 from the Wells Fargo Owasco, LLC account, falsely claiming they were business expenses.  These payments were in addition to any money paid to Person 3 for any work she performed and in addition to what she received as wages.  Based on the Defendant's false representations, the CA Accountants classified the payments as deductions which reduced the income to him from Owasco, PC and his income tax.  Further, during his meeting with the CA Accountants on January 28, 2020, the Defendant falsely told the CA Accountants that all payments to Person 3 in 2018 were "100% business related."

G.  The Defendant wired money to JP Morgan Chase to pay personal expenses and falsely represented to the CA Accountants that these wire transfers were business expenses

128. During the January 28, 2020 meeting the Defendant falsely told the CA Accountants that $57,000 worth of payments wired from Owasco, PC's bank account to JP Morgan Chase were all business related.  On February 6, 2020, the Defendant repeated this misrepresentation and told the CA Accountants that these payments were to a third party for consulting services.

129. The CA Accountants did not have access to the details of the wire transfers from Owasco, PC's account to JP Morgan Chase and repeatedly asked the Defendant to provide that detail.  He did not.

130. In truth, the wire transfers from the Owasco, PC account to JP Morgan Chase were to pay for personal expenses, for example:

a.   The Defendant paid Person 5 approximately $6,000 in July and August 2018. Person 5 "cleaned and [] ran errands, simple things like going to get him some boxers, or get him some food, go grocery shopping, or just grabbing the alcohol. . . that was really just the scope of it."

b.   In or about July 5, 2018, the Defendant sent a $18,000 wire to Person 4, and the wire details, which the CA Accountants were not shown, said $10,000 of it was for a "golf member deposit." In fact, at the Defendant's direction, the $10,000 was used to purchase a membership in a sex club, which he visited with Person 4.

c.   The Defendant made an additional $26,500 in payments to Person 4 in June and October, in addition to what she received as wages.

131. Based on the Defendant's representations, the CA Accountants classified the approximately $57,000 in payments from Owasco, PC's Wells Fargo account to JP Morgan Chase as a business expense for consulting.  This had the effect of reducing the income paid to the Defendant from Owasco and reduced his individual income taxes.

H. <u>The Defendant used the business line of credit to pay personal expenses and falsely represented to the CA Accountants that it was for business expenses</u>.

132. Similarly, the Defendant also told CA Accountants that approximately $119,000 in payments from the Owasco, PC account used to pay off the business line of credit had also been for business expenses, including travel.

44

133. The CA Accountants did not have access to the statements for the business line of credit and repeatedly asked the Defendant to provide them.  He did not.

134. In truth, the Defendant had used the business line of credit to pay for luxury hotels, restaurants, high-end clothing, and other personal items in New York and in California during 2018, among others. For example, the Defendant charged the business line of credit:

      a.   $1,713 paid to the 1 Hotel Park in New York City in December 2017 and January 2018;

      b.   $567 paid to "Primp in Home," a mobile spa, for his then-girlfriend, in New York City in January 2018;

      c.   $3,941 paid to Rag & Bone, a high-end clothing store in New York City for items for himself and his then-girlfriend, in January 2018;

      d.   $469 paid to the Watergate Hotel in Washington, D.C. in January 2018;

      e.   $3,947 in payments made to M Street Management, a strip club in Washington, D.C., in January 2018;

      f.   $3,373 paid to Expedia for a hotel stay in New York City in February 2018;

      g.   $5,425 paid to the Soho Grand Hotel in New York City in January and March 2018;

      h.   $2,952 paid to the 6 Columbus Circle hotel in New York City in January 2018;

      i.   $773 via Venmo on April 1, 2018, to an exotic dancer; and

1      j.   $1,219 paid to the District Hotel in Washington, D.C.,

2 in January 2018;

3      135. The Defendant also used the business line of credit to make

4 payments for the benefit of his children and his own benefit because

5 it artificially reduced his income tax liability including:

6      a.   $19,535 in rent payments for one of his daughters in

7 New York City; and

8      b.   $1,509 in payments to another daughter.

9      136. The Defendant also used the business line of credit to make

10 $27,316 in payments to an online pornography website, which in total

11 accounted for one fifth of all of the business line of credit

12 expenditures.  The Defendant also used the Owasco, PC Wells Fargo

13 account to make payments to the same site.  The latter category of

14 payments were initially captured in the Office Expense schedule and

15 the Defendant identified them as personal expenses and they were

16 removed.  Yet he failed to inform the CA Accountants that he had also

17 used the business line of credit to make payments to the same

18 pornography website and failed to provide them with statements from

19 the business line of credit that would have revealed this to them.

20      137. Based on the Defendant's representation, the CA Accountants

21 categorized the business line of credit payments as travel and meal

22 expenses.  Treating payments from Owasco, PC to the business line of

23 credit as business related caused the Owasco, PC Form 1120 to

24 overstate its business expenses, to reduce the Defendant's taxable

25 income and therefore artificially reduced his individual income tax

26 liability.

27

28

I. The Defendant knowingly signed false tax returns.

138.    On or about Wednesday, February 5, 2020, the Defendant emailed the CA Accountants the following:

> Wanted to know where we stand on filing.  I have a deadline to share 16/17/18 returns with my ex-wife by Friday.  Even if we have not filed 17/18 I would like to get the 16 completed return (she needs to sign anyway) and drafts of 17/18 to her.  Please Advise.  Thanks.

139. On or about February 7, 2020, the CA Accountants transmitted draft 2018 Forms 1040 and 1120 to the Defendant's counsel, seeking any "proposed changes, comments, or thoughts." The cover email noted that there was "information still outstanding that [the accountants] would prefer to obtain before filing the returns; however, if you and our client feel it necessary to file these returns on Monday, we will follow your instruction and finalize the returns as is." The CA Accountants then listed the missing information, which included statements supporting the business line of credit for 2017 and 2018.  No comments or questions were received, and the CA Accountants did not modify the draft returns.

140. On or about February 11, 2020, the Defendant met with the CA Accountants. The Defendant reviewed and discussed his individual and corporate income tax returns for 2017 and 2018 with the CA Accountants.  After reviewing them, the Defendant signed the tax returns.  The returns were then mailed to the IRS at the Defendant's direction.

141. The 2018 Form 1120 contained false information, on line 26 and in Statement 3 in the return and elsewhere including but not limited to the following:

1       a.  Claiming false "Travel, Transportation and Other"

2  deductions including, but not limited to, luxury vehicle rentals,

3  house rentals for his then-girlfriend, hotel expenses, and New York

4  City apartment rent for his daughter;

5       b.  Claiming false "Office and Miscellaneous" deductions,

6  including, but not limited to, the purchase of luxury clothing,

7  payments to escorts and dancers, and payments for his daughter's

8  college advising services;

9       c.  Claiming false "Legal Professional and Consulting"

10  deductions, including, but not limited to, payment of his daughter's

11  law school tuition and his personal life insurance policy;

12       d.  Claiming false deductions for payments from Owasco,

13  PC's account to pay off the business line of credit, specifically by

14  allocating 80 percent to "Travel Transportation and Other" and 20

15  percent to "Meals," when in truth and in fact most of the business

16  line of credit expenses were personal, including to a website

17  providing pornographic content, payments at a strip club, and

18  additional rent payments for his daughter; and

19       e.  Claiming false deductions for payments from Owasco,

20  PC's account to JP Morgan Chase, specifically that these were for

21  "consulting," when in truth and in fact, these transfers included

22  payments to various women who were either romantically involved with

23  or otherwise performing personal services for the Defendant,

24  including a $10,000 payment for his membership in a sex club.

25    142. The 2018 Form 1120 also contained false information, on

26  line 13, specifically, claiming false payroll deductions, including

27  deductions for "wages" paid to women with whom he had personal

28  relationships including a woman who was then pregnant with his child.

143. The 2018 Form 1040 contained false information, on line 6, as the Defendant underreported his total income. That is, the Defendant failed to include in his total income the use of Owasco, PC's corporate funds to pay for his personal expenses.

144. Because these false business deductions were in fact payments of the Defendant's personal expenses, they should have been categorized as income to him from Owasco, PC which he, in turn, would have had to report on his 2018 Form 1040 and pay tax on that income. Because these personal expenses were falsely categorized by the Defendant as business expenses, he falsely underreported his income from Owasco, PC, on line 6 of his 2018 Form 1040 and self-assessed a lower amount of tax due and owing than was accurate.

<u>The Charge</u>

145. From on or about January 1, 2018, through on or about February 18, 2020, in the Central District of California and elsewhere, the Defendant ROBERT HUNTER BIDEN, willfully attempted to evade and defeat income tax due and owing by him to the United States of America, for the calendar year 2018, by committing the following affirmative acts among others:

a. Preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was submitted to the Internal Revenue Service;

b. Using, and causing to be used, Owasco, PC funds to pay for personal expenses and later deducting, and causing to be deducted, these same personal expenses as corporate expenses on the Owasco, PC tax return on Form 1120;

c.    Claiming personal expenses, paid with personal funds, were business expenses of Owasco, PC and deducting and causing to be deducted, these same personal expenses as corporate expenses on the Owasco, PC tax return on Form 1120; and

d.    Paying, and causing to be paid, by Owasco, PC certain salary and healthcare benefit expenses of individuals who performed no work on behalf of Owasco, PC while on payroll, and deducting and causing to be deducted, these same expenses as corporate expenses on the Owasco, PC tax return on Form 1120.

In violation of Title 26, United States Code, Section 7201.

COUNT SEVEN

[26 U.S.C. § 7206: filing a false and fraudulent 2018 Form 1040]

146. The Grand Jury re-alleges paragraphs 1 through 48, 93 through 104 and 109 through 144 of this Indictment here.

147. On or about February 18, 2020, in the Central District of California, and elsewhere, the Defendant ROBERT HUNTER BIDEN willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service, a false 2018 Form 1040, which was verified by a written declaration that it was made under the penalties of perjury and which Defendant did not believe to be true and correct as to every material matter. That Form 1040 reported on line 6 total income in the amount of $2,187,286, whereas, as Defendant knew, his income was greater because he had claimed false business deductions on Owasco, PC's Form 1120 that were in fact additional income to him.

In violation of Title 26, United States Code, Section 7206(1).

COUNT EIGHT

[26 U.S.C. § 7206: filing a false and fraudulent 2018 Form 1120]

148. The Grand Jury re-alleges paragraphs 1 through 48, 93 through 104 and 109 through 144 of this Indictment here.

149. On or about February 20, 2020, in the Central District of California, and elsewhere, the Defendant ROBERT HUNTER BIDEN willfully made and subscribed and filed and caused to be filed with the Internal Revenue Service, a false Form 1120, which was verified by a written declaration that it was made under the penalties of perjury and which Defendant did not believe to be true and correct as to every material matter. The 2018 Form 1120 contained false information on:

    a.   line 26 and in Statement 3 in the return and elsewhere including but not limited to the following:

        i.  Claiming false "Travel, Transportation and Other" deductions including, but not limited to, luxury vehicle rentals, house rentals for his then-girlfriend, hotel expenses, and New York City apartment rent for his daughter;

        ii.  Claiming false "Office and Miscellaneous" deductions, including, but not limited to, the purchase of luxury clothing, payments to escorts and dancers, and payments for his daughter's college advising services;

        iii. Claiming false "Legal Professional and Consulting" deductions, including, but not limited to, payment of his daughter's law school tuition and his personal life insurance policy;

        iv.  Claiming false deductions for payments from Owasco, PC's account to pay off the business line of credit,

52

specifically by allocating 80 percent to "Travel Transportation and Other" and 20 percent to "Meals," when in truth and in fact most of the business line of credit expenses were personal, including to a website providing pornographic content, payments at a strip club, and additional rent payments for his daughter; and

v.  Claiming false deductions for payments from Owasco, PC's account to JP Morgan Chase, specifically that these were for "consulting," when in truth and in fact, these transfers included payments to various women who were either romantically involved with or otherwise performing personal services for the Defendant, including a $10,000 payment for the Defendant's membership in a sex club.

b.  on line 13, specifically, claiming false payroll deductions, including, deductions for "wages" paid to women with whom he had personal relationships including a woman who was then pregnant with his child.

150. Because these false business deductions were in fact payments of the Defendant's personal expenses, they should have been categorized as income to him from Owasco, PC which he, in turn, would have had to report on his 2018 Form 1040 and pay tax on that income. Because these personal expenses were falsely categorized by the Defendant as business expenses, he falsely underreported his income from Owasco, PC, on line 6 of his 2018 Form 1040 and self-assessed a lower amount of tax due and owing than was accurate.

In violation of Title 26, United States Code, Section 7206(1).

COUNT NINE

[26 U.S.C. § 7203: failure to pay 2019 Form 1040]

151. The Grand Jury re-alleges paragraphs 1 through 48 of this Indictment here.

A. The Defendant earned a substantial income in 2019.

152. Over the course of 2019, the Defendant earned approximately $1,045,850 in gross income from the sources identified above.

B. The Defendant had a legal obligation to file a U.S. Individual Income Tax Return and pay taxes in 2019.

153. For tax year 2019, anyone under 65, filing individually, and who made more than $12,200, had to file a federal tax return.

154. The deadline for filing federal tax returns and paying taxes for 2019 was July 15, 2020, because of an automatic extension provided by the IRS during the COVID-19 pandemic, unless a taxpayer filed for an extension, which made the deadline October 15, 2020.

C. The Defendant knew he had to pay taxes for 2019.

155. From at least January 2019 through September 2019, the Defendant was provided with periodic updates regarding his cashflow and outstanding liabilities, including his various income tax liabilities. The Defendant controlled his finances and directed which bills should be paid, routinely choosing personal expenses over his income tax liabilities.

D. The Defendant owed taxes for 2019, which he chose not to pay.

156. The Defendant filed a 2019 From 1040 on October 15, 2020, and self-reported that he earned total gross income of $1,045,850 and

taxable income of $843,577 and self-assessed that he owed $197,372 for the 2019 tax year.

157. The Defendant did not pay any of his outstanding tax debt when he filed his return.

E. The Defendant had the funds available to pay his taxes.

158. In 2020, prior to when the Defendant filed the 2019 Form 1040, the Defendant's agent received multiple payments from the publisher of his memoir and then transferred the following amounts to the Defendant's wife's account in the amounts and on the dates that follow:

    a.   $93,750 on January 21, 2020; and

    b.   $46,875 on May 26, 2020.

F. Rather than pay his taxes, the Defendant spent millions of dollars on an extravagant lifestyle.

159. From January through October 15, 2020, the Defendant spent more than $600,000 on personal expenses rather than pay any of the $197,372 he owed for tax year 2019.

The Charge

160. During the calendar year 2019, the Defendant ROBERT HUNTER BIDEN, had and received taxable income of $843,577, on which taxable income there was owing to the United States of America an income tax of $197,372. He was required by law to pay, on or before July 15, 2020, that income tax to the Internal Revenue Service Center, at San Francisco, California, or to another Internal Revenue Service office permitted by the Commissioner of Internal Revenue, including the Internal Revenue Service office in Los Angeles, California. Well knowing all of the foregoing, he did willfully fail on July 15, 2020,

1   in the Central District of California and elsewhere, to pay the

2   income tax due.

3       In violation of Title 26, United States Code, Section 7203.

4

5                                          A TRUE BILL

6

7                                          ___/s/_____
                                           Foreperson

8

9   DAVID WEISS
    Special Counsel

10

11  _____
    LEO J. WISE

12  Principal Senior Assistant Special
    Counsel

13

14  DEREK E. HINES
    Senior Assistant Special Counsel

15  United States Department of Justice

16

17

18

19

20

21

22

23

24

25

26

27

28