# EXHIBIT 1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3
      UNITED STATES OF AMERICA,    )
 4                                 )
                                   ) CRIMINAL ACTION
 5    v.                           ) NO. 23-mj-274(MN)
                                   )
 6    ROBERT HUNTER BIDEN,         ) CRIMINAL ACTION
                                   ) NO. 23-61(MN)
 7                 Defendant.      )

 8
                         Wednesday, July 26, 2023
 9                       10:00 a.m.
                         Initial Appearance
10                       Plea Hearing

11
                         844 King Street
12                       Wilmington, Delaware

13
      BEFORE:  THE HONORABLE MARYELLEN NOREIKA
14             United States District Court Judge

15


16
      APPEARANCES:
17

18                       UNITED STATES ATTORNEY'S OFFICE
                         DISTRICT OF DELAWARE
19                       BY:  BENJAMIN L. WALLACE, ESQ.
                         BY:  DEREK E. HINES, ESQ.
20                       BY:  LEO J. WISE, ESQ.

21
                                Counsel for the United States
22

23

24

25
```

1

**APPEARANCES CONTINUED:**

2

3                    **CLARK SMITH VILLAZOR LLP**
                     **BY:  CHRISTOPHER J. CLARK, ESQ.**

4
                     **-and-**

5
                     **BERGER HARRIS, LLP**

6                    **BY:  RICHARD I.G. JONES, JR., ESQ.**

7
                              **Counsel for the Defendant**

8

9

10                    **_ _ _ _ _ _ _ _ _ _ _**

11

12            THE COURT:   All right.  Good morning, everyone.

13    Please be seated.  All right.  Hold on.  Let me just start

14    by reminding everyone that there is no recording of these

15    proceedings that is permitted.  For those of you in the

16    back, you are certainly permitted to watch, but we will not

17    have any disruptions.  Any disruption or attempt to disrupt

18    will result in the Court's security personnel or the U.S.

19    Marshals escorting you out.

20            All right.  With that.

21            MR. WISE:   Good morning, Your Honor.  Leo Wise,

22    Derek Hines, and Benjamin Wallace on behalf of the United

23    States.  Now is the time the Court has set for an initial

24    appearance on the criminal information filed in the United

25    States versus Robert Hunter Biden, 23-cr-61-MN charging the

1    Defendant with a firearm offense, and for the entry of a

2    guilty plea to the criminal information filed in the

3    separate matter, United States versus Robert Hunter Biden,

4    23-mj-274-MN, charging the Defendant with two counts of

5    failure to pay taxes.  The parties are ready to proceed.  I

6    ask permission to pass up an executed version of the plea

7    agreement in the tax case at this time.

8              THE COURT:  You may.  Thank you.

9              MR. WISE:  And my understanding, Your Honor, is

10   that we're going -- Your Honor first will conduct the

11   initial appearance on the firearm charge and then turn to

12   the plea hearing on the tax charge.

13             THE COURT:  No.  Hold on.  Let me just take a

14   look.  All right.

15             Good morning, Mr. Clark, Mr. Biden.

16             MR. CLARK:  Good morning, Your Honor.

17             THE COURT:  Just so that we don't have you

18   feeling that you need to pop up and down, I am fine if you

19   want to when I'm asking questions stay seated so you don't

20   have to just keep popping up.

21             MR. CLARK:  We won't do it any other time.

22             THE COURT:  All right.  Thank you.  Okay.  So we

23   do have two cases here, one is a criminal action based on a

24   felony information related to a gun charge, and the other is

25   Criminal Action 23-274 based on the misdemeanor involving

1    the tax charges.  This is the Defendant's first appearance.

2    I had planned to conduct the initial appearance on the two

3    cases at the same time.  Is there any objection to that?

4              MR. WISE:  None, Your Honor.  Thank you.

5              MR. CLARK:  None, Your Honor.

6              THE COURT:  I thought it might be more efficient

7    and save some time.

8              THE COURT:  Mr. Biden, in Criminal Action 23-61,

9    the United States Attorney for the District of Delaware has

10   filed a felony information which charges you with possession

11   of a firearm by a person who is an unlawful user of or

12   addicted to a controlled substance in violation of 18 United

13   States Code Sections 922(g)(3) and 924(a)(2).

14             And in Criminal Action 23-274, the United States

15   Attorney for the District of Delaware has filed a

16   misdemeanor information which charges you with two counts of

17   willful failure to pay tax in violation of 26 United States

18   Code Section 7203.  Do you understand that those are the

19   charges that are pending here?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Do you understand that the maximum

22   penalties for the gun charge are ten years of imprisonment,

23   a fine of $250,000, three years of supervised release, and a

24   special assessment of $100?

25             THE DEFENDANT:  Yes, Your Honor.

1              THE COURT:  And do you understand that the

2    maximum penalties for each of Counts I and II of the tax

3    case are twelve months of imprisonment, a $100,000 fine or

4    twice the gross gain or loss from the offense, whichever is

5    greater, one year of supervised release, restitution and a

6    $25 special assessment as well as costs of prosecution?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  All right.  Now, Mr. Biden, you have

9    the right to be represented by an attorney in these matters,

10   that means if you can afford to, you can hire an attorney of

11   your own choice.  If you can't afford to, you may ask the

12   court to appointment an attorney to represent you.  Do you

13   understand that?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  All right.  You are presently

16   represented by Mr. Clark.  Do you wish to continue that

17   representation?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  All right.  Now, Mr. Biden, you have

20   the right to a preliminary hearing in these cases.  At that

21   hearing, the government would have to produce sufficient

22   evidence to show that it has probable cause to believe that

23   you committed the crimes with which you are being charged.

24   At that hearing you would have the right to introduce

25   evidence and to cross-examine any adverse witnesses who

```
 1    would be testifying against you.  Do you understand that?

 2                  THE DEFENDANT:  Yes, Your Honor.

 3                  THE COURT:  All right.  Now, I understand that

 4    you intend to plead guilty to the tax charges.  Do I have

 5    that right?

 6                  THE DEFENDANT:  Yes, Your Honor.

 7                  THE COURT:  All right.  Do you understand that

 8    if you plead guilty to those charges, you will be waiving

 9    your right to a preliminary hearing?

10                  THE DEFENDANT:  Yes, Your Honor.

11                  THE COURT:  I also understand that the plan for

12    the gun charge is a Diversion Agreement.  Counsel, do we

13    need to do anything regarding a preliminary hearing at this

14    point in light of the planned Diversion Agreement?

15                  MR. WISE:  No, Your Honor.

16                  MR. CLARK:  We're in agreement with that, Your

17    Honor.

18                  THE COURT:  All right.  Mr. Biden, you are not

19    required to make any statements to the authorities.  If you

20    had already made statements to the authorities, you may stop

21    and not make any more.  If you start to make a statement and

22    you change your mind, you may stop at any time.  And any

23    statement that you do make may be used against you.  Do you

24    understand all of that?

25                  THE DEFENDANT:  Yes, Your Honor.
```

1          THE COURT:  All right.  Now, pursuant to the Due

2    Process Act, I confirm that the government has a continuing

3    obligation pursuant to Brady v. Maryland and its progeny to

4    produce all exculpatory evidence and I order that it do so

5    at the appropriate time.  The consequences for violating a

6    Brady obligation and/or my order could include, but are not

7    limited to, contempt proceedings, sanctions, referral to

8    disciplinary counsel, adverse jury instructions, exclusion

9    of evidence and dismissal of the charges.  Does the

10   government understand that?

11          MR. WISE:  Yes, Your Honor.

12          THE COURT:  Has all Brady material been

13   produced?

14          MR. WISE:  Yes, Your Honor.

15          THE COURT:  Mr. Clark, any concerns about that?

16          MR. CLARK:  None whatsoever, Your Honor.

17          THE COURT:  Thank you.

18          Pretrial release, what is the government's

19   position?

20          MR. WISE:  The conditions that have been

21   recommended we agree with.

22          THE COURT:  Any concerns about that, Mr. Clark?

23          MR. CLARK:  No, Your Honor, we're in accordance.

24          THE COURT:  You can't help yourself, you're just

25   going to keep jumping up.

1               MR. CLARK:  I was taught at a hard school.

2               THE COURT:  I know.  I couldn't even think if I

3       wasn't standing.

4               I understand that pretrial release -- I agree

5       that pretrial release is appropriate subject to the

6       following conditions which I will read into the record.  The

7       Defendant must not violate federal, state, or local law

8       while on release.

9               The Defendant must cooperate in the collection

10      of a DNA sample if it is authorized by 34 United States Code

11      Section 40702.

12              The Defendant must advise the court or the

13      pretrial services officer or some supervising officer in

14      writing before making any change in residence or telephone

15      number.

16              The Defendant must appear in court as required

17      and if convicted must surrender as directed to serve a

18      sentence that the Court may impose.

19              I also impose the following additional

20      conditions.

21              Sir, you must submit to supervision by and

22      report to supervision to the probation office in the

23      district in which you are residing.  You must continue or

24      actively seek employment.  You must communicate in writing

25      all international travel plans and provide supporting

1    documentation if requested to both the District of Delaware

2    and the district in which you are residing.  You must not

3    possess a firearm, destructive device or other weapon.  You

4    must not use alcohol.  You must not use or unlawfully

5    possess a narcotic drug or other controlled substance

6    defined in 21 United States Code, Section 802, unless

7    prescribed by a licensed medical practitioner.  I will

8    clarify, however, that marijuana is not legal under federal

9    law and you are prohibited from using marijuana regardless

10   of whether it is legal or not in the state in which you are

11   or it is prescribed by a medical practitioner.

12            You must submit to testing for a prohibited

13   substance if required by the pretrial services officer or

14   supervising officer.  Testing may be done with random

15   frequency and may include urine testing, the wearing of a

16   sweat patch, remote alcohol testing system and/or any form

17   of prohibited substance screening or testing.  You must not

18   obstruct, attempt to obstruct or tamper with the efficiency

19   or accuracy of prohibited substance screening or testing.

20            Just give me a minute here.

21            And you must participate in a program of

22   inpatient or outpatient substance abuse, therapy, or

23   counseling if directed by the pretrial services officer or

24   the supervising officer.  Do you understand those

25   conditions, sir?

 1                    THE DEFENDANT:  Yes, Your Honor.

 2                    THE COURT:  All right.  Any objection or

 3      comments on the conditions imposed?

 4                    MR. CLARK:  None from the defense, Your Honor.

 5                    MR. WISE:  Nor from the United States, Your

 6      Honor.

 7                    THE COURT:  All right.  Mr. Biden, violating any

 8      of the conditions of release may result in the immediate

 9      issuance of a warrant for your arrest, revocation of your

10      release, an order for detention, forfeiture of any bond or

11      prosecution for contempt of court, and it could result in

12      imprisonment, a fine, or both.  Do you understand that?

13                    THE DEFENDANT:  Yes, Your Honor.

14                    THE COURT:  Anything I left out or anything I

15      need to address with respect to the initial appearances?

16                    MR. WISE:  Not from the United States, Your

17      Honor.

18                    MR. CLARK:  No, Your Honor.

19                    THE COURT:  Now, we have two cases and two

20      agreements and I understand that the Diversion Agreement is

21      not something that is typically before the Court, but you

22      all did send it to me so I do want to talk about that a

23      little bit.  There are some provisions in those agreements

24      that are not standard and are different from what I normally

25      see, so I think we need to walk through these documents and

1    get some understanding of what is being proposed so that I

2    can give due consideration to the determination that you all

3    are asking me to make.  So I want to start with Criminal

4    Action 23-274 involving the tax charges.

5             All right.  Now, Mr. Biden, you told me that you

6    intend to enter a plea of guilty in those cases, correct?

7             THE DEFENDANT:  Yes, Your Honor.

8             THE COURT:  So it is my responsibility to make

9    sure that that plea is a voluntary and knowing plea.  And in

10   order to do that, I first need to ask you a series of

11   questions.  Before I ask you those questions, I am going to

12   have you placed under oath to answer those questions

13   truthfully.  And it's important that you do answer those

14   questions truthfully because if you don't, any false answers

15   may be used against you in a separate prosecution for

16   perjury.  Do you understand that?

17            THE DEFENDANT:  Yes, Your Honor.

18            THE COURT:  All right.  Mr. Buckson, will you

19   please swear in the Defendant.

20            COURT CLERK:  Will you please rise and raise

21   your right hand.  Please state and spell your full name for

22   the record.

23            THE DEFENDANT:  Robert Hunter Biden.

24   R-O-B-E-R-T, H-U-N-T-E-R, B-I-D-E-N.

25            ROBERT HUNTER BIDEN, was duly sworn under oath.

 1                    THE COURT:  Thank you, sir.  You may be seated.

 2      All right.  Now, sir, if at any time you want to confer with

 3      your counsel when I'm asking you questions, you may, just

 4      let me know.  All right?

 5                    THE DEFENDANT:  Thank you, Your Honor.

 6                    THE COURT:  How old are you?

 7                    THE DEFENDANT:  Fifty-three years old, Your

 8      Honor.

 9                    THE COURT:  How far did you go in school?

10                    THE DEFENDANT:  Law school, Your Honor.

11                    THE COURT:  When did you graduate from law

12      school?

13                    THE DEFENDANT:  1996.

14                    THE COURT:  You're member of the bar?

15                    THE DEFENDANT:  Yes, Your Honor.

16                    THE COURT:  Any particular?

17                    THE DEFENDANT:  District of Columbia and

18      Connecticut, Your Honor.

19                    THE COURT:  Thank you.  And you speak and

20      understand English?

21                    THE DEFENDANT:  Yes, Your Honor.

22                    THE COURT:  Are you currently or have you

23      recently been under the care of a physician or psychiatrist?

24                    THE DEFENDANT:  No, Your Honor.

25                    THE COURT:  Have you ever been hospitalized or

1    treated for any mental illness or addiction to narcotic

2    drugs of any kind?

3                    THE DEFENDANT:  I have attended treatment

4    facilities for addiction, Your Honor.

5                    THE COURT:  Okay.  So that was included in my

6    question which is treatment for addiction to drugs.

7                    THE DEFENDANT:  Yes, Your Honor.

8                    THE COURT:  So I need you to tell me about that.

9    How many times have you, to the best of your recollection,

10   been treated whether inpatient or outpatient?

11                   THE DEFENDANT:  Beginning in 2003 with the

12   inpatient, Your Honor, I have been to I believe close to six

13   inpatient over the course of twenty years.

14                   THE COURT:  All right.

15                   THE DEFENDANT:  And I have also been in

16   outpatient programs also during that time.

17                   MR. CLARK:  Just to be clear, it's numerous,

18   Your Honor.

19                   THE COURT:  I'm not going to walk through every

20   single one, but I just want to make sure I have some

21   understanding.

22                   All right.  Now, sir, each time that you were

23   treated in an inpatient facility, what was it for?

24                   THE DEFENDANT:  For addiction to alcohol

25   primarily originally, Your Honor.

```
 1                    THE COURT:  Okay.  And have you ever been in an

 2      inpatient treatment program where you were treated for

 3      something else other than alcoholism?

 4                    THE DEFENDANT:  Drugs, also, Your Honor.

 5                    THE COURT:  Okay.  And I'm just not sure how

 6      these programs work.  I'm sorry.  Is it for any particular

 7      drug that you're treated or is it just sort of --

 8                    THE DEFENDANT:  No.

 9                    THE COURT:  Everything.

10                    THE DEFENDANT:  Everything, Your Honor.

11                    THE COURT:  Okay.  And when was the most recent

12      time that you were in treatment?  Well, are you currently in

13      treatment for your alcohol or drug issues?

14                    THE DEFENDANT:  No, I'm not, Your Honor.

15                    THE COURT:  When was the last time that you were

16      in treatment?

17                    THE DEFENDANT:  I believe the fall of 2018.

18                    MR. CLARK:  I think that's right, Your Honor.

19                    THE COURT:  Okay.

20                    THE DEFENDANT:  Your Honor, sorry.

21                    THE COURT:  That's okay.  So the fall of 2018,

22      and was that inpatient or outpatient?

23                    THE DEFENDANT:  Inpatient, and then also

24      outpatient.

25                    THE COURT:  Okay.  And when you -- did you
```

1     complete that program or did you leave that program prior to

2     completion?

3                    THE DEFENDANT:   I completed that program, the

4     inpatient portion of it, Your Honor.

5                    THE COURT:   Okay.   And after you completed that

6     program, did you then continue to use drugs for some period

7     of time?

8                    THE DEFENDANT:   I did, Your Honor.

9                    THE COURT:   All right.   So when was the last

10    time -- so the fall of 2018 was the last time that you

11    received any treatment, right?

12                   THE DEFENDANT:   Yes, Your Honor.

13                   THE COURT:   Okay.   When was the last time that

14    you used, ingested, or were under the influence of any drug,

15    legal or illegal medication or alcoholic beverage of any

16    kind?

17                   THE DEFENDANT:   June of 2019, Your Honor.

18                   THE COURT:   All right.   And so just to be clear,

19    you are not presently under the influence of any drug, legal

20    or illegal, medication or alcoholic beverage of any kind, is

21    that correct?

22                   THE DEFENDANT:   No, Your Honor.

23                   THE COURT:   Well, let's just be clear because,

24    you know, people might look at this transcript.   I said is

25    that correct and you said no.

```
 1                    THE DEFENDANT:  I'm sorry, yes, Your Honor,

 2      excuse me.

 3                    THE COURT:  And sir, do you understand what's

 4      going on and why we're here today?

 5                    THE DEFENDANT:  Yes, I do understand.

 6                    THE COURT:  Counsel, do you have any doubt as to

 7      your client's competence?

 8                    MR. CLARK:  None whatsoever.

 9                    THE COURT:  Any concerns from the government?

10                    MR. WISE:  No, Your Honor.

11                    THE COURT:  Based on the information that I

12      received, Mr. Biden, I find that you are competent and

13      capable of proceeding here today.

14                    So now I want to talk about the misdemeanor

15      information which contains the tax charges that you are

16      pleading guilty to.  Have you received a copy of the

17      information pending against you?

18                    THE DEFENDANT:  Yes, Your Honor.

19                    THE COURT:  Have you fully discussed those

20      charges and the case in general with Mr. Clark?

21                    THE DEFENDANT:  Yes, Your Honor.

22                    THE COURT:  Are you fully satisfied with the

23      counsel, representation, and advice you received from him in

24      this case?

25                    THE DEFENDANT:  Yes, Your Honor.
```

 1                  THE COURT:  You have the right to have the

 2       information read out loud at this hearing, but you can also

 3       waive that reading.  Would you like me to ask the government

 4       to read it or do you waive that?

 5                  THE DEFENDANT:  I waive that, Your Honor.

 6                  THE COURT:  Okay.  Next, the Memorandum of Plea

 7       Agreement which was handed up to me.  First, let me ask

 8       counsel, what provision of the rules is this plea agreement

 9       being presented under?

10                  MR. WISE:  It's presented under Rule

11       11(c)(1)(B), Your Honor, of the Federal Rules of Criminal

12       Procedure.

13                  THE COURT:  All right.  And so just so we're

14       clear, and Mr. Clark, you agree with that?

15                  MR. CLARK:  I do, Your Honor.

16                  THE COURT:  All right.  Just so we're clear,

17       this is not a plea under Rule 11(c)(1)(C), what is often

18       called a C plea which binds me to impose a specific sentence

19       if I accept the plea, is that correct?

20                  MR. WISE:  It is, Your Honor.

21                  MR. CLARK:  We agree, Your Honor.

22                  THE COURT:  So in your view, what is my role

23       here under Rule 11(c)(1)(B)?

24                  MR. WISE:  Your Honor has two roles as Your

25       Honor has already begun to determine that the plea is

1    knowing and voluntary under Rule 11(B), and to apprise the

2    Defendant that you are not bound by the recommendation of

3    the United States in this case pursuant to Rule 11(c)(3)(B).

4              THE COURT:  That's it?

5              MR. WISE:  That's it.

6              THE COURT:  All right.  Now, is it my role to

7    accept or reject this plea?

8              MR. WISE:  It is not, Your Honor.

9              THE COURT:  Now, let me just ask you this.

10   Would my role be different if this were a plea under Rule

11   11(c)(1)(A)?

12             MR. WISE:  Yes, Your Honor, it would.

13             THE COURT:  How would you say it's different?

14             MR. WISE:  Both Rule 11(c)(1)(A) pleas and

15   11(c)(1)(C) pleas require the Court to either accept, reject

16   or defer on the plea agreement itself, not on the plea which

17   is governed by like I said a separate provision of the rule

18   which is 11(B), but in terms of the Court's role vis-a-vis

19   the agreement is to accept, reject or defer.

20             THE COURT:  All right.  And I do want to talk

21   about that a little bit further, but when we talk about the

22   plea, but you can sit down for now.

23             Now, wait, let me ask you this.  If it's a

24   11(c)(1)(A) plea, what is your understanding of the factors

25   that I need to look at?

1          MR. WISE:  So the rule itself is silent on the

2    factors, but the case law suggest that the factors -- that

3    the rejecting or accepting the plea would relate to the

4    Court's traditional role at sentencing, so if, for instance,

5    the Court thought that the charge bargain which is what

6    11(c)(1)(A) does, if the Court thought the charge bargain

7    did not adequately reflect the seriousness of the offense

8    which would affect the Court's ability to sentence, then

9    there is case law that says under those circumstances the

10   Court could reject the charge bargain that was contained in

11   the (c)(1)(A) plea.

12          THE COURT:  When you say the charge bargain, you

13   mean the bargain by which the Defendant pleads guilty and

14   the government agrees not to bring other charges or to drop

15   charges that have already been brought?

16          MR. WISE:  Exactly, Your Honor.

17          THE COURT:  All right.  And in looking at an

18   11(c)(1)(A) plea, would I need to consider or are those

19   factors that you just sort of talked about, is that usually

20   referred to as in the interest of justice?

21          MR. WISE:  They are, Your Honor.

22          THE COURT:  All right.  You can be seated.

23          So yesterday I received from third parties a

24   letter with almost 900 pages of attachments in one case, and

25   a memorandum of law with hundreds of more pages of exhibits

1    in the other.  I have not had time to review those

2    submissions.  I understand that there is some objection to

3    them and I will give the Defendant and the government if it

4    wishes an opportunity to respond to those if they choose.

5    But even though I have not been able to review the

6    third-party submissions, I do understand that they request

7    that I reject the plea agreement based on information that

8    the filers submit cast doubt on the investigation performed

9    or the charges brought or both.

10           So let me ask you this.  If I were to think that

11   the facts presented in those submissions or even the facts

12   that have been presented to me in this case and the attached

13   agreements suggest that the investigation was lacking or

14   that more serious charges should have been brought, is it

15   within my power to ask or direct the United States Attorney

16   or the Attorney General of the United States to redo the

17   investigation or bring different or more serious charges?

18           MR. WISE:  I don't believe so, Your Honor, no.

19           MR. CLARK:  We agree, Your Honor, it would raise

20   obviously massive separation of powers questions if that was

21   to be taken.

22           THE COURT:  Okay.  And isn't that decision about

23   what charges to bring for the prosecutor as part of the

24   Executive Branch?

25           MR. WISE:  It is, Your Honor.

1          MR. CLARK:  We concur, Your Honor.

2          THE COURT:  All right.  So if there were a

3     failure in the investigation or the charges brought were

4     inappropriate, how would that get addressed in our form of

5     government?

6          MR. WISE:  Through the political process, Your

7     Honor.

8          MR. CLARK:  In particular, Your Honor, the

9     Executive Branch is charged fully with investigating, making

10    prosecutorial discretion decisions, and indeed that's where

11    the term prosecutorial discretion comes from, it is vested

12    in the Executive Branch.

13         THE COURT:  All right.  Okay.  Let's walk

14    through some of the provisions of the plea, Memorandum of

15    Plea Agreement.  Do you have it in front of you, sir?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  It's six pages long and has an

18    attached Exhibit 1 which is four pages long as well as a

19    sealed attachment referenced as Attachment A.  Attachment A

20    is a document that is not public, but it is a standard

21    document that is filed in all cases in this district and is

22    not filed only in connection with this case.  The Memorandum

23    of Plea Agreement has three signatures on the final page.

24    Is one of those signatures yours?

25         THE DEFENDANT:  Yes, Your Honor.

```
 1                    THE COURT:  Okay.  And when did you sign it?

 2                    THE DEFENDANT:  This morning, Your Honor.

 3                    THE COURT:  And before you signed it, did you

 4       have an opportunity to read it and discuss it with your

 5       attorney?

 6                    THE DEFENDANT:  I did, Your Honor.

 7                    THE COURT:  Are you satisfied with the advice

 8       and counsel you received regarding the plea agreement.

 9                    THE DEFENDANT:  I am, Your Honor.

10                    THE COURT:  All right.  Let's have a side-bar up

11       here.

12                        (Sealed Attachment A side-bar discussion under

13       separate cover.)

14                        (End of sealed Attachment A discussion.)

15                    THE COURT:  All right.  Let's go back on the

16       unsealed portion of the record.

17                    So I'm now going to ask the prosecutor to read

18       the essential terms of the plea agreement.  Sir, I'll ask

19       you to listen carefully to what he says because when he's

20       finished, I'm going to ask you if the agreement as recited

21       by him reflects the deal that you believe you reached with

22       the government.

23                    Mr. Wise.

24                    MR. WISE:  Thank you, Your Honor.

25                    Paragraph 1 provides that the Defendant waives
```

1    any challenge to the information based on venue and agrees

2    to plead guilty in the United States District Court for the

3    District of Delaware to Counts I and II of the information

4    which charge him with willful failure to pay tax in

5    violation of Title 26 United States Code Section 7203.

6            Paragraph 2 describes how the Defendant

7    understands that the maximum penalties for each of Counts I

8    and II are as Your Honor previously indicated, twelve months

9    of imprisonment, a $100,000 fine or twice the gross gain or

10   loss from the offense, whichever is greater, one year of

11   supervised release, restitution and a $25 special assessment

12   per count and the cost of prosecution which the parties

13   stipulate is zero.

14           Paragraph 3 describes the essential elements

15   that the government would have to prove if the case went to

16   trial and those are one, that the Defendant had a duty to

17   pay tax.  Two, that the tax was not paid at the time

18   required by law.  And three, that the failure to pay was

19   willful.  The Defendant knowingly and voluntarily and

20   intelligently admits his guilt to each of these elements and

21   further admits to the information contained in the statement

22   of facts which is attached to the memorandum as Exhibit 1.

23           Paragraph 4 provides that the Defendant is

24   pleading guilty to Counts I and II because he is in fact

25   guilty.

1          Paragraph 5 contains certain stipulations under

2     the sentencing guidelines.  Paragraph 5A provides that the

3     amount of loss as to Counts I and II, so a combined loss is

4     no less than $1,199,524 and no greater than $1,593,329.

5          Subparagraph B provides that the conduct set

6     forth in the statement of facts which is Attachment A to the

7     Diversion Agreement filed, which will be filed today does

8     not constitute relevant conduct pursuant to United States

9     Sentencing Guideline 1(b)(1.3).  Paragraph C provides that

10    provided that the United States does not subsequently learn

11    of conduct by the Defendant inconsistent with the acceptance

12    of responsibility, that it will not oppose a two level

13    decrease pursuant to U.S. Sentencing Guideline 3(e)(1.1)(a)

14    for acceptance.  And further, that should it be determined

15    that the Defendant's offense level is 16 or greater prior to

16    the application of the two level reduction for acceptance

17    that the United States will move to reduce the sentence, the

18    guideline by one additional level pursuant to U.S.

19    Sentencing Guideline 3(e)(1.1)(b) for a total reconduction

20    of three levels.

21          It is understood and agreed by the parties that

22    these stipulations are not binding upon either the probation

23    office or the Court.

24          Second, that the Court may make factual and

25    legal determinations that differ from these stipulations

1    that may result in an increase or decrease in the sentencing

2    guideline range and the sentence that may be imposed.

3            Paragraph 6 provides that for reasons to be

4    articulated at or near the time of sentencing, the United

5    States will recommend a sentence of probation.

6            Paragraph 7 provides that the United States

7    retains the right to defend the rulings of the District

8    Court in any subsequent proceeding.

9            Paragraph 8 outlines at length the sentencing

10   procedure which I believe the Court will review with the

11   Defendant in more detail.

12           Paragraph 9 contains a broad appellant waiver

13   which I also understand the Court will review with the

14   Defendant in greater detail.

15           Paragraph 10 provides that the Defendant agrees

16   to pay a $50 special assessment at the day of sentencing.

17           Paragraph 11 provides that the memorandum

18   expressly incorporates Attachment A which is attached and

19   filed under seal and that the government as Your Honor has

20   said routinely files such an attachment even though it may

21   or may not continue additional terms.  To the extent it

22   does, however, the parties acknowledge and agree to be bound

23   by it.

24           Paragraph 12 addresses restitution under the

25   Mandatory Victim Restitution Act.  And the Defendant agrees

1     to the entry of the restitution order for the full amount of

2     the victims loses attributable to his activities as ordered

3     by the Court which is expected to be zero because the self

4     assessed tax due at the time of filing and associated

5     interest and penalties have been paid to the Internal

6     Revenue Service by a third party on behalf of the Defendant.

7     However, the Defendant understands that an unanticipated

8     amount of a restitution order will not serve as grounds to

9     withdraw his guilty plea.  The parties further understand

10    that should the Internal Revenue Service determine there are

11    additional taxes due and owing for the tax years 2014

12    through 2019, they are not subject to the terms of this

13    agreement and for the purposes of this memorandum the sole

14    victim of Counts I and II is the United States Treasury.

15              And finally paragraph 13 provides that it is

16    further agreed by the parties that the memorandum and

17    Exhibit A together with the sealed attachment supersedes all

18    prior promises, representations and statements of the

19    parties, that the memorandum may be modified only in writing

20    signed by all the parties and that any and all promises,

21    representations, and statements made prior to or after this

22    memorandum are null and void and have no affect whatsoever

23    unless they comport with the subsequent written

24    modifications and provisions of this paragraph.

25              THE COURT:  Thank you.  I did have a couple of

1    initial questions.

2              Paragraph 5A says that the amount of losses no

3    less than 1,100 -- well, actually before we ask that,

4    because I'm going to ask how it relates to the facts, why

5    don't you go through Exhibit 1 you referenced, why don't you

6    put Exhibit 1 on the record.

7              MR. WISE:  Yes, Your Honor.

8              At all times relevant to the instant

9    Information, the Defendant, Robert Hunter Biden, hereafter

10   Biden, was an attorney and businessman with lucrative

11   domestic and international business interests.  From 2017 to

12   2019, he served on the board of a Ukrainian energy company

13   and a Chinese private equity fund.  He further negotiated

14   and executed contracts for business and legal services that

15   paid millions of dollars of compensation to him and/or his

16   domestic corporations, Owasco, PC and Owasco, LLC.  Through

17   at least early 2017, he also was employed by a prestigious

18   multi-national law firm in an "of counsel" capacity.  For

19   this work, he earned substantial income, totaling more than

20   $2.3 million in 2017 and $2.1 million in 2018.

21             Biden also has a well-documented and

22   long-standing struggle with substance abuse.  Following the

23   death of his brother in 2015, Biden relapsed and over time

24   progressed from alcohol to abusing illegal drugs, including

25   crack cocaine in 2016.  This contributed to the collapse of

1   his marriage, with his divorce finalized in March 2017, as

2   well as the collapse of his most significant professional

3   relationship in Fall 2017.  Nonetheless, in 2017, despite

4   his addiction, Biden successfully entered into business

5   ventures and landed legal clients, earning millions of

6   dollars.  By his own telling in a memoir published in 2021,

7   Biden's substance abuse worsened in 2018, a year that

8   included a move to Los Angeles and what he has described as

9   a "spring and summer of nonstop debauchery."  Even during

10   this period, however, Biden continued to earn money and

11   exercise control over his personal and corporate finances.

12           Federal income tax returns and payments are due

13   on or about April 15th of each year for the prior calendar

14   year.  Biden, like many other taxpayers, routinely requested

15   an automatic extension to file his returns, pushing the due

16   date for a tax return to on or about October 15th.  An

17   extension of time to file a return, however, does not extend

18   the deadline for payment of taxes, which remain due on the

19   April filing date.

20           During calendar year 2017, Biden earned

21   substantial income, including: just under $1 million from a

22   company he formed with the CEO of a Chinese business

23   conglomerate; $666,666 from his domestic business interests;

24   approximately $664,000 from a Chinese infrastructure

25   investment company; $500,000 in director's fees from a

1   Ukrainian energy company; $70,000 relating to a Romanian

2   business; and $48,000 from the multi-national law firm.

3           Throughout tax year 2017, Biden worked with a DC

4   and Maryland based accountant to prepare his individual and

5   corporate tax returns.  In 2018, this accountant (who died

6   in 2019) prepared Biden's 2017 corporate and individual

7   income tax returns and throughout the fall repeatedly

8   attempted to provide them to Biden for review and signature.

9   These efforts included directly contacting Biden, reaching

10  out to his administrative assistant, and sending copies to

11  his former business partner.  The former business partner

12  reviewed the returns and sent several emails to Biden in

13  which he commented on their substance and reminded Biden of

14  his filing obligations.  The former business partner left

15  the final returns for Biden at Biden's office.  Despite

16  these actions, Biden neither signed nor submitted the

17  individual or corporate income tax returns to the Internal

18  Revenue Service.

19          Not only did the accountant timely prepare

20  Biden's individual and corporate tax returns, the accountant

21  repeatedly encouraged Biden to timely pay the taxes

22  associated with the 2017 tax returns.  Beginning in

23  April 2018 and continuing into October 2018, the accountant

24  advised Biden to make his tax payments, noting approximately

25  $600,000 owed by Biden personally and an additional $204,000

1    owed by Owasco, PC.  Biden told the accountant he could pay

2    $25,000 in April 2018 towards his taxes, but no such payment

3    was made to the Internal Revenue Service.  His large tax

4    liability stemmed in part from the fact that over the course

5    of 2017, Biden began withdrawing substantial funds outside

6    of Owasco, PC's established payroll system, which had been

7    created, in part, to ensure that Biden had sufficient

8    withholdings to timely pay any outstanding tax liability.

9    The end of year liability should not have come as a

10    surprise.  At the time of those withdrawals, Biden's

11    business partner advised him that these transfers, made

12    without withholding, would result in a significant tax

13    liability at year end.

14         Despite his large outstanding tax liability and

15    profligate spending, on or about April 17, 2018, the due

16    date for 2017 tax payments, Biden did, in fact, have the

17    funds available to pay his outstanding 2017 tax liability

18    for both his personal and corporate returns.  On or about

19    March 22, 2018, Biden received a $1 million payment into his

20    Owasco, LLC bank account as payment for legal fees for

21    Patrick Ho, and $939,000 remained available as of tax day.

22    Over the next six months Biden would spend almost the

23    entirety of this balance on personal expenses, including

24    large cash withdrawals, transfers to his personal account,

25    travel, and entertainment.

1    Biden continued to earn handsomely and spend

2    wildly in 2018.  He received a little over $2.6 million in

3    business and consulting fees from the company he formed with

4    the CEO of a Chinese business conglomerate and the Ukrainian

5    energy company.  However, without the structure of a stable

6    business partner and still in the throes of addiction, Biden

7    essentially ignored his tax obligations, withholding only

8    approximately $38,465, less than six percent of the taxes

9    owed.  Tax returns and filings for tax year 2018 were due on

10   April 15th, 2019.  On that date, Biden traded emails with

11   his DC accountant and his attorney about seeking an

12   extension.  The accountant advised Biden of his obligation

13   to make a tax payment on that date, irrespective of the

14   extension to file a return.  Ultimately, the extension was

15   filed, making the return due on October 15, 2019.  Biden,

16   however, paid nothing.  As with tax year 2017, at the time

17   his 2018 tax payment was due, Biden continued to have

18   substantial income and the ability to pay his tax liability,

19   having received payments totaling approximately $758,000

20   during March and April 2019.  By late May, Biden had spent

21   almost the entire sum on personal expenses, including large

22   cash withdrawals, payments to or on behalf of his children,

23   credit card balances, and car payments for his Porsche.

24          After numerous programs and trips to rehab,

25   Biden got sober in May 2019, the same month he married his

1   current wife.  He has remained sober since.  Biden remained

2   in California and spent much of 2019 painting and developing

3   plans for his memoir, which he began working on through the

4   fall and into the winter.  During summer 2019, he was sued

5   in two different domestic-relations lawsuits, both seeking

6   payment of support obligations.  He still did not, however,

7   make preparations to file or actually file either his 2018

8   individual or corporate income tax returns on or about

9   October 15, 2019, the extension due date.

10              In or around November 2019, Biden engaged a

11  California accountant to prepare his individual and

12  corporate income tax returns for 2017 and 2018.  The

13  California accountant began gathering materials and started

14  preparing Biden's 2017 and 2018 returns in early 2020.  By

15  that time, the domestic relations lawsuits had progressed,

16  and having failed to do so previously, Biden was under court

17  order to provide his tax returns or face potential sanctions

18  including imprisonment.  On or about January 27, 2020, Biden

19  signed a representation letter for the California

20  accountants, averring that he was providing the accountants

21  with truthful and accurate information and acknowledging his

22  responsibility for the accuracy of those tax returns.  Over

23  the days that followed, Biden participated in a series of

24  meetings with the California accountants and identified

25  business and personal expenses in connection with his tax

1    returns.  During this process, Biden miscategorized certain

2    personal expenses as legitimate business expenses, resulting

3    in a reduction in his tax liability.  At the same time, the

4    California accountants overreported Biden's income, which

5    partially offset this reduction.

6                Or on about February 18th, 2020, Biden filed his

7    individual and corporate income tax returns with the

8    Internal Revenue Service for tax years 2017 and 2018.  On

9    his 2017 Form 1040, Biden reported $2,376,436 in total

10   income and a self-assessed tax due of $710,598, of which

11   $125,909 was timely paid, leaving a balance due and owing of

12   $581,713.  On his 2017 Form 1120 for Owasco, PC, Biden

13   reported gross receipts of $2,698,041 and a self-assessed

14   tax due and owing of $13,630.  On his 2018 Form 1040, Biden

15   reported $2,187,286 in total income and a self-assessed tax

16   of $659,366, of which $38,465 was timely paid, leaving a

17   balance due and owing of $620,901.  No additional payments

18   were included at the time of filing.  On his 2018 Form 1120

19   for Owasco, PC, Biden reported gross receipts of $2,659,014

20   and a self-assessed tax due and owing of $4,247.

21               Approximately a year-and-a-half later, on or

22   about October 18th, 2021, a third party paid the Internal

23   Revenue Service $955,800 to cover Biden's self-assessed

24   individual tax liability with interest and penalties for tax

25   year 2017 and $956,632 to cover Biden's self-assessed

1   individual tax liability with interest and penalties for tax

2   year 2018.

3          In addition, in or around February of 2020,

4   Biden's California accountants discovered that Biden's 2016

5   Form 1040 had not been filed.  The return was originally

6   prepared in or around October 2017 and showed $15,520 in

7   taxes due and owing.  Though it was delivered to Biden at

8   Biden's office, this return was not filed with the Internal

9   Revenue Service.  After learning in 2020 that the Form 1040

10  for 2016 remained unfiled, Biden filed a Form 1040 on

11  June 12, 2020.  For tax year 2016, Biden reported $1,580,283

12  in total income and self-assessed tax due of $492,895, of

13  which $447,234 was timely paid, leaving a balance due and

14  owing of $45,661.  Biden did not include a payment with this

15  return.  On or about October 18, 2021, this liability, plus

16  accrued interest and penalties, was also fully paid by a

17  third party.

18         Finally, after seeking an extension, Biden

19  timely filed his 2019 Form 1040 on or about October 15th,

20  2020.  He did not, however, pay his estimated tax due when

21  filing for an extension as required by law.  For tax year

22  2019, Biden reported $1,045,850 in total income and a

23  self-assessed tax due and owing of $197,372.  On October 18,

24  2021, this liability, plus accrued interest and penalties,

25  was also fully paid by the same third party.

1          THE COURT:  All right.  Thank you.  Now I did

2    have a few questions.

3          Paragraph 5A says that the amount of loss as to

4    Counts I and II including the relevant conduct as defined in

5    sentencing guideline is no less than $1,199,524, and no

6    greater than $1,593,329.  Is that the combined loss or the

7    loss for each count?

8          MR. WISE:  Combined loss, Your Honor.

9          THE COURT:  All right.  In Exhibit 1, there are

10   references to taxes paid by a third party on Mr. Biden's

11   behalf of $955,800, and $956,632, as well as $492,000 in

12   2016 and $197,000 for 2019.  Just looking at 2017 and 2018

13   which are the subject of this case, those numbers add up to

14   more than $1.9 million.  Can you help me square that with

15   the relevant conduct.

16         MR. WISE:  So the amount that was paid by the

17   third party includes significant penalties and interests

18   which we have not included in the loss stipulation that's in

19   paragraph 5A.  The paragraph 5A is the taxes and there is a

20   dispute as to what the taxes were based on the business

21   deductions and that's something that the parties will

22   address in their sentencing memorandum, but this number is

23   loss without inclusion of the penalties and interest.

24         THE COURT:  Is that standard?

25         MR. WISE:  Yes, Your Honor.

1           THE COURT:  Did you want to say something?

2           MR. CLARK:  I was going to say it's a relevant

3    guideline, Your Honor, for a failure to pay case omits

4    penalties and interests from the calculation of the tax

5    table loss.  And there is a dispute about where in the range

6    it goes, but the explanation, penalties and interest are not

7    properly included under this guideline for this offense.

8           THE COURT:  And if it were tax evasion, would

9    those be included?

10          MR. CLARK:  It's my understanding that they

11   would be, Your Honor.

12          MR. WISE:  Yes, Your Honor.

13          THE COURT:  Okay.  Paragraph 5b refers to the

14   Diversion Agreement.  That's the Diversion Agreement

15   contemplated in the Criminal Action 23-61, the felony gun

16   charge?

17          MR. WISE:  Yes, Your Honor.

18          THE COURT:  All right.  Paragraph 12 refers to

19   restitution, and says the self-assessed tax due at the time

20   of filing and the associated interest and patents have been

21   paid to the Internal Revenue Service by a third party on

22   behalf of the Defendant.  What does self-assessed mean?

23          MR. WISE:  It means the amount when the returns

24   were prepared that, the return prepared determine what was

25   owed based on the income that was reported and deductions

1    and credit.

2              MR. CLARK:  I think, Your Honor, based on that

3    and all this process, these numbers are based on payout

4    numbers that were obtained from the IRS.  Self assessment is

5    a process by which a return filer writes a return, says this

6    is how much tax I owe.  There was a lot of process here

7    between the IRS and these returns and at the end of the day

8    a payout number was obtained by the IRS and that number was

9    paid.

10             THE COURT:  So this isn't -- that's what I'm

11   trying to figure out, is there someone still looking into

12   that to see if the self-assessed number is accurate, or do

13   you know that it's zero?

14             MR. WISE:  So the self-assessed number again is

15   the amount on the return plus the interest and penalties

16   that were derived through the payoff.  As the statement of

17   facts addresses, there is a dispute as to what was

18   self-assessed or what the self-assessed number would be for

19   tax year 2018 and that will be addressed in the sentencing

20   memoranda.

21             MR. CLARK:  To be clear, the dispute is we think

22   it's lower.  As the statement of facts recites, there was

23   actually an overstatement of Mr. Biden's income that year.

24   I mean, my understanding is all of the monies that the IRS

25   takes a position Mr. Biden owes as a result of every tax

1    year being discussed have been paid based on their

2    calculation, if that answers Your Honor's question.

3              MR. WISE:  So our position, Your Honor, is there

4    are additional -- there are deductions that were taken that

5    were improper and so that's why for the loss purposes,

6    putting aside what the payoff number was in our sentencing

7    memorandum, we will address those.  The IRS in arriving at

8    the payoff number didn't --

9              THE COURT:  Well, I'm just asking because you

10   said it's expected to be zero, why is it expected to be zero

11   if you're telling me that the numbers might be wrong?

12             MR. WISE:  Because that is the payoff amount

13   that the IRS gave to the Defendant which is sort of a

14   process that produces that that is separate from the

15   criminal investigation and essentially divorced from it.

16   That's why the agreement doesn't bind the IRS if they then

17   make a decision essentially for additional restitution that

18   could occur.

19             THE COURT:  Why do you say it's expected to be

20   zero?

21             MR. WISE:  Because as of the payoff number that

22   was given, there is no at this moment restitution owed to

23   the IRS.

24             THE COURT:  All right.  So those are my initial

25   questions.  I may have some more as we go through this, but

1    that's what I had at this moment.

2              Mr. Biden, does the written agreement as

3    summarized by Mr. Wise accurately reflect the agreement you

4    have reached with the government?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Has anyone threatened you or forced

7    you into entering this written agreement?

8              THE DEFENDANT:  No, Your Honor.

9              THE COURT:  Has anyone made you any promises

10   that are not contained in the written agreement?

11             MR. CLARK:  Your Honor, with the exception of

12   the Diversion Agreement --

13             THE COURT:  We're not making an exception.  I

14   want to know, has anyone made you any promises that are not

15   contained in the written Memorandum of Plea Agreement?

16             MR. CLARK:  Yes, there are promises from the

17   government in the Diversion Agreement, Your Honor.

18             THE COURT:  And sir, are you relying on the

19   promises made in the Diversion Agreement in connection with

20   your agreement to plead guilty?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  And if the Diversion Agreement were

23   not valid or unenforceable for any reason, would you enter

24   into the Memorandum of Plea Agreement?

25             THE DEFENDANT:  No, Your Honor.

1          THE COURT:  All right.  So we're going to

2   discuss that agreement in a bit, but for now let me say --

3   by the way, I didn't get a copy of paragraph 15 of the

4   agreement, but the parties provided me with a copy of that

5   agreement prior to this hearing, so that's what I'm going to

6   quote from at the moment.

7          Paragraph 15 of the Diversion Agreement states

8   the United States agrees not to criminally prosecute Biden

9   outside of the terms of this agreement for any federal

10  crimes encompassed by the attached statement of facts,

11  Attachment A to the Diversion Agreement, and the statement

12  of facts attached as Exhibit 1 to the Memorandum of Plea

13  Agreement filed this same day.  This agreement does not

14  provide any protection against prosecution for any future

15  conduct by Biden or by any of his affiliated businesses.

16          And just so we're clear, I think you already

17  answered this, sir, but are you relying on that promise in

18  connection with your agreement to accept the Memorandum of

19  Plea Agreement and plead guilty?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  If that provision were not valid or

22  not enforceable, would you accept the Memorandum of Plea

23  Agreement?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  If you had no immunity from the

1      government, perhaps even a different prosecutor and the

2      government could bring a felony tax evasion charge or drug

3      charges against you, would you still enter the plea

4      agreement and plead guilty to these tax charges?

5                  THE DEFENDANT:  No, Your Honor.

6                  THE COURT:  All right.  So I need some help here

7      because you all told me this was a plea under Rule

8      11(c)(1)(B) and not (c)(1)(A), but yet I have this provision

9      that I would think is normally in a plea agreement.  So tell

10     me, how do these agreements relate?  Are they part of a

11     package deal?

12                 MR. WISE:  So, Your Honor, the United State's

13     position is that the agreements stand alone by their own

14     terms and both agreements include their last paragraph that

15     says that with this one caveat --

16                 THE COURT:  This is a big caveat, though, if

17     you're telling me Rule 11(c)(1)(B) doesn't give me any

18     authority to look at this, (c)(1)(A) refers to, you know,

19     having an agreement not to prosecute.  That's why I'm

20     looking at this.  I'm not saying that you're wrong, but I

21     need to understand this.

22                 MR. WISE:  Sure.  So Your Honor, again, our view

23     is the plea agreement stands alone.  There is no charge

24     bargaining in the plea agreement, period.  And that's what

25     they have agreed to.  The Diversion Agreement --

1              THE COURT:  But he would not agree, just so I

2      understand, sir, you would not agree to that plea agreement

3      if you didn't get some immunity from other charges, is that

4      right?

5              MR. CLARK:  Speaking for my client, that's

6      correct, Your Honor.

7              THE COURT:  I didn't mean that to be a

8      rhetorical question.  So you're trying to tell me that

9      that's separate, but I think -- and I understand why he's

10     saying no, I wouldn't -- that isn't separate to me, I need

11     them both.

12             MR. WISE:  That's the intention with the

13     agreement he signed.

14             THE COURT:  So the intention of the agreement he

15     signed was that it would be completely separate and if that

16     Diversion Agreement were not valid or unenforceable and he

17     were on the hook for other charges that he would still be

18     pleading guilty?

19             MR. WISE:  That's right, because that's what the

20     final paragraph of the plea agreement says he's agreeing to,

21     that the plea agreement stands on its own without any

22     additional promises outside the four corners of that

23     agreement.

24             THE COURT:  Do you guys need to talk about this

25     for a few minutes?

1                  MR. CLARK:  Yes.

2                  THE COURT:  How about I give you guys an

3     opportunity so we can make sure we're on the same page

4     because part of my charge here is to make sure that the

5     Defendant knows what he's pleading to.

6                  MR. CLARK:  We appreciate it, Your Honor.

7                  COURT CLERK:  All rise.

8                  (A brief recess was taken.)

9                  THE COURT:  All right.  Please be seated.  Where

10    are we?

11                 MR. CLARK:  Your Honor, I want to apologize for

12    maybe my unartful phrasing for some of the issues that came

13    up a minute ago.  Perhaps I can explain the Defendant's

14    position and that may clarify things.  There are two

15    agreements in this case.  They are both very important to

16    the Defendant.  One is a plea agreement that the Court has

17    before it and my client is ready to enter a plea to that

18    plea agreement without contingency, without reservation, and

19    without connection.  There is another agreement which is a

20    Diversion Agreement which --

21                 THE COURT:  Right.  So let me just ask you, if

22    that Diversion Agreement were not valid or were

23    unenforceable for some reason, would he enter this plea?

24                 MR. CLARK:  He is ready to live by the terms of

25    that agreement --

1          THE COURT:  If that Diversion Agreement did not

2     exist, he would be willing to live by the terms of the plea

3     and plead guilty?  I have concerns about that Diversion

4     Agreement so I'm asking you, if it were not valid, if it

5     were unenforceable, would he plead to the memorandum of

6     plea?

7          MR. CLARK:  Based on our understanding of the

8     Diversion Agreement, which is a bilateral agreement between

9     the Defendant and the government which the government has

10    reaffirmed to me it will stand by, then yeah, he would enter

11    the plea.

12         THE COURT:  So you're not answering my question.

13    You're saying well, we think it's valid and enforceable.

14    I'm asking you, if it were not, go with me here, if that

15    agreement were not valid and enforceable, if that agreement

16    did not exist and he could not rely on it, would he enter

17    the memoranda of plea?

18         MR. CLARK:  You're asking for a hypothetical

19    from me, Your Honor.

20         THE COURT:  Yes, I'm asking that because --

21         MR. CLARK:  Yes, my client would resolve this

22    case on these terms in the hypothetical situation that exist

23    without that Diversion Agreement.  I want to be clear that

24    it is the parties' position that there is a Diversion

25    Agreement between the parties which is binding.  But take

1    that out of today's proceeding and my client is ready to

2    enter a plea under the plea agreement.

3                    THE COURT:  All right.  Let me ask you those

4    questions again, Mr. Biden.  If the Diversion Agreement were

5    not valid and enforceable for any reason, would you enter

6    the Memorandum of Plea Agreement?

7                    THE DEFENDANT:  Yes, Your Honor.

8                    THE COURT:  And are you relying on the promise

9    in the Diversion Agreement not to prosecute you in

10   connection with your agreement to accept the Memorandum of

11   Plea Agreement and plead guilty?

12                   THE DEFENDANT:  No, Your Honor.

13                   THE COURT:  And so if you had no immunity from

14   the government through that Diversion Agreement and the

15   government could bring felony tax evasion charges or drug

16   charges against you, would you still enter the plea

17   agreement and plead guilty to these tax charges?

18                   THE DEFENDANT:  Yes, Your Honor.

19                   THE COURT:  All right.  Now, I want to talk a

20   little bit about this agreement not to prosecute.  The

21   agreement not to prosecute includes -- is in the gun case,

22   but it also includes crimes related to the tax case.  So we

23   looked through a bunch of diversion agreements that we have

24   access to and we couldn't find anything that had anything

25   similar to that.

1          So let me first ask, do you have any precedent

2     for agreeing not to prosecute crimes that have nothing to do

3     with the case or the charges being diverted?

4          MR. WISE:  I'm not aware of any, Your Honor.

5          THE COURT:  Do you have any authority that says

6     that that's appropriate and that the probation officer

7     should agree to that as terms, or the chief of probation

8     should agree to that as terms of a Diversion Agreement?

9          MR. WISE:  Your Honor, I believe that this is a

10    bilateral agreement between the parties that the parties

11    view in their best interest.  I don't believe that the role

12    of probation would include weighing whether the benefit of

13    the bargain is valid or not from the perspective of the

14    United States or the Defendant.

15         THE COURT:  So have you ever seen -- I think I

16    just asked you this, but have you ever seen a Diversion

17    Agreement where the agreement not to prosecute is so broad

18    that it encompasses crimes in a different case?

19         MR. WISE:  No.  And I would say, Your Honor, I

20    don't think it is broad in the sense that --

21         THE COURT:  We're going to talk about that.  You

22    can sit down.

23         All right.  Now, is an agreement not to bring

24    charges or an agreement to drop charges typically something

25    that is included in a Memorandum of Plea Agreement?

1                    MR. WISE:  It can be.

2                    THE COURT:  And if it were included in the

3       Memorandum of Plea Agreement, would that make this plea

4       agreement one pursuant to Rule 11(c)(1)(A)?

5                    MR. WALLACE:  It would.

6                    THE COURT:  In your view, that would change the

7       analysis of what I needed to do in evaluating whether to

8       accept this plea or not, right?

9                    MR. WISE:  It would.

10                   THE COURT:  And so let's just understand this.

11      If it were that, then my role would be to accept or reject

12      the plea, right?

13                   MR. WISE:  It would.

14                   THE COURT:  What happens if I accept the plea,

15      we go forward to sentencing?

16                   MR. WISE:  Yes.

17                   THE COURT:  And what happens if I reject the

18      plea?

19                   MR. WISE:  Then we -- this is one of the issues

20      with charge bargaining.

21                   THE COURT:  Because there is a waiver of venue.

22                   MR. WISE:  Well, there is a waiver of venue, but

23      also, and this has been addressed by some courts outside of

24      this circuit, because of the separation of powers, if the

25      Court were to reject a (c)(1)(A) on its view that the

1    charges should be different --

2                    THE COURT:  Well, what if I were to reject the

3    (c)(1)(A) plea on the grounds that it includes an agreement

4    not to prosecute, that as we're going to talk about in a few

5    minutes, I don't really understand the scope of.

6                    MR. WISE:  So --

7                    THE COURT:  I mean, forget all the

8    investigation, what charges were brought, I think that the

9    parties have made clear that we live in a system of

10   separation of powers, those powers are given to the

11   Executive Branch.  Right?

12                   MR. WISE:  Right.

13                   THE COURT:  So I don't mean to violate the

14   separation of powers or do anything unconstitutional.  I'm

15   trying to figure out what my role is and what the

16   appropriate rule is that applies to this.

17                   MR. WISE:  Right.

18                   THE COURT:  Okay.  And so I am trying to

19   understand if I were to reject the plea, I'm not saying I am

20   going to, I have not -- for anyone in the back, I have not

21   made that determination, but if I were to reject the plea,

22   just tell me what happens.

23                   MR. WISE:  So then we have two charges against

24   the Defendant and they're misdemeanors, so he doesn't need

25   to be indicted and we go forward and there is a trial on

1    those charges, and there is a possibility that there could

2    be additional charges brought.

3              THE COURT:  Related to the tax issues?

4              MR. WISE:  Yes.

5              THE COURT:  Do you agree with that, Mr. Clark,

6    what would happen?  Again, I want to make sure I'm not

7    saying that's my decision.

8              MR. CLARK:  I understand, Your Honor.  I don't

9    necessarily disagree.  I'm not aware of any additional

10   charges that could validly be brought with regard to the tax

11   charges.  Again, without getting into the whole

12   investigation, but I do think there is some context that's

13   important here.  The U.S. Attorney's Office and me spent

14   five years in meeting after meeting, hours, ten hour long

15   meetings going through my client's taxes on a line-by-line

16   basis, and this is the disposition the parties came to after

17   a five-year investigation that was pursued with unbelievable

18   diligence and doggedness.  And so first of all, I don't

19   think there are any other charges to be brought.  I think,

20   you know, we thought that just like in any compromise

21   situation, we had valid arguments with regard to these

22   charges, but my client undertook to plead guilty to them

23   because it was the right disposition for all the parties

24   after extensive negotiation, and so yeah, I think we would

25   have two filed informations and the Court and the parties

1    would figure out how to proceed on those informations and

2    that would be the rest of the process.

3              THE COURT:  All right.  So you said there might

4    be additional charges.  Are you at liberty to tell us what

5    you're thinking those might be or is that just a

6    hypothetical that there might be?

7              MR. WISE:  It was a hypothetical response to

8    your question.

9              THE COURT:  Is there an ongoing investigation

10   here?

11             MR. WISE:  There is.

12             THE COURT:  May I ask then why if there is we're

13   doing this piecemeal?

14             MR. WISE:  Your Honor may ask, but I'm not in a

15   position where I can say.

16             THE COURT:  Okay.  So you can sit down.

17             I think what I'm concerned about here is that

18   you seem to be asking for the inclusion of the Court in this

19   agreement, yet you're telling me that I don't have any role

20   in it, and you're leaving provisions of the plea agreement

21   out and putting them into an agreement that you are not

22   asking me to sign off on.  So I need you to help me

23   understand why this isn't in the written plea agreement.

24             MR. CLARK:  If I may, Your Honor.  I mean, the

25   original conception here was something like a deferred

1    prosecution, non-prosecution agreement, which generally the

2    Court doesn't necessarily weigh in on.  I don't think it was

3    the -- we are not asking the Court to rule in any way on the

4    Diversion Agreement.  The diversion as far as I understand

5    it has been approved by probation, there is a -- you've

6    arraigned the Defendant on the instrument and I believe that

7    process will go forward.

8              THE COURT:  We have to talk about the Diversion

9    Agreement because you have included me into the Diversion

10   Agreement, so we are going to talk about that.  But I am

11   just still, you know, normally -- so we have two agreements,

12   we have a plea agreement where you're saying Judge, we're

13   all here in front of you for him to plead.  You're saying I

14   don't even get to accept it, I guess I'm supposed to rubber

15   stamp it under Rule (c)(1)(B).  But then it would be a plea

16   under Rule (c)(1)(A) if the provision that you have put in

17   the Diversion Agreement which you do not have anyplace for

18   me to sign and it is not in my purview under the statute to

19   sign, you put that provision over there.  So I am concerned

20   that you're taking provisions out of the agreement, of a

21   plea agreement that would normally be in there.  So can you

22   -- I don't really understand why that is.

23             MR. WISE:  So the bargain that was reached by

24   the parties was the Plea Agreement that is in front of Your

25   Honor, which is a (c)(1)(B) as I mentioned, where there is

1    only a recommended sentence, that is -- that is the Plea

2    Agreement --

3              THE COURT:  Well, it's not, because you do

4    reference -- you reference the Diversion Agreement in the

5    Plea Agreement.

6              MR. WISE:  Not in the Plea Agreement.

7              THE COURT:  You do.  I asked you if paragraph 5B

8    referred to the Diversion Agreement and you said yes.

9              MR. WISE:  Only insofar as it's not relevant

10   conduct.

11             THE COURT:  You reference it in the Plea

12   Agreement, right?

13             MR. WISE:  But it doesn't incorporate it.

14             THE COURT:  And in the Diversion Agreement, you

15   reference the Memorandum of Plea Agreement, right?

16             MR. WISE:  Only part of it.

17             THE COURT:  And you say that the -- in the

18   Diversion Agreement when you say there is not going to be

19   any prosecution, you say that's not just prosecution on the

20   gun charge which is the subject of the Diversion Agreement,

21   you say also no prosecution with respect to anything in the

22   statement of facts attached to the memorandum of plea,

23   right.

24             MR. WISE:  Yes.

25             THE COURT:  All right.  Okay.  So I don't really

1    understand, though, why that's not part of the Plea

2    Agreement.

3              MR. WISE:  Because by the terms of the Plea

4    Agreement, the only function, the Diversion Agreement --

5    well, it has no function but the parties negotiated that

6    their view, and it's their view, probation can take a

7    different view, Your Honor can take a different view, their

8    view is the firearms offense should not be considered

9    relevant conduct for calculating the guidelines related to

10   the tax offense, that is all that 5(b) says.  It does not

11   incorporate the paragraph 15 or any part of the Diversion

12   Agreement, it simply says our view is the Diversion

13   Agreement, the firearm offense should not be considered

14   relevant conduct in calculating the guidelines.

15             I think practically how this would work, Your

16   Honor, is if Your Honor takes the plea and signs the

17   Diversion Agreement which is what puts it into force as of

18   today, and at some point in the future we were to bring

19   charges that the Defendant thought were encompassed by the

20   factual statement in the Diversion Agreement or the factual

21   statement in the Plea Agreement, they could move to dismiss

22   those charges on the grounds that we had contractually

23   agreed not to bring charges encompassed within the factual

24   statement of the Diversion Agreement or the factual

25   statement of the tax charges.

1          MR. CLARK:  That's my understanding, Your Honor,

2     we would be enforcing a contract with the Department of

3     Justice.

4          THE COURT:  I don't understand how you have an

5     agreement not to pursue other charges in the case, the

6     misdemeanor case, and you say that is not part of his Plea

7     Agreement.

8          MR. WISE:  Because the Plea Agreement does not

9     include that.

10         THE COURT:  All right.  So let's talk a little

11    bit more about this.  To the extent that the agreement --

12    you can sit down.

13         To the extent that the agreement not to

14    prosecute is promised, do the parties have some

15    understanding what the scope of that agreement is?

16         MR. WISE:  Yes, Your Honor.

17         THE COURT:  No, tell me, like specifically what

18    does it include.  You said that there is an investigation, I

19    don't know what that is, but you must know that if there are

20    particular charges that could be brought based on the facts

21    that are there.

22         MR. WISE:  So I can tell you what I think we

23    can't charge.  I can't tell you what the ongoing

24    investigation is.  So, for instance, I think based on the

25    terms of the agreement, we cannot bring tax evasion charges

1  for the years described in the factual statement to the Plea

2  Agreement.  And I think we cannot bring for the firearms

3  charges based on the firearm identified in the factual

4  statement to the Diversion Agreement.

5          THE COURT:  All right.  So there are references

6  to foreign companies, for example, in the facts section.

7  Could the government bring a charge under the Foreign Agents

8  Registration Act?

9          MR. WISE:  Yes.

10          THE COURT:  I'm trying to figure out if there is

11  a meeting of the minds here and I'm not sure that this

12  provision isn't part of the Plea Agreement and so that's why

13  I'm asking.

14          MR. CLARK:  Your Honor, the Plea Agreement --

15          THE COURT:  I need you to answer my question if

16  you can.  Is there a meeting of the minds on that one?

17          MR. CLARK:  As stated by the government just

18  now, I don't agree with what the government said.

19          THE COURT:  So I mean, these are contracts.  To

20  be enforceable, there has to be a meeting of the minds.  So

21  what do we do now?

22          MR. WISE:  Then there is no deal.

23          THE COURT:  All right.  I guess then the

24  question is where does that leave us?  So what do we need to

25  do?  Do you guys need some time to talk?  Do you need me to

1    set a date -- do we need to talk about a preliminary hearing

2    since we didn't really need to do one with the agreement?

3              MR. CLARK:  We'll waive the preliminary hearing.

4    As far as I'm concerned, the Plea Agreement is null and

5    void.  You know, we'll have -- we are going to have to

6    discuss things with the government.

7              THE COURT:  All right.  So I think we're on the

8    clock now.  So what should we do?  Do you want me to set a

9    date for pretrial motions?  Do you want to exclude a little

10    bit of time so that you have some time to talk?  What do you

11    want to do?

12              MR. CLARK:  I think we would need thirty days

13    after the trial clock to figure out what's going on.

14              THE COURT:  All right.  I agree.  I know that

15    this has come as a little bit of a curve ball, but I think

16    that having you guys talk some more makes sense, and we will

17    exclude the time up through -- so the thirty days takes us

18    to the Friday before Labor Day.  Do you want that or do you

19    want the following week?

20              MR. CLARK:  I think that's fine, Your Honor.

21              THE COURT:  So we'll exclude up through

22    September 1st, you guys can get me a status report then.  I

23    think it does make sense in the interest of justice to do

24    so.  We'll get a status report and then we'll figure out

25    where we are.

1          MR. CLARK:  Your Honor, can we ask you to take

2     ten minutes and see whether we can somehow make any headway

3     on this?

4          THE COURT:  Okay.

5          MR. CLARK:  Thank you, Your Honor.

6          COURT CLERK:  All rise.

7          (A brief recess was taken.)

8          THE COURT:  All right.  Please be seated.  Where

9     are we?

10          MR. CLARK:  Your Honor, we have had some

11     discussion between the parties to try to clarify the

12     understanding and I just want to kind of summarize where we

13     are and if the government's counsel wants to correct me.

14     The parties have taken the position that the Diversion

15     Agreement is a separate agreement from the Plea Agreement.

16     The Diversion Agreement is a bilateral contract between the

17     parties.  Your Honor has asked the parties what their

18     understanding of the paragraph 15 of the Diversion Agreement

19     is.  I think there was some space between us and at this

20     point, we are prepared to agree with the government that the

21     scope of paragraph 15 relates to the specific areas of

22     federal crimes that are discussed in the statement of facts

23     which in general and broadly relate to gun possession, tax

24     issues, and drug use.

25          THE COURT:  So are you going to rewrite that?

1          MR. CLARK:  The government says that's what it

2     means and Your Honor asked for what the parties agree.

3          THE COURT:  I'm just looking at the language of

4     that.  So you're comfortable with that's what it means even

5     though the language of that seems substantially broader?

6          MR. CLARK:  Your Honor, I just put on the record

7     what I have --

8          THE COURT:  You didn't just answer yes so that

9     also -- so yes, you are comfortable that that provision

10    means that it only relate and for what period of time?

11         MR. WISE:  It would be the period of time in the

12    statement of fact, both statement of facts.

13         THE COURT:  Help me out with that.

14         MR. WISE:  '14 to '19 for the tax offenses and

15    the drug -- and the admission of drug use in that period and

16    then the firearms is obviously specifically identified in

17    the time period in which that was possessed.

18         THE COURT:  All right.  So the defense agrees

19    that the agreement not to prosecute only includes the time

20    period from 2014 to 2019, it only includes tax charges in

21    that time period, drug charges in that time period, and the

22    particular -- the firearms charges that relate to this

23    particular firearm?

24         MR. CLARK:  Yes, Your Honor.

25         THE COURT:  All right.  So you can be seated.

1    Let me just take a look here.  I mean, part of the issue

2    that I'm having is understanding, you know, regardless of

3    whether this is a plea under subsection B or subsection A,

4    it has to be a knowing plea and I'm already faced with the

5    Defendant under oath saying both that he would not enter the

6    Memorandum of Plea Agreement if the Diversion Agreement were

7    not valid, and that he would.  And so I'm a little bit

8    confused about that.  So I think we can work through that.

9    But let's take a look at some of the rest of this.

10             All right.  Sir, other than what we have just

11   discussed, are there any other promises that have been made

12   to you to entice you to enter the Memorandum of Plea

13   Agreement?

14             THE DEFENDANT:  No, Your Honor.

15             THE COURT:  Do you understand that this is the

16   time to tell me of any promises not in the record or of any

17   threats that have been made because after today you won't be

18   able to withdraw your plea based on information that you

19   could have shared with me here?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Do you understand that the plea --

22   terms of the Plea Agreement are merely recommendations to

23   me, that I can reject those recommendations without

24   permitting you to withdraw your plea and impose a sentence

25   that is harsher or longer or more severe than the one that

1    you may anticipate?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Are you pleading guilty of your own

4    free will because you are, in fact, guilty?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  All right.  Now I want to walk

7    through some of the specific provisions of the agreement.

8    First, venue.  Do you have the agreement in front of you?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  All right.  So paragraph 1 states

11   that you waive any challenge to the information based on

12   venue.  Do you understand that absent that waiver, you could

13   challenge this Court being the appropriate Court to hear

14   these charges?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  By entering this plea you are giving

17   up that challenge?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Did you discuss that provision with

20   your counsel?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Again, are you satisfied with the

23   advice that you received?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  Now, next, in paragraph 2, Mr. Wise

1    went over the maximum penalties for Counts I and II when he

2    summarized the essential terms and I mentioned those to you

3    earlier when we were doing the initial plea.  Do you

4    understand what the maximum penalties are for each of the

5    counts that's pending against you?

6                   THE DEFENDANT:  Yes, Your Honor.

7                   THE COURT:  Do you need me to go through them

8    one more time or are you okay?

9                   THE DEFENDANT:  No, Your Honor, thank you.

10                  THE COURT:  Paragraph 3.  Paragraph 3 list the

11   essential elements of Counts I and II that the government

12   would have to prove.  Specifically for each count the

13   government would have to prove beyond a reasonable doubt

14   that the Defendant, you, had a duty to pay a tax.  Two, the

15   tax was not paid at the time required by law.  And three,

16   that your failure to pay was willful.  Do you understand

17   that if I accept your guilty plea, the government will not

18   have to prove anything?

19                  THE DEFENDANT:  Yes, Your Honor.

20                  THE COURT:  Paragraph 3 also references the

21   statement of facts attached to the Plea Agreement as

22   Exhibit 1.  Mr. Wise read those into the record and that is

23   something that is not common in my experience.  I just want

24   to ask you about some of those.  I'm not going to go through

25   all of those facts but I want to ask them because it is part

1    of the Plea Agreement that is being presented to me and

2    particularly given our earlier discussion about the fact

3    that those facts are incorporated into the agreement not to

4    prosecute.

5              All right.  So, do you have those in front of

6    you?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  All right.  So in the very first

9    paragraph of Exhibit 1, it says towards the end, it says

10   through at least early 2017 -- I think before that, in the

11   first paragraph, in the second sentence it says from 2017 to

12   2019, you served on the board of Ukrainian energy company

13   and a Chinese private equity fund.  Can you tell me what

14   those companies were?

15             THE DEFENDANT:  The Ukrainian energy company was

16   Burisma, and the Chinese private equity fund was Bohai,

17   Harvest and Rosemont.

18             THE COURT:  And some of this I'm asking just so

19   I understand because there are other references to Ukrainian

20   companies and Chinese companies and I can't tell if they're

21   the same company or not, so that's part of why I'm asking

22   you.  Later in that paragraph, it says through at least 2017

23   you were employed by a prestigious multi-national law firm

24   in an of counsel position.  It says through at least 2017.

25   What were the years, do you remember like how long you

1    worked there?

2           THE DEFENDANT:  Your Honor, I think I was at

3    Boise Schiller 2010, maybe, was when I started, but I am not

4    positive of that.  That's what I believe.

5           THE COURT:  Okay.  And were you in an of counsel

6    position that whole time?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  All right.  Now, it says then that

9    you -- for the work you did, you earned 2.3 million in 2017

10   and 2.1 million in 2018.  Now, you left Boise Schiller in

11   2017, right?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  So, can you tell me how -- I'm

14   trying to understand the 2018 $2.1 million.

15          MR. CLARK:  My understanding, Your Honor, is

16   that sentence picks up the work described in the last couple

17   of sentences, not just the work for Boise Schiller.

18          THE COURT:  Well, Mr. Biden actually knows.

19          THE DEFENDANT:  Yeah, exactly, Your Honor, I

20   believe what the government intended for that sentence was

21   that it was the total income, not just as it relates to my

22   capacity for Boise Schiller.

23          THE COURT:  So for all your work --

24          THE DEFENDANT:  For this work, it's all of the

25   things that are listed above there.

1          THE COURT:  All right.  Thank you.  Okay.  In

2    the next paragraph, it says you have a well-documented and

3    long-standing struggle with abuse and you did tell me

4    already, I'm not going to ask you again about your efforts

5    to treat that.  But when we talk about well-documented, is

6    there a particular thing that we're looking at for where

7    it's documented or is that just based on your discussions?

8          THE DEFENDANT:  Well, I believe the government

9    is referring to a book that I wrote about my struggles with

10   addiction in that period of time in my life.  And quite

11   possibly other news outlets and interviews and things that

12   have been done.

13         THE COURT:  Okay.  In that paragraph, it refers

14   sort of towards the middle, it refers to your struggles with

15   addiction led to the collapse of your most significant

16   professional relationship.  Is that referring to the law

17   firm or something else?

18         THE DEFENDANT:  My business relationship, my

19   business relationships, all of my business relationships,

20   ultimately including the law firm.  I had a business that

21   was Rosemont Seneca advisors, and I had a long-standing

22   business partner from the inception of that company that I

23   started.  And others that all collapsed during that period

24   of time.

25         THE COURT:  So one of the businesses was

1   Rosemont Seneca.  Were there others that collapsed?  The one

2   reference here to Owasco.

3               THE DEFENDANT:  Virtually everything collapsed.

4   Owasco is the holding company for all of the other companies

5   below there.

6               THE COURT:  Okay.  And who was your business

7   partner?

8               THE DEFENDANT:  A gentleman named Eric Schwerin.

9               THE COURT:  All right.  The fourth paragraph

10  says during the calendar year 2017, you earned substantial

11  income including just under a million dollars from a company

12  you formed with a CEO of a Chinese business conglomerate.

13  Is that the same or a different Chinese company from the one

14  you referenced earlier?

15              THE DEFENDANT:  I started a company called

16  Hudson West, Your Honor, and my partner was associated with

17  a Chinese energy company called CEFC.

18              THE COURT:  Who was your partner?

19              THE DEFENDANT:  I don't know how to spell his

20  name, Yi Jianming is the chairman of that company.

21              THE COURT:  Is that company still in existence?

22              THE DEFENDANT:  No.

23              THE COURT:  Okay.  Then it says you made

24  $666,666 from your domestic business interest.  Is that the

25  Rosemont Seneca one?

1              THE DEFENDANT:  Yes, Your Honor, I believe

2    that's what it refers to.

3              THE COURT:  $664,000 from a Chinese

4    infrastructure investment company.  Is that one of the

5    companies we've already talked about?

6              THE DEFENDANT:  I believe so, yes, Your Honor.

7              THE COURT:  Which one is that?

8              THE WITNESS:  I believe CEFC.

9              THE COURT:  Okay.  $500,000 in director's fees

10   from the Ukrainian energy company.  That's the one that you

11   already told me about?

12             THE DEFENDANT:  Same, Burisma.

13             THE COURT:  Burisma.

14             Okay.  48,000 from the law firm.

15             THE DEFENDANT:  Yes.

16             THE COURT:  That's the Boise Schiller?

17             THE DEFENDANT:  Yes, it is.

18             THE COURT:  All right.  Okay.  The bottom of

19   that first page, the final paragraph says that the

20   accountant sent copies of the tax documents, copies of the

21   tax documents to your former business partner.  Is that

22   Mr. Schwerin?

23             THE DEFENDANT:  I believe that's who it's

24   referring to, yes, Your Honor.

25             THE COURT:  All right.  On the next page, at the

1    end of the second paragraph, starting four lines from the

2    bottom in the middle of the line, the paragraph talks about

3    your tax liability.  And it says the end of year liability

4    should not have come as a surprise.  Do you see that?

5              THE DEFENDANT:  I'm sorry, I'm just trying --

6              THE COURT:  That's okay.  Take your time.

7              THE DEFENDANT:  Yes, I see that here.

8              THE COURT:  It says it should not have come as a

9    surprise.  It wasn't a surprise, is that right?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And you knew --

12             THE DEFENDANT:  Well, I don't -- I didn't write

13   this, Your Honor, so the characterization --

14             MR. CLARK:  Can we elaborate the time there,

15   Your Honor?

16             THE COURT:  Yes.

17             MR. CLARK:  So essentially there was a tax

18   treatment that was undertaken in that year, and it changed

19   the tax treatment at the very end of the year for a

20   particular asset.  And so I think the point is, and I didn't

21   write this either, there was substantial influx of income

22   during that year.  There was an issue with this last minute

23   tax treatment change, and so there were expressions at times

24   of surprise at that.  I think the government's point is you

25   knew you made a lot of money, it shouldn't have come as a

1    surprise.

2              THE COURT:  My only concern is when I read this

3    as a lawyer, it shouldn't have come as a surprise, that

4    doesn't preclude Mr. Biden from saying yes, it did.

5              MR. CLARK:  Your Honor's characterization is

6    exactly right.

7              THE COURT:  You're saying it actually was a

8    surprise?

9              MR. CLARK:  In that year.

10             THE COURT:  You guys are okay with that?

11             MR. WISE:  Yes, Your Honor.

12             THE COURT:  All right.  But you did know that

13   you owed tax money, right?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  And your business partner,

16   Mr. Schwerin, told you that no withholdings had been made?

17             THE DEFENDANT:  Yes, Your Honor, I believe that

18   to be the case.

19             THE COURT:  All right.  In the third paragraph,

20   which is actually the second full paragraph, it says on or

21   about March 22nd, 2018, you received a million dollar

22   payment into your Owasco bank account as payment for legal

23   fees for Patrick Ho.

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  Who is that payment received from,

 1    was that the law firm?

 2                THE DEFENDANT:  Received from Patrick Ho, Your

 3    Honor.

 4                THE COURT:  Mr. Ho himself?

 5                THE DEFENDANT:  Yes.

 6                THE COURT:  Were you doing legal work for him

 7    separate and apart from the law firm?

 8                THE DEFENDANT:  Yes, Your Honor.  Well --

 9                MR. CLARK:  That wasn't through Boise Schiller,

10    Your Honor, Mr. Biden was engaged as an attorney.

11                THE COURT:  Right.  So that's why I asked.  You

12    were doing work for him --

13                THE DEFENDANT:  My own law firm, not as counsel.

14                THE COURT:  So you had your own law firm as

15    well?

16                THE DEFENDANT:  I think Owasco PT acted as a --

17    acted as a law firm entity, yeah.

18                THE COURT:  Okay.

19                THE DEFENDANT:  I believe that's the case, but I

20    don't know that for a fact.

21                THE COURT:  Okay.  The final paragraph on the

22    second page of the exhibit says that you received a little

23    bit more than $2.6 million in business and consulting fees

24    from the company you formed with the CEO of the Chinese

25    business conglomerate and the Ukrainian energy company, and

1    -- I guess originally I was asking if that was in addition

2    to the money you had received from the -- if that was in

3    addition to the money you had received from the law firm,

4    but I think we clarified earlier that --

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  So I guess what I'm confused about

7    is -- so is that $2.6 million, that was in 2018?

8            MR. CLARK:  That's our understanding, Your

9    Honor.

10           THE COURT:  But it says in the first paragraph

11   of the exhibit for the work that you did for the Ukrainian

12   company and the Chinese company and your domestic

13   businesses, it was $2.1 million.

14           MR. CLARK:  Your Honor, I think actually for

15   this one, and again, we didn't write this, but we don't

16   dispute its accuracy, I think this may summarize a chain of

17   payments that was made over a couple of years.

18           MR. WISE:  Your Honor, as I read that, the

19   reference in the first paragraph is to -- is income and it's

20   more than -- the language is more than 2.1 million in 2018,

21   and by contrast the paragraph Your Honor just pointed out,

22   it's talking about fees he generated at about 2.6 million, I

23   think there were expenses that were business expenses that

24   would be taken from those fees that would get you to a lower

25   income number that's north of 2.1 million.

1           THE COURT:  Okay.  In the first full paragraph

2      on the third one, it says after numerous programs and trips

3      to rehab, you got sober in May of 2019.  Do you see that?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  When I asked you earlier when you

6      last used or were under the influence of a controlled

7      substance or a medication, you said June of 2019.  What was

8      it that you did in June of 2019?

9           THE DEFENDANT:  I was married on May of --

10     May 17th of 2019, and that is my sobriety date.

11          THE COURT:  When I asked you earlier --

12          THE DEFENDANT:  I was being conservative, Your

13     Honor.  I think in between that date to be technically and

14     completely honest from the day that I got married until

15     June 1st, I did have a drink or two.

16          THE COURT:  Okay.

17          THE DEFENDANT:  So I count my sobriety date at

18     least in the program that you attend as June 1st, so that's

19     why I did that.

20          THE COURT:  You said the program you attend.  I

21     thought you -- are you attending a --

22          THE DEFENDANT:  No, a separate program that

23     required anonymity, Your Honor.

24          THE COURT:  Okay.  But I am just trying to make

25     sure that we don't --

1           THE DEFENDANT:  No, no, I'm not saying that

2   there are any programs that I'm involved in right now, I'm

3   saying meetings that I go to, the sobriety date is often

4   quoted.

5           MR. CLARK:  He draws a distinction between

6   treatment and a program.

7           THE COURT:  Okay.

8           THE DEFENDANT:  And it's not --

9           THE COURT:  And I appreciate that, whether we

10  call it a treatment or something, you are doing something to

11  support your sobriety, is that correct?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Okay.  All right.  Then that

14  paragraph says that you did not make preparations to file or

15  actually file your 2018 individual or corporate income tax

16  when it was due in 2019.  Is that right?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  And it was due according to

19  this in October of 2019.  Right?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  And you were sober at that time?

22          THE DEFENDANT:  I was, Your Honor.

23          THE COURT:  But you didn't file your taxes.

24          THE DEFENDANT:  Yes, Your Honor, in putting my

25  life back together, it was a flood, an enormous amount of

1    problems and by the time I was able to find someone to be

2    able to help me, I was already past the deadline in which I

3    should not have gone past.

4              THE COURT:  At the end of the next paragraph, it

5    says that in 2020, during the process of putting together

6    your 2017 and 2018 tax returns, you mischaracterized certain

7    personal expenses as legitimate business expenses.  What's

8    that referencing?

9              MR. CLARK:  Your Honor, it may be better if I

10   explain it because Mr. Biden is actually not that close to

11   the facts.  In essence, in a very compressed time frame,

12   Mr. Biden was asked to identify for all of these tax years

13   that were being done from his credit cards and other bank

14   accounts what's a business expense and what is a personal

15   expense.  And he was asked to go through charts and mark

16   them.  And there are situations in which he made an error

17   with regard to marking business expenses or personal

18   expenses.  In several instances, most of them relate to one

19   account, which was a business line of credit account, which

20   he and his accountants treated as business expenses but that

21   he never reviewed the actual records for because the

22   accountants couldn't get the records.  So we concede that he

23   made mistakes, erroneous mistakes in categorizing some of

24   these business and personal expenses.  And that's what it

25   refers to.

1                THE COURT:  Do you know the approximate amount

2       of money of these mistakes?

3                MR. CLARK:  That's what the discussion of the

4       dispute was.  We see it in not minimizing, around $30,000

5       over the entirety of all the filings.  I think the

6       government thinks it's higher.  But that's part of what

7       we're going to shake out at sentencing.  It is not massive

8       amounts of money from the perspective of these tax returns.

9       And as this points out I think in the next sentence, during

10      the same year that these errors were made, Mr. Biden's

11      accountants erroneously overreported his income by several

12      hundred thousand dollars.  And so there is -- there are

13      errors going both ways in that year, some of them are these

14      mistakes, and that mistake by his accountants.

15               THE COURT:  And just so I understand, are these

16      things that he made these mistakes and gave them to his

17      accountant and then they were corrected or he made these

18      mistakes, gave them to his accountant and then those

19      mistakes ended up in the filing that were ultimately made to

20      the Internal Revenue Service?

21               MR. CLARK:  It was the latter, the accountants

22      didn't catch the mistakes.

23               THE COURT:  And again, sir, this was done after

24      you were already sober?

25               THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  In the next paragraph,

2     there are more references to self-assessed tax.  Is that the

3     same as we discussed previously, the amount of tax that he

4     determined he owed?

5          MR. WISE:  Yes, Your Honor.

6          THE COURT:  And at the top of the last page, and

7     also in I guess the last paragraph, or maybe even all those

8     paragraphs, there is a reference to a third party who paid

9     your tax liability.  Is it the same person who paid all of

10    the outstanding liability?

11         THE DEFENDANT:  Yes, Your Honor.  I took a loan

12    from that individual.

13         THE COURT:  You took a loan?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Do you make payments on that loan?

16         THE DEFENDANT:  Not currently, Your Honor, but

17    it's a normal typical loan with terms and a time frame.

18         THE COURT:  Okay.  All right.  Let's talk now

19    about the paragraph 9, the appellant waiver provision.

20    Mr. Biden, your agreement contains an appellant waiver

21    provision in paragraph 9.  This waiver limits your ability

22    to appeal your sentence.  Have you discussed this waiver

23    with your attorney?

24         THE DEFENDANT:  Yes.  Yes, I have Your Honor.

25         THE COURT:  Are you satisfied with the advice

1    and counsel you have received with respect to the waiver?

2                    THE DEFENDANT:  Yes, I am, Your Honor.

3                    THE COURT:  Now, I can read the waiver to you if

4    you would like me to or you can tell me that you're

5    confident that you understand it.  Do you want me to review

6    it with you?

7                    THE DEFENDANT:  I'm confident that I understand

8    it, Your Honor.

9                    THE COURT:  Do you understand that it is a broad

10   waiver provision and it leaves you with narrow appellant

11   rights should you disagree with your conviction or your

12   sentence?

13                   THE DEFENDANT:  Yes, Your Honor.

14                   THE COURT:  And that it leaves you little

15   ability to challenge your conviction or sentence?

16                   THE DEFENDANT:  Yes, Your Honor.

17                   THE COURT:  Do you understand that it is

18   unlikely that the conditions that would allow you to appeal

19   will occur and you will likely have no relief should you

20   receive a sentence that is different than the one that you

21   anticipate?

22                   THE DEFENDANT:  Yes, Your Honor.

23                   THE COURT:  All right.  I find that the

24   Defendant has knowingly and voluntarily waived his appellant

25   rights.

1              Now, as Mr. Wise said earlier, I want to talk to

2      you a little about the sentencing process in federal court.

3      It's not required in a misdemeanor case, but I am going to

4      ask the United States Probation Office to prepare a

5      presentence investigation report to the Court before

6      sentencing.  You and the government will have a chance to

7      review and challenge the facts in that report.  Do you

8      understand that?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  It's been my responsibility under

11     the statute, 18 United States Code Section 3553(a) to impose

12     a sentence that is sufficient but not greater than necessary

13     to provide punishment and afford deterrents.  Under the

14     current law I have to follow a three-step process.  First, I

15     have to consider the sentencing guidelines that's been

16     calculated by the probation office and any objections to

17     those guidelines.  Then, I have to rule on any motions for a

18     departure from those guidelines and explain how those

19     motions if granted would impact the guidelines.  And

20     finally, I have to consider all of the factors in the

21     statute including personal factors that would help me to

22     determine what an appropriate sentence is.  And that

23     sentence may, again, vary either upwards or downwards from

24     the guidelines.

25             The government has agreed not to oppose a

1       sentence of probation, but it's important that you

2       understand that without reviewing the presentence report, I

3       can't predict for you today whether I will agree that that's

4       an appropriate sentence or not.  Do you understand that?

5                    THE DEFENDANT:  Yes, Your Honor.

6                    THE COURT:  Do you also understand that parole

7       has been abolished and that to the extent that you were

8       given any period of imprisonment, you would not be released

9       on parole from that imprisonment?

10                   THE DEFENDANT:  I understand that, Your Honor.

11                   THE COURT:  Do you understand that if you're

12      sentenced to a term of incarceration followed by a period of

13      supervised release or a period -- if you were given a period

14      of probation, if you are found in violation of the

15      conditions of your supervised release or your probation that

16      that may be revoked and you would have to serve additional

17      time in prison if you were imprisoned or if you were on

18      probation that you might have to serve time in prison?

19                   THE DEFENDANT:  Yes, Your Honor.

20                   THE COURT:  Do you understand that your sentence

21      may include payment of a fine or payment of restitution, and

22      it will include a mandatory special assessment for each

23      offense to which you plead guilty?

24                   THE DEFENDANT:  Yes, Your Honor.

25                   THE COURT:  Have you discussed with your counsel

1    what the sentencing guideline calculation might be for the

2    offenses to which you are pleading guilty?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  And do you understand that if I

5    impose a sentence that is harsher or longer or more severe

6    than the one that you may anticipate, you will still be

7    bound by your plea and will not have the right to withdraw

8    it on that basis?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  All right.  Now I want to talk about

11   some of the rights that you waive if you plead guilty.  Do

12   you understand that you have the right to plead not guilty

13   to this offense, to persist in your plea of not guilty and

14   to have a trial by jury on the offense during which you

15   would also have the right to the assistance of counsel and

16   the right to see and hear all of the witnesses and have them

17   cross-examined on your behalf?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  The standard of proving guilt is

20   beyond a reasonable doubt and it is the highest standard of

21   proof in our justice system.  If the government failed to

22   establish your guilt beyond a reasonable doubt, you would be

23   acquited of the charges against you.  Do you understand

24   that?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Do you understand that at trial you

2    would have the right on your own part to decline to testify

3    or to put on any evidence at all and that if you decided not

4    to testify or to put on any evidence, that could not be used

5    against you?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Do you understand that if the case

8    were to go to trial, it would be the government's burden to

9    prove to the jury, again, beyond a reasonable doubt, each of

10   the essential elements of the offenses charge and the jury

11   would have unanimously agree as to your guilt?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Do you further understand that by

14   entering a plea of guilty, there will be no trial and you

15   will have waived and given up your right to trial by jury as

16   well as the rights associated with that trial?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  I'm going to ask the prosecutor to

19   summarize for us what the government would be prepared to

20   prove if the case were to go to trial.

21         MR. WISE:  Your Honor, I have read in its

22   entirety the factual statement that we would be prepared to

23   prove.

24         THE COURT:  All right.  Do you want to tell me

25   how that meets the essential elements?

1              MR. WISE:  Yes, Your Honor.

2              THE COURT:  I mean, I can figure it out, but I

3     think it's probably worthwhile you telling me.

4              MR. WISE:  The first element, the Defendant had

5     a duty to pay a tax.  The Defendant earned substantial

6     income as the factual statement points out.  And we can go

7     with -- as Your Honor has pointed out, there are several

8     places in the factual statement where it identified where he

9     obviously earned, looking at the first paragraph,

10    2.3 million in 2017 and 2.1 million in 2018, he therefore

11    had a duty to pay a tax on that income.  That is the highest

12    level of summary.

13              The tax was not paid at the time required by

14    law.  Again, even when he received an extension, the tax was

15    due in April of 2018 for calendar year 2017 and in April of

16    2019 for calendar year 2018.  And finally, the failure to

17    pay was willful.  And the Plea Agreement statement of facts

18    describes that despite his addiction issues, he was able to

19    generate significant amounts of income and made financial

20    decisions about how to spend that money, and that those

21    decisions did not include meeting his obligations to pay his

22    taxes.

23              THE COURT:  All right.  Mr. Biden, is there

24    anything you wish to challenge or amend in the government's

25    recitation of proof?

1              THE DEFENDANT:  No, Your Honor.

2              THE COURT:  Do you disagree with any of the

3     government's factual recitations?

4              THE DEFENDANT:  No, Your Honor.

5              THE COURT:  Mr. Clark, do you have any

6     objections or concerns with the government's recitation of

7     proof?

8              MR. CLARK:  I do not, Your Honor.

9              THE COURT:  All right.  Now at this point I

10    would normally ask Mr. Biden how he pleads, but as we've

11    already discussed, the Diversion Agreement is out there in a

12    felony case, it is cross-referenced in the Memorandum of

13    Plea Agreement.  The Plea Agreement is cross-referenced in

14    the Diversion Agreement, so before I ask him how he pleads,

15    I need to understand -- well, ask him how he pleads or

16    decide if I can accept the Plea Agreement, I need to

17    understand the Diversion Agreement.

18             So the felony gun charge here is a bit unusual,

19    and we don't usually make diversion agreements public.  I

20    don't usually see a diversion agreement as the parties up

21    here have hinted, but in fact you all did send it to me and

22    it is referenced in the agreement that is before me in the

23    tax case.

24             So it's a little bit unique in that I have a

25    copy of the Diversion Agreement and that the Diversion

1    Agreement contains what I view to be some nonstandard terms

2    like the broad immunity and a term that invokes the Court or

3    involves the Court as part of that agreement.

4         So given all that, Mr. Wise, why don't you go

5    ahead and summarize the terms of the Diversion Agreement

6    given that the parties have agreed to make it public.

7         MR. WISE:  Yes, Your Honor.  The first under

8    Roman numeral one, the parties to the Diversion Agreement

9    are the United States of America by and through the United

10   States Attorney's Office for the District of Delaware and

11   Robert Hunter Biden.

12        Roman two describes the terms and conditions of

13   the agreement.  Paragraph 1 provides that it's for a

14   two-year period, twenty-four months beginning on the date of

15   approval of this agreement, and that would be when the chief

16   probation officer, Ms. Brey signs it, unless there is a

17   breach as set forth in paragraphs 13 and 14.

18        Paragraph 2 provides that this 24-month period

19   will be known as the diversion period.

20        Paragraph 3 provides that Biden shall waive

21   indictment in relation to the information filed in the gun

22   case, which again is 23cr61 which charges him with one count

23   of knowingly possessing a firearm while an unlawful user or

24   person addicted to a controlled substance in violation of

25   Title 18 United States Code Section 922(g)(3) and 924(a)(2).

1    And the relevant year for the conduct is 2018.

2              Paragraph 4 provides that if Biden complies with

3    his obligations under the agreement, then the United States

4    within thirty days after the expiration of the diversion

5    period will file a motion with the Court seeking the

6    dismissal of the information.

7              Paragraph 5, Biden agrees that the United States

8    has probable cause to bring the charge in the Information

9    and that the charge is not frivolous or made in bad faith.

10   He also agrees at a future time the United States should

11   move to dismiss the information pursuant to this agreement,

12   he will not be a prevailing party with regard to the

13   Information and he waives any possible claims to attorney

14   fees or litigation expenses arising out of the investigation

15   or prosecution of this case.

16             Paragraph 6 provides that in light of the fact

17   that Biden has accepted responsibility for the actions

18   referred to in the statement of facts as Attachment A to

19   this agreement and taken into consideration Biden's candid

20   acknowledgment of his historical drug use as well as his

21   current sobriety and in consideration for the other terms in

22   the agreement, the United States shall divert this matter in

23   the manner set forth in this agreement pursuant to the terms

24   and conditions also set forth in the agreement.

25             Paragraph 7 provides that Biden agrees to waive

1    all defenses based on statute of limitations with respect to

2    charges in the information and any other federal firearm

3    charges that could be brought with respect to the conduct

4    set forth in the statement of fact which again is Attachment

5    A.  And he agrees that the applicable statute of limitation

6    period for any charges arising under the firearms purchase

7    shall be tolled during the diversion period.  He agrees not

8    to assert any speedy trial rights under the Sixth Amendment

9    or Federal Rule of Criminal Procedure 48(b) B or any local

10   rule here in the District of Delaware.

11           Paragraph 8 provides that it is the intent of

12   this agreement for Biden to agree to be subject to the

13   jurisdiction of and venue in the United States District

14   Court for the District of Delaware with respect to the

15   charge set forth in the information and for any federal

16   charges arising out of the firearms purchase set forth in

17   the statement of facts.

18           Paragraph 9 and its subparagraph are the

19   commitments and undertakings of Biden and that includes not

20   purchasing, possessing, attempting to purchase firearms as

21   that term is defined in the relevant statute during the

22   diversion period, consent to a permanent entry in the

23   National Instant Criminal Background Check System such that

24   he will be denied via NICS if he attempts to legally

25   purchase another firearm.

1           And then paragraph C, I'm not going to read the

2     entire paragraph, but it's a provision that the gun in

3     question is forfeited to the United States.

4           Starting at paragraph 10 --

5           THE COURT:  Could I ask to you pause for one

6     second.  I forgot my glasses and I'm going to ask someone in

7     the back to get my glasses, but I didn't want her to open

8     the door and freak people out.

9           All right.  Apologies, go ahead.

10           MR. WISE:  Starting at paragraph 10, or in

11     paragraph 10 and subparagraph are additional conditions

12     applicable to the diversion period and these include that

13     Biden is subject to supervision as directed by U.S.

14     Probation and Pretrial Services; that he continue to

15     actively seek employment; that he refrain from unlawfully

16     possessing controlled substance; that he refrain from using

17     alcohol; that he submit to substance abuse testing and

18     participate in substance abuse treatment as directed by the

19     U.S. Probation and Pretrial Services Office in this

20     district; that he submits to fingerprinting by the FBI and

21     it describes what will be done with that fingerprint and how

22     it will be preserved for a time; that he communicate in

23     writing all international travel plans and provide

24     documentation, if requested, to U.S. Probation and Pretrial

25     and that he not commit a violation of any federal, state or

1    local law.

2              Paragraph 11, in paragraph 11 Biden acknowledges

3    and agrees to the statement of facts that are Attachment A

4    to this agreement and he agrees that they're truthful and

5    accurate.

6              Paragraph 12, Biden agrees that neither he nor

7    anyone else at his direction will make any statement in

8    litigation or otherwise repudiating or contradicting the

9    statement of fact.  If the United States believes such a

10   contrary statement has been made, and such statement

11   constitutes a knowing material breach, then the United

12   States may seek a determination regarding such alleged

13   breach pursuant to the procedures set forth in paragraph 14.

14             Starting in paragraph 13, it lays out the

15   procedure if there is a breach.  First, paragraph 13.  Biden

16   agrees that a knowing failure to abide by or fully perform

17   any of the terms, promises, or agreements set forth in this

18   Agreement shall constitute a breach of this Agreement.

19             Paragraph 14 provides that if the United States

20   believes that a knowing material breach of this Agreement

21   has occurred, it may seek a determination by the United

22   States District Judge for the District of Delaware with

23   responsibility for supervision of this agreement.  Upon

24   notice to Biden the United States may seek a determination

25   on a preponderance of the evidence presented to such

1    District Judge.  Biden shall have the right to present

2    evidence to rebut any such claim.  If after that process the

3    judge overseeing such process makes a final determination

4    that Biden has committed a knowing material breach of this

5    agreement, then the United States may elect from two

6    remedies that are specified in the agreement depending on

7    the nature and seriousness testify breach.

8              Remedy 1, which is a sub A of paragraph 14 is

9    the United States may give Biden a specific time period in

10   which to remedy the breach.  If the United States determines

11   that Biden has failed to remedy the breach during the

12   specified time period, then the United States may elect

13   Remedy 2.  Remedy 2 is the United States may prosecute Biden

14   for any federal criminal violation in which the United

15   States has knowledge including crimes relating to the

16   conduct set forth in the statement of facts, which is

17   Attachment A, and that includes obstruction of justice and

18   any such prosecution is not time barred by any statute of

19   limitation on the date of signing of this agreement,

20   notwithstanding the statute of limitation between the

21   signing and the commencement of such prosecution.

22             And finally, the United States does not require

23   to offer Remedy 1 before proceeding to Remedy 2 if in its

24   sole determination the nature and the serious of the breach

25   warrants termination of the agreement.

 1              Paragraph 15 is the agreement not to prosecute.

 2    The language, the United States agrees not to criminally

 3    prosecute Biden outside the terms of this agreement for any

 4    federal crimes encompassed by the attached statement of

 5    facts, Attachment A, and the statement of facts attached as

 6    Exhibit 1 to the Memorandum of Plea Agreement filed this

 7    same day.  This Agreement does not provide any protection

 8    against prosecution for any further conduct by Biden or by

 9    any of his affiliated businesses.  Obviously this paragraph

10    has been orally modified by counsel for Mr. Biden and we

11    would -- I'm not going to attempt to paraphrase it.  I don't

12    want to make the record muddy.  The statement by counsel is

13    obviously as Your Honor acknowledged a modification of this

14    provision, and that we believe is binding.

15              Paragraph 16, starting paragraph 16, there are

16    general terms and conditions, the parties consented to the

17    public disclosure of this agreement, and shall be publicly

18    filed.  The parties stipulate and agree that the conduct set

19    forth in the statement of facts does not constitute relevant

20    conduct for the offenses, to the tax offenses, which Your

21    Honor has identified as a similar provision in the Plea

22    Agreement, that the firearms offense is not relevant conduct

23    for the tax charge.

24              Paragraph 18 this agreement may be executed in

25    counterparts, each of which constitutes an original and all

```
 1        of which constitutes one and the same agreement.

 2                    And paragraph 19 is an incorporation agreement

 3        like in the Plea Agreement, this agreement sets forth all of

 4        the terms of the agreement between the United States and

 5        Biden.  It constitutes a complete and final agreement

 6        between the United States and Biden in this matter.  There

 7        are no other agreements written or otherwise modifying the

 8        terms, conditions or obligations of this agreement.  No

 9        future modifications or additions of this agreement in whole

10        or in part shall be valid unless they are set forth in

11        writing or signed by the United States, and Biden and

12        Biden's counsel.

13                    THE COURT:  All right.  Thank you.

14                    Mr. Clark, any corrections you want to make?

15                    MR. CLARK:  No, Your Honor.

16                    THE COURT:  The information charges Mr. Biden

17        with violation of 18 United States Code 922(g)(3).  Does

18        anyone have any concerns about the constitutionality of that

19        charge in light of the recent Third Circuit *Range* case?

20                    MR. WISE:  No, Your Honor.

21                    MR. CLARK:  Your Honor, I note our -- that's one

22        of the reasons the parties I think are in the disposition we

23        are in.  We don't waive in a later prosecution any

24        challenges on that.

25                    THE COURT:  I completely understand that.  That
```

1    was kind of why I was asking the government the question.

2                So if 922(g)(3), which makes it unlawful for a

3    drug user addict to possess a gun were found by some court

4    to be unconstitutional, what happens to the Diversion

5    Agreement?

6                MR. WISE:  Your Honor, the Diversion Agreement

7    is a contract between the parties so it's in effect until

8    it's either breached or a determination, period.

9                MR. CLARK:  I can tell you our intention would

10   be to abide by the agreement and only raise such

11   constitutional determining at such time that somebody tried

12   to bring any charges on this, otherwise it's an agreement

13   between the parties.  We are going to honor the agreement.

14               THE COURT:  I have had one or two cases

15   involving a person struggling with addiction who bought a

16   gun, we usually see a felony charge for false statement.

17   The Defendant has admitted that his statement was false, but

18   he wasn't charged.  Again, I'm not trying to get into the

19   purview of the prosecutor, and I understand the separation

20   of powers, it's in your discretion, but I just want to ask,

21   does the government have any concern about not bringing the

22   false statement charge in light of our discussion of

23   922(g)(3) and the constitutionality of that charge.

24               MR. WISE:  No, Your Honor.

25               THE COURT:  Paragraph 7 says that the statute of

1    limitations is waived.  Can you just tell me when would the

2    statute of limitation be waived on a charge for false

3    statement if the Diversion Agreement were not in place?

4              MR. CLARK:  When would it run, Your Honor?

5              THE COURT:  I understand it's tolled by the

6    agreement.  I have concerns about the agreement, that's why

7    I'm asking these questions, so if the agreement weren't

8    there.

9              MR. CLARK:  It would be October 2023.

10             MR. WISE:  October 12th, 2023.

11             THE COURT:  All right.  Thank you.

12             All right.  Now I have reviewed the case law and

13   I have reviewed the statute and I had understood that the

14   decision to offer the defendant, any defendant a pretrial

15   diversion rest squarely with the prosecutor and consistent

16   with that, you all have told me repeatedly that's a separate

17   agreement, there is no place for me to sign off on it, and

18   as I think I mentioned earlier, usually I don't see those

19   agreements.  But you all did send it to me and as we've

20   discussed, some of it seems like it could be relevant to the

21   plea.

22             One provision in particular stands out to me,

23   and that is paragraph 14.  That paragraph says if the United

24   States believes that a knowing material breach of this

25   agreement has occurred, it may seek a determination by the

1    United States District Judge for the District of Delaware

2    with responsibility for the supervision of this agreement.

3    It then goes on to say that if I do find a breach, then the

4    government can either give the Defendant time to remedy the

5    breach or prosecute him for the crime that is the subject of

6    the information or any other that falls within the language

7    of the agreement.  Do I have that understanding correct?

8              MR. CLARK:  That's my understanding of the

9    provision, Your Honor.

10             THE COURT:  So can you tell me what's

11   contemplated by that, how it would work?

12             MR. WISE:  So, Your Honor, obviously the

13   Diversion Agreement covers offenses related to firearms, so

14   if there was a breach, then he could be charged with -- the

15   offenses related to that firearm as well as perjury,

16   obstruction of justice, and any prosecution not barred by

17   the statute of limitations related to that.

18             MR. CLARK:  I think Your Honor may be asking the

19   functionality of your involvement.  And the concept was

20   along the lines of a VOSR where a situation is brought to

21   the Court and the Court would make a factual determination

22   in the first instance that there was a violation of

23   supervised -- I mean, diversion is not supervised release,

24   but in some senses it can be, and so the idea was that the

25   Court would determine whether or not there was a violation

1    and then the government would move on to a remedy.

2               THE COURT:  First it got my attention because

3    you keep telling me that I have no role, I shouldn't be

4    reading this thing, I shouldn't be concerned about what's in

5    these provisions, but you have agreed that I will do that,

6    but you didn't ask me for sign off, so do you have any

7    precedent for that?

8               MR. WISE:  Your Honor, no.  No, I don't have

9    precedent.

10              THE COURT:  As I read it, tell me if I'm reading

11   this correctly, that under the agreement as you all have

12   drafted it the only way that charges could ever be brought

13   is if I have the hearing that you all agreed that I have to

14   have, right?

15              MR. WISE:  Yes.

16              THE COURT:  So if I don't have a hearing or make

17   a finding, no criminal charges can be pursued for the gun

18   charge or any other federal charge within the scope of the

19   agreement not to be prosecuted, right?

20              MR. WISE:   I believe that's right, Your Honor.

21              THE COURT:  So is there some requirement that

22   you have that I have to make that finding that you all

23   agreed that I would without asking?

24              MR. WISE:  Is there some --

25              THE COURT:  Requirement that says I have to make

1      that finding?

2                    MR. WISE:  No.

3                    THE COURT:  And you don't have any precedent for

4      that, right?

5                    MR. WISE:  No, Your Honor.

6                    THE COURT:  Do you have any authority that any

7      Court has ever accepted that or said that they would do

8      that?

9                    MR. WISE:  No, Your Honor, this was crafted to

10     suit the facts and circumstances.

11                   THE COURT:  I'm concerned that that provision

12     makes me a gatekeeper to criminal charges and puts me in the

13     middle of a decision as to whether to bring a charge.  And

14     we already talked about separation of powers and that choice

15     as to whether to bring charges is not -- that's the

16     executive branch, not the judicial branch, so is this even

17     constitutional?

18                   MR. CLARK:  I believe it is, Your Honor, because

19     what the structure makes clear is that Your Honor is just

20     finding facts.

21                   THE COURT:  But no charges -- usually in these

22     agreements, right, Mr. Clark, the prosecutor says we think

23     he breached, and I don't mean to point it out, I'm not

24     saying you're going to breach.

25                   MR. CLARK:  I understand.

1             THE COURT:  We're doing a hypothetical.

2             MR. CLARK:  I understand the question.

3             THE COURT:  The prosecutor says there is a

4    breach, Judge, we got to move forward on the information.

5    You then come forward and you're like, Judge, he didn't

6    breach, review this, okay, so that's the standard.  The

7    government has -- the executive branch has already made a

8    determination we are going to proceed with the charges.

9    Now, the government cannot make the decision to proceed with

10   charges absent involving the Court.

11            MR. CLARK:  Respectfully, Your Honor, I don't

12   think that's the way it's structured and I do think the way

13   it's structured may get some way past your concern.  What it

14   is is that it's not that the government has decided to bring

15   charges, it's that the government believes there is a

16   breach.  In paragraph 14, the government brings the breach

17   to Your Honor and says we need a determination of whether

18   there is a breach.  So it's not a question that we've

19   decided what to opt into, we've decided what to do, we want

20   your -- it's Your Honor, we believe there is a factual

21   dispute between the parties, not a breach, we would like you

22   to make a factual determination.

23            THE COURT:  Why can't you do that in the normal

24   way?  As I read this, the government has no discretion to

25   bring charges if it believes that a breach has occurred

1        unless I opine.

2                    MR. CLARK:  Can we approach and discuss one

3        issue with Your Honor?

4                    THE COURT:  You mean because it's confidential?

5                    MR. CLARK:  Yeah.

6                    THE COURT:  Okay.  You're going to have to make

7        -- you're going to have to make a showing as to why.  As I

8        understand, once we're in court in the Third Circuit, it's

9        essentially strict scrutiny, so can you explain to me why

10       this is something that cannot go on the record?

11                   MR. CLARK:  It relates to the plea discussions

12       between the parties generally which aren't discussed

13       publicly.

14                   THE COURT:  I will allow you to have -- we will

15       have a discussion on the sealed portion, but you're going to

16       have to convince me that it needs to be maintained as

17       sealed.  All right?  Because I can't -- it's hard for me to

18       say that in the abstract if you're saying that's a plea

19       discussion.

20                   MR. CLARK:  Your Honor, let me try to handle it

21       separately.  There was a desire because of there being as

22       Your Honor has seen a tremendous amount of political drag

23       with this Defendant that the normal mechanism that might

24       take place would have the protection of the Court not in the

25       discretion to bring a charge, but in finding a breach, and

1    so that that wouldn't be something that would become more

2    politicized, but rather would be something that the parties

3    could rely on, someone we consider a neutral arbiter to

4    determine the breach, not the charge.

5            THE COURT:  I understand.  Look, I knew why you

6    brought it, okay, I could see why you would want that

7    provision in here, but I don't -- you are putting me -- the

8    government, the executive branch has the discretion to bring

9    charges.  Here, the government does not have discretion to

10   continue to pursue this charge or any other charge unless

11   you include the Court.  And that seems like it's getting

12   outside of my lane in terms of what I am allowed to do.  And

13   thus, I have concerns about the constitutionality of this

14   provision.  That gives me concerns about the

15   constitutionality of this agreement because there doesn't

16   seem to be a separate severability, and that gives me

17   concerns about whether the Defendant has the protection from

18   prosecution that he thinks he's getting if this agreement

19   turns out to be not worth the paper it's written on.

20           MR. CLARK:  Your Honor, all --

21           THE COURT:  My concern is, and part of what I

22   have to do is knowing and voluntary, and I can't let him --

23   I'm not convinced this is a plea under subsection B, but

24   even if it is, and all I have to say is, is it knowing and

25   voluntary.  I can't let him plead to something if he thinks

1    he has protection and he doesn't.

2              MR. CLARK:  Absolutely, Your Honor.  I think the

3    analogy to a VOSR is not a bad analogy.  The government

4    comes to the Court and it says Your Honor, we believe there

5    has been a violation of supervised release.  Unless you,

6    Judge, make a factual finding that that's happened, we can't

7    do what we would normally do with regards to this Defendant.

8    Right?  And again, it's the fact and then the discretion.

9    Right?  And so here it's very analogous to that process

10   which is not a violation of separation of powers.  I

11   understand what your Your Honor is saying.

12             THE COURT:  I think I might need a little bit

13   more on this because it is confusing to me.  But let me --

14   or concerning I should say more than confusing.

15             Let me ask you this, if that provision violates

16   the constitution, what happens to the Diversion Agreement?

17             MR. CLARK:  If that provision violates the

18   constitution, the diversion -- first of all, I'm not aware

19   of a manner in which we can challenge the Diversion

20   Agreement, but if it did, I think we would say that, if it's

21   unconstitutional, right --

22             THE COURT:  The way I'm seeing it is the

23   government decides -- not to be politicized, the government

24   decides we're going to bring a charge and you say no, that's

25   prohibited by the Diversion Agreement, and the government

1    says that Diversion Agreement is unconstitutional.  You

2    don't have the protection of it.  So I'm not going to not

3    voice my concerns when I think that there are -- you know,

4    you telling me we're not going to challenge it, that really

5    doesn't --

6              MR. CLARK:  No, I'm not saying that, Your Honor.

7    Under those circumstances we would have a contractual

8    dispute about this contract between the government and us

9    and that would get litigated like any other contractual

10   dispute would get litigated.  That's what this is.

11             THE COURT:  But what if it is unconstitutional,

12   what happens to the Diversion Agreement?

13             MR. CLARK:  I think it's valid but for this

14   provision.

15             THE COURT:  Is there a severability provision?

16             MR. CLARK:  There isn't, but there is nothing

17   that says it is a unitary contract either, it's kind of half

18   and half.  There is no merger clause or severability clause,

19   so in my -- it's a toss up on that, right, Your Honor.

20             THE COURT:  So if I say that I am not going to

21   do what is requested, what you all have agreed that I am

22   going to do, what happens to the Diversion Agreement?

23             MR. CLARK:  If you're saying it right now in a

24   binding manner --

25             THE COURT:  I'm just asking you, I'm not making

1    a finding, I'm asking you because I'm trying to exercise due

2    deliberation and consideration and make sure that we don't

3    make a misstep.

4              So Mr. Wise, if I say I'm not doing it, your

5    contract has an impossibility in there because nothing can

6    happen, I understand Mr. Clark might say that's fine, Your

7    Honor, but the government, what happens if I say I'm not

8    going to do that, you can agree I'm going to do it, but I'm

9    not?

10             MR. WISE:  So in negotiating these terms we

11   obviously agreed to -- as Your Honor has pointed out, the

12   executive branch has the authority to bring charges, we have

13   agreed to a limitation, if you will, that is predicated on

14   the Court taking certain action.  If the Court declines to

15   take the action contemplated by the agreement, we would have

16   to examine whether there were other ways to seek the

17   enforcement of the agreement.

18             MR. CLARK:  And there is a way to modify the

19   agreement obviously between the parties, Your Honor, so by

20   written modification we could modify that provision if Your

21   Honor said I won't participate.

22             THE COURT:  All right.  So what are you talking

23   about?

24             MR. CLARK:  I'm saying that if Your Honor said

25   I've determined that this isn't proper, I'm not going to

1    participate, we would work on provision, paragraph 19 which

2    says that, you know, we can modify or add to the agreement

3    with the written consent of the parties and we would come up

4    with an alternative dispute resolution system.

5              I personally, Your Honor, I mean, again, I don't

6    mean to hang everything on a VOSR analogy, I have done many

7    of them in my life, I don't think it is unconstitutional, I

8    think it's very fair question from the Court, I don't think

9    it is, but I think if the Court were to determine it was not

10   appropriate, we would modify the contract and you would

11   determine on another dispute resolution.

12             MR. WISE:  The analogy that I would offer, Your

13   Honor, VOSR's statutory framework is many U.S. Attorney's

14   offices' practice around the country have proffer agreements

15   or Queen for a day agreements where a defendant -- a

16   defendant, a witness, a target will sit down, make certain

17   statements pursuant to an agreement and some of those

18   agreements have provisions that in the event that the

19   government believes there is a breach that they lied, they

20   will go to a judicial officer for a determination and if

21   that is the case and the agreement is deemed void, then

22   charges, for instance, 1001 charges making a false statement

23   to a law enforcement officer could be brought.  So I think

24   that's a similar -- and those agreements unlike VOSR are not

25   governed by an elaborate statutory scheme, they're contracts

1    between United States and individuals, but it contemplates a

2    role for a judicial officer that then affects the ability of

3    the government to bring charges.

4                THE COURT:  I take your points on the analogy to

5    the VOSR, but I know, I asked if there is any precedent for

6    this, I was told no.  I was asked if there is any authority

7    for this, I was told no.  And I get the analogy, but I don't

8    think that I can on the fly make the analogy that you're

9    asking me to make or even, you know, you're telling me that

10   this is -- so that this is appropriate.  So I am not sure --

11   I'm not sure what to do with that.  It may be that you're

12   correct, that that's an appropriate analogy, but it may be

13   that you are not.

14               MR. CLARK:  May I propose something, Your Honor?

15   You don't have to -- there is no action again, not to -- I

16   know you don't necessarily want to hear that all the time,

17   that you have to take with a regular Diversion Agreement.

18   Can I propose that Your Honor can take time with regard to

19   this provision, inform the parties, and if you find that the

20   provision is improper, and we can even brief it to you, I'll

21   commit with the government that we'll work under

22   paragraph 19 to implement another procedure.  But again, I

23   don't think that needs to hold up today's disposition.

24               THE COURT:  The problem that I have, I'm not

25   sure that it doesn't.  Again, you all are telling me just

1    rubber stamp the agreement, Your Honor, because all we're

2    doing is recommending a plea.  But it seems like the

3    argument you're making is form over substance.  What's funny

4    to me is you put me right smack in the middle of the

5    Diversion Agreement that I should have no role in, you plop

6    meet right in there and then on the thing that I would

7    normally have the ability to sign off on or look at in the

8    context of a Plea Agreement, you just take it out and you

9    say Your Honor, don't pay any attention to that provision

10   not to prosecute because we put it in an agreement that's

11   beyond your ability.

12            So this is what I am going to do.  These

13   agreements are not straightforward and they contain some

14   atypical provisions.  I am not criticizing you for coming up

15   with those, I think that you have worked hard to come up

16   with creative ways to deal with this.  But I am not in a

17   position where I can decide to accept or reject the Plea

18   Agreement, so I need to defer it.

19            First, I don't know which rule this falls under.

20   I am not convinced that it is actually a plea under

21   subsection B, which you all suggest is me rubber stamping

22   the plea if it's a knowing plea.  But even if it were, I

23   have testimony under oath both that the Defendant is

24   concerned about ensuring that he has immunity from

25   additional charges, and also that well, he doesn't need that

1     in terms of the Plea Agreement.  So I need to think about

2     that.

3              Additionally, I need some understanding as to

4     why this is a plea under B and that my concern about the

5     form over substance of the agreement not to prosecute is not

6     valid, or why I should do this.  So I would like some

7     briefing, additional briefing on why subsection B is the

8     appropriate section, and if I were to determine that this

9     actually is a plea under subsection A, it would be helpful

10    to me to have your views on what it is that makes this plea

11    acceptable, because I'm not saying that it is not, but

12    nobody seems to really have given me that what I would need

13    if I were to determine that as I read this as a whole, I

14    think that that really is what is in front of me.  So I need

15    that.

16             And then I would like as you offered, Mr. Clark,

17    you guys can go back and work on whether or not you can take

18    out that provision and come up with something else that's

19    acceptable, and while you do that, you might, though I'm not

20    trying to tell you how to negotiate the Diversion Agreement,

21    you might fix that one paragraph that you have orally

22    modified today.

23             I would like to understand why that provision,

24    if you want it to go forward is appropriate, and why I am

25    not doing something that gets me outside of my lane in terms

1    of my branch of government if I were to do what is being

2    requested.

3              Does that make sense?

4              MR. CLARK:  That makes sense, Your Honor.  I

5    think that the parties have been very eager to resolve this

6    matter, and it has been pending for an extended period of

7    time.

8              THE COURT:  It hasn't been pending for that long

9    a period of time, I know that when you guys first called,

10   you said you would send me the agreements on a Tuesday or a

11   Thursday and you wanted to have the hearing within a few

12   days.  I couldn't accommodate that schedule, but the fact

13   is, this is a -- this is our normal course of timing of

14   things and so I understand, and I certainly understand why

15   you want to get this resolved, but I am not in a position

16   where I can do that now.  So if you guys want to tell me

17   when you're thinking you can get me the papers that I'm

18   asking for.

19             MR. WISE:  Your Honor, we would -- what I would

20   anticipate is we'll need to order the transcript from

21   today's proceeding to address some of the issues you have

22   raised to make sure we're precisely addressing what you're

23   asking us to, so I think building in a little bit of time to

24   get the transcript and then a reasonable amount of time

25   after that to submit, I would say at least fourteen days.

1               MR. CLARK:  Fine with us, Your Honor.

2               MR. WISE:  I would also say, Your Honor, we're

3    not asking the Court to rubber stamp anything.

4               THE COURT:  It certainly sounds like it.  Tell

5    me again what you think my role is for a plea under

6    11(b)(1)(B).

7               MR. WISE:  It's not what I think the Court's

8    role --

9               THE COURT:  I agree, I read the rule, the rule

10   says I couldn't accept or reject, you're saying it's not a

11   rubber stamp, so what is it I do?

12              MR. WISE:  You don't take action on the Plea

13   Agreement.  What Rule 11(c) says is for Rule (c)(1)(B) the

14   Court must advised the Defendant that the Defendant has no

15   right to withdraw the plea if the Court does not follow the

16   recommendation or request.  So the rule does not contemplate

17   the Court taking any position on the agreement if it's a

18   (c)(1)(B), rather the rule requires the Court to give that

19   advisement, and that is the extent of the Court's role.  And

20   this has been briefed not in this circuit, but in other

21   circuits and we can certainly include that, that's not my

22   view --

23              THE COURT:  I certainly understand what -- if

24   it's a plea under subsection (c)(1)(B), I am not going to

25   just agree with you as to the limits of my role.  My problem

1    is I am not -- I am not sure, and I need to understand the

2    propriety, it may very well be that it is appropriate, but

3    as I said, it did catch my attention, you throw me in there,

4    Judge, you're the gatekeeper and then you take me out of the

5    other aspects of the -- you throw me into the Diversion

6    Agreement and then you take me out of the Memorandum of Plea

7    Agreement.

8            So I cannot accept the Plea Agreement today.  I

9    mean, based on what you just said, Mr. Wise, Mr. Clark, if

10    you want, I can accept a guilty plea while I defer my

11    decision on the Plea Agreement, which the Supreme Court said

12    is appropriate in the *Hyde* case, 520 U.S. 670 (1997), if

13    your client wants to plead guilty pending my determination

14    on the Plea Agreement.

15            MR. CLARK:  We're pleading guilty pursuant to

16    the Plea Agreement, Your Honor, so that would not be

17    something that we would do.

18            THE COURT:  Does that mean that I need to take a

19    plea of not guilty?

20            MR. CLARK:  I believe you do, Your Honor.

21            THE COURT:  All right.  So Mr. Biden, I know you

22    want to get this over with, and I'm sorry, but I do want to

23    make sure that I am careful in my view of this.  So I do

24    need some more information.  And part of that is making sure

25    that your plea gets you what you think it gets and part of

1    it is making sure that I do justice as I'm required to do in

2    this court.  So I need some additional information.  I'm not

3    saying I'm not going to reject the plea, I'm not saying I'm

4    going to accept the Plea Agreement.  I need more

5    information.

6              So at this point I'm just going to ask you,

7    without the Plea Agreement, without me saying that I would

8    agree to the Plea Agreement, how do you plead to the charges

9    that we have been discussing?

10             THE DEFENDANT:  Not guilty, Your Honor.

11             THE COURT:  Thank you.

12             So I will look forward to the parties'

13   submissions.  And after we have a chance to review those, we

14   will either issue an order as to what we're planning to do

15   with the plea or we'll have a status conference or we'll get

16   back here.

17             Do we need to do anything else?  I know that we

18   talked about we were on the clock now.  Can we exclude the

19   time, that gives me some time to look at these for

20   thirty days or not?

21             MR. CLARK:  I would imagine the Court can

22   exclude the time for briefing, yeah.

23             MR. WISE:  We agree, Your Honor.

24             THE COURT:  So we will do that.  And after we

25   see it, we will take a look and get back to you.

1             Mr. Biden, I need you to just stick around for a

2      minute after we adjourn.  I need you -- my deputy is going

3      to ask you to sign the release order that we talked about,

4      and then I need you to go downstairs to the marshals for

5      processing and to catch up with probation.

6                   All right?

7                   THE DEFENDANT:  Yes, Your Honor.

8                   THE COURT:  Anything else that we need to talk

9      about while we are here today?

10                  MR. WISE:  Not on behalf of the United States.

11                  MR. CLARK:  No, Your Honor.

12                  THE COURT:  Thank you.

13                  (Court adjourned at 1:14 p.m.)

14

15             I hereby certify the foregoing is a true and
       accurate transcript from my stenographic notes in the proceeding.
16

17                         /s/ Dale C. Hawkins
                           Official Court Reporter
18                          U.S. District Court

19

20

21

22

23

24

25