DAVID C. WEISS
Special Counsel
LEO J. WISE
Principal Senior Assistant Special Counsel
DEREK E. HINES
Senior Assistant Special Counsel
    950 Pennsylvania Avenue NW, Room B-200
    Washington, D.C. 20530
    Telephone:  (771) 217-6091
    E-mail:     Leo.Wise@USDOJ.GOV, DEH@USDOJ.GOV

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 23-cr-00599-MCS |
| Plaintiff, | |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR SELECTIVE AND VINDICTIVE PROSECUTION AND BREACH OF SEPARATION OF POWERS |
| ROBERT HUNTER BIDEN, | |
| Defendant. | Hearing Date: March 27, 2024 |
| | Hearing Time: 1:00 p.m. |
| | Location:     Courtroom of the |
| |                  Hon. Mark C. Scarsi |

Plaintiff United States of America, by and through its counsel of record, hereby opposes defendant's motion to dismiss for selective and vindictive prosecution and breach of separation of powers (Dkt. 27) (the "Motion").

//

//

//

//

This opposition is based upon the attached memorandum of points and authorities, the filings and records in this case, and any further argument as the Court may deem necessary.

Dated:   March 8, 2024    Respectfully submitted,

            DAVID C. WEISS
            Special Counsel

            LEO J. WISE
            Principal Senior Assistant Special Counsel

            _____

            DEREK E. HINES
            Senior Assistant Special Counsel

            Attorneys for Plaintiff
            UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.      SUMMARY ................................................................................................. 1

II.     FACTUAL BACKGROUND .................................................................... 2

        A.      The Defendant Chose to Commit Serious Tax Crimes .................... 2

        B.      The Defendant Also Chose to Commit Serious Gun Crimes ...................... 4

        C.      The Tolling Agreements and Post-Hearing Conduct of the Defendant
                Do Not Support His Claims ...................................................... 4

        D.      The Grand Jury Returned an Indictment After the Defendant Pled Not
                Guilty to the Information and Agreed it Should be Dismissed .................... 7

III.    ARGUMENT ............................................................................................ 7

        A.      The Defendant Bears the Burden of Proving his Claims with "Clear
                Evidence" and "Objective Evidence" ......................................... 7

        B.      The Defendant's Selective Prosecution Claim Fails Because He Does
                Not Identify a Similarly Situated Person Who Was Not Prosecuted ............ 8

        C.      The Defendant's Selective and Vindictive Prosecution Claims Both
                Fail Because There is No Evidence of Discriminatory Animus by
                Prosecutors .................................................................... 10

                1.      The Defendant failed to identify a legal right that *he* exercised ....... 10

                2.      The Defendant's motion lacks direct evidence of prosecutorial
                        animus. ............................................................. 11

                3.      The motion lacks circumstantial evidence of prosecutorial
                        animus. ............................................................. 12

        D.      The Defendant's Presumption Claim is based on Legitimate Pretrial
                Prosecutorial Conduct, which the Supreme Court Rejected ..................... 16

        E.      Because the Defendant Failed to Establish He Is Entitled to A
                Presumption, the Government Need Not Proffer Reasons ..................... 18

        F.      The Defendant's Novel Separation of Powers Claim is Frivolous ............. 19

        G.      The Defendant's Request for Discovery and a Hearing is Unfounded ....... 20

IV.     CONCLUSION ........................................................................................ 20

# TABLE OF AUTHORITIES

Cases

*Blackledge v. Perry*,
    417 U.S. 21 (1974)................................................................................18

*In re Grand Jury Subpoena, Judith Miller*,
    438 F.3d 1141 (D.C. Cir. 2006)............................................................19

*Mabry v. Johnson*,
    467 U.S. 504 (1984)..............................................................................17

*McCleskey v. Kemp*,
    481 U.S. 279 (1987)..............................................................................10

*Puckett v. United States*,
    556 U.S. 129 (2009)..............................................................................17

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)................................................................................7

*United States v. Alexander*,
    287 F.3d 811 (9th Cir. 2002) ...........................................................8, 10

*United States v. Arenas-Ortiz*,
    339 F.3d 1066 (9th Cir. 2003) ...........................................................7, 20

*United States v. Armstrong*,
    517 U.S. 456 (1996)........................................................................passim

*United States v. Bourgeois*,
    964 F.2d 935 (9th Cir. 1992) ...............................................................20

*United States v. Edmonds*,
    103 F.3d 822 (9th Cir. 1996) ...............................................................10

*United States v. Esposito*,
    968 F.2d 300 (3d Cir. 1992)................................................................18

*United States v. Garza-Juarez*,
    992 F.2d 896 (9th Cir. 1993) .................................................................8

ii

*United States v. Goodwin*,
457 U.S. 368 (1982) ..................................................................passim

*United States v. Hare*,
820 F.3d 93 (4th Cir. 2016) ...................................................20

*United States v. Hastings*,
126 F.3d 310 (4th Cir. 1997) ...................................................9

*United States v. Lewis*,
517 F.3d 20 (1st Cir. 2008) ...................................................9

*United States v. Mardis*,
670 F. Supp. 2d 696 (W.D. Tenn. 2009) ...................................19

*United States v. Molina*,
530 F.3d 326 (5th Cir. 2008) ...................................................19

*United States v. Paramo*,
998 F.2d 1212 (3d Cir. 1993)...........................................17, 18

*United States v. Sellers*,
906 F.3d 848 (9th Cir. 2018) ...................................................20

*United States v. Smith*,
231 F.3d 800 (11th Cir. 2000) ...................................................9

*United States v. Spears*,
159 F.3d 1081 (7th Cir. 1998) ...................................................16

*United States v. Steele*,
461 F.2d 1148 (9th Cir. 1972) .....................................8, 11, 14

*United States v. Texas*,
599 U.S. 670 (2023)...................................................8

*United States v. Torquato*,
602 F.2d 564 (3d Cir. 1979)...................................................9

*United States v. Turner*,
104 F.3d 1180 (9th Cir. 1997) ...................................................10

*United States v. White*,
   928 F.3d 734 (8th Cir. 2019) ............................................................... 9

*United States v. Wilson*,
   639 F.2d 500 (9th Cir. 1981) ............................................................... 8

*Wayte v. United States*,
   470 U.S. 598 (1985) ................................................................ 8, 10, 18

Statutes

18 U.S.C. § 922(g)(3) ........................................................................ 4

26 U.S.C. § 7201 ........................................................................... 4, 7

26 U.S.C. § 7203 ........................................................................... 4, 7

26 U.S.C. § 7206 ............................................................................. 7

26 U.S.C. § 7206(1) ......................................................................... 4

26 U.S.C. § 7206(2) ......................................................................... 4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  SUMMARY

The defendant signed a series of tolling agreements for all charges that were later included in the Indictment in this case. Between the signing of those tolling agreements and the return of an Indictment, the parties engaged in plea negotiations and proposed two agreements to the court in the District of Delaware. When the court did not accept those agreements and asked the parties to consider certain changes, the defendant declined and insisted one of those agreements was already in effect, when it was not. Because it was not in effect, and because he pled not guilty and did not waive venue in Delaware, the government presented the tax charges that were previously under consideration to a grand jury in this district. From this fairly unremarkable set of procedural events, the defendant concocts a conspiracy theory that the prosecution has "upped the ante" to appease politicians who have absolutely nothing to do with the prosecution and are not even members of the current Executive Branch.

The defendant's conspiratorial "upped the ante" claim is nothing more than a house of cards. The defendant fails to refute two facts that completely undermine his theory. First, on July 26, 2023, the government appeared before the court in Delaware for a hearing and at the beginning of that hearing signed the agreements the parties had negotiated.  If the statements by politicians prior to the hearing truly influenced the prosecution in the way the defendant claims they did, why did the government sign the agreements and present them at the hearing? Second, to state an obvious fact that the defendant continues to ignore, former President Trump is not the President of the United States. The defendant fails to explain how President Biden or the Attorney General, to whom the Special Counsel reports, or the Special Counsel himself, or his team of prosecutors, are acting at the direction of former President Trump or Congressional Republicans, or how this current Executive Branch approved allegedly discriminatory charges against the President's son at the direction of former President Trump and Congressional Republicans. The defendant's fictious narrative cannot overcome these two inescapable facts.

Furthermore, the defendant's claims fail as a matter of law. The defendant fails to meet his burden of supporting his motion with "clear evidence" and "objective evidence." *See* Section 3.A. The defendant fails to establish the first element of his selective prosecution claim because he did not identify a similarly situated person who was not prosecuted. *See* Section 3.B. The defendant fails on the second element of his selective prosecution claim and on his vindictive prosecution claim because he did not provide evidence of animus by the actual prosecutors, nor did he connect the alleged animus to any legally cognizable right that *he* exercised. *See* Section 3.C. Additionally, his *apparent* vindictiveness claim fails as a matter of law because it is premised on pretrial prosecutorial conduct—plea negotiations—a theory the Supreme Court has rejected. *See* Section 3.D. Accordingly, the defendant fails to show he is entitled to a presumption. *See* Section 3.E. His separation of powers claim is frivolous. *See* Section 3.F. And his request for discovery and an evidentiary hearing are unsupported by the facts and the law. *See* Section 3.G. Accordingly, the defendant's motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    The Defendant Chose to Commit Serious Tax Crimes

The defendant engaged in a four-year scheme to not pay at least $1.4 million in federal taxes he owed for tax years 2016 to 2019 and to evade the assessment of taxes for tax year 2018 when he filed false returns. Dkt. 1 at ¶ 4. To further this scheme, the defendant subverted the payroll and tax withholding process of his own company, he spent millions of dollars on his extravagant lifestyle rather than paying his tax bills, and, in 2018, he stopped paying his outstanding and overdue taxes for tax year 2015. *Id.* at ¶ 4 (a)-(c). The defendant willfully failed to pay his 2016, 2017, 2018, and 2019 taxes, despite having access to funds to pay some or all of these taxes. *Id.* at ¶ 4(d). Even well after the defendant had regained his sobriety, he chose not to pay his tax liabilities in 2020. *Id.* at ¶ 48. Despite receiving $1.2 million in financial support from a friend to maintain his lifestyle, the defendant did not make payments towards his tax obligations. *Id.* Instead, he spent

hundreds of thousands of dollars on personal expenses, including renting a lavish house on a canal in Venice Beach, California, his Porsche, and media relations services. *Id.*

The defendant also chose to lie to his accountants in 2020, again, after he had regained his sobriety. For example, the defendant falsely claimed extensive business travel in 2018 during a period in which he later described his crack cocaine use as "twenty-four hours a day, smoking every fifteen minutes, seven days a week." *Id.* at ¶ 114. The defendant lied to his accountants by claiming as business expenses $43,696 in stays at the Chateau Marmont with his "merry band of crooks, creeps, and outcasts." *Id.* at ¶¶ 116-118. He falsely claimed that payments for his daughter's apartment rental in New York were business expenses. *Id.* at ¶ 119. He falsely claimed other business expenses, including a $1,500 payment to an exotic dancer, $11,500 in payments to an escort, and a $30,000 payment for his daughter's tuition. *Id.* at ¶¶ 120-122. He falsely claimed that monies paid to women with whom he had personal relationships were wages, reducing his tax burden. *Id.* at ¶ 123. The defendant falsely identified business deductions, including for a Lamborghini rental and hotel stays that he subsequently described as the locations of his months-long drug binge. *Id.* at ¶ 124. He falsely represented to his accountants that a $10,000 payment to a sex club was a business expense. *Id.* at ¶ 130. He falsely represented to his accountants that his business line of credit had been used for business expenses, when in fact he used it to make payments to a strip club and exotic dancer. *Id.* at ¶¶ 132-134. Thus, even after he regained his sobriety, the defendant lied to his accountants in many ways so he could continue to cheat the system and attempt to evade taxes. He then chose to file a false 2018 Form 1120 that falsely categorized personal expenses as business expenses and a false 2018 Form 1040 that underreported his income. *Id.* at ¶¶ 138-144.

Unlike the average American, the defendant earned millions of dollars in income between years 2016 and 2019. *Id.* at ¶ 27. The defendant performed very little actual work for the $7 million in income he was paid during this period. *See id.* The defendant spent nearly $5 million on personal expenses to live an extravagant lifestyle instead of paying his taxes. *Id.* at ¶ 37-38. Then, after announcing his awareness of a federal investigation

in late 2020, the following year (2021) he chose to author, sell, and promote his memoir, *Beautiful Things*, and to release an audiobook in a lucrative deal that heightened his prominence and drew further attention to his crimes.[1]

### B.   The Defendant Also Chose to Commit Serious Gun Crimes

The defendant's crimes were not limited to tax violations. In 2018, he chose to purchase a gun, he chose to lie on background check paperwork by stating he was not addicted to drugs, and he certified that his answers on the paperwork were true, when in fact, he had lied about his addiction. *See generally United States v. Robert Hunter Biden*, Indictment, Dkt. 40 (D. Del). When he later chose to publish his memoir, he included countless admissions about his drug use in 2018 when he possessed the gun.

### C.   The Tolling Agreements and Post-Hearing Conduct of the Defendant Do Not Support His Claims

In July 2021, the Defendant and his counsel signed an agreement tolling the statute of limitations for tax offenses from July 1, 2021, to March 1, 2022. Exh. 1. In March 2022, the Defendant and his counsel signed a second tolling agreement that further tolled the statute of limitations from March 2, 2022, through June 15, 2022. Exh. 2. The scope of the tolling included the following crimes: Willful failure to file a return or pay tax, in violation of 26 U.S.C. § 7203; Tax evasion, in violation of 26 U.S.C. § 7201; Filing a false tax return, in violation of 26 U.S.C. § 7206(1); and Assisting in the preparation of a false tax return, in violation of 26 U.S.C. § 7206(2).  Exh. 1, 2.

As is sometimes the case in a pre-indictment negotiation, the parties negotiated a potential resolution that did not include all the potential charges that were under consideration by the government. On June 20, 2023, the United States filed an information charging the defendant with two counts of failing to pay taxes, in violation of 26 U.S.C. § 7203, and a one-count information charging him with violating 18 U.S.C. § 922(g)(3) and 924(a)(2) related to his illegal gun possession. *See United States v. Hunter Biden*, 1:23-

---

[1] As outlined in the Indictment, the defendant made statements and admissions in the book relevant to the charges against him.

4

CR-61 (hereafter "D. Del. Dkt.") & 1:23-MJ-274 (D. Del.). The parties presented a proposed Plea Agreement and proposed Diversion Agreement to a court in Delaware.

At the hearing on July 26, 2023, the United States tried to move forward with the proposed resolutions. The court deferred a decision on the two proposed agreements at the hearing, ordering further briefing if the parties intended to proceed with those draft agreements. The court stated, "I would like as you offered, [Mr. Biden's counsel], you guys can go back and work on whether or not you can take out [Paragraph 14] and come up with something else that's acceptable, and while you do that, you might, though I'm not trying to tell you how to negotiate the Diversion Agreement, you might fix [Paragraph 15] you have orally modified today." ECF 25-2 at 105. The Court further stated, "I would like to understand why [Paragraph 14], *if you want to go forward*, is appropriate, and why I am not doing something that gets me outside of my lane in terms of my branch of government if I were to do what is being requested." ECF 25-2 at 105 (emphasis added). When the court informed the defendant that it was deferring a decision on accepting both the proposed Plea Agreement and the proposed Diversion Agreement, the defendant chose to plead "not guilty" to the tax information at the hearing.

After the hearing on July 26, 2023, defense counsel asked to meet with the government and proposed changes to both documents. *See* D. Del Dkt. 32 at p. 1-2. The government considered the defendant's proposals but concluded they were not in the best interests of the United States and offered counterproposals on July 31, 2023. *Id.* The government proposed changes to the agreements that addressed <u>only</u> the issues identified during the hearing. Exh. 3. The defendant rejected these counterproposals on August 7, 2023. *Id.* Instead, the defendant began insisting that the proposed Diversion Agreement had bound both parties, even though it had not been approved by the Chief U.S. Probation Officer, a condition precedent to formation that would have brought it into effect. Moreover, by taking this position, he chose to shut down any further negotiations that could address the issues raised at the hearing. *See* D. Del. Dkt. 27 at p.2.

In his motion, in multiple places, the defendant falsely states that DOJ "inexplicably demanded Mr. Biden plead guilty to felonies with jail time." Motion at FN 2, *see also* p. 6, FN 45. He cites nothing in support of his false claims, which is a consistent theme across his motions. The government attaches as Exhibit 3 a redacted letter from the defendant's counsel which confirms the defendant understood that the government had proposed changes to only those paragraphs that were at issue during the hearing, not paragraphs regarding the charges the defendant must plead to or any "jail time" the defendant must serve. As shown in Exhibit 3, the government proposed changes to Paragraphs 14, 15 and 17 of the Diversion Agreement, and Paragraph 5(b) of the Plea Agreement. The government proposed no changes to Paragraph 1 of the Plea Agreement, which required the defendant to plead guilty to two misdemeanors. Nor did the government propose any changes to Paragraph 6 of the Plea Agreement, in which the United States had agreed to recommend a sentence of probation.[2] The defendant rejected these counterproposals and refused further negotiations. *See* Motion at 17 ("The prosecution suggests that it was justified in bringing charges because plea negotiations fell through, but the parties had already reached a substantive agreement.") His newly invented claim in his motion that the government "inexplicably demanded Mr. Biden plead guilty to felonies with jail time" is patently false, unsupported by evidence, and belied by his own letter and representations in his filings in the Delaware case.

Because no agreement was reached between the parties, and because the proposed Diversion Agreement had not entered into effect, *see* Dkt. 35, the government prepared for an indictment as it would in any other case where plea negotiations were unsuccessful and presented the exact same charges it had previously considered prior to plea negotiations, as confirmed by the tolling agreements.[3]

---

[2] The redactions in Exhibit 1 do not include any discussion of proposed changes to paragraph 1 or paragraph 6 because the government did not propose such changes.

[3] Indeed, the defendant also made presentations to the government involving each of the charges in the Indictment, as well as for other charges that were not charged.

**D.     The Grand Jury Returned an Indictment After the Defendant Pled Not Guilty to the Information and Agreed it Should be Dismissed**

On August 11, 2023, the government filed a motion to voluntarily dismiss the tax information without prejudice so that charges could be brought in a district where venue lies. D. Del. Dkt. 31. The defendant did not oppose the motion and stated, "[w]ithout adopting the Government's reasoning, as venue for the existing information does not lie in this District, the information must be dismissed." D. Del. Dkt. 40. The court granted the motion and dismissed the information without prejudice. D. Del. Dkt. 43.

In November and December 2023, the government called over a dozen witnesses to testify before the grand jury in this district. On December 7, 2023, the grand jury returned an Indictment which included the following charges: four counts of willful failure to timely pay tax, for tax years 2016 through 2019, in violation of 26 U.S.C. § 7203 (counts 1, 2, 4, and 9); two counts of willful failure to timely file a tax return, for tax years 2017 and 2018, in violation of 26 U.S.C. § 7203 (counts 3 and 5); attempted evasion of assessment for tax year 2018, in violation of 26 U.S.C. § 7201 (Count 6), and two counts of willfully filing a false and fraudulent tax return (one individual and one corporate), for tax year 2018, in violation of 26 U.S.C. § 7206 (Counts 7 and 8). Dkt. 1. The Indictment included only the charges the defendant acknowledged were already part of the government's criminal investigation when he signed the tolling agreements. Exh. 1, 2.

## III.    ARGUMENT

**A.     The Defendant Bears the Burden of Proving his Claims with "Clear Evidence" and "Objective Evidence"**

Because selective prosecution claims "invade a special province of the Executive," the standard for proving them is "particularly demanding," requiring a defendant to present "clear evidence" that establishes that a prosecutor did not act lawfully. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999); *United States v. Armstrong,* 517 U.S. 456, 463–465 (1996). The standard is a "rigorous" one because it is "designed to minimize interference with the prosecutorial function." *United States v. Arenas-Ortiz*, 339

F.3d 1066, 1069 (9th Cir. 2003). Because the Executive Branch has 'broad discretion' as to whom to prosecute, "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607–08 (1985). In short, "decisions about enforcement of 'the Nation's criminal laws' lie within the 'special province of the Executive.'" *United States v. Texas*, 599 U.S. 670, 679 (2023) (citing *Armstrong*).[4]

Similarly, the defendant bears the burden of establishing a prima facie case for vindictive prosecution and must "prove an improper prosecutorial motive through objective evidence." *United States v. Alexander*, 287 F.3d 811, 818 (9th Cir. 2002). Only objective evidence that indicates "a realistic or reasonable likelihood of vindictiveness may give rise to a presumption of vindictiveness on the government's part." *United States v. Garza-Juarez*, 992 F.2d 896, 906 (9th Cir. 1993). The filing of additional charges after a failed plea negotiation cannot establish such a presumption. *United States v. Goodwin*, 457 U.S. 368, 380 (1982) ("For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.").

## B.   The Defendant's Selective Prosecution Claim Fails Because He Does Not Identify a Similarly Situated Person Who Was Not Prosecuted

The defendant's selective prosecution claim draws on "ordinary equal protection standards" and the defendant must first prove by "clear evidence" that the federal action "had a discriminatory effect." *Armstrong* 517 U.S. at 465. The defendant fails to prove this element because he does not show that persons similarly situated have *not* been prosecuted. *Id*. A "similarly situated person" is "one who engaged in the same type of

---

[4] Federal prosecution necessarily involves decisions to charge only some offenders and "[m]ere selectivity in prosecution creates no constitutional problem." *United States v. Steele*, 461 F.2d 1148, 1159 (9th Cir. 1972). Tax cases are "perhaps the most selective of all" because "with millions of returns, and many thousand that reveal some basis for further investigation, it is not surprising that only a very small number can be prosecuted." *United States v. Wilson*, 639 F.2d 500, 504 (9th Cir. 1981) (acknowledging "limited enforcement resources are deployed to develop the strongest cases for prosecution").

conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant . . . and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000); *United States v. Lewis*, 517 F.3d 20, 27–28 (1st Cir. 2008) ("[a] similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced"); *United States v. White*, 928 F.3d 734, 743 (8th Cir. 2019).

The defendant fails on this first element because he does not identify someone who is similarly situated but was not prosecuted. *See United States v. Torquato*, 602 F.2d 564, 570-72 (3d Cir. 1979) (recognizing defendant's First Amendment political membership claim but finding a "complete absence of evidence" of a similarly situated individual); *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997) (finding delinquent tax filer was "unable to show that there were other persons with similar characteristics who were spared prosecution because of their political affiliation.") The defendant compares himself to only two individuals: Robert Shaughnessy and Roger Stone, both of whom resolved their tax cases civilly for failing to pay taxes. Shaughnessy failed to file and pay his taxes, but he was not alleged to have committed tax evasion. By contrast, the defendant chose to file false returns years later, failed to pay when those returns were filed, and lied to his accountants repeatedly, claiming personal expenses as business expenses. Stone failed to pay his taxes but did timely file his returns, unlike the defendant. Neither Shaughnessy nor Stone illegally purchased a firearm and lied on background check paperwork. And neither of them wrote a memoir in which they made countless statements proving their crimes and drawing further attention to their criminal conduct. These two individuals are not suitable comparators, and since the defendant fails to identify anyone else, his claim fails.[5]

---

[5] The defendant cites media commentary by former Attorney General Eric Holder, who acknowledged that the defendant is not similarly situated to other individuals: "This isn't some kind of ordinary run-of-the-mill tax case, [] this was an abuse of the tax system . . . ." *see* https://transcripts.cnn.com/show/lcl/date/2023-12-07/segment/01. These comments only underscore the severity of the defendant's tax crimes.

**C.  The Defendant's Selective and Vindictive Prosecution Claims Both Fail Because There is No Evidence of Discriminatory Animus by Prosecutors**

To support his selective prosecution claim, the defendant must also establish a second element, discriminatory purpose, and prove that "the decision to prosecute him was made on the basis of an unjustifiable legal standard, such as race, religion, or some other arbitrary factor." *Armstrong,* 517 U.S. at 464. To prove a vindictive prosecution claim based on the filing of an indictment, "the defendant must show vindictiveness on the part of those who made the charging decision." *United States v. Edmonds* 103 F.3d 822, 826 (9th Cir. 1996); *see also Alexander*, 287 F.3d at 818 ("a prima facie case for vindictive prosecution requires that a defendant 'prove an improper prosecutorial motive through objective evidence before any presumption of vindictiveness attaches.") Under both theories, the defendant must show a discriminatory motive by the actual prosecutors, not third parties uninvolved with the prosecution. *McCleskey v. Kemp*, 481 U.S. 279 (1987).[6]

As discussed below, the defendant fails to provide evidence of a legal right he exercised which caused prosecutors in this case to have animus. Moreover, he cites to only two purported actions on the part of prosecutors that he claims meets his burden of establishing prosecutors had an intent to discriminate against him. Because neither of his claims are true, the defendant falls far short of meeting his burden.

**1.  The Defendant failed to identify a legal right that *he* exercised.**

The defendant's motion dodges defining any legal right he exercised. He includes instead only a conclusory allegation that "Mr. Biden is being targeted because of *his* political and familial affiliations, both of which are constitutionally protected, as well as for trying to enforce his legal rights." Motion at 15. His failure to identify facts that support any actual legal right that *he* exercised should end the inquiry and preclude further analysis

---

[6] The Ninth Circuit has explained that "[A]wareness of consequences" is not the same as "intent to discriminate" and the defendant must prove intent by establishing "the government undertook a particular course of action 'at least in part 'because of,' not merely 'in spite of' its adverse effects upon an identifiable group." *United States v. Turner,* 104 F.3d 1180, 1184 (9th Cir. 1997) (citing *Wayte*, 470 U.S. at 610).

1  of his claims. No court has recognized a derivative selective or vindictive prosecution

2  claim based on a family member's exercise of rights.

3        Even if he had specified some legal right that *he* personally exercised, he must show

4  causation between the prosecutorial decision and *his* exercise of that legal right. Because

5  "[t]he imposition of punishment is the very purpose of virtually all criminal proceedings,"

6  a defendant cannot simply point to "[t]he presence of a punitive motivation," since that

7  "does not provide an adequate basis for distinguishing governmental action that is fully

8  justified as a legitimate response to perceived criminal conduct from governmental action

9  that is an impermissible response to noncriminal, protected activity." *Goodwin*, 457 U.S.

10  at 373. The defendant's claim should be denied because he does not establish a connection

11  between this prosecution and any right *he* exercised.

12        2.   <u>The Defendant's motion lacks direct evidence of prosecutorial animus.</u>

13        The defendant fails to include any direct evidence in his motion that establishes

14  animus by prosecutors. The only attempt the defendant makes to link animus directly to

15  prosecutors is his claim that "reports indicate Mr. Weiss himself admitted [the charges]

16  would not have been brought against the average American." Motion at 13. However, his

17  citation does not include a reference to reports (plural), rather it includes a single *New York*

18  *Times* citation, which includes a denial immediately after the quoted excerpt: "A senior

19  law enforcement official forcefully denied the account."[7]  An anonymous account that is

20  "forcefully denied" is not evidence that can satisfy the defendant's burden of producing

21  "clear evidence" of discriminatory intent and animus by prosecutors. Although the Special

22  Counsel did not make the comment, there is nothing discriminatory about the comment

23  itself.  *See United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) (""[m]ere

24  selectivity in prosecution creates no constitutional problem.") The defendant's motion is

25  devoid of any other purported statements or direct evidence by prosecutors.

26

27

28      [7]  *See*  https://www.nytimes.com/2023/08/19/us/politics/inside-hunter-biden-plea-
deal.html.

3.      The motion lacks circumstantial evidence of prosecutorial animus.

Most of the defendant's motion consists of factual assertions about third parties who are not the prosecutors in his case and are irrelevant to his claims, as he conceded in his Delaware reply.[8] As it relates to prosecutors, he argues that this court should draw an "inference" from a "chronology of events" which he claims shows "DOJ changing its charging decisions and upping the ante on Mr. Biden in direct response to political pressure and its own self-interests." Motion at 1, 2. But, the "chronology" he constructs to try to show prosecutors "upping the ante" is built on a series of misrepresentations and distortions by his own counsel. Moreover, an "inference" is not "clear evidence" or "objective evidence." First, the defendant falsely asserts, "DOJ determined no felony charges were warranted." He provides no evidence or citation for his claim, and it should be disregarded because no such determination was ever made. In his motion, the defendant concedes that "[b]etween January 2022 and May 2023, Mr. Biden discussed the alleged tax violations with DOJ and gave several presentations . . ." Motion at 5. Why would the

---

[8] The Defendant states, "[s]ince its inception in 2018, the investigation of Mr. Biden has been compromised by politics." Motion at 1. In his Delaware Reply filed after the government challenged his claims, he conceded that his recitation of disputed events prior to the July hearing were not the basis of his claims:

> The prosecution contests the facts that preceded these events, noting that no charges were brought against Mr. Biden under the Trump Administration and that it was the Biden Administration that held Mr. Weiss over as U.S. Attorney and that later named him Special Counsel. **To be clear, Mr. Biden does not object to the fact that he was investigated or dispute that the prosecution considered a host of different charges . . . he focuses his challenge on the prosecution's decision to abandon the Plea and Diversion Agreement framework it had signed** . . ."

*Reply*, Dkt. 81, at p. 2, FN 1 (emphasis added). In his Motion, however, he again repeats some of these same disputed events that occurred before the July hearing. *See* Motion at pp. 4, 11, 12, FN 33. Given his concession that he was not unlawfully prosecuted during the Trump administration and that his claim is apparently focused on the prosecution's conduct following the July hearing, these claims are irrelevant. Out of an abundance of caution, the government notes that his claims, including "tweets" and "Truth Social" posts he cited as "evidence" were fully addressed in its Response in the Delaware case. *See* Dkt. 68 at pp. 34-39. Since no charges were brought during the Trump administration, his claims that former President Trump is "ground zero for improper motive" is irrelevant.

1   defendant ask the government not to indict him on these charges if the government had
2   already determined they weren't warranted? Moreover, the defendant signed tolling
3   agreements in 2021 and 2022 which show that he understood that the investigation was
4   ongoing and involved all the charges later returned in the Indictment. *See* Exh. 1, 2. The
5   defendant has failed to prove his first allegation that the government "upped the ante."

6       Next, the defendant suggests that informal plea discussions illustrate not one, but
7   two instances where the government "upped the ante," and that these two instances
8   somehow show discriminatory intent. Notwithstanding the ridiculous suggestion that
9   prosecutors cannot engage in plea discussions lest they violate a defendant's constitutional
10  rights if they or their supervisors decide a more significant resolution is warranted, both
11  claimed "antes" are based on distortions. The defendant incorrectly claims that DOJ
12  "proposed a non-prosecution agreement for the gun and tax charges, even though DOJ had
13  already determined the charges should not be brought." Motion at 5. His only support for
14  that claim is a citation to two paragraphs of his own counsel's declaration. However, a
15  review of that declaration shows only that there were discussions between line prosecutors
16  and his counsel about a *potential* non-prosecution agreement. It does not show that a non-
17  prosecution agreement was ever approved by DOJ and sent to defense counsel. These
18  discussions cannot fairly be described as "DOJ's Second Charging Decision," as he claims
19  in his motion. Moreover, during these same negotiations, the line prosecutors and defense
20  counsel discussed whether to resolve the case with a deferred prosecution agreement.
21  Again, the emails attached by the defendant in his other motion, Dkt. 25, clearly show
22  these were merely informal plea discussions at the line prosecutor level that were subject
23  to supervisory approval.[9] It is a farce to call this "DOJ's Third Charging Decision."

---

25      [9] The line prosecutor who engaged with defense counsel repeatedly indicated that
    her discussions were just that—discussions—and that the terms she discussed had not been
26  approved by supervisors within the DOJ. For example, in an email to defense counsel
    dated May 18, 2023, about "a *potential* non-trial resolution," Document 25-5 at p. 73, the
27  AUSA stated, "As I said during our call, **the below list is preliminary in nature and
    subject to change. We have not discussed or obtained approval for these terms**, but
28                                                *(footnote cont'd on next page)*

                                          13

As is the case in many pre-indictment negotiations, the parties negotiated a potential resolution that did not include all potential charges that were being considered by the government. At the hearing on July 26, 2023, the United States in good faith tried to move forward with the proposed resolutions, both the proposed Diversion Agreement and a separate proposed Plea Agreement in the tax case. After the court deferred a decision on the agreements, asked the parties to "go back and work on whether or not you can take out [Paragraph 14] and come up with something else that's acceptable," Dkt. 25-2 at 105:16-19, the government proposed changes to those agreements that would have addressed only those issues raised at the hearing. Exh. 3. The government did not propose any changes to the number or nature of charges in the agreements and the government did not propose changes to the paragraph that contained its recommendation of probation. Exh. 3. Instead, the defendant reversed course and took the unfounded position that the proposed Diversion Agreement had already bound the parties even though it had not been approved by the Chief U.S. Probation Officer, a condition precedent to formation that would have brought it into effect, and even though neither agreement was accepted by the court. *Id.*

It is patently false that the defendant, through his counsel, now claims that DOJ "inexplicably demanded Mr. Biden plead guilty to felonies with jail time." Motion at FN 2, p. 6, FN 45. His claim is contradicted by his counsel's own letter. That counsel is willing to make such a misrepresentation to support this motion only underscores how weak the defendant's arguments are on the facts. In all the correspondence he submitted to the court, he does not identify any evidence of animus by the prosecutors during the history of the

---

are presenting them in an attempt to advance our discussions about a **potential** non-trial resolution . . ." The following week, in an email to defense counsel dated May 23, 2023, Document 25-5 at p. 69, the AUSA stated, "**As we indicated in our emails and discussions we did not have approval for a pre-trial diversion agreement. As you know, that authority rests with the US Attorney who ultimately did not approve continued discussions for diversion related to the tax charges**." In response to this email, defense counsel wrote, "Ok. My client has asked that I speak to you further. Are you able to speak? I may have some slight flexibility." These discussions merely indicate the parties were engaged in conversations at the line prosecutor level and the AUSA repeatedly disclosed that such discussions were subject to approval by the U.S. Attorney.

plea negotiations. This case should be treated no differently than any other case involving pre-indictment plea negotiations. *See United States v. Goodwin,* 457 U.S. at 372 (discussed below). The defendant's fourth claim of "upped ante" is also false.

Finally, what the defendant calls the "Fifth Charging Decision" is actually the first and only indictment that was returned in this tax case. It includes only some of the charges the defendant had agreed to toll during plea negotiations. It was returned only after the defendant balked at further plea negotiations, as he concedes in his motion when he acknowledges he shut down negotiations by (incorrectly) claiming the parties had already reached a substantive agreement that was in effect. Motion at 17.

The defendant's "ante up" claims, constructed on an almost entirely fictitious series of levels, only underscore the absence of actual or apparent prosecutorial animus in this case. The defendant's motion and farcical arc of "upped antes" attempts to transform a seemingly bland set of plea discussions into a conspiracy theory driven by statements of third parties that have absolutely nothing to do with the prosecution.

Although the defendant has not provided clear evidence or objective evidence in support of his claims of prosecutorial animus and it is his burden to do so, the government offers two undisputable facts that rebut the defendant's claims.

***First***, after criticism by politicians about the potential resolution, U.S. Attorney Weiss, and the undersigned counsel acting on his behalf, signed the plea on July 26, 2023, and showed up in court to move forward with the proposed resolutions. If former President Trump and Congressional Republicans really were driving the case against Mr. Biden, why did the government sign the proposed agreements on July 26, 2023—weeks after politicians had railed against them—and why did the government show up at a hearing and urge the court to accept the proposed agreements? If the government wanted to scuttle the plea deal in response to supposed partisan demands, the government wouldn't have signed the proposed agreements and showed up in court arguing for their acceptance. The defendant's claim simply does not withstand scrutiny.

*Second*, to state the obvious, former President Trump is not the President. The defendant's father is the President. The defendant fails to establish how President Biden or the Attorney General, to whom the Special Counsel reports, or the Special Counsel himself, or his team of prosecutors, are being improperly pressured by former President Trump or Congressional Republicans, such that the Executive Branch approved allegedly selective and vindictive charges to be brought against the President's son in violation of the law. The defendant ignores the fact that the Attorney General personally exercised his discretion to direct "a full and thorough investigation" of these matters and conferred on the Special Counsel authority to prosecute this case. *See* Order No. 5730-2023 (Aug. 11, 2023).[10] Thus, the defendant's claims must contend with the presumption of regularity not only for the Special Counsel's decision to prosecute but also for the Attorney General's decision to authorize the prosecution of the defendant. The defendant ignores these facts and offers no evidence that President Biden or the Attorney General had ill-motives when empowering the Special Counsel to pursue this prosecution.

### D. The Defendant's Presumption Claim is Based on Legitimate Pretrial Prosecutorial Conduct, which the Supreme Court Rejected

A presumption of vindictiveness generally does not apply to "pre-trial prosecutorial conduct." *United States v. Spears,* 159 F.3d 1081, 1086 (7th Cir. 1998) ("the Supreme Court has refused to extend the presumption of vindictiveness to pre-trial prosecutorial conduct") (citing cases)*; see Goodwin,* 457 U.S. at 384 ("The possibility that a prosecutor would respond to a defendant's pretrial demand for a jury trial by bringing charges not in the public interest that could be explained only as a penalty imposed on the defendant is so unlikely that a presumption of vindictiveness certainly is not warranted."). The fact that a prosecutor files additional charges after a failed plea negotiation cannot establish a presumption of vindictiveness. *Goodwin*, 457 U.S. at 380 ("For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial,

---

[10]  https://www.justice.gov/d9/2023-08/order.appointment_of_david_c._weiss_as_special_counsel.pdf.

a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.").

In providing a framework for determining which prosecutorial decisions are vindictive and which are not, the Supreme Court has distinguished between a prosecutor's decision to add charges in the pretrial context and such a decision after trial or appeal. In the pretrial context, the Supreme Court recognized that, "by tolerating and encouraging the negotiation of pleas, this Court ha[s] accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his constitutional right to stand trial." *Id.* at 378. Moreover, the addition of charges in the pretrial context does not give rise to a presumption that the prosecutor is acting vindictively. "An initial indictment—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the legitimate interest in prosecution." *Id.* at 380. "In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *Id.* at 381. In short, "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution." *Id.* at 382.

Moreover, "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." *Mabry v. Johnson*, 467 U.S. 504, 507 (1984), *disapproved on other grounds by Puckett v. United States*, 556 U.S. 129 (2009). Plea negotiations in such circumstances may continue, or a prosecutor may choose to add charges, cease negotiations, and go to trial. "A charging decision does not levy an improper 'penalty' unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution." *Goodwin*, 457 U.S. at 380 n.11; *see also United States v.*

*Paramo*, 998 F.2d 1212, 1221 (3d Cir. 1993). Because the defendant's vindictiveness claim is based on legitimate pretrial prosecutorial conduct, he is not entitled to a presumption.

### E. Because the Defendant Failed to Establish He Is Entitled to A Presumption, the Government Need Not Proffer Reasons

Even if the Court were to consider applying a presumption based on pretrial plea negotiations, which it should not, the Court could only apply a presumption where the defendant's objective evidence established a "realistic likelihood of vindictiveness." *Blackledge v. Perry,* 417 U.S. 21, 27 (1974). However, "[w]here the government's conduct is attributable to legitimate reasons, [courts] will not apply a presumption of vindictiveness." *Paramo* at 998 F.2d at 1220 (citing *United States v. Esposito,* 968 F.2d 300, 305 (3d Cir. 1992). To meet his burden, the defendant must establish that the punitive prosecutorial action "was 'brought *solely* to 'penalize' [him] and could not be justified as a proper exercise of prosecutorial discretion." *Goodwin* at 457 U.S. at 380 n.12 (emphasis added). If, and only if, the defendant meets his burden and a court finds that he has established a realistic likelihood of vindictiveness, then the prosecution has "an opportunity to proffer legitimate, objective reasons for its conduct." *Paramo* at 998 F.2d at 1220*; Esposito,* 968 F.2d at 305; *Goodwin,* 457 U.S. at 374. Because the defendant failed to establish actual vindictiveness and because he does not meet his threshold showing of a *reasonable* and *realistic* likelihood of retaliation for his exercise of a lawful right, his claim should be rejected. Unless and until there is an adjudication by this court that there is a "realistic likelihood of vindictiveness," the government need not disclose its deliberative processes and waive any privileges. If the Court does make such a finding, then the government should have an opportunity to proffer legitimate, objective reasons for its conduct. *Paramo*, 998 F.2d at 1220 citing *Esposito,* 968 F.2d at 305.[11]

---

[11] These reasons may include, but will not be limited to, the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan. *Armstrong*, 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at 607).

### F.     The Defendant's Novel Separation of Powers Claim is Frivolous

Relying only on one out-of-district case that <u>denied</u> a defendant's <u>baseless</u> breach of separation of powers claim, he claims "it is the role of this Court to intercede." Motion at 19. He does not explain what he means by "intercede." However, "it is well established that the exercise of prosecutorial discretion is at the very core of the executive function." *In re Grand Jury Subpoena, Judith Miller,* 438 F.3d 1141, 1153 (D.C. Cir. 2006). The power to prosecute is a core executive function. *See Armstrong,* 517 U.S. at 467. The Executive Branch's decisions with respect to its exercise of prosecutorial discretion "are not subject to judicial review absent a showing of actual vindictiveness or an equal protection violation." *United States v. Molina,* 530 F.3d 326, 332 (5th Cir. 2008). Similar to the reasoning in *United States v. Mardis*, 670 F. Supp. 2d 696 (W.D. Tenn. 2009), the only case he relies on, here the defendant's allegations about statements by politicians do not demonstrate that the Legislative Branch has assumed any duties of the Executive Branch. The defendant fails to show how Congress made any prosecutorial act or decision. His request for the Court to invade the province of the Executive Branch should be denied.

Tucked into a reply brief in Delaware, the defendant claimed that the Special Counsel's investigation and recent indictment in the case of *United States v. Alexander Smirnov* "infected this case." D. Del Dkt. 89 at p. 6. Anticipating he may make this claim in his reply here, the government notes the following. Ironically, in his recent congressional testimony before two House Committees, the defendant cited the indictment brought by the Special Counsel in the case of *U.S. v. Alexander Smirnov* as evidence that the Special Counsel had undermined the investigation by Republicans. He claimed, "Smirnov, who has made you dupes in carrying out a Russian disinformation campaign waged against my father, has been indicted for his lies."[12] While the defendant testified to Congress that the Special Counsel had undermined the impeachment inquiry conducted by House Republicans, to this Court he argues instead that the Special Counsel is working

---

[12]     *See* https://oversight.house.gov/wp-content/uploads/2024/02/ Hunter-Biden-Transcript_Redacted.pdf at 14:4-6.

1   at the behest of House Republicans. Motion at 13. Which is it? Indeed, the defendant has

2   no evidence to support his shapeshifting claims because the Special Counsel continues to

3   pursue the fair, evenhanded administration of the federal criminal laws.

4        **G.**    **The Defendant's Request for Discovery and an Evidentiary Hearing is**

5               **Unfounded**

6        The defendant makes the unsupported request that, "if the Court declines to dismiss,

7   it should order discovery and a hearing so that Mr. Biden may provide further support for

8   his claims." Motion at 20. However, it is well established that the standard for discovery

9   for his claims "should be nearly as rigorous as that for proving the claim itself." *See United*

10  *States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018) ("the standard was intentionally hewn

11  closely to the claim's merits requirements."); *Armstrong*, 517 U.S. at 468; *see also United*

12  *States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2016) ("The standard for obtaining discovery in

13  support of a selective prosecution claim is only 'slightly lower' than for proving the claim

14  itself.").[13] The Ninth Circuit has explained, "[a]s has been true historically, it will be the

15  rare defendant who presents a sufficiently strong case of selective prosecution to merit

16  discovery of government documents." *United States v. Bourgeois*, 964 F.2d 935, 939 (9th

17  Cir. 1992). The defendant's motion fails to meet the exacting standards both for the merits

18  of such claims and for seeking discovery in aid of them. Because "[d]iscovery imposes

19  many of the same costs present when the Government must respond to a prima facie case

20  of selective prosecution," both by "diverting prosecutors' resources" and potentially

21  "disclosing the Government's prosecutorial strategy," the Court should deny the

22  defendant's request to go on a fishing expedition instead of preparing for trial. His request

23  for an evidentiary hearing is likewise unwarranted and should be denied.

24  **IV.**   **CONCLUSION**

25        For the foregoing reasons, the defendant's motion should be denied in its entirety.

26

27       [13] The denial of a request for discovery is reviewed for abuse of discretion. *See United States v. Arenas-Ortiz*, 339 F. 3d 1066, 1070 (9th Cir. 2003) ("[m]erely

28  demonstrating that better evidence cannot be obtained without discovery does not suddenly render otherwise insufficient evidence sufficient").