# EXHIBIT F

3/29/24, 3:03 PM
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times
Case 2:23-cr-00599-MCS    Document 66-8    Filed 04/01/24    Page 2 of 18   Page ID #:1164

# Inside the Collapse of Hunter Biden's Plea Deal

An examination of confidential correspondence and interviews with those close to Mr. Biden and lawyers involved in the case show how the deal ultimately fell apart amid schisms and withering external pressures.

  

By Michael S. Schmidt, Luke Broadwater and Glenn Thrush

Aug. 19, 2023

There were signs, subtle but unmistakable, that Hunter Biden's high-stakes plea agreement with federal prosecutors might be on shaky ground hours before it went public in June, according to emails sent by his legal team to the U.S. attorney's office in Delaware.

When one of Mr. Biden's lawyers sent over the draft of the statement they intended to share with the news media, a top deputy to David C. Weiss, who had overseen the inquiry since 2018, asked to remove two words describing the status of the investigation, according to interviews and internal correspondence on the deal obtained by The New York Times. "Concluded" and "conclusion" should be replaced with the weaker "resolved," the deputy said.

Six weeks later, the federal judge presiding over a hearing on the agreement would expose even deeper divisions and the deal imploded, prompting Mr. Weiss to seek appointment as special counsel with the freedom to expand the inquiry and bring new charges.

The deal's collapse — chronicled in over 200 pages of confidential correspondence between Mr. Weiss's office and Mr. Biden's legal team, and interviews with those close to Mr. Biden, lawyers involved in the case and Justice Department officials — came after intense negotiations that started with the prospect that Mr. Biden would not be charged at all and now could end in his possible indictment and trial.

Earlier this year, The Times found, Mr. Weiss appeared willing to forgo any prosecution of Mr. Biden at all, and his office came close to agreeing to end the investigation without requiring a guilty plea on any charges. But the correspondence reveals that his position, relayed through his staff, changed in the spring, around the time a pair of I.R.S. officials on the case accused the Justice Department of hamstringing the investigation. Mr. Weiss suddenly demanded that Mr. Biden plead guilty to committing tax offenses.

Now, the I.R.S. agents and their Republican allies say they believe the evidence they brought forward, at the precise time they did, played a role in influencing the outcome, a claim senior law enforcement officials dispute. While Mr. Biden's legal team agrees that the I.R.S. agents affected the deal, his lawyers have contended to the Justice Department that by disclosing details about the investigation to Congress, they broke the law and should be prosecuted.

"It appears that if it weren't for the courageous actions of these whistle-blowers, who had nothing to gain and everything to lose, Hunter Biden would never have been charged at all," a team of lawyers for one of the I.R.S. agents said in a statement, adding that the initial agreement reflected preferential treatment.

A spokesman for Mr. Weiss had no comment. He is legally barred from discussing an open investigation, and a senior law enforcement official with knowledge of the situation pushed back on the idea that Mr. Weiss had been influenced by outside pressures, and ascribed any shifts to the typical ebb and flow of negotiations.

The documents and interviews also show that the relationship between Mr. Biden's legal team and Mr. Weiss's office reached a breaking point at a crucial moment after one of his top deputies — who had become a target of the I.R.S. agents and Republican allies — left the team for reasons that remain unclear.

3/29/24, 3:03 PM
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times
Case 2:23-cr-00599-MCS    Document 66-8    Filed 04/01/24    Page 4 of 18   Page ID #:1166



Two I.R.S. officials accused the Justice Department of hamstringing their investigation of Hunter Biden. Hailey Sadler for The New York Times

Above all, this inside chronicle of the agreement vividly illustrates the difficulty of the task facing Justice Department officials like Mr. Weiss, who have been called upon to investigate prominent figures at a time of extreme polarization, when the nation's political and criminal justice systems are intertwining in treacherous and unpredictable ways.

No one supervising a comparable inquiry in recent years — like those who oversaw the investigations into Hillary Clinton and Donald J. Trump — managed to smoothly unwind their investigations when they chose not to indict their targets.

Precisely what happens next is unclear. Mr. Biden's top lawyer has quit, and accused prosecutors of reneging on their commitments. And Republicans, who waged an all-out war to discredit the deal, are seeking to maximize the political

3/29/24, 3:03 PM
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times
Case 2:23-cr-00599-MCS   Document 66-8   Filed 04/01/24   Page 5 of 18   Page ID #:1167

damage to President Biden, seeing it as a counter to the four criminal prosecutions of Mr. Trump, their party's presidential front-runner.

Mr. Weiss had a few reasons to ask Attorney General Merrick B. Garland to appoint him special counsel. The status could grant him greater authority to pursue leads around the country, and could provide him with added leverage in a revamped deal with Mr. Biden. But he was also motivated by a requirement to produce a report that would allow him to answer critics, according to people with knowledge of the situation — an accounting that could become public before the 2024 election.

David C. Weiss was appointed special counsel after the implosion of an agreement that would have spared the president's son prison time. Suchat Pederson/The News Journal, via Associated Press

## An Opening Bid

In January, Christopher J. Clark, a lawyer for Hunter Biden, arrived in Wilmington, Del., to push Mr. Weiss to end the investigation into the president's troubled son that had, at that point, dragged on for more than four years.

Mr. Clark began by telling Mr. Weiss that his legacy would be defined by how he handled this decision.

If his host somehow missed the message, Mr. Clark followed up with an even more dramatic gesture, reading a quote from a Supreme Court justice, Robert Jackson, who had been a prosecutor at the Nuremberg trials: Prosecutors could always find "a technical violation of some act on the part of almost anyone" but should never succumb to pressure from the powerful.

That first face-to-face interaction, between a fiery white-collar defense lawyer who has represented Elon Musk and a late-career federal prosecutor known for keeping his gray-haired head down, set into motion months of intense negotiations that led to an agreement that appeared to end Mr. Biden's tax and firearms violations, only to derail over the extent of his immunity from future prosecution.

Mr. Biden's foreign business ventures, especially when his father was vice president and later when he was addicted to crack cocaine, had long raised ethical and legal concerns. In 2018, Mr. Weiss was quietly assigned the Hunter Biden investigation and then kept on by Justice Department officials in the Biden administration to complete the job.

Mr. Weiss cast a wide net from the start, examining a range of Mr. Biden's business dealings, his finances and personal conduct. But the inquiry eventually narrowed.

By late 2022, Mr. Weiss — who relied on the work of I.R.S. investigators, the F.B.I. and lawyers in the Justice Department's tax division — had found some evidence but determined that he did not have sufficient grounds to indict Mr. Biden for major felonies, according to several people familiar with the situation.

Mr. Weiss told an associate that he preferred not to bring any charges, even misdemeanors, against Mr. Biden because the average American would not be prosecuted for similar offenses. (A senior law enforcement official forcefully denied the account.)

But in January, the two sides hunkered down on the business at hand. Mr. Clark first tried to undermine the gun case, arguing that the charge was likely unconstitutional and citing recent legal challenges after the Supreme Court's decision last year expanding gun rights.

Then he took on the tax case, laying out with slides how Mr. Trump's longtime confidant, Roger J. Stone Jr., had failed to pay his taxes for several more years than Mr. Biden but had been allowed to deal with it civilly and had faced no criminal punishment.

Mr. Weiss seemed noncommittal.

If he chose not to charge, members of Mr. Biden's legal team believed Mr. Weiss still wanted something from Mr. Biden — like an agreement to never own a gun again — to show there was some accountability after his long-running inquiry.

Mr. Clark would have to wait awhile to find out.

3/29/24, 3:03 PM
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times
Case 2:23-cr-00599-MCS    Document 66-8   Filed 04/01/24   Page 8 of 18   Page ID #:1170

When Republicans took over the House in 2022, they had pledged to conduct investigations into the younger Mr. Biden. Al Drago for The New York Times

Four months later, on Monday, May 15, a familiar figure reached out to Mr. Clark: Lesley Wolf, a top Weiss deputy with whom Mr. Clark had developed a rapport over the previous two years. In a conference call with the Biden legal team, she acknowledged Mr. Clark's core demand: that his client never be asked to plead guilty to anything.

She then made a proposition — a deal in which Mr. Biden would not plead guilty, but would agree to what is known as a deferred prosecution agreement.

Such a deal allows a person charged with a crime to avoid entering a formal plea if he or she agrees to abide by a series of conditions, like enrolling in drug treatment or anti-violence programs, relinquishing ownership of weapons or forgoing alcohol.

The agreements, widely used to avoid clogging courts and jails with low-level offenders, have legal teeth. If the terms are violated, a person can be charged with the original crimes.

Mr. Clark — knowing Mr. Biden wanted to bring an end to the investigation that had hovered over him, his family and the Biden White House — was amenable. He told Ms. Wolf he would draft language for such an agreement, an opening bid that would kick off final talks.

By Thursday, Mr. Clark and his legal team sent Ms. Wolf their version of an agreement. It made no mention of a guilty plea, but included a promise that Mr. Biden would never again possess a gun and a pledge that he would pay his taxes.

Ms. Wolf suggested additions, including a demand for a statement of facts, a detailed and unflattering narrative of an individual's conduct that had been investigated.

The parties then turned to the most important provision of all, an issue that would ultimately unravel the deal: Mr. Clark's sweeping request for immunity not only for all potential crimes investigated by Mr. Weiss, but also for "any other federal crimes relating to matters investigated by the United States" he might have ever committed.

Ms. Wolf appears to have discarded Mr. Clark's language. Mr. Clark pushed back in a call with Mr. Weiss and the language was replaced with a narrower promise not to prosecute for any of the offenses "encompassed" in the statement of facts.

The end seemed in sight. When the basic outline was hashed out, Mr. Clark asked Ms. Wolf if she was serious about finalizing the agreement — if so, he would fly out to California to explain the terms to his nervous client.

Take the trip, she said.

Mr. Clark ran all of this by Mr. Biden in a meeting at his Malibu house — in a garage where he works on his paintings. He approved the plan.

That Friday, Mr. Clark asked Ms. Wolf if he should stay in California to finalize the deal in Mr. Biden's presence over the weekend.

No, she replied, it would take her a few more days.

Mr. Clark, believing that they were on the brink of a deal, flew back to New York.

3/29/24, 3:03 PM
Case 2:23-cr-00599-MCS  Document 66-8  Filed 04/01/24  Page 11 of 18  Page ID #:1173
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times

Gary Shapley, a veteran I.R.S. investigator, tried to pursue what he believed could be a major break in the Biden investigation. Kenny Holston/The New York Times

## Outcry on Capitol Hill

But on Capitol Hill, the efforts to upend a resolution were gaining momentum.

While Mr. Weiss concluded that there was not enough evidence to charge Mr. Biden with major crimes, not all his colleagues shared that opinion. The perception that Mr. Biden was being treated too softly spurred resistance among some investigators who believed that his office had blocked them from following all leads.

Few were more frustrated than Gary Shapley. A veteran I.R.S. investigator, he had worked major cases and helped take on big bankers. But every time he said he tried to pursue what he believed could be a major break in the Biden investigation, he felt stymied.

When investigators went to interview Hunter Biden, they were told they couldn't approach the house. An attempt to serve a search warrant on Joseph R. Biden Jr.'s guesthouse? Denied. The request to search a storage unit belonging to Hunter Biden? Derailed.

Finally, he reached out to Mark Lytle, a former federal prosecutor, and the men eventually connected with former Republican staff members who had worked for Senator Charles E. Grassley, Republican of Iowa, and had knowledge of federal whistle-blower protections.

Mr. Shapley had been raising concerns internally since at least the fall of 2022, but that winter, he took his allegations to the Justice Department's watchdog, lodging a complaint in February.

By April, Mr. Shapley offered to share insider details with House Republican committee investigators, including his claim that Mr. Weiss had told him that federal prosecutors in Washington and California had refused to bring tax charges against Mr. Biden. His most startling allegation: Mr. Weiss had been so frustrated that he had considered asking Mr. Garland to appoint him as special counsel in late 2022. (Mr. Weiss and Mr. Garland have both denied that account.)

3/29/24, 3:03 PM
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times
Case 2:23-cr-00599-MCS   Document 66-8   Filed 04/01/24   Page 13 of 18   Page ID #:1175

"I am committed to making as much of his report public as possible," said Attorney General Merrick B. Garland, who has minimized contact with Mr. Weiss in hopes of insulating himself from the investigation into the president's son. Kenny Holston/The New York Times

Mr. Shapley requested special protections to bypass legal restrictions on discussing ongoing federal investigations.

It all began to explode into public view on May 15 — the same day Ms. Wolf contacted Mr. Clark — when it was reported that the investigative team that had worked on the case, including Mr. Shapley, had been removed. The next day the chairman of the House Ways and Means Committee fired off a letter to the I.R.S. commissioner demanding an explanation.

Around that time, lawyers for a second tax investigator sent a letter to the I.R.S. commissioner, claiming the team of investigators on the case had been removed after expressing concerns about political interference from the Justice Department.

The letter was quickly made public. The agents' claims were the breakthrough House Republicans had long been seeking.

The I.R.S. investigators had given Congress something genuinely new: summaries of WhatsApp messages that appeared to show Hunter Biden involved in a shakedown in which he had invoked his father, firsthand testimony from people who had reviewed Mr. Biden's finances and the credibility of their long careers at the tax agency.

On May 24, CBS aired an interview with one of the agents. Two days later, he testified behind closed doors before the House Ways and Means Committee, creating buzz on Capitol Hill. The second man testified on June 1. Three weeks later, the committee voted to publicly release transcripts of the testimony, leading to even more news coverage.

3/29/24, 3:02 PM
Inside the Collapse of Hunter Biden's Plea Deal - The New York Times
Case 2:23-cr-00599-MCS   Document 63-8   Filed 04/01/24   Page 14 of 18   Page ID #:1176



Mr. Weiss was quietly assigned to investigate Hunter Biden in 2018, and was kept on by the Biden administration. Doug Mills/The New York Times

# Shifting Ground

As the testimony from the I.R.S. agents took hold, Mr. Biden's legal team felt the ground shift beneath them. The U.S. attorney's office suddenly went quiet.

Early in the negotiations, Ms. Wolf included what seemed like a boilerplate disclaimer in an email, that her team "had not discussed or obtained approval" from her superiors for the terms of the final agreement.

On Tuesday, May 23, after four days of silence, Ms. Wolf delivered unwelcome news. Mr. Weiss had revised what he wanted in the deal, now demanding that Mr. Biden plead guilty to two misdemeanor counts of failing to pay his taxes. It crossed a red line for Mr. Clark.

Erupting in anger, Mr. Clark accused Ms. Wolf of misleading him. He renounced the possibility of any deal, but after consulting with Mr. Biden, reversed course and told Ms. Wolf that Mr. Biden was willing to go along.

Mr. Clark then went to Wilmington to meet the prosecutors, where they hammered out the details of the deal.

By the middle of June, both sides were prepared to announce a deal.

Under the agreement, Mr. Biden would plead guilty to two tax misdemeanors and avert prosecution on the gun charge by enrolling in a diversion program.

Mr. Biden's legal team was eager to issue a statement claiming that the agreement represented the conclusion of the government's investigation. That Monday, June 19, Mr. Clark sent a draft to Shannon Hanson, another Weiss deputy, which clearly stated the investigation was over.

"I can confirm that the five-year long, extensive federal investigation into my client, Hunter Biden, has been concluded through agreements with the United States Attorney's Office for the District of Delaware," it read.

"With the conclusion of this investigation, he looks forward to continuing his recovery and moving forward," it continued.

Ms. Hanson suggested the edit from "has been concluded" to "resolved," and she also asked Mr. Clark to strike the phrase "With the conclusion of this investigation."

But hours after the agreement was announced, confusion set in. In a news release, Mr. Weiss's office said that the investigation was "ongoing," taking Mr. Biden and officials at Justice Department headquarters by surprise.

It was at this critical juncture that Ms. Wolf began to take a significantly reduced role, although it is unclear whether that had anything to do with the Biden case.

In their testimony, the I.R.S. whistle-blowers claimed that Ms. Wolf — who had made a couple of campaign donations to Democrats — had discouraged them from pursuing lines of inquiry that could lead to the elder Mr. Biden.

Around this time, Leo Wise — a senior prosecutor who had spent nearly two decades in the Baltimore U.S. attorney's office — was quietly transferred to the department's criminal division, then detailed to Delaware to add legal firepower to the relatively small Delaware office.

It was his name, not Ms. Wolf's, that appeared on the plea deal. And it was Mr. Wise who was responsible for defending the deal, one he had not negotiated, in front of a federal judge who proved to be unforgiving.

Hunter Biden's plea deal fell apart at the courthouse in the J. Caleb Boggs Federal Building in Wilmington, Del. Kenny Holston/The New York Times

# A Deal Upended

Hunter Biden walked into the Wilmington federal courthouse on July 26, with the expectation that his long legal odyssey was nearing an end.

But there were signs all was not well. Hours earlier, the Republican-controlled House Ways and Means committee had made one final stab at scuttling the agreement, urging the court to consider the whistle-blowers' testimony.

It turned out to be unnecessary.

Judge Maryellen Noreika, a Trump appointee, repeatedly informed the two sides that she would be no "rubber stamp." She picked apart the deal, exposing substantial disagreements over the extent of the immunity provision.

Mr. Clark said the deal indemnified his client not merely for the tax and gun offenses uncovered during the inquiry, but for other possible offenses stemming from his lucrative consulting deals. Mr. Wise said it was far narrower — and suggested the government was still considering charges against Mr. Biden under laws regulating foreign lobbying.

The two sides tried to salvage it, Judge Noreika was not convinced, and Mr. Biden silently left the courthouse under a hail of shouted questions.

*A correction was made on Aug. 19, 2023*: *An earlier version of this article misstated the date of Hunter Biden's plea hearing. It was July 26, not July 31.*

---

When we learn of a mistake, we acknowledge it with a correction. If you spot an error, please let us know at nytnews@nytimes.com.   Learn more

**Michael S. Schmidt** is a Washington correspondent covering national security and federal investigations. He was part of two teams that won Pulitzer Prizes in 2018 — one for reporting on workplace sexual harassment and the other for coverage of President Trump and his campaign's ties to Russia. More about Michael S. Schmidt

**Luke Broadwater** covers Congress. He was the lead reporter on a series of investigative articles at The Baltimore Sun that won a Pulitzer Prize and a George Polk Award in 2020. More about Luke Broadwater

**Glenn Thrush** covers the Department of Justice. He joined The Times in 2017 after working for Politico, Newsday, Bloomberg News, The New York Daily News, The Birmingham Post-Herald and City Limits. More about Glenn Thrush

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: How Plea Deal Went Off Track For Biden's Son