# EXHIBIT AA

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   ███████████

Thursday, June 1, 2023

Washington, D.C.

The interview in the above matter was held in room 5480, O'Neill House Office Building, commencing at 9:41 a.m.

Present:   Representative Jason Smith.

<u>Appearances:</u>

For the COMMITTEE ON WAYS AND MEANS:

██████████, MAJORITY COUNSEL

██████████, MAJORITY COUNSEL

██████████, MAJORITY COUNSEL

████████████, MAJORITY STAFF

████████████, MAJORITY STAFF

████████████, MAJORITY COUNSEL

██████████████, MINORITY COUNSEL

████████████, MINORITY COUNSEL

██████████████████, MINORITY COUNSEL

For ████████████:

DEAN ZERBE

PARTNER

ZERBE, MILLER, FINGERET, FRANK AND JADAV, LLP

████████████████████

████████████

<u>MAJORITY COUNSEL 1.</u>    Let's go on the record.

Good morning.

This is a transcribed interview of an Internal Revenue Service criminal investigator.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on May 24th, 2023, indicating your desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Could the witness please state your name for the record?

Mr. ██████.   It's ██████████.

<u>MAJORITY COUNSEL 1.</u>    And counsel for the witness, please state your names for the record.

Mr. <u>Zerbe.</u>    Dean Zerbe.

<u>MAJORITY COUNSEL 1.</u>    On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is ██████████.   I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else here from the committee introduce themselves, starting with the chairman.

Chairman <u>Smith.</u>    Jason Smith, chairman of the Ways and Means Committee.

<u>MAJORITY COUNSEL 2.</u>    ██████████, also with the Ways and Means Committee staff.

<u>MAJORITY COUNSEL 3.</u>    ██████████, Ways and Means majority staff.

Ms. ████.   ██████████, Ways and Means majority staff.

Ms. ███. ████████, Ways and Means majority staff.

<u>MINORITY COUNSEL 1.</u> ████████, Ways and Means minority staff.

Ms. ███. ████████, Ways and Means minority staff.

<u>MAJORITY COUNSEL 1.</u>   I'd like to now go over the ground rules and guidelines that we will follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity make an opening statement.

Following your statement, the questions will proceed in rounds.   The majority will ask questions first for 1 hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.   We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break, apart from that, please just let us know.

As you can see, there's an official court reporter taking down everything we say to make a written record.   So we ask that you give verbal responses to all questions.

Do you understand?

Mr. ████.   Yes, I do.

<u>MAJORITY COUNSEL 1.</u>   So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on the staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone down at the end of the table can hear you.   It is important that we do not talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete and truthful manner

possible, so we will take our time.    If you have any questions or if you do not understand one of our questions, please let us know.    Our questions will cover a wide range of topics, so if you need clarification at any point, just let us know.

If you honestly don't know the answer to a question or do not remember it, it's best not to guess.    Please give us your best recollection.    It is okay to tell us if you learned information from someone else.    Just indicate how you came to know the information.

If there are things you do not know or cannot remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with your counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that by law you're required to answer questions from Congress truthfully.

Do you understand?

Mr. ████.    Yes, I do.

MAJORITY COUNSEL 1.    That also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. ████.    Yes, I do.

MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements under 18 U.S.C.    Section 1001.

Do you understand that?

Mr. ████.    Yes, I do.

MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful answers to today's questions?

Mr. ████.    No, there is not.

MAJORITY COUNSEL 1.    I would like to note that the information discussed here today is confidential.    As an IRS investigator, I know you understand the significance of our tax privacy laws.    Chairman Smith takes those tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

I'm sure you know 26 U.S.C. Section 6103 makes tax returns and returns information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, the statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. ████.    I did.

MAJORITY COUNSEL 1.    Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. ████.    I have.

MAJORITY COUNSEL 1.    And do you wish to disclose that information to the committee today?

Mr. ████.   I do.

MAJORITY COUNSEL 1.   In addition to Section 6103(f)(5), the chairman of the Committee on Ways and Means has the authority under Section 6103(f)(4)(A) to designate agents to receive and inspect returns or return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has designated the individuals in this room for the purposes of receiving the information you wish to share.

The chairman considers this entire interview and the resulting transcript as protected confidential information under Section 6103.   That means that this interview can only proceed so long as everyone in the room is properly designated to receive the information.

The chairman has designated the court reporters and the related individuals that provide transcription services to the House of Representatives.

I would like to remind the witness and everyone in the room that 26 U.S.C. Section 7213 makes it unlawful to make any disclosure of returns or return information not authorized by Section 6103.   Unauthorized disclosures of such information can be a felony punishable by fine or imprisonment.

Given the statutory protections for this type of information, we ask that you do not speak about what we discuss in this interview to individuals not designated to receive such information.

For the same reason, any marked exhibits that we use here today will remain with the court reporters so that they can go in the official transcript and any copies of those exhibits will be returned to us when we wrap up.

Your letter to the committee references the fact that you have been removed from a high-profile case and that you are concerned about possible retaliation.

Chairman Smith values whistleblowers and knows that whistleblowers take significant risks when disclosing wrongdoing.    That is why there are legal protections in place for whistleblowers making disclosures to Congress.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers.    The IRS Commissioner replied, quote:    "I can say without any hesitation there will be no retaliation for anyone making an allegation," end quote.

We understand your removal from the case team came subsequent to that testimony from the Commissioner.    This is very troubling, and we will certainly discuss that in more detail today.

That's the end of my remarks.    Is there anything that my colleagues from the minority would like to add?

MINORITY COUNSEL 1.    No.    We'd just like to thank you for coming to talk to us today, and we look forward to hearing your testimony.

MAJORITY COUNSEL 1.    And with that, I'll give you the opportunity to make an opening statement.

Mr. Zerbe.    I don't have as nearly extensive [remarks], but just a couple of points, particularly with the chairman here.

We just want note that if the committee -- we made this point but just to have it -- that if the committee were to elect or choose to release the transcripts, we would ask for strong consideration for his anonymity in terms of that.    You can identify him in terms of his role and position and release the transcript.    But in terms of his identity, his specific name, we would ask that consideration, strong consideration, be given for keeping that anonymous.

And the second is, just a blanket point, is he'll be covering an enormous amount of topics ranging over a number of years today and to the best of his ability, but, obviously, to understand he is doing his best in terms of recall and remembering what is going on and making his best efforts in that.    But, obviously, folks are not infallible on that.    But we'll strive to be as accurate and complete as possible.

So, ██, go ahead.

Mr. ██████.    So as was stated, I am a special agent with the Internal Revenue Service Criminal Investigation.

I wanted to start out by saying I'm coming here to you today after someone from your committee reached out to my counsel to come in and testify.    I paid for my own flight to be here in front of you, as I do not live in the D.C. area.    I have not accepted any payments from anyone in coming here, and I have legal representation through my attorney, Dean Zerbe.

I felt that it was my duty as a government employee to abide by your request, and I think that it's important that all you should know from my recollection of what happened during the Hunter Biden investigation so that we can learn from it, fix some things so justice is served, and create policy so that it doesn't happen again to us in the future.

One thing that I know, people would say about me, is that I'm passionate about my job and my career at the IRS.    I always strive to be the most efficient and best agent I can possibly be, always fighting for justice, and I always try make sure that we are doing the right thing for the right reason.

But in doing the right thing, I've found that people will fight me tooth and nail and do everything in their own power to protect their own self-interests.

So if I get emotional during some of this, I apologize, but this has been 5 years of

my life.    So what's happened has been [difficult] -- yeah.    So I apologize for that.

I'm an American, and my allegiances are to my country and my government.    I'm also a gay man.    I have a husband, two dogs, a home, and a life full of family and friends.    But above all else, I'm a human being.    My sexuality doesn't define me as a person.    It's just who I love.

I'd like to say one more thing regarding this topic of sexuality, especially since it's the start of Pride Month.    But people have said that I'm gay and people have said, because I'm gay and that I am working as the case agent on this investigation, that I must be a far-left liberal, perfectly placed to fit some agenda.    This was stuff that was on social media regarding me.

I can tell you that I am none of those things.    I'm a career government employee, and I have always strived to not let politics enter my frame of mind when working cases.

I've tried to stay so nonpolitical that in the last Presidential election I voted but had decided to not vote for the Presidential candidate because I didn't want to be asked that question in a court proceeding in the future and I didn't want to show any potential bias.

My political beliefs are simple.    I'm as middle of the road as they come but would consider myself to be a Democrat.    When I was younger, I grew up in a conservative household.    I also held conservative beliefs.    But over time those beliefs have changed.

At the end of the day, I will always vote for love, kindness, justice, and fairness, because that's what I believe God would want for all of us.

I heard something recently that I think is overly relevant:    The eyes are useless when the mind is blind.    Basically showing us that you can have the best investigators in the world, but if you don't have prosecutors, people willing to pursue justice, and are constantly putting up roadblocks, you'll never achieve a resolution.

I've been an agent with the IRS since 2010.    In 2007, I received my undergraduate degree in accounting from ██████████ and my MBA from ██████████, so my master's in business administration.    Prior to starting my career at the IRS, I worked as an external auditor for ██████████.

Throughout my career with the IRS, I have held multiple collateral positions, as well as worked a variety of criminal tax and money-laundering investigations.    Over the years, I have received "outstanding" on my performance evaluations in receiving multiple performance awards and have also received a quality step increase, which is one of highest-valued performance awards.

I was [a] healthcare fraud coordinator, worked criminal tax and money-laundering investigations of physicians, pharmacists, and medical billing companies.    I have authored and have been the affiant of multiple physical and electronic search warrants. I have authored and been the affiant on multiple seizure warrants, having seized millions of dollars' worth of criminal proceeds laundered through the purchase of homes, vehicles, jewelry, and the use of bank accounts.

I was a public information officer previously in which I worked as a liaison with the IRS and the U.S. Attorney's Office, our law enforcement partners, and the media partners in helping get publicity for our tax cases.

This collateral duty allowed me to get a whole different perspective of the why we do our job.    If you have a successful criminal tax case and no one hears about it, was it really successful?

The mission of the IRS is clear.    We are to investigate potential criminal violations of the Internal Revenue Code and related financial crimes in a manner that fosters confidence in the tax system and compliance with the law.

My agency has continually worked to show the American public this mission, it's

against the law to commit these tax offenses, and what would happen if they chose to do so.

[In] November of 2018, I transitioned out of being the public information officer and I transitioned to the International Tax and Financial Crimes group out of Washington, D.C., where we specialized in international tax crime tax cases.   We're a specialty group. We sit all over the U.S., and we primarily work international tax cases.

This was around the same time that I had initiated the criminal tax investigation into Robert Hunter Biden.   I will come back to that topic here in a few minutes.

But I wanted to give you guys an example of what I was working prior to this, something very similar that happened in that case, and kind of my perspective on that and the differences between that case and the Hunter Biden case.

While I was working as the public information officer, I took over as the case agent of an extremely complex captive insurance tax investigation.

This investigation was the first of its kind.   It had a lot of issues, to include age of the case, and I was coming in as the second assigned agent, as the previous agent was promoted.   So there's an example of why an agent might drop off [of a case].   They got promoted.

So I came in as the second agent, and I worked the case for approximately 3 years with attorneys from the Tax Division and the U.S. Attorney's Office.

One of the Tax Division attorneys assigned to that case is the same attorney that was assigned in the beginning of the Hunter Biden investigation.   His name is Jason Poole.   He was eventually promoted at DOJ Tax and oversaw the Hunter Biden investigation as [the] chief of [the] Northern [Area].   So chief of DOJ Tax Northern.

I know that Mr. Poole would say how good of an agent I was, how good my work was, and I think he would speak highly of me.

Now, why does this captive investigation matter?

Prior to joining the case, DOJ Tax had approved tax charges for the case and the case was in the process of progressing towards indictment.   Our assigned Assistant United States Attorney was promoted to judge, and DOJ Tax had made the decision to reinvestigate the case.

After working thousands of hours on that captive case, poring over evidence, interviewing witnesses all over the U.S., the decision was made by DOJ Tax to change the approval to a declination and not charge the case.

I was devastated when I found that out, but at the end of the day I understood.

We did everything we could to try to work through the issues and get the captive case ready for indictment.   I fought hard, having meetings with the leaders of my agency and DOJ Tax to try and get it charged.   But at the end of the day it was a difference in opinion, and DOJ Tax didn't want to set precedence.

I'm bringing this up to show you an example of difference in opinion between the investigators and prosecutors when it came to charging.   The captive case and the steps taken were significantly different than what happened with the Hunter Biden investigation, and hopefully I can show you that with my testimony here today.

So I have ultimately made the decision to come forward and agree to your request because I believe I made multiple attempts at blowing the whistle internally at the IRS. One of those was an email that I sent internally to the Commissioner of the IRS and was essentially intimidated and retaliated against after I sent that.

And I will bring that if you guys want.   I can bring that up later on.

Mr. Zerbe.   We can provide that email, right.

Chairman Smith.   Is it the current IRS Commissioner or the acting?

Mr. Zerbe.   Mr. Chairman, yes, it's the current.   This is the one that was in the

newspapers that was attached to the longer letter by Mr. Shapley.   You've essentially got most of the context of that letter.   But, yes, Mr. Chairman, it's within the last 2, 3 weeks.   So yes.

Mr. ███.   So I'm sitting here in front of you right now terrified.   In coming forward, I'm risking my career, my reputation,

and the casework that I'm working outside this investigation.   I believe that the Delaware U.S. Attorney's Office and DOJ Tax have a clear target on me and my supervisor's back, and I believe that they are waiting for an opportunity pounce on us.

My own agency retaliated against me, as I just stated, even after years of essentially being left on an island from them when it came to this investigation.

I did not ask to be in this position, nor do I want to be.   My supervisor, who I wholeheartedly respect, decided to blow the whistle on how this investigation was handled because his red line was crossed.

The timing of when he did that was something that we did not agree on but he felt he had to, and I wasn't going to stop him from doing what he thought was right.

I'd like to note that I wasn't present at the leadership meeting on October 7th, 2022, that Mr. Shapley and leaders from the IRS were a part of with U.S. Attorney David Weiss, the meeting where he made the statements about not being in charge.

I also wanted to continue to protect the record and my ability to testify as the case agent in the future, which is also a part of the reason I didn't come forward to you.

At the end of the day, I worked on a complex criminal tax investigation over the last 5 years, and the investigative process is 99.9 percent done, and we were in the process of bringing the case to indictment.   And I have emails and stuff that I can reference that show that.

Since October of 2022, the Delaware U.S. Attorney's Office and DOJ Tax have

pretty much stopped communicating with me and my team, and we have ultimately been removed and replaced from the investigative team.    I want to make that clear.    We were removed, and they replaced us with a new agent and a new supervisor.

I'm pleased to respond to the committee's request to assist them in oversight work and to provide information through statutorily authorized provisions of 6103(f)(5). I have reason to believe that there was gross mismanagement present throughout this investigation, that there was gross waste of funds relating to the tax dollars spent on investigating this case, and that there was an abuse of authority by DOJ Tax and the Delaware U.S. Attorney's Office.

I will present some evidence now and later, if needed. I will present evidence now and at a later date, if needed.    And I will leave it to you to make your own determinations, based on my testimony and the documents, what they say about the handling of this investigation.    Obviously, we have not provided any documents to you guys so far.

In providing this testimony, I will protect sensitive and secret material, first off. And I will also strive to protect current and ongoing investigations that are spin-offs from the Hunter Biden investigation.

I would also like to mention something else that's very important.    Sometimes I think the excellent work that the investigators did regarding this investigation is being overlooked.

I have worked with some of the best investigators on this team, some of the best investigators, by far the best forensic accountant with the FBI [I have] ever worked with. Amazing, intelligent people from the IRS, an amazing co-case agent who was there for me every step of the way, who took my calls when I felt like I couldn't go on with the investigation anymore because of what was being done and the roadblocks that were

being put in front of me.

My supervisor, Gary Shapley, best supervisor I've ever worked with in my life.   He was someone I could come to whenever I needed to vent, was someone who always fought with his heart and soul to do what was right, even if we didn't agree on the path, and would try to make sure that we always were heard.   He is someone I look up to as a leader in our organization.

Now, as for the prosecutors on the case, which included AUSAs from Delaware and line attorneys from DOJ Tax.   I considered a lot of these people my friends and we spent a lot of time together over the last 5 years.

Their conduct since October of 2022 has honestly been appalling, and I do not think that they are considering the human impact of the decisions they're making.

I have respected their work but think they got lost in the type of investigation they were overseeing.   Looking back on everything, they had the best investigators in the Nation and the prosecutors were the JV squad and weren't up to the task of handling such a big case.   They would often slow-walk investigative steps, often not follow the appropriate investigative procedure, and would say that we couldn't do or had to wait on certain steps because there were too many approvals in front of us.

I recently heard from another case agent on the investigation that the Delaware U.S. Attorney's Office loves to slow-walk cases and overthink everything.   They felt that this was exaggerated tenfold because of this case.

That agent also said that they had to work with this U.S. Attorney's Office.   So they had to keep the status quo and not raise any questions or issues that could potentially hurt that relationship.

I was different.   I was coming in from the outside.   I was able to bring up real issues, challenge their arguments, and it was apparent that they didn't like it.   It was

often met with rolling eyes, dismissing my ideas, and telling me that they would, quote, "think about it."

I started this investigation in November of 2018 after -- so this is going to go through kind of a timeline chronology of the case, just so you guys are aware.

I started this investigation in November of 2018 after reviewing bank reports related to another case I was working on a social media company.    Those bank reports identified Hunter Biden as paying prostitutes related to a potential prostitution ring.

Also included in those bank reports was evidence that Hunter Biden was living lavishly through his corporate bank account.    This is a typical thing that we look for in tax cases -- criminal tax cases, I should say.

In addition, there was media reporting related to Hunter Biden's wife, ex-wife, divorce proceedings basically talking about his tax issues.    And I wanted to quote some of the things that were said in her divorce filing which was public record.

"Throughout the parties' separation, Mr. Biden" -- referring to Hunter Biden -- "has created financial concerns for the family by spending extravagantly on his own interests, including drugs, alcohol, prostitutes, strip clubs, gifts for women with whom he had sexual relationships with, while leaving the family with no funds to pay legitimate bills.

"The parties' outstanding debts are shocking and overwhelming.    The parties have maxed-out credit card debt, double mortgages on both real properties they own, and a tax debt of at least $300,000."

This is all the information that I had in my hand in November when I wanted to open this investigation.

So I began talking with colleagues in my group, and they were asking me why would I want to open up a case like this.    Big cases, big problems was the thing I was

constantly hearing.

I responded to say it shouldn't matter the name of the person on whether we work a tax case or not.    It should be the merit of the evidence, the allegation, and the clear understanding of why we are opening that investigation.    So doing the right thing for the right reason.

After discussing the case with my previous supervisor at the time, Matt Kutz, he made a decision to look into the case further before sending it -- sending the case up for referral.

So I wanted to note something here.    When we get a bank report, a lot of times we are able to take the information in that and bring it over to the U.S. Attorney's Office to say, "Hey, look at this bank report.    We need -- are you guys interested in potentially opening up an investigation?"

So that's typical.    And because we're in D.C., he lived in D.C., we would have taken it to the D.C. U.S. Attorney's Office.

My manager at the time told me, "No, you cannot do that.    That's a tax disclosure issue."    I didn't agree with him because there's been multiple instances where we do that.    That's a normal part of our job.    But he was my manager, and I wasn't going to fight him on it, and he told me that I had to open this up the normal tax administrative way that we would do [for] these cases.

At this point in 2018, I believe that I was the only agent in the U.S. looking into Hunter Biden.    So I immediately drafted a criminal tax initiation package and sent it to my manager for his review.

I wanted to provide an example of something that my SSA [at that time] told me which caused me pause and concern.    This is from what I recall.    But he said a political family like this, you have to have more than just an allegation and evidence related to

that allegation.    In order for this case to move forward, you basically have to show a significant amount of evidence and similar wrongdoing that would basically illustrate a prosecution report.

So he's basically telling me that I have to show more than just non-[filed] tax returns and the information from the ex-wife in the divorce proceedings.

I did not agree with him at this time -- and I told him that we have to treat each taxpayer the same, it shouldn't matter on their name.    But he was my manager and I had to do what he said.

So after three of these initiation packages, he finally allowed me to push this forward to DOJ Tax for their review.

So the way that our grand jury cases -- or the way -- I'm sorry.    The way that our cases work is when the case is referred from IRS to DOJ Tax, the case has to go through our ASAC and SAC, and then it goes to DOJ Tax where they review and approve it and send it to the appropriate venue or jurisdiction.

So in [or] around March or April of 2019, the case went up to DOJ Tax.    And at that time we were told that William Barr made the decision to join two investigations together.    So at that point in time I had found out that Delaware had opened up an investigation related to the bank reports and that that occurred in January of 2019, so 2 months after I started mine.

So when I found out about their case and was told that we had to merge the two, I did a venue analysis.    I showed them that, "Hey, the venue's in D.C.    It's not in Delaware.    We need to work this in D.C."    But, ultimately, I was overruled, and it was determined to send the case, join the two case together, and work everything under Delaware.

So it was at that time that we had learned that the FBI in Delaware were referring

to the Hunter Biden -- were referring to Hunter Biden and the case by the name "Sportsman."

So what were the potential issues I saw with working the case in Delaware?    We were working with a small U.S. Attorney's Office who might not have ever worked a case of this caliber.    Delaware was in the State in which the subject's father lived, and the family was extremely well-known throughout the State, including people on the team. And when I say team, the investigators and prosecutors on the team.

This was later evident by President Joe Biden -- well, he was formerly Vice President at that time -- having to come into the FBI office on an unrelated matter and it being joked with the team.

There's another issue where a magistrate judge in Delaware made an inappropriate comment at the signing of the first electronic search warrant that caused her to remove herself -- that caused her to recuse herself from the investigation.    This set us back an additional 4 months as we had to draft new warrants and redo investigative steps.

I want to correct the record on that and say that that's themself, so just so that we're clear on that.

This is a few of the many issues that we encountered with working the case out of Delaware.    But at the end of the day, I constantly remember telling myself and my co-case agent and my supervisor that these are issues, we have to deal with it -- that we have to deal with -- and there's nothing we can change.

Around the same time in 2019, I had emails being sent to me and the Hunter -- and the prosecutors on the case, the Hunter Biden prosecutors, from my IRS supervisor. So this was Matt Kutz still.

From what I was told by various people in my agency, my IRS supervisor, Matt

Kutz, created memos which he put in the investigative files regarding the investigation potentially violating the subject's Sixth Amendment rights.    He also referred to Donald Trump's tweets at the time.

I recall that at one point I had to go around my supervisor and ask his boss, ASAC George Murphy, to tell him to stop sending me and the Hunter Biden prosecution team these emails and that I was searching media articles on a weekly basis and was aware of everything being written in the media regarding the case.

So one of the first disagreements I recall between the IRS investigators and the prosecutors was the idea of going overt.    When we work criminal tax investigations, there's an IRS policy in place that we need to interview the subject within 30 days of elevating the investigation.

I would like to note that there are reasons why we might wait to interview the subject of an investigation, to include potential undercover work, active crimes continuing to occur, and other covert investigative steps.    But with tax cases, the evidence is typically historical, which allows us to go overt sooner, which is why this is stated in the IRM.

I thought this to be even more true about wanting to go overt, because at the time of starting the investigation Hunter Biden had unfiled returns for 2016 and '17 and had unpaid taxes for '15.    And I wanted to put Hunter Biden on notice in the event that he filed tax returns and potentially paid his taxes.

In a normal investigation, we would typically advise the subject of the criminal investigation, try to get a statement from them, try to get an understanding of why there were unfiled returns.    And it sort of puts us on notice -- or puts them on notice that the IRS is looking into them currently and then it kind of preserves the record in an essence.

I was overruled during multiple meetings almost to the point that I couldn't bring

it up anymore to the attorneys, and they would get visually upset with me.    And I was continually being told that we had to stay covert to preserve potential evidence from the FBI side of the investigation.    I even offered just IRS agents going forward in interviewing the subject, just, "Hey, we have a criminal tax investigation.    We want to talk to you." But it was ultimately overruled.

So I can recall being assured by the AUSAs and DOJ Tax attorneys that we would still be fine with potential Spies evasion charges because other activities would be similar to us interviewing the subject, which included the Senate investigation at the time, as well as the Arkansas case related to Lunden Roberts.

So Spies evasion.    Spies evasion is essentially when you have unfiled returns.    So normally unfiled returns is a misdemeanor.    Spies evasion is a felony.    So it's essentially stating that they willfully evaded the requirement to file and/or pay their taxes, and there were overt acts present, that essentially that's the reason why they unfiled or didn't file the tax returns.

Mr. <u>Zerbe.</u>    Spies is spelled S-p-i-e-s.

Mr. █████.    Thank you.

So we did not end up going overt and conducting interviews until after the 2020 election on December 8th, 2020, after I continually pushed the issue at various meetings.

So I wanted to continue on with this, my memory of events from May 2019 to December 8th, the date we went overt with the case.

So throughout that time period we were obtaining multiple electronic search warrants, so email accounts.    There were QuickBooks accounts.    There was a Dropbox. There was an Apple iCloud.    There was the laptop.

And with Hunter Biden being an attorney, all of this information had to go through a lengthy review.    So it had to go through a filter team, a filter AUSA.    So they're

filtering out any attorney-client privilege documents.    And then ultimately we on the team, on the investigative team, would get the documents to review for relevancy or nonrelevancy.

Throughout this entire time, we're getting these email search warrants.    We're reviewing the records.    We're working as a team.    We're actually bringing in people to do the filter review.

Throughout all this time we're having biweekly meetings.    At these biweekly meetings, I am continually bringing up that we need to go overt.

There came a point in time to where there were some bank reports out there that were going to get released, and they were going to include potentially the names of the investigators from the IRS and the FBI who received those bank reports.

So with that being released in the public, we're like it's going to out our investigation, so we need to come out and go overt with the tax case.

And I remember there were always times to where we were always on an impending election cycle.    It was always the election being brought up.

In early 2020, it was the midterms.    I think that Iowa was the very first one where we weren't sure what we were allowed to do or we weren't -- it was always wait and see. And then ultimately --

Mr. Zerbe.    Correct.    So when you say the midterms, you mean the caucuses and the primaries for the Presidential run?

Mr. ██████.    Yeah.    No, I'm sorry.    I mean the -- exactly.    I'm sorry.    The primaries.

So we on our side were preparing for the day of action.    We were trying to establish who were the witnesses we wanted to talk to, who were -- we wanted to do search warrants.    We wanted to do search warrants of physical residences.

In a failure to file case, that's typically what you want to do, is search warrants. So get inside the house and get evidence related to the unfiled returns, see if they were trying to get their returns filed and just never ended up doing it.

We were always talking about those search warrants, talking about going overt. And it was always we need [to] go through the evidence.   We need to go through all [of] the search warrant records.   We need to make sure that we've kind of gone through everything before we go overt.

And we didn't agree with it.   We pushed this up our management chain that we didn't agree with it.

Our leadership, so leadership within my office, my S-A-C, my SAC, she agreed that we needed to go overt, but at the end of the day they outweighed us on this.

One other thing I would like to note is September 4th, 2020, we had a conference call and [DOJ Tax and Delaware USAO] told us essentially that we were on pause from any overt activities or any activities that could be overt whatsoever.   So we couldn't -- we weren't allowed to issue subpoenas.

So I have an example of this -- so October 20th, 2020, right before the election, we're getting ready to go overt the week or two after the election.   The election's in early November.   We're getting ready to go overt after the election.

And we needed to do a walk-by to make sure where Hunter Biden lives.   That's typical of our -- we would go in general clothes, walk by the residence, see what's going on, see if there's Secret Service.

And in an email to Mark Daly, one of the DOJ Tax attorneys, he says:    "Tax does not approve.    This will be on hold until further notice."

I have never in my career have had Tax Division, let alone approve us doing a walk-by or anything like this.

So my response to him was:    "I'm sure I'll get asked."    So this is October 20th, 2020.    "But can you ask for the reasons why, since I think this would still be a covert action, especially since the U.S. Attorney approved this?"

He says:    "Call when free."

And, ultimately, we never were able to do the walk by the residence until after the election.    And that's ultimately when we went overt and were able to do the activities that day on December 8th.

Another devastating blow came to the investigation when we lost one of the AUSAs to the private sector in early 2020.

Former AUSA Jamie McCall, who was a judge advocate for the Marine Corps, working primarily as a prosecutor, achieving the rank of captain in the Marine Corps, was a hardworking, no-nonsense kind of AUSA.

I always thought in talking with him that he wanted to do the right thing for the right reason.    He would constantly push the envelope, and it was apparent that he was following the evidence and not working to create roadblocks.    I firmly believe that his departure had a significant impact on the future of the investigation and the investigative steps.

So I plan on providing you some more assistance -- or some more instances in which the assigned prosecutors did not follow the ordinary process, where they slow-walked and put in unnecessary approvals.

This is obviously not all of them, but is a small set of examples.    I can recall [a] meeting prior to the 2020 election in September of 2020 when we were discussing [with the prosecutors] potential additional electronic search warrants and covert subpoenas related to the case.

One of the prosecutors suggested removing the subject's name from the request.

I said on that call that I didn't feel comfortable with removing the subject's name from any documents just based on what might or might not be approved, and I told them that I thought that that was unethical.

DOJ Tax Attorney Jack Morgan said that doing it without Hunter Biden's name would essentially get us most of what we were seeking.   I have never been a part of an investigation where we talked [with the prosecutors] about even removing the subject's name from a subpoena, especially a covert subpoena.

Okay.   So after the day of action on December 8th, 2020, the prosecutorial team met --

Mr. Zerbe.   Explain "day of action."

Mr. ███.   Okay.   Day of action was when we went and attempted to do interviews.

All along we were preparing for doing interviews.   I had a list of probably 30 people and I tiered them.   So it was Tier 1, Tier 2.   And I had a proposal early on that said I want to go and talk to all these people.

It got whittled down to, I think, 10 people on the day of action, some of those people who we were only allowed to serve subpoenas and weren't allowed to talk to.

So that day of action happens.   We go and talk to everyone.

So that night, December 8th, 2020, the prosecutorial team met on a phone call. During that phone call we talked about a storage unit that Hunter Biden vacated when he vacated his Washington, D.C., office and stored a lot of the items in there.   That was uncovered through that day of action.

On the night, at the direction of Lesley Wolf, I prepared an affidavit in support of the search warrant for the storage unit.   And I thought, in looking back at this, that these were pretty telling.

Mr. <u>Zerbe.</u>   You need to be clear.   Lesley Wolf, who was Lesley Wolf?

Mr. ████.   Lesley Wolf was the assistant United States attorney in Delaware.

I say to her on December 8th, 2020:   "Sending the draft affidavit.   I guess I'm happy we drafted this before.   I kept the computer language in the warrant in case there are electronic devices."

So I'm going to move on to the next paragraph.

"We will work to get this approved ASAP on our end.   So please communicate your thoughts.   I would like to possibly execute this sometime next week.   I think that is reasonable, given the upcoming holiday."

Her response to me, December 9th, was:   "We are getting to work on this, but I want to manage expectations with you regarding timing.   It has to go through us, DOJ Tax, possibly OEO, and definitely [Eastern District of Virginia] (EDVA), who has never seen the case before, layer in the filter requirements in the Fourth Circuit, and it's just not clear it's going to happen next week, even with everyone making it a priority."

So that tells me two things right there.   That David Weiss wasn't really in charge. And it also tells me that I have never had a case [investigation] to where, if we needed to get records and preserve them, that we didn't do everything in our power to get a search warrant approved and get moving on that expeditiously.

So I guess with the storage unit -- we asked them to keep an eye on it and tell us if anyone went to it.   But it was highly unusual that I'm being told that we couldn't even do it the following week.

So let me go back to this.

So after I sent -- after we sent each other these emails, it was ultimately decided by AUSA Lesley Wolf to not do the storage unit search warrant.

On a phone call with AUSA Lesley Wolf -- and this is just from my recollection, I

didn't document this in notes -- I told her that I completely disagreed with her and that we weren't following the appropriate investigative steps to get the stuff in the storage locker and that I thought that she might be acting inappropriately.

At the time AUSA Wolf asked me if we had problems working together now and if I had issues with her moving forward.    I responded at the time that I didn't and that we could move forward.

After thinking about it further, I approached them with an idea, AUSA Wolf, and I said:   What if we didn't tell Hunter Biden's counsel about the storage unit?    He's been given a request for records.    What if at the time that he's given for those requests for records he doesn't access the unit?    And if he doesn't access the unit, we know he's not complying with that request.    So if at the end of that time he doesn't access it, let's do a search warrant on it then.    She told me she would think about it.

So I pushed this up to my leadership.    I pushed it through my SSA.    They all agreed with it.    They thought it was a great idea.    So they called David Weiss, the U.S. attorney in Delaware.

David said to them that -- they called it "█████ Plan."    "Yes, that sounds like a great idea.    Let's plan on doing that."    That's what he told them from what I was told after that call, on the call with -- on that call.

So I find out a couple days later that, on a phone call from them, that AUSA Wolf and DOJ Tax Mark Daly called Hunter Biden's counsel and told them about the storage location and said that the request for records includes the stuff [in] there.

So they literally went around my back, my idea, around what we [had] already talked about, and did something completely different.    And I guess it was at this point -- there were a lot of things that happened before this.    But it was at this point for me that I started to believe that the attorneys with the Delaware U.S. Attorney's Office

and DOJ Tax were not acting appropriately, they were not following the appropriate investigative steps, and that we were not a part of the trajectory and/or the planning of the investigation as we normally are.

I can recall another situation in which investigative activities were being held up by unnecessary approvals and constant slow-walking.   In essence, they were not letting me do my investigative job.

So this is an email regarding requesting documents.   So I say:   "Attached are these document requests for interviews I'm planning to do that are out of town."

So I'm planning to do these interviews, and I send those document requests to them.

Lesley Wolf says to me on September 9th, 2021:   "I do not think that you are going to be able to do these interviews as planned.   The document requests require approval from Tax Division.   At present, Jack and Mark are racing to get the EWC motion on Stuart's desk" -- so Stuart was the [Acting] Deputy [Assistant] Attorney General, Stuart Goldberg at Tax Division -- "Stuart's desk for approval before he leaves town for a week.

"Along with the approval for the" -- and I'm going to leave the name out of that -- "both of these items are higher priority and we can't pull time and attention away to move these subpoenas through.

"Appreciate that are you always trying to stay active and do some travel before your end, but we will be able to get these interviews and document requests done when we have a little more breathing room."

My response to her, September 10th, 2021, was:   "Okay.   I had planned stuff like this for weeks in advance to prevent this from happening.   I had brought up these interviews on multiple occasions, dating back to August 18.   And now we are being prevented from doing it 4 days before.

"This is making it difficult for me to do my job.    I don't understand why DOJ Tax senior management is needing to approve every simple document request and/or witness interview, and maybe this is a conversation that needs to be had at a higher level.

"I can push these interviews off.    Just know that I'm trying to do as much as I can to plan and get the tasks handed down to me accomplished in a timely manner in an effort to ultimately finish the pros report.

"I discussed with Mark" -- Mark Daly, DOJ Tax attorney -- "that interviews we had planned for the end of the month should be a priority as they relate to a former employee, previous business partners, and some 2018 expenditures.    I will have those subpoenas for those interviews in California to the pros team by next week so we don't have this issue again."

And so, again -- end of the month I request [to the prosecutors that] subpoenas go out -- or I request document requests to go out -- to go out and travel.    And Mark Daly, DOJ Tax attorney, says in an email to me on September 20th -- and these were document requests relating to prostitutes that Hunter was paying.

He says in this:    "Subject:    Emails sent to management with list of ten document requests to be served."

And he says:    "Ask whether they object."

And I said:    "You are the man.    I will fill you in tomorrow on my issues.    I'm almost at the end of my rope, and I am sick of fighting to do what's right.    Can you send me the final version so I can send them?"

So this is me further stating -- what I see as further stating to them that I'm sick of fighting for always doing what's right.    There were so many situations, and these are just a few, to where I'm fighting to get document requests to go do interviews.    I'm fighting to -- and it's just all:    Let me think about it.    There's too many approvals to go get that

done.

And then not only was I having issues with the prosecutors on the case, but then I had issues internally within the IRS.    And I had to go around my senior leadership to my director of field operations.    So that's the fourth person above me.

He told me that I can come to him any time with issues on this case -- it's the director of field operations, his name is Mike Batdorf -- that I can come to him at any time and with any issues that I'm having.

And was raising issues all along with so many various people in my management about the slow-walking, the issues that we were having with doing interviews, with doing document requests.

I said to him, Mike Batdorf, on September 20th:    "Again I hate to bother you with this.    I'm almost at the end of my rope, and I think I'm at the point again where I need your help.    I have a ton of interviews and travel planned and scheduled for the next 3 months.    Keeping on a timeline is extremely important, and I don't want this to continue to be a problem.    I don't mind the questions from management, but it feels like they are not listening to me."

That is a number one -- like the fact that management was not listening to me is an overarching theme regarding this investigation.    It felt like they left me on an island.

Mr. <u>Zerbe.</u>    Could you give the date of that email?

Mr. ███<u>.</u>    Yeah, September 20th, 2021.

Mr. <u>Zerbe.</u>    Let me just pause there for a second because I want to be mindful of the chairman.

I would say, ███, that he's probably going -- you've probably got about another 15 minutes to go.

Mr. ███<u>.</u>    Yeah.

Mr. <u>Zerbe.</u>   He's probably got 15 minutes to go in his opening statement, if that's all right, but we can also pause because I think you're going to get into the prosecutorial memo referral, which is kind of important, but kind of a natural break point.

So we're happy to keep going.    We're happy to pause.    And if the chairman's got any questions, because I know you're a busy fellow, we can do that, too.    So you tell me how you want to --

<u>MAJORITY COUNSEL 1.</u>   I think if you have 15 minutes, let's go ahead and finish that up.

Mr. <u>Zerbe.</u>   Okay.

<u>MAJORITY COUNSEL 1.</u>   And then we can take a short break.

Mr. <u>Zerbe.</u>   Okay.   Perfect.

Go ahead.   I'm sorry.

Mr. █████.   Okay.   I wanted to mention one more thing.   I can recall wanting to interview and getting records from Hunter Biden's children and members of the Biden family.   There were expenses paid for the children, as well as potential credit card expenditures and Venmo payments, that were deducted on the tax return.

On October 21st, 2021, AUSA Lesley Wolf told us it will get us into hot water if we interview the President's grandchildren.   That was completely abnormal, out of the question.   And it's a part of our normal process that we go and interview people, especially people who are receiving money or receiving payments related to a case like this.

So that's just another example of issues like that.

So in October of 2021, we had what was called a tax summit to where we all met together.   When I say "we all," so the prosecutors, so Jack Morgan and Mark Daly from DOJ Tax, Lesley Wolf and Carly Hudson from the U.S. Attorney's Office in Delaware.

So at that time we decided what charges we were going to push forward in the prosecution report.   So we all made the decision on that we were going to move forward with 2014, 2015, 2016, 2017, 2018, and 2019.   And it would be felony counts related to 2014 and felony counts related to 2018.   That was the decision made at that time.

So I drafted the prosecution report.   I spent all Thanksgiving, around that time, drafting this massive report.   Our reports are a lot of evidence.   There's a lot of stuff that goes into it.

So in November [I] drafted the report.   It went up to our internal counsel.   So they're called Criminal Tax counsel.   Went up to our internal counsel.

They review it for legal issues, and they actually give a recommendation to our leadership on whether to move the case forward or not.   They basically give an approval or a declination.

All along they were telling me that that -- CT counsel attorney was telling me -- her name was Christy Steinbrunner -- we're good to go on these, I'm going to give you [a] green [light].   So green being that you're good to go on those years, and yellow, yellow being caution.   She was telling me that they were going to concur to it.   I was hearing that all along.

And they took almost -- more than 60 days on their review, which is more than they're allowed.   Took more than 60 days.   And in February of 2022 -- and I'm not going to get into the details of this -- they end up sending a nonconcur, so a declination for all of the tax years at hand.

And I asked -- I messaged the CT attorney, Christy Steinbrunner, and I go:   You told me that we were concur, that we were good to go.

And she said:   I always told you it was green -- or I always told you it was green

and yellow.

I have to look at what the statement says.    But basically she told me what I stated in there, that it was a concur.

So that was one of the first times where I was like, well, gosh, now we have these issues with our U.S. Attorney's Office and DOJ Tax, and now I'm also having issues with CT counsel.

So our leadership ended up pushing that forward and ended up approving it and sending it to DOJ Tax in February or March of 2022.

So let me go to my notes here.

So February 25th, 2022, the IRS sent the prosecution report forward to DOJ Tax and the U.S. Attorney's Office.    So in my report proper venue for the case was in D.C. and California.    We had no venue in Delaware whatsoever for the tax charges.

I recall hearing --

Mr. Zerbe.    And why is that?

Mr. ███.    So for failure to file charges, if there are failure to file charges, it's where the subject lives.

If it's a false return or if it's an evasion charge -- so if it's false return, it's where the return is prepared or sent from.    If it's an evasion charge, it can be where the overt acts occurred.    So for 2014 and 2015, venue was D.C.    For 2016, '17, '18, and '19, the venue was in California.

On or about March 14th, 2022, they're now able to have what's called a taxpayer conference with defense counsel.    That gives an opportunity for defense counsel to come in and present:    Here are our defenses.    Here's why we don't think that you have a case.

All the cases I've ever been a part of, they're afforded one.    In this case I know

that they've had three.    With the most recent one, they've had four.    So that's high -- I have never heard of that in my career.

So they have the taxpayer conference.    On or about April 26th, 2022, they have a second taxpayer conference.    At that conference -- at that taxpayer conference they present defenses for 2014 and 2015.    We end up reinvestigating the case relating to 2014 and 2015.

I guess -- most importantly, I need to step back a second.

March of 2022, we are told -- I get a phone call that they are bringing the case forward to start -- I need to ask you a question about how I --

MAJORITY COUNSEL 2.    We can go off the record, please.

[Discussion off the record.]

[10:41 a.m.]

Mr. ███. Okay. So in March of 2022, we know that they are going to D.C. to open a case, okay?

So I'm told -- and this is from my recollection of conversations, and I do not have notes on this. As I am the case agent, we wouldn't typically take notes on this.

I am told that it was sent to the line attorneys in the D.C. U.S. Attorney's Office. They got my prosecution report, all the information that we had, and said, hey, we want to open up this case here. The line attorneys there said, here's the process. We'll get you guys going.

Two days later, I find out another meeting was -- so meanwhile, presenting the case to D.C. was something we asked for but was denied. We were not allowed to go there to present the case to D.C. We were all to rely on the attorneys to go and do that.

So in March -- or a couple days later after that meeting, I get a phone call. And this is -- from my recollection, from Mark Daly, the DOJ Tax attorney. And I think he was a little bit too forward with his information he gave me. But he basically said that now that the U.S. Attorney looked at the case, they don't want to move forward with it.

And essentially what he told me is that not only are they not going to join the case and give us assistance -- so give us another AUSA, give us someone to help there -- they also told our prosecutors that they don't think we have -- that we can -- or they don't think that we have the charges -- or not the ability, but the evidence for the charges to charge in D.C.

So not only was it a, no, we're not going to help you, but it was a, you shouldn't bring the charges here, essentially.

Mr. Zerbe. Can we go off the record?

MAJORITY COUNSEL 1.    Off the record, please.

[Discussion off the record.]

MAJORITY COUNSEL 1.    On the record.

Go ahead.

Mr. ████.    So the first impression from the D.C. U.S. Attorney's Office was, yeah, this all looks great.    Here's the process.    It didn't sound like they were going to move to say no to it.    It sounded like, hey, the lower-level attorneys were like, whatever we need to do to get this going.    And then it changed.

So, I mean, that was frustrating for me.    But at the end of the day -- they're following this normal process that they call[ed] it.

So that all happened.    So we're no longer talking about D.C. anymore.    Now we have -- the defense is presented 2014, 2015, and I was having a lot of issues with the DOJ Tax attorneys and the AUSA regarding 2014 to 2015, because now they're doubting it. So what we ended up doing is reinvestigating all of it.

We ended up looking at the evidence, and we found emails that actually showed that Hunter Biden [had] planned [for] what happened that caused him to essentially evade his taxes for 2014.    We presented this.    We dug into it.    We figured this all out. And hopefully after this, I can go through some of that for you guys.

But we dug through this all.    And then we were like, we finally figured it out. This is why this happened.    And it felt like the line attorneys weren't listening to us. They weren't following the evidence.    They were saying, well, they provided this defense, so that's the way it has to be, versus us looking at it like, well, no, let's figure out the way that the evidence shows us.

So there was a heated argument between myself and Jack Morgan, the DOJ Tax attorney, where I said, I don't think you are looking at the evidence appropriately.    You

are saying something completely different than what the evidence is showing.

And he asks another time, do we have a problem here, ██?   Are you questioning my ethics?   Are you questioning my integrity?   Another argument like that.

So we ultimately ended up asking for a meeting with David Weiss, the U.S. Attorney in Delaware.   We were afforded that.   And at that same time -- so this is in mid-June -- we met with David Weiss and all the leadership.   Including FBI, ASAC, SAC, all the people from FBI, and Stuart Goldberg, the [Acting Assistant Attorney General] of Tax Division.   We all met in D.C.   We were able to present on the findings regarding 2014, 2015, the case, and moving forward related to it.

We were constantly pushing David.   We were pushing our leadership with -- I'm using the wrong word.   We were reciting what the evidence showed.   And I'll show you what the evidence was.

Ultimately, what happened is we have a meeting.   A phone call.   It's in early August.   And we get a phone call, all the teams on it together.   So AUSA Lesley Wolf, Carly Hudson, Jack Morgan, and Mark Daly, DOJ Tax.

And they say at that meeting that we are going to approve the recommendation of charges for the -- and this is from my recollection.   They are going to approve the recommendation of charges for the 2017, 2018, and 2019 tax years and that the venue for those -- the appropriate venue for those is California.   They were not approving 2014, 2015.   And I don't remember if it included 2016.   I can't remember that off the top of my head.

But I want to say that -- in an email from Mark Daly on August 18th, 2022, after this phone call, he basically said, we have three upcoming interviews, these three interviews for weeks in September.   He says, in here, the week of September 19th, we may be conducting the case in two separate districts:   Delaware, Los Angeles.   And they

say for Los Angeles, they're going to intro the case and possible readback.    So that shows me that they're presenting the case out to California, they've approved the charges, and they're moving forward on it.

I want to say one more thing.    We also learned that they gave what's called discretion.    This is what I was told.    This is from my memory.    But that they didn't get full on approval.    They gave discretion to charge the case.    From my understanding with Tax Division, if they were to approve the charges, according to policy, California would have to charge the case.

So we have one last meeting with David Weiss, U.S. Attorney in Delaware, in early September -- it was either end of August, early September 2022 -- to talk about the 2014, 2015 tax year.    And at that meeting, David says to us -- and this is from my recollection -- that he agrees with us regarding the 2014, 2015 tax year.    They're great. Yes, we investigated it.    We figured it out.    But he has been getting concerns from DOJ Tax regarding the tax years because they viewed that, at a trial -- that it could affect the later years.    That the information regarding the subject's brother's death, the substance abuse -- that all those things could play a huge role and cause the jury to say essentially -- to have sympathy for him and to not convict on the charges.

At that time, David is telling us, well, I'm still weighing it.    I love the 2014, 2015. Essentially, I want to charge it.    And at that meeting, he tells us -- we ask him, when are we going to charge?    And he says, well, hopefully end of September.    It was kind of up in the air.

Then October 6th happens to where there's an article in -- I apologize.    So this gets into what happened and why we were ultimately removed.    So October 6th -- I believe is the date -- The Washington Post has an article.    In that article, it talks about this difference between the investigators and the prosecutors.

And there are statements that are made in there from Hunter Biden's counsel that basically is saying that we're not getting a -- we're getting a biased view and that -- threatening us with criminal wrongdoing if this is being leaked to the media.

So October 6th, that article comes out.    October 7th was the meeting with the leadership and David Weiss.    And that's where those statements were made regarding David saying, I'm not the deciding official on whether charges are filed.    He has no authority to charge in California, essentially, is what is told to me about that meeting.

After that article on October 6th, we have one more interview left.    We're still talking with the AUSAs.    They're still meeting with us.

October 12th, 2022, was the last investigative interview that we did.    I had a phone call -- I think it was around the week of October 22nd.    I have it in my notes over here.

But I had a phone call with AUSA Lesley Wolf, and she asked me for the significant case reporting that my manager sent up to [IRS] leadership.    She asked this as a part of discovery.    She didn't ask for --    Five months prior to this, we turned over some discovery.    It's highly unusual -- or I've never had it happen to where they've asked me for my manager's either emails or discovery.

And it was at that point that I believe things changed with them, and they saw some information in -- or I don't know what it was, but -- they request[ed] discovery to include emails from the team, but it also included emails and documents from supervisors.

And just so you know, that would be super unusual because -- imagine if the chief of our agency had to provide discovery in all the cases that we work.    It just would be impossible.

Anyways.    So, requests discovery.    And then -- I'm sorry.    We essentially get

removed from the investigation.    So at that point, we are essentially removed.

So I sent an email on December 7th that says, "So I was informed by my SAC that the meeting scheduled for tomorrow needed to be canceled and that he will field updates from now on.    Please confirm that this is correct and send out a meeting cancellation to the team."    This is December 7th, 2022, to Mark Daly, DOJ Tax.

Mark responds December 8th.    David -- meaning David Weiss, U.S. Attorney -- and Darrell -- Darrell Waldon, the SAC of IRS -- had been in conversation, and that's what they have decided.    I will let the team know.

So we found out through talking with our SAC that the attorneys had found -- we were always asking for updates on charging.    When are we going to charge?    When are we going to charge?    We were told that the prosecutors had found some emails that concerned them if they could actually charge the case.    That's what they said to us.

So at that point, I'm just -- I'm shocked.    And I'm like, you guys told me prior to this that these years are slam dunks.    We were in a whole posture to charge.    And then all of a sudden, they are saying this.

Continue to move forward to end of April.    The media article comes out regarding the whistleblower, and I don't think it was maybe 2 weeks later.

Mr. <u>Zerbe.</u>    Can we go off the record?

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    We'll go on the record.

Mr. ██████.    I wish to close with one final thought.    I think about all of this, the difficult and grinding path that I and my colleagues have had to take in this matter, and how best it could be avoided.

I humbly view my role here today and response to the committee's request was to provide the facts as I best understood them, and to let Congress, the administration, and

the public consider those facts and determine the best path forward.

However, for myself, as I reflect, it is not difficult not to believe that appointing a special counsel in this matter is the best way to go forward to give everyone confidence in the fairness of our tax system.

While the impression was that the U.S. Attorney in Delaware has essentially the powers of special counsel in this case, free rein to do as needed, as is clearly shown, this was not the case.    The U.S. Attorney in Delaware in our investigation was constantly hamstrung, limited, and marginalized by DOJ officials as well as other U.S. Attorneys.    I view that a special counsel for this case would have cut through the toughest problems that continues to make problems for this case.

I would ask Congress and the administration, after reviewing the facts, to consider a special counsel for this case as well as consider the appropriateness of this special counsel taking under their authority all the related cases and spin-off investigations that have come forward from this investigation, related cases that I believe are subject to the same problems and difficulties we had.

Lastly, I would encourage Congress and the administration to consider establishing an official channel for Federal investigators to pull the emergency cord and raise the issue of the appointment of a special counsel for consideration by your senior officials.

I do not want my colleagues at the IRS, FBI, and other Federal law enforcement agencies to go through my frustrating and disheartening journey.    I believe having such a path will strengthen the public's confidence in their institutions and the fair and equal treatment of the Americans under law.

<u>MAJORITY COUNSEL 1.</u>    Let's go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    We'll go back on the record.

And I'll turn it over to Chairman Smith to ask a few questions.

Chairman <u>Smith.</u>   Thank you.

Thank you for your opening statement and getting us started, and thank you for your bravery as to what you stated to do the right things for the right reasons.   We appreciate that.

A couple things that I want to talk about.   Earlier, you said you sent an email just a few weeks ago to the Commissioner of the IRS.   What was the email address that you sent the email to?

Mr. ███.   So I believe it was just Douglas -- I believe it was just his email that was in our directory --

Chairman <u>Smith.</u>   I just wanted to clarify if it was the same email that I have for him.   That's why I want to know if you could tell me what his email address that you sent --

Mr. <u>Zerbe.</u>   Sure.   We'll get it --

Mr. ███.   I don't have it with me, but I would need to go in my computer, and I can actually see the email.

Chairman <u>Smith.</u>   Exactly.   If you could get that to us, that would be helpful.

Also, could you tell if that email had been opened?

Mr. ███.   I didn't put [a] read receipt on it.

Chairman <u>Smith.</u>   Okay.   Did you get a response from that email?

Mr. ███.   No, I did not.

Chairman <u>Smith.</u>   Okay.   In that email, did it ask for him to look at it with concerns of the case?   What was the basis of the email?

Mr. ███.   Do you care if I read it?

Chairman <u>Smith.</u>   Sure.

Mr. ████.   I actually -- if you don't mind, like, it was something --

Mr. Zerbe.   Just to be clear, we're happy to share the email with you as well.   It was kind of either bring material or don't bring material.   So we had not wanted to --

Chairman Smith.   Read the email for the record.

Mr. Zerbe.   Yeah.

Mr. ████.   Okay.   So it went to Douglas O'Donnell, [Deputy] Commissioner, Daniel Werfel, Commissioner, Jim Lee, chief of IRS CI, Guy Ficco, which is deputy chief, Michael Batdorf, who was the director of field operations, Kareem Carter, who was my special agent in charge, and Lola Watson, who was my assistant special agent in charge.

It says, "My respective IRS leadership, first off, I apologize for breaking the managerial chain of command, but the reason I am doing this is because I don't think my concerns and/or words are being relayed to your respective offices.   I am requesting that you consider some of the issues at hand.   I'm sure you are aware I was removed this week from a highly sensitive case out of the Delaware U.S. Attorney's Office after nearly 5 years of work.   I was not afforded the opportunity of a phone call directly from my special agent in charge or assistant special agent in charge, even though this had been my investigation since the start."

And outside, I still have not received a phone call from my assistant special agent in charge or anyone in my IRS CI leadership other than my supervisor.

"I can't continue to explain how disappointed I am by the actions taken on behalf of our agency.   I want to echo that I love my job, I love my agency, and I am extremely appreciative of the job and position that I've had over the last 13 years.   There is a human impact to the decisions being made that no one in the government seems to care about or understand.   I had opened this investigation in 2018, have spent thousands of hours on the case, worked to complete 95 percent of the investigation, have sacrificed

sleep, vacations, gray hairs, et cetera.    My husband and I, in identifying me as the case

agent, were both publicly outed and ridiculed on social media due to our sexual

orientation.    And to ultimately be removed for always trying to do the right thing is

unacceptable, in my opinion.

"Again, my leadership above my direct manager, who was also removed, didn't

give me the common courtesy of a phone call, did not afford me the opportunity of

understanding why this decision was made, and did not afford me an opportunity to

explain my case.    If this is how our leadership expects our leaders to lead, without

considering the human impact -- or without considering the human component, that is

just unacceptable, and you should be ashamed of yourselves.    I am continually asking

myself, is this the kind of culture we want within the IRS and that I want to be a part of?

For the last couple years, my SSA" -- supervisor -- "and I have tried to gain the attention of

our senior leadership about certain issues prevalent regarding this investigation.    I have

asked for countless meetings with our chief and deputy chief, often to be left on an island

and not heard from.    The lack of IRS CI senior leadership involvement in this

investigation is deeply troubling and unacceptable.    Rather than recognizing the need to

ensure close engagement and full support of the investigatory team in this extraordinarily

sensitive case, the response too often had been that we were isolated, even when I said

on multiple occasions that I wasn't being heard and that I thought I wasn't able to

perform my job adequately because of the actions of the U.S. Attorney's Office and

Department of Justice.

"My concerns were ignored by senior leadership.    The ultimate decision to

remove the investigatory team from Delaware, without actually talking with the

investigatory team, in my opinion, was a decision made not to side with the investigators,

but to side with the United States Attorney's Office and the Department of Justice, who

we have been saying for some time has been acting inappropriately.    I appreciate your time and courtesy in reviewing this email.    Again, I can only reiterate my love for my work at CI and great appreciation for my colleagues and a strong desire for CI to learn from and be strengthened by my difficult experience.    I never thought in my career I'd have to write an email like this, but here I am.    Thank you, again, for your consideration with me."

And that email did receive a response.

Mr. <u>Zerbe.</u>    We'll go off the record.

[Discussion off the record.]

Chairman <u>Smith.</u>    Back on the record.

Mr. ███.    On May 19th, 2023, Lola Watson wrote to me.    On the subject line, it says, "Reminder:    Chain of command."

"Good afternoon, Special Agent ████.    We acknowledge your email received yesterday morning.    You have been told several times that you need to follow your chain of command.    IRS Criminal Investigation maintains a chain of command for numerous reasons to include trying to stop unauthorized disclosures.    Your email yesterday may have included potential grand jury material -- grand jury, a.k.a. 6(e) material -- in the subject line in contents of the email, and you included recipients that are not on that 6(e) list.    In the future, please follow previous stated directives and this written directive that no information should be sent to the director of field operations, deputy chief, chief, or any other executive without being sent through my office or the SAC's office first."

Chairman <u>Smith.</u>    The letter your counsel sent to the committee references your removal from the case.    I think you know that on May 15th, 2023, a letter was sent to me and Ranking Member Neal by another whistleblower's counsel, noting that the entire investigative team had been removed from the case.

Can you confirm that you were removed from the case?

Mr. ██████. I can confirm that I have been removed from the case, yes.

Chairman <u>Smith.</u> How long had you been working on this investigation by the time you were removed?

Mr. ██████. Since November of 2018. So approximately 5 years.

Chairman <u>Smith.</u> Who informed you that you were being removed from the investigation?

Mr. ██████. I learned through my supervisor, Gary Shapley.

Chairman <u>Smith.</u> How were you informed that you were being removed from this investigation?

Mr. ██████. He told me -- Gary Shapley told me that he was removed and I was removed.

Chairman <u>Smith.</u> So it was by phone call?

Mr. ██████. Yes.

Chairman <u>Smith.</u> Have you ever been removed from an investigation prior to the one at issue here?

Mr. ██████. Can we go off the record for a second?

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u> We can go back on the record.

Mr. ██████. So I want to be clear with this. Can I explain what happened?

The assistant special agent in charge, Lola Watson, sent Gary an email -- not me, Gary Shapley -- my supervisor an email saying that they want to have a call regarding Sportsman. So a Sportsman update call. Gary, not feeling comfortable with our leadership, asked me to be on that call as a witness. I was not invited on that call, but I participated via phone on that phone call.

And it was during that call that -- I overheard it, and they said that essentially the ITFC -- so our group was removed from the investigation, and they were going to replace us with some other agents within the D.C. Field Office that they didn't know the names of yet.    There was no mention of, we need you to tell ██.    No mention of me whatsoever. It was just that we were removed from the case.

Chairman <u>Smith.</u>    Do you know who it was that said that on the call?

Mr. ██.    That was Special Agent in Charge Kareem Carter.

Chairman <u>Smith.</u>    Okay.

Mr. ██.    And I can tell you that Supervisor Gary Shapley really challenged him with, you're not doing the right -- you're not making the right decision here.    Really challenged him with, are you sure you want to make this decision?    So --

Chairman <u>Smith.</u>    And the individual that made that statement on the call, who was he employed by?

Mr. ██.    The Internal Revenue Service.

Chairman <u>Smith.</u>    The IRS?

Mr. ██.    Yes.

Chairman <u>Smith.</u>    Not the Department of Justice?

Mr. ██.    Correct.

Chairman <u>Smith.</u>    Who are his supervisors?

Mr. ██.    His supervisor would be Mike Batdorf, director of field operations, for the IRS Criminal Investigation.    And then above him would be Guy Ficco, deputy chief of IRS Criminal Investigation.    And then above him would be our chief, Jim Lee, IRS Criminal Investigation.

Chairman <u>Smith.</u>    And then who is above Jim Lee?

Mr. ██.    The Deputy Commissioner, Daniel Werfel, and then Commissioner

Douglas O'Donnell.

Mr. <u>Zerbe.</u>    To clarify that, that's the Deputy -- the Commissioner is Werfel.

Mr. ████.    Yes.    You're right.    I'm sorry.

The Commissioner is Daniel Werfel.    Deputy Commissioner is Douglas O'Donnell.

Chairman <u>Smith.</u>    Have you ever been removed from an investigation prior to the one at issue here?

Mr. ████.    No, I have not.

Chairman <u>Smith.</u>    The May 15th letter notes that you and your team were informed that the change was at the request of the Department of Justice.    Is that your understanding?

Mr. ████.    Yes.

Chairman <u>Smith.</u>    But it was the IRS employee that, on the phone call, said you were removed?

Mr. ████.    Correct.

<u>MAJORITY COUNSEL 1.</u>    Why do you believe it was the Department of Justice?

Mr. ████.    I have a document I could go to, but I believe it's because he said it was at the Department of Justice's request.    That's just from my recollection of what I heard.

Chairman <u>Smith.</u>    If you have a document, that would be helpful.

Who was responsible for communicating your job duties and responsibilities?

Mr. ████.    It would be my supervisor.    My direct supervisor.    So Gary Shapley.

Chairman <u>Smith.</u>    Who has the ability to reduce or change your job duties and responsibilities?

Mr. ████.    Anyone from my supervisor all the way up to -- it could be anyone in

that chain of command.

Chairman Smith.    Could Commissioner Werfel have any responsibilities and direction of any of his employees at the IRS?

Mr. ■■■■.    That, I don't --

Mr. Zerbe.    Let me rephrase the question.

I think, Chairman, you're asking, would the Commissioner have the authority to assign or reassign your duties if he chose to do so?

Mr. ■■■■.    That was the purpose of my email, was to make him aware of what happened.    And I thought that he was -- I'll give you an example.

With a chief executive officer at a company, you would think that they're in charge of everything that happens within their company.    So that was where my thoughts were, is that if I'm having difficulty with my chain of command -- my leadership that I've gone to for so long on this case -- I had to go above them.    That was my thought.

Chairman Smith.    You've been an IRS employee how long?

Mr. ■■■■.    13 years.

Chairman Smith.    13 years.

And do you view the Commissioner of the IRS as the top of the chain of command?

Mr. ■■■■.    So I think that Janet Yellen out of the Treasury, since we're under the Department of Treasury, would be above that, but --

Mr. Zerbe.    Right.    Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. ■■■■.    Yeah.    I would think that the Commissioner is in charge of the IRS.

Chairman Smith.    And of all of the 80,000-plus employees of the IRS?

Mr. ▮▮▮.   Yes.

Chairman <u>Smith.</u>   Who do you believe is responsible for your removal from the case team?

Mr. ▮▮▮.   This is my opinion based on my observations and everything that I've seen so far.   It would be -- Department of Justice Tax would have been involved, so Mark Daly and Jack Morgan.   I think that Stuart Goldberg also would have had some say in this, who is the deputy attorney general for Tax Division.   And then David Weiss and the people that were part of the U.S. Attorney's Office, so Lesley Wolf and Carly Hudson. I would say that those people had some say.

Chairman <u>Smith.</u>   Is there anyone else at the IRS that we should talk to to fully understand how this decision was made?

Mr. ▮▮▮.   It would be the special agent in charge, Kareem Carter.   And I think it's important that, on that phone call, we asked for a reason why and weren't given that.

Chairman <u>Smith.</u>   Have you been given a reason yet to this day?

Mr. ▮▮▮.   No, we have not.   And I can tell you in my normal course of investigations I work, why an agent would be removed is for conduct.   So if they did something wrong.   But I've never seen it to where they would remove from a supervisor down -- anything like that ever.

Chairman <u>Smith.</u>   How many people were removed from this team?

Mr. ▮▮▮.   So from the way that it was phrased on the phone call, it was my supervisor and our International Tax and Financial Crimes group.   So there's 12 people total in our group.

Chairman <u>Smith.</u>   So 12 people were removed counting the supervisor?

Mr. ▮▮▮.   It would be 13 counting the supervisor.   But that's just me going off of my recollection.   It's around that figure.

Chairman <u>Smith.</u>   Okay.   One other thing that I want to just touch on that's a little bit different than this, in your opening statement, you were talking about an individual that made the statement to you saying that the President's grandchildren, you should not interview?   What was that?

Mr. ████.   Yeah.   So -- yeah.   So AUSA Lesley Wolf -- and this was in quotes, so this must have been something that my -- so I also want to be clear on something else. Normally in an investigation, if we're having a meeting or whatnot, we would take notes, investigative notes, but there really isn't much that goes into those notes in a meeting. And I didn't think I would need to document things that were being said during those meetings.

But at this time, after discussions we were having internally, my supervisor felt it necessary when some of the inappropriate comments that were being made -- to start documenting them.

So, yeah, it says in quotes, "will get us into a lot of hot water if we interview the President's grandchildren."   And I don't remember what ultimately happened with the grandchildren.   I know I have never interviewed them, and we have not interviewed them.

Chairman <u>Smith.</u>   And who was it that said that?

Mr. ████.   AUSA Lesley Wolf.

Chairman <u>Smith.</u>   Was it common when talking about this case to talk about how the President felt?

Mr. ████.   No, not how the President felt.   No, I don't think so.

Chairman <u>Smith.</u>   Or to even refer to it as the President's son or the President's grandchildren?

Mr. ████.   Yeah, I think there were times where we did refer to them as the

President's grandchildren, yes.    Like, for example, for James Biden, we would call him

the uncle.    So that's how we referred to him, as the uncle.

    Mr. <u>Zerbe.</u>    Let me go off the record.

    [Discussion off the record.]

    <u>MAJORITY COUNSEL 1.</u>    Back on the record.

    Mr. ████<u>.</u>    There were a lot of times to where they would discuss the election

or discuss politics, and I had to say, on multiple occasions, that I felt that it was

inappropriate that they were saying it.    And there were things that would come up.

For example -- even though there were smaller transaction amounts -- there were Venmo

transactions that were paid to family and friends.    And some of these Venmo

transactions were deducted.

    So I continually asked, Can I go and interview them?    And can we understand

what these payments were for?    If they made other payments?    And those were always

met with no.    And I think one of them was Valerie Owens that we talked about that I

wasn't allowed to go and do that interview.    I believe that Valerie is a relative of Joe

Biden.    It might be his sister.    I don't -- all I know is she's a relative of his.

    Yeah.    So standard practice is -- for any transaction, you want to go out -- and a

lot of our job is hitting the pavement, going out and talking to people.    There was a lot of

different investigative steps that we took, that even going and talking to the prostitutes,

we found multiple people that he called his employees that were also prostitutes, and

that he would have them clean his hotel room or -- there were a lot of these interviews

that we ended up going and doing and talking to people that were so worth it, even

though someone might -- we were always being told by the prosecutors, you guys are

wasting your time going and doing that.    It's not worth it.    And literally, I would surprise

them every time and find everyone.

Chairman <u>Smith.</u>    Thank you.

Mr. <u>Zerbe.</u>    Thank you.

Mr. ███.    Thank you.

BY <u>MAJORITY COUNSEL 1</u>:

Q    So to follow up on some of the chairman's questions, you mentioned Kareem

Carter as the person who made the statement on the phone call about the removal of the

team.    Is that right?

A    Yes.

Q    And you mentioned the chain of command up from there.

Do you know whether anyone else in that chain of command was aware of this

decision?

A    I do not know that.    I think they are after my email.

Q    Understood.

But you don't know prior to that?

A    Yeah.    And to be completely candid with you, I was talking with my -- I

essentially wanted to have a meeting or a sit-down and explain to -- now above all my

leadership -- because at the end of the day, I don't think we would be sitting here right

now if us as agents -- myself and the co-case agent and Gary -- were afforded the

opportunity to sit down with our chief or deputy chief to explain to them, hey, guys,

here's the problems we're encountering.    Here's the meeting that [we] just had.    What

do we do to fix this?    Because we're the IRS.    They're Department of Justice.

Obviously, we refer the case to them to prosecute, but if we feel that something is

going wrong with it, they should be there to help us through those problems, not putting

their head down and not listening to us.

Q    So you mentioned Michael Batdorf and that he had told you previously that

you could go directly to him.    Is that right?

A       Yes.

Q       Did you do that at the stage where you learned that you were removed?

A       I did not.

Q       Okay.    Did you feel like you could talk to him about this issue?

A       No, because I've been having other issues with him on another case I'm working that is -- I felt like that chain of -- that that relationship was broken.

Q       When did that relationship start to break down?

A       Probably since mid-October, maybe, would be my guess.    I mean, it's -- yeah.    It's definitely --

Q       Mid-October 2022?

A       Yes.

Q       And you mentioned issues you were having with him on another case.    It's totally fine if you don't want to get into the specifics of that particular case, but can you generally describe the issues that you're referring to?

A       Yeah.    I need to stay very, very high level on this.

I had received approval with a strategy related to this case.    And they backtracked that approval a couple weeks later and said to me that we need to put this on pause and that we'll get back to you on what strategy we're going to do moving forward.    And we're still on a pause right now.

MAJORITY COUNSEL 1.    Can we go off the record real quick?

[Discussion off the record.]

MAJORITY COUNSEL 1.    We're back on the record.

BY MAJORITY COUNSEL 1:

Q       We were talking about the approval on the strategy for this other case.

And just to clarify, this is a totally unrelated matter?

A       Unrelated matter, yes.

Q       Okay.    And can you describe more about what happened to that strategy?

A       It felt like it was -- all along, we had been -- for the past probably year, we had been communicating a strategy on this case that is tackling a big problem and trying to tackle it efficiently, okay?    And it's a compliance issue in this area.

So we were briefing our [IRS] leaders and constantly having meetings about what we're planning on doing, and they were on all [of] these phone calls, and we were sending emails of our strategy.    And very recently, one of those strategies was moving forward on this compliance issue, and we were a go on it.

And a few weeks later, I receive[d] a phone call that basically says, you're being paused, and we're having to relook at what you were doing, and we will make a determination moving forward.

So now, to all my peers and the different people, I was the one pushing the strategy, and it got halted in place, and now I have to go back to [these] people and explain to them why -- it was just a mess.    It was an absolute mess.

Q       When did you get that phone call saying that you were being paused?

A       It was in February of 2023.    It was either a phone call or an email.

Q       And have you been able to proceed since then, or do you remain paused?

A       On that specific aspect of that investigation, as of right now, yes, we're still on a pause.

Q       So other than the removal from the case team, are there any other issues that have come to your attention that give you concern about possible retaliation?

A       Yeah.    So when I say there's a lot of this -- I sent an email on April 13, 2023, to Lola Watson, my assistant special agent in charge.    And I said, "So I want to put" -- [at

this point] we're still on the Hunter Biden investigation.

And I say, "So I want to put some stuff in front of you regarding updates I am hearing on the Sportsman, et al investigation, that I am not hearing through you or Kareem" -- Kareem Carter being the SAC -- "which is concerning to me.   I don't think that you or Kareem have any reason to keep things from me, but I wanted to make you both aware of some of these updates."

And some of these updates were Hunter Biden's counsel meeting with DOJ Tax -- or meeting with Main DOJ at the end of the month, which I viewed as a significant update that I hadn't heard through them.   Because remember that previous email, all communication was now [to go] through David Weiss and the SAC.

It also says here, "I have heard that David Weiss is currently asking for a pros memo" -- prosecution memo -- "from DOJ Tax approving the tax charges.   I would consider this a significant update since indicating that David is seeking the charging authority."

And then there's other related investigative questions that I had, but I thought that this was another email in the chain that was, like, no one's -- we were essentially removed since --

Q       So this is prior to what we could call formal removal in May 2023.    Is that right?

A       Yes.

Q       So at this time, you were still officially on the case.    Is that right?

A       Yes.

Q       Okay.    Is it your testimony that, although you hadn't been formally removed, you felt that you had been cut out of the case prior to that?

A       Yes.    Absolutely.

Q      Okay.    And when did you first feel that you were cut out of the case?

A      It most likely would have been at the end of October.    When they requested my discovery so that -- the significant case reporting and the emails from my supervisor.    That was when I felt that the -- or I didn't feel.    I thought that the posture changed with our relationship.

[Discussion off the record.]

Mr. ██████.   We're back on the record?

MAJORITY COUNSEL 1.    Yeah.

Mr. ██████.   So October 6th was the Post article.    And I remember hearing from them that that touched super close to the investigation and that they felt that [it] was information that's coming [from] inside the investigation.

All along, all up until this point, we would constantly be on the forefront of, Hey, any media updates?    What's going on?    On our weekly calls, we would always discuss media.

Prior to this, there were other leaks.    After our day of action in December of 2020, we got word that a couple of the news sources were going to release an article on the investigation.    This was a couple days prior to us going public -- going overt.

So that leak happened, and nothing changed after that one.    And everything indicated, even in communication in meetings from what I recall -- we thought that the leak was potentially from someone in [the] Department of Justice.    So we would constantly be talking about, yeah, it's not an IRS person.    It's not anyone on the team. It's always -- it appeared like it was someone from Department of Justice.    So that's what kind of shocked me with this moving forward.

I was interviewed by an investigator -- I think they were with TIGTA.    I told them, I didn't leak anything.    I thought that the leak might have come from either defense

counsel, or from DOJ like the other ones came.    But what I can tell you, and I've told this to the prosecution team, I've done everything that I can to keep my record clean and to keep my ability to testify as the case agent as clean as I possibly can.

And it honestly -- it hurt.    It hurt that these are people I talked with on a daily basis.    And even after the investigators came and I told them that I didn't leak the information, it was a complete shutoff of talking.

So it was end of January, early February, I am told about a meeting that is held with FBI only.    There's no IRS people there.    And it's regarding some of the spin-off investigations.    And one of the former forensic accountants who was on the case was a part of that meeting.    So they were moving on with some of our other spin-offs.

We had other tax spin-off investigations that were completely stopped.    We haven't done anything on those since.    But yet they were moving on those other ones. But we were not there.

BY <u>MAJORITY COUNSEL 1</u>:

Q      And is that atypical?

A      Yes.    Normally, we would have been invited, especially because those other spin-off cases -- one of them has a tax component to it.

Q      And the timing of that was late January, early February 2023?    Is that right?

A      Yes.

Q      Okay.

A      I did hear from FBI that they were being treated the exact same way -- that they had to communicate through their SAC to the U.S. Attorney in Delaware.

Q      Can you tell us who you heard that from?

A      So I could -- so her name -- I'm not meaning to be -- so it's Michelle Hoffman. I know she's a career employee there.    I would ask that if her name could be redacted,

that we redact it.

Q    Understood.

A    But I don't want -- because she's not someone that would want to be brought into something like this.    She has a career.

Q    Understood.

Taking a step back on the issue of spin-offs, how would it typically work if you were working a large case and you learn of other information that leads you to think you need to investigate a spin-off in another issue?    What kind of process would normally play out?

A    So the process is a little bit different because we're with this international tax group.    We can work cases anywhere.    So the venue for the stuff we work really doesn't matter.

But typically within our agency, if we have a spin-off and there's -- there were other spin-offs in this case that we spun off the information to another IRS office.    So we actually met with them.    We sat down.    Here's the evidence.    And then they took the case on after that.

But the ones that I held closely in this case were ones that were in the area of where we were working this case, and they were -- it was information -- they were current investigations I was conducting.

Q    So the nature of these specific spin-offs would typically involve your international tax group --

A    Yes.

Q    -- on a going-forward basis?

A    Yep.

Q    Okay.    So after October 2022, any other concerns or instances that might

be considered retaliation that you have?

A     None that I can think of.

[Discussion off the record.]

Mr. ██████.   Could I say something else real quick?

MAJORITY COUNSEL 2.   Of course.

Mr. ██████.   So what's kind of the most shocking to me is that we were on the trajectory of charging the case.   And we literally finished our investigative steps.   The pros memo from Department of Justice Tax was written.   I had worked with the -- they call it a third-party person who reviewed the case.   I had discussions with him.   And in all reality, we were looking towards indicting.

And to hear from the DOJ Tax people -- they weren't sure whether David was going to able to sign the indictment alone or whether it would have to be David and the U.S. Attorney in that area.

And now, I've come to learn through everything that David couldn't sign an indictment that's out of district.   He had to have that U.S. Attorney there.   That's what my understanding is, at least.   And I've come later to hear -- through multiple people, that California also said no.

So now you have -- and that's another frustrating part was we asked to present this after we found this new information related to 2014 and 2015 to D.C.   We wanted to present the case, the facts.   And we were not afforded that.   We wanted to do the same thing to California.   And we were not afforded that.   It was always, we'll handle it.

And this is very atypical.   Up until October, we were very involved with -- here's the evidence.   Here -- helping them out through their writing of their pros memo.

BY MAJORITY COUNSEL 2:

Q     Can we just break down each of the years involved and help us understand

how much money is at stake?

A     Yes.

Q     Starting with 2014?

A     Okay.    So 2014 -- it would have been false return and evasion of assessment that we were looking into.    So 7206(1) -- Title 26, [U.S.C. Section] 7206(1), and Title 26, [U.S.C. Section] 7201.    I'm going to go through the charges, and then I can go through them by year, if that's okay.

Q     Okay.

A     And then 2015, we proposed charges for Title 26 United States Code [Section] 7203, failure to timely pay tax.

Tax year 2016 was, again, [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2017 was [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2018 was [Title 26, U.S.C. Section] 7201, evasion of assessment and payment; [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax; and [Title 26, U.S.C. Section] 7206(1), false return.

So just to be clear, failure to timely file and pay tax -- that's a misdemeanor.    And false return -- false return and evasion are felonies.    So false return is basically that an item you report on your return is false.    So it's a little bit different than the elements for evasion, but it is essentially the same thing.

And then 2019 was failure to timely file and pay.

So Hunter Biden had had a lot of tax issues, even predating all of this stuff.    Back in 2002, he filed his Form 1040 late-filing and owing over $100,000 in taxes; 2003, owed more than $100,000 dollars in taxes; 2004, late-filed and owed more than $20,000 in taxes; and then 2005, late filed his personal return and owed over $100,000 in taxes.

[11:47 a.m.]

Mr. ████.   So he had a history of tax issues.

So those tax issues is why he asked for Eric Schwerin to be his finance accounting person.   So that happens in 2006, 2007, because of the issues that Hunter was having with his taxes.

So Eric Schwerin actually creates an entity called Owasco P.C., which was a C Corp. And so the problem that Hunter was having was he was receiving a lot of [Form] 1099 income.   So that [Form] 1099 income wasn't having any taxes withheld.   So that's why he was owing a ton of money when it came to filing his returns.

So he created this C Corporation.   The C Corporation would take in this 1099 income, and it would pay him a salary in W-2 wages.   So Eric Schwerin sets that up.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Do you know what he was doing to earn the money?

A    At that time I believe it was legal work.   I don't remember off the top of my head.   But I know that he worked for a law firm for a period of time.   Oldaker Biden -- my memory is not the best on that.   I do know it was for legal services.

Moving forward -- and the reason why this was so important is -- for 2014, so he enters into this Burisma contract.   And the Burisma contract is with him and Devon Archer.   So they were earning a million dollars a year, both of them, for being put on this board.   And essentially Archer was put on the board one month before Hunter was.   So as a part of getting on that board, Hunter sends an email to Devon Archer, stating here's my plan for how we're going to pay -- or here's our plan for what we're going to do with this million dollars.

At that time Devon Archer and Hunter Biden were also looking into this Bohai

Harvest investment.    There was about a million dollars that they had to put forward.

Hunter didn't have the money to put that forward.    So Devon was, like, why don't I take

part of the Burisma money.    We can pay another part of it to you and then half of it will

go into the investment in this Chinese company.

So [Hunter Biden] sets this out in this email and what ends up happening is -- so

imagine this.    If you are an owner of a company and your friend tells you that, I want to

pay my wages to your company and you're going to loan the money back to me, that's

essentially what happened here.    He took loans from that corporation -- which were

distributions.    And he didn't pay taxes on those loans.

So what we had found is that -- can I pause for a second?

MAJORITY COUNSEL 2.    Off the record.

[Discussion off the record.]

Mr. ███.    Back on the record?

BY MAJORITY COUNSEL 2:

Q    Yes.

A    All right.    So essentially for 2014, we had found that Hunter didn't report

any of the money he earned from Burisma.

So the reason why this is important is because Hunter set it up this way, to

not -- to essentially earn the money through his friend's corporation and then have his

friend pay him back half of the money as loans, quote, unquote, loans.    So --

Q    How much in tax liability are we talking about here?

A    Okay.    So -- no, these are the -- oh, you printed it up.

Mr. Zerbe.    Yeah, I --

Mr. ███.    Okay.    So -- the most conservative approach would have been

$124,845 in tax loss.    So this would have --

Mr. <u>Zerbe.</u>   For what year?

Mr. ████.   For 2014.

So this would include payments that he would have received directly from Rosemont Seneca Bohai, so $315,000, payments that were made by the Rosemont Seneca Bohai entity by Archer for Sportsman or for Hunter's benefit, so $4,500 that was paid to a medical bill, and then another medical bill of $6,000.   So that's the most conservative approach.

In addition to this, we had a Porsche that was purchased through Rosemont Seneca Bohai that was for Hunter's benefit.   That was from Novartus holdings which is Kegnes Rakishev.   Kegnes Rakishev is a Kazakhstan official or a Kazakhstan person.

And from what we were told, this was paid for Hunter to build a Tesla dealership in Kazakhstan.   I took it to be that it was for future business that the two of them might have together.   But the --

BY <u>MAJORITY COUNSEL 2</u>:

Q      So none of this was taxed.

A      None of it was taxed.

Q      And to date none of it has been paid or prosecuted.

A      So none of this has been paid or prosecuted.

And I would also like to note that the statute has run out on these tax years or on the 2014 tax year.

Q      Okay.

A      They were extending that statute up until December of --

Q      It's a 6-year statute?

A      Yes.   They were extending that statute -- he was signing statute extensions. And from the best of my knowledge, he never continued to sign those.   And I do not, as I

know it today, that the 2014 tax year, the statute's gone.    I have brought up that --

Mr. <u>Zerbe.</u>    Right.    Go ahead.

Mr. ████.    I have brought up that if we went based on an evasion theory, that he evaded these taxes -- so one more step to this is Hunter to his counsel told them about this scheme.

So basically said -- Devon Archer was handling the taxes and I was taking some of the money as loans.

So there's documentation of this and the date, everything.    So we viewed that as he's lying to his attorney.    He's telling his attorney exactly what happened, and he's trying to cover it up.    But ultimately it gets found out, and then Eric Schwerin ends up investigating it and figures out that, hey, you didn't report this money.    You need to file an amended return.

It's actually included on the marital separation agreement this tax due and owing related to this unfiled or related to this amended tax return.

So they actually were preparing and trying to file the [amended] returns.    We have found out that Hunter might have received advice that if you don't have the money to pay your taxes, then you don't have to -- then I wouldn't file your tax return or that amended tax return.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    Under what conceivable theory did DOJ not find that to be worthwhile to prosecute?

A    They believed -- they believed the fact that the -- they believed their defense that the money was a loan and that -- so through our investigation we did find out that --

Q    What did they contend it was a loan for?

A    Well, that was our argument, that you can't loan yourself your own money.

It just doesn't make any sense.    So --

Q    I mean, this just seems to be a series of sham transactions, correct?

A    So, yes, I would agree that the transactions would -- you would want to sham the transactions, yes.

I do know that, there were some issues prevalent that were brought up related to Devon Archer and his credibility.    So, also having a potential witness there, was also a problem.

But I offered, well, why don't you have the agent testify to this email?    The email's pretty clear in what he's setting out here.    Why doesn't an agent testify to this?

Q    At least with respect to the Burisma income --

A    Okay.

Q    -- he's getting a million dollars a year.    It started at least part of the way through 2014.    Okay.    So maybe it's 600 and --

A    So it's $666,667.

Q    Okay.    So he received 600 -- you know, north of $660,000 for serving on the Burisma board by all accounts for doing nothing.    And that money completely escaped taxation, correct?

A    A portion of it was taxed.    The reason why a portion of it was taxed -- and I don't want to get into the details.    But the money held in the account that was going towards investments, so the half that was going for that Bohai Harvest investment, that half, because there was no offsetting expense, would have been taxed.

Q    Okay.

A    Does that make sense?

Q    Okay.    Yes.

A    Because there was no offsetting expense, he wasn't deducting the payments

he's making, so Archer wasn't deducting the payments he's making on the return, that money would have been taxed.    So that money Archer would have paid some taxes over for about half of it.

Q    Okay.

A    That's why in our theory our most conservative approach would have been half the money.

Q    Okay.    Okay.    What can you tell us about 2015?

A    Okay.    So for --

Q    He's getting a million dollars from Burisma in 2015, correct?

Mr. Zerbe.    Excuse me.    I want to make sure.

MAJORITY COUNSEL 2.    We're off the record here.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Okay.    We're back on the record.

Mr. ███.    So 2014 and 2015 are interrelated because this is -- during 2014 and 2015, Hunter is having his [Burisma] payments paid to Rosemont Seneca Bohai.    So essentially what happens in 2015, the amount of taxes he owes at the end of the year, which I'm going to explain in a second, is because of what happened in 2014, because of this setup.

But what he brought up that I wanted to reiterate is the 2014-2015 tax year can still be in play.

And so what ended up happening is we were assigning statute extensions.    We were having these meetings on the 2014-2015 tax year.    And I believe that from what happened is, because D.C. said no, they have since let that statute run.    So they no longer asked for statute extensions.

I never got ahold of those statute extensions.    I don't know what they look like.

But what I could say is, if we had a neutral person come in here, in explaining my theory that in an evasion case, it's your last affirmative act.   If there are affirmative acts which [I believe] there are within the last 6 years, then we could potentially work that tax year.

Mr. <u>Zerbe</u>.   And you use affirmative acts.

Mr. ███.   I believe that there could be but I'd have to look at -- I would argue that there could be.   And then that being the meeting that he had with his attorneys where he basically tells them what happened and I view that as a lie, because what he did was actually different than what happened.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.

A    So 2015?

Q    2015.

A    All right.   So in early 2016, Hunter and Devon Archer receive a document request related to Devon Archer's Tribal bonds scheme.   So that document requests from Hunter.

So Eric Schwerin says:   What's this Rosemont Seneca Bohai entity?   You always told me that you had it taken care of.

So Eric Schwerin starts investigating it.   Starts investigating it in March and April.   Eric realizes that the [Burisma] money from 2014 wasn't reported.   So they need to report that, the money that Rosemont Seneca Bohai is earning, [on Hunter's] 2015 [tax extension].

So on the extension they include income from Burisma.   They pay a large amount of money with the extension.   And when the return is filed, Hunter owes, with this 2015 filing, so October 15, 2016, he owes $176,550 with no payment.   So at the time of filing, it's that amount.

In May of 2017, Hunter starts a self-imposed $10,000-dollar-a-month payment plan, making seven payments of $10,000 over the period May of 2017 through March of 2018, and then stops.

So our theory was with our case was that the amount that he owed after that payment plan stopped would be the most conservative amount.    So it would be $100,675.

But you could argue that the actual amount that he reported when he filed his return and did not pay $176,000, that that would be the tax amount [charged].

BY MAJORITY COUNSEL 2:

Q    Okay.

A    And that amount has been paid.    That amount has since been paid.

Q    The $176,000?

A    The amount that was owed for the 2015 tax year, yes.

Q    Okay.    And what was that amount?

A    It was over $100,000.    So it was including penalties and interest.

Q    So 2015's off the table now?

A    2015, yes, 2015 would be off the table because it followed the 2014 tax year. So that was D.C.

Q    Okay.    When you sought to get this prosecuted in D.C., what year was that for?

A    2015.

Can you ask the question again.    I'm sorry.

Q    Well, if you say 2015 has been paid --

A    Oh, so --

Q    I'm just trying to reconcile.    You said 2015 has been paid.

A     Yeah, so --

Q     But 2015 was also sent to the U.S. Attorney's Office in D.C. for prosecution.

A     With a willful failure to timely file and pay [charge] --

Q     Uh-huh.

A     -- the statute is that the taxes are owed.

And even if you pay them after --

Q     Uh-huh.

A     -- the crime still --

Q     Okay.

A     -- occurred.

Q     Okay.   Fair enough.

A     Yes.   2014 and 2015 in D.C.

Q     Okay.   And then what can you tell us about 2016?

A     Okay.   For 2016, there's quite a few things.   So --

Q     Is this D.C. or California, 2016?

A     2016, he didn't file his personal return.   But he did file his C Corp return.

Q     Okay.

A     So he filed one of them but didn't file the other.

And on the personal return, he didn't report payments he received, personal payments he received from Rob Walker.

Q     Uh-huh.

A     So it was $162,179, which would have given additional tax due and owing of $69,000.

Q     Okay.

A     But those payments, there was a reliance issue with that.   He had told this

or Eric Schwerin had told his accountants about those payments -- or the receipt of that money, in the beginning of the year, the [accountants] dropped it off later.   So we knew that there was going to be an issue with that.

So the only thing on the table for that year was the failure to timely file and pay the taxes for his personal return --

Q      Okay.

A      -- which would have been $45,661 that he filed with -- when his [Form] 1040 was [filed] --

Q      Okay.   And how about 2017?

A      Could I say some other stuff regarding 2016 --

Q      Okay.

A      -- real quick?   During the fall of 2017, Eric Schwerin and his accountant, Bill Morgan -- and I have to say that Bill Morgan has since passed away.   He died in 2019. But that was his accountant.

Both made a significant effort in getting Hunter -- in getting the prepared returns to Hunter.   They sent multiple emails to Hunter and even a package with the returns, ready to go in his office.   All he had to do was sign it and mail it in.

In an email from Hunter to Eric Schwerin on November 17, 2017, he says:   "Also, I just saw last week the unmarked envelope in the office requiring signature for my taxes."

This email further confirms that Hunter received the 2016 tax returns but failed to file them timely with the IRS.

And the venue for that would have been California.

Q      Is that because he moved to California?

A      With the failure to file, it would have been where you lived.   I'd have to

look back in my notes.    But this one also could be D.C. or California.

Q    Okay.    When did he move to California?    Do you know?

A    I know he officially moved April 1st, on or about April 1st, 2018.

Q    2017?

A    Yes.

Failure to timely file and to pay taxes owed when -- so this is for both his corporate and personal returns.

Q    Uh-huh.

A    The taxes owed when he filed his Form 1120 was $13,630.    I don't believe that those taxes have since been paid but -- to the best of my knowledge I don't believe that the corporate taxes, that small amount has been paid.

Q    Okay.

A    And then for his personal return, failure to timely file and pay his taxes owed when his Form 1040 was filed, $581,713.

Q    So half a million dollars.

A    Yep.    And that has been paid and that is through, which it's in the media, is through Kevin Morris paid that.

Q    When was that paid?

A    That was paid in and around October of 2020 or October 2021 -- I apologize -- 2021.

Q    Okay.    How about 2018?

A    All right.    So 2018 was the false return year, but then you also have failure to timely file and pay because these are the returns that were filed late.

So what ended up happening is Hunter goes out to California in 2018.    In his book he's talking about substance abuse and drug use and all these different --

prostitution --prostitution use and all this different type of stuff.

So in 2019, he marries his wife, Melissa Biden, Cohen-Biden.    And he is newly sober.    At that same time, I believe there's also a Senate investigation, and he also is having the Arkansas child support payment case.    And then at that same time he also had the ex-wife that he was in breach of the marital separation agreement.    So he has all these things coming to a head.

And it's not until November of 2020 -- let me go back to the first page.    It's not until November of 2019 -- I apologize -- 2019 that he hires Edward White & Company as his new accountants.    So he hires Edward White.    They're out in California.    And the reason why is the judge in the Arkansas court case asked for tax returns.

Q    Okay.

A    We believe that that was part of the reason why.

So February of 2020, he files his 2017 and 2018 Forms 1040 and 1120.    2016's [Form 1040 was] not filed at that point.    July of 2020 --

MAJORITY COUNSEL 2.    I should note we're at our hour mark.    We want to be respectful of our time.    So we may have to push pause.

MINORITY COUNSEL 1.    Okay.    That's great.

EXAMINATION

BY MINORITY COUNSEL 1:

Q    Thank you very much for appearing before us today.

I have some questions that I wanted to go over from some of the things that you had already mentioned, and I want to make sure that I actually had them correct in my notes.    Some things should be relatively straightforward.

You talked about being on the case, and you were assigned to the case November of 2018.    This was in your opening statement.    You were talking about the fact that you

had gotten some comments from some of the AUSAs about the case itself.

You had said, quote, "After three of these filings, they said that we could go forward."

What were the three filings that you were referring to?    This was in the context of, I guess, moving the case forward.

Mr. Zerbe.    Can we go off the record here?

MAJORITY COUNSEL 1.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. ███████.    My initiation packet, so sending the case forward to get -- we call it subject case.    It's an SCI.    It's elevating the case to actually working the investigation.

My first one showed the unfiled returns and the taxes owed for 2015 and that was it on my first package.    So that was the wrongdoing that we were alleging.

And my supervisor goes:    You don't have enough.    You need to find more.

So I kept digging for more and more.

And even after that point, he goes:    You haven't found enough.

So I ended up searching bank reports that [I] ran on the periphery of what we were looking at.

So I ran bank reports for Burisma, and in those bank reports I had found additional payments that Hunter had received.    And then at that point I had found that Hunter did not report the income for 2014 related to Burisma.

So now I had a false return year.    So that alone -- it was basically so much evidence that I put in there -- allowed us to elevate the case.

BY MINORITY COUNSEL 1:

Q    You filed three of those initial reports?    Is that what the three filings were,

or was it three times going back to him?

A    Three times going back to him.   That would be the correct way to state it.

Q    Shortly after that, you talked about in March and April of 2018 that Attorney General Barr had made a decision to join the cases.   And then you said that Delaware had opened the case.   You said January of -- is that 2019 or 2018 or 2020?   I didn't get the year.

A    It was January of 2019 --

Q    Okay.

A    -- that Delaware, U.S. Attorney's Office, and FBI had opened up the investigation.   They wouldn't have been able to see in our IRS system that we had a case open.

Q    Okay.

Mr. Zerbe.   Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 3.   Back on the record.

Mr. ███.   Okay.   So that would have been that we joined -- you're talking about one that we joined together?

BY MINORITY COUNSEL 1:

Q    [Nonverbal response.]

A    May of 2019.

Q    Okay.   You're talking about 2019.   You were mentioning the fact that there was a George Murphy that was writing memos or emails and documenting some of his conclusions that were on the other side regarding this case.

Could you tell us more about him?   What's his title and who is he and how does he relate to you in terms of your chain of command?

A      So it was actually Matthew Kutz.    He was my supervisor at the time and from the articles that he was sending me, I would say he had more of a liberal view than I had and it was pretty obvious from the things he would send me and discuss.    And that's just me making an observation.

So I later found out about these memos that were put in the file regarding the issues that he saw with the investigation, the fact that we even had it opened.    So I only learned about those after.

And then it came to a point to where he's sending us so many media articles about different issues that I had to tell him stop, please.    And I had to go around him.    And that's when I went to my ASAC at the time, George Murphy, who was above him.

MAJORITY COUNSEL 2.    Off the record.

MAJORITY COUNSEL 1.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    On the record.

Mr. ████.    So these articles were a lot about -- were a lot of articles regarding Trump and getting a fair investigation and things related to that, Trump's tweets and stuff like that.    So, that's what drew me to my conclusion.

BY MINORITY COUNSEL 1:

Q      What was the purpose behind him sending you the Trump tweets?    What was he trying to get at, or was he trying to give you more information for your case?    Why would he send those, or do you know?

A      Yeah, I think he was bringing up concerns with potentially us prosecuting the case down the road, potential issues we're going to incur.    I don't remember the exact email that he sent that caused me to be -- that he had to stop sending me some of the news articles, because it wasn't even the fact that he was sending me these news articles.

It was the opinion he was providing in those emails that I did not agree or that I did

not -- not agree with but did not think was appropriate.    That's --

Q    Okay.    You mentioned -- this is a little ways later -- I believe on September

the 9th of 2021 that you had an email.    You were reading through it, and you had

mentioned that Stuart Goldberg was leaving town.

You said there was a name that you wanted to leave out when you were reading

the email.    What was that name?

A    So it was the name of Hunter's personal counsel, George Mesires.

Q    Okay.    Moving forward -- and we are into October 12th of 2022.    You had

mentioned, I think, at some point that you had maybe a list of 30 individuals you wanted

to interview.    Then they had maybe dwindled that down to, say, 10.    On October 12th

of 2022, you said the last interview took place.

How many interviews did you do in total?

A    Of witnesses?    Well over 60.

Mr. <u>Zerbe.</u>    No, no, no.

Of the 30 that you had put in the list, take her through what happened to that list

of the 30.

Mr. ████.    Oh, okay.    So of the 30, of the 30 that were in the list, I believe we

talked to or had the opportunity to talk to all of them or a majority of them.

And there were even additional ones that came after that.    So I think total in the

case we talked to maybe 60 witnesses, if not more.

BY <u>MINORITY COUNSEL 1</u>:

Q    Is that typical for the amount of taxes that were owed in this case that you

would talk to 60 witnesses?

A    Yeah, so I would say when it's a joint investigation with FBI and

IRS -- especially for a false return to where they're deducting things that appear personal, that would be typical that you would go out and talk to people around him at the time, that these returns are around, or that the tax returns are around.

I guess this kind of has a nuance, though.    So a lot of the issues that we were encountering were regarding substance abuse.    So his frame of mind, was he -- like he was obviously involved in these large dollar deals.    But -- how did he act?    Was he in a clear frame of mind?    Was he a functioning addict?    All those different things were important and why we went and talked to a lot of the witnesses we talked to.

Q    Okay.    A little bit later on you had mentioned that he was sending Venmos to family and friends.    In particular, one person was Valerie Owens, his sister.

What was the amount of these Venmo transactions?    I know you wanted to reach out and talk to the individuals.    What was the size of the Venmo transactions?

A    I'd have to look back at them, but they were between zero and $2,000.

And I know that some of the family members were on trips and went to visit with Hunter during this time period.    So that's why some of those things, if they were out there, visiting him and he's claiming that these are business deductions, they would give insight as to where, what business was he doing, stuff like that.

Q    Is this typical that you would want to talk to people's grandchildren and relatives when they have amounts that are between zero and $2,000?    Is that typical?

A    So I can say for the kids -- there was Columbia school tuition, $30,000.    That was deducted -- I believe that was for ███████ or █████ .    There was prep, study prep, checks that were deducted for one of the kids or one of -- and when I say the kids, one of Hunter's kids.

So it wasn't just those smaller dollar amounts.    There were others that were included in there.

BY <u>MINORITY COUNSEL 2</u>:

Q    Following up on that, the deductibility of tuition expenses and fees is sort of a matter of law.    Right?

A    Yeah.

Q    -- its treatment is pretty clear in the Tax Code one way or the other.

What kind of information would you generally hope to gain from talking to the grandchildren about payments that were sent?

A    So there were other payments or other credit card payments, so for clothing, for jewelry, for certain things.    There's a ton of different expenses that were also included in there, in addition to something like Columbia or prep or the tuition.

So as a part of our cases -- you have to have a third party that comes in.    And we can't just rely on that statement that, oh, it's not deductible.    We have to actually call someone in, as a witness, to --

Mr. <u>Zerbe.</u>    Confirm.

Mr. ████.    -- confirm what that's for.    There's a legal term for it, but I can't think of it off the top of my head, for why we have to do that.

BY <u>MINORITY COUNSEL 1</u>:

Q    Typically, and we're asking here, if the IRS goes to investigate an individual for taxes that weren't filed or weren't paid, such as the situation that we're in now, the IRS goes out and talks to all of their relatives and grandchildren and other people, 60-plus witnesses, that's typical for a case?

A    What I would say to that is every case is different.    You have to follow where the evidence leads you.    If evidence is leading you to family members or people receiving payments on behalf of that person, then those would be leads that you would go and follow.

So in addition to some of this stuff that we've been talking about, he also had members of his family, including Lunden Roberts, on his payroll.   We know that during the time period she was paid, she did not work for him.   So he was deducting things for salary for employees that were his family members.   A lot of those witnesses are people we would go and talk to.

Q     Before you get to this point, is there any set of questions that you send out to the person that they can answer and respond back to you?   Or is it at the point that it reaches your group it's like, 60 interviews?   You're out, talking to every person that they know.

Is there an opportunity for the person to agree or not agree to anything that you're saying is personal and maybe not a proper business deduction?

A     So when it comes to witnesses, those interviews are voluntary.   They don't have to talk to us if they don't want to.   So a part of what we do in our job is we go out there and we interview witnesses.   So there are situations where we can let them know that we're coming but the majority of the time we go and it's a surprise visit.   So they don't know that we're coming.   They're not prepared for what they're going to say. That's typical of our cases.

Q     Is this in a situation where the person contests what they owe, or do you just do this off the bat if it gets referred to your unit?

Mr. Zerbe.   I didn't hear that que -- can you --

Mr. ███.   Yeah.

Mr. Zerbe.   Can you say it one more time, ███?   I'm sorry.

BY MINORITY COUNSEL 1:

Q     I'm trying to understand if, in this situation, was there some opportunity where any taxpayer -- doesn't even have to be this particular one -- does the taxpayer

have an opportunity to see the facts and decide whether they're going to contest what you're saying?    Could he have just paid this at the very beginning is my question?

  A So -- I guess the problem with that would be the reason why -- let's take a step back, big picture.

  So there's IRS civil.    So they're coming in, and they would do audits.    They would do all different sorts of type of work related to civil issues.    So that essentially means that you made a mistake on your return.    You didn't report something.

  Where we come in, IRS criminal investigation, is that there was a willful omission or there was a willful criminal act that you took part in, in order to either evade your taxes, to file a false return, to not file timely your tax return, to not pay your taxes.

  There's a big difference and there's a big distinction between what's civil and what's criminal.

  And so with us on the criminal side, as far as your question goes, does he get an opportunity to come in and explain, so once our case is referred we offer the person an opportunity to talk to us.    We go and do an interview.    If he has an explanation, a lot of people will offer their defenses at that time.

  In this case, December 8th, 2020, we went and tried to interview Hunter.    And he declined to be interviewed.    So that's his choice.    That's his right.    But we did afford him an opportunity to explain what happened.

  And then as far as when the case is referred, when a case is referred for prosecution to Department of Justice tax, the target or the subject of that case is entitled to what's called a taxpayer conference.    And that's where they meet with their defense counsel, and their defense counsel says here are my defenses.    Here's why I don't think you should charge me.

  Q And did he do that?

A       His account[ant] -- I was not allowed at those meetings which, to be honest with you, that -- sometimes they don't have us at these -- at those meetings.    But with a case like this, of this caliber -- we asked to be at those meetings.    They said that we couldn't be there.    I know of other agents that are at those taxpayer conference meetings.

Q       Okay.    I want to get some sense generally of your caseload and what you work.    How many cases do you currently have?    How many cases did you have back in 2018 when this case was assigned to you?

A       I was new to the group.    So this was one of two cases that I was working at the time.    And then moving forward to right now, I have one large case.    But it includes probably 80 tangential cases -- or 80 sort of spinoff cases that I'm trying to manage and work, as well.

That's abnormal.    Normally for an IRS special agent, normally it's one or two cases that they're working a year because of how much work goes into them.

Q       You mentioned that one of your other cases is paused.    How many cases do you have that are paused?    I don't know how you count the one large one with the 80 tangentials.    But how many of those are paused?

A       Probably 20-ish.    Let me rephrase that.    I would say 10 to 15.

Mr. Zerbe.    Why are they paused?    You might expand on that.

BY MINORITY COUNSEL 1:

Q       I was going ask that question.    So, yeah, go ahead.

A       They are second-guessing the strategy that we're putting forward on those.

Q       Do you have any idea of a timeline when they would get back to you on when they would lift the pause?

A       I didn't -- I was told it was going to be quick.    And it -- I know that my

supervisor is meeting with some of the leadership today to talk about it.

Q    In your cases that you've had, first starting back since November of 2018, coming forward, have you had disagreements in other cases that you've been working?

A    Yeah, yes.

Q    How did that play out?    How do your disagreements play out generally?

A    I can give you an example of in another situation I was working, we also had a person who had failed to file returns and they earned a significant amount of money and they went out into -- I need to be -- so they had that situation at hand.

I went to the prosecutors on the case.    And I said, hey, this person has these unfiled returns.    I'm thinking that specifically with what has happened -- and specifically with what has happened in news reporting related to them, I think we need to go talk to them.

And they were, like, well, no, you probably shouldn't do that.

They at the beginning onset they did not agree with me.    So me and my supervisor, we sat down with them.    And we said here's the reasons why we should go forward and interview [them].    Put [them] on notice regarding a potential tax investigation and see if [they] want to come in and talk to us.

And they were a "no" in the beginning and they changed to being a "yes" and we actually went out and did that and that is turning out to be something successful right now.

Q    Is that the same supervisor that you had on this case or --

A    Yes.

Q    -- is it a different supervisor?

A    Same supervisor, Gary Shapley.

But I want to draw your -- so remember that captive insurance case that I talked

about?   That was a huge disagreement.   I was honestly devastated by that.   And I met with top, top officials on presenting the evidence and presenting the case.   And at the end of the day it was still a "no."

And that was a huge -- I felt that the evidence was strong enough but their opinion was different than mine.   So that was something that -- that's the best example that I can give of that.

Q    You said that there are 12 people, roughly, in your group?   Is that correct? How many are in your group?

A    Twelve.

Q    Twelve.   Those twelve individuals, did they all -- oh, go ahead.

A    Approximately 12.   Let me --

Q    Okay.   Approximately 12.   Did all 12 of those individuals work on this case?

A    So in some form or fashion, they would have either helped with interviews, been a secondary on interviews.   There are a couple of newer agents who haven't had time to help in our group.

But, I think the notion that our group was removed was they weren't going to assign it to another person within my group, if that makes sense.   They wanted to go outside of that.

Q    How many groups like yours are at IRS?

A    There's only one International Tax and Financial Crimes group.   There are similar groups but they work different things.   So there's a Cybercrimes group.   They specifically work cybercrime cases.   There's an Excise Tax group.   They work alcohol, tobacco.   I forget what specific name they have.   But they only work those types of cases.

So we have specialty groups that are established around.    We're unique to the international tax realm.

Q      Do you have any questions?

BY MINORITY COUNSEL 2:

Q      I do have a few questions.    I apologize that I was late.    I had a preexisting commitment this morning.

I want to also clarify some things in your statement.

Could we talk a bit about C.T.?

A      Sure.

Q      Who is Christy Steinbrunner exactly?    What was Christy Steinbrunner's position?   Do I have that name right?    Christy Steinbrunner?

A      Yeah, Christy Steinbrunner.

Mr. Zerbe.    Can you spell it?

Mr. ████.    She had that correct spelling over there.    So I think --

Mr. Zerbe.    Okay.    Good.

Mr. ████.    She is essentially a line attorney with the national office, and she deals directly with our international tax group.

BY MINORITY COUNSEL 2:

Q      But was she a part of C.T.?

A      Can you say that again?

Q      I think in your testimony we said that the report went up to C.T. --

A      Yep.

Q      -- and that Christy Steinbrunner had been saying all along that this was good to go.    This was the green light.    Or a yellow light.    I'm trying to figure out what the relationship between her and C.T. was.

[Discussion off the record.]

Mr. ████.   So within IRS we have what's called Criminal Tax counsel.   They're our advisory internal counsel for the IRS.   So, when we send a case initiation package forward to DOJ tax, it has to go through their review, as well.   And they provide [an] advisory [opinion].

BY MINORITY COUNSEL 2:

Q     And so Christy Steinbrunner was not part of that advisory group per se.

A     She is -- she's the line attorney who does the initial review --

Q     Okay.

A     -- of the prosecution report.

Q     I see.   Then it goes to some sort of review panel?   I'm still trying to figure out --

Mr. Zerbe.   We'll just take you through it again.   Okay.   So --

Mr. ████.   So from my understanding -- and this is what I've learned after is she reviews the prosecution report.   She reviewed our package.   So let me step back even further.

So this entire case, since Christy was the one who reviewed my initiation package, she's someone I've been communicating to with issues, evidentiary issues, what's been going on in the case.   So I've been keeping her apprised with everything that's been going on.

So when the case comes to her, she's not just taking this cold.   When the case gets up to C.T. counsel, she reviews it and writes what's called a CEM, a Criminal Evaluation Memo.   That CEM, she was telling me the entire time, was a concur and it was what she was calling a green and a yellow light, green for the later tax years, yellow for the earlier tax years.

And what I had learned is that needs to go up to a panel at [CT-Counsel], their national office, because of this case, for them to review.

And what I've heard on the back end -- this is technically hearsay -- is that they all agreed with her recommendation.    But then it went to people above her and they told her that -- your writing appears like you want to give a nonconcur.    So this needs to be a nonconcur to all charges.

BY <u>MINORITY COUNSEL 2</u>:

Q    And there's no document that was produced out of C.T. memorializing that nonconcur judgment?

A    So they provided a -- what, the Criminal Evaluation Memorandum?    So there is a document that is, yeah, that memo.

Q    That's a document that Christy Steinbrunner wrote.    And the idea is that -- and I'm just sort of trying to -- she was told that -- because I assume initially when she wrote it, she concluded, this was a green or a yellow.

Was she instructed to change her evaluation or was there a subsequent other written document that evaluated the work that she's submitted and gave other reasons why there was a nonconcurrence?

A    So, I mean, I don't know that.    Obviously, there has to be records of what went up and then what came back down.    So there is definitely -- if it's there, it's there.

But, I have an exchange with her through Messenger where I said to her:    Did you know that they were always saying it's going to be a nonconcur?

Ms. Steinbrunner responded:    "What?    No. I sent them a yellow light."

After discussing this, I couldn't believe, because we were doing everything in our power to show -- because normally what happens is, if they give us a nonconcur, we try to go back to them with additional evidence or additional investigative work so that they

can give us a concur.

The fact that it came back just a flat nonconcur to all years, it was one of many

blows that we encountered.

Q    Right.

A    I had even suggested sending the report up without the subject's name,

putting in just the Doe so that people couldn't see.    But they said it would be too hard to

take out the details related to the subject, that people would know who it was.

Q    Can you describe for me to the best of your ability why Christy

Steinbrunner -- you just said that she represented to you that her recommendation was a

yellow.    What is the difference between a yellow and a green?    Why would a

recommendation be yellow as opposed to green?

A    So from what my understanding that she said is, yellow is we're concurring

but we're giving cautionary statements of these are the legal impediments that we see.

So these are the legal issues that we see.    Even though we're agreeing to move it

forward, we think that these issues might come up.    But a red is basically, we don't think

you should move forward on this.

Q    Were there specifics that she mentioned as far as what legal issues might,

what the hazards of litigation were in particular?

Mr. ███.    Can we go off the record?

MAJORITY COUNSEL 2.    Off the record.

[12:46 p.m.]

MAJORITY COUNSEL 1.    We can go back on the record.

Mr. ████.    Part of the impediments were how a jury was going to look at this.

BY MINORITY COUNSEL 2:

Q    And that being because a jury might find the facts sympathetic?

A    Yes.

Q    You alluded to that possibility as well -- when the case went higher up -- or at least -- I'm not sure if you heard this information directly or if this was information that you testified that you heard indirectly regarding a decision that one part of the DOJ had reportedly made that suggested that facts that might have come out in 2014 or 2015 could create something of a sympathetic taint for later tax years.

Is that something that typically, in your role primarily as an investigator, you would discuss in a normal course of business with those who made the prosecuting decision?

A    Yeah, because those are things that we want to counteract throughout our investigation, or those are things that we need to address as a part of our investigation.

Q    And --

Mr. Zerbe.    I'm sorry.    Go ahead.

MINORITY COUNSEL 2.    Oh, no, no, I think that you're sort of anticipating my next question.

BY MINORITY COUNSEL 2:

Q    Would you be able to describe what those factors might have been that would give concern to those making a prosecuting decision?

A    Yeah.    So, you're referring to the meeting that we had with David Weiss,

the U.S. attorney, in September of 2022.

In that meeting he had alluded that DOJ Tax was of the mindset that the jury's sympathy -- related to the death of his brother and the drug use -- would affect the later tax years, and that David, at that time, was weighing whether to go forward based on that or not because he was getting swayed one way or the other.   And David said he felt strongly with the evidence and what we were presenting.

And another part I want to add in is, when we say that the scheme is developed in 2014 -- so 2014, Hunter is entering this million-dollar board agreement with Burisma. So, he is very well aware.   He's not apparent to be on drugs at that point.   It's not until Beau dies in May of 2015 that he kind of falls off the wagon and all these different issues start arising.

So I guess that's also important, is that during his sober -- or not his sober time, but during a clear-of-mind time, he's engaging in this agreement.   And then that caused the false return to be prepared.

But, looking back at everything, I don't know if those meetings held with us were just to make us happy, because David didn't -- we were already told no by D.C., and they told us not to bring forward a case.   I don't even know if at that time whoever at DOJ leadership told them, because I've learned later that he was told that he can't get special counsel authority to charge the case in D.C. and that he needed to follow the normal process.

Q     Okay.   Thank you.   That's a helpful clarification.

Just a few other specific follow-ups.

Going back now to the CT report and your work.   I don't know if it was a report per se.   But you learned of some judgment on this panel.   You went on to say that the leadership nonetheless, notwithstanding this recommendation, ended up pushing this

case through to the DOJ Tax.

What do you mean by "our leadership" in that decision?

A       So I don't know -- I know it has to go up to the special agent in charge, but I don't know if it went above him.    I thought it would have to go above him.    But it was either the director of field operations or the special agent in charge approves the referral that ultimately sends the case to Department of Justice Tax Division.

And so what happens at that point is DOJ Tax then reviews it.    In this case, they established a third-party reviewer, John Kane, to come in and look at the merits of the evidence.    And then, he's supposed to take an objective view of the case, which he was doing.    And that then goes to Stuart [Goldberg, Acting Deputy Assistant Attorney General] to ultimately be approved or declined.

Q       In your discussion of the various frustrations that you experienced along the way in terms of conducting your investigation, you discussed internal IRS issues and that often you went to the director of field operations, for instance, and that there was a lot of slow-walking involved in the IRS.

Do you think that the fact that they approved or pushed forward, in IRS leadership and the director of field operations, a case which had otherwise received a negative or a nonrecommended charge from this review panel is indicative of the fact that they weren't trying to slow-walk anything?    How do you reconcile, I guess is my --

A       No, I understand what you're saying.

So CT counsel is advisory.    They took the maximum amount of time to review this case that they could possibly take.    That's first off.

As far as my leadership goes, we're trying to point out that the slow-walking and the approvals for everything, a lot of that happened at the U.S. Attorney's Office in Delaware and DOJ Tax level.    So it wasn't more -- and we were just trying to make our

leadership aware of all those issues that we were encountering.

Q      So the slow-walking was not from the internal IRS per se, or maybe it was at the behest of DOJ --

A      Yeah.

Q      -- you suspect?

A      Yes.    And I would like to say that -- it appeared that our agency had their head down and didn't want to know any of the details or problems that we were having. We would communicate a lot of issues up, and they would say that they're communicating those higher than them, but we would never know if that were to happen.    We only ever met one time with the chief on this investigation, and it was towards the middle of our investigation.

I wanted to -- maybe this fits, maybe this doesn't, but -- communication issues.

So there's an FBI supervisor -- this is August 25th, 2022.    So Garrett Curley is his name.    He was an acting supervisor over the group that was working this case.

He says:    "I know we have our monthly meetings" -- and this is going to Lesley Wolf, AUSA for Delaware -- "but dissemination of information in between those meetings is being missed.    At least for me, I'm finding out about meetings, updates, and interviews well after the fact, which is causing me to send the wrong information to my headquarters.    I figured with everyone's schedules, an easiest way to correct this is through an email chain or going back to weekly meetings."

Lesley's response on August 25th, 2022, was:    "Garrett (ph), please stand down on this until we've had a chance to connect the next week."

So he was basically shut down after he was like:    You guys aren't communicating to me.

Q      Did you know if they ended up connecting?

A     I believe that they did end up connecting, yes.

Q     In my experience, sometimes having long email chains on things like that, sometimes things are missed.    Maybe what she was suggesting was a phone call would be easier to talk about.

A     Well, we were such a big team, there was a lot of this happening to where -- like us not being included in the taxpayer conference meetings.    There was a lot of information turned over at those meetings that we didn't hear about or we heard about late.   So there was definitely a breakdown in communication of what we heard.

And one thing that I want to be clear on, that there was information -- and I don't know the detail of that information that was withheld from us -- but there was information withheld from the investigators.

And some of that was withheld for privilege.    But there was other things -- we went out and talked to one of the potential prostitutes.    And there were videos that I've seen out there on Twitter, on the internet, and information related to that person that I had never seen before.

And I brought this up as an issue.    I'm like:    I'm seeing things here.    Why am I not seeing that from you guys?    And when I say "you guys," the prosecutors.    And there was a notion that some information was being held back from us, and I don't know what that information was.

Q     Because we discussed this earlier, that there were leaks, there were multiple leaks throughout the course of the investigation.

Would you say that the number of leaks to the media was typical in this case compared to a normal case in CI?

A     I would say, in my personal opinion, I would say it was low.    With a case of this high-profile nature, I would have thought it was low.

Q      But in terms of a comparably high-profile case anyway.    There were leaks, and there were some -- but you think --

A      So I'd go back --

Q      What's an example of another high-profile case that we're comparing that to?

A      So some of the information that was released -- or some of the information that was leaked related to the Trump classified documents.    So that case.    So there were actual pictures that were leaked from inside the search warrant.    And this is what my memory of seeing things in the media.    So that's something that I remember.    But, I mean -- yeah.

Q      I guess my follow-up is, do you think in a case where there have been leaks and there's perhaps concern about leaks through the media, it's appropriate for, in some cases on some levels, for information to be held in a tight group to sort of -- prevent further leaks?

A      I do understand what you're saying.    But if the investigators don't get the material to investigate the case -- typically -- we investigate the evidence, and we send that to the prosecutors to review, or here's the pertinent stuff.    It's not the other way around, typically.

So I am following what you're saying, but we had, in my opinion, we had no concerns of leaks on our internal team.    Prior to us going overt, prior to that December 8th day of action, up until a couple days before, there were no leaks at all.    So that just shows you how tight-knit our group was.

Q      I have one more question, and then I can turn to ███ again.

I want to skip way forward again to the removal of your team from the investigation.    I guess I have a few questions.

As far as you know, is there still an active investigation in the matter?

A      Yes.

Q      Obviously, the IRS is a very large organization, 80,000-some employees.

I think you recited it for the chairman, but just to confirm -- in terms of layers of review between you and Commissioner Werfel, are we talking six, seven, roughly?

A      One, two, three, four, five, six.    So he'd be number seven.

Q      Number seven.

In the normal course, would you expect that the Commissioner of the IRS would have direct knowledge of any kind of personnel shifting or maneuvers seven levels down?

A      I would think in a case of this nature, if I were a leader of -- if I were in charge of an agency, I would want to know about stuff that's going on with inside the IRS, and here's the reason why.    It is things like this can affect the reputation of the agency. You know what I mean?    It's a big risk with something like this out there.    And, that's my opinion.

Q      But you have no reason to believe that Commissioner Werfel knew of this short of his being informed by perhaps his deputy or someone below under the normal course of events, someone in the command would have to explicitly inform Commissioner Werfel.    For instance, Commissioner Werfel would not in the normal course directly make these personnel changes.

A      So I would say that he knew that there were, prior to my email, he knew that there were whistleblowers related to this case because they specifically asked him about whistleblowers within the IRS.

Mr. Zerbe.    I want to make sure -- you made one point.    I think you need to clarify it for him.    He asked if the case is going forward.

I think for everybody here, explain though that it's not just kind of Garanimals

where they can swap you in and out.    Talk about, you not being on the case, you have to put somebody in new, but kind of how that impacts.    I just want you to understand that.

Mr. ▮▮▮▮.    So what's frustrating -- and I think it's obvious is he removed two of the people who have been challenging and been kind of like this is the -- we're trying to do the right thing, we're trying to do the right thing.    And it was kind of like we got loud enough, and they found an avenue to remove us.

I have been told by so many people on this case that we're where we are today because of my work.    It's 5 years of an investigation.    You can't just pick up that and move it onto someone else.

And if they removed all the prosecutors, DOJ Tax, and had a brand-new team, I would understand that completely if that's the decision that they made.    But they just removed us.    Not our management -- I mean, that right there should tell you a lot.

Did I answer that?

Mr. Zerbe.    Yeah.    Let me go off the record.

[Discussion off the record.]

Mr. ▮▮▮▮.    On the record.

I just want to say that I made every effort to -- when we work these cases, you have to be careful of what you might say that could be used against you if you were to go to trial or if you were to go in front of a grand jury.    Usually, the IRS special agent is the final witness, the summary witness.    So things that you put out there in emails, they can attack you at a later date.

So I did everything that I could to possibly make the record as clean as it possibly could, investigated the case, but in doing that, here's all the things that happened because of that.

MINORITY COUNSEL 2.    ?

BY <u>MINORITY COUNSEL 1</u>:

Q    Okay.    I only have one other question that I wanted to go back to.

In your cases that you have, the what I would say spin-offs and everything that you've worked since November of 2018, are there any other cases that involve sensitive individuals that you would consider to be sensitive cases?

A    Not of a political nature.

Q    Okay.    Is this the only case that involves, say, children or family members of a politician?

A    Yes.

Q    Okay.    Are there any cases that involve politicians themselves?

A    That I've been removed from or --

Q    Just that you've worked since November of 2018.

A    That are spin-offs of this case?

Q    Just in general.    I'm trying to --

Mr. <u>Zerbe.</u>    I don't think she's trying-- let me think about it.

Let me go off the record?

[Discussion off the record.]

Mr. ███.    On the record.

This is the only one that is of a nature that's politically sensitive.    So the answer to your -- yes, this is the only one.

<u>MINORITY COUNSEL 1.</u>    Those are all my questions for now.    Thank you.

Mr. <u>Zerbe.</u>    Can I suggest, if we could take a break.

<u>MAJORITY COUNSEL 1.</u>    We'll go off the record.

[Recess.]

<u>MAJORITY COUNSEL 1.</u>    We'll go back on the record.

We've got a series of questions we're going to jump back into.   I know you had a lot of prepared materials, and I just want you to know that when we get to the end, we'll make sure to give you an opportunity if there's anything we haven't covered.   So I don't want you to think it's your last chance to cover stuff.

BY <u>MAJORITY COUNSEL 1</u>:

Q     Okay.   When we last left off our questioning, we had, I think, just gotten through tax year 2018.

A     Yep.

Q     Could we go back to what we were talking about?   And can you tell us what we need to know about tax year 2019?

A     And do you guys care if I -- so I want to put this in an even bigger picture. And I'm sorry I didn't start out with this, but now that I've got some food in my belly.

Global income streams for everyone altogether, so it's for the period 2014 through 2019, our investigative years, so the total global transfers that Hunter and his associates would have received from Ukraine, Romania, and China was $17.3 million, approximately.   Okay?   So a staggering amount.

So Burisma paid to everyone involved $6.5 million.   Burisma to Blue Star, $540,000.   Burisma to Boies Schiller -- that was the law firm that Hunter was of counsel for -- $288,000.   So that's $7.3 million to those people.

Approximate total transfers from the Romania company -- I say the Romania company, I just want to keep it at that -- to everyone was $3.1 million.   The total transfers from HW III to everyone was $3.7 million.   Total transfers from State Energy HK to Rob Walker was $3 million -- or to Robinson Walker, LLC, correct that.

Total transfers from CEFC Infrastructure to Owasco P.C. was $100,000.   So that's $6.8 million.   So that gives you $17.3 million.

Of this amount, for the period 2014 through 2020, I have extended it one more year, but it pretty much ends at the end of 2019, that's when income stops coming in, it's $8.3 million.    This is what Hunter would have received of that.

So total Burisma net of Devon Archer payments was $2.6 million.    Total transfers from the Romania company via Rob Walker was $1 million.    Total transfers from HW III net any payments to James Biden was $2.3 million.    The total transfers from CEFC was $100,000.    Total transfers from State Energy HK from Rob Walker was $664,000.

You also have cash that was deposited.    That was $50,000.    You have a chip diamond and a larger diamond.    The larger diamond from various reports that I've read, it's about $80,000.    We still don't know where that diamond is at to this day.

You have the Porsche, which was $142,000.    You have half of an investment in a company called American Well that was $25,000.    You have medical payments made by Archer, that's $10,000.    So these are all approximates.    Let me just reiterate that.    And then you have the one-third capital contribution made into Bohai Harvest that was $325,000.

You also have other [Form] W-2 payroll that he received of $859,000.    So that gives you a total of $8.3 million.

This does not also include any benefit or payments received by Kevin Morris.    Okay.

MAJORITY COUNSEL 2.    When Kevin Morris paid the 2017 tax bill --

Mr. ████.    He paid the 2017 tax bill, yes.

MAJORITY COUNSEL 2.    That's a taxable event, correct?

Mr. ████.    So can I -- since it's 6103, can I --

Mr. Zerbe.    You can explain it.

Mr. ████.    Okay.    So on Hunter's 2020 tax return --

MAJORITY COUNSEL 2.   Let me ask you this.   Did he plus it up?

Mr. ███.   Did he?

MAJORITY COUNSEL 2.   Plus it up?

Mr. Zerbe.   Let him --

MAJORITY COUNSEL 2.   Okay.

Mr. ███.   What do you mean by "plus it up"?

[Discussion off the record.]

Mr. ███.   Okay.   Yeah.   No, I apologize.

BY MAJORITY COUNSEL 2:

Q   No worries.

A   So on his 2020 tax return, personal tax return, Hunter stated:   "See statement in 2020.   The taxpayer received financial support from a personal friend totaling approximately $1.4 million.   The parties agreed in 2020 to treat the support as a loan and later documented their agreement in a promissory note in the amount of $1.4 million, 5 percent interest.

"The promissory note requires periodic payments between 2025 and 2027.   The promissory note was executed by both parties on October 13th, 2021.

"The taxpayer is treating this amount as a loan for tax purposes.   The balance of the financial support is treated as a gift.   No amount of the support is treated as a reported taxable event on this tax return."

So that's what was filed with the return.

Q   And has that transaction been investigated or --

A   I'm no longer a part of an investigation related to that.

Q   Okay.   That wasn't the question.

The question was, do you know if that has been investigated by the IRS?

A    So I'm going to --

Q    It's a voluntary interview.    If you're not comfortable saying, you don't have

to answer the question, any of our questions.

A    It goes back to one of my -- if there is potentially a current investigation

that's out there to --

Mr. Zerbe.    Let's go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Go back on the record?

Mr. Zerbe.    Yes.

MAJORITY COUNSEL 2.    Is there anything else about the tax years of 2014

through 2019 that we haven't discussed that ought to be made clear?

Mr. ████.    Yeah.    There's 2018 that we left off on.    I went through the global

payments.

So 2018 was the false tax return year.

If we don't include relevant conduct -- so relevant conduct is conduct that we

didn't subpoena or that we didn't get records for that could, at sentencing, be included.

So if you don't include relevant conduct and it's just expense items that we

investigated, Hunter underreported his tax return by $500,000 or -- give me one second.

That's including relevant conduct.

Okay.    So he underreported his total income by $267,000, if you are using the

most conservative approach, and that is a tax loss of $106,000.    So that includes

deductions for personal wages and salaries paid, personal travel expenses paid, personal

children expenses that he paid, and personal other expenses that he paid.

So let's talk about his 2018 tax year.

2018 was so significant because, at the same time he is writing his book, he is

having the returns prepared.    And the statements in his book completely contradicted what was being deducted on his tax return.    He essentially said in his book that he was in a drug-addled haze and was essentially learning how to cook crack, was some of the quotes in the book.

So some of the items that he deducted were personal no-show employees.    He deducted payments that were made to who he called his West Coast assistant, but she was essentially a prostitute.

He made payments -- there's an $18,000 wire that is made to one of these individuals, and on the wires they say $8,000 in wage and $10,000 in golf -- $10k golf club member deposit.    And we know that that $10,000 went to pay for a sex club.    He went to a sex club, and we've talked to the person that owned that sex club, and they confirmed that he was there.    And the guy has to pay $10,000, and the girl -- whoever is referring him there doesn't have to pay anything.    So that was deducted on the tax return.

The Columbia tuition was deducted on the tax return.    There were all of these sorts of things.    And the thing that showed his involvement in it is he would actually go through the bank statements and would highlight items that were -- either he was excluding from being deducted or that he was highlighting from his personal accounts to deduct on his tax return.    So it was kind of twofold.

And in addition -- because what we viewed that the accountants didn't feel comfortable with the information being provided by Hunter, they actually made him sign what's called a representation letter.    And essentially with this representation letter, he's representing that all the income is being reported and all the deductions are being -- they're for business nature, and they're being reported properly.

BY MAJORITY COUNSEL 1:

Q      Why do accountants have clients sign those kind of letters?

A      I've never seen that in my career.

Q      Do you have an understanding of why they did that in this case?

A      So the timing of it occurred after he started submitting a lot of these expenditures.    So his expenditures that year were very, very high.

He also tried to -- the money that he earned from Hudson West III, he tried to say that that was a loan.    Same thing we have all going along back to Burisma -- I'm loaning from my own capital in the company -- even though he didn't put any capital in the Hudson West III.    It was zero.    So he was trying to say that it was a loan.    But the accountants were so good that they really dug into it, and they were like:    No, no, no, you can't deduct this -- or you can't take this as a loan on your tax return.

He tried to -- or he deducted expenses for hotel rooms for one of his drug dealers or what we believed to be one of his drug dealers.

He deducted a hotel room for his dad, Joe Biden.    There is an invoice in the dad's name -- I'm sorry.    Not the dad, but Joe Biden's name.    The President, President Joe Biden's.

        MAJORITY COUNSEL 2.    For how many nights?

        Mr. ███.    What was that?

        MAJORITY COUNSEL 2.    For how many nights?

        Mr. ███.    It was for two nights.

And let me correct the record.    President Joe Biden's name.    And, yeah, that was included.

There was a significant amount of expenses deducted related to his girlfriend at the time, Airbnbs related to her, hotel rooms.    So he deducted a lot for the Chateau Marmont, and he actually was blacklisted and thrown out of the Chateau Marmont.    We

actually have videos -- or we have photos of the rooms and the destruction that was done to the rooms.

BY <u>MAJORITY COUNSEL 1</u>:

Q    When he deducted two nights for Joe Biden -- he deducted those as business expenses?   Is that right?

A    Yes.

Q    Was --

A    From what I believe.   I apologize.   I didn't mean to interrupt you.   From what I believe, yes.

Q    Okay.   And were you aware of any business that he was involved in with Joe Biden?

A    So this is a complicated issue, and we really -- there was the 10 percent for the big guy in the Sinohawk deal.   We know that the Sinohawk deal never went through. And that relates to CEFC and China.   So essentially, Hunter cut everyone out of that.

And we do know that there were WhatsApp -- I believe it was WhatsApp messages found that there is clear indication -- and Hunter is saying this in those WhatsApp messages, that:   I'm sitting here with my dad ready to make a deal, we're waiting for the phone call.   And that was one of the -- I mean, we couldn't believe that we saw that. That was more indication that the dad might have been involved.

I know that we wanted to get location data because I went to the prosecutors with this, and they, again, came back at me with:   Well, how do we know that?   He could just be lying and claiming that the dad -- that his dad's there, but his dad is not there.

And I said:   Well, this is what we would normally do.   And I have it on a meeting agenda where we talk about location data.   And I don't know if the FBI ever did anything

with it, but I would think it would be a road we would want to go down or that we could go down, and the reason being that, if President Joe Biden was getting any source of income, whether it's through someone else's entity or for his benefit at some point, that could be income.    So that's why it would matter to us.

Q    Anything else on tax year 2018?

A    There was the fact that he deducted some hotel and travel expenses.    So they argued that, well, he tried to make his best effort.    And they -- and when I say "they," that's Hunter and his counsel.    I would argue that this shows that they are making an effort to not make it look as suspicious.    Deducting everything would be overly suspicious in an audit, and therefore he tried making as many deductions as he could to minimize his tax.    That's what my beliefs would be.

There is something else.    So I told you guys about the additional income.    But you also had the unfiled returns.    So on his personal return for 2018, he owed taxes of $620,901.    And then for 2019, for the personal return -- so that would have also been a failure to file year -- that was $197,372.

And there were definitely some issues with the 2019 return.    He withdrew money from a 529 plan.    It was in the ballpark -- I think I actually -- hold on one second. Let me go into my notes and see if I -- I have the email here.

Q    Can I ask you something a little more general?

So given all these specific aspects that you're referring to of activities with regard to tax returns that would you agree, at least, rise to the level of suspicious?

A    Yeah.

Q    What's your general view of why someone would engage in these kinds of deductions, reporting of expenses, et cetera?

A    So from what I believe based on the evidence is his alimony and his child

support payments are based on how much income he earns.    So if he reduces his income, he doesn't have to pay as much.

Q    And what are you basing that opinion on?

A    I would be basing that on discussions I had with prosecutors on the case and my review -- so my recollection of this isn't as clear, but I do recall that coming up in reviewing the marital separation agreement.

And the reason why I say it's complicated is because it changes as you go throughout the years.    So I don't remember the specifics, but I know that that was a part of it.

Q    Okay.    Understood.

You mentioned CEFC.    Did you look at an entity called CEFC Infrastructure Investment, LLC?

A    I believe so, yes.

Q    Do you know what kind of business CEFC was involved in or pursuing?

MAJORITY COUNSEL 1.    Can I go off the record?

Mr. ▇▇▇▇.    Yeah.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record?

Mr. ▇▇▇▇.    I don't feel comfortable disclosing anything further on that issue.

BY <u>MAJORITY COUNSEL 1</u>:

Q      Understood.    Okay.

The U.S. House Committee on Oversight and Accountability has publicly identified a series of companies, mostly LLCs, that are connected to this taxpayer.    We'd like to walk through the list of companies and ask simply whether or not you've come across them in the course of your investigation.    A yes-or-no answer is fine.

Lion Hall Group, LLC?

A      Yes.

Q      Owasco P.C.?

A      Yes.

Q      Robinson Walker, LLC?

A      Yes.

Q      Skaneateles LLC?

A      Skaneateles, yes.

Q      Seneca Global Advisors, LLC?

A      Yes.

Q      Rosemont Seneca Partners, LLC?

A      Yes.

Q      Rosemont Seneca Principal Investments, LLC?

A      Yes.    Yeah, I know.    It's abbreviated RSPI.

Q      Rosemont Realty, LLC?

A      Yes.

Q      Rosemont Seneca Technology Partners, LLC?

A      Yes.

Q      Rosemont Seneca Thornton, LLC?

A      Yes.

Q      Rosemont Seneca Advisors, LLC?

A      Yes.

Q      Rosemont Seneca Bohai, LLC?

A      Yes.

Q      JBB SR, Inc.?

A      Yes.

Q      RSTP II Alpha Partners, LLC?

A      Yes.

Q      RSTP II Bravo Partners, LLC?

A      Yes.

Q      Owasco, LLC?

A      Yes.

Q      Hudson West III, LLC?

A      Yep.

Q      Hudson West V, LLC?

A      Yes.

Q      And CEFC Infrastructure Investment U.S., LLC?

A      Yes.

Q      Okay.   Did there come a time when you learned about testimony from Attorney General Garland before Congress?

A      Yes.   So that was actually something I was going to get into in my closing.

So Attorney General Merrick Garland appeared before the Senate Appropriations Committee in April -- April 22nd, 2022.   At this hearing, when he was questioned about the Hunter Biden investigation, he said:   "Because we put the investigation in the hands

of a Trump appointee from the previous administration who is the U.S. attorney for the District of Delaware, and because you have me as the Attorney General who is committed to the independence of the Justice Department from any influence from the White House in criminal matters, the Hunter Biden investigation is being run by and supervised by the United States attorney for the District of Delaware, he is in charge of that investigation, there will no interference of political or improper kind."

Q    And in your experience with the case, did you find that to be accurate?

A    Can I say at the time and where I sit now?

Q    Sure.

A    So at the time -- I don't remember when this topic of what Merrick Garland said came up -- when exactly this came up, but I can tell you that I always viewed it as David was our advocate sometimes.    David was -- if we wanted to go with a big issue, we went to him.

Q    You're referring to David Weiss?

A    David Weiss.    I apologize.    The U.S. attorney.

So if we wanted -- and I viewed him as he's a Republican from the prior administration.    We have to have faith that he's going to do the right thing and that he's going to push this forward and that he is the person we need to get in front of to tell -- because there were times where we didn't believe that what we were stating regarding the evidence was getting to him.    Because our understanding of the evidence was different than what some of the line attorneys' understanding of the evidence, and we wanted to present on that.    It was the 2014, 2015 issue.

And I'm thankful that we ultimately were able to.    But now looking back at it, I think that -- it depends on when he asked for a special counsel, but those meetings that he had with us were for naught because we didn't end up charging 2014, 2015.

Q      So looking back on it now -- what is your opinion of whether his testimony
was accurate?

A      I guess I would say that's not up to me to make that determination, but -- in
what I know --

Mr. Zerbe.    Do you want to take a break?    A pause?

Mr. ██████.    Yeah.    Off the record, please.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. ██████.    So in response to your question, I can't speak to what Merrick
Garland thought at the time or what he might have been made aware of at that time.    I
was only aware of certain people within the chain that were aware of this investigation.

But looking back at it, the U.S. attorney, David Weiss, he had to follow the normal
process.    He had to go to Washington, D.C., the U.S. Attorney's Office, them saying no.
So he really wasn't in charge.    He had to follow the process.

And at the end of the day, he went to political appointees, and he's technically not
a political appointee, so it's all back to square one again.

BY MAJORITY COUNSEL 1:

Q      We were talking about a hearing in 2022, which we have as April 26th.    I
think you said 22nd, but I think it was April 26th.

A      Okay.

Q      The next year, moving forward to 2023, March 1st, 2023, Attorney General
Garland was again testifying before Congress and was asked whether, without special
counsel authority, a U.S. attorney could bring charges in other jurisdictions outside of
Delaware.

Attorney General Garland said that he had been advised that he has full authority

to make those kind of referrals that you're talking about or bring cases in other jurisdictions if he feels it's necessary, and I will assure that if he does, he will be able to do that.

Based on what you testified to earlier, in your opinion, did U.S. Attorney Weiss have that authority to bring charges in other jurisdictions?

A     In what he said, I look kind of at the words from Merrick Garland, and he said he has the full authority to make the referrals.    Did I hear that correct?

Q     Correct.

A     And, yes, he's in charge of making those referrals, but whether --

Mr. Zerbe.    Read the whole quote again.

BY MAJORITY COUNSEL 2:

Q     Let's just back up here.

The Attorney General said the U.S. attorney in Delaware has been advised that he has full authority to make those kinds of referrals that you were talking about.

A     Yes.

Q     Or bring cases in other jurisdictions if he feels it's necessary.    And I will assure that if he does, he will be able to do that.

And the record reflects -- and correct us if we are wrong -- that the U.S. attorney in Delaware tried to bring a criminal case in D.C., and the U.S. attorney in D.C. said no.

A     That's correct.

Q     The U.S. attorney for Delaware, Mr. Weiss, tried to bring a case in California -- was it the Central District of California?

A     Yes.    It was wherever Los Angeles -- yes.

Q     And he was told no.

A     Yes.

Q      Okay.   So going back to what the Attorney General said, how do you

reconcile those two?   Maybe the Attorney General didn't know.   Maybe they were

actively keeping information from the Attorney General.   But it's either that or he's

lying.

A      Yeah.

Q      Are we missing something?

A      No, I agree with you completely.   And when he said that and I looked back

on things, it was completely different from what I recall happening.

My understanding of a person -- so this is from my understanding from what I

have heard from other cases that have happened.   If you are a special counsel, you have

full authority to bring it wherever.

So I do not know if this is true.   And I'm sure you guys will figure this out.   But

DOJ Tax doesn't say:   "Okay, you're approved to charge the tax charges."   I believe that

special counsel has authority to bring whatever charges wherever they want.   And in my

observations over the past 5 years, that is completely different than what happened.

Q      And the Q&A continues, and it just puts a finer point on it.   And this is with

Senator Grassley at the March 1st, 2023, hearing.

Grassley asks as a follow-up:   "Does the Delaware U.S. attorney lack independent

charging authority over certain criminal allegations against the President's son outside

the District of Delaware?"

And the Attorney General responded:   "He would have to bring…if it's in another

district, he'd have to bring the case in another district.   But as I said, I have promised to

ensure that he is able to carry out his investigation and that he be able to run it.   And if

he needs to bring it in another jurisdiction, he will have full authority to do that."

And as we have seen, he tried to bring the case to the U.S. Attorney's Office in

D.C., to the U.S. Attorney's Office in the Central District of California, and he was denied, and he did not have full authority to bring the case, and he did not have special counsel authority.    Isn't that correct?

        A       Yes.

        Q       And like you testified earlier, we're not talking about $2,000.    Okay?    This isn't a $2,000 type of prosecution.    This is -- and I believe your number was $8.3 million for Hunter Biden.    And on top of that, it was $17.3 million for the group of folks and companies and concerns involved here.    Isn't that correct?

        A       Yes.

        MAJORITY COUNSEL 1.    On the issue of special counsel authority, do you know whether U.S. Attorney Weiss requested special counsel authority?

        Mr. ██████.    I only know this secondhand from what my supervisor told me after that October 7th meeting, that --

        MAJORITY COUNSEL 1.    And this is what you know -- [who did you hear this] from secondhand?

        Mr. ██████.    I know this from Gary -- my supervisor, Gary Shapley -- telling me about what happened during that meeting.    That --

        Mr. Zerbe.    Let's go off.

        [Discussion off the record.]

        Mr. ██████.    So I heard it was a contentious meeting.    My SAC and my supervisor were there.    There were members from FBI there.    And they had asked him about this, about bringing the case in D.C., and he explained that he was essentially told no.    And then he went back and asked for special counsel authority, and they told him no.    I don't think they said who he went back to, but they told him no.

                BY MAJORITY COUNSEL 1:

Q      So you don't know who he requested special counsel authority from?

A      Yes, I do not know that.    But I know that they ultimately said:    No, follow the normal process.

Q      Do you know when he requested special counsel status?

A      That, I do not know.

Q      Do you know if he did it more than one time?

A      That, I do not know.

Can I add one more thing to the special counsel?    So there are multiple discussions within my agency up to our leadership.    So when I say our leadership, [up] to the DFO.    So the director of field operations saying:    This is a case where we need a special counsel brought in; because of all the problems we're having, we need a special counsel.    And he literally looked at us and was like:    I don't know what that means.    I don't know how to even do that.

And then also to that point, I recall discussions with our FBI counterparts on the case, the same issue.    And I thought that they were trying to raise the special counsel issue up through their leadership.

On that note, I just want to let you guys know that the way that FBI and their leadership -- their leadership was very, very much involved in this investigation.    I heard of multiple times that they were reporting up to their leadership, meeting with their leadership.    They had to advise them on this.

And when I say I felt like we were out on an island, we were left out on an island as it comes to this case.    And there was a clear difference between what the FBI was doing and what we were doing when it came to reporting this case and issues up to leadership.

Q      When you say FBI leadership was involved, do you know how high up at the

FBI?

A      That, I do not know.

MAJORITY COUNSEL 2.    You testified this morning in your opening statement

that there was a very long list of incidents where the prosecutors in Delaware would not

let the investigative team pursue certain matters, whether it was to go overt at a certain

point of time, whether it was to conduct interviews, or whether it was with the storage

unit.

And my question is, how do you reconcile that long list of efforts to shut down

avenues of investigation?    How do you reconcile that with, ultimately, the U.S.

Attorney's Office in Delaware did try to bring charges in both D.C. and California?

Mr. ██████.   I don't mean to toot [my horn] -- they had me.    They had me that

pushed -- traveling on weekends.    I know that people on the case would say that we

would not have a tax case right now if it wasn't for me.    If it wasn't for my investigative

abilities and the evidence that we found through our investigation, if it wasn't for that,

then we wouldn't be sitting here today talking about potential charges.

MAJORITY COUNSEL 2.    So is it fair to say that, despite their efforts to shut down

avenues of investigation, they couldn't fail to bring the case because of the evidence you

and the rest of the team brought to light?

Mr. ██████.   To be honest with you, I think they were -- this is just me talking

from my opinion and my perspective -- I think they were always afraid of:    well, that's

going to be too many approvals, let's not do that.    They were afraid of all these different

things.

That might touch the campaign, so we can't talk about that right now.    That

might touch this area, so we can't talk about that right now.    And it was always, well,

we'll sit here and we'll think about it.    We might be able to do it because I'm going to

keep pressuring them to do it.

So I had a long list that I tracked all of our interviews.    And I was like, this is when we're doing this.    I was very organized, and I was very much, like this is what we're doing to get this case done.    And I scheduled everything out.    And I didn't want it to be on me that I was the reason why we didn't pursue the charges in the case.

BY <u>MAJORITY COUNSEL 1</u>:

Q    Do you take that thorough approach to all your cases?

A    Absolutely.

Q    And did you have any reason to pursue this case with any more vigor than any other case?

A    Yeah, I often ask myself:    Am I too much in the weeds, and am I too far into the case that I really don't understand what's going on?

So what I did to combat that was we presented on the issues to neutral third parties.    So our DFO, he sat in for:    Here is the evidence that we had.    Am I looking at this the wrong way?    Am I perceiving this?    And all the people within that chain of command agreed with what we -- that's why it ultimately was pushed forward.

Q    So it wasn't just you pursuing this case on your own?

A    No.

Q    Okay.    I want to go back to what you testified earlier about the day of action.

On that day -- which I understand to be the time when the investigation would go overt.    Is that correct?

A    Yes.

Q    How many interviews were you planning to conduct on that day?

A    So our planning for -- I want to say the approximate number would be 10.

Q      And how many interviews did you actually conduct on that day?

A      So we met with pretty much everyone.    Only one person ended up talking
that day.

Q      And who was that?

A      Rob Walker.

Q      And was there anyone you were unable to talk to?

A      Yeah.    There were a lot of people that we were unable to get in touch with.

Q      And why were you unable to get in touch with them?

A      So one of those was the subject, Hunter Biden.    So he had a Secret Service
protection detail.    So getting access to him was pretty hard.

Q      Are there ways you can get access to someone that has Secret Service
protection?

A      So I didn't go and do that interview.    It was -- if we would have gone a week
earlier or when we were supposed to go in the beginning of November.    We were
supposed to go, I believe, November 10th, 11th, or 12th.

And it got pushed for -- I don't remember the ultimate reason, but there were a
lot of different things being thrown in.    That the election wasn't finalized yet.    That we
were still technically on a pause.

So I think there were a lot of different balls in the air, and we just didn't go
forward at that time.

So the decision was made out of my hands to not -- and if we would have went,
then he wouldn't have had a protection detail.    So we would have been able to do the
interview.

Q      Did someone attempt to interview him on the day of action?

A      Yes.

Q    And who was that?

A    Gary Shapley, my supervisor, and Joe Gordon, the supervisor at the FBI.

Q    And they were unable to interview the subject?

A    Correct.

        BY <u>MAJORITY COUNSEL 2</u>:

Q    Do they believe they were hampered by having somebody tipped off --

A    Yeah.   I was --

Q    -- that the interviewees were coming?

A    Yeah.    I was informed of that by my supervisor after.    And I know that

that's an issue that he's brought up to me regarding letting Hunter's team -- or letting the

transition team know, I think, is the way that my boss put it to me.

Q    Letting the transition team know, the political team?

A    I don't know which.    All he ever told me was it was the transition team.

What that entailed, I don't know.

[2:30 p.m.]

BY <u>MAJORITY COUNSEL 2</u>:

Q     Okay.   This isn't the first time that we've heard about the subject, or the

target, being tipped off.    You mentioned this morning in context of the storage unit that

you did say it was Mark Daly and Lesley Wolf --

A     Yes.

Q     -- contacted Hunter Biden's lawyers and tipped them off about the storage

unit --

A     Yes.

Q     -- when you had developed a plan where you were going to not alert anyone

on the Hunter Biden side of the storage unit, wait and see if they went to get responsive

materials, which you knew was in the storage unit, correct?

A     Yes.

Q     And so by contacting Hunter Biden's lawyers, they totally blew the plan.

A     Yes.

Q     Is that not favoritism?

A     I would hope they weren't doing that for favoritism, but yes, it does look like

favoritism.

Q     Was there any other, during the course of the investigation -- I know it's 5

years.    So, there's a lot of time period here.    Were there other instances where the

Hunter Biden camp was tipped off by U.S. Attorney officials, or DOJ Tax officials?

A     This might not go into that area.    But, this is something that I wanted to

bring that up I thought was -- so in the Washington -- was it Washington -- hold on.    I

think it was Washington Post.

In The Washington Post article that came out on October 6th that I referred to, Chris Clark, which is Hunter Biden's lawyer, said in a statement to the newspaper that he's had no contact whatsoever with any Federal investigative agent.    Therefore, a rendition of this case from such an agent is inherently biased, one-sided, and inaccurate.    It is regrettable that law enforcement agents appear to be violating the law to prejudice a case against a person who is a target simply because of his family name.

And, when he said that, it made me think back on we weren't allowed by the prosecutors at any of the taxpayer conferences.    So we couldn't even meet Chris Clark to hear whatever the defense might be.

So I don't know if that was a strategy so that he could make that claim.    I don't know.    But, looking back at specifically what he said, that caused me pause.

Q    Do you think Chris Clark or the lawyers for Hunter Biden actively procured your absence from those meetings?

A    I think they could have, yes.    They could have asked for the agents to not be there.

Q    At these taxpayer conferences, do defense counsel have an opportunity to set the terms ordinarily for those meetings?

A    So I'm usually not in charge of them, but I've never heard of them before.

Q    But you've never been excluded before either, is that correct, to your knowledge?

Mr. Zerbe.    Let's go off the record.

MAJORITY COUNSEL 3.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.    We'll go back on the record.

Mr. ████.    So I know of agents that are part of those taxpayer conferences, one

specifically with Mark Daly.    There are other cases where he doesn't have

communications with defense counsel without an agent there.    I do know that.

        BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    So you found it unusual that you were excluded?

A    Yes, especially with a case like this.

Q    Okay.

A    Can I make one more comment?

Q    Of course.

A    It was relayed to us that his counsel said something like if you charge this

case, good luck with finding a job outside of here or good luck with -- it's career suicide I

think is what he said.

Q    And who was that related to?

A    I believe that was --

Q    Was that at the taxpayer conference?

A    I don't know when that occurred.    So I don't know which situation that

would have occurred.

Q    How was it related to you?

A    It was just relayed to me through either one of the attorneys or through

David Weiss.    I don't remember who said it to us.

Q    So you just don't recall who relayed that to you?

A    Correct.

Q    Okay.

Mr. █████.    Can we go off the record for a second?

[Discussion off the record.]

Mr. █████.    Back on?

<u>MAJORITY COUNSEL 2.</u>   On the record.

Mr. ████.   Thanks.   Yeah, so not being there, apparently there was information brought up during those meetings that we didn't hear until weeks after, if we heard everything.   So there could have been things said there that were never relayed to us.

And it's super important for us because if there's defenses being put out there, we're going to want to know everything, because we're the investigators.   We go back and -- when I say the first taxpayer conference, they presented defenses on 2014-2015. We took their defense and worked through them and tried to refute them with the evidence.   And not being there gave a whole -- it wasn't efficient.   It wasn't -- I don't know.

BY <u>MAJORITY COUNSEL 1</u>:

Q   So you testified earlier that there was a time when you got the sense that investigators had not been provided all the information.   You had seen public reporting. Videos, you mentioned.   Were you aware of Hunter Biden's laptop?

A   Yes.

Q   Did the IRS have access to the material on that laptop?

A   So it was obtained by the FBI, and it was an IRS search warrant.   So it was a Title 26 IRS search warrant of that laptop.

Q   Can you explain that for a second?   So it was a Title 26 search warrant meaning --

A   It was only tax charges and the initial warrant that allowed to us essentially get access to the laptop.   So we had to get a search warrant of it and it wasn't --

Q   And the FBI executed that search warrant?

A   So it would have been done by the FBI forensic, like their forensics team.

Q      And was the information on that laptop shared with IRS investigators investigating the alleged tax crimes?

A      So it's quite complicated, and my memory is not the best when it comes to the laptop, because there were   storage backups to it.    There was also the laptop.

We had different members of our team that would -- we had one agent who looked through the laptop.    We had one agent who looked through backups of it.    So there were a variety of people kind of tackling it all at once.    That's kind of how we tried to do everything.

So from what I do know -- and this has been -- I believe I've gone back through statements that were documented -- that there were some things that were held back from us for one reason or another.    But I don't still know what that is.

Q      Were you aware of any other limitations placed on investigators in this case that we haven't discussed?

Mr. ███.   Can we go off the record?

[Discussion off the record.]

MAJORITY COUNSEL 2.    Okay.    Back on the record.

Mr. ███.    Yeah, things related to the campaign were kind of, at least during the investigative stages, were off limits.

BY MAJORITY COUNSEL 1:

Q      Do you mean the Presidential campaign?

A      Yes, the Presidential campaign.

Q      In 2020.

A      No.    This would have -- yes, but we would not have found out about it until after -- everything was done.    So this would have been when we went overt.

Does that make sense?

Mr. <u>Zerbe.</u>   Go off the record.

<u>MAJORITY COUNSEL 3.</u>   Off.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>   Back on the record.

Mr. <u>Zerbe.</u>   Go ahead.

Mr. ███.   It would occur after our day of action, after we went overt.   And I recall there being a crisis management meeting.   And because of attorney-client privilege issues, and potentially issues related to the campaign, I felt that some things were off limits discussing.

BY <u>MAJORITY COUNSEL 1</u>:

Q   Why did you feel that way?

A   Because during interviews there was an atmosphere that made it very difficult to ask questions because -- and I know I wasn't the only one that felt this way -- that you get eyes rolling or --

Q   From whom?

A   From Lesley Wolf or from Mark Daly or whoever was -- it was a very intimidating atmosphere sometimes to ask questions.

And the same thing goes from our -- we had biweekly meetings that I would run. And I didn't have a problem with bringing up challenging issues.   But every single time I brought up challenging issues, they would get shot down.

And I recall having phone calls immediately after with my supervisor and my co-case agent and wanting to pull my hair out because I'm just trying get this case done.

Q   And those ideas would be shot down by Lesley Wolf?

A   Would be shot down by the prosecutors on the call.   So it would be Lesley Wolf or Jack Morgan or Mark Daly.

Q      Anyone else?

A      It wasn't all the time, but it did happen.

Q      Other than the three people you mentioned, anyone else that would fall into
the role of shooting down ideas?

A      And I want to go back for a second.    It was I'm going sit here and think
about it, and then you'd have to bring it up again.    We're thinking about it.    When I say
"shooting down," I want to be very loose about that question.

Q      Let me clarify my question.    So you mentioned the creation of an
atmosphere that -- would it be accurate to say -- would make you second-guess raising
issues?

A      Yeah, absolutely.

Q      Okay.    And other than Lesley Wolf, Jack Morgan, and Mark Daly, was there
anyone else that you think created that atmosphere?

A      No.

       BY MAJORITY COUNSEL 2:

Q      Do you have any information about whether Lesley Wolf was doing this
because she wanted a job in the administration?    Did she try and get a job with Main
Justice?

A      I have not heard that.    This is my personal opinion that Lesley's always
been -- she's a really good arguer.    I actually talked with another case agent about that
she's really good at arguing and really good at talking her way out of do[ing] whatever.

       And it was a lot of things.    I'll be completely honest with you.    If we would have
brought this case in SDNY, who I know was super aggressive because you see it all the
time, I don't think we'd be sitting here right now.    If we were to bring this in -- maybe
even D.C. U.S. Attorney's Office from the get-go, I don't think we'd be here right now.

BY <u>MAJORITY COUNSEL 1</u>:

Q    I want to go back to something you mentioned earlier regarding a walk-by of Hunter Biden's residence.    I believe you testified that Mark Daly told you that someone had denied your ability to do that walk-by.

A    Yeah.

Q    Who was it that denied that walk-by?

A    It doesn't say.    So it would have been any manager above him.    So it would have been anyone in his management chain --

Q    At DOJ.

A    -- at DOJ Tax.    And I could tell you that's never happened to where you had someone weighing in on whether you could do a covert action, walking by someone's house.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Why did you have to get approval for that?

A    Because we were in a posture at that point that we couldn't do anything that appeared -- any investigative activities pretty much whatsoever.

Q    But you weren't wearing an IRS windbreaker, and you weren't driving a car marked with IRS letters on it.    So how would anyone possibly know?    It's a free country. You're allowed to drive by any house you want.

A    Yeah, I didn't want it -- because I think at that time we were trying to do surveillance of pretty much everyone we were going to potentially interview.    So he was just another one of the people that we wanted to do that for.    I guess I don't know --

Q    But did you have to travel to do the walk-by?

A    No, we would have sent an agent from that area --

Q    Okay.

A       -- out to help.

Q       And was it ordinary that you would have to ask permission from the prosecutors to do something like that in any other case?

A       Not at all ordinary.

Q       So this was special to the Hunter Biden case.

A       Yes.    So it says:    Tax does not approve.

So whatever that means, tax does not approve.

BY MAJORITY COUNSEL 1:

Q       What is that email in reference to?

A       This is in reference -- this is October 20th, 2020, walk-by of possible residence.

And Mark Daly says:    Tax does not approve.    This will be on hold until further notice.

BY MAJORITY COUNSEL 2:

Q       And the plan was you were just going have an IRS agent out in California walk by the house?

A       Yes.

Q       Drive by the house.

A       Yes.

Q       Check it out.

A       Uh-huh.

Q       Not stop, not interview anyone, not interview neighbors.

A       Nope.

Q       Not knock on the door.    Just drive by the house.

A       Yes.

Q     That was denied.

A     Yes.

BY <u>MAJORITY COUNSEL 1</u>:

Q     We talked earlier about the potential of interviewing I believe it was President Biden's grandchildren.    Is that right?

A     Yes.

Q     So that would be Hunter Biden's children?

A     Yes.

Q     And the interest in conducting their interviews is because Hunter Biden made payments to those individuals?    Is that right?

A     Or made payments for the benefit of them.

Q     And the interest in interviewing them about those payments was not because he made those payments but was because he deducted those on his taxes.    Is that correct?

A     Correct.

Q     And what type of evidence would you need to properly evaluate whether a deduction was properly taken in an instance like this?

A     So you'd want a statement from -- so there's two points to this.    You'd first get the records from, let's say it's Columbia school.    You get records from Columbia school, and they would show you why the person paid that $30,000.    So that's step one.

Step two would also be, if it's paying for someone else, finding out why that person paid that.    Was there any business purpose or reason for paying that?    If it was -- she did work for me and in return for doing some work for me, I paid for this, so that could potentially be a deduction, so reasons like that.

And I want to be clear on this.    I believe what happened down the road is that

there was a potential of it being stipulated, that the kids' expenses were for personal

purposes, so it being stipulated from his counsel.    But I don't know if we ever officially

got that or -- someone -- an attorney can say that and you can still go back on that down

the road.    You know what I mean?

Q       In the absence of a stipulation like that, would it be normal to interview a

third party who received a payment that was then deducted on taxes and there was a

reason to question the deduction?

A       Yes.    And to be honest with you, sometimes it doesn't matter the dollar

amount.    Sometimes -- I've had cases of mine to where there was a small deduction.

But then they told us about this information that was completely unrelated to this.

Oh, he told me to open up this bank account for him.

And it can lead on to something that's completely different.

Q       In a typical case, would you consider the interviews of individuals like this to

be a completely reasonable step in an investigation like the one you were conducting?

A       Yes.

Q       One other clarifying question on something you mentioned earlier.    You

mentioned that when you opened the case at IRS, in the course of moving it forward, you

learned that the U.S. Attorney's Office had opened their own case.    Is that right?

A       Yes.

Q       And those two cases were merged.    Is that right?

A       Yes.

Q       And my understanding of your testimony earlier is that the merger of those

two cases created a process that would be different from if the case had just proceeded

at the IRS.    Is that right?

A       Can you rephrase that question?

Q       What would happen in a typical case if the two cases had not been merged?

A       Oh, we would have opened the case -- the case would have been sent to the intake, so the tax intake, specifically the tax intake at the D.C. U.S. Attorney's Office. They would have evaluated our -- it's called a [Form] 9131, but -- basically our work product.   And they would have done the paperwork to get an investigation going.

So Delaware could have done their own, and we would have done our own thing in D.C.

Q       Under the auspices of the U.S. Attorney in the District of Columbia?

A       Yes.   Because sometimes there are cases to where you have split venue, and sometimes you do want to merge both of them.   But I do know of -- yeah, so, it just honestly depends.   There are situations where both are true.

MAJORITY COUNSEL 2.   Our hour's up.

Mr. Zerbe.   Can we take a quick break and just breathe in and out?

MAJORITY COUNSEL 3.   Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.   We'll go back on the record.

BY MINORITY COUNSEL 1:

Q       Okay.   I wanted to go back to something that you mentioned earlier.   You said that in March/April -- and I think you meant 2018, but I'm not sure -- that Bill Barr made the decision to join these cases together.

A       So that would have been 2019.

Q       2019.

And then you said that the case in Delaware was opened January of 2019?   Is that correct?

A       Yep.

Q      Okay.    And then this case was opened May of 2019?

A      So the cases were joined May of 2019.

Q      How was it communicated to you that Bill Barr joined these cases together?

A      I believe it was my manager that told me.    My manager would have been Matt Kutz.

Q      How would he have known?    Would that have come from Justice somewhere or where does that come from --

A      From his leadership, most likely, when we were told -- we were essentially told that we had go up to Delaware to meet them.    And the decision was made at his direction, from what I recall.

Q      "His" being Bill Barr?

A      Yes.

Q      Okay.    Was there any other discussion of Bill Barr taking interest in this case that you heard of beyond it being joined?

A      Not at all.

Q      Was there any reporting up the chain that you know of to Bill Barr?

A      No, not that I know of.

Q      Okay.    Who were the Justice attorneys on the case at the time that Bill Barr decided to join these cases together?

A      So you had Assistant U.S. Attorney Lesley Wolf, Assistant United States Attorney at the time, Jamie McCall.    And then from DOJ Tax it would have been Kimberly Shartar.    And I believe it was either -- I think that was Jason Poole, [DOJ Tax,] but I don't know if he was promoted at that point.    It could have been also Mark Daly[, DOJ Tax]. So it was two or three attorneys from DOJ Tax.

Q      These attorneys that were on the case, did they change when the new

administration started in 2021?

A    Could you elaborate more on that?

Q    So Lesley Wolf --

A    Okay.

Q    -- she was there in 2018, 2019 when these cases were joined.    Is she still on the case?

A    Yes.

Q    And was she --

A    From what I know, yes.

Q    Okay.    Was she on the case at the beginning of 2021?

A    Yes.

Q    January 1 of 2021?

A    Yes.

Q    The same thing with Jamie McCall.    Was he on the case at the very beginning when Bill Barr joined these cases together?

A    Yes, he was.

Q    Was he on the case January 1 of 2021?

A    No.

Q    He was gone?

A    Yes.

Q    Okay.

A    And they were --

Q    Was someone else put on the case?

A    Yes.    Carly Hudson.

Q    When did Carley join the case?

A    At some point in 2020.

Q    Do you know how attorneys are added to cases?    Do you know if that would have been a Bill Barr decision?

A    I don't know, but I don't think so.

Q    What about Kimberly Shartar?

A    Shartar.

Q    Shartar.    Was she --

A    Shartar.

Q    Was she on the case at the beginning?

A    I believe so, yes.

Q    Was she still on in 2021?

A    No.    She left for a position to become an Assistant United States Attorney in another district.

Q    Was someone else appointed, or put on the case?

A    At some point, Jack Morgan was put on [from] DOJ Tax.

Q    Do you know when he was added?

A    That I do not know.

Q    Would it have been before 2021?

A    Yes.

Q    Jason Poole and Mark Daly -- one of them was on at the beginning?

A    Yes.

Q    One of them was still on in 2021?

A    Yeah, Mark Daly was still on in 2021.

Q    Is he still on the case now?

A    I believe so, yes.

Q      Okay.    Now you mentioned the storage unit and the decision regarding the search.    That was in 2020, correct?

A      Yes.

Q      At the time that the search decision was being made in 2020, were these individuals, the ones that we discussed that were there in 2020, were they the ones that would have made the decision about the storage unit?

A      One of those people, yes.    It would have been up to Lesley Wolf and Mark Daly and potentially Jack Morgan.

Q      But that was a decision still made under the prior administration, and it was made sometime in 2020 after Bill Barr had joined the cases, correct?

A      Yeah, I don't know if by that point -- I don't know when Bill Barr left Main DOJ.

MAJORITY COUNSEL 2.    December 23rd --

Mr. ████.    Okay.

MAJORITY COUNSEL 2.    -- 2020.

BY MINORITY COUNSEL 1:

Q      In your experience, would you think that individuals that had been working a case would change their position because a new administration comes in in 2021?

A      I have never seen that, and I would have reason to hope to believe that that wouldn't happen.    And I have no indication that it was because of a change of administration.

Q      It seems as if they were acting -- in my mind their actions seem consistent over the two administrations, that they had a position that they took and they continued with that position going forward when they made their decision to -- when you probably left the case or even today, since we don't know what's going on today in the case.

A      Yeah, I would to like say something to that, that it wasn't always all bad as it might -- I know I'm bringing up some of the things that have happened that I thought were out of the ordinary and what, looking back, might have been improper.    There was some good that we did, too.

So I don't want it to appear like it was just -- but it was definitely an atmosphere and it was -- as you can see in my emails and, looking back, it was very hard for me to do my job.    I was not handheld but --

Mr. <u>Zerbe.</u>    Handcuffed.

Mr. ██████.    -- handcuffed.

<u>MINORITY COUNSEL 2.</u>    How unusual, or in your experience, how frequently have you seen cases merged from the DOJ and IRS?

Mr. <u>Zerbe.</u>    Let's go off the record.

<u>MAJORITY COUNSEL 3.</u>    Off the record.

[Discussion off the record.]

BY <u>MINORITY COUNSEL 2</u>:

Q      That's what I'm asking.    How common is that circumstance?

Sorry.    Back on the record.

A      I have never had that happen in my career.

Q      Would you say it was something of an unusual occurrence for the Attorney General himself to order that?

A      Looking back at it, I think he was trying to utilize the resources that he had. And I recall doing venue analyses for them to determine where proper venue was, to see if -- but everything that I did said that we were -- there's no residence of Hunter other than his dad's residence, his dad, President Biden, in Delaware.

So his return preparers are in, I think it's Maryland, his -- at the time were in

Maryland.    So everything was pointing to outside of Delaware.

Q    Well, when you say utilize his resources, is it usual for the Attorney General to take a specific interest in a case that maybe conservatively would be of, you know, $1 million in value to the U.S. Government, which, although obviously is a lot of money to the folks sitting here, is pretty small, small dollars relative to the entirety of the fiscal --

A    Can ask you your question again?    I apologize.

Q    Does the Attorney General usually weigh in on cases where you're talking about $1 million?

A    I've never had that happen before.

Q    To your knowledge, did Attorney General Barr weigh in, or seek updates on the investigation after those cases were joined?

A    Not to my knowledge.

BY MINORITY COUNSEL 1:

Q    You mentioned that the FBI leadership was involved in the case.

A    Uh-huh.

Q    And there was some reporting up the chain that you were aware of regarding the FBI leadership's being kept in the loop, I guess, for lack of a better word.

A    Yes.

Q    When did that start, that you became aware of it?    And when did it start, the reporting up the chain at the FBI?

A    I would honestly say it started in the beginning.    I was constantly hearing about them having to report up their chain regarding what was going on.    And towards the end of the case, what was kind of -- it wasn't amusing to me but, the fact they were updating their leadership on a tax investigation.    So their high-up leadership, I should say, was more caring about what we were doing in our investigation.

Q       When you say that the FBI leadership was kept in the loop from the beginning, do you mean November of 2018-ish, in 2018 when you first got involved?

A       So my knowledge of it would have started occurring in the summer of 2019.

Q       Did that continue through 2020?

A       I believe so.

Q       Are you aware of the FBI leadership at any point talking to Attorney General Barr and his leadership regarding this case?    Are you aware of any meetings like that?

A       Not that I'm aware of.

Q       I want to ask a little bit more about the grandchildren.    You said that it's not abnormal to talk to relatives and family.    How old were the grandchildren that you were seeking to interview?

A       We never got -- I honestly don't even know.    I know one of them had to have been in college, so college age, yeah.    To be honest with you -- because we were never allowed to go do it -- normally I would have pulled public reporting, or I would have pulled information that would tell me this.

But because we weren't going to go do it, I didn't need to pull any of that.    So I didn't know their age.

Q       But college age?

A       The one, yes, I believe is college or has graduated from college.

Q       When asked whether this was a reasonable step, you said that you thought that it was a reasonable step to interview someone because another person took a deduction regarding them on the tax return?    That's typical at the IRS?

A       It's not -- in my opinion, that's more of a blanket statement.

How we do our jobs is if -- when we're doing an investigation and we're looking into someone's tax returns, we find the areas that there might be fraudulent deductions.

If this is a deductions case, we look at the deductions.

So if we have a payment that's made to ABC company, and on the memo line it says for whatever their daughter's name is, then we would want to go and talk to that person.    Why was this payment made on your behalf?

And then that's kind of the reason or the line of why we do those interviews.

Q      Okay.    You mentioned that, for instance, your first step might have been to go to Columbia school and ask about the $30,000 and get their records.

Why would that have not been enough to establish what the $30,000 was for if it was for tuition?    Why the extra step of trying to talk to the grandchild?

A      So like I said, typically if -- there could be a situation where I did work for someone, and then instead of giving me actual monetary compensation, they pay for my school.    So that could be a deduction for you, a legitimate deduction.    So as a part of our investigation, we have to figure that out.

BY MINORITY COUNSEL 2:

Q      Did you, as a part of your investigation, talk to all of the hotels where payments were flagged?

A      Almost 100 percent of them.    There was a significant amount of them, yes, specifically for 2018.

Q      What were you seeking in talking to the hotels?

A      We were seeking records regarding hotel stays and the reason for the expenses.    I have the answer for you.    It's a Boulware [Greenberg] issue.    So that's what the legal term is for it: Boulware [Greenberg].    That's why you want to go to a third party to find out.    So we can't just rely on that, this looks personal.    We have to actually go and figure that out.

Q      Is that the name of a case?

A       I believe so, yes.

BY MINORITY COUNSEL 1:

Q       In talking to the hotels, did you establish who stayed in the hotels each of the nights that were deducted?

A       Yes, we got information from the hotels about whose name was on the room.    If there were any issues with the rooms, yeah, there was a lot of information that we got from the hotels.

Q       You mentioned one of the nights was in the name of President Biden?

A       Yes.

Q       Okay.    Do you know if his Secret Service was there with him that night?    Is that on your hotel records?

A       That I do not know.

Q       Were you able to establish that he was actually in the hotel?

A       No, I was not.

Mr. Zerbe.    Can we go off the record?

MAJORITY COUNSEL 3.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 3.    On the record.

Mr. █████.    Back on the record.    I apologize.

I have a receipt of something that was purchased from the person, whoever stayed there, a receipt for food for room service.

BY MINORITY COUNSEL 1:

Q       Oh, you have the receipt that someone was in the hotel room?

A       Yes.

Q       Okay.    But not necessarily who it was in that hotel room?

A     Correct.

Q     Okay.   When you interviewed the hotel, did you interview the employees, as well?

A     So let me be clear on this.   We didn't interview the hotel in this situation. We would have asked for records from the hotel.

BY MINORITY COUNSEL 2:

Q     Would you submit that asking for records from a business is less intrusive than surprising an individual for an interview with the Justice Department or the IRS Criminal Investigation Unit?

A     When we do interviews, or when we do records requests, we don't -- at least in my profession, we don't consider what's least intrusive.   We consider that for search warrants.   But when it comes to going to someone's door and knocking on it to see if they want to submit to a voluntary interview, I would not consider that intrusive.

Q     Is it not that you wouldn't consider it intrusive per se?   It's just whether it's intrusive or not is something that you would not factor into in your investigative process?

A     So if it's a situation of either interviewing someone or issuing them a records request, both of them require me going to them to give it to them or to actually go there and talk to them.   So both -- in the situation with a hotel, you can mail those certified mail.

Q     Right.

A     But in terms of individuals, we can't -- there are situations where we could mail them, but typically we go to the door and we knock.

MINORITY COUNSEL 2.   Can I --

MINORITY COUNSEL 1.   Go ahead.

BY MINORITY COUNSEL 2:

Q      What is the purpose of a drive-by?

A      To establish if someone's living there, if they're present at home, their modus of -- when they are home and when they're not home.    It's to give people or to give the investigators an idea of just their normal course of what they're doing.

And it's also to establish in this case, if there was Secret Service out front, if there was a protection detail.    All those various things come into play.

Q      In order to establish, for instance, whether the person is home, whether it's lived in, what their pattern of usage of the home was, it's not merely sort of walking by casually on the street.    It's repeatedly doing so, correct?

A      It doesn't necessarily have to be repeatedly doing so.

Q      But it often can be?

A      It can be, yes.    In our job, we are trained and taught to do surveillance without being caught.    So that's part of our training, surveillance or a drive-by or a walk-by.

Q      Do we know if Mr. Biden's house was, for instance, at the end of a cul-de-sac?    On a street?    Had a sidewalk where people typically walk?

A      I think this one was in Venice Beach.    It so was just on a -- I think I have actually been there.    There was a sidewalk.    It's a normal neighborhood.

BY <u>MINORITY COUNSEL 1</u>:

Q      On surveillance, you had mentioned that you had roughly 60 people that you wanted to interview.    Did you put surveillance on all 60 of those individuals?

A      No.

Q      On how many of them?

A      Let me be clear on that, that it was originally, we had a larger group of people that we first wanted to interview.    That got smaller, smaller, and smaller until we

got to 10.   I believe that all 10 of those people, we did some sort of surveillance to get eyes on them before doing our day of action.

Mr. Zerbe.   Just off the record.

MAJORITY COUNSEL 3.   Off.

[Discussion off the record.]

MAJORITY COUNSEL 3.   Back on.

BY MINORITY COUNSEL 1:

Q    I think that I was talking more broadly than just the day of action.

A    Okay.

Q    Of all the people that you interviewed, which I assume it's roughly 60 or more, how many had surveillance of any sort?   A drive-by?   A walk-by?   A sit in front of their house?   How many people?

A    It would have been just in that first very instance, the people that we did that December 8th activity related to.

Q    So the 10.   And would the --

A    It would approximately be the 10.

Q    Approximately 10.

Would you have done your surveillance over a number of days?   Weeks?   Is it one day?   One hour?   How long?   How much surveillance?

A    I honestly don't know.   Some of the time we can -- they have a specialty unit within the FBI that can go and do surveillance if we need it of that particular person.

Q    Related to the day of action, which was going to be in 2020 under the prior administration, you had surveillance out on roughly 10 individuals, the ones that you were planning to do the interviews of on that day.

A    And I think it was only to establish that they lived there, to verify that the

person lived there.

Q    Who are the 10?    Do you know who they were?

A    I honestly do not.

Q    Does it include his family members?    Any family members?

A    It does, but it -- so one of the family members that we weren't able to -- they
didn't allow us to interview but we were able to serve a records request was James Biden
and Sara Biden -- I don't think that we did surveillance of them at all -- his ex-wife,
Kathleen Buhle.    And this is all from my memory.    So it was on that day or around that
day.    There was also, I believe, Hallie Biden?

Q    Who is Hallie Biden?

A    That is his deceased brother's wife -- widow.    I'm sorry.

BY MINORITY COUNSEL 2:

Q    For clarity, this was in October of 2020?    I'm sorry.    The date of action,
what date are we looking at again?

A    December 8th.

Q    December 8th, 2020.

Do you think that, given the fact that many of these were relatives of the
President-elect, there would be media presence possibly surrounding some of these
individuals?

A    Not that I was aware of.

Q    But if there were to be media presence in some form or another, would that
be of concern to either the Department of Justice or the Criminal Investigation Unit?

A    I don't know -- what I can say from my normal process and procedure, if I
saw the media out front of someone's house, maybe I might wait until the next day, or
wait until that media -- it just depends on the situation.    If it's an interview that I need,

the whole purpose of that was that we were trying to somewhat take people off guard, surprise, and get information from them.

But this was their personal residences.    I wouldn't expect the media to be outside their personal residences.

Q    Can I go back to something that you said -- my colleagues were asking questions previously.    We were referring to Lesley Wolf.    Our counterparts asked whether she was potentially looking for a job in the administration and you suggested -- not that you were aware of and the like.

But then you said something to the effect of, if we had brought this case in SDNY or D.C., we wouldn't be here right now.    That surprised me a bit.    And, leaving SDNY aside, I'm curious why you have that opinion about D.C., when we've learned that D.C. declined to take this case up?

A    So it was a President Biden-appointed attorney who I believe said no to working this case in Washington, D.C.

When a lot of times when another U.S. Attorney's Office gets a case at the absolute end of that case, they don't like it very much because they didn't do the investigation.    So what I was trying to say by that was the D.C. U.S. Attorney's Office and New York, they've worked cases of this caliber.    So they know how to aggressively work these cases.

And this is just from my observations and opinion.    Let me clarify that.    But that's personally what I believe.

Q    In your experience, the Attorney General's Office in Delaware has historically not pursued either tax crimes or other financial crimes with any vigor?

A    No, I don't want to say that at all.    I would want to say that it's a smaller U.S. Attorney's Office.    So a lot of times when you have a smaller U.S. Attorney's Office,

they're a lot less -- I don't want to use the wrong word here.

It's just it's -- the problem that the agent that I spoke with that's from that U.S. Attorney's Office that said that they love to slow-walk things.    It's very common in that office.

Yeah, I said earlier that they were the JV squad, in my opinion, and weren't up to the task of tackling this.

Q    Was this your first time working with that office?

A    Yes.

Q    So safe to say, you were frustrated with working with that office.    But at the same time, as a general matter, as a condition of your job, when you have to work with different U.S. Attorney Offices around the country, oftentimes you get sort of different flavors in an office.

A    Yes.

Q    Is that safe to say?

A    Yes.

Q    At least to an extent, sort of understanding the flavor of how that office worked is part and parcel of your job.

A    Yes.

BY <u>MINORITY COUNSEL 1</u>:

Q    Can I go back to the $10,000 payments that were made per month?    You mentioned that he was making payments voluntarily.    Is that correct?    Or did he have --

A    Yes.

Q    -- some sort of installment agreement with the IRS?

A    He had a quasi-payment plan that he set up through his accountant, paying $10,000 a month.    But, yes, he had something set up.    It wasn't actually officially set up

with the IRS though.

Mr. <u>Zerbe.</u>   Let's go off the record.

<u>MAJORITY COUNSEL 2.</u>   Off.

[Discussion off the record.]

<u>MAJORITY COUNSEL 3.</u>   On.

<u>MINORITY COUNSEL 1.</u>   Back on.

Mr. █████.   Okay.   So it wasn't an official monthly installment agreement, no. It was self-imposed through his accountant.

And I would also like to say that his passport was revoked.   He wasn't able to get another passport because of the delinquent taxes.

They sent multiple notices.   There's an actual email where he asked how long he can go without paying his taxes.   And, meanwhile, let me reiterate that in the time after this, when he stopped the payment plan -- he stops making the payment plan.   He earns, I think it's over -- I don't want to mistake this number.   He earns $2.4 million from Hudson West III but can't make the $10,000 payment he was making on his taxes.

BY <u>MINORITY COUNSEL 1</u>:

Q     What was the date of when he stopped making the payments?

A     March 5th, 2018.

Mr. <u>Zerbe.</u>   Is the last payment?

Mr. █████.   Is the last payment, yes.

BY <u>MINORITY COUNSEL 1</u>:

Q     Do you know how much he had paid by that point on the $10,000 payments, how many months he had paid?

A     Seven of them, $70,000.

Q     Okay.   I want to go back to the loan.   You said that the way that they set it

up was that there was something attached to his return and it said that part of this was a loan and there was an interest rate of 5 percent.

A    Uh-huh.

Q    Okay.    Did you look into any paperwork regarding that loan?

A    We did attempt to obtain that note, yes.    We did attempt to obtain it, yes.

Q    Did you obtain it, or you just attempted?

A    I don't recall, and I go back to my previous statement that I don't feel comfortable going any further than.

Q    Okay.    Okay.

MINORITY COUNSEL 2.    For clarity's sake, though, because I just want to make sure something is clear on the record -- do you agree that, assuming that there is a true loan, which is to say, a promissory note with interest, and the interest is [paid]-- it's not a sham.    There's nothing untoward about that loan -- an individual making a loan for the ability of another person to satisfy his tax liability.    There's no tax fraud element to such a thing.

[3:33 p.m.]

Mr. ████.   It honestly depends if you're able to sham the transaction.

BY MINORITY COUNSEL 2:

Q      Assume it's a true loan.   It's a true honest loan.   This is not a trick

question.   I'm not -- I'm just trying to --

A      So, yes, if something is a loan, we would give them the benefit of the doubt.

And our most conservative approach is that it's not income, correct.

Q      Similarly, in the case of someone who provides someone with funds out of

detached and disinterested generosity in order to satisfy their tax liability, that would be

considered a gift and thus not subject to Federal income tax, at least by the recipient?

A      There would be gift tax reporting requirements, and those would have to be

upheld, but --

Q      By the donor?

A      Correct.

Q      I want to make sure that, at least on the face of the transaction as described

to us, there are certainly two avenues under which such an arrangement would not raise

any flags from the perspective of the Internal Revenue Service?

A      Correct.

BY MINORITY COUNSEL 1:

Q      All right.   I want to go back to a little bit of the discussion on the

Washington Post article and the comment by Chris Clark, and then there was a question

to you.

The statement was that you had heard something somewhere that someone had

maybe said that, if they were to charge this, it would be career suicide.   That was

hearsay, third party, that --

A      Yes.

Q      -- you just heard from a third party?

A      Yes.

Q      You have no name as to who said that?

A      I believe it came from Chris Clark, but I only know that from --

Q      But you don't know anyone inside that said this would be career suicide to charge this?

A      Inside the --

Q      The IRS.

A      Oh, yeah.   No, I -- no.   No, no, no.   No.

Q      Okay.   What about from Justice?   Did you hear anybody say that?

A      No.

Could I add one more thing?   I know this is on your time but.

There are potential other spin-offs and things that were in the process of being worked that I somewhat fear are going to get lost in the shuffle of everything that went on in that because, essentially, all I'm having to do is turn my information over to the next case agent.   So that is of a definite concern to me, and it's why I think I've been so vocal on the special counsel perspective and having that neutral person come in there and essentially review the evidence and make his decision.

BY MINORITY COUNSEL 2:

Q      Can I ask one more question?   I did have one more note that I wanted to raise.

What is the difference between making a referral or bringing a case in the case of Mr. Weiss?   I'm sort of curious.   At least from your perspective, what is the difference

between those two things, at least as spoken by Attorney General Garland?

A      I would -- this is my assumption based on that.   It's referring the matters from your jurisdiction to another jurisdiction.   So referring the work to the other jurisdiction to where you want to charge the case.   So that's bringing the case.

Q      Those seem to be synonyms, as you're describing them.

Mr. Zerbe.   I just want him to see the writing.   I think there's a referral to the case or to bring cases.

Mr. ███.   Yeah, that leads me to believe that statement right there that he has full authority to do whatever he wants with his cases.

BY MINORITY COUNSEL 2:

Q      Admittedly, it's an ambiguous term or phrase because he does say make a referral or bring a case.   I'm trying to understand what the difference between those two are because you pointed out that he did make a referral and he had authority to make a referral, but what would bringing a case be?   What would he do differently if he were to bring a case as opposed to make a referral?

A      So you have this right here where it says, "I have not heard anything from that office that suggests they are not able to do anything that the U.S. Attorney wants them to do."

And the U.S. Attorney wanted them to bring charges in the District of Columbia. And that completely contradicts that statement.

Mr. Zerbe.   Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.   Back on the record.

Mr. ███.   So each of these two statements showed to me that there wasn't going to be anything political involvement in this.   That you had this neutral person from

the prior administration that's coming in, and that he's going to be able to do whatever

he wants.    And that's what they have confidence in.

The problem I saw was that you have President-appointed U.S. Attorneys who are

a part of the process now, so now it has become political again.    So you have a political

appointee from a different party that was literally just nominated.    I think it was U.S.

Attorney Estrada.    And this is the first thing he gets on his desk.    So the President just

appoints me, and this is the first thing that I've got to deal with.

And the part that was -- I know I use this word a lot -- frustrating was that this was

for the years that they told us were slam dunks.    Slam-dunk cases.    I was told that by

the AUSAs and the DOJ Tax attorneys.

BY MINORITY COUNSEL 1:

Q    Could it be that, when there's a referral, the receiving AUSA -- it's at their

discretion then to decide to bring the case versus just bringing the case directly?

A    Yeah.    Yes.

Q    Could it be that the AUSAs that received it have other considerations based

on their jurisdiction and cases that they've seen that have been successful in their own

jurisdiction?

A    Yes, that is true.    AUSAs can provide guidance based on what they know

from their area.

Q    The AUSA -- Weiss -- he was Trump-appointed, correct?

A    Yes.

Q    The two -- well, at least for D.C., the AUSA was Biden-appointed, correct?

A    Yeah.    If you want, the name of him -- just so we're clear for the record.    I

have it.    Matthew Graves.

Q    Matthew Graves.

But it isn't that one is more correct than the other, it's just that you have two AUSAs, and they have different opinions of the case?

A     So I go back to Merrick Garland's statement that he says.     "He is in charge of that investigation.    There will not be interference of any political or improper kind."

Q     I guess what I'm asking is, if the situation had been turned around and he had taken the case, then we wouldn't be here.

So, as long as it's a yes, then there's no political interference, but if there's a no, then there is political interference?    That can't be the way that we decide whether or not an AUSA brings a case.

A     So I guess I want to be clear here.    I was not afforded an opportunity to present to D.C. on the merits of the case, what we had found through our investigation for 2014, 2015.    I was not afforded the opportunity to present to the Los Angeles U.S. Attorney or the U.S. Attorney's Office with the evidence that we had found in this case. That was not given me the opportunity.

So that right there alone, I think, is improper on its face.    The people that know the case the best, the case agents that work the case, should be the ones that present on the material.

The thing that draws me pause is the conversations I had with Mark Daly in March 2022 to where -- they get the case.    They get the referral.    They're like, here's what we're going to do to help you guys.    And then a few days later, they meet with the U.S. Attorney, and the U.S. Attorney says, someone in that -- this is all what I heard from it. They said, not only are we not going to help you with that case, but we also don't think you should bring charges here.    So that led me to believe that there might be something else going on there.

Q     In the other cases that you have, have there not been any disagreements in

any of those cases in your career?    When cases go up to the AUSAs, they just take them all?    They take every case that IRS sends?

A       They do not, no.

BY MINORITY COUNSEL 2:

Q       In general, in your experience -- well, I'll just say this.

In my working experience, I often would love to be the person who -- when I feel like I'm closest to the facts -- is the one presenting the information to the principal, making the [decision] -- but quite frankly, I don't always get that opportunity.    I think it's an experience that many of us in our legal careers have experienced.

Is this the only time that you haven't been able to present your case to the decision-maker and someone above -- the level above you was in charge of doing that instead?    Or even two levels above you?

A       Well, yes, there are situations like that.    But from what I know, no one from the IRS, my agency, got to present to the D.C. U.S. Attorney's Office or California.

MINORITY COUNSEL 1.    We're good.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q       During our discussion of the 2018 tax year, you mentioned that Hunter Biden was making business expenses for prostitutes?

A       Yes, in some circumstances.

Q       Could you give us a little bit more information on that?    What was the nature of the -- was he paying for -- were they on the payroll?    Was he paying for travel?

A       In some situations, they were on payroll, and that was to get them health insurance in certain situations.    There was --

Q      So he's paying for health insurance for his prostitutes?

A      Not necessarily for -- so let me go back and -- so one of his girlfriends was on the payroll and --

Mr. ██████.   Off the record, please, for a second.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>   Back on the record.

Mr. ██████.   So Lunden Roberts, she was on his payroll.   She was not working. She was actually living in Arkansas pregnant with his child, and she was on his payroll.

There were expenditures for one of -- he called it his West Coast assistant, but we knew her to also be in the prostitution world or believed to be in the prostitution world. And he deducted expenses related to her.   She relates to the sex club issue.

And then there were -- and I know that my counsel brought this up earlier. There were some flying people across State lines, paying for their travel, paying for their hotels.   They were what we call Mann Act violations.

Q      Where he was paying for the travel of an individual to fly out to California or wherever?

A      Or Boston or wherever he was at.   D.C.   I think one of them -- he flew someone for the night.   So, yeah, there were situations like that as well.

Q      And were those Mann Act violations referred to the Justice Department?

A      I know that they were compiling them together.   I don't know what they ended up doing with them.   I know there was an effort at some point to compile them, but I don't know what ultimately happened with them.

Q      And did you interview any of the prostitutes that traveled across State lines --

A      I don't --

Q     -- for that purpose?

A     I don't remember.   There were -- so let me use the correct term here.   If there were prostitutes -- some ended up being his girlfriends.   So, they all kind of morphed and changed.   So I want to be accurate in how I represent them.   But there were a lot of females that I believe he was having sexual relationships with that I ended up interviewing.

Q     And he was paying money for the purpose of a sexual relationship, correct? To the best of your knowledge?

A     To the best of my knowledge, yes.

Q     Okay.   The discussion last round about the Attorney General Barr's involvement, are you aware of the Justice Department policies and procedures that relate to sensitive investigative matters and political matters?

A     I am not.

Q     And do you know if the Attorney General, under the DOJ rules and procedures, has to make some of these decisions?

A     I did not.

Q     Would it surprise you if, in fact, the Attorney General does have to sign off on certain things when it relates to the son of a Presidential candidate or an incoming President-elect?

A     It wouldn't surprise me at all.

Q     Okay.   When Joe Biden stayed at a hotel and Hunter Biden expensed that as a business expense, did you come across any other evidence that Joe Biden was involved with business dealings of Hunter Biden other than the 10 percent for the big guy that you mentioned earlier?

A     Yeah, I'd also mention the WhatsApp.   The indication in there that

regarding -- right before they entered into the CEFC deal --

Q    Okay.

A    -- that the data was there.    And then as far as the trip out to California and the hotel stay, we don't know whether that was for a business purpose -- we just know it was supposedly deducted.

Q    And that was in 2018?

A    Yes.

Q    Okay.    So Joe Biden wasn't the Vice President at that time?

A    No.

Q    Correct?    And he wasn't President?

A    No.

Q    So he didn't, to the best of your knowledge, have Secret Service detailed during 2018, correct?

A    Not that I'm aware of.

Q    It's my understanding -- I think we can stipulate that former VPs get Secret Service for, I think, 90 days or 6 months after their term of office, but then the Secret Service is no longer applicable.

You have no reason to believe that he had Secret Service during the 2018 timeframe, do you?

A    No.

Q    Okay.    Just a question about working with the U.S. Attorney's Office in Delaware.

It seems like the elephant in the room is that -- correct me if I'm wrong, but -- Joe Biden and anyone in the Biden family is royalty in Delaware.    Is that not the case?

A    It was definitely something that was overly apparent in the State, yes.

Q      So whether the President is a Republican or a Democrat, if you are in the district of Delaware, and you are in the U.S. Attorney's Office, and you are trying to bring a case against a family member of Joe Biden, that inherently has its challenges, doesn't it?

A      Yes.

Q      Because Joe Biden is, in effect, royalty in Delaware, correct?

A      I don't know if I would use the term "royalty," but I think he is someone that's a big deal within that State.

Q      Right.   And so all the nonpolitically-appointed officials in the office certainly could be affected by the fact that we're dealing with Joe Biden, correct?   In that office?

A      I went into it with the belief that I would hope that that wouldn't happen. But it being in the Delaware area, it very well could have happened that way.

Q      Okay.   And Lesley Wolf wasn't a political appointee, correct?

A      She was -- not to the best of my knowledge.

Q      Okay.   And Mark Daly wasn't a political appointee, was he?

A      Not to the best of my knowledge.

Q      And Jack Morgan wasn't a political appointee, correct?

A      Not to the best of my knowledge.

BY MAJORITY COUNSEL 1:

Q      And when the U.S. Attorney in D.C. declined, that U.S. Attorney was a political appointee, right?

A      Yes.

Q      And that person was appointed by President Joe Biden.   Is that correct?

A      From the best of my knowledge, yes.

Q      And in the Central District of California, they declined charges in that U.S. Attorney's Office.   Is that correct?

A      From what I have been told through third party, yes.

Q      And that person, that U.S. Attorney, was a political appointee appointed by President Joe Biden.    Is that correct?

A      Yes.

Q      And Attorney General Garland was appointed by President Joe Biden.    Is that correct?

A      Yes.    I would also like to add, I don't know if -- since this recent testimony or things that have happened recently -- if some of this has changed, so --

Q      Understood.

A      And they very well could change their stance, and so I want to make that clear.

Q      Sure.    Is there anything else that we haven't covered today that you would like to share with us?

A      Yeah.    So when we were going through all these issues, we actually sat down after a meeting -- when I say "we," it's me, Gary Shapley, and my co-case agent, Christine Puglisi.

And we wanted to -- at that time -- so this might have been 1 or 2 years ago.    I don't recall the time.    I'm sure if we go back, we can figure it out.    It probably was about a year ago.

But we wanted to get down on paper so that we knew at the time all the problems that we were dealing with.    And we have a list of -- what is it -- seven different areas, and they include lack of transparency, outside the normal course of an investigation, recurring unjustified delays, enforcement actions, misrepresentation of investigator's requested actions, investigator discussions related to the conduct of prosecutors.    And defense counsel bullying and threats.

This is actually in here.    Prosecutors told investigators on a call on August 12th,

2022, that Defense Attorney Chris Clark threatened them, stating that their careers would

be ruined if they brought various charges against Hunter.

They also said -- which I think that this is important, too -- in several other

conversations, prosecutors told investigators that defense counsel requested meetings

with high-ranking DOJ officials before any charging decisions were made.

Q      And at the time that Chris Clark made those statements, he was

representing Hunter Biden.    Is that right?

A      Yes.

Q      And Hunter Biden's father was the President of the United States.    Is that

right?

A      Yes.

Q      And the people that he made that statement to were employees of the

Justice Department.    Is that correct?

A      Yes.    And a lot of these things, I think we've already gone over in detail.

I'm going to look through here and see if there's anything that stands out that is

important to you guys.

MAJORITY COUNSEL 2.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    We'll go back on the record.

Mr. ▮▮▮▮▮.    So June 15th, 2022, the meeting with Stuart Goldberg, [Acting

Deputy Assistant Attorney General].    The meeting with DOJ Tax at Main DOJ where the

purpose of the meeting was misrepresented to the agents.    We had no idea that they

were going to bring up a huge presentation to everyone there regarding the reasons why

we shouldn't charge this case.

So they presented on their stuff.    I ended up presenting on my side our
understanding of the evidence and the investigation.    And it caught us off guard because
they misrepresented that meeting to us.

BY <u>MAJORITY COUNSEL 1</u>:

Q     Who was present at that meeting?

A     So you had the SAC and ASAC at the time of FBI.    You had my leadership,
which included my supervisor.    Gary Shapley.    That included my SAC at the time.    So
that would have been Darrell Waldon.    And I believe my DFO was also present there.    I
could be wrong on that.    His name was Mike Batdorf.    Stuart Goldberg was there.    He
was the DAG.    David Weiss was there.    Lesley Wolf, Jack Morgan, Mark Daly, and then
the agents from the FBI who were part of the case team.

Q     And who gave the presentation?

A     Jack Morgan and Mark Daly.

Q     So not David Weiss?

A     Not David Weiss.

This was lack of transparency section.    "Assistant U.S. Attorneys irrationally
dismissed most suggestions from the investigators, creating an environment where
investigators were apprehensive to bring up differing opinions."

There's one in here that -- can I do something off the record?

<u>MAJORITY COUNSEL 1.</u>    Go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ███.    "Prosecutors at one point instructed investigators not to complete
any other work that was not specifically tied to the tax year 2014."

And the whole reason behind that was because we were running out of our

statute.    We had an issue with our statute that year.    So they made us focus everything in our work on 2014.

"Prosecutors instructed investigators not to ask questions in a certain area because they did not want to get DOJ PIN" -- Public Integrity -- "involved because that would result in another layer of approvals."

Yeah.    There was -- "A recurring discussion occurred between the FBI and IRS CI" -- so agents with both -- "about the unprofessional conduct engaged by the prosecutors."

And this is under investigator discussions related to conduct of prosecutors.

"FBI telephoned IRS CI in May or June of 2022 suggesting that we request a special counsel be assigned."

Q    Do you know who at the FBI made that call?

A    I do not know.    But I believe that was the supervisor at the time, Joe Gordon.

"At several times during this investigation, we were made aware that FBI leadership was confused and concerned about the path the case was taking.    Evidence of this concern was that the Baltimore FBI SAC at the time attended a meeting at Main DOJ at the Tax Division knowing that only tax charges were on the table being discussed. The FBI SAC asked several questions about the tax case and presented rebuttals to DOJ Tax attorneys, who were presenting on defenses raised by defense counsel.    The FBI SAC made comments during breaks while talking with Gary Shapley that the issues raised by DOJ Tax that might result in not charging are nonsense."

There was one more thing that I was going to bring up, but I --

Q    You've shared a lot with us.

Who was the FBI SAC -- that made the comment you just referred to regarding

"nonsense"?

A    So I would have to get that.    I know I have it.    So we owe you the IRS Commissioner's email, and I can get you that.

Q    Okay.    Is there --

Mr. <u>Zerbe.</u>    What does he want?

Mr. ███.    The IRS Commissioner's email.

Mr. <u>Zerbe.</u>    I got that.

Mr. ███.    And then the SAC that attended the -- we called it the Tax Summit.

Mr. <u>Zerbe.</u>    Okay.

<u>MAJORITY COUNSEL 1.</u>    I'm going to go ahead and stop there and turn it over to my colleague.

        BY <u>MINORITY COUNSEL 1</u>:

Q    We want to follow up.

You mentioned a June 15, 2022, meeting where you say they misrepresented the purpose of the meeting, and they presented the reasons why you should not charge. What were some of the reasons that they gave at the meeting?

A    More so a lot of the evidence related to the defenses that were presented. So I'll give you an example.

I had an argument with one of the DOJ Tax attorneys regarding the loan.    The Burisma money loan.    And he was telling me -- so the money kind of switches in 2017. Hunter starts paying Archer half of his money from Burisma starting in 2017.    And they actually enter into an agreement stating that they're going to do that from that point on. Because at that point, Archer is no longer on the board because he had his pending legal issue going on.

So they kept saying that that money being sent to Archer in the later years was a

repayment of loan.    And I literally held up the document.    I'm like, there's this

document that literally lays this out that this is for services rendered related to the

Burisma board.    And there's no indication at all, whatsoever, that this money is a loan.

And that was the part where it just got so frustrating with -- I'm showing you

evidence, and you're just not listening to me.

BY MINORITY COUNSEL 2:

Q    But they had a whole presentation prepared on their decision not to charge?

A    It wasn't on their decision not to charge.    It was all the reasons why we

shouldn't charge for 2014, 2015.

Q    How long would you say that presentation was?    Was it a PowerPoint?

A    I don't remember, to be honest with you.

Q    But presumably, there were a litany of reasons?

A    Yeah.    So when they found out the defense -- that the money was a loan

and that part of the taxes were paid, they threw their hands up and they were like, oh,

this -- it was essentially like this is the end of the world.

And what me and the investigator did is we figured it out.    We found out stuff

after that that we didn't know before.    And we spent so much time working through the

issue and showing how it wasn't a loan at all.    There's no indication of it whatsoever.

Again, I go back to -- you can't loan yourself your own income.

Q    Can I ask a bit about -- you mentioned just in response to ████'s

question -- or it was related around this information.

You said the prosecutors asked you to limit some of your [questions] -- I'm not

sure exactly what you suggested they were limiting    -- because they didn't want to get

DOJ Public Integrity involved.    Can you talk a little bit more about what DOJ Public

Integrity is?

A       It's just another level of approval that, for certain issues, will come and opine and approve whether -- I believe that Public Integrity is involved if you're issuing a subpoena to an attorney.    If they're involved in that.    So there are certain things where they give their approvals for whether you can do something or not.

Q       Does Public Integrity -- I'm sort of trying to get a sense of what would you say the general purpose of that unit or that approval process is?    What is the point of it?

A       I believe when cases are of a political nature and when there's complex issues, or when you need someone outside of your team to opine on something, they're the people you go to.

Q       So --

A       That's my understanding.    So this is -- I'm not a part of DOJ.    So I only know this from what I've heard.

Q       Doesn't the fact that prosecutors were sort of trying to avoid that extra layer of review indicate -- not that they were trying to stonewall the process, but actually rather trying to expedite the process?

A       I guess I'm confused by the question.

Q       Well, presumably, another layer of review would only add time to various steps along the investigative process, right?

A       I just -- I wanted to follow the evidence.    I wanted to do the right thing. And I go back to -- if David is truly in charge and he's supposed special counsel, why are we going to these approvals?    Why can't David, who is in charge of the investigation, just allow us to do it?

Q       I guess I don't know the answer to that question.

But are these -- I don't know to what extent -- maybe you can tell me.    Does David have the authority to bypass all DOJ approval processes at his discretion?

A       I don't think so.    But, in my opinion, that would be something that you guys would have to figure out.    What authority did he -- and, everything is pointing to me that he didn't have that authority.

Q       As a matter of course, can an AUSA, bypass those kinds of procedures? Who would need to grant permission to bypass the standard DOJ procedures such as getting approval from the Public Integrity?

A       Yeah -- I would look at current special counsel cases.    What approvals are they having to get?    What are they having to do?    So that's what I would do if I were trying to figure out an answer to that.

I had no issue -- to be honest with you, I had no issue with getting the approvals. But when you're putting the approvals as a roadblock that we don't want to do it because, well, that's going to take too much time to get those approvals and when we're trying to put everything out there to follow the right path, that is frustrating.

Q       I guess what I'm wondering is, is there a balance?    In any organization, you know, there are processes and approvals.

It incumbent upon the prosecutors to sort of weigh the probative value of the evidence that they might potentially gather with the speed and other issues potentially related to Public Integrity and the like that could be intended in gathering that evidence?

A       I understand what you're saying, but, yeah, I don't know how to appropriately answer that.

Mr. <u>Zerbe.</u>    I just want to make sure you answer --

Mr. ███.    Off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

<u>MINORITY COUNSEL 2.</u>    I don't have anything else.

MINORITY COUNSEL 1.   That's it.   We have nothing else.

BY MAJORITY COUNSEL 1:

Q   I just have a couple follow-ups or maybe just one.

If someone meets all the elements for a crime of willful evasion and are found to, in conjunction with that, owe a liability, and they pay off that liability years later when they've been caught, has a crime still been committed?

A   Yes.

Q   Is there anything else we haven't covered today that you would like to share with us?

A   Not that I can think of.

MAJORITY COUNSEL 1.   With that, I have no further questions.   I'd like to thank you for making this disclosure and for coming in and for your service.   Thank you very much.

[Discussion off the record.]

MAJORITY COUNSEL 1.   Back on the record.

Mr. ████.   Any of the agents' names that I've said, if those could be redacted. Because, I'm coming forward as a witness.   I'm asking for those protections as well, but I don't want to ruin people's careers because they're a part of this investigation, so --

MAJORITY COUNSEL 1.   We understand your request, and we'll take that under advisement.

Mr. ████.   Okay.

MAJORITY COUNSEL 1.   Thank you.

Off the record.

[Whereupon, at 4:21 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee


    I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.


_____

Witness Name


_____

Date