1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                WESTERN DIVISION

4       THE HON. MARK C. SCARSI, JUDGE PRESIDING

5

6   UNITED STATES OF AMERICA,          )
                                       )
7                    Plaintiff,        )
                                       )
8            vs.                       ) No. 2:23-CR-00599-MCS-1
                                       )
9   ROBERT HUNTER BIDEN,               )
                                       )
10                   Defendant.        )
    _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16              Los Angeles, California

17            Wednesday, March 27, 2024

18                  1:00 P.M.

19

20

21

22

23              Wil Wilcox, CSR 9178
        Official U.S. District Court Reporter
24         350 West First Street, Room 4311
             Los Angeles, CA  90012
             wil.wilcox@gmail.com
25

```
 1    APPEARANCES OF COUNSEL:

 2
      FOR THE PLAINTIFF:
 3
                MR. LEO J. WISE
 4              MR. DEREK EDWARD HINES
                US DEPARTMENT OF JUSTICE
 5              OFFICE OF SPECIAL COUNSEL, DAVID C. WEISS
                950 PENNSYLVANIA AVENUE NW
 6              ROOM B-200
                WASHINGTON, DC 20530
 7              (771)217-6091
                ljw@usdoj.gov
 8              deh@usdoj.gov

 9

10    FOR THE DEFENDANT:

11              MR. ABBE DAVID LOWELL
                MS. ANGELA M. MACHALA
12              WINSTON & STRAWN, LLP
                1901 L STREET NW
13              WASHINGTON, DC 20036-3508
                (202)282-5000
14              abbelowellpublicoutreach@winston.com
                (213)615-1997
15              amachala@winston.com

16

17

18

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CA.; WEDNESDAY, MARCH 27, 2024

 2                              1:00 P.M.

 3                              - - - - -

 4              THE CLERK:  This United States District Court is

 5  now in session, the Honorable Mark C. Scarsi presiding.

 6              Please have a seat.

 7              Calling item number one, 23-CR-00599-MCS,

 8  united States of America v. Robert Hunter Biden.

 9              Counsel, state your appearances, please.

10              MR. WISE:  Good afternoon, Your Honor.  Leo Wise

11  and Derek Hines for The United States.

12              THE COURT:  Good afternoon.

13              MR. LOWELL:  Good afternoon, Your Honor.

14  Abbe Lowell, Angela Machala, and Laura Markarian for

15  Mr. Biden.

16              THE COURT:  Good afternoon.

17              So we are here on a number of motions to dismiss.

18  We've got eight of them to go through.  I've been through

19  all the papers, read the briefs and the oppositions, the

20  replies, the evidence that was submitted along with the

21  briefs.  I went through the Government's surreply that was

22  requested by the Court.  So I think I have a pretty good

23  sense of what the arguments are.

24              But the way I think we ought to proceed is I'll

25  give each side an opportunity to briefly speak on each
```

1   motion.  We'll go one at a time.

2           So I'll ask the Defendant to briefly give us an

3   overview of the motion.  And I'll ask the Government for a

4   brief overview of your -- of your response to it.  And then

5   I'll -- I've got some questions for the -- for the parties.

6   We'll go through the questions after that.  This way,

7   everybody has a sense as to what we're talking about with

8   respect to the motions as we get into the arguments.

9           So with that being said, let's start out with the

10  immunity motion.

11          MR. LOWELL:  With the Court's permission, I'd like

12  to put in perspective the motions.  It would only take me a

13  few minutes, but it goes with what you just said, in order

14  to have an overview.  Is that okay?

15          THE COURT:  Sure.  And just so you know, I have

16  been through all the papers, both here and in Delaware, so I

17  have a good sense as to what we're talking about.  So I just

18  wanted to allow you to frame it, and especially for public

19  and press who may not be as familiar with the papers, give

20  you an opportunity to briefly give us -- give us an overview

21  of the motion.

22          MR. LOWELL:  And before I do that, Your Honor,

23  then I'd like to give you an overview of the totality of the

24  motions.

25          THE COURT:  Sure.

```
 1            MR. LOWELL:  Because I think that makes this case
 2    somewhat unique.  So please let me start with something
 3    general before I do what Your Honor said and start one by
 4    one through the motions.
 5            THE COURT:  Well, I want to deal with the motions
 6    one at a time.  So we'll deal with the immunity motion first
 7    and then move on from there.
 8            MR. LOWELL:  Yes.  But before I even get into the
 9    immunity, I'd like -- give me this leave.
10            THE COURT:  Sure.
11            MR. LOWELL:  Because I know -- Judge, ordinarily I
12    know courts approach challenges to criminal cases with the
13    presumption of regularity, depending on what motion is
14    coming forward and maybe not so far as looking to see how
15    every Government action subject to the motion can be
16    explained away and a motion be denied.  But it surely
17    starts, most of the time, with the idea that things were
18    probably done well enough to allow a case to go forward.
19    And then, in seriatim, a court takes up the individual
20    motions one by one.
21            And in preparing to be here today, Judge, when I
22    was looking at all the motions, it dawned on me that while
23    any and each of the motions, even some of the more uncommon
24    ones, like addressing selective prosecution or outrageous
25    government conduct, has merit in its own.  And many, in our
```

1  view, like the existence of this diversion agreement,

2  doesn't yet have what we think is a satisfactory response at

3  all.

4           And I will, as we go through the motions,

5  Your Honor, point out what I'll call some of the curious

6  statements the Government has made in its oppositions.

7           But the point here is contrary to the normal

8  saying that a whole is not as great as the sum of its parts,

9  I'd like the Court to consider, as it's going through each

10  of our motions, the opposite, which in this case, the whole

11  is actually greater than all of the sum of its parts, and

12  that is because there is one penetrating fact:  That the

13  prosecutors have not been able to explain away.

14          And that is that after five years of a painstaking

15  and thorough investigation, including interviews, grand

16  juries, documents, meetings, presentations by counsel,

17  then-U.S. Attorney Davis Weiss believed the correct result

18  were two tax misdemeanors and a diverted gun charge.

19          What changed between the June 2023 agreement of

20  that and the charges that followed were not any real new

21  evidence, as our motions will point out, and not a change in

22  the law.

23          Indeed, the only changes in the law have made the

24  charges less strong, both in terms of more courts addressing

25  the unconstitutionality of the gun charge and the IRS

1    implementing various new tax relief proposals.

2            What changed were all the things the motions point

3    out, making this perhaps, in the amalgam, the least ordinary

4    prosecution a person could imagine, and reversing that

5    decision in June of 2023, which then occurred in the court a

6    month later, is the beginning of what the prosecutors, we

7    believe, did to bring these charges.  And so we've created

8    something to go through them very briefly before we go into

9    the actual immunity agreement.

10            In *The United States versus Hunter Biden*, what we

11    have called the district -- the DOJ missteps, before the

12    June agreements of 2023, Your Honor, in that five years, if

13    you look at the left side of this chart, look what you see.

14    You don't see much.  In fact, you don't see anything.

15            And then after June of 2023, there was a

16    four-month scramble between July of 2023 and the charges

17    that were brought in two different courts.

18            And this is what happened in between.  There was

19    no stopping two IRS agents publicly doing their media tour

20    and, in the course of that, disclosing various things that

21    the taxpayer never has disclosed to the public, including

22    grand jury information.

23            There was the reopening of the Alexander Smirnov

24    Russian-created debunked allegations.

25            There was the reneging on the deal to include any

1   immunity at all in the correspondence you asked us to

2   resubmit -- which we did in Exhibit C, D, and E of the

3   chronology -- so that there would no longer be any immunity,

4   there would not be a no-jail recommendation, and there was

5   no tax misdemeanors.  And all that happened after the outcry

6   by Republicans in the media and the pressure that did.

7            There was the seeking of special counsel status by

8   Mr. Weiss despite his repeated statements that he didn't

9   need that status because he had all the authority he needed

10  to bring a case anywhere, anytime, and anyplace.

11           There were the claims that when we brought that

12  to the attention of the prosecutors and Your Honor and Your

13  Honor in Delaware, they said that they could do this now

14  because they had overwhelming evidence, which we then

15  chronologically were able to show they acquired three months

16  after they brought the charges.

17           They sought search warrants and lab tests for

18  charges that we pointed out only after the charges were

19  brought.

20           They, we found out, were soliciting information in

21  the grand jury in Los Angeles, which they then used -- or

22  will use for evidence in Delaware.

23           And they, in the course of fighting our motions

24  for discovery, filed a pleading in court, claiming that a

25  picture of sawdust was our client's cocaine.

1          They filed in a California court that Mr. Biden's

2    residence was in California after filing in Delaware court

3    that his residence was in the District of Columbia.

4          And as I'll point out when we get to that motion,

5    they have the selective use of when the special counsel

6    wants to claim he's the special counsel or when he can

7    fall back on an alternative that he still remains the

8    U.S. Attorney.

9          You can take that down.

10          These events haven't stopped, Your Honor.  Just in

11    the last two weeks, Republican congressional chairs have

12    actually now brought a lawsuit against two Tax Division

13    attorneys that may still be working on the case and asked

14    that they have another meeting with the Assistant U.S.

15    Attorneys in Delaware that signed the agreement in June.

16          Not only did the IRS, in February of 2024,

17    announce a plan where taxpayers who have not filed for paid

18    years between 2017 and 2021 -- which is even further than

19    the charges against Mr. Biden -- get relief and forgiveness

20    when Mr. Biden is being charged, but last week, I couldn't

21    help but reading that the Republican candidate for senate

22    here in California owes as much as three-quarters of a

23    million dollars for 13 years and faces, as far as we see, no

24    criminal investigation of any kind.

25          We show that the chronology of events indicates

1   that at the exact time the prosecutors sitting at counsels'

2   table, but then were in Delaware, were beginning to question

3   the terms of the June agreement in the correspondence we've

4   submitted to Your Honor.  That was when they were beginning

5   to relook at those three-year debunked allegations of

6   bribery by the President of the United States and his son

7   that were pedaled by Russian information -- disinformation

8   peddler Alexander Smirnov.

9          And last week, something labeled as a

10  congressional hearing was revealed that former Rudy Giuliani

11  colleague Lev Parnas gave Congress documents, including one

12  from February 2019.  Think about that.  February of 2019,

13  where a right-wing media star was sending to other Giuliani

14  colleagues what he called was 261 pages of Mr. Biden's

15  financial records he said were obtained by the FBI for them,

16  in turn, to send to the U.S. Attorney in Pittsburgh and to

17  the media.

18         And as weeks go by, what will we learn next?

19         And if the Court allows, I will, in each motion,

20  point out a handful of what I'll call curious arguments that

21  prosecutors have made in their opposition which reflect that

22  scramble of four months that I've brought to your attention.

23         In a phrase, Your Honor, please, I want to put

24  forward to this Court, because you have shown over and over

25  again since I first met you, that you are a scrutinizing,

1    careful, thorough person to look at these motions, that

2    there's nothing regular about how this case was initiated,

3    investigated, or why and how a two-misdemeanor tax agreement

4    turned into nine charges in this court.  And I'm asking the

5    Court to look at these through and consider that the prism.

6            And with that, Your Honor, I will address the

7    immunity clause.

8            THE COURT:  If you could just briefly give us an

9    overview of that motion, then we'll get a brief overview

10   from the Government as to their opposition, and then I've

11   got a number of questions for the -- for the parties.

12           MR. LOWELL:  In an overview way, the motion to

13   dismiss that we call the existence of an agreement relies on

14   the following premise or premises:

15           First, that in June of 2023, a filing was made,

16   reflecting that an agreement had been made.

17           Second, when that came to court in July of 2023,

18   the document which was written by the Government and,

19   therefore, are responsible under basic contract law, let

20   alone, that which applies in plea bargains, to be the one

21   who has to deal with any ambiguity or any problem, because

22   it's their model, their language, their document, came into

23   court to explain it.

24           When they came into court to explain it, they

25   explained it as being a document which they then signed.

1    And the curious argument begins with them trying to address,

2    in their opposition, the concept that you can view this case

3    through normal contract law and not through that extra

4    burden that the Government has when they are the drafters in

5    a resolution case like a plea agreement.

6         And the phrase that we have put in this motion --

7    and it will come up again later when we deal with the venue

8    issue -- is the issue that you've heard us remark and say

9    judicial estoppel, which means you can't go to a court in

10   July and say one thing and then say something else someplace

11   else.

12        THE COURT:  We'll get to that judicial estoppel

13   when we get to the -- get to the motion on that.

14        So with respect to the immunity motion on the

15   diversion agreement, I just want to give you a chance to

16   give an overview of your argument, and then we'll turn to

17   the Government.

18        MR. LOWELL:  Okay.  The overview part will be --

19   and you've read it.  And, again, I know part of this is to

20   remind the Court, but you've also said we want this to be an

21   educational moment as well.

22        We've put forward the exact quotes that the

23   prosecutor spoke to the judge at the July 26th hearing;

24   whereas, afterwards, they claimed this agreement was either

25   a draft or a proposed agreement and they, as you have seen

1   over and over again, call the diversion agreement.  That

2   separate agreement, that is separate.  It stands on its own.

3   It's a bilateral agreement that is between the parties.

4              The parties are defined to be The United States

5   represented by the Delaware U.S. Attorney and Mr. Biden.

6              What's critical about that for the overview is

7   when you're looking at an agreement, you have to determine

8   who the parties are, and this document defines who the

9   parties are and defines them to be those two entities.

10             The Government's response is that it never really

11  got to be an agreement because the probation officer didn't

12  sign on that last page on July 26th.

13             And the problem with that point of view is a few

14  fold, but one overview point is that they're not a party.

15  They're not led -- they're not defined to be a party.

16             The second problem in that overview is that their

17  role is different.

18             The third is that you look at the document over

19  and over again when it talks about what the parties can do,

20  it doesn't ever mention the Probation Office.

21             And more importantly, when Mr. Wise was in court

22  in July, and he's saying that this is an agreement in the

23  present tense, and he talks about what can happen, including

24  modifications which can only occur in writing by the

25  parties, he uses the present tense, and not once in court,

1    not once does he call it a draft.  Not once does he use the

2    word "The Probation Office has to sign it.

3              And by the way, they're sitting over there, and

4    they haven't signed it yet."  Not once.

5              We hear all of that after the fact as an excuse to

6    try to get out of something that was clearly in effect at

7    the time.

8              So the Probation Office which is their now hook to

9    try to put forward the concept that there is not an actual

10   binding agreement where they used the word "binding," where

11   they used "separate," where they used the word "parties,"

12   where they define what the parties are.  That hook makes no

13   sense because, for example, we pointed out that, in that

14   modification clause the parties can modify and only the

15   parties can modify, they can take the Probation Office out

16   of the agreement altogether, and the probation officer

17   doesn't have a word to say about it.

18             And one quote, just one quote in this overview, I

19   think, makes sense.  This is what Mr. Weiss -- Mr. Wise

20   said, "this is a bilateral agreement between the parties

21   that the parties view is in their best interest."

22             I don't believe that the role of Probation would

23   include weighing whether the benefit of the bargain is valid

24   or not from the perspective of the parties.

25             So what have they done in reverse?  They then put

1    in the concept to try to save their argument by saying, "No,

2    no, no.  What we meant, it's a condition precedent."

3            Well, again, you probably -- based on your

4    practice before and your being on the bench, you know the

5    rules of a condition precedent.

6            The condition precedent has to be something that

7    is clearly stated as such.  It can't go after the fact it

8    occurs by a signature line on the last page.  It has to use

9    the words, "It is conditioned on only if something happens."

10           That didn't happen.  What was more than ironic was

11   the fact that when he was a judge on the D.C. Circuit,

12   Attorney General Garland had a plea agreement case where he

13   rejected a similar claim from the Justice Department that

14   something like this could be a condition precedent.

15           So I don't know what they do.  And when I said

16   even some of these motions don't have adequate responses,

17   there is no adequate response in this overview or even in

18   the specifics between what was clearly said in court.

19           And I can tell you, if it gets to that,

20   Your Honor, I have no fewer than a dozen-and-a-half quotes

21   by Mr. Wise in the court where he talked about this being a

22   valid agreement between the parties in the present tense and

23   makes no representation of the things that they've written

24   in their papers since.

25           THE COURT:  Okay.  Thank you.

1          Now, I'll just give the Government a brief

2     opportunity to overview your opposition to the first motion.

3          MR. WISE:  Thank you, Your Honor.

4          Before I do that, Your Honor, if I could, just for

5     a second, address Mr. Lowell's sort of statement at the

6     beginning.

7          THE COURT:  You can, but briefly.  You don't

8     really need to.  I mean, I'd like to get to -- get to the

9     motions, if we can.

10         MR. WISE:  What occurred to me listening to him

11    was, you know, he said this is a case where the sum of the

12    whole is greater than the parts.  I think, actually, the

13    theme that runs across all the motions is not that old

14    adage.  It's the old adage:  When you don't have the facts,

15    attack the law.  When you don't have the law, attack the

16    facts.  When you don't have the facts or the law, attack the

17    prosecutors.

18         And that's what all of these motions do again and

19    again and again, calling us rank partisans working for

20    Jim Jordan on the one hand or the Biden White House on the

21    other or Vladimir Putin on the third.

22         And what they all lack are facts.  These are

23    essentially fact-free pleadings that make these accusations,

24    and it starts with the diversion agreement.

25         Mr. Lowell stood up in front of you a moment ago

1    and said that, you know, "I never used -- I never described

2    the agreement the way we've described it in our papers."

3    Not true.

4            As we pointed out in our response at page 83 of

5    the transcript, when I was asked by the Court to summarize

6    the agreement, and we quoted this, I said -- this is a

7    quote:

8            Paragraph 1 of the proposed diversion agreement

9    provides that it's for a two-year period, 24 months,

10   beginning on the date of approval of this agreement.  And

11   that would be when -- when, in the future; that's what

12   "when" means in that context -- the chief probation officer,

13   Ms. Bray, signs it, because everyone in that courtroom knew

14   she hadn't signed it.  And that's why we submitted that

15   declaration, because Your Honor wasn't in that courtroom.

16           And so we wanted to bring that fact to your

17   attention to make it very clear that the revisionist history

18   in this case is to be -- is what the defense is doing,

19   acting like everyone knew an unsigned agreement that she

20   expressly declined to sign and that Judge Noreika, at

21   multiple instances in the transcript, clearly referred to as

22   a proposal, as something that she would advise Ms. Bray

23   whether she should sign -- not that she had signed, that she

24   should sign.  We quoted that as well.  That was what

25   everyone in that courtroom understood.

```
 1          And it's only since that point that they have
 2   constructed this argument that, no, everyone knew it was in
 3   effect.
 4          And they misquote me and mischaracterize me and
 5   say when I answered that question -- and we point this out
 6   in our -- in our papers --
 7          THE COURT:  Just to advise the parties.  I've gone
 8   through and read the transcript from the Delaware hearing,
 9   so I know exactly what happened there.  I know the point
10   you're going to make about the context of what -- of what
11   you said.  So we can kind of move beyond that.
12          MR. WISE:  Thank you, Your Honor.
13          This was clearly a condition precedent.  There are
14   no magic words required by the law.  The kind of language
15   that is used to establish a condition precedent -- we quote
16   this -- are things like "on condition of" or "if."
17          As we point out in a screenshot, so that there's
18   no ambiguity, the agreement specifically has "Terms and
19   Conditions" as the very first heading in the agreement.
20          And what it says -- and we say this in our
21   papers -- are that the term of the agreement is 24 months
22   from approval.  That's the term, and the condition is
23   clearly approval.  And the signature page has, in block
24   capital letters, "Approved By" above only one signature, and
25   that's Ms. Bray.
```

```
 1          Even if you accept their argument that implicit in
 2   executing the agreement was approval, fine.  It clearly
 3   provided that approval by Ms. Bray was a necessary condition
 4   to the formation of the contract.
 5          And they go on and on about the fact that she's
 6   not a party to the modification clause.  But if you look at
 7   contracts that have conditions precedent to formation,
 8   that's always the case.  If something has to happen to put a
 9   contract into force, the fact that that something doesn't
10   play a role in later modifying it is without moment.
11          The reason why approval was so important was
12   because Probation's role was central to this arrangement.
13   Without it, the Government got no benefit of the bargain.
14   Without it, all the Government got was an empty promise that
15   Mr. Biden would abide by the rules, and we knew we couldn't
16   count on that.
17          So supervision by Probation was essential.  And
18   without it, the Government got no benefit of the bargain.
19   That's why it had to be approval.
20          Now, they say approval meant acknowledge.  They
21   say this in their reply.  Well, that's not what the contract
22   says.
23          They say approval meant consulted.  That's not
24   what the contract said.
25          If the parties had intended for Probation just to
```

 1    acknowledge it, it would have said "acknowledged by."

 2           If the parties had just intended it to be a

 3    consultation, it would have been reflected in some way in

 4    that.

 5           We put forth the declaration to make it clear it

 6    wasn't approved by Probation.  All they offered was this

 7    draft pretrial services recommendation to the court, which

 8    is clearly not approval.  And just like we tell juries, when

 9    the court is finding facts, you don't have to leave your

10    common sense at the door.

11           If Ms. Bray had approved it when she was asked to

12    sign it, she would have signed it.  And it's the strongest

13    indication that she didn't by the fact that she declined to

14    do so.

15           And they cite case law that, yes, parole evidence

16    can be used not in the interpretation of unambiguous

17    contracts but to determine whether assent was given.  But

18    that's in a situation where we don't know if someone signed

19    it or not.

20           Here, we know she didn't.

21           And so when you stack up their recommendation that

22    he be considered for pretrial diversion against her express

23    declination to approve it, regardless of who has the burden,

24    that's clear that the condition precedent to formation

25    wasn't satisfied.

1          THE COURT:  Thank you.

2          So let me ask a few questions.

3          There's a little bit of attention in the briefing

4    with respect to what law applies to how the Court is to

5    interpret the diversion agreement.

6          So the Ninth Circuit has some pretty clearly laid

7    out principles with respect to interpreting plea agreements,

8    for example.  And it's Ninth Circuit law, as opposed to the

9    state, in which the plea agreement is entered into or

10   signed.

11         Other circuits have held that diversion agreements

12   are interpreted just like plea agreements.  The Ninth

13   Circuit hasn't said that expressly, but the logic seems to

14   follow.  And there doesn't seem to be anything in Ninth

15   Circuit law that would steer the Court away from treating --

16   interpreting a diversion agreement just like a plea

17   agreement under the standards of the Ninth Circuit.

18         So we're looking at kind of Ninth Circuit common

19   law contract interpretation, even though that doesn't

20   necessarily make sense in the ordinary course.

21         The parties have said that Delaware law, New York

22   law, California law.  Do you agree that I should be looking

23   at the Ninth Circuit law here?

24         MR. WISE:  So I think what the Ninth Circuit and

25   the Third Circuit both say is that it is federal common law,

| | |
|---|---|
| 1 | and it can be informed by contract principles.  So I think |
| 2 | that is a body of law that includes Delaware law, where the |
| 3 | contract was negotiated; Third Circuit law, where it was |
| 4 | debated and discussed; and now Ninth Circuit law, where |
| 5 | you're being asked to interpret certain provisions of it. |
| 6 | I think it's, frankly, all of those. |
| 7 | THE COURT:  So your argument would be that the |
| 8 | Ninth Circuit common law is informed by state law. |
| 9 | MR. WISE:  Exactly. |
| 10 | THE COURT:  Let me ask you this:  With respect to |
| 11 | the contract, you're arguing it's not ambiguous, correct? |
| 12 | MR. WISE:  Exactly. |
| 13 | THE COURT:  And under whatever law I look at, if |
| 14 | the Court finds the contract is not ambiguous, then I look |
| 15 | at the plain language of the contract. |
| 16 | MR. WISE:  Yes. |
| 17 | THE COURT:  And I don't consider parole evidence, |
| 18 | correct? |
| 19 | MR. WISE:  Correct. |
| 20 | THE COURT:  And it would be important to the Court |
| 21 | to kind of hone in on a interpretation of the contract that |
| 22 | both comports with the plain language and captures the |
| 23 | intent of the parties, correct? |
| 24 | MR. WISE:  Yes. |
| 25 | THE COURT:  So I should be concerned about what |

 1   did the parties intend when they signed this agreement.

 2              MR. WISE:  Yes.

 3              THE COURT:  You're arguing that the Probation's

 4   approval was a condition precedent to formation; in other

 5   words, there was no contract until Probation signed.

 6              MR. WISE:  Yes.

 7              THE COURT:  That's the argument of the Government.

 8              What I'm wondering is, why isn't it a condition

 9   precedent to performance?

10              In other words, the parties -- the parties could

11   have an agreement.  The term of an agreement might not have

12   started yet because Probation hasn't signed.  That seems to

13   be the -- if we look at the letter that -- that you all sent

14   to the Defendant back in August of 2023 --

15              MR. WISE:  Uh-huh.

16              THE COURT:  -- you seem to have been arguing in

17   that letter that the 24-month period following execution and

18   approval hasn't started.

19              MR. WISE:  Yes.

20              THE COURT:  And so would it be inconsistent with

21   the rules of contract interpretation for the Court to hold

22   that the parties had an agreement, but the term hadn't

23   started yet?

24              MR. WISE:  So I think the reason why it's a

25   condition precedent to formation as opposed to performance

1    is because Probation's role is not -- does not speak to the

2    Government's performance.

3              And when I've looked at cases that draw a

4    distinction between conditions precedent based on formation

5    versus conditions precedent based on performance -- for

6    instance, the *Mellon Bank* case that's talked about.  In that

7    case it was Aetna, the party that was being sued for breach,

8    they didn't -- I'm summarizing this from memory -- they

9    didn't buy the loans or they didn't -- they didn't engage in

10   the financial transaction because the representation of

11   solvency that was a condition precedent to their performance

12   had not been met.

13             Here, I think it is -- it is based on the plain

14   terms of the agreement and again -- and I said this

15   earlier -- how fundamental Probation's role is.  Without it,

16   not only does the Government not perform, but the agreement

17   just doesn't work.

18             The Government doesn't get the benefit of the

19   bargain if Probation hasn't approved it and agreed to take

20   on this supervision -- this supervision role.  Because

21   again, without their -- without their supervision of him, we

22   don't know if he's abiding by any of the terms, not just

23   something we have to do, but any of the things he has to do.

24             We don't have the ability to go to the court to

25   say there's been breach because we have -- we have no way of

1    knowing there's been breach.

2           Probation is the surveillance mechanism that makes

3    the bargain work from the Government's perspective.  And

4    without it, the contract has no meaning for us.

5           THE COURT:  But if Probation were to approve the

6    agreement -- let's say Probation today signed the agreement,

7    couldn't the Defendant hold you to the promises you made in

8    that -- in that agreement?

9           MR. WISE:  No.  I think because of the language we

10   cite of the prevailing principle that's, again, adopted from

11   the case law around plea agreements, but that either party

12   can withdraw from a plea agreement until the point at which

13   the court accepts the plea.

14          The analogy is we were free to withdraw because,

15   as of when we withdrew, Probation had not approved the

16   agreement.  The condition precedent to formation had not

17   occurred; and, therefore, we were not bound, nor was the

18   Defense, because the contract simply didn't exist.

19          THE COURT:  But that would require a condition

20   precedent for formation as opposed to --

21          MR. WISE:  Yes.

22          THE COURT:  -- performance.

23          MR. WISE:  Yes.

24          THE COURT:  The agreement itself has an immunity

25   provision that sweeps in the statement of facts from the

plea agreement as well as a statement of facts in the diversion agreement.

There was a representation made by the Plaintiff in the declaration of Mr. Clark that there was never any -- there was never any tie between the diversion agreement and the plea agreement; in other words, Mr. Biden pleading guilty to the misdemeanors wasn't required in order for the Government to agree to the diversion agreement.

Is that -- is that correct?  I know -- I know that you didn't -- you didn't respond to Mr. Clark's declaration on that point.

MR. WISE:  So the Defense has taken multiple inconsistent positions on that.

We were clear right from the start, from the beginning of the hearing to the end, that the two agreements were independent.

The Defense has taken -- and it may take a second to sort of go through this -- multiple inconsistent positions on how the two agreements relate to one another, if at all.

First, in the hearing, when Mr. Biden got up to do the Rule 11 colloquy with Judge Noreika, she went through the questions in the rule; one of which, of course, is:  Are you relying on any promises outside of your plea agreement to enter into the plea of guilty?  And this obviously goes

1  to voluntariness.

2          And if the answer is yes, the plea is -- the plea

3  can't be accepted, right?  That means he's not entering

4  voluntarily into the agreement.  To everyone's surprise, he

5  said, "Yes, I am relying on promises outside the agreement."

6          And at that point, Judge Noreika stopped.  She

7  asked a few more questions, but then she stopped, as you saw

8  from the transcript, recognizing at that point, the plea was

9  dead.  She couldn't take the plea because he wasn't

10  voluntary at that point.  And she said, "Why don't you all

11  talk about this."

12          Mr. Clark then came on -- back on the record and

13  reversed himself, and Mr. Biden then gave the opposite --

14  the exact opposite answers to the same Rule 11 colloquy

15  questions.

16          No, he wasn't relying on the diversion agreement

17  immunity.  If the diversion agreement immunity was found to

18  be unenforceable or uncon- -- whatever, he was -- he was --

19  he was voluntarily entering into this plea.

20          And that was part of why at the end -- and that --

21  that flip was part of why, at the end of the hearing,

22  Judge Noreika didn't accept the plea.

23          In their papers, they seem to reverse themselves

24  again, and we point this out.  And they say the only reason

25  he proceeded with, for instance, allocuting on the facts in

1    the plea agreement was because of the promise of immunity in

2    the diversion agreement, which, again, is completely

3    inconsistent with the position they took the second time in

4    the hearing.

5          And so the mess -- the sort of -- you know, the

6    gum in hair, the more you work it, the harder it gets to

7    figure out what they're saying, is coming from their side.

8          We were always clear that these were separate

9    agreements, and the incorporation clauses at the end said

10   that.

11         The other area where they've been totally

12   inconsistent --

13         THE COURT:  Let me just step in here.  I'm trying

14   to figure out if they were separate agreements, then the

15   immunity clause in the diversion agreement would give the

16   Defendant immunity on the tax charges regardless of whether

17   he pleads guilty, no?

18         MR. WISE:  Yes.

19         THE COURT:  And that was the intent of the -- of

20   the Government, was to give the Defendant immunity on both

21   the gun and the tax charges without requiring the Defendant

22   to enter a plea on the tax charges.

23         MR. WISE:  So as I understood it -- and this is --

24   this predated my involvement -- there was a good-faith

25   belief that Mr. Biden was going to plead guilty, and that

```
 1   was represented to the Government.  And on that basis, the
 2   Government proceeded the way it did.  That, obviously, did
 3   not come to pass.
 4            THE COURT:  So the Government didn't give any --
 5   didn't give itself any protection against Mr. Biden saying,
 6   "You know, I don't think I'm going to plead guilty anymore."
 7            MR. WISE:  No.  We relied on the good faith
 8   representation of Mr. Clark, that his client intended to
 9   plead guilty.  And ultimately, his client did not plead
10   guilty at the end of the hearing.
11            THE COURT:  Okay.  Okay.
12            Let me ask some questions to the Defendant.
13            MR. LOWELL:  Your Honor, can I respond to that, or
14   should I wait?
15            THE COURT:  Well, let me just ask you this:  If
16   the -- if the diversion agreement -- so your position is
17   that the diversion agreement went into effect as soon as
18   both parties signed it, correct?
19            MR. LOWELL:  The diversion agreement went into
20   effect when the parties came to an understanding that they
21   had an agreement and then executed the document by their
22   signatures, because that's what manifests their agreement,
23   and it came into effect between the parties at that moment.
24            THE COURT:  And at that point, Mr. Biden,
25   according to you, has got immunity for the tax changes and
```

1  the gun charges, correct?

2          MR. LOWELL:  And according to Mr. Wise, tax

3  charges, gun charges, and if they were going to go forward

4  with any drug charges.  Those were the three.

5          THE COURT:  Okay.  And so then at that point,

6  Mr. Biden proceeds to enter into at least discussions about

7  entering a plea agreement, correct?

8          MR. LOWELL:  At that point.  Then they moved to

9  the different agreement that was involved between the

10 parties and got as far as it got.

11         THE COURT:  But why would Mr. Biden plead guilty

12 if he already had immunity?  It doesn't make any sense to

13 me.  It would almost seem like it's malpractice to have your

14 client plead guilty when he already had immunity.

15         MR. LOWELL:  No.  Because it is not the case

16 that -- what he's getting immunity for is what now exists in

17 your courtroom.  What he was not getting immunity for was

18 the five-year decision by the now-special counsel that this

19 case ends with two misdemeanors.

20         So it is not that they were completely divorced.

21 And when Mr. Wise says that there was a good-faith

22 understanding, that went on both people's parts.

23         So what he's getting immunity for is not having

24 nine counts in California, three of which are felonies, five

25 or six of which misdemeanors beyond two years that were

1  being discussed on July 26th.

2          What he was getting immunity for, or the

3  equivalent, was not being charged with three felony counts

4  in Delaware that has now been brought against him when

5  before, it was a diversion agreement.

6          What he was getting immunity for was whatever else

7  the facts said were encompassed in the period of time that

8  that was going on.

9          THE COURT:  So he was getting immunity for the

10  facts that were attached to the plea agreement, correct?

11          MR. LOWELL:  He was getting immunity for -- I

12  think the phraseology was for the events and facts that are

13  encompassed by the statement of facts in the agreement.

14          THE COURT:  So the United States agrees not to

15  criminally prosecute Biden outside the terms of this

16  agreement for any federal crimes encompassed by the attached

17  statement of facts, Attachment A.  That was the gun charge.

18  And the statement of facts attaches Exhibit 1 to the

19  memorandum of plea agreement that was filed the same day.

20          So at this point -- at this point, he has immunity

21  for any crimes arising out of those two sets of facts.

22          MR. LOWELL:  And the statement of facts of the

23  plea agreement were the statement of facts attached to the

24  possibility and the understanding that this was going to end

25  with two misdemeanor counts and nothing more than that.

```
1            THE COURT:  Well, the plea agreement facts are not
2    necessarily limited to misdemeanors, correct?  I mean, it's
3    a factual statement.  It's not a charging document, so it
4    doesn't have -- and so what I'm wondering is, again,
5    since -- since your argument is that Mr. Biden had immunity
6    as soon as the agreement was signed, why would he go forward
7    and plead guilty?
8            MR. LOWELL:  Because you're saying that the
9    immunity was encompassing that which he was prepared at that
10   date to plead guilty to.
11           Whereas, the immunity is beyond that which he was
12   prepared to be guilty to.
13           I mean, isn't the best example of what I'm saying
14   is that you have in front of you a nine-count indictment,
15   and that's not what was happening on July of 26 of 2023.
16           THE COURT:  I'm not sure I get your point,
17   because, if you look at Exhibit 1 of the plea agreement,
18   it's a statement of facts that essentially goes through and
19   details Mr. Biden's issues with respect to taxes from -- you
20   know, from 2017 all the way up to 2020 -- I'm sorry -- for
21   tax years 2016 through 2019.
22           And this factual statement includes all of the
23   underlying facts that underlie the charges brought here
24   today in this courtroom.
25           And so I guess what I'm wondering about is why he
```

1    would plead guilty -- well, let me ask a different question.

2            In looking at the plain language, right, you would

3    agree that in the -- that the diversion agreement, in

4    construing the diversion agreement, the Court looks at the

5    agreement, and if it's not ambiguous, the Court gives it its

6    plain language, correct?

7            MR. LOWELL:  Agreed.

8            THE COURT:  And in looking at the paragraph that I

9    talked about with opposing counsel, in looking at the term

10   of the agreement, Item 1 says:  "The term of this agreement

11   shall be 24 months, beginning on the date of approval of

12   this agreement, unless there is a breach as set forth in

13   paragraphs 13 and 14."

14           And then paragraph 2 says:  "The 24-month period

15   following the execution and approval of this agreement shall

16   be known as the diversion period."

17           In looking at those two paragraphs together, we

18   see the language "execution and approval."  So your theory

19   is that execution and approval are doing the same thing,

20   correct?

21           MR. LOWELL:  And a contract, as you well know, can

22   be shown to exist and approved by something other than a

23   signature and consequently put in the record that which had

24   all the parties approving and executing.  So it doesn't have

25   to be in one document at one time.

```
 1              And what Mr. Wise answered to you, for example,
 2    their concept that we've now turned this into a condition
 3    precedent, then takes you down the path of whether it's a
 4    condition precedent for the formation or a condition
 5    precedent for the performance.
 6              THE COURT:  Right.  But what I'm wondering about
 7    is the term "execution and approval."  If I buy your theory,
 8    aren't I reading one of those terms out of this agreement?
 9    And I wouldn't -- isn't that a redundant statement,
10    "execution and approval"?
11              MR. LOWELL:  It's a redundant statement, in a
12    sense.  It's not reading it out.  I mean, again, if you are
13    creating -- I'm sorry.
14              If the Government's argument is that those two
15    things mean something different but, in all intents and
16    purposes, they reflect the same concept, then you're
17    creating ambiguity.
18              If they're creating ambiguity on a document that
19    they wrote and insisted upon in what is an unusual way of
20    doing it, then it gets interpreted against them.
21              THE COURT:  But that's not the Government's
22    argument, though.  That's your argument.  I mean, your
23    argument is that those two terms mean the same thing,
24    correct?
25              MR. LOWELL:  As to which parties?  As to the
```

1    United States Attorney representing the United States of

2    America, there is both the execution and approval, because

3    the execution reflects the approval, let alone, the back and

4    forth that occurred in court.  That's that.

5            If you now want to say that somehow Probation --

6    which, by the way, Judge, you just read who the parties were

7    in Roman Numeral I.  And then you went to Roman Numeral II,

8    and you looked at one and two, and you said it begins on the

9    approval of this agreement.

10           And the question is:  Where does it say approval

11   of this agreement by the probation officer when number one

12   says the parties are the two parties?

13           I recognize that there's a signature page at the

14   end, and I recognize it says that Ms. Bray signs it.  I have

15   to come back to that in a minute.  I understand that.

16           But I don't read one and two to say that that's

17   what it's referring to.

18           And if there's ambiguity about that, then you need

19   to apply that against the Government.

20           THE COURT:  Right.  But the signature block, it

21   doesn't just say Margaret M. Bray.  It says, "approved by

22   Margaret M. Bray."

23           MR. LOWELL:  Yes.

24           THE COURT:  So we have approved here, and we have

25   approved back in paragraph 2 -- in paragraph 1 and 2.  And

1    I'm wondering why the natural reading wouldn't be to -- when

2    I see "approval" in paragraph 1, why that doesn't refer to

3    the signature block "Approved by" at the end of the

4    document.

5            MR. LOWELL:  Because every contract binds the

6    parties, and the parties are clearly defined in this

7    agreement.

8            THE COURT:  No.  I understand that.  The parties

9    are bound.  But the parties are saying -- okay.

10           MR. LOWELL:  Sorry.

11           THE COURT:  You and I can have a contract, right?

12   And we could say, "We're going to -- we're going to build a

13   building together, and we're going to agree to do it if it's

14   an -- if these plans are approved by the city."

15           Okay.  We can have that contract, correct?

16           MR. LOWELL:  Right.  And that would be a condition

17   precedent.

18           THE COURT:  I think that would be a condition

19   precedent to execution of the contract.

20           MR. LOWELL:  On the performance of it.

21           THE COURT:  Yeah, per performance.  Right.

22           MR. LOWELL:  We can have that contract.

23           THE COURT:  And so you --

24           MR. LOWELL:  Take a hypothetical step further.  If

25   that same contract between me and the contractor said that

there was a good-faith deposit that we were giving him to

begin his work, and that was something that we agreed to,

and then, thereafter, the city didn't approve, if it's not

clear that that, then, stopped the parties from going

forward with what they did, I still owe that money to the

contractor.

So it is not the same to say that because there's

that signature line at the end, it goes all the way back to

amend Roman Numeral I, number 1.

But if it does -- if it does -- there's two things

that we didn't -- I didn't say before, which is the

Government's case depends on suggesting that because

Ms. Bray didn't sign it -- and by the way, I have to point

this out --

THE COURT:  Well, let me ask you before you move

off that point.

The declaration that was submitted by the

Government indicated that -- that Ms. Bray was asked to sign

it, and she declined, indicating that she didn't give her

approval.

MR. LOWELL:  Right.

THE COURT:  You didn't respond to that in your

reply.  I'm wondering, do you have a response to that?

MR. LOWELL:  I do have a response to that.

Notice, the Government didn't tell you when that happened.

1          Ms. Bray wasn't even asked to sign it when the

2    beginning of that agreement occurred.

3          Mr. Wise was in court.  So was I.  I was watching

4    everything that was going on.  I'm not here to be a fact

5    witness, but I'm telling you that when things started to

6    fall apart, then there was nobody going to Ms. Bray and

7    saying, "While the judge is asking questions about the plea

8    agreement" and what is the term, et cetera, "why don't you

9    go ahead and sign this while we're all discussing whether it

10   covers drugs, taxes, and what?"

11         It doesn't say that she was ever asked to sign

12   this, on the morning or the day before, in which it was her

13   signature line because it was presented to the parties on

14   that very day.  They -- notice that they don't tell you when

15   that disagreement or whether her, quote, refusal occurs.

16         So I will also -- and this is important, Judge.

17   If they're going to engraft her into an agreement in which

18   he's not defined as the parties but want to say that her,

19   quote, approval, end quote, was necessary -- she gave her

20   approval --

21         Mr. Wise did not mention, and I didn't when I was

22   at the podium first, remind the Court of the July 19th

23   Probation Office sending to the parties their approval

24   through recommending this period of time begin and, also,

25   the conditions.

```
1          What Probation was agreeing to, what they needed
2   to approve was their willingness to supervise Mr. Biden,
3   which included, by the way, that he lives in California, and
4   they had to make arrangements to how that was going to
5   happen.  That's what they are approving.  That they
6   accepted.
7          But the agreement didn't require them to do that.
8   The agreement was between the parties.  But if that were not
9   clear enough, they don't respond to our pointing out over
10  and over again that on July the 20th, the prosecution
11  notified the Delaware court that:  The prosecutor, comma,
12  the defense and Probation -- and what's the phrase they
13  used -- have agreed to the diversion agreement.  Have
14  agreed.
15         And we have countless cases that point out that
16  once an agreement is manifest between the parties -- and I
17  think filing something with the district court and putting
18  your name in it is a pretty significant admission -- that a
19  signature thereafter doesn't make that agreement go away.
20  They did agree.
21         And when the Government says we make inconsistent
22  arguments, that is one of those curious arguments.
23         THE COURT:  Okay.  Let me stop you there.  You
24  indicated that you thought that Probation did approve the
25  agreement in the July 19th letter, correct?
```

40

| | |
|---|---|
| 1 | MR. LOWELL:  I don't see that a probation officer |
| 2 | can say, "We recommend this," and not have agreed to it or |
| 3 | approved it.  That's an English structure of a sentence that |
| 4 | doesn't make any sense. |
| 5 | THE COURT:  But you agree with me that the |
| 6 | diversion agreement wasn't final at that point.  It wasn't |
| 7 | final until days later, right? |
| 8 | MR. LOWELL:  No.  The agreement for there to be a |
| 9 | diversion agreement was already filed.  That was what |
| 10 | happened in June of 2023. |
| 11 | The paper in which manifest what it was going to |
| 12 | be, that gets written and presented to the court in July |
| 13 | 2023. |
| 14 | THE COURT:  But it wasn't finalized on the 19th. |
| 15 | MR. LOWELL:  It wasn't finalized on the 19th. |
| 16 | THE COURT:  And the point you were trying to make |
| 17 | about the declaration of Mr. Wallace, that he doesn't say |
| 18 | when the probation officer refused to sign.  He says, in his |
| 19 | declaration:  "While Mr. Biden, Mr. Clark, and Mr. Wise were |
| 20 | signing the two agreements, I approached the chief |
| 21 | justice -- I'm sorry -- the Chief United States Probation |
| 22 | Officer for the District of Delaware, Margaret M. Bray, to |
| 23 | tell her the draft diversion agreement would be ready for |
| 24 | her signature shortly, Ms. Bray expressly declined to sign |
| 25 | the drafted diversion agreement." |

```
1              MR. LOWELL:  Yeah.

2              THE COURT:  So what was the point you were making

3    about this not occurring at a particular time?

4              MR. LOWELL:  I don't know when, along that very

5    strange day and morning, that occurred.

6              THE COURT:  And let me ask this:  Why does it

7    matter?

8              MR. LOWELL:  It probably -- well, it matters in

9    the following way.  If what was happening was questions were

10   being raised, and that's why she didn't do it, or for any

11   other reason, after she manifested her agreement in what she

12   sent to the court on July 20th or what the Government said,

13   then it probably doesn't matter.

14             I don't think it really matters why at that moment

15   and when it doesn't -- when it happened.  I'm just saying

16   that I think the sequence of what happened on July the 26th

17   is murky, at best.

18             And I'd like to have Ms. Bray be the one to give a

19   declaration, not somebody else that talks about what

20   happened and when it happened and why it happened.  I was

21   there, so it would be good if the person who did it, did it.

22   But that's not what they submitted.

23             THE COURT:  Okay.  Last question:  If this Court

24   were to decide that the diversion agreement is an agreement

25   between the parties, the parties have signed it, they have
```

1    agreed to be bound by its terms, but the term of the

2    diversion agreement, pursuant to paragraph 1, hasn't started

3    yet, and it hasn't started yet because it was never approved

4    by the probation -- by the chief probation officer, would

5    you be -- if that was the ruling of the Court, would you be

6    making a different argument?

7                MR. LOWELL:  I'd be making a different argument

8    than you asked me the question of.

9                Performance by the parties is a manifestation of

10   something.  And here, what do we know?  That from the day

11   that it was signed, Mr. Biden has subjected himself to the

12   supervision, has done exactly what the diversion agreement

13   required him to do, had done that from the very beginning

14   through before there were even charges brought in which he

15   was now in pretrial services again.  So the parties have

16   manifest.

17               Probation who -- the person -- Mr. Wallace says

18   whatever he says.  They didn't eschew their responsibilities

19   under this agreement.  They supervised him.  He is under

20   supervision.  And he was under supervision before the

21   charges then were brought thereafter, which can -- you could

22   argue, "Oh, now he's under the supervision because he's now

23   been recharged, and so it's a pretrial."

24               It's not what happened in those intervening weeks

25   and months.

1          THE COURT:  Okay.

2          MR. LOWELL:  So I would say to you that if they

3    have manifested their agreement with the July 19th and the

4    July 20th and they are performing as if they had agreed and

5    approved and if they are supervising, the term began when it

6    was supposed to begin, because they are acting like it did.

7          And what do we make about those weeks and months

8    in which that happened?  And then, consequently, we are in

9    that period.

10         THE COURT:  Okay.  Thank you.

11         MR. LOWELL:  I have -- just -- I'm sorry.  Maybe

12    it's not important, but he did make some points that you

13    might dwell on.  And I want to point out, first of all,

14    because people are in the audience.

15         There's no place in all the papers we filed in

16    which we ever called them "rank partisans."  What we said is

17    rank partisans have been pressuring them, and they

18    succumbed.  We didn't even use the word "rank."  But that's

19    neither here or there.

20         Second of all, I want to point out that the one

21    thing they say is that Mr. Biden initially said something

22    when he was asked, and then there was a break for him to

23    talk to his counsel, and then the counsel and he understood

24    what the question was.  That is not a ground for -- to say,

25    "Oh, Mr. Biden changed his view.  It was an informed

1    decision for him to answer when he was informed as to what

2    it meant."

3              THE COURT:  Okay.  Let me ask one question about

4    the hearing as long as we're talking about the hearing in

5    Delaware.

6              You know, at some point, the -- the prosecution

7    goes through the diversion agreement kind of piece by piece

8    by piece before the judge, just to give the judge a sense as

9    to what the agreement is about.

10              And the prosecutor says something along the lines

11   of, "And the term, the immunity will begin when we have

12   approval from the probation officer."

13              And then he goes on to talk about other terms.

14              The judge then turns to Mr. Clark and says, "Does

15   that all sound good?"

16              And Mr. Clark says, "Yes."

17              Doesn't that show the parties' intent at the time,

18   the meaning of the minds of the parties was there had to be

19   approval of the probation officer before the immunity kicked

20   into effect?

21              MR. LOWELL:  I think you're taking the word "will"

22   or "would" or "is."  I think Mr. Clark -- and I'm not

23   Mr. Clark, and he's got his own declaration.  But I will

24   tell you what it means if you were in real time at the time.

25              If you're Mr. Clark and Mr. Biden, and you come

45

1    into court and you shake the hand of Ms. Bray and you shake
2    the hand of Mr. Wallace, and you go to your desk, and you
3    now hear the exchange going on between counsel for the
4    Government and counsel for him.  And you already know that
5    you've had conversations with the Government and have gotten
6    the July 20th email to the court, in which it says the
7    Government, Mr. Biden, and Probation have agreed, you're not
8    sitting there and going, "Oh, my gosh.  What they meant on
9    July 20th is that they agreed.  But today, we don't have the
10   signature on the last page."
11            So when Mr. Clark says -- or doesn't answer or
12   doesn't refute it, you've got to put it in the context of
13   why he was standing there and what would have been in the
14   record.
15            And what would have been in the record was all
16   that, including an interview that occurred that very day by
17   Mr. Biden with a probation officer in which they went
18   through all those conditions of release.
19            So that's what would be the natural inflection if
20   that's what your background was when you came to court that
21   day.
22            THE COURT:  Thank you, very much.
23            And then one thing that I just want to -- we'll
24   get to this later, but as long as we're on the diversion
25   agreement.  I guess, well -- I guess I'll bring this up at

1    the appropriate time.

2              Let me turn to the Government.  A brief response

3    to the arguments here?  And I wanted to just, again, hear

4    briefly about the distinction you want to make between a

5    condition precedent to performance versus a condition

6    precedent to formation.

7              MR. WISE:  Sure.

8              THE COURT:  And what's the -- what's the case I

9    should go back and look at that convinces me this is a

10   condition precedent to performance as opposed to -- I'm

11   sorry -- a condition precedent to formation as opposed to a

12   condition precedent to performance?

13             MR. WISE:  So starting with that, Your Honor, we

14   cite -- we cite cases and contract restatements that talk

15   about the distinction between the two.  The case

16   specifically that I would point you to that we bring up in

17   our brief is it the *Gonzalez* case, which involved a wired

18   plea, where three defendants were presented with plea

19   agreements.  They were -- they all had to accept them for

20   the plea agreements to come into force.

21             Two of -- at least two of the defendants declined.

22   The Government withdrew the plea agreements.  The defendant

23   was convicted at trial and then on appeal said that he --

24   that the defendant should have had the ability -- the

25   Government should be held to the deal, and he should have

1    had the ability to enter that plea.

2              And the court said, no, that was a condition

3    precedent to formation; and, therefore, the Government,

4    under the case law we cite that says you can withdraw a plea

5    before it's accepted and before the defendant pleads guilty

6    applied.

7              THE COURT:  Okay.

8              MR. WISE:  I think that's the closest.

9              Just very briefly, Your Honor.  Mr. Lowell said we

10   didn't know -- the declaration didn't say when.  I think you

11   picked up on this.  We said exactly when Ms. Bray declined

12   to sign.

13             Before the district judge took the bench, the

14   parties signed the draft.  This happened in a matter of

15   minutes.

16             While Mr. Biden, Mr. Clark, and Mr. Wise were

17   signing, I approached Chief United States Probation Officer

18   for the District of Delaware, Margaret Bray, to tell her the

19   draft diversion agreement would be ready for her signature.

20   Ms. Bray expressly declined to sign.

21             It was literally in the moments before the

22   hearing.  It wasn't in some confusing time period that no

23   one knows.  He couldn't be more explicit.

24             The other thing Mr. Lowell says that's not

25   accurate is he keeps saying we filed the diversion agreement

1    in June.  No, we didn't.  If you look at the docket --

2              MR. LOWELL:  You sent it to the court.

3              THE COURT:  Counsel, just direct all your comments

4    up here.

5              MR. WISE:  If one looks at the docket, when the

6    agreement was docketed was August the 2nd, after there was a

7    request from the press to see what we all had been fighting

8    about during that hearing.  The diversion agreement was not

9    docketed because, as Your Honor pointed out, it wasn't

10   finalized at the time they claim, and there were ongoing

11   negotiations, and it wasn't clear what the final form would

12   take.

13             Another point I want to make that Your Honor clued

14   in on.  If you accept their argument that even -- and

15   Mr. Lowell said this.  It wasn't just signing when the

16   Government was bound.  It had actually -- we had actually

17   been bound -- and he doesn't tell you when -- at some

18   earlier date, then you're right.  Why on earth would the

19   Defendant have pled guilty?  That immunity language, it

20   would have been malpractice.

21             The statement of facts in the plea agreement

22   covers the misdemeanors.  It was a plea -- it was a

23   statement of facts for the misdemeanors.

24             So under their view, if the diversion agreement

25   had been already enforced prior to that hearing, it would

```
 1   have been insanity for him to plead guilty.
 2           THE COURT:  And you're not making the argument
 3   that the statement of facts doesn't also cover the felonies
 4   here, do you?
 5           MR. WISE:  No.
 6           THE COURT:  You're not making that argument.
 7   Okay.  I just want to be clear.
 8           MR. WISE:  Yeah.
 9           THE COURT:  Because it covered both the
10   misdemeanors and the felonies.
11           MR. WISE:  It covered all the tax facts.
12           THE COURT:  Yeah, right.  Right.  Okay.  Thank
13   you.
14           Okay.  I think I've heard enough on that motion,
15   and I appreciate -- appreciate the argument.
16           MR. LOWELL:  Your Honor, actually, two quick
17   points that I misdirected to them, and I'd like to direct it
18   to you.
19           It wasn't docketed, but they sent it to the judge.
20   And the judge at the hearing said, "I don't know why you're
21   sending this.  I don't have any role in this.  I don't have
22   to approve it."
23           And that's why I said that it was -- I misused the
24   word "filed."  It was sent to the court.  That's a pretty
25   remarkable thing, to send it to the court.
```

1    THE COURT:  Okay.  Again, I've read the whole

2    transcript in Delaware, and I've looked through all the

3    emails back and forth, and so I know exactly what happened.

4    So there aren't any questions there.

5         Let's move on to the second motion, the special

6    counsel appointment motion.  So in this motion, I'm going to

7    rescind my offer to allow the parties to frame the issues,

8    and I'm going to just frame them myself briefly.

9         So in this motion, the appointment of special

10   counsel, Mr. Biden is arguing that the appointment of the

11   special counsel is invalid because there is a Code of the

12   Federal Regulations, 600 -- 28, Chapter 6, 600.1 through 10.

13   600.3 says the special counsel has to be appointed from

14   outside the Government.

15        And the special counsel here is not outside the

16   Government.  And so the argument for Mr. Biden is that this

17   is a invalid appointment and, also, that there's funding

18   from Congress for special counsel.

19        And because Mr. Weiss is not independent pursuant

20   to the Special Counsel statute, he is an invalid special

21   counsel, and the case ought to be tossed because of that.

22        Did I correctly summarize your argument?

23        MR. LOWELL:  You did.

24        THE COURT:  Okay.  So let me ask you a few

25   questions on this.

```
 1          Now, as you know, the appointment of the special
 2   counsel here was done pursuant to -- at least -- at least
 3   when it was written, it said it was done pursuant to some
 4   statutory authority:  28 U.S.C. 509, 510, 515, and 533.  And
 5   those essentially say the Attorney General can delegate his
 6   authority to anybody he wants to.
 7          And so in here, the Attorney General said, "I'm
 8   going to make -- I'm going to make the special counsel here,
 9   I'm going to give him the special counsel powers pursuant to
10   that statutory authority."
11          And he kind of picked a section of the CFR, 600.4
12   through 600.10, and said, "Those are the bucket of authority
13   I'm giving this to the special counsel."
14          My question for you is this:  Let's say that --
15   let's say the Attorney General didn't authorize a special
16   counsel in that -- in that way.  But instead, the Attorney
17   General said, "I'm going to -- I'm going to make a new
18   position that I'm going to call designated counsel.  And I'm
19   going to -- I'm going to create a designated counsel, and
20   I'm going to authorize the designated counsel to investigate
21   a matter, and I'm going to authorize the designated counsel
22   to investigate this matter with Mr. Biden and his taxes.
23   I'm going to designate him pursuant to U.S.C. 509, 510, 515,
24   and 533.  And I'm also going to give him the -- the autonomy
25   that's set out in 600.4 through 600.10 of the Federal
```

1    Register."

2            The Attorney General could do that, correct?

3            MR. LOWELL:  If the Attorney General decided he

4    wanted to create a new regulation under 28 CFR --

5            THE COURT:  No, no.  I'm not -- without creating

6    any new regulation at all.  Couldn't the Attorney --

7            MR. LOWELL:  509, 510, and 515 and 533, give him

8    enough authority to create his own delegation under those

9    four statutes?  I hadn't thought about it until you asked.

10   I think, in some theoretical way, I suspect he could have

11   done that, and then maybe he could have grafted from various

12   things what that would have meant.

13           Of course, I know you're asking a hypothetical

14   because that's not what happened.

15           THE COURT:  Right.  But what I'm saying is you'll

16   agree that the Attorney General has that authority, right?

17           MR. LOWELL:  I don't know that the Attorney

18   General has that authority when a previous Attorney General,

19   through the proper 28 CFR, created the implementing

20   regulation of what 509, 510, and 515 and 533 meant, because

21   as Your Honor said, those are four statutes.

22           Remember, 591 had expired.  591 was the

23   Independent Counsel statute.

24           THE COURT:  But the argument you're making would

25   seem to imply that the CFR kind of trumps the statute.

```
 1          MR. LOWELL:  It doesn't trump the statute.  When
 2   somebody has authority by statute, then if there's nothing
 3   that implements that or regulates it or details what should
 4   be done on day 1, 6, or 9, then maybe that statute is
 5   enough.
 6          But if the Attorney General and the Justice
 7   Department take those four statutes, and then they implement
 8   it through a regulation properly noticed and commented and
 9   put into effect they have made the decision this is the way
10   they do it.
11          You have created a window for them to call it an
12   elephant when it's some other animal by saying it's
13   designated as opposed to special.  That's not what they did.
14   They said it's a special counsel.  It's a word of art.
15          Prior to the Attorney General appointing Mr. Weiss
16   as the special counsel, there's a preexisting methodology.
17   You know, and we stated the case law on the specific trumps
18   not what you said, but the specific trumps the general.
19          So if the Attorney Generals passed and the Justice
20   Department has said, when it comes to this entity which
21   morphed from independent counsel to -- special prosecutor to
22   independent counsel to that hybrid that somebody like
23   Patrick Fitzgerald had, to now be something called special
24   counsel, and we're doing it through this regulation, then
25   the regulation is the funnel where 505, 509, 510, 515, and
```

1    533 has to pass through.

2         And if they tried to go around it, then the

3    question would become:  Can they do that when they've

4    already said when it comes to things called special counsel?

5         And the evidence is he didn't create it out of

6    whole cloth.  He didn't call it designated.  He picked and

7    chose what part of 600 he wanted to put into this, including

8    ones that make it not independent because it has the

9    reporting requirements that incur in 600.

10        THE COURT:  And the Department of Justice has done

11   that before, correct?  They've done the same thing before

12   where they've picked portions of the CFR, 600.4 going

13   forward, and appointed a special counsel pursuant to that.

14        MR. LOWELL:  Well, first, I don't know whether,

15   for example, when they did that for John Durham is one of

16   the examples.  They may have done it.  But remember, nobody

17   challenged them for doing it.  So we don't know whether

18   that's like a tree in the forest that didn't make any noise

19   because there was nobody there to complain.

20        Consequently, if that's what they did in Durham --

21   and I don't know if they picked and chose among 600.  I do

22   know what they did here.  I do know what the Attorney

23   General and Mr. Weiss did here.  They said, "You're a

24   special counsel."  That's what it's called.  There is a

25   regulation.  And I have to pay attention to it because I am

1   going to pick and choose what parts of this I want.

2          And they don't get the right to pick and choose.

3   And the reason they don't get the right to pick and choose

4   is that the whole purpose of the special counsel regulation,

5   in the shadow of what came before it, was to create

6   independence.

7          And two parts in 600, which the Attorney General

8   clearly wanted to avoid, was the very first clause of 600.1

9   where it says why we do this.  We do this when there's an

10  appearance or an actual conflict.  And the next very phrase

11  is "And so we pick somebody outside the Government."

12         And then 600.3 says it's outside the Government.

13         So your hypothetical to me, I understand.  But

14  that's not the way it worked.  And it's also not the way

15  it's supposed to work.  When a government binds itself to a

16  particular way of doing something, they are held to the way

17  to do something.

18         And that's what happened here because those four

19  statutes then ended up with 28 CFR 600 and sequence.

20         THE COURT:  So you would argue that -- that

21  because of the implementation of the CFR, that the

22  Government, the Department of Justice couldn't do what I

23  suggested.  They couldn't create a new position of

24  designated counsel.  They would be foreclosed from doing it

25  unless they change the CFR.

| | |
|---|---|
| 1 | MR. LOWELL:  I think that's right, or I think I |
| 2 | could also say it also the following way. |
| 3 | It was clear that they were trying to get around |
| 4 | what they had already bound themselves as to what makes |
| 5 | somebody a special counsel by calling something that's not |
| 6 | what it is something that it's not.  Then I think if they |
| 7 | had brought a case against somebody using that, then there |
| 8 | would be a challenge to that designation because they had |
| 9 | already decided what is the way to get it done right.  And |
| 10 | by not following it, they would have provided another |
| 11 | vehicle to challenge. |
| 12 | So if they had never done a 600 and special |
| 13 | counsel regulation and they were only relying on 509, 510, |
| 14 | 515, and 533, with no implementing regulation, maybe he |
| 15 | could have invented a new method of doing it, but that's not |
| 16 | happened.  And they had already bound themselves to a |
| 17 | procedure that nobody understands why they would -- well, we |
| 18 | do understand why, that would basically pick and choose. |
| 19 | I know he's not outside the Government, but I'm |
| 20 | going to do it anyway.  And then I'm going to use the |
| 21 | appropriations that are required for an independent counsel, |
| 22 | and I'll make that work too. |
| 23 | That's not what happened. |
| 24 | THE COURT:  Let me move to the second issue on the |
| 25 | funding.  So the funding from Congress says this is funding |

1    for independent counsel.  And it seems that it's -- that
2    there's a judgment call to be made as to whether or not the
3    counsel is independent or not.
4         I'm wondering what your view is on how the Court
5    is to arrive at what that word "independent" means.
6         MR. LOWELL:  I forgot the word you used a moment
7    ago when you said there's something about what independence
8    is, but I don't think there's any problem.
9         Independent, as used in the Appropriation Act,
10   it's not a subjective.  It's not like on Monday we go to
11   Mr. Weiss and we grill him and see whether or not he feels
12   independent that day, or we put him on some sort of machine
13   and see whether or not he's lying when he says he is.
14        It is not a subjective test.  It's a word that has
15   a meaning.  It's a word of art.  And where does it come
16   from?  It comes from the independent counsel statute, which
17   defines independence in a particular way and said, "These
18   are the funds you can use when you are independent."
19        THE COURT:  Right.
20        MR. LOWELL:  That is its parents.  And if that's
21   the parents, independent is not -- it's not a wishy-washy
22   term.  It has a very precise meaning.
23        And how do we know what it means?  The independent
24   counsel statute and the appropriation that was first granted
25   did it for somebody who was, quote, outside the Government,

1    end quote.

2          And consequently, when you are applying

3    independent in any other context from an appropriation

4    statute, it has to drag along the same meaning.

5          THE COURT:  So the independent counsel that's

6    identified in the congressional authorization is a -- it's

7    saying independent counsel appointed pursuant to the

8    Independent Counsel Act or other independent counsel,

9    correct, or other lowercase independent counsel?

10          MR. LOWELL:  I think it could be that.  And I want

11    to point out that it's our reply to their saying, "You see,

12    there's precedent for this, Judge, they said, because look

13    at the *Stone* case."

14          And the reason in the *Stone* case it isn't right

15    partially because they are trying to make two different

16    things, GAO responding to one particular person that was

17    sui generis, Patrick Fitzgerald.

18          But in -- the *Stone* case makes our very point,

19    which is that the decision said the appropriation was okay,

20    because why?  Special Counsel Mueller was appointed from,

21    quote, outside the Government, end quote.  And so

22    consequently, that meaning has meaning, and it's very clear

23    what that meaning is.

24          THE COURT:  Great.

25          Let me hear from the Government on this.

59

```
1          MR. WISE:  Thank you, Your Honor.
2          So to your question -- their argument devolves
3   into just empty formalism.  Yes, if you called it delegated
4   counsel, if you called it extra special counsel, sort of
5   special counsel, you would be able to get out from under
6   what they were saying -- what they're saying.
7          The statutory authority the Attorney General has
8   had since the founding of the department, which is codified,
9   as Your Honor cited, at 509, 510, 515, and 533 wasn't
10  repealed or modified by the Ethics and Government Act that
11  created the independent counsel.
12         And when the independent counsel statute lapsed,
13  the regulations at 26 -- or at 28 CFR, part 600, also,
14  because the regulations didn't repeal or otherwise change
15  the statutory authority, the Attorney General has always had
16  to delegate authority to Officers of the United States.  And
17  that's what the U.S. Attorney in this case, that's what U.S.
18  Attorney Durham, that's what U.S. Attorney Fitzgerald, all
19  of them were Officers of the United States.
20         Now, the Attorney General elected to apply the
21  other provisions in the 600 series to his statutory
22  delegation of authority, and that was an election he was
23  free to make.
24         As Mr. Lowell pointed out, he did not invoke the
25  very first provision that said there was an appearance of
```

60

1    conflict and, therefore, there was a basis to go outside the

2    Government.  That was a deliberate choice, and I think that

3    should be respected.

4            As far as the appropriation -- and they sort of

5    gloss over this -- the GAO -- the GAO not only blessed the

6    Fitzgerald funding, but the Congress, in response, didn't

7    change the law, and actually lifted the audit requirement on

8    GAO, which under the case law that's been cited, all

9    indicates that Congress does not find the department's use

10   of these funds inconsistent with their intent in

11   appropriating them.

12           THE COURT:  But you'll agree, though, that there

13   hasn't been a case that's on all fours with our case.  And

14   so we don't know, for example, that the GAO would bless the

15   use of funds in this case.

16           MR. WISE:  I think Fitzgerald -- Patrick

17   Fitzgerald's prosecution in the *Libby* case is pretty close.

18           THE COURT:  It's close.  But he's not -- he was --

19   he was from inside the Department of Justice, right?

20           MR. WISE:  Yes.  He was the sitting U.S. Attorney

21   in Chicago.

22           THE COURT:  But he didn't have the CFR provisions

23   that required him to report, correct?

24           MR. WISE:  That's right.

25           THE COURT:  And so you would agree, he's a little

```
 1    less independent than the special counsel here -- I'm
 2    sorry -- more independent than the special counsel.
 3            MR. WISE:  Yeah, I think he's arguably a little
 4    more independent.
 5            But there -- again, there, the conflict was over
 6    whether the Vice President's Chief of Staff had outed
 7    Valerie Plame.  So I think there was a reason for that
 8    additional layer of independence that isn't present here.
 9    And it's not -- I don't think it's irrational or arbitrary
10    that that's -- that there is -- that there is a difference.
11            THE COURT:  So how is the Court supposed to
12    decide?  I mean, we look at -- Fitzpatrick or Fitzgerald?
13            MR. WISE:  Patrick Fitzgerald.
14            THE COURT:  Patrick Fitzgerald.  We look at
15    Mr. Fitzgerald, and we say, "Well, the GAO blessed that, and
16    he had a level of independence that we don't quite have
17    here."  How do we know that the GAO would bless this?
18            MR. WISE:  So I think that's a question that the
19    Congress could address.
20            THE COURT:  So what is the Court's role in making
21    that determination, or are you suggesting that I should just
22    not make that determination, and if Congress wants to
23    object, they can object?
24            MR. WISE:  I think it's that, Your Honor.
25            THE COURT:  And what's the basis for Defendant
```

1    saying that the funding's not appropriate, and so he ought

2    to be able to kind of shut the prosecution down?

3         MR. WISE:  So I don't think -- I mean, they sort

4    of glance over issues of standing.  But I don't think they

5    can challenge the use of the funding in this way.  I don't

6    think that's -- I don't think they have standing to do that.

7         I also think -- and we point this out -- that, I

8    mean, the regulations make it very clear that these don't --

9    these regulations do not create substantive rights that can

10   be enforced by third parties.

11        So their argument that not only should they be

12   able to enforce them, but that the extraordinary step of

13   dismissing an indictment returned by a valid grand jury is

14   the remedy that's appropriate, is doubly -- doubly

15   problematic, and we cite the case law about remedies needing

16   to be tailored to the harm.

17        I think dismissing the indictment of -- by a

18   validly seated grand jury here in Los Angeles is far in

19   excess of their technical argument, as Your Honor pointed

20   out, that if the Attorney General had called him designated

21   counsel, that wouldn't trigger the same concerns that

22   calling him special counsel does.

23        THE COURT:  And here, when we look at the funding,

24   it's a little bit mixed, right, because originally, this

25   investigation was being funded through the U.S. Attorney's

```
1    Office in Delaware, correct?
2              MR. WISE:  Yes.
3              THE COURT:  And then, at some point, when
4    Mr. Weiss became special counsel, I guess it would be funded
5    from that separate fund from Congress for lowercase -- and
6    lowercase independent counsel.
7              MR. WISE:  That's my understanding.
8              THE COURT:  Okay.  Thank you.
9              MR. LOWELL:  And just briefly, three things,
10   please.
11             THE COURT:  Briefly.
12             MR. LOWELL:  I promise I'll be brief.
13             As to the GAO point that Your Honor made and asked
14   the prosecutor to address, I mean, let's start with the
15   premise that the GAO is not precedent case law.  But if you
16   were going to look at it as such, what it made clear is what
17   Your Honor just said, that Mr. Fitzgerald was sui generis
18   because he was given, quote, all the authority of the
19   Attorney General, end quote.  Not some, but all the
20   authority.  He was about as independent as a person could be
21   because he didn't have to answer to anybody, and that was
22   the basis of the GAO saying that.
23             The second is that Congress didn't object.  We
24   know that quagmire of figuring that out, but when they knew
25   that this was a sui generis event and that no one since has
```

1  gotten all the authority of the Attorney General, why would

2  they do anything?  Because it is, in fact, sui generis.

3        And the last point is, what you just asked about,

4  it's a mixed bag of appropriations.  First of all, as we

5  pointed out, appropriations clause cases require very

6  specific adherence to what it is that's appropriated because

7  that does implicate separation of powers as we pointed out.

8        But more importantly, we are here today not

9  because they spent the money when they were wearing their

10  U.S. Attorney hat and brought a diversion agreement and a

11  plea agreement of two misdemeanors, we are here today

12  because wearing that other hat, they've brought three

13  felonies with all the money that they spent to do that and

14  nine counts in California in an appropriation that's not

15  supported by what we just pointed out.

16        So it is everything that's here today is the

17  appropriation that they're misappropriating.

18        THE COURT:  Thank you.

19        Okay.  Let's move on to the motion on selective

20  vindictive prosecution separation of powers.  As I take it,

21  the gist of Defendant's motion is that the -- that the

22  charges in this case were morphed from misdemeanor charges

23  in Delaware to felony charges in California based on undue

24  influence on the prosecution team by other forces,

25  Republicans in Congress, the -- I guess you could throw in

1    the whistleblowers from the IRS.  And that's what -- that's

2    what turned this case to a case from three misdemeanors to

3    three felonies and seven misdemeanors -- or three felonies

4    and, I guess, six misdemeanor charges.

5          The question I've got is for you on this selective

6    prosecution vindictive prosecution case is that there

7    doesn't seem to be any evidence that anything that was going

8    on in Congress, anything that was, you know, going on with

9    the IRS whistle -- whistleblowers, there's no evidence that

10   that influenced the prosecutors' decision here other than

11   just the pure timeline that we're looking at.

12         Is that really what it boils down to is the

13   timeline creates the smoke, and where there's smoke, there's

14   fire?

15         MR. LOWELL:  Almost.  Because you used that

16   phrase, I want to start with the discovery case that we

17   provided to you where the standard is lower.  I point the

18   court to the *Adams* case in the Sixth Circuit, which

19   concludes -- or doesn't conclude, but addresses your point

20   that says there may not be fire, but enough has been

21   presented of smoke to take a look.

22         Now, having said that, I don't know what the

23   communications among and between the folks in the Delaware

24   U.S. Attorney's Office are.  We've asked to find that out.

25   I don't know what was incoming from members of Congress who

1   found their email addresses.  We've asked to find that out.

2          But the Government, every week of every year, goes

3   to juries and courts and says, "I can put together the

4   necessary proof beyond reasonable doubt by putting together

5   a timeline of events which are -- make no sense other than

6   the natural inferences that you" -- and to use Mr. Weiss --

7   "bring to the courtroom your common sense."

8          So you're right in the sense that if after

9   five years -- putting aside the diversion agreement.  The

10  diversion agreement is important for why we argued it.  But

11  what does it mean?  Taking that part out.

12         How can anybody still say, after five years, you

13  decided that the appropriate resolution was what we know it

14  was, two misdemeanors and a diverted gun charge.  That was

15  it, and then all the stuff happened.

16         Now, what didn't happen in that intervening

17  period?  In the five years, they knew all the things that

18  are in the indictment in California on the tax charges.

19  There had been meetings between the Government and

20  Mr. Biden's defense counsel, going through each and every

21  one of those years and each and every one of the reasons why

22  they happened.

23         The gun.  The gun was in 2018.  By the time of

24  2023, there was nothing new.  And how do you know that,

25  Judge?  Because on December 4th of 2023, the prosecutors

1   went to the court in Delaware and sought a search warrant to

2   go back into Mr. Biden's data to look for evidence.  And in

3   the face of the search warrant, it says for evidence about

4   or for information that's pertinent to the gun charge.  The

5   gun charge had already been filed three months before.

6          Now, what they found after they did that is

7   particularly not all that weighty.  For example, they tout

8   this brown pouch where they had cocaine residue on it,

9   recognizing that between 2018, when it was seized, and when

10  it was finally sent to the lab, also after the charges were

11  brought.

12         So you're right, Judge.  I don't have

13  transparency.  What I have is the kind of evidence the

14  prosecutors go to a jury every week and say, "You can

15  connect the dots because of the events which are

16  unmistakable."

17         And here's the facts that are unmistakable; one,

18  June, 2023, two misdemeanors, one gun charge; September and

19  then later in November, nine counts here and three there.

20         What changed in that period of time?  And it's the

21  possibility that, again, they may not be the rank partisans.

22  But I don't think anybody in this courtroom is going to

23  suggest that that Chairman Comer, Chairman Jordan,

24  Chairman Smith, Speaker Johnson, all the people that rail

25  every day about the deal that happened and still rail by

1    suing the Tax Division attorneys and demanding that

2    Ms. Lesley Wolf come back for another interview, they're

3    doing it for improper purposes.

4            And the fact that they were succumbing to that,

5    because, why not?

6            THE COURT:  Let me ask you.  The first question I

7    have, I mean, I think the biggest hurdle that this motion

8    has, or one of the big hurdles, is that it's not filed with

9    any evidence, right?

10           So your original motion, no declaration, no

11   evidence.  The motion contains a lot of -- a lot of

12   citations to things on the Internet, you know, websites and

13   things, but they're not submitted to the Court as evidence.

14           So, for example, in one of the other motions, you

15   filed a request for judicial notice.  You wanted the Court

16   to take notice of two of the -- of the -- two of the

17   Informations filed in Delaware.  So you filed a request to

18   the Court to take judicial notice of that, which the Court

19   can do because they're public documents publicly filed.

20   That -- that's fine, the Court will rule on that motion and

21   accept those documents.

22           But in this motion, there really is no evidence.

23   I mean, you cite to a lot of things on the Internet, but

24   there's no -- those aren't evidence in the court.  Those

25   aren't evidence on the motion.

```
 1              As you know, right, in order to submit evidence,
 2   you have to have a declaration that says what this evidence
 3   is and provide a copy of it to the Court on any motion
 4   before the Court.
 5              Just because something is out there in the
 6   Internet doesn't mean it's a fact on which we can decide the
 7   motion.  So that's problem one with the motion, is that it
 8   just doesn't have any evidence.
 9              But I'll -- you know, for purposes of argument,
10   I've actually gone through and I've looked at all of the --
11   all of the Internet sites, I've read all the articles, even
12   though they're not evidence on this motion.  But I -- but I
13   wanted to read them to make sure that I understood the
14   arguments and could give you a fair shake.
15              I understand the timeline.  As I understand what
16   the Government's saying is they're saying that up until the
17   hearing in Delaware, where it seemed the parties --
18   everything was fine.  At that point, you wouldn't indicate
19   there was any outside pressure, correct?
20              MR. LOWELL:  The beginnings of the pressure
21   occurred shortly before the pleading that was filed on the
22   plea agreement in June.  But you saw my chart in the
23   beginning, it was a blank page on the left side.
24              THE COURT:  Right.  And so -- and so at the
25   hearing, it seemed like the Government was willing to go
```

1    forward with the deal.  It didn't seem like the Government

2    was blocking from that.

3           And, in fact, even after the -- after the hearing,

4    it looked like the Government was agreeing to again

5    recommend no jail time.

6           MR. LOWELL:  I'm sorry, Judge.  I'm curious to see

7    your citation for that.

8           THE COURT:  Well, if you recall, the

9    back-and-forth letters on changes to the agreements, the

10   Government didn't recommend changing -- they recommended

11   change to the plea agreement on whether or not the

12   information from diversion agreement could be relevant

13   conduct to the plea agreement.  You recall that.

14          But they didn't recommend any changes to the plea

15   agreement with respect to their recommendation of no jail.

16          MR. LOWELL:   Okay.  But fundamental to your

17   question is what you're skipping over, that immediately

18   thereafter, July 26th, the Government did three things.

19          You're pointing to the one thing that you're not

20   finding that they said that they would do, which is if a

21   plea was entered on the misdemeanor that occurred on

22   July 26th, they'd still, quote, maybe make a recommendation.

23          But look what else they did.  They did two things.

24   They immediately said, "We're striking from these agreements

25   all references to immunity, which was what the bargain was

1    supposed to create."

2            It's like saying that they agreed that, "We'll

3    do" -- "we'll agree to a little thing, but we can indict the

4    heck out of you on anything else we want."

5            That was the first thing they said.

6            And the second thing that they said was, as you

7    just pointed out, they did -- "in terms of any sentencing

8    that would occur, one of the fundamental premise of the

9    agreement that occurred in the summer was that whatever

10   happened in the tax would not be relevant conduct for the

11   gun; whatever the gun, would not be relevant conduct for the

12   tax."  And that was the second thing that they demanded be

13   done.

14           And so you're asking, "Well, didn't they give you

15   a little bone?"  They gave us, like, a Milk-Bone, when the

16   deal itself was an entire steak bone.  So I don't know how

17   that forwards.

18           And you said to me that they came to court that

19   day, and they were still willing to do it.  I would beg to

20   differ.  Because at a moment in the hearing, when it became,

21   what does this cover, we know something today that we didn't

22   know in July.  We know that in the beginning of July, before

23   they came to court, they knew something that we didn't; that

24   they had started to renew, resuscitate, and consider the

25   allegation that had been put forward years before by

1    Alexander Smirnov.  And they say that in their pleadings,

2    that they started doing that a week or two or three before

3    the hearing.

4            Nobody said anything to us that that was part of

5    what they were doing.

6            And I point Your Honor to the exchange between

7    counsel for the Government and counsel for Mr. Biden where

8    counsel for Mr. Biden said, "Can we, with this agreement,

9    say that the investigation is concluded?"

10           This is before they did the Smirnov.  And what

11   does AUSA Shannon say?  "Don't use the word 'conclude,' say

12   'resolve.'"

13           We go to Webster's.  There's no difference between

14   the two.  And what happened after that?  They decided to pay

15   some attention to this guy that they should have paid no

16   attention to.

17           THE COURT:  Okay.  So let me get back to the point

18   I was trying to tease out.

19           Is there any evidence that pressure from any

20   outside entity influenced the prosecution team, other than

21   the timeline?

22           MR. LOWELL:  Okay.  Well, two things.  First, if

23   it is my fault that it just never dawned on me that if

24   something is read about by the Court, et cetera, that I

25   should have put a declaration that said, "See this website.

 1    See this *Post* article.  See Fox News."  I hope the Court
 2    would allow that because you've already read it, and they
 3    exist.
 4            If you're asking me, "Is it just a timeline?"
 5    Okay.  You've been using the word "just."
 6            THE COURT:  Do you have any evidence other than
 7    the timeline?
 8            MR. LOWELL:  The timeline, plus what we've learned
 9    ahead as to why they came to court in July.  And when, out
10    of the blue, Judge Noreika said, "By the way, could you
11    still bring a fairer charge against Mr. Biden?"
12            And they were quick to say, "yes, we could."
13            Now we know why they said, "yes, they could."
14            It was our view now that they knew exactly what
15    they were going to do, which is why they didn't want that
16    immunity agreement.
17            And why is it that the first thing they did after
18    the deal on July 26th required back and forth?  What did
19    they take out first?  What did they take out first?  They
20    took out all references to any form of immunity.
21            So, yes, there's a timeline.  There's no other
22    evidence that occurs between them.
23            We put in our motion those vindictive cases that
24    specifically ask the Court to scrutinize did they have all
25    the evidence in their possession at the time at which they

1    upped the ante?  And the answer to that in this case is that

2    they did.

3              And if they didn't, they didn't have it until

4    after they had already put the charges in place three months

5    later, and that's what they argued in Delaware.  They don't

6    necessarily argue it here because their overwhelming

7    evidence basically falls apart when you do that timeline.

8              So in effect, I would agree with Your Honor, but

9    it's not just a timeline that has two dates in it.  It's a

10   timeline that has Mr. Weiss being dragged to Congress.  And

11   three weeks later, he brings the California charges.

12             It's a timeline that we now know has them

13   resuscitating that FD 1023.  It's a timeline that has a

14   member of Congress intervening or trying to intervene to

15   disrupt the plea.  It's a timeline, but it's a juicy

16   timeline.

17             THE COURT:  Right.  But the Congress -- the impact

18   of Congress -- you know, the statements of Congress with

19   respect to this, without any -- without showing that

20   there's -- well, there's no evidence that those impacted --

21   the evidence in the record that they impacted the

22   prosecution, you would say, is the timeline.

23             MR. LOWELL:  You keep coming back to that, and

24   when you do that, I can't say you're wrong, but I can say

25   that it's too simple a way to look at it.

1          We gave you the *Monsoor* case, which talks about
2     you don't have to have the animus yourself if you're
3     motivated by the people who do.
4          If the prosecutor had a gun to his head and
5     somebody said, "You better indict Mr. Biden, or else I'm
6     going to shoot you," then the person who's committing the
7     wrong to begin with is the gun holder.
8          THE COURT:  Right.
9          MR. LOWELL:  But if he succumbs, and if there's
10    nothing in between that, then you have to ask, "Oh, were you
11    afraid of the gun?"
12         And if you -- you started with me, and I started
13    back with you the saying, if this isn't a case that opens
14    the door to find out what was really going on, then those
15    discovery cases don't mean anything, because a timeline
16    itself can create the presumption and the circumstantial
17    evidence that this Court should be curious about and this
18    Court ought to find out more about before they say there is
19    no such connection.  The causation is there.
20         THE COURT:  What do you say about the *Brown* case,
21    *United States versus Brown*, that says that the courts ought
22    to give a lot of deference to pretrial charging decisions,
23    that's something the court really should kind of back off
24    on?
25         MR. LOWELL:  Right.  I couldn't agree more, that

1    that's normally the case.  Sorry.  I didn't mean to

2    interrupt.

3              THE COURT:  Tell me why I should ignore *Brown*.

4              MR. LOWELL:  Brokenshire (phonetic), the

5    *Bordenkircher*, I never say that right.

6              The cases that talk about a government prosecutor

7    going to a defendant and that defendant's counsel and

8    saying, "Here's the plea deal.  We've got ultimate

9    discretion, as a prosecutor, up to the moment the indictment

10   to work out a plea deal."  If the defendant doesn't take the

11   deal in the *Bordenkircher* case and others, and you say

12   *Brown,* then it's okay, the law says, for the prosecutor

13   says, "Take this deal, or I'm going to throw the book at

14   you."

15             And that's where they have discretion.  It's not

16   been found to be prosecutorial vindictiveness.

17             But that gets back to what happened in June and

18   July.  It wasn't a plea deal that was being negotiated.

19   They already negotiated that they told Your Honor what they

20   thought the right outcome was, two tax misdemeanors and a

21   diverted gun charge.  That's not negotiated.  That's in the

22   agreement.

23             Now they say, "Well, it was a proposed agreement.

24   It was a draft agreement."

25             Whatever it is, it indicates what they thought the

1   resolution was to be.  So it's not in the nature of *Brown* or

2   *Bordenkircher*.  It's not during plea negotiations.  They had

3   already occurred.  The deal had already been agreed to.

4         That's where they don't have any discretion

5   anymore.  Because as the Third Circuit said, in the case we

6   supplemented, or at least put in our reply brief, in *Cruz*,

7   two or three weeks ago, prosecutors must keep their

8   promises, and that was a promise made.

9         THE COURT:  All right.

10        Let me hear from the Government on the selective

11  vindictive prosecution motion.  Please proceed.

12        MR. HINES:  Thank you, Your Honor.

13        I'd like to respond, to start, with Mr. Lowell's

14  statement that rank partisans have pressured the U.S.

15  Department of Justice.

16        What he continues to fail to contend with is that

17  on August 11, 2023, Attorney General Garland authorized this

18  prosecution in this courtroom, this very courtroom, the

19  Attorney General appointed by the Defendant's father, the

20  U.S. Department of Justice led by President Biden and

21  Attorney General Garland.

22        What the fallacy in the Defendant's claim reveals

23  is that these outside officials, Republicans in Congress,

24  Former President Trump, IRS whistleblowers, there's no link

25  or causal connection whatsoever to the decision-making in

1    this case.

2            He has taken one parallel universe of events, and

3    within that large parallel universe of political statements,

4    in this day and age, with Twitter and Truth Social, you can

5    find something that happens around the time of anything that

6    happens in entirely parallel set of events in a litigation.

7            And in this case, the *Goodwin* Supreme Court case

8    precludes the Defendant from proceeding on the ground that

9    he attempts to do; that is, invoking, ante up in the status

10   of pretrial plea negotiations, because you can't go forward

11   on that ground unless you show actual animus, not a

12   reasonable likelihood of animus.  You have to show actual

13   animus to move forward there.

14           You're not entitled to the presumption under the

15   theory the Defendant is moving forward on, and because of

16   that, they have gone to extraordinary lengths to distort an

17   otherwise unremarkable benign set of plea discussions that

18   occurred in a lengthy investigation between counsel and

19   Government, resulted in a plea and a diversion agreement

20   that were not accepted by the Court.

21           As Your Honor mentioned in the questions of

22   Mr. Lowell, clearly the Government tried to continue to move

23   forward after the hearing, trying to resolve the case on the

24   same charges as well as a recommendation of probation.  The

25   fact the Defendant took this position -- and Your Honor will

1   decide it, based on the very first motion that was argued

2   today.  He's taking the position that the diversion

3   agreement has bound all parties.

4        There is no way to resolve the case at that point.

5   It's completely unresolvable.  And as we -- as the letter

6   showed in this case, the negotiations between counsel

7   occurred even before Mr. Lowell entered his appearance.

8        And so Your Honor had asked the parties to docket

9   the letter from Mr. Clark and us back to Mr. Clark, and I

10  just want to highlight those for a second.  Because where

11  this started in the case in Delaware, nowhere in their

12  briefs did they allege that the Government demanded

13  Mr. Biden plead guilty to felonies and serve jail time and

14  then declare an impasse.

15       That's exactly what they said in their motion

16  here.  We were shocked when Mr. Lowell said that.

17       In the letter, you can clearly see from -- it's

18  ECF 58-1, docketed by the Defendant.

19       Following the hearing on July 26th, 2023, Mr. --

20  this is, again, a letter from us to Mr. Clark in the course

21  of these negotiations.  It was Mr. Biden's counsel that came

22  to our office and demanded three entirely different

23  alternatives to the set of agreements that are up for

24  discussion here today, further evidencing the fact that they

25  aren't in effect.

1          We responded, trying to address only the issues

2     that were identified at the hearing, only the issues that

3     were identified at the hearing.  Some, of course, were

4     identified by the judge.  One, of course, was identified by

5     the Defendant.  He had gave two entirely inconsistent

6     accounts of what the immunity covered.  During the course of

7     questioning by the judge, that collapsed because, in

8     response to an open-ended question about FARA, he tried to

9     broaden the scope of that immunity, ultimately conceded it.

10    But at that point in the hearing, he had testified to two

11    entirely different things.

12          Our proposal was addressing that.  Instead of

13    making a counterproposal, they insisted the agreements were

14    in effect.  That's not the type of vindictive plea

15    negotiations that they seek to establish in this case.

16          Mr. Lowell, even in his declaration, has totally

17    backed off the allegation that the Government demanded that

18    Mr. Biden plead guilty to felonies, serve jail time, and

19    then declare an impasse, which is the pleading that -- that

20    the Government filed in August, before Mr. Lowell even

21    entered the case.  There were no discussions at that point

22    because of what he was doing and the position that they were

23    taking.

24          So looking at these -- the five antes -- coming

25    back to the point I made a moment ago, in a vindictiveness

1 case, based on *Goodwin* -- and this is *Bordenkircher* as well,

2 the other two cases cited in that case that are Supreme

3 Court cases -- you can't prop up an apparent vindictiveness

4 claim based on pretrial plea negotiations.

5        It is common practice that Government, as the case

6 moves forward, you evaluate the evidence differently.  You

7 pursue additional charges.  They tried to construct five

8 antes here I think in recognition of that black letter law,

9 that principle that they can't overcome.  You know, one

10 ante, two ante, is not enough.  They thought they had to get

11 to five.  But when you deconstruct them -- and I hope our

12 response showed this -- there is no five antes.  There was

13 no charging decision from day one that we weren't pursuing

14 charges against Mr. Biden.  That's a fallacy.

15        The informal plea discussions between the prior

16 prosecutor and counsel, she caveated all of her discussions

17 that they were subject to supervisory approval.  That's

18 standard across the department.  You have to have

19 uniformity, consistency in plea negotiations.  You bring

20 supervisors with experience to the table.  They counted that

21 as two additional antes.

22        Then this fourth ante that they backed away from

23 never happened.  You can see it because the correspondence

24 is now docketed in court.

25        And so the fifth ante -- the fifth ante, this

1    timeline, which is all they're left, with no direct evidence

2    whatsoever and no circumstantial evidence, this timeline is

3    really the first charging decision in this case beyond the

4    information.   It's the indictment in this case when plea

5    negotiations fell through.   And the charges that were

6    brought in that indictment are the charges that were

7    discussed between counsel at the earliest stages.

8         They were -- that is documented in the tolling

9    agreements that we provided as exhibits in this case.   There

10   weren't any new charges fabricated.   It was everything that

11   was on the table before the resolution.

12        And as sometimes happens, a resolution in this

13   case did not involve all of the potential charges.   But now

14   that the case is not resolved, it does.

15        So there's really no unique set of circumstances

16   about the plea negotiations themselves.

17        What the Defendant has tried to do is really link

18   in all these Tweets, Truth Social posts.   I don't even know

19   what it's called.   I couldn't even access the website.

20   Claiming that when President Trump -- Former President Trump

21   tweets, "Where's Hunter?"   We're at his beck and call.   And

22   we're going to run to our computers and type up a felony

23   indictment.

24        Like, it is absolutely outrageous types of

25   allegations that they brought to the table here.

1          THE COURT:  Okay.  I'm just trying to -- you know,

2    in making some sense as to how this --

3          So the big question, right, is the how did we get

4    from, you know, the three misdemeanor counts, or however

5    many there were, to three felonies and six misdemeanors.

6          And so what I see the Defendant's argument is, you

7    know, "Hey, we were at misdemeanors, and now, you know,

8    there was a bunch of -- a bunch of, I guess, commentary and

9    a bunch of people that were concerned after they saw this,

10   the plea deal.  That created a big fuss, and we got to an

11   indictment now with a bunch of felonies in it.  How did that

12   happen?"

13         What I see you as saying is that the Defendant's

14   unwillingness to recognize that the diversion agreement was

15   not in -- was not effective, that's what made the

16   negotiations break down.

17         Is that correct?

18         MR. HINES:  So the charges that were brought were

19   the exact same charges that the Defendant agreed were under

20   investigation within the scope of the tolling agreement.

21         The position that he took meant that either the

22   diversion agreement was in effect or we had to proceed with

23   other charges.  There's no -- there's no middle ground when

24   the Defendant says, you know, "You're bound by this."

25         THE COURT:  And I think I'll ask the Defendant

1   about this.  But I think some of the confusion is -- and

2   correct me if I'm wrong -- but in a typical prosecution, the

3   charges are brought first, and then there's a negotiation on

4   a plea.  Then the parties negotiate on the plea.  And

5   they -- somebody ends up pleading guilty to some of the

6   charges, and the Government dismisses the others, and they

7   go -- they go forward to sentencing.  Kind of a -- kind of a

8   typical case, right?

9            MR. HINES:  Yes.  However, in white-collar cases,

10  it does happen with some frequency that the parties resolve

11  cases with a plea to an information, and further charges

12  aren't brought at that time.

13           There are certainly cases where an indictment is

14  returned, and then there's a plea negotiation and charges

15  are dismissed, but it definitely happens both ways.

16           THE COURT:  Right.  And I'm thinking about this

17  case being different from the -- kind of the typical case I

18  see, for example, on drug cases or something.

19           And in this case, you have a negotiation.  You

20  have a -- have an -- kind of an appraisal of the charges or

21  of the potential charges, which, you know, you point out was

22  done with a back-and-forth discussion, Mr. Biden making

23  presentations on all of the charges.  So an appraisal of the

24  charges and a negotiation, and the negotiation kind of makes

25  its way into an Information.

```
1            MR. HINES:  Yes.  That's correct, Your Honor.
2            THE COURT:  And that's why -- at least your
3    argument would be that's why, even though you were always
4    contemplating felony and misdemeanor charges, the
5    Information only contained misdemeanor charges because this
6    was the result of a negotiation.
7            MR. HINES:  Exactly.  And now, to be clear,
8    though, the Supreme Court in Goodwin has said even if the
9    Government had not been -- which we were contemplating those
10   charges as evidenced in the tolling agreement -- the
11   Government can continue to add charges moving forward
12   because that's in the pretrial process.
13           This isn't like Bordenkircher or the other cases
14   that acknowledge that if it's post-appeal and the Government
15   has lost and they want to retaliate against the Defendant
16   for having invoked their rights on appeal, that could be
17   evidence of apparent vindictiveness.  This is nothing like
18   that.
19           Pretrial charging decisions are solely within our
20   purview, and we're entitled under the law to continue to
21   investigate the charge as we move forward.
22           THE COURT:  Let me go back to Mr. Lowell.
23           So what about that scenario, that in a typical
24   white-collar case, you have an investigation, you apprise
25   the Defendant of the charges, you come up with some
```

 1    negotiation, and that gets reduced to an Information, and so

 2    that would explain why -- you know, how we got from

 3    misdemeanors to felonies here?

 4              MR. LOWELL:  I don't understand the sequence that

 5    you're asking me about.

 6              THE COURT:  I may have been unclear.

 7              So in a white-collar example, potential

 8    investigation, someone's approached with an assessment of

 9    the potential charges you could bring against them,

10    including felonies and misdemeanors, and there's a

11    discussion that happens, and there's an agreement on what

12    the Defendant would plead guilty to.  That agreement is

13    reduced to an Information, and that Information would

14    contain just the misdemeanors, not the felonies that the

15    Government agreed not to prosecute on.

16              MR. LOWELL:  That's usually what happens when

17    there's a pre-charged set of negotiations.

18              THE COURT:  And there was here, correct?

19              MR. LOWELL:  Yes, of course.

20              So some terms that you asked me about and that you

21    just heard from the prosecutor, they say that the fact that

22    other charges had been contemplated, or to use their phrase

23    also "considered in the past," absolves them when they try

24    to fit into the coat of this being a *Bordenkircher* or *Brown*

25    kind of case.

But that piece of clothing doesn't fit them because of a few things.  First, we keep coming back to they thought after that -- the fact that they may have considered it three years ago, but in June of 2023, after considering it, contemplating it, tolling agreementing [sic] it, they decided, "Okay, I know how to end this case, two tax misdemeanors and one diverted gun charge."

And it's not just between the parties.  They sent the proposed plea agreement on the docket, and they did send the diversion agreement to the Court.

Normally, when I am talking to prosecutors about a would-be deal, we don't send it to the Court.  We don't tell them we have something.  It means we have something when that happens.

And that's why your question on the sequence I asked you to clarify because it doesn't work that way.  It ended.  They had something they thought was appropriate, and then they changed it.  So that's one issue.

The second thing that they said that I think bears -- because you asked me, and you asked them.  Yes, they may have maintained that recommendation of probation.  But, Judge, what did they recommend it for?  It was only for misdemeanors, but they took the immunity out from before they showed you the exhibit that responds to Mr. Clark.

What kind of crazy defendant and crazier defense

1    lawyer would be in a room where they say, "Yeah, we're going

2    to recommend probation if we bring these two tax

3    misdemeanors, but when we bring the felonies and three gun

4    charges, all bets are off."

5            When they yell that we mischaracterized what

6    happened on October 29th, okay, did they ever say the words,

7    "We demand felonies."  Have we stated it that way, a little

8    hyperbolic.

9            But let's say what did happen, and that's what the

10   record shows.  They say, "We're not accepting the

11   misdemeanor deal that we signed -- or that we proposed."

12   They say, "There's no immunity anymore."  They say, "There's

13   not going to be, at that meeting, a recommendation of

14   probation."

15           And the only issue -- the word that came up in our

16   conversations that day had the "F" word, and I don't mean

17   the other "F" word.  I mean the felony "F" word, and that's

18   what was said out loud.

19           Now, okay.  You know the old adage, you know.  If

20   there's no jail recommendation, the immunity deal is off,

21   they have not said they will go forward with the two

22   misdemeanors, that's the proverbial duck that walks,

23   squawks, looks like a duck.

24           Sure, the conclusion that they gave that day was

25   that it was felonies which would expose jail or nothing, or

1    why take -- why take immunity off the table.

2          Third, when they say we, in that letter, proposed

3    three things, they take that out of context.  That's after

4    they had already said there's no immunity.

5          So if there's no immunity, one of the people that

6    would have said, "Okay, maybe we can resolve this by

7    something other."  That's true that that was now a new

8    possibility.

9          But, again, I ask the Court to consider the

10   fundamental truth of all the motions.  It's not

11   *Bordenkircher*.  It is not *Goodwin*.  It is we have an

12   agreement.  We're sending it on the docket, and we're

13   telling the Court what the diversion agreement says.

14         That never happens in plea agreements, and after

15   five years, you know, because I've said it too many times

16   for my own ears, what they thought was the proper

17   conclusion.

18         And the last thing I would indicate in terms of

19   what makes something vindictive is when you have all the

20   evidence, and you, then, do something that did not have any

21   basis before, you just have to ask the question:  Why?

22         And I would be just amazed that we haven't rung

23   the bell to get to the point where somebody has to disclose

24   more about what's behind the curtain as to why this

25   happened, because it doesn't make sense in any other way.

```
 1        If -- again, they pointed out to Delaware.  "Oh, I
 2   can explain why we upped the ante.  We have this
 3   overwhelming evidence."
 4        That's an admission of significance because it
 5   didn't come about until after they brought the charges, and
 6   they don't respond to that in my motion or their opposition.
 7   They just let it gloss, and they'll never use the phrase
 8   that we had overwhelming evidence which justifies in this
 9   courtroom.  Okay.  But it doesn't mean they didn't say it.
10        So I guess the last point I would make to answer
11   the question that you asked Mr. -- asked the prosecutor --
12   I'm sorry -- was that they say that it was not accepted by
13   the Court, as if somehow that's going to save them too.
14        But let's be clear what wasn't accepted.  What
15   wasn't accepted -- and the only time the Court made any
16   mention of that was a plea that was not yet accepted.
17        The Court made abundantly clear that she had no
18   role in having to approve the diversion agreement.  And then
19   what their answer to that was that the --
20        THE COURT:  Well, but the Court did ask the
21   parties to go back to the drawing board, correct?
22        MR. LOWELL:  Yes.  What she said was, "Maybe you
23   will go back and make this clearer."
24        But it was pretty clear that day when both sides
25   came to the podium and said the diversion agreement covers
```

1   tax, gun, drugs, not FARA, not anything else; tax, drugs,

2   guns.

3          She said, "You might want to clarify that."

4          You know what, Judge, in court, in a transcript

5   where both sides say the same thing, that was pretty darn

6   clear.

7          THE COURT:  Yes.  I've got the transcript.  Okay.

8   Thank you on that.

9          So I want to take a ten-minute break just to give

10  our court reporter a chance to stretch his legs.

11         So we'll -- can we resume here at five minutes to

12  3:00, and we'll try to go through the rest of these motions

13  a little bit quicker.  Thank you.

14                         *(Recess.)*

15         THE COURT:  Okay.  So the next motion is the

16  outrageous Government conduct motion.

17         As I understand the position, it's the disclosures

18  of Shapley and Ziegler of the Defendant's tax information,

19  the grand jury information, their appearing on television

20  shows and giving interviews, along with other conduct, is

21  the outrageous conduct that the Court should base a decision

22  to use its supervisory authority to dismiss the case,

23  correct?

24         MR. LOWELL:  That's right, Judge.  And I'd start

25  by saying to Your Honor that I realize the outrageous

1    conduct standard in criminal law is one of the highest to

2    get to, and I understand it is a big climb.  I do understand

3    that.

4            THE COURT:  But you have --

5            MR. LOWELL:  In a nutshell, as you are apt to do,

6    defined that pretty well.

7            THE COURT:  Now, if we're looking at the *Walters*

8    case that I believe you cited, and I'm not sure if the

9    Government also cited it, but that's a case where there was

10   a disclosure of information by the -- by the prosecutor, and

11   the court found that it wasn't enough to sort of override

12   the -- or meet the outrageous conduct standard.

13           I wonder if you've looked at that case or if you

14   could tell me how you think I should distinguish this case

15   from that one.

16           In *Walters*, the Court essentially said -- let me

17   find it here.  The Court of Appeals said:  We agree with the

18   district court that the outrageous conduct is not

19   appropriate here.  Although the misconduct at issue is

20   deeply disturbing and perhaps even criminal, it simply is

21   not commensurate with the conduct in those cases where

22   indictments were dismissed for coercion or violations of

23   bodily integrity.

24           The Court went on to say that even though they

25   didn't agree with the conduct, they didn't think it met that

1   standard.

2           It seems like there's a -- you know, there's a lot

3   of cases where the Government's involved in the --

4   committing the criminal act.  And it's pretty easy to see

5   the outrageous conduct there, right?

6           We're not talking about an instance of that here.

7   We're just talking about other Government conduct.

8           How do you distinguish *Walters*?

9           MR. LOWELL:  I think the point is just that

10  sometimes it's not an event like in *Walters* that there was a

11  leak of grand jury.  It's how much is happening.

12          So a single leak of an important aspect of a grand

13  jury investigation could never -- even if I think it was

14  completely intentional by the Assistant U.S. Attorney in the

15  room with the grand jury who did that, that would be a hard

16  sell for me to convince a court that was enough, depending

17  on what it was.

18          I mean, if it was some smashing revelation about a

19  defendant or, at that point, the target that nobody would

20  know otherwise, maybe it would be so prejudicial.

21          So if *Walters* stands for the proposition that a

22  small amount, a single event, then I don't have any quarrel

23  to say, "Fine, the language of *Walters* could apply."

24          But our motion points out quite a bit more.  It

25  wasn't just one.  It wasn't just two.  It was repeated,

1    numerous, and it wasn't just that they were going on the

2    air.

3              Every time they went on the air, they were

4    revealing both 6103 material and 6(e) material on many

5    occasions.  I can't trace every line as to know which one

6    came from one, or just one came from the other.  I mean, in

7    your life, Judge, when have you seen two investigators

8    who -- okay, they ended up being removed, but they are still

9    employed?  They still have something to say about this case?

10             How many times have you seen agents go on

11   television multiple, multiple times, each time saying things

12   that are covered by the very provisions that are supposed to

13   protect the integrity of the system and the fairness of

14   whatever is out there?

15             Every person in America that has any form of news,

16   not only knows that Mr. Biden has been charged with tax, but

17   he knows that the Government is alleging, among other

18   things, that he was involved with escorts, and hotel rooms,

19   and drug dealers, and all that was put in that indictment.

20             On that point, Judge, you know what significantly

21   changes *Walters* from what we have?  I'll ask you to look at

22   what we've put in as -- and what the record shows about just

23   compare what the IRS -- and by the way, earlier, you called

24   them whistleblowers.  I know that that's a word.  I am going

25   to put that word in quotes for a variety of reasons because

1   they were told what whistleblowers are supposed to do.  They

2   were even admonished to do anything they do the right way,

3   and they blew past those warnings.  And they blew past those

4   warnings by doing that at a congressional committee.  That's

5   not covered by the whistleblower statute or the

6   whistleblower procedure.

7           But look what they did.  The first thing that they

8   did is they actually went on and said, "This is what

9   Mr. Biden should be charged with."

10          And they said, It should be failure to file,

11  failure to pay, tax evasion in 2018.

12          Look in the indictment that you have on your desk.

13  Each one of the charges is exactly what those two agents

14  said should happen.

15          What else did they say?  They went on and they

16  said, "And this is what he did as opposed to paying his

17  taxes."  And they talked about all of his lifestyle, luxury,

18  drugs, escorts, sex clubs, whatever they put in.

19          What happened?  It's exactly the phraseology that

20  the special counsel put in, which is abhorrent.  It doesn't

21  happen in pure government tax cases, where they go on for

22  36 pages, but that's exactly what the agents demanded and

23  said.  So *Walters* is not just --

24          THE COURT:  I'm sorry to interrupt.

25          How do you tie that together, though?  So you seem

1    to be -- that's the issue I'm wondering about Shapley and

2    Ziegler.  How did they -- how are they responsible for

3    what's in the indictment?  That's what I'm not -- is it the

4    argument that they exerted undue pressure, that they

5    pressured the special counsel to put that information in the

6    indictment?

7            MR. LOWELL:  That is the same issue that you asked

8    me in the last -- one of the last motions about the

9    vindictive, right?

10           THE COURT:  Right.

11           MR. LOWELL:  I can only say this:  If you have --

12   and I know you've done this for a while.  You took any tax

13   case that's indicted by the Government, including one I'll

14   tell you about when we get to another motion, and talk about

15   how it works, and what it said, and you look at this.  I

16   don't know that that's why the prosecutors did it, but it's

17   exactly the script that the agents did.

18           Can I say that the prosecutors saw Mr. Shapley and

19   Mr. Ziegler on Fox News and said, "Oh, that's interesting.

20   I'll take their words and put it in."

21           Where did they get the concept that they were

22   going to do a 36-page talking indictment?  I mean, just

23   unprecedented.  But your point is incredibly well taken.  I

24   can't make the connection that that's why that was done.

25           I can say the following:  Outrageous Government

1    conduct often is in the context of an entrapment, sting

2    operation, or what you asked me about, for sure.

3           But the language applies to what we've put in our

4    briefs -- and I don't need to explain that to you because

5    you've read those -- about the Government taking actions

6    which are inexplicable and beyond that which gives integrity

7    to the system.

8           So what we know today is they did the causation.

9    It was those two agents that started the domines.  That's

10   what happened here.

11          They started in May to complain about what they

12   say is done wrong in the case.  The next thing, they're on

13   the airwaves.  The next thing is members of Congress put

14   them in their hearing.  The next thing, they reveal what

15   they were -- said in the hearing, and release the

16   transcripts wholesale, in the midst of those famous

17   negotiations that were happening.

18          The next thing that happens is members of Congress

19   complain about the June agreement.  The next thing that

20   happens is -- while they're still out there complaining, you

21   know, in May, when they were removed from the case, they

22   didn't go home.  They didn't go work on some other case, or

23   if they did, they had plenty of time to go on their

24   publicity tour.

25          So then the next thing that happens is

1    Chairman Smith of the Ways and Means Committee tries to

2    intervene to squirrel the deal in Delaware.  All that starts

3    with these agents.

4         Now, I don't know whether all those events that we

5    point out are in, for example, beyond that one case you and

6    I talked about months ago in Tennessee, the *Marty's* case

7    about separation of powers, which was one congressman

8    exhorting the prosecutors federally to bring charges when a

9    state plea agreement was in effect, but these are far

10   greater than that in terms of the amount, and that's what

11   separates it from *Walters*, in part, I think.

12        And the second thing is they -- the Government

13   says, "Well, we're not doing what it is these agents said."

14        Well, then the causation is the dominoes.

15        Now, I understand that I can't sit here and say

16   when it was that the two gentlemen sitting down to my left

17   decided to do that indictment with all of the little things

18   in it.  I can tell you that before they did that, that's

19   exactly what these two agents were demanding.  That's what I

20   can tell you.

21        THE COURT:  So the prejudice, right -- so the

22   prejudice that the Defendant suffers from the conduct of

23   agents -- or Messrs Ziegler and Shapley is what?  Is that he

24   was indicted for these charges?

25        MR. LOWELL:  The prejudice is threefold.

1          One, the dominoes that they put in effect is what

2    caused the prosecutors to renege on a deal that had two tax

3    misdemeanors and one diverted gun charge.  That's pretty

4    prejudicial.

5          The second is whatever comes from that, which is

6    now he's got two cases with felonies to have to deal in two

7    parts of the United States, where he didn't have that

8    before.

9          And as I said to you before, I understand that we

10   can pick a jury with excruciating detail if we ever get that

11   far; Lord knows we shouldn't.  But if that came about, can

12   we screen out of people's mind everything that they've heard

13   about this case and its charges and the specifics about

14   Mr. Biden?  That's prejudicial too.

15         Why is it that there are rules that say thou shall

16   keep sacred 6103 material and thou shalt not leak 6(e)

17   material?  Why do we have those rules?

18         It is for two reasons.  One is that people who are

19   charged should not be in public of somebody who was under

20   investigation.

21         And the second is, if that person is charged, then

22   the Rules of Evidence should come into pass as to what is

23   going to be used against that person.

24         These two people did neither, and they both

25   violated both.

```
 1              THE COURT:  Okay.
 2              MR. LOWELL:  And as I started with you, I
 3    understand it's a high mountain, but I don't know of another
 4    case that you can skim through that's not overreaching in
 5    an -- in a sting, which is the tried and true way these
 6    cases usually are decided.
 7              I can't find a parallel, and that's a good thing.
 8    It's a great thing, by the way.  The fact that I can't give
 9    you a related case makes me feel good about the way the
10    system normally works, because agents don't go on Fox News,
11    CBS, all the other Newsmaxes and do what they did.  And they
12    don't put into effect dominoes that give the Congress the
13    right to come and intervene and scuttle the deal.  That's a
14    good thing.  But it doesn't mean that when it happens, it
15    doesn't fit into the language of an outrageous conduct.
16              THE COURT:  Thank you very much.
17              Let me hear from the Government on this motion.
18              MR. WISE:  So I think the Defense's problem is the
19    same problem you identified in the last motion, which is
20    they offer no proof.  None.  None whatsoever that there's
21    causation.
22              I wrote down what Mr. Lowell said.  He said the
23    agents "did the causation."  What does that mean?
24              Where's the proof that these two guys going on TV
25    had anything to do with what we did?
```

1          Well, they said, "Oh, they started the dominoes."
2   What dominoes?  Where is the proof of any of that?
3          Other than insulting us, where is the proof that
4   anything these two agents -- who I couldn't have picked out
5   of a lineup -- had anything to do with our decision-making?
6          The idea that every American knows this story,
7   that's absurd.  I mean, the myopia of people that live in
8   Washington, to think that everyone in America cares what
9   Gary Shapley and -- I don't even know what Ziegler's first
10  name is -- what Ziegler says.  That's not proof.
11         You know, he talks about, "Well, did the -- where
12  did the prosecutors get the concept of a speaking
13  indictment?"
14         I've been a white-collar prosecutor for 18 years.
15  I've been writing speaking indictments the entire time.  We
16  didn't have to get the idea from Gary Shapley saying, "Oh,
17  Biden -- Biden was involved with drugs and escorts."
18         Biden wrote about that in his book.  I mean, we
19  could read about it in the book.  America can read about it
20  in the book.  You don't have to watch some obscure pundit on
21  some podcast I've never heard of talk about it.
22         So, I mean, this is as weak, as factless as the
23  vindictive selective motion was.  This one is even worse,
24  because here, they can't even articulate a theory of
25  causation.  It's just these guys are hyenas, baying at the

1    moon, and that must have had something to do with us, and

2    there's simply no proof of it.

3              There's no dominoes.  There's no -- you know, over

4    and over again they talk about -- and this is what's just so

5    startling about the way they wrote these motions.

6              On page 1 of their reply, they write, you know,

7    that "the conduct upped the ante and forced the hand of

8    then-U.S. Attorney Weiss to renege on a plea deal."

9              That's a factual representation to this Court,

10   that they forced the hand.  Where is their proof?  There's

11   nothing.  The paragraph in the reply ends there.

12             And then -- and then they do it again.  They do it

13   over and over again.  On the next page, they write, "Shapley

14   and Ziegler's congressional testimony and media statements

15   spawned the cascading events that culminated in Weiss

16   reneging on the deal."

17             What's their proof of that?  Nothing.

18             The only time -- and I thought this was -- I mean,

19   this was remarkable.  On page 4 of their reply, they write,

20   "on the very evening, December the 8th" -- which is actually

21   an incorrect date; it was December the 7th -- "that the

22   prosecution filed nine tax charges in this district.

23   Shapley and Ziegler issued a joint statement" -- I was

24   unaware of this until I read this in their motion,

25   candidly -- claiming that it was, claiming "the indictment

1  was complete vindication of our thorough investigation."

2          And then this is what they write.  "Thus -- thus,

3  the tax indictment of Biden was a direct result of Ziegler

4  and Shapely's public conduct."

5          So on that theory, if Shapley and Ziegler said,

6  "We made the sun come up they must be responsible for it,"

7  it's patently absurd.  And they haven't come within a mile

8  of establishing that that conduct, which is what they have

9  to do, resulted in these charges.  That's the Ninth

10  Circuit's decision that we cite in our -- in our brief, that

11  they have to -- that they acknowledge that the *Pedrin* case.

12          They start their motion with the indictment should

13  be dismissed as it results from what the courts defined as

14  outrageous government conduct, and they never do that.  They

15  never make that causal link.

16          They also don't address effectively the Ninth

17  Circuit's decision in *Michaelian*, which says 6103 is never a

18  basis for dismissing an indictment because the Congress has

19  created other remedies, and the same logic applies to

20  violations of 6(e).

21          And on that note, the last thing I'll say is, they

22  actually don't give you -- just like they didn't on the last

23  motion -- any evidence that they actually violated 6103 or

24  6(e).

25          They make these vague references to these TV

1   appearances and these conclusory statements that they

2   disclose confidential filer information.  They don't have

3   transcripts.  They don't have quotes.  This Court -- they

4   have not put before this Court, nor has any other court

5   found, that what they did violated 6103 or 6(e).  But they

6   would ask you to, again, take the extraordinary step of

7   dismissing an indictment returned by a legitimate grand jury

8   just on the basis of because they say so.

9          THE COURT:  Yeah.  And to be clear to both sides,

10   the Court's -- in the Court's ruling, the Court won't be

11   ruling on whether or not they violated 6103 or 6(e) because

12   there's ongoing proceedings going on right now with respect

13   to that.  And this Court is not going to get involved in

14   that at all.  And so I'm not going to make a value judgment

15   on any violation of 6103 or 6(e).

16          Let me get a brief response.

17          MR. LOWELL:  Just a couple of things, please,

18   Judge.  I was going to ask the Court to take a look at the

19   entirety that you have in terms of whether or not these

20   agents were warned about what they were doing, whether or

21   not it ultimately concludes, as Your Honor just said.  I

22   think that's the point.

23          And I agree with learned counsel to my left about

24   the causation issue, but I needed to address it.  It's not

25   the same as my vindictive prosecution one.

1          There comes a point that outrageous conduct cases

2    don't look to necessarily do more than point out what's

3    outrageous and what its impact is.

4          And what I can tell you is -- he says there's no

5    dominoes.  I don't know of a case in which agents give the

6    ammunition to Congress.  Congress takes the ammunition and

7    floods the airwaves with it.  The airwaves then causes a

8    chairperson of a committee to seek intervention.

9          When was the last time that a chairperson of a

10   congressional committee moved to seek intervention to ask

11   that a deal not be granted?

12         I don't know that I need to point out so many

13   dominoes when that is one big domino that's knocking down

14   all the rest.

15         And I have only three other things to add.

16         First, is you can look at the record as to -- I

17   totally agree, by the way, that 6103, in itself, there are

18   other remedies to go after them.  But we have pointed out,

19   as the record shows, they were pointed out that there were

20   6(e) ramifications for what they're doing.

21         So I just wanted to make that clear.

22         And as to their argument or point that the

23   prejudice doesn't exist because people could pick up

24   Mr. Biden's book.  Okay, they probably could pick up

25   Mr. Biden's book.

1          But that's not what happened here.  We have two

2     agents making 15 media appearances that do go to a whole lot

3     of people that say everything that I put in our motion that

4     they do say with the ramifications that we finally said.

5          And I would leave the podium with a challenge to

6     Mr. Wise.  I want him to come to court and give me an

7     indictment that he wrote.

8          THE COURT:  Counsel, direct everything to me.

9          MR. LOWELL:  Sorry.

10          I would like the Court to ask the Government to

11     give them an indictment on a tax case of failure to file and

12     failure to pay that reads or looks anything like the one

13     that was filed in this case.

14          I've looked for one.  I'm going to ask the Court,

15     when I get to the motion on Count 9, to consider another

16     case.  But if they can do that, then Mr. Wise saying to Your

17     Honor, "Well, everybody can read it in Mr. Biden's book,"

18     is -- falls on deaf ears, because that's not where it is.

19     It's now in the public docket.  And it's what the agents had

20     said.

21          So consequently, I would like the Court to inquire

22     to see such an indictment that these two gentlemen ever have

23     written before.

24          THE COURT:  And then let me just ask you, Counsel,

25     quickly on -- so one of the arguments the Government makes

1   is just because Shapley and Ziegler said that the

2   prosecution vindicated their work, they essentially were

3   taking credit for it, that that doesn't mean that they

4   deserve credit for it.

5          MR. LOWELL:  I agree -- I agree with that.  It's

6   just again, when you are a defendant in a case in which

7   there's also rules for when you open the door to some

8   limited amount of discovery, you have to try to connect

9   dots.

10          THE COURT:  Uh-huh.

11          MR. LOWELL:  You make circumstantial leaps, and if

12   they're too great, they don't work.  But they're not too

13   great in the case -- in the motion I was arguing before your

14   break, and they're not too great here.

15          I totally agree that they're waving the flag and

16   saying, "We're responsible for this doesn't mean it."  But

17   it's certainly something to consider when you're considering

18   whether we should find out more about what actually

19   happened.

20          THE COURT:  Okay.  So let's -- let's get to the

21   remainder of the motions.  And now we're dealing with

22   motions that are a little bit more granular in that they

23   affect only certain counts.

24          The motion on Count 1, with respect to the statute

25   of limitations, as I understand the argument, the

1    Defendant's arguing that the willfulness in Count 1 is pled

2    to have occurred later by the Government tactically so it

3    could avoid the statute of limitations problem.

4            If that is allowed to stand, then the other counts

5    will fail because they're -- they're inconsistently pleading

6    willfulness in those counts.

7            Did I get that mostly right?

8            MR. LOWELL:  As always, you got it more than

9    mostly right.  I'd have to add one sentence.

10           The Government, in order to save Count 1, has to

11   come up with what I'm calling the roaming willfulness

12   theory.  And they pick June of 2020 as the moment that they

13   say they can bring this case that comes back to a filing

14   that they allege should have been made more than six years

15   before they bring the charges because they say willfulness

16   in 2020 is defined by two things, basically; one, that he

17   didn't pay; and second, that people around him, including

18   his accountants and attorneys, told that he owed money.

19           They say that occurred in 2020.  But Your Honor's

20   already on to the fact that's the exact allegation that they

21   make when they previously, in the indictment, say what

22   happened in 2017.

23           So if what was not the -- because the law says you

24   look to the first moment of willfulness.  It's not a

25   continuing crime.  You have to pick the first moment.  They

1    would have Your Honor pick June 2020, and they do it based

2    on these two allegations.

3          What we're saying is those are the exact same

4    allegations that they allege in their indictment occurred

5    three years later -- earlier in 2017.  Exactly the same.  We

6    gave you a chart that compares those.

7          So if that was not the first moment of

8    willfulness, based on those two criteria in '17, then it

9    can't be what's 2020, other than they have no means to be

10    able to save that count.

11          And then when they did that, look what they did

12    after that, then they had to figure out what to do with

13    counts in later years, which might be within the statute of

14    limitations.  So they do this alternative theory, which is

15    his willfulness was in April of '18 and in June of 2020 or

16    February, depending on which one we're talking about.

17          His willfulness occurred in 2018 or '19 -- for '18

18    and also 2020.  They had to do that or else it would stick

19    out like a sore thumb that they did that to save Count 1.

20          THE COURT:  Right.  And those are Counts 2 and 4

21    you're referring to?

22          MR. LOWELL:  Yes.  And then on the filing, which

23    is Count 3, that's the last moment -- not the first moment,

24    where the event of failure to file occurs, but that's in

25    October, which is beyond the statute of limitations for a

1    different reason than 1, 2 and 4.  And then you may ask me

2    about it, but if you weren't, I would just say one word.

3            The other thing they say is that they had the

4    tolling agreements.  First, I want to tell the Court and

5    tell Counsel that in our motion, I would have addressed it

6    if I knew that they had existed.  But when I found out they

7    existed, it doesn't -- it doesn't save them.

8            This is one of those moments where the special

9    counsel wants to have a special counsel hat on when he wants

10   to get the benefit of that and his U.S. Attorney hat when he

11   doesn't, because unlike the diversion agreement, those

12   tolling agreements are clearly between the United States

13   Attorney for the District of Delaware and Mr. Biden.

14           THE COURT:  And the tax department.

15           MR. LOWELL:  And the tax department.  Thank you.

16   And that's not who brought this case.

17           Now, it turns out that Mr. Weiss is still the

18   U.S. Attorney in Delaware, and he wears the hat of special

19   counsel, which he shouldn't have had for the motion that we

20   argued earlier.

21           But the point of pointing that out is the tolling

22   agreements cannot help somebody who's not a signatory, and

23   that's just basic criminal procedural law, and it doesn't

24   matter that he is the same human being.  It's the office

25   that matters.

1          So if you take that out of the equation, they have
2     to fall back on this roaming willfulness concept, and that
3     has the flaw that we told you about.  And we gave you the
4     reasons why they're not the same entity and factually about
5     what they've done in a different domain name, et cetera,
6     et cetera, but the point is either they have to pick one or
7     the other.
8          But when they pick the roaming willfulness, they
9     are infecting their other counts in the way that we have
10    told you they're infecting the other counts.
11         THE COURT:  Thank you.  And thank you for the
12    information on the tolling agreement.
13         The reason why I asked for the surreply is because
14    it just -- you know, it came up in opposition, and I had
15    your position on it in reply, but I didn't have the
16    Government's position.
17         As I understand it now, we'll find out from the
18    Government, they're not relying on those agreements in this
19    case, and so I don't think the Court needs to reach that
20    issue as to whether or not they would be enforceable.
21         MR. LOWELL:  Thank you, Your Honor.
22         THE COURT:  Yeah.
23         Let me hear from the Government on this Count 1.
24         And, you know, we kind of drifted over into the
25    motion and duplicitous counts for 2 and 4, and so we can

1    talk about it all at once if you want to.

2         MR. WISE:  So, Your honor, again, the reason we

3    brought up the tolling agreements is, in all of these

4    motions, they ascribe bad motives to us, and they did it

5    again.  And this time it was, was, "oh, we were -- were -- I

6    think the language was "We were sloppy.  We sat on our

7    hands.  And it wasn't until the partisans forced us that we

8    discovered we needed to bring these charges.  So we did.

9    And at that point, the statute was blown."  All not true.

10        The Tax Division can bring all of these charges.

11   It's not just the U.S. Attorney's Office in Delaware.  It's

12   not just the special counsel.

13        So the point of bringing the tolling agreements to

14   the Court's attention was we didn't need to -- we didn't

15   need to gin up an indictment, you know, deviously because we

16   had blown the statute.  The charges could have been pursued

17   by the Tax Division, which was a party to the tolling

18   agreements, but we don't need to rely on the tolling

19   agreement.

20        And, in fact, the relief they're asking for is

21   unavailable at this point because they're asking the Court

22   to make factual determinations that will be up to the jury

23   at trial.

24        When did willfulness arise?

25        Late willfulness has been recognized in the Ninth

1   Circuit in the *Andros* case and then in *Easterday*.  There's
2   no question that is black letter law.
3          And the facts pled indicate that willfulness arose
4   on the date it did in the indictment in 2020, and that's
5   within the statute.
6          They're asking you to decide certain facts that
7   you find more compelling than others to determine that
8   willfulness was much earlier.  Well, that's just not how it
9   works.  Only the jury can determine -- can determine that.
10          And as -- you know, he faults us for the lengthy
11   indictment.  The purpose of the lengthy indictment is to put
12   the Defendant on notice.  We made it abundantly clear what
13   we think the facts are that give rise to willfulness in each
14   of those years.
15          And '16 was different.  It wasn't a sleight of
16   hand.  That's the phrase they use.  '16 was different.
17          How is it different?  And this is all pled in the
18   indictment.  '16 was the last year that the Defendant
19   attempted to pay.  He didn't do it in '17.  He didn't do it
20   in '18.  He didn't do it in '19.
21          There's --
22          THE COURT:  I'm sorry to interrupt you.
23          But I was going to ask Mr. Lowell about this, but
24   let me ask you.  Is it significant that in the indictment on
25   paragraph 58, where the Defendant says he paid his taxes for

1    2016, he's talking to his ex-wife, and he says, "I paid.  I

2    paid the taxes," right?

3            And his ex-wife says, "Oh, no, no.  Wait.  You

4    didn't because -- because they're still here."

5            And he says, "Oh, no, those are copies."

6            And she says, "No, there's checks attached to

7    them," right?

8            So that would show, at least by that date, that

9    there was an intent to pay taxes.

10           MR. WISE:  Yes.

11           THE COURT:  And so willfulness -- unlike the other

12   counts, we don't have positive evidence of the Defendant

13   intending to pay taxes.  Here, we've got some evidence that

14   there was checks already written to pay those taxes.

15           MR. WISE:  Yes.  And so they say, "Look, people

16   telling him he owed taxes and him not paying is the only

17   evidence of willfulness across all the counts."

18           First of all, that's not true.  It's -- the

19   lengthy indictment makes that clear.

20           But what's different about '16 is he does -- there

21   is some indication, incorrect or not, that he is attempting

22   to pay.  He has paid some.  He may mistakenly think he has

23   paid.  So in that case, we pled the charge conservatively.

24   And we charged the later date where there is no question

25   that he knew he owed these taxes because he filed and he

1  owed additional taxes.

2          So there's no sleight of hand.  There's no -- you

3  know, what makes the argument fatal is on page 2 of their

4  motion they say that all the counts rely -- they actually

5  relay, but it's "rely" -- on the same evidence.

6          Well, they don't.  And '16 is unique in that

7  regard because there is some indication that he intended to

8  pay and thought to pay, and that's clearly absent in '17 and

9  '18 and '19, and it's clearly absent when he finally does

10  file the '16 return in '20.

11          And another fact we plead -- and I don't think

12  they mention this -- is he hires Edward White & Company to

13  file the '17 and '18 returns.  He doesn't hire them to file

14  the '16 returns.  They discover, when they call the service,

15  that the '16 return hasn't been filed.  And we expressly

16  plead that, that they learned that after they had already

17  been engaged, which, again, suggests he thought, perhaps, he

18  had filed and paid earlier.

19          And so this is not -- this is not some nefarious

20  thing we've done.  We looked at the evidence, and we pled at

21  conservatively, and that puts it at the later date when we

22  think the evidence is overwhelming he had willfulness.

23          THE COURT:  Okay.  Let me ask you this:  In

24  Count 2, the charge in Count 2 says -- and, again, I'm

25  jumping to the motion on duplicity of Counts 2, 4, and 6.

```
 1          But it says that:  "While knowing of the
 2   foregoing, he did willfully fail on April 17th, 2018, and on
 3   February 18th, 2020, in the Central District of California
 4   and elsewhere to pay the income tax due."
 5          So is it -- is it either or, or are you saying he
 6   was willful?  And if it was willful on April 17th, 2018, are
 7   you saying he continued to be willful on February 18th,
 8   2020?  And if so, why does that matter?
 9          MR. WISE:  So it comes back to the case we cited,
10   the Ninth Circuit case, *Arriola* -- or something.
11          THE COURT:  *Arriola*?
12          MR. WISE:  Yeah.  That the indictment, which is,
13   again, meant to put the defendant on notice, that the
14   defendant may charge multiple ways of committing the same
15   crime.
16          THE COURT:  Uh-huh.
17          MR. WISE:  And so in this instance, there is
18   evidence he was willful.  Unlike in '16, there was evidence
19   that he was willful as to 2017 in calendar year 2018.
20          There is also evidence that he was using drugs and
21   that there were other factors that potentially could
22   indicate a lack of willfulness.  In 2020, when he regains
23   his sobriety and hires accountants, he also doesn't pay.
24   Clearly, evidence of willfulness.
25          And so we've put the Defendant on notice that
```

1   there will be evidence of willfulness as to both periods.

2   And the way the jury will address that is, if necessary,

3   through a unanimity instruction, in which case they will

4   deliberate on the early date.  If they find he's willful,

5   then the deliberations stop.  They've satisfied the

6   elements.  If they find he wasn't willful, they can, then,

7   consider the later date.

8           And this kind of pleading occurs in lots of

9   criminal cases; in multi-object conspiracy cases where

10  juries have to decide between multiple objects pled in a

11  conspiracy; in conspiracy cases with multiple overt acts,

12  they have to decide which overt act has been proven; in RICO

13  cases where there are multiple RICO predicates that are

14  alleged, and they have to decide.

15          So it's not a duplicity issue.  It's a unanimity

16  issue.  And even they, the way they describe it, talk about

17  it as running a risk of unanimity or lack of unanimity.  And

18  we cite the *Gonzalez* case, the Ninth Circuit *Gonzalez* case,

19  that says the way you address that is through an additional

20  unanimity instruction, not just the general one, but a more

21  specific one that tells them, "You have to be unanimous as

22  to which of the two dates that are pled in the indictment

23  there was willfulness if you were to find him guilty, if you

24  were to find the Government satisfied that element."

25          And that's how -- that's how what they call

 1   duplicity is really addressed.

 2        THE COURT:  And similarly, with Count 6, you would

 3   argue that the multiple filings are all evidence of the same

 4   crime?

 5        MR. WISE:  Yes.  Acts of evasion -- I mean, you

 6   could have hundreds of acts of evasion in a single count

 7   related to a single year.  You could have payments to all

 8   kinds of third parties to shelter money.  You could have

 9   filings in multiple separate jurisdictions.

10        They're saying the false -- the false 1120 for

11   Owasco is one crime, and the false 1044 for his personal

12   income taxes is another one.  But that just -- that shows a

13   fundamental misunderstanding of the way evasion charges are

14   pled.

15        There's plenty of case law that shows multiple

16   filings can be acts of evasion for the same tax year.  And,

17   again, it would be a unanimity instruction that tells the

18   jury, "You have to be unanimous as to which act of evasion

19   you find, beyond a reasonable doubt, he committed."

20        And the two are -- they're not unrelated, right?

21        He overstates his business expenses for Owasco,

22   which reduces the amount of income Owasco pays him, which

23   reduces his tax burden.  So it's not like it's different

24   years, different -- you know, which would be potentially

25   duplicity.  It's all related to the '18 tax year and evasion

1    in the '18 tax year.

2         The false filing counts are separate.  The 1120 is

3    a false filing.  The 1040 is a false filing.  But acts of

4    evasion -- and we cited a specific case, *Corona*, where they

5    gave a unanimous -- a unanimity instruction and found it

6    appropriate where there are multiple acts of evasion, which

7    is exactly the situation here.

8         THE COURT:  And I guess the argument -- and then

9    I'm talk to Mr. Lowell in a second -- but the argument that

10   he would make, I guess, in cases -- like, if we look at the

11   evasion, the Defendant could have committed each of those

12   acts of evasion.  So it's almost -- you know, it's almost

13   like a or; you know, he did this or that or that, but

14   they're all -- they could all be consistent together.

15        MR. WISE:  Yes.

16        THE COURT:  Whereas, in 2 and 4, if he was -- if

17   he was first willful in 2020, then he wasn't willful in

18   2018.  They kind of contradict each other.

19        MR. WISE:  Well, he could be willful in both.

20   It's just that the jury would stop deliberating once they

21   had found him willful on the earlier date.

22        He could have -- he could very well have said, you

23   know, "I'm not paying my taxes.  I want to spend the money

24   on what I want to spend them on in '18," and then have made

25   the exact same decision in '20.

```
 1            But the case law talks about not -- charging,
 2    frankly, as few counts as possible.  There's a preference in
 3    the law, and this is what multiplicity obviously attacks,
 4    that if we had taken the one tax year and said he actually
 5    failed to pay on the one year and separately charged it as
 6    he failed to pay later, they would make a multiplicity
 7    argument.  You've taken one count of failure to pay, and
 8    you've split it.
 9            Here, again, if they reach willfulness as to the
10    early date, they're finished.  That's the end of their
11    deliberations because we've met our burden at that point.
12            THE COURT:  Okay.  Let me go to Mr. Lowell.
13            Just the issue -- one of the issues I asked
14    counsel about is paragraph 53 [sic] in the indictment seems
15    to indicate that the Defendant -- or at least it alleges
16    that the Defendant intended to or was -- I'm sorry,
17    paragraph 58 -- at least in the process of trying to pay his
18    2016 taxes because he had copies of his taxes.  There were
19    checks attached.  So it looks like there was an intent to
20    pay.  So we wouldn't have had willful failure to pay at that
21    point.
22            If we believe the indictment is true, does that
23    hang together that there's no statute of limitations problem
24    with Count 1 because at least by March 9th, 2018, the
25    complete crime hadn't been committed yet?
```

1          MR. LOWELL:  No.  For two reasons.

2          He makes a statement to his ex-wife.  And

3    immediately, she corrects him that it's not true.  So now

4    there is -- if you understand what the Government's

5    alleging, the point that he paid less than was owed -- and

6    it's called a partial payment, meaning he owed more.  In

7    order to get an extension, he's still not -- had to pay.

8          That's not a fact that cuts against the

9    Defendant's motion.  It's a fact that cuts for the

10   Defendant's motion because on the date that he is

11   acknowledging that he owes X and pays less than X, including

12   when his wife -- ex-wife sets him straight, he now is under

13   the notion that he hasn't done all he's supposed to do.

14         And, Judge, there's no difference from that moment

15   to the next week to the next week to the next week, in which

16   his willfulness continues, until they decide that it's in

17   June of 2020 that they absolutely now have him because it

18   saves the statute of limitations.

19         They picked an arbitrary date.  They could have

20   picked any date.

21         THE COURT:  Sorry.  If we go back to this March

22   date, March 9th, 2018, there, it seems like at least the

23   Defendant was, at some point, under the belief that he had

24   filed his taxes.  He was later corrected by his wife.

25         But on that date, you would agree that he

1    didn't -- wasn't guilty of willfully failing to pay his

2    taxes.

3            MR. LOWELL:  No.  But then you just change the

4    word.  On that day, he was not -- this indication that he

5    couldn't be found within necessary intent for failure to

6    file, which is what is the exchange going on there, but

7    that's not what they charged.

8            THE COURT:  I see.

9            MR. LOWELL:  They charged failure to pay.

10           THE COURT:  Right.

11           MR. LOWELL:  And there is the difference, because

12   again, in failure to pay, it's the moment in time where it's

13   the first indication of willfulness.  And it comes about in

14   that period which would be more than six years unless you

15   agree that the exact same allegations that they say

16   enlightened him in 2020 didn't enlighten him in 2017.

17           And then I point out, Your Honor, that from

18   April 15th or 16th -- whatever that year would have been of

19   2'17, everyday between that day and the day that they decide

20   to use as the benchmark, he has the same level of

21   willfulness, and so that's the difference.  It's a

22   failure-to-pay case.

23           THE COURT:  Okay.  So let's talk about the

24   duplicity issue with Counts 2 and 4.

25           The Government's essentially giving two alternate

1    dates for when willfulness first began.  I know we have a

2    potential jury unanimity problem.

3             Other than that, though, why is what the

4    Government's doing -- why does it violate any rights of

5    Mr. Biden?

6             MR. LOWELL:  Well, let's start off with the notion

7    that we like to believe that grand juries matter.  We'd like

8    to think that they are bringing probable cause charges based

9    on some notion of what a Defendant did.  And we have no

10   idea, did the quorum necessary to vote decide that he was

11   willful in one or the other?  So let me start there.

12            Let me take it forward.  Duplicity is a term of

13   criminal procedure.  It means when you are basically

14   charging two crimes in one count.  Counsel's saying, "Oh,

15   that's no different than when multiple conspiracies are" --

16   I'm sorry -- "multiple objects of a conspiracy."

17            That count just still says 18 United States

18   Code 371, which requires two or more people, an overt act to

19   occur, et cetera, or when they say there are other forms

20   when the jury has to decide in a special verdict form.

21            Duplicity and unanimity are not the same.  The

22   *Arriola* case that he cites, that you raised, that I'll

23   raise, says it's an election.  We're not saying that they

24   can't elect, but they can't have it both ways.

25            When he says that the jury can decide -- this

1    isn't a game of darts.  We don't put a board and say, "You

2    can decide he was willful in '16 or '17 or '18."  There's

3    got to be a charge that they've got to go against, and

4    that's the difference between duplicity and unanimity.

5           And it also exposes, as you well pointed out when

6    he came to the podium, that it does carry over from our

7    previous issue of the statute of limitations.  I don't think

8    they would have done that and if they didn't understand the

9    ramifications of them doing it in Count 1.

10          And the fact that he does pay a little but knows

11   he knows -- pays -- I'm sorry -- owes more, that's the

12   difference between file and pay, between one and, for

13   example, three.

14          The last thing that he said, that Mr. Wise said

15   that I want to make sure the Court knows, but we did say

16   this in our -- I guess the tolling agreement point no longer

17   matters because they're not relying on it.

18          But the fact that the U.S. Attorney's Office could

19   bring it or the Tax Division, it's not what happened.  I

20   mean, it was the special counsel's office that did it.

21          And the last point I would say to you is that the

22   pleading notice is not what is governing.  It does not

23   describe what they did in terms of putting him on notice.

24          For example -- and, again, I just want to carry

25   over to that talking indictment.  I mean, you don't have to

1   put Mr. Biden on notice that he was a drug addict.  You

2   don't have to put Mr. Biden on notice that when he was in

3   the depths of his addiction, he did ridiculously stupid

4   things.  Those things don't have any bearing on whether or

5   not at a moment in time he did or did not have the

6   willfulness that they want to claim.  So if they're saying

7   that that's the reason they did it, okay, you should

8   consider that as well.

9            And the last point on the issue of -- not on the

10  duplicity nature, but on the statute of limitations is, all

11  I'm asking Your Honor to do, whether you use our chart or do

12  it yourself as you scrutinize the indictment, is to look not

13  at what Mr. Wise said -- Wise said in court or what I'm

14  saying as to whether the allegations of what amounts to

15  willfulness in '16, '17, and '18 are exactly the same as

16  what they say is willful in 2020.

17           Do that with your colleagues over there, and

18  you'll see that those are the exact same allegations.  And

19  if they didn't make for the first moment of willfulness when

20  they're first alleged, how can they be said to meet

21  willfulness in any other year?

22           THE COURT:  So counsel for the Government says

23  I've got to -- I've got to resolve a fact dispute in order

24  to resolve this, and you would say, "I'm not resolving a

25  fact dispute, I'm just -- I'm just taking note of the

 1  inconsistent allegations."

 2          MR. LOWELL:  Thank you.  I am so remiss not to

 3  have started with that after my grand jury point, and I

 4  appreciate you reminding me.

 5          THE COURT:  But that's the -- that's the argument

 6  you're making, right?

 7          MR. LOWELL:  The argument -- it is not a fact

 8  point.  They cannot have a pleading that they write that

 9  they allege willfulness equals A and B in 2020.

10          You don't need a jury.  The judge can do this.  If

11  A and B in 2020 is the same as A and B in 2017, the jury

12  doesn't have to parse that out.  They've already said it's

13  their theory.  You don't need a trial to do that.  You just

14  need to look at two clauses.

15          THE COURT:  Okay.  Thank you.

16          Okay.  Let's move on to the motion on Count 9, and

17  Count 9 is another selective or vindictive prosecution

18  motion.

19          Essentially, what Count 9 says is that Count 9 is

20  for tax year 2019.  And when the 2019 taxes were due in

21  2020, everybody got leniency because of COVID.  And so this

22  count should be -- is a example of a vindictive or selective

23  prosecution because nobody was charged with this offense in

24  a criminal context for failing to pay 2019 taxes.

25          Is that the gist of the motion?

1          MR. LOWELL:  That is the gist.

2          THE COURT:  And I guess the motion doesn't have

3    with it any evidence necessarily of others that were -- that

4    were treated differently than Mr. Biden.  But what you would

5    say is that the policies that you submitted of the IRS show

6    that no one was being prosecuted for that because of COVID.

7          MR. LOWELL:  Yeah.  We threw the gauntlet down and

8    said, "Show us somebody on the same facts with the

9    circumstances that occurred that is charged in the way that

10   Mr. Biden has been charged."

11         And because I don't have the ability to look at

12   their files and know, and in their opposition they didn't do

13   that, and so I can't prove a negative, but we have all the

14   policy and all the programs.

15         But we have one more thing, Judge, that happened

16   just this last week.

17         What causes somebody to be indicted in this period

18   of time?  Well, in this courthouse, you know.  Because last

19   Friday, the Government, including the Tax Division -- which

20   may include some of the same people; I'm not sure about

21   that -- brought a tax case against a person named

22   Milton Grimes, which is on the docket so the Court can take

23   notice of it.

24         What does it take to get somebody charged in this

25   period of time for the kinds of things they charged

1    Mr. Biden with?  He was an LA attorney.  He owed 2.4 million
2    owed, according to the indictment.  There were attempts to
3    have him pay for 13 years, since 2011.  The Government put
4    30 levies on him in those 13 years, and he still didn't.
5            And not only did he not do it, what he did do was
6    avoid those levies by a scheme of cashing cashier's checks
7    that the Government alleges to have been $16 million while
8    they're trying to collect.
9            And what did they do with this record brought in
10   the same courthouse?  They charged him with one felony and
11   four misdemeanors, and the indictment is eight pages long.
12   And guess what it doesn't say?
13           It doesn't say Mr. Grimes used the money he had
14   that he could have paid over the 13 years with a 16 million
15   of cashier's check to go and buy a house or go on a vacation
16   or fly a private plane or have anything about his ability to
17   pay.  You won't find it in a guy that's 2.4 million,
18   13 years, 30 levies, and basically evaded those levies by
19   additional criminal conduct.  One felony, four failures to
20   pay.  And now look at what they did to Mr. Biden.
21           So in Count 9, as well as the others, if you're
22   looking for disparate treatment, I can't find one that
23   matches what he did.  I can find a case where somebody did
24   15 times worse than what he did, and look what that person
25   is suffering versus Mr. Biden.

```
 1            THE COURT:  Okay.  Let me get back to the Count 9
 2   thing on the COVID relief programs.
 3            The Government's argument is that Mr. Biden wasn't
 4   eligible for those programs.  Any dispute with that?
 5            MR. LOWELL:  Well, I disagree that in the context
 6   of the policy as to whether you owe -- whether you have
 7   income of a certain amount, and whether or not you are owed
 8   a certain amount, that you would not have been qualified.
 9   And especially the one that we point out that occurs in
10   February of 2024, which I realize is after the charges are
11   brought.
12            But it bears on what you said before.  It is the
13   Government's policy, Government writ large, with the IRS
14   being the principal agency that deals with taxes, to decide
15   when you're going to go criminal.
16            And in their opposition they said, "Well, all
17   these programs only resolved and help people civilly."
18   Well, if the IRS and the Government thinks that this gets
19   you out of a civil jam, how do they justify bringing
20   criminal cases?
21            So in a way, you and they are right.  And in a
22   way, it still doesn't reflect that the policy is to get
23   payment.  The policy is to do it civilly.  The policy is to
24   have somebody have the time, especially after the COVID
25   extensions, to work it out.
```

```
 1              And, again, remember, this case is brought, and
 2    this is lost.  And I realize a trial that will never occur,
 3    I hope, that whether or not he had already paid his taxes
 4    may or may not be relevant to his intent and his state of
 5    mind.
 6              But unlike those other people, he paid all of his
 7    taxes with interest and penalty two years ago and filed all
 8    of his filings then, and they brought the charges anyway
 9    against the policy of the IRS to basically have people file
10    and pay, which he did.
11              THE COURT:  And I take your word for it, but
12    that's another example of a fact that's not in the record,
13    right, because it's not part of any filing or any
14    declaration or anything.  Just so you know, there's no
15    evidence in the record of that.
16              MR. LOWELL:  That's on me.  That's something that
17    the Government concedes and puts in their motion opposition,
18    and concedes that he paid his taxes, and paid and did his
19    filing, is something that I should have also declared and
20    put in his filings.
21              I hope the judge, Your Honor, will let me
22    supplement if that is an important reason.  And I'm not
23    saying it's not.  It just never would have dawned on me if
24    the Government concedes a point, then I need to prove it.
25              THE COURT:  Thank you.
```

```
 1            Let me turn to the Government on the Count 9
 2    issue, and essentially what your argument is, is the
 3    indictment kind of all goes together.  You're charging him
 4    with 2016, 2017, 2018.  And so because of that pattern,
 5    you're throwing in 2019 as well, and that's how the Court
 6    ought to look at it.
 7            MR. HINES:  Yes.
 8            THE COURT:  The Defendant's counterargument to
 9    that is that, "Hey, each count is its own separate thing,
10    and you can't mix it together like that."
11            What's your response to that?
12            MR. HINES:  I cannot identify any cases and
13    there's nothing in the defense counsel's brief that says
14    that the Court can look at counts and segregate them with a
15    myopic focus, like he suggests they can.
16            Instead, the standard is whether an individual is
17    similarly situated, and courts routinely analyze that
18    standard through the lens of what are the facts involved in
19    all of the criminal conduct, in all of the underlying
20    criminal conduct here.
21            So I don't think it's fair to sort of segregate
22    one count out, and, moreover, doing it on the basis of these
23    COVID programs, which they believe are amnesty programs.
24    The programs themselves don't even apply to the Defendant by
25    their very plain terms.
```

1          THE COURT:  And do you know anything about this

2     Grimes individual that Defendant brought up?

3          MR. HINES:  What I know is that this is just

4     another attempt to flip the standard articulated in

5     *Armstrong.*  It's the Defendant's burden to find someone who

6     is similarly situated but not charged.

7          And so in his brief, he continues to bring up

8     instances.  I can't find someone else who is similar to

9     Mr. Biden who was charged who is being treated differently,

10    but *Armstrong* has foreclosed that.  That's not -- that's not

11    the question here.

12         Mr. Grimes, I don't know all of the circumstances

13    of his arrest and conviction, but looking at someone who was

14    charged does not absolve him of that other burden.

15         THE COURT:  Any response, Mr. Lowell?

16         MR. LOWELL:  Only one, Your Honor.

17         How can a defense -- a defendant or a defense

18    attorney ever figure out a way to figure out who the

19    Government knew had the following elements, A, B, C, D, and

20    decided not to charge?

21         They don't file something with the newspapers or

22    in a docket that says, "Today, we investigated Sara Smith,

23    and Ms. Smith had the following things, but we decided not

24    to charge her."

25         So all we can do is say, "Show me a case where

1    it's a -- somebody who did what Mr. Biden did, who's

2    resolved his issues, is in the midst of these policy

3    issues."  We can do that, which we did.

4            And then we can say, how else do you look at what

5    it takes to have somebody -- when you're arguing that

6    somebody is being treated differently if you can't show when

7    they decided not to charge, and you have a glaring example

8    of what it takes to have somebody charged?  It is something

9    that the Court should pay attention to.

10           MR. HINES:  Can I just say one thing, Your Honor?

11           THE COURT:  Sure.

12           MR. HINES:  I don't disagree that it's a high

13   standard that the Defendant can't meet here, and it's a

14   challenging standard.  But that's because the Supreme Court

15   has made it that way in light of the fact that the claim

16   itself is looking at executive privilege, prosecutorial

17   decision-making, things that are squarely within the

18   province of the executive branch.  And so to get there,

19   that's why the Supreme Court has made it that significant

20   standard.

21           MR. LOWELL:  I promise this will be one sentence,

22   if you'll indulge me.

23           THE COURT:  Sure.

24           MR. LOWELL:  The statistics we put forward shows

25   millions of Americans file late, fail to pay, don't do it

1    when they're supposed to.  And in that millions, including

2    the policy we quoted, the IRS even says that this program

3    they're putting in effect says -- it's two sentences; it's

4    compound -- puts in that this is indicia of even tax

5    evasion.

6         So if you take the millions of Americans, there is

7    a presumption that in that millions of Americans that aren't

8    charged, there's my request that the Court make of the

9    Government, show us a case on all fours or even three out of

10   the fours in which the conduct is the same and you charged

11   criminally.

12        THE COURT:  Okay.  The last motion, on venue.

13        So there seems to be a -- or at least the Defense

14   is requesting that the Court take judicial notice of the

15   venue allegations made in Delaware, hold the Government to

16   those venue allegations here, and find that the venue

17   allegations made in the current indictment are -- should

18   be -- should result in Counts 1 to 4 being dismissed.

19        MR. LOWELL:  Indeed.  And there's more though,

20   Your Honor, and this is one where I hope the Court won't say

21   that I was remiss, because whatever I'm about to say, I

22   could not have known until I saw the Government's opposition

23   on Monday -- I mean, I'm sorry -- on the surreply on Monday,

24   in which they said Mr. Biden moved to California in 2018,

25   which is, to use their phrase, without any evidence of that.

1           So I need to bring to the Court's attention a

2      couple of things that are in their possession that they

3      actually provided us in discovery, which they did not put in

4      their surreply and I would like the Court to consider beyond

5      just their judicial statement in Delaware, which is pretty

6      dispositive in itself.

7           Because what it says is:  "During calendar year

8      2017, the Defendant, Hunter Biden, who was a resident of

9      D.C." -- in that pleading, it doesn't say, who was a

10     resident in D.C. and sometimes a resident in California.

11          Similarly, During the calendar year 2018, the

12     Defendant, Hunter Biden, who was a resident of D.C. -- it

13     doesn't say anything other than that.  So we start with that

14     premise.

15          In addition to which they point out, even today in

16     court, read his book, and they quote from his book when

17     convenient.  If you read his book and quote, he tells you

18     exactly when he moved to California, which was in the late

19     spring of 2019.  But put that aside.

20          THE COURT:  Let me just ask you this because this

21     is something that caught my eye and I wanted to ask you

22     about earlier.  But if we go back to -- all the way back to

23     the diversion agreement and we look at the statement of

24     facts attached to the diversion agreement, the statement of

25     facts attached to the diversion agreement says Biden moved

1  to California in the spring of 2018.

2         MR. LOWELL:  I didn't see that in the statement of

3  facts.  That's in the plea agreement?

4         THE COURT:  That's in the diversion agreement.

5         MR. LOWELL:  That's in the diversion agreement.

6         THE COURT:  Right.  And the diversion agreement,

7  as you're aware, requires Mr. Biden not to -- not to -- give

8  me one second.

9         Mr. Biden agrees that he shall not himself or

10  through any agent or representative make any statement in

11  litigation or otherwise repudiating or contradicting the

12  statement of facts, Attachment A.  The statement of facts in

13  Attachment A says he moved to California in the spring of

14  2018.

15         So I'm wondering about in this whole -- like, you

16  know, this whole mix of things -- this, the informations you

17  pointed me to in Delaware, what the -- what the indictment

18  says, it seems like this is going to be a question of fact

19  for the jury to decide, not a question of fact that the

20  judge ought to decide.

21         MR. LOWELL:  That would be the case, and I see

22  what you're suggesting.  I don't have a good answer for you

23  as to why that quote slipped through the cracks.

24         But can I tell you what the Government said right

25  after that?

1          THE COURT:  Sure.

2          MR. LOWELL:  So in their filing another pleading,

3    which they point to as their withdrawal of the agreements

4    that they say never occurred, what they say about that

5    period of time where he buys the gun is as follows.

6          He's charged as follows:  In Delaware, from on or

7    about October 12th, 2018, through October 23rd, 2018, where

8    to they allege he resides in that pleading?  In Delaware,

9    not in any other place.

10         But I want the Court -- the reason I don't think

11    this is a fact issue -- and in their surreply, they want to

12    make it that and kick it down the road.  I don't think --

13    and I will definitely do this in supplement.

14         Please consider the following things:

15         Consider for -- to begin with, in addition to what

16    I already said about their statement in their plea

17    agreement -- I understand you have a contradictory sentence

18    that they wrote in a different statement of facts.  I get

19    that.

20         THE COURT:  But, again, this is the diversion

21    agreement, which you're arguing Mr. Biden is complying with.

22         MR. LOWELL:  He has been complying with it.  So I

23    understand -- I understand the distinction you're making.

24    And I just need to tell you that I don't know, other than

25    pointing out what was simultaneously said, why that one

1    wasn't corrected at the time.

2            If you want to find out when somebody is a

3    resident, that doesn't require a jury, where would you look?

4    Among other things, you might look to the Franchise Tax

5    Board, and the Franchise Tax Board has criteria by which

6    somebody becomes a tax resident.  And in that regard, it

7    looks at seven or eight different factors.

8            If you look at those factors, driver's license,

9    et cetera, et cetera, none of them are in California.  All

10   of them are outside of California.  And the reason I'm

11   raising that is that two of those things are things the

12   Government gave us.  They gave us the lease agreement that

13   was put into effect in December of '17 through December of

14   2018, no matter what the diversion agreement statement of

15   facts say.

16           And what does it say in that lease agreement that

17   they gave us in discovery?  It says that he and his then

18   person he was dating and his children were residing in an

19   apartment in Delaware.

20           They gave us his driver's license.  His driver's

21   license is not California.  It's Delaware.  But they gave us

22   something much more significant.  They gave us, as they were

23   looking at a tax case, his tax returns.

24           And it's not just his federal tax returns.  On

25   February of 2020 --

1          THE COURT:  Let me just back you up there for a

2      second.

3              So the problem, though, is, again, we're getting

4      around to the Court having to determine whether or not he

5      resided in California or not, and I think that's a question

6      of fact that the Court's not allowed -- not unlike civil

7      proceedings, right?  We don't have a summary judgment

8      mechanism where we can -- you know, we can decide that no

9      reasonable jury could rule against you pretrial.  We don't

10     have that in the criminal context.

11             So I think I'm bound to -- even if the -- even if

12     you're telling me the evidence outweighs the statement in

13     the indictment, I don't think there's anything this Court

14     can do about that pretrial unless there is some estoppel.

15             And in looking at the estoppel, in order for there

16     to be judicial estoppel, courts look at making sure the

17     position is clearly inconsistent with a position taken

18     later.  That's one factor; whether the party has persuaded a

19     court to accept that fact; whether the parties seeking to

20     assert an inconsistent position would derive an unfair

21     advantage; and whether the inconsistency amounts to knowing

22     misrepresentation of fraud on the court.

23             Well, here, in applying that test, the positions

24     are not necessarily absolutely inconsistent.  Just because

25     he resided in Washington doesn't mean he couldn't have also

1    resided during that calendar year in California.  No court

2    was convinced of that position.  So it wasn't arguably

3    before a court, and the court accepted it, because those

4    informations went away.  They weren't acted on.

5            I don't think there's any evidence that -- that

6    this was -- there was a fraud on the court with respect to

7    this.  So I don't think judicial estoppel applies.  And

8    because of that, I think I'm hamstrung in making any ruling

9    on venue because it requires a fact to be resolved.

10           MR. LOWELL:  If I did not point the Court to

11   what -- the phrase "fraud on the court" seems extreme to me.

12   So if that's the high standard, then you need to consider

13   the next thing I will tell Your Honor.

14           THE COURT:  Okay.

15           MR. LOWELL:  If you're doing a tax investigation,

16   you look to somebody's returns.  If you look to somebody's

17   returns, which they did, you're going to look at the federal

18   returns, but they also provided the state returns, and the

19   state returns are pretty clear that they know what I'm about

20   to say.

21           I mean, I don't know that they know it.  I don't

22   know why they would have given it to us if they haven't

23   thought about it.  So that's an interesting question.

24           In 2018 and 2017 -- but we're talking about 2018

25   for this purpose -- he files the federal tax later on, 2020,

 1  and he files a number of states.  He files in California as

 2  a nonresident.  It's a record that you could find that I

 3  could supplement by way of a declaration that's a document

 4  that's official, et cetera.  And he pays $900 for that.  He

 5  files in the District of Columbia for a resident.  He pays

 6  133,000 and change.  They have that document.  They gave it

 7  to us.

 8        Now, you're right that if I can't convince the

 9  Court that that is in the same nature, then I want the Court

10  to consider this.

11        We're right.  And if there's no vehicle, as you

12  say, generally, other than looking at their judicial

13  statement of where he was, and we are going to have to try

14  that, what an unfairness to basically get that far for those

15  counts and only then say, "Oops, I think we should have

16  tried this case elsewhere."

17        And, Your Honor, let's be clear why they did this.

18  And I'm not calling them a name when I say this.  They

19  wanted felony counts after the deal fell apart.  That's what

20  was going on.

21        Those felony counts could not be brought in the

22  District of Columbia.  They could not be brought anyplace

23  other than where he filed his taxes that they alleged to

24  have false statements.  That had to be here.  And so,

25  consequently, they found a way to try to get the others here

1    as the tail with the dog coming.

2            THE COURT:  Counts 1 through 4 that are the

3    subject to this motion are misdemeanor counts.

4            MR. LOWELL:  Yes.

5            THE COURT:  And they're not the felony counts.

6            MR. LOWELL:  No, no.  But the felony counts that

7    they want -- but they couldn't do that.  You see, they

8    needed to do this the right way.  The right way is to bring

9    1 through 4 in D.C. or wherever they think, and if they

10   thought there was an evasion to bring it here.  But I

11   understand Your Honor's saying that where does it get to be

12   a jury question?

13           I think it's not a jury question when, for

14   example, just this week, the Congress, that wonderful

15   institution that keeps making our lives a little harder in

16   this case, released two transcripts, one of Mr. Weiss, and

17   one of assistant -- I'm sorry -- U.S. Attorney Matthew

18   Graves of D.C.

19           And it's important to point out what we just

20   learned this week.  And, again, I would have submitted it if

21   I had known, but Mr. Graves in his testimony in front of

22   Congress, says, "But clearly Mr. Weiss called because he

23   wanted to bring a case in the District of Columbia."

24           And Graves says, "That's right."

25           And then he also states, "So what else did he say

1    about whether he had the authority?"

2          And Mr. Graves says, "You're doing an

3    investigation that you say you have realized you have to

4    bring the charges in D.C."

5          Now, why do I have to wait until a jury -- gosh

6    knows, we have so many motions that won't get us there -- in

7    order to hear the same admission, it's an admission of the

8    Government when they say that.

9          So if Mr. Weiss is telling Mr. Graves that he

10   can't bring this case anywhere but D.C., and we have the tax

11   returns that show that he's a resident of D.C. and a

12   nonresident in California, and we have the statement he made

13   in Delaware that he resided, why isn't that enough to

14   prevent the unfairness that comes for bringing somebody to

15   trial and hoping that it all gets worked out after?

16         THE COURT:  And, again, unfortunately, the Court

17   doesn't have the ability to determine facts in a criminal

18   case like I would, for example, on a summary judgment motion

19   in a -- in a civil case, and I think that -- that's the rub

20   here.

21         MR. LOWELL:  I think -- sorry.

22         THE COURT:  But let me turn to the Government for

23   a response on this motion.

24         MR. LOWELL:  And I won't even respond, but one

25   point about that.

1          When the Government makes a filing in court -- and

2     we've said that, that becomes this judicial event of where

3     he resides -- the only way to get around it, Judge, is to

4     say, "Well, it's not mutually exclusive when they said that,

5     but they didn't say 'and also.'"  Maybe they meant and also

6     some other state.

7          THE COURT:  But it could be the case that they

8     were just wrong, couldn't it?  And that the Government filed

9     an Information in Delaware saying that the Defendant resided

10    in Washington in 2016 or, let's say, in 2018.  And then they

11    realize at some point after that indictment -- after that

12    Information was dismissed, that they were wrong, couldn't

13    they allege here that he resided in California?  Would there

14    be anything wrong with that?

15         MR. LOWELL:  They could change their view and undo

16    the bell they rang by alleging it was elsewhere in an

17    important document.  Okay.  Fine.  And then, unfortunately,

18    if we had to go to trial, their admissions, including what I

19    said about what Mr. Graves said Mr. Weiss said, and in their

20    possession knowing that he files a nonresident tax return

21    for being someplace other than D.C., then they'd have to say

22    to the jury each one of those was a mistake, and I think

23    that's an unfair thing to require.

24         THE COURT:  Thank you.

25         Okay.  Let me hear from the Government on this

1    motion, and we've got a promise that there will be no reply

2    from Mr. Lowell.

3              MR. LOWELL:  Well, if he doesn't cover a new

4    thing.

5              MR. HINES:  And I'll go all afternoon.

6              I've got just a couple of points, Your Honor.

7              First is just a factual inaccuracy slip of the

8    tongue, perhaps.  Mr. Lowell said that the gun indictment in

9    Delaware alleged that Mr. Biden lived in Delaware.  It

10   doesn't allege that he lived in Delaware.  It alleges that

11   the conduct occurred in the District of Delaware, which, in

12   any event, is not a fact that supports their argument that

13   the prosecution knows that he lived in the District of

14   Columbia.

15             And I want to go to that to start, because what I

16   think you can see across all of these motions, all nine

17   motions that they filed, is that even where it's unnecessary

18   to allege, you know, discrimination and unethical behavior

19   on behalf of the prosecutors, they nonetheless do it.

20             And so what we responded to in this series of

21   motions was, when Mr. Lowell argued we knew that Mr. Biden

22   lived in the District of Columbia as of the summer of 2019,

23   that we were presenting a false indictment to a grand jury

24   in bad faith.  But as the Court has pointed out, there is a

25   multitude of facts that can go in either direction.

```
 1           This is really a question for a jury to decide,

 2   ultimately.  Was he -- should we believe his own words, that

 3   he showed and manifested an intent to live in California?

 4   Should we believe what Mr. Lowell points out is something

 5   that his accountants put on his tax returns that shows he

 6   was in the District of Columbia?

 7           So it is -- it is purely a jury question, and I

 8   just think -- I think even in this motion -- I just want to

 9   point out, it's completely unnecessary that the Defendant

10   went to that level.  They still could have made their point.

11           Furthermore, what I'll say is -- and I think I'll

12   end with this:  The Court is right to point out -- and this

13   is a really good catch -- in the diversion agreement, the

14   Defendant has conceded that he moved to California in the

15   spring of 2018.

16           What that is evidence of is evidence that the

17   Defendant does not believe that the diversion agreement is

18   in effect, because he would not have actually stood here

19   through his counsel, repudiated that statement, and breached

20   the agreement, had it been in effect.

21           THE COURT:  Thank you.

22           Do you want to respond?  Briefly.

23           MR. LOWELL:  I feel bad because I said I wouldn't,

24   but he did say something that I didn't address.

25           THE COURT:  Sure.
```

1    MR. LOWELL:  And then I'd like 30 seconds for a
2    conclusion.
3    THE COURT:  Sure.
4    MR. LOWELL:  Thank you.  You've been very
5    indulgent, and I appreciate it.
6         I don't know what, quote, moved means, but you
7    know that's not the operative phrase.  You can move, but it
8    not still be your intention to stay, or it might not be your
9    legal residence for taxes.  So we'll have to explore,
10   perhaps, someday -- I hope not -- what that was meaning.
11        And, lastly, we have not said -- other than when
12   they give me something that reflects that they know better,
13   when we point it out to the Court that they know better.
14   When they give me a document that shows that he files a
15   resident tax in someplace and a nonresident in that place,
16   it reflects whether when they said in the court in Delaware
17   he resided in D.C., that wasn't a mistake.  That wasn't a
18   mistake.
19        So I made my two points about that.
20        And if the Court will indulge me, I'm ready to
21   conclude.
22        THE COURT:  Sure.  And just before we do, I thank
23   both parties for the briefing.  It was all very helpful.
24   Thank you for the arguments.
25        And I will say the briefing -- you know, as you

1    probably know, I mean, being in this business for a while,

2    you see a lot of, the other side's horrible because they did

3    this, and that back and forth, and that just -- we just

4    ignore all that.

5            So to the extent anybody's thinking that we're

6    taking any of that to heart, we're just looking at the facts

7    and the law, and all the sort of aspersions on each other

8    just kind of roll past us.

9            MR. LOWELL:  And if the Court and all of you that

10   are looking at these motions will look past the aspersions

11   that the Government has made against me, and my team, I'll

12   consider that a draw.

13           THE COURT:  We'll overlook all the aspersions

14   against anyone, even the Court.

15           MR. LOWELL:  I haven't done that yet, I hope.

16           So in conclusion, Judge, I started, however many

17   hours ago by asking Your Honor to not basically start with

18   what often is the case, and you take nine or eight, in this

19   case, different motions, and you figure out each one on its

20   own, and you will need to do that.

21           But if sometimes the eight means something, you

22   step back and look.  I will obviously point out that I

23   argued things like venue or statute of limitations or

24   duplicity because they need to be preserved.

25           But the first two motions we filed on the

1    existence of the agreement and any condition being one of

2    performance, not precedent, for formation or this

3    ineffective or inappropriate or improper appointment

4    resolves all the other motions, and you don't have to --

5    have to rule on those as well.

6          We do have what I thought was the case that -- we

7    have a lot of things for the Court to consider.  So I leave

8    you with this:  If we're right -- especially on count -- on

9    Motions 1 and 2, putting aside selective or vindictive -- if

10   we're right, and you disagree and you're wrong, then what

11   happens?

12         Mr. Biden has to undergo trials in two different

13   jurisdictions with multiple penalties that a Court of

14   Appeals might decide should never have happened.  That's a

15   lot of prejudice.

16         If we're right, and you agree that we're right,

17   the Government doesn't have that prejudice.  They just get

18   to find out whether they were right.  It's not like this

19   case has been languishing for years.  This case has been

20   languishing for months.

21         And so consequently, the Court should also look at

22   what the ramifications are in case in these motions which

23   are not flimsy.  You know, Motion 1, Motion 2, they're not

24   flimsy.  They're substantive.  They have things to think

25   about that are unusual.

```
 1              And if we're right, then Mr. Biden shouldn't have

 2    to undergo that prejudice, and it may be that he doesn't

 3    because, as you pointed out last time we were here, some of

 4    these elements may give us grounds to ask for that review

 5    later or before we have to get to the trial date.  But I

 6    wanted the Court to be left with that notion of weighing, if

 7    we're right, why should we not have to be able to vindicate

 8    that right away?  And we would be, because I am sure the

 9    Government will not fail to appeal something that they think

10    is appealable, as we wouldn't.

11              But I wanted to leave you with that.

12              THE COURT:  Thank you.

13              I guess, do you want to say a few sentences, or

14    are you done?

15              MR. HINES:  On this, or in general?

16              THE COURT:  Just in general, wrapping up.  You

17    don't -- you don't need to.

18              MR. HINES:  I just have two things, Your Honor.

19              I think, just for clarity, my recollection -- I

20    could be mistaken -- was Your Honor directed the parties to

21    the extent there was any consideration of an interlocutory

22    appeal, to put that in their briefing?

23              THE COURT:  That's correct.

24              MR. HINES:  That wasn't done by the Defense in

25    this case, and I wanted to alert the Court that in the last
```

1    status conference we had in the gun case, it was my

2    understanding, based on the comments of counsel, that they

3    understand there's no basis for an interlocutory appeal here

4    as well.

5              MR. LOWELL:  I don't believe that to be the case,

6    Your Honor.

7              THE COURT:  I don't -- I don't -- I don't hear

8    counsel is conceding his ability to argue for interlocutory

9    appeal.  What I hear counsel is saying if I'm -- if I'm kind

10   of on the fence, I should remember that if I rule in his

11   favor, the Government will immediately appeal and has that

12   appeal right.  If I rule in your favor, he's going to sit

13   through a trial.

14             MR. HINES:  Correct.  And our position is that

15   there is no immediate appellate right for the Defendant.

16             The second thing I wanted to raise with Your Honor

17   is, at the last status conference with the court in

18   Delaware, Judge Noreika indicated that she would like to set

19   the trial date in the gun case for June 3rd.

20             We alerted her to the fact that we have our

21   pretrial conference here on June 3rd, and we wouldn't be

22   able to start that Monday.

23             She's asked us to ask the Court to consider

24   whether the pretrial conference that is currently scheduled

25   for June 3rd could be a different date.  And our proposal

 1   would be that it be sometime the preceding week, if that's

 2   amenable to the Court.  I believe that's the week of

 3   Memorial Day.  That's the Monday.  So it would be between

 4   May 28th and May 31st.

 5           THE COURT:  Sure.  I mean the Court could do --

 6   let's see.  Hang on one second.

 7           THE CLERK:  We could do a Wednesday, May 29th.

 8           THE COURT:  Yeah.  Let's do Wednesday, May 29th.

 9           Does that work for Mr. Lowell?

10           MR. LOWELL:  Indulge me a moment, Your Honor.

11           MR. HINES:  That works for the Government,

12   Your Honor.

13           MR. LOWELL:  What I'm looking for, Your Honor --

14   sorry.  What I'm looking for, Your Honor, is to have to get

15   here from the East Coast and try to figure out when that

16   could happen.  What time of day?  And I have something to

17   say about that in a second.

18           THE COURT:  It will be 1 o'clock in the afternoon.

19           MR. LOWELL:  Could we put that on?  I think I

20   could make arrangements.

21           THE COURT:  Okay.  1 o'clock on May 29th.

22           MR. LOWELL:  Okay.  But I understand that what

23   Your Honor's doing is just guarding Your Honor's calendar

24   without it already having decided the issues that we took

25   hours and hours to be able to brief and argue to Your Honor.

1     I also will point out that when we spoke to

2  Judge Noreika in Delaware, we also pointed out the scrunch

3  of time between wherever we are and two trials in two

4  different states to occur within two weeks of each other,

5  and something might have to give.

6     I did not commit that we could do her trial on the

7  date she said.  I said I needed to find out what's happening

8  here.  I may be addressing that with Your Honor or with her.

9     We want to be able to, if it ever got that far,

10 make sure that we are effective and doing what our client

11 needs.  But I will make this happen in the -- I don't

12 know -- likely unpossible event that we need a pretrial in

13 May.

14     Having said that, I appreciate what you said.

15     And one last thing, Judge.  I couldn't possibly

16 know whether or not we have the grounds for an interlocutory

17 appeal until I know what you rule and why you rule, for

18 example, separation of powers.

19     So if I didn't say that clearly before, I want to

20 make sure that I'm not saying something that everybody

21 misunderstands.  You may do something that is not.  And then

22 I'm stuck, or you may do something, in your opinion, against

23 us that is, but I think we'll cross that bridge when we get

24 to it.

25     THE COURT:  Anything else from the Government?

154

```
 1          MR. WISE:  Just had a question, Your Honor.  I
 2   know we're scheduled for June 20th, which is a Thursday.
 3   Would Your Honor -- to start, would Your Honor sit that
 4   Friday?  And then I had just a question about the July 4th
 5   week, given the holiday.  July 4th is also a Thursday.  And
 6   so I don't -- I don't know if Your Honor had thought about
 7   whether the jury would be off just that Thursday and Friday.
 8          The other thing I understand, from talking to
 9   folks here, is that Mondays are often used for, I think, law
10   and motion day, is the phrase I've heard.  So I wasn't sure
11   if that was going to be at play here either.
12          THE COURT:  Yeah.  I think we will be in jury
13   selection for a while.  So I would imagine we would go
14   Thursday and Friday, and then we may -- we may be dark
15   Monday, and we'll get -- we'll decide as we get closer to
16   it, depending on what the -- what the Court's calendar is,
17   but we'll definitely be going Thursday and Friday.
18          MR. HINES:  Okay.
19          MR. WISE:  Okay.
20          THE COURT:  Yeah.  And we may not pick up again
21   until Tuesday.
22          MR. WISE:  Okay.
23          MR. LOWELL:  It's my nature to say we might, and
24   that's all I have to say about that.
25          THE COURT:  Okay.  Thank you, Counsel.  I
```

1    appreciate the arguments.  I appreciate all the -- all the

2    good, hard legal work here.  And we'll talk to you soon.

3    We'll try to get an order out.  I think I said before we

4    would get it out by the 17th of April.  So we should have it

5    by then.

6            We'll get it out by the 17th of April, and then

7    we'll have the conference scheduled in May.  But if we need

8    to, we could schedule a status conference before then.

9            Thank you very much.

10           MR. WISE:  Thank you, Your Honor.

11           THE CLERK:  All rise.  This Court is adjourned.

12           (At 4:15 p.m. proceedings were adjourned.)

13                           --oOo--

14                         CERTIFICATE

15           I hereby certify that pursuant to Section 753,

16    Title 28, United States Code, the foregoing is a true and

17    correct transcript of the stenographically reported

18    proceedings held in the above-entitled matter and that the

19    transcript page format is in conformance with the

20    regulations of the Judicial Conference of the United States.

21

22    Date:  April 17, 2024

23

24                           /S/____WIL S. WILCOX_____
                                  U.S. COURT REPORTER
                                    CSR NO. 9178
25