86 Geo. L.J. 2133

Georgetown Law Journal
July, 1998

Symposium: The Independent Counsel Act: From Watergate to Whitewater and Beyond
Contribution
Brett M. Kavanaugh [a1]

Copyright (c) 1998 by the Georgetown Law Journal Association; Brett M. Kavanaugh

# THE PRESIDENT AND THE INDEPENDENT COUNSEL

## TABLE OF CONTENTS

| | | |
|---|---|---|
| INTRODUCTION | | 2134 |
| I. | BACKGROUND | 2138 |
| | A. THE CURRENT LEGAL SCHEME | 2138 |
| | 1. The Policy Justification for a Special Counsel | 2138 |
| | 2. Two Statutory Mechanisms for Appointment of Special Counsels | 2139 |
| | B. ARE OUTSIDE FEDERAL PROSECUTORS EVER NECESSARY? | 2140 |
| | 1. An Illusory Debate | 2140 |
| | 2. The Deeply Rooted American Tradition of Appointing Outside Federal Prosecutors | 2142 |
| | 3. Outside Federal Prosecutors are Necessary in Some Cases | 2145 |
| II. | IMPROVING THE SYSTEM | 2145 |
| | A. APPOINTMENT AND REMOVAL OF THE SPECIAL COUNSEL | 2146 |
| | 1. Appointment of the Special Counsel | 2146 |
| | 2. Removal of the Special Counsel | 2151 |
| | B. THE CIRCUMSTANCES UNDER WHICH A SPECIAL COUNSEL SHOULD BE APPOINTED | 2152 |
| | C. JURISDICTION | 2153 |
| | D. REPORTS | 2155 |
| | E. INVESTIGATION AND PROSECUTION OF THE PRESIDENT | 2157 |
| | F. THE PRESIDENT'S PRIVILEGES | 2161 |
| | 1. Non-Constitutional Executive Privileges | 2163 |
| | 2. Constitutionally Based Executive Privileges | 2166 |
| | 3. The Relevance of *Nixon* to a Claim of Governmental Attorney-Client or Work Product Privilege | 2172 |
| | 4. The Policy of Executive Privileges | 2173 |
| | CONCLUSION | 2177 |

*2134 INTRODUCTION

Officials in the executive branch, including the President and the Attorney General, have an incentive not to find criminal wrongdoing on the part of high-level executive branch officials. A finding that such officials committed criminal wrongdoing has a negative, sometimes debilitating, impact on the President's public approval and his credibility with Congress—and thus ultimately redounds to the detriment of his political party and the social, economic, military, and

diplomatic policies that the President, the Attorney General, and other high-ranking members of the Justice Department champion. [1] For those reasons, the criminal investigation and prosecution of executive branch officials by the Justice Department poses an actual conflict of interest, as well as the appearance thereof.

In addition, when the law of executive privilege is unclear or involves the application of a balancing test, the Attorney General labors under a further conflict of interest. When the Justice Department seeks access to internal executive branch communications, the Attorney General simultaneously must perform two potentially contradictory functions. First, she must act as the chief legal advisor to the executive branch (a role in which she generally would seek to protect the confidentiality of executive branch communications). Second, she must serve as a prosecutor (a role in which she generally would seek to cabin privileges so as to secure relevant evidence). As former Watergate prosecutor Archibald Cox recognized and as Attorney General Reno's role in the privilege disputes between the President and the Whitewater Independent Counsel has revealed, those dual roles place the Attorney General in a difficult, if not impossible, position in determining when the President's assertion of privileges should be challenged. [2] This conflict alone necessitates an outside prosecutor **\*2135** (unless the Attorney General announces at the outset of the investigation that she will not accede to any executive privilege claim other than national security). Otherwise, the public cannot be sure that the Attorney General has not improperly sacrificed law enforcement to the President's assertion of executive privilege.

The conflicts of interest under which the Attorney General labors in the investigation and prosecution of executive branch officials, particularly high-level executive branch officials, historically have necessitated a statutory mechanism for the appointment of some kind of outside prosecutor for certain sensitive investigations and cases. As the Watergate Special Prosecution Task Force stated in its report, "the Justice Department has difficulty investigating and prosecuting high officials," and "an independent prosecutor is freer to act according to politically neutral principles of fairness and justice." [3] This article agrees that *some* mechanism for the appointment of an outside prosecutor is necessary in *some* cases.

Nonetheless, Congress can improve the current "independent counsel" system, which was established by the Ethics in Government Act of 1978. [4] Several problems have been identified with the current system, including the following: (1) the appointment mechanism, by attempting to specify situations where an independent counsel is necessary, requires the President and Attorney General to *seek* appointment of an independent counsel in cases where it is not warranted and permits the President and Attorney General to *avoid* appointment of an independent counsel in cases where it is warranted; (2) the appointment and removal provisions (which do not involve the President) are contrary to our constitutional system of separation of powers and, both in theory and perception, lead to unaccountable independent counsels; (3) the investigations last too long; (4) an independent counsel can investigate matters beyond the initial grant of jurisdiction; and (5) independent counsel investigations have become "politicized" (a commonly used but rarely defined term).

This article suggests that those problems—to the extent they are unique to an independent counsel and do not apply to federal white-collar investigations more generally—result primarily from the uneasy relationship between the President and the independent counsel that the independent counsel statute creates. This article advances several proposals that would clarify the President's role in independent counsel investigations, thereby reducing the number of investigations and expediting those that are necessary. Each of these proposals stands on its own; the adoption of any one proposal does not necessitate or depend upon the adoption of any other.

*First*, Congress should change the provision for appointing an independent **\*2136** counsel. A "special counsel" [5] should be appointed in the manner constitutionally mandated for the appointment of other high-level executive branch officials: nomination by the President and confirmation by the Senate. Currently, an independent counsel is appointed by a three-judge panel selected by the Chief Justice of the United States. Although this unusual procedure survived constitutional scrutiny in *Morrison v. Olson*, [6] it is unwise to assign a small panel of federal judges to select the special counsel because the

prosecutor, no matter how qualified, will lack the accountability and the instant credibility that comes from presidential appointment and Senate confirmation. Appointment by the President, together with confirmation by the Senate, would provide greater public credibility and moral authority to the independent counsel and would dramatically diminish the ability of a President and his surrogates, both in Congress and elsewhere, to attack the independent counsel as "politically motivated." In addition, any supposed concerns about "accountability" would be alleviated if the independent counsel were appointed (and removable) in the same manner as other high-level executive branch officials.

*Second*, the President should have absolute discretion (necessarily influenced, of course, by congressional and public opinion) whether and when to appoint an independent counsel. The current statute, by attempting to specify in minute detail the precise situations requiring an independent counsel, is largely overinclusive, thus producing too many investigations. At the same time, the statute is underinclusive because it allows an Attorney General to use the law as a *shield* in situations that by any ordinary measure would warrant the appointment of a special counsel.

For example, Attorney General Janet Reno appointed an independent counsel to investigate whether Secretary of Agriculture Michael Espy accepted illegal gratuities—a very important investigation, but one that Congress and the people *might* have entrusted to the Justice Department. [7] On the other hand, the Attorney General has refused to appoint an independent counsel for the campaign fund-raising matter based on a narrow analysis of the independent counsel statute's triggering mechanism. That approach ignores the broader question that *should* be the issue (and historically has been the issue): At the end of the day, will the American people and the Congress have confidence in the credibility of the Justice Department investigation if it culminates in a no-prosecution decision against those high-level executive branch officials under investigation?

*Third*, with respect to an independent counsel's jurisdiction, Congress should **\*2137** codify and expand upon the Eighth Circuit's 1996 decision in *United States v. Tucker* [8] to ensure that the President and the Attorney General, rather than any court, define and monitor the independent counsel's jurisdiction. Such a clarification would place sole responsibility for the independent counsel's jurisdiction on these publicly accountable officials. Congress will exercise sufficient oversight to deter the President and Attorney General from illegitimately restricting the independent counsel's jurisdiction. This change would greatly expedite special counsel investigations. Jurisdictional challenges have caused severe delays. For example, a specious challenge to the Whitewater Independent Counsel's jurisdiction delayed a trial of Arkansas Governor Jim Guy Tucker for over two and one-half years before he and his codefendants finally pled guilty.

*Fourth*, Congress should eliminate the statutory reporting requirement. The reporting requirement adds great time and expense to independent counsel investigations, and the reports are inevitably viewed as political documents. The ordinary rules of prosecutorial secrecy should apply to evidence gathered during an independent counsel investigation, except that the special counsel should be authorized to provide the President and the House Judiciary Committee with a classified report of any evidence regarding possible misconduct by current officers of the executive branch (including the President) that might dictate removal by the President or impeachment by the Congress.

*Fifth*, Congress can answer a question that the Constitution does not explicitly address, but that can greatly influence independent counsel investigations: Is the President of the United States subject to criminal indictment while he serves in office? Congress should establish that the President can be indicted only after he leaves office voluntarily or is impeached by the House of Representatives and convicted and removed by the Senate. Removal of the President is a process inextricably intertwined with its seismic political effects. Any investigation that might conceivably result in the removal of the President cannot be separated from the dramatic and drastic consequences that would ensue. This threat inevitably causes the President to treat the special counsel as a dangerous adversary instead of as a federal prosecutor seeking to root out criminality.

Whether the Constitution *allows* indictment of a sitting President is debatable (thus, Congress would not have the authority to establish definitively that a sitting President *is* subject to indictment). Removing that uncertainty by

providing that the President is *not* subject to indictment would expedite investigations in which the President is involved (Watergate, Iran-Contra, and Whitewater) *and* would ensure that the ultimate judgment on the President's conduct (inevitably wrapped up in its political effects) is made where all great national political judgments ultimately must be made—in the Congress of the United States.

*Sixth*, Congress should codify the current law of executive privilege available in criminal litigation to the effect that the President may not maintain any executive privilege, other than a national security privilege, in response to a **\*2138** grand jury or criminal trial subpoena sought by the United States. That rule strikes the appropriate balance between the need of federal law enforcement to conduct a thorough investigation and the need of the President for confidential discussions and advice. Codifying the law of executive privilege in this manner would expedite investigations of executive branch officials and ensure that such investigations are thorough and effective (at least, unless the courts were to reverse course and fashion a broader privilege as a matter of *constitutional* law).

These six proposals together would reduce the number of special counsel investigations and expedite those investigations that do occur. The proposals would enhance the public credibility of special counsel investigations, reduce the inherent tension between the President and the special counsel, and better enable a special counsel to conduct a thorough and effective law enforcement investigation of executive branch wrongdoing. Finally, the changes would ensure that a specific entity (Congress) is directly and solely responsible for overseeing the conduct of the President of the United States and determining, in the first instance, whether that conduct warrants a public sanction.

## I. BACKGROUND

### A. THE CURRENT LEGAL SCHEME

#### 1. The Policy Justification for a Special Counsel

The theory behind the appointment of an outside federal prosecutor is that the Justice Department cannot be trusted to investigate an executive branch official as thoroughly as the Justice Department would investigate some other similarly situated person.[9] Regardless whether the Justice Department is *actually* capable of putting political self-interest aside and conducting a thorough investigation, the problem remains. In cases in which charges are *not* brought, Congress and the public will question whether the investigation has been as thorough and aggressive as it would have been absent the political incentive not to indict. There is no real or meaningful check to deter an under-aggressive or white-washed Justice Department investigation of executive branch officials or their associates.

On the flip side, however, contrary to the claims of some critics, *there is a real check against an over-aggressive special prosecutor*—the same check that deters an over-aggressive Justice Department prosecutor. It is the jury. As Professor Katy Harriger correctly noted:

> Prosecutors, both independent and regular, must have sufficient evidence to **\*2139** convince a jury that a crime has been committed. One clear constraint on independent counsel … is one that is on all prosecutors. They must ask themselves whether their case will pass the "smell test" in front of a jury. Will they find criminal action beyond a reasonable doubt? There is virtually no incentive for any prosecutor, independent or otherwise, to pursue a criminal case that fails that test. *To argue then that there are no checks on the independent counsel is, to say the least, disingenuous for it ignores the fact that independent counsel do not operate outside the established legal system in their pursuit of criminal cases.* They cannot escape the requirement that their case against an individual be reviewed by an impartial judge and a jury of his peers.[10]

Indeed, an acquittal is far more damaging for an independent counsel (whose record will be judged on, at most, a handful of prosecuted cases) than for the Justice Department prosecutor who will handle dozens if not hundreds of cases in his career and for whom one acquittal is ordinarily not a significant blemish.

### 2. Two Statutory Mechanisms for Appointment of Special Counsels

Commentators do not always appreciate that current federal law provides *two* different mechanisms for appointment of special counsel to investigate and prosecute a particular matter. First, under the discretionary "special attorney" provisions, the Attorney General may directly select a special attorney to conduct a particular investigation where she deems it appropriate. [11] Consistent with this authority, Attorneys General throughout our history have looked outside the Justice Department to appoint special attorneys to handle particular high-profile or politically charged cases. [12] For example, the Watergate special prosecutors and the first Whitewater outside counsel were appointed directly by the Attorney General under this authority.

Second, under §§ 591-599 of Title 28, the mandatory "independent counsel" statute, Congress has specified a number of covered persons as to whom the Attorney General must seek the appointment of an independent counsel if, after a preliminary investigation, she finds "reasonable grounds to believe that further investigation is warranted." [13] The Attorney General does not select an independent counsel herself, but instead applies to a panel of three judges (the "Special Division") preselected by the Chief Justice of the United States. [14] The panel of judges then selects an independent counsel. [15] The independent counsel's **\*2140** jurisdiction is technically defined by the Special Division, [16] although the Special Division defines it in the manner requested by the Attorney General. [17] The independent counsel is to conduct all investigations and prosecutions "in the name of the United States," [18] and is to conclude his investigation by notifying the Special Division and filing a report on "the work of the independent counsel." [19] The independent counsel may not expand his jurisdiction to cover unrelated matters except upon application to the Attorney General and approval by the Special Division. [20] Pursuant to this statute, nearly twenty independent counsel have served since 1978, most notably in the Iran-Contra and Whitewater matters.

There are two important differences between the *discretionary* "special attorney" statute and the *mandatory* "independent counsel" statute. First, the special attorney is appointed by the Attorney General, not by a panel of judges. (Neither system involves the Senate.) Second, the Attorney General possesses unfettered discretion whether to seek a special attorney for a particular case, whereas the independent counsel statute requires that the Attorney General seek an independent counsel in certain cases.

### B. ARE OUTSIDE FEDERAL PROSECUTORS EVER NECESSARY?

### 1. An Illusory Debate

Let's briefly put aside the questions of *who should appoint* the outside federal prosecutor as well as the question of *under what circumstances* the outside prosecutor should be appointed. The initial, fundamental issue is whether Congress should provide *any* statutory mechanism for authorizing the selection of persons outside the Justice Department to lead particular federal criminal investigations and prosecutions. Indeed, the rhetoric spewed and the ink spilled over the independent counsel law often frame the question in these terms—namely, whether an outside prosecutor is *ever* necessary for the investigation of executive branch officials.

This supposed debate is, however, entirely illusory. Even the most severe **\*2141** critics of the current independent counsel statute concede that a prosecutor appointed from outside the Justice Department is necessary *in some cases.*

For example, Professor Julie O'Sullivan has criticized many aspects of the mandatory independent counsel regime. She nonetheless concedes that "[a]s in the past, in extraordinary cases where the appearance or reality of a genuine conflict of interest requires that a matter be referred to someone outside the DOJ, that referral should be made to a regulatory IC" appointed from outside the Justice Department by the Attorney General. [21]  In other words, Professor O'Sullivan agrees that there must be *some* legal mechanism for appointing an outside special counsel to handle high-profile investigations of executive branch officials.

Similarly, former Justice Department official Terry Eastland has criticized the independent counsel statute in a lengthy analysis of the history and policy of special prosecutors. But Mr. Eastland, too, believes that "[i]nsofar as criminal investigation and prosecution goes, Presidents or their Attorneys General could exercise their discretionary authority in cases of conflict of interest and name Watergate-type prosecutors." [22]

Theodore Olson, head of the Office of Legal Counsel under President Reagan, has criticized the statute but also has stated that "there is nothing wrong with the idea of going outside the Department of Justice to pick someone special to pursue an investigation because public integrity requires that." [23]  Mr. Olson noted that Attorney General William Barr, for example, had selected special prosecutors from outside the Justice Department to ensure that the lead prosecutor was not a "permanent direct subordinate of the Attorney General or the President." [24]

The Bush Administration lobbied against the independent counsel statute in 1992. However, the Deputy Attorney General conceded that "we all recognize that there is a need" for the Attorney General to appoint an outside counsel on occasion, and explained that Attorney General Barr "has on two occasions availed himself of the statute [28 U.S.C. § 515] that allows him to appoint an outside authority as a special counsel." [25]

Finally, the most famous critic of the independent counsel statute is Justice Antonin Scalia. His dissent in *Morrison v. Olson,* [26]  the decision upholding the constitutionality of the independent counsel statute, is largely an analysis of the Constitution's separation of powers, including the requirements of the Appointments Clause and the Court's jurisprudence regarding the removal power of the **\*2142** President. Notwithstanding the length and force of his dissent, Justice Scalia's objection to the independent counsel statute was really quite simple: The President must be able to appoint and remove at will the independent counsel. If the President can select the independent counsel, and the President can remove the independent counsel at will, then Justice Scalia would have no objection. [27]

## 2. The Deeply Rooted American Tradition of Appointing Outside Federal Prosecutors

It is not surprising that most critics of the current mandatory independent counsel statute accept the appointment of prosecutors from outside the Department of Justice in certain cases. This Nation possesses a deeply rooted tradition of appointing an outside prosecutor to run particular federal investigations of **\*2143** executive branch officials. Outside counsels are *not* a modern phenomenon. Between 1870 (the birth of the Justice Department) and 1973, presidential administrations appointed outside prosecutors on multiple occasions. [28]

In 1875, for example, President Ulysses S. Grant named a special counsel to prosecute the St. Louis Whiskey Ring—a scandal involving a close friend of President Grant. President Grant later ordered the firing of the special prosecutor because the prosecutor was allegedly too aggressive. [29]

During President Theodore Roosevelt's Administration, two outside counsels were appointed. In 1902, the Attorney General appointed a Democrat as special counsel to prosecute a land fraud implicating a high-level executive branch officer. The following year, President Roosevelt appointed a special counsel to investigate charges of corruption in the

Post Office. [31]  In so doing, President Roosevelt stated that "I should like to prevent any man getting the idea that I am shielding anyone." [30]

In 1924, following a Senate resolution calling for appointment of a special prosecutor, [32] President Calvin Coolidge appointed two special prosecutors, one Republican and one Democrat, to jointly conduct the criminal investigation of the Teapot Dome scandal. [33] The special prosecutors subsequently obtained the conviction of the former Secretary of Interior for taking a bribe. [34]

In 1952, President Harry Truman's Attorney General appointed a Republican as special counsel to investigate allegations of criminal wrongdoing within the administration, including within the Justice Department. [35] Like President Grant over seventy years earlier, President Truman's Attorney General eventually fired the special prosecutor.

In 1973, President Nixon's Attorney General named a Democrat, Archibald Cox, as special prosecutor to investigate and prosecute the Watergate cases. President Nixon fired Mr. Cox, but subsequently appointed another Democrat, Leon Jaworski. The prosecutor eventually obtained the convictions of numerous members of the Nixon Administration.

In the wake of Watergate, Congress enacted the Ethics in Government Act of 1978, [36] which required the appointment of an independent counsel in certain cases. Since then, Presidents and Attorneys General have sought the appointment **2144** of nearly twenty independent counsels under the statute but also continued to appoint special prosecutors *outside* the mandatory independent counsel mechanism in cases where that statute did not apply or had lapsed.

During President Bush's Administration, for example, Attorney General William Barr appointed retired Judge Frederick Lacey as special counsel to investigate allegations related to Iraqi involvement in an American bank, the so-called BNL investigation. He also appointed Judge Nicholas Bua to investigate the Inslaw case, which involved allegations directed at the Justice Department. [37]

In 1994, during a brief period when the independent counsel statute had lapsed, President Clinton asked the Attorney General to appoint a special counsel to investigate the Whitewater matter, which involved criminal referrals and allegations against former business partners of the President (James B. McDougal and Susan H. McDougal) and a separate, specific allegation of wrongdoing against the President by former Arkansas businessman and Judge David L. Hale. The Attorney General selected Robert B. Fiske, Jr., who served until the independent counsel statute was reauthorized, at which time the panel of judges determined that the statute required appointment of an independent counsel who was not an administration official. [38]

This extensive history demonstrates a clear "tradition" of "naming special prosecutors in certain, exceptional circumstances." [39] It shows that criminal investigations of executive branch officials or their associates were handled either "through normal channels, within the Justice Department, or outside them through counsels specially appointed by the President or the Attorney General and therefore accountable to the President for their exercise of power." [40]

### *2145  3. Outside Federal Prosecutors are Necessary in Some Cases

American legal history has clearly demonstrated the necessity of a mechanism to appoint an outside prosecutor to conduct certain sensitive investigations of executive branch officials. In light of this consistent historical practice, it would take an extraordinarily compelling justification for Congress to turn its back on history and common sense by eliminating all mechanisms for appointing a prosecutor from outside the executive branch.

Such a case has not been made—*nor has anyone really attempted to make it.* And although there is no scientific answer to the question, it is rather untenable as a matter of common sense to contend that an outside prosecutor is *never* necessary —that an ordinary Justice Department prosecutor should *always* preside over a Justice Department investigation. What if the allegation of wrongdoing is directed against the Attorney General herself? What if the allegation of wrongdoing is against the President's spouse or his best friend or the White House Counsel? Would any rational American in such a case believe that the Attorney General and the Justice Department would pursue the matter as vigorously as an outside prosecutor whose personal and professional interests would not be adversely affected by a thorough and vigorous investigation? Two centuries of experience inform us that the citizens (as represented by Congress and the media) will not accept such a procedure. Indeed, the fact that there have been so many outside prosecutors appointed throughout our history demonstrates their importance and necessity. And the further fact that even the strongest critics of the mandatory independent counsel statute concede that an outside prosecutor is necessary in some cases is telling evidence that some mechanism for appointment of an outside prosecutor is appropriate.

For these reasons, future debates should not focus on *whether* a special counsel statute is necessary, but rather on the more pertinent questions of *by whom* and *under what conditions* a special counsel should be appointed.

## II. IMPROVING THE SYSTEM

This article proposes that Congress enact the following statutory language in lieu of the current independent counsel statute.

### Section 1. Appointment and Jurisdiction of a Special Counsel

(a) When the public interest requires, the President may appoint, by and with the advice and consent of the Senate, a Special Counsel to investigate and prosecute matters within the jurisdiction assigned by the President.

(b) The Attorney General and the Special Counsel shall consult as necessary and appropriate regarding the Special Counsel's jurisdiction. The Special Counsel's jurisdiction shall not be reviewed in any court of the United States. Notwithstanding Federal Rule of Criminal Procedure 6, the Attorney General or the Special Counsel may report to Congress regarding the Special Counsel's jurisdiction.

### *2146  Section 2. Reports by a Special Counsel.

The Attorney General or Special Counsel shall disclose evidence of possible misconduct regarding any impeachable officer of the United States in a sealed report to the President, and to the Chairman and Ranking Member of the Judiciary Committee of the House of Representatives. Federal Rule of Criminal Procedure 6 shall not apply to such reports. No person to whom disclosure is authorized under this section shall further disclose the information except as specifically authorized by the Congress.

This article also proposes that Congress adopt two provisions not inextricably linked to special counsel investigations, but which have a substantial impact on them.

**Presidential Immunity.**

> The President of the United States is not subject to indictment or information under the laws of the United States while he serves as President. The statute of limitations for any offense against the United States committed by the President shall be tolled while he serves as President.

**Presidential Privileges.**

> In response to a federal grand jury or criminal trial subpoena sought by the United States, no court of the United States shall enforce or recognize a privilege claimed by the President in his official capacity, or by an Executive department or agency, except on the ground of national security, or as provided by a federal statute or rule that refers specifically to the privileges available to government officials or agencies in grand jury or criminal trial proceedings.

### A. Appointment and removal of the special counsel

The single most important change this article proposes concerns the appointment and removal of an independent counsel. Congress should eliminate §§ 591-599 of Title 28, and adopt a new statutory provision:

> When the public interest requires, the President may appoint, by and with the advice and consent of the Senate, a Special Counsel to investigate and prosecute matters within the jurisdiction assigned by the President.

This seemingly simple change in appointment and removal would greatly change the perception of the appointed prosecutor and thus would satisfy many opponents of the current statute.

### 1. Appointment of the Special Counsel

There are two current statutory alternatives for selecting an independent counsel. Under § 515 and § 543 of Title 28, the Attorney General has the **\*2147** discretion to select a special attorney herself (as Robert Fiske was selected). If the mandatory independent counsel statute is triggered, under § 592, the Attorney General applies to the Special Division and the three-judge panel selects an independent counsel (as Kenneth Starr was selected).

Neither alternative suffices in the kind of investigations of executive branch officials and their associates likely to cause the President and Attorney General, in the exercise of discretion, to seek a special counsel. Congress, therefore, should repeal the provision in the independent counsel statute providing for appointment of an independent counsel by the Special Division and should instead provide that a special counsel be appointed in the manner constitutionally mandated for high-level executive branch officials: appointment by the President and confirmation by the Senate. [41]

Section 515, by which the Attorney General directly selects a special attorney, is problematic because there is no check to prevent the President or Attorney General from handpicking a "patsy" prosecutor. Section 592, the current independent counsel statute by which the Special Division selects a special counsel, is problematic for different reasons.

First, the judges selecting the independent counsel may be perceived as politically motivated partisans because of their previous careers and affiliations. (Sure enough, the current Special Division panel repeatedly has been attacked as excessively partisan.) If the selection process is perceived as political, the credibility of the independent counsel will suffer. [42]

Second, because of its isolation and its inability to conduct a searching inquiry of the candidates, the panel may select someone who does not possess the qualifications that a special counsel should possess—simply because the panel of judges is not able to conduct the kind of search and inquiry that would produce the best possible person.

Third, neither § 515 nor § 592 provides the independent counsel with the moral authority and public credibility that will insulate him from the inevitable political attacks. The need for a special counsel to have the greatest possible insulation against erroneous charges of political partisanship has been demonstrated time and again. Whether it is Ron Ziegler complaining that the Watergate  *2148  Special Prosecution Task Force is a hotbed of liberals or President Clinton agreeing that the Whitewater Independent Counsel is out to get him, charges of political partisanship are almost sure to occur during independent counsel investigations.

Such attacks are inevitable because they are built into the system. The very point of an *outside* federal prosecutor is to counter the assumption that the investigation has been whitewashed because of political kinship (the charge to which the Department of Justice has been subject in the campaign fundraising investigation). [43] For that reason, outside special counsels historically have been selected from the party *other than that of the President.* [44] But the appointment of someone from the party opposing the President inevitably sparks doubts whether the outside counsel—theoretically a political "foe" of the President in some sense—possesses too much of a partisan agenda *against* the President.

Watergate Special Prosecutor Archibald Cox is perhaps the most notorious example. He had worked in the Kennedy Administration and was a very close friend and ally of Senator Edward Kennedy (an opponent of President Nixon). But in virtually all cases, the independent counsel will be quite vulnerable to attacks of political partisanship by the President and his allies simply by virtue of his known political affiliation.

This is not an idle problem. The glib answer that the independent counsel should just "take it" when he is criticized as politically motivated is a nice theory, but it does not work in practice. Although many prosecutors receive complaints that they are politically motivated, those complaints take on a different order of magnitude when they emanate from the Oval Office. [45] Sustained presidential (and presidentially directed) criticism of an independent counsel eventually will have an impact on a large percentage of the citizens and on their opinion of the independent counsel. Those citizens include both potential *witnesses* and potential *jurors.* The decision by witnesses whether to volunteer the full truth (or not) often may depend on their impressions of the credibility and integrity of the special counsel. As to juries, a truly energetic political campaign to destroy the credibility of an independent counsel is an effort to obtain a hung jury, and there is a real danger that it will work in all but  *2149  the most clear-cut cases of guilt. [46]

Congress can and should make it harder for future Presidents and presidential allies to attack the credibility of outside federal prosecutors. The best way to ensure as much insulation as possible, consistent with our constitutional structure, is to require presidential appointment and Senate confirmation. This process would serve many purposes.

First, the President could not credibly attack the special counsel whom the President had appointed. Similarly, Senate confirmation would make it difficult for anyone to claim that the special counsel is excessively partisan, for any person likely to put politics above law and evidence would not navigate the confirmation process.

Second, presidential appointment and Senate confirmation would ensure that the credentials of a special counsel are extraordinarily high. And particular issues regarding the nominee's past could be fleshed out and explained rather than being dredged up years down the road by the subjects of the investigation.

Third, unlike the special attorney provision of § 515, Senate confirmation would prevent charges that the special counsel is *too sympathetic* to the incumbent administration. Before the independent counsel statute was reauthorized in 1994, Robert Fiske was selected by the Attorney General as a special attorney for Whitewater. Like Kenneth Starr after him, Mr. Fiske possessed precisely the kind of superb credentials one would hope for in a special counsel. Yet Mr. Fiske was not subject to Senate confirmation, and Republicans such as Senator Lauch Faircloth were subsequently able to attack Fiske as soft on the administration. [47] These attacks on Fiske's supposed partisanship would have seemed ludicrous had those same Senators been forced to vote for him during the confirmation process.

Senate confirmation "serves both to curb executive abuses of the appointment power … and to promote a judicious choice of persons for filling the offices of the union." [48] As Alexander Hamilton noted, "the necessity of their concurrence would have a powerful … operation. It would be an excellent check upon a spirit of favoritism in the President. … The possibility of rejection would be a strong motive to care in proposing." [49] The Supreme Court similarly noted that " b y requiring the joint participation of the President and **2150** the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one." [50]

To be sure, presidential appointment and Senate confirmation is not a fool-proof method of insulating a special counsel from unfair political attacks. But it would render the special counsel "accountable," in theory and appearance, and would give the special counsel greater ability to pursue his tasks without being subject to unfair and unrelenting political attack. In short, it would provide the aura of moral and political authority that the special counsel needs if he is to do his job as aggressively as we would hope.

There no doubt will be some objections to this proposal. Some might argue that the President would not be inclined to appoint a truly independent and aggressive prosecutor because the allegations almost by definition would involve the activities of his close associates. But that is the wisdom of Senate confirmation. Indeed, the President would be wise to and likely would consult closely not only with his Attorney General and perhaps his White House Counsel, *but also with Senate leaders*, before even nominating a special counsel. Moreover, the media no doubt would aggressively probe the background and credentials of the individual selected by the President. The danger of the President appointing, and the Senate confirming, a crony or patsy as special counsel seems almost nonexistent.

As noted above, some might oppose this proposal by arguing that a prosecutor should not worry about attacks on his reputation. That, too, is a naive view. Attacks on the prosecutor's reputation ultimately are designed to scare potential witnesses and to infect the jury pool with negative feelings towards the prosecution. It is no secret that many defense attorneys engage in these smear tactics. The prosecutor, as a representative of the people of the United States, must take appropriate steps to counter such attacks lest they allow an injustice to occur—namely, a guilty person being erroneously acquitted because of the jury's negative view of the prosecutor. By means of this proposal, Congress can help to prevent such dangerous reputational attacks on a special counsel.

Others might oppose this proposal on the ground that Senate confirmation is a slow and unwieldy process or that it could turn into a political circus. Neither argument is ultimately persuasive. When the Senate considers nominees for important positions as to which there are severe time constraints, the Senate can and does act very quickly. For example, the Senate proceeds with extraordinary expedition to confirm the Cabinet of a newly elected President so that the Cabinet is in place when the President takes office. A respected individual selected as special counsel would be promptly considered and confirmed.

To be sure, certain Senators might use the opportunity to attack the subject of the investigation, or alternatively to attack the nominee. The first scenario seems unavoidable, but not particularly costly. As to the second, that is the point of the process. Any special counsel who would engender *significant* opposition should **\*2151** not be nominated in the first place—or should be withdrawn if serious opposition develops.

### 2. Removal of the Special Counsel

Currently, an independent counsel can be removed for "good cause," [51] a term undefined as a matter of law or practice. A special attorney appointed directly by the Attorney General can be removed at will. [52]

The "good cause" provision strikes many commentators as unconstitutional or, at least, unwise. As Justice Scalia intimated in *Morrison*, at first blush it is somewhat difficult to understand why the President does not have the authority to dismiss *any* executive branch official at will. [53] In any event, Justice Scalia also argued that a federal prosecutor should be removable at will for more practical reasons—that "the primary check against prosecutorial abuse is a political one" and that the independent counsel system thwarts this traditional check on a prosecutor's actions. [54] If there is an out-of-control prosecutor, Justice Scalia reasons that the President should possess the authority and the responsibility to remedy the situation.

The notion that the independent counsel is "unaccountable" has become the mantra of subjects of the investigation who inevitably attempt to denigrate the investigation as partisan and out of control. Currently, a President can complain that an independent counsel is politically motivated while implying that he is powerless to do anything about it. This essentially gives the President and his surrogates freedom to publicly destroy the credibility of the independent counsel, and to cleverly avoid questions about why the President does not remove him. Congress should give back to the President the full power to act when he believes that a particular independent counsel is "out to get him." Such a step not only would make the special counsel accountable, but it also would force the President and his surrogates to put up or shut up.

The objection to "removal at will" is that the independent counsel might be too timid because of fear that he could be fired. That objection overstates the danger. After all, a number of special prosecutors have been appointed throughout our history, and there is simply no persuasive evidence that the threat of removal adversely affected their investigations. Indeed, in a perverse way, removal is a sure way to immortality, as Archibald Cox learned. Moreover, **\*2152** President Nixon's firing of Cox—the last occasion when a President removed a special counsel—created an enormous controversy and triggered impeachment proceedings. [55] History clearly demonstrates that the President will pay an enormous political price if he does not have a persuasive justification for dismissing a special counsel. The deterrent to a President dismissing a special counsel thus would be the same as the deterrent to his firing the Attorney General—a practical and political (as opposed to legal) deterrent requiring the President to be able to explain his decision to Congress and the public.

### B. THE CIRCUMSTANCES UNDER WHICH A SPECIAL COUNSEL SHOULD BE APPOINTED

As noted above, this article proposes the following statutory language.

> When the public interest requires, the President may appoint, by and with the advice and consent of the Senate, a Special Counsel to investigate and prosecute matters within the jurisdiction assigned by the President.

Congress should no longer try to specify *in advance* the circumstances requiring a special counsel. The triggering mechanism of the current mandatory independent counsel statute can be grossly over-or under-inclusive depending on the circumstances. In some cases, the Attorney General is required to request an independent counsel even when it seems evident that Congress and the public would accept the credibility of a Justice Department investigation (for example, the investigation of Secretary of Labor Alexis Herman). In other cases, such as the Democratic campaign fundraising matter, the mandatory appointment provision of the statute is not triggered, even though there seems an obvious need for an outside prosecutor in order to assure the public of a thorough and credible investigation.

Indeed, the campaign fundraising matter has revealed a series of heretofore unforeseen flaws in the triggering mechanism of the statute. First, the decision whether to appoint an independent counsel has degenerated into a debate between the Attorney General and her critics over the precise features of the triggering mechanism—for example, whether a sufficiently specific and credible allegation has been made against a "covered person." This dispute has focused on the question of which telephones were used to make certain fundraising calls. The debate over such technicalities has obscured the broader question of whether United States officials, or members of American political parties, knowingly solicited or accepted contributions which were provided by citizens of foreign countries. [56]

 **\*2153**  Second, at least at the outset of the investigation, Justice Department prosecutors reportedly used the independent counsel statute as a shield to protect the President and Vice President from the kind of investigation that any ordinary citizen might receive. Over the reported objection of FBI investigators, Justice Department officials prohibited certain investigative techniques because the threshold for triggering the independent counsel statute was not met. [57] Thus, the Attorney General (or, at least, her delegates) has used the statute not as a *sword against* executive branch officials, but as a *shield to protect* them.

Of course, the precise specificity and credibility of allegations against covered persons should be irrelevant. For purposes of the independent counsel statute, the important question should not be whether certain technical requirements have or have not been met. Instead, it should be the following: Will the Congress and the public have confidence in the credibility and thoroughness of the investigation if the investigation results in a determination that such officials did *not* violate the criminal law?

There can be no definitive answer to this question, but that is the point. Depending on the circumstances—who committed the alleged offense, the nature of the offense, the credibility of the Attorney General, the confidence of the Congress in the Justice Department—there may be more or less of a perceived need for a special counsel to take over. It has proved wildly unwise for Congress to try to anticipate those situations; the debate over whether an independent counsel should be appointed for the campaign fundraising issues has only highlighted the flaws in the current triggering mechanism.

Some might contend that the statute should still be mandatory against certain officials such as the President and Attorney General. As will be discussed further below, an independent counsel should never be appointed to prosecute the President (because a sitting President should not be subject to criminal indictment until he leaves office or is removed by impeachment proceedings). If the Attorney General is the subject of a truly serious allegation and remains in office, the people can be confident that the President or the Congress will ensure that a special counsel is appointed.

In sum, the decision whether to appoint a special counsel should be at the President's discretion as informed by the Congress and the media. That is as it should be—those audiences are the two primary representatives of the citizens, and the citizens are the persons who ultimately must be persuaded that an investigation resulting in a no-prosecution decision was thorough and credible.

## C. JURISDICTION

The following proposed statutory language relates to jurisdiction.

> When the public interest requires, the President may appoint, by and with **\*2154** the advice and consent of the Senate, a Special Counsel to investigate and prosecute matters within the jurisdiction assigned by the President.

> The Attorney General and the Special Counsel shall consult as necessary and appropriate regarding the Special Counsel's jurisdiction. The Special Counsel's jurisdiction shall not be reviewed in any court of the United States. Notwithstanding Federal Rule of Criminal Procedure 6, the Attorney General or the Special Counsel may report to Congress regarding the Special Counsel's jurisdiction.

The current mandatory independent counsel statute authorizes the Attorney General to delineate the independent counsel's jurisdiction, to refer related matters to the counsel, and to seek expansion of the counsel's jurisdiction. The statute is silent on the question of whether a criminal defendant or subpoena recipient can challenge the jurisdiction of the prosecutor. In *United States v. Tucker*, however, the Eighth Circuit ruled that the independent counsel's jurisdiction, as specified by the Attorney General, is not subject to judicial review. [58]

Congress should clarify the jurisdictional provisions in a manner consistent with *Tucker*, such that only the President and Attorney General, and not the courts, define and monitor the independent counsel's jurisdiction. This clarification would ensure direct oversight over the independent counsel's jurisdiction by the official primarily affected (the Attorney General), but should not unduly hamper the investigation.

As explained by the Eighth Circuit in *Tucker*, the Attorney General, on behalf of the President, has the competence and authority to monitor an independent counsel's jurisdiction. Ordinarily, she is the "traffic cop" who decides whether a particular investigation should be handled by Main Justice or by a local United States Attorney's Office. She also resolves clashes between different United States Attorneys' offices. So, too, with respect to a special counsel's jurisdiction, the Attorney General should play the role of traffic cop, the role she already performs to some degree. Of course, there is always a danger that the President or Attorney General will attempt to limit an independent counsel's investigation to protect the administration. Regular congressional oversight of the independent counsel's jurisdiction should deter the imposition of such restraints, however.

To be sure, one can expect that there will be some friction at the margins between the special counsel and the Attorney General. [59] The Attorney General must take pains not to hamstring the special counsel, not to make his investigation *less* effective than an ordinary Justice Department investigation. In particular, it is, of course, common and accepted (and even necessary) police and prosecutorial practice to attempt to investigate and prosecute witnesses for *other* **\*2155** crimes, thereby inducing the witness to tell the truth in the primary investigation. As Robert Fiske has correctly noted, it would be unwise in the extreme for the Attorney General to take that authority away from a special counsel: "I do think that it is very important that the independent counsel have the authority to pursue related matters when those related matters involve the use of a key witness that the independent counsel may not want to turn over to someone else and, secondly, when those related matters, in his or her judgment, are reasonably designed to produce, in one way or another, evidence against the subject of the investigation." [60]

Codifying *Tucker* thus would not only clarify the role of the Attorney General and special counsel, but also would greatly expedite special counsel investigations. Judicial challenges to independent counsel jurisdiction have caused severe delays in the Michael Espy and Whitewater independent counsel investigations. For example, a trial of Arkansas Governor Jim Guy Tucker in the Whitewater investigation was delayed well over two and one-half years because of a challenge to the independent counsel's jurisdiction.

### D. REPORTS

Congress should enact the following statutory language regarding the special counsel's duty to provide information regarding the evidence developed during his investigation.

> The Attorney General or Special Counsel shall disclose evidence of possible misconduct regarding any impeachable officer of the United States in a sealed report to the President, and to the Chairman and Ranking Member of the Judiciary Committee of the House of Representatives. Federal Rule of Criminal Procedure 6 shall not apply to such reports. No person to whom disclosure is authorized under this section shall further disclose the information except as specifically authorized by the Congress.

The most illogical part of the current independent counsel statute is its final report requirement. The provision was originally designed to ensure that the special prosecutor did not "whitewash" the investigation. That rationale does not justify a report; the fear of whitewashing is the reason that a special counsel is appointed in the first place. If anything, the supposed justification for the reporting requirement would call for the *Justice Department* to provide a report in those high-profile investigations where there is a potential for a conflict, but where the Department nonetheless conducts the investigation.

In any event, § 594(h) of the current statute requires that an independent counsel's final report set forth "fully and completely a description of the work of the independent counsel, including the disposition of all cases brought." [61] **\*2156** Before the 1994 amendment, the statute also required that the final report set forth "the reasons for not prosecuting any matter within the prosecutorial jurisdiction" of the independent counsel. [62]

Section 595(c) of Title 28 also requires that the independent counsel report to the Congress on any information that "may constitute grounds for an impeachment." [63] The latter provision codifies the process by which Leon Jaworski transmitted a report to Congress during the Watergate investigation. As far as is publicly known, however, a report under § 595(c) has never been issued since its enactment in 1978.

As a general proposition, a public report is a mistake. It violates the basic norm of secrecy in criminal investigations, it adds time and expense to the investigation, and it often is perceived as a political act. It also misconceives the goals of the criminal process. A report discussing facts and evidence would make sense if the prosecutor's goal was to establish publicly by a preponderance of the evidence what happened with respect to a particular event—as often is the case in congressional or inspector general investigations, or in civil litigation. That is not the goal of the independent counsel. Instead, an independent counsel is appointed only to investigate certain suspected violations of federal criminal law in order to determine whether criminal violations occurred, and to prosecute such violations if they did occur. That goal—to determine whether criminal violations occurred—is quite different from the goal of issuing public conclusions regarding a particular event. [64]

On the other hand, as is reflected in § 595(c), there is a strong sense that evidence of the conduct of executive branch officers should not be concealed, at least not from Congress, which is constitutionally assigned the duty to determine their

fitness for office. Thus, any information gathered with respect to executive branch officials that could reflect negatively on their fitness for office should be disclosed to Congress (not dissimilar to the manner in which FBI background information is disclosed when a nomination is pending). The statutory language proposed by this article thus attempts to incorporate the best of § 594(h) and § 595(c), to eliminate the worst, and to ensure that, on the one hand, miscreants not serve in the executive branch, and on the **\*2157** other, that personal privacy and reputation not be sacrificed unnecessarily and unwisely.

## E. INVESTIGATION AND PROSECUTION OF THE PRESIDENT

This article proposes the following statutory language to establish that a sitting President cannot be indicted.

> The President of the United States is not subject to indictment or information under the laws of the United States while he serves as President. The statute of limitations for any offense against the United States committed by the President shall be tolled while he serves as President.

The supposed "politicization" of independent counsel investigations occurs primarily in those investigations where the President is a target or a potential defendant; those investigations quickly become politicized because of the threat that the President might be indicted. As will be explained, a serious question exists as to whether the Constitution *permits* the indictment of a sitting President. Regardless how the Supreme Court ultimately would rule on that question, however, Congress should enact legislation clarifying the proper procedure to follow when there are serious allegations of wrongdoing against the President. In particular, Congress should clarify that a sitting President is not subject to criminal indictment while in office. Such legislation not only would go a long way towards disentangling the appearance of politics from special counsel investigations, it also would greatly expedite those investigations where the President otherwise would be one of the subjects of the investigation. [65]

In an investigation of the President himself, *no* Attorney General or special counsel will have the necessary credibility to avoid the inevitable charges that he is politically motivated—whether in favor of the President or against him, depending on the individual leading the investigation and its results. In terms of credibility to large segments of the public (whose support is necessary if a President is to be indicted), the prosecutor may appear too sympathetic or too aggressive, too Republican or too Democrat, too liberal or too conservative.

The reason for such political attacks are obvious. The indictment of a President would be a disabling experience for the government as a whole and for the President's political party—and thus also for the political, economic, social, diplomatic, and military causes that the President champions. The dramatic consequences invite, indeed, beg, an all-out attack by the innumerable **\*2158** actors who would be adversely affected by such a result. So it is that any number of the President's allies, and even the Presidents themselves, have criticized Messrs. Archibald Cox, Leon Jaworski, Lawrence Walsh, and Kenneth Starr—the four modern special prosecutors to investigate presidents.

The Constitution of the United States contemplated, at least by implication, what modern practice has shown to be the inevitable result. The Framers thus appeared to anticipate that a President who commits serious wrongdoing should be impeached by the House and removed from office by the Senate—and then prosecuted thereafter. The Constitution itself seems to dictate, in addition, that congressional investigation must take place in lieu of criminal investigation when the President is the subject of investigation, and that criminal prosecution can occur only after the President has left office. [66]

Watergate Special Prosecutor Jaworski concluded, for example, that "the Supreme Court, if presented with the question, would not uphold an indictment of the President for the crimes of which he would be accused." Accordingly, he thought

it would be irresponsible conduct to recommend that the grand jury return an indictment against the President. He based this conclusion on the arguments presented to him:

> [T]he impeachment process should take precedence over a criminal indictment because the Constitution was ambivalent on this point and an indictment provoking a necessarily lengthy legal proceeding would either compel the President's resignation or substantially cripple his ability to function effectively in the domestic and foreign fields as the Nation's Chief Executive Officer. Those consequences, it was argued, should result from the impeachment mechanism explicitly provided by the Constitution, a mechanism in which the elected representatives of the public conduct preliminary inquiries and, in the event of the filing of a bill of impeachment of the President, a trial based upon all the facts. [67]

President Nixon similarly argued that "[w]hatever the grand jury may claim about a President, its only possible proper recourse is to refer such facts, with the consent of the court, to the House and leave the conclusions of criminality to that body which is constitutionally empowered to make them." [68] As Solicitor General, Robert Bork reached the same conclusion, arguing that a Vice President could be criminally prosecuted, but that the President could not. [69] Judge George MacKinnon, too, argued that "a President is subject to the criminal  **2159**  laws, but only after he has been impeached by the House and convicted by the Senate and thus removed from office." [70] To indict and prosecute a President or to arrest him before trial "would be constructively and effectively to remove him from office, an action prohibited by the Impeachment Clause. A President must remain free to travel, to meet, confer and act on a continual basis and be unimpeded in the discharge of his constitutional duties." [71] Therefore, he concluded, " t he real intent of the Impeachment Clause, then, is to guarantee that the President always will be available to fulfill his constitutional duties." [72]

The Supreme Court's decision in *Clinton v. Jones* [73] indicated that the President is subject to *private* lawsuits to remedy individuals harmed. But the Court's decision does not apply to *criminal* proceedings against the President, which seek to enforce *public*, not private, rights. The Court thus repeatedly referred in its opinion to "private" actions against the President. [74]

The constitutional mechanism of impeachment recognizes, at least implicitly, that criminal prosecution of a sitting President is fraught with peril—virtually untenable as a matter of practice and unwise as a matter of policy. The President is not simply another individual. He is unique. He is the embodiment of the federal government and the head of a political party. If he is to be removed, the entire government likely would suffer, the military or economic consequences to the nation could be severe, and the President's political party (and the causes he champions) would almost certainly be devastated. Those repercussions, if they are to occur, should not result from the judgment of a single prosecutor—whether it be the Attorney General or special counsel—and a single jury. Prosecution or nonprosecution of a President is, in short, inevitably and unavoidably a political act. [75] Thus, as the Constitution suggests, the decision about the President while he is in office should be made where all great national political judgments in our country should be made —in the Congress of the United States.

**2160**  The words of Alexander Hamilton ring as true today as they did two centuries ago:

> [O]ffenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust … are of a nature which may with peculiar propriety be denominated POLITICAL ….
> The prosecution of them, for this reason, will seldom fail to agitate the passions of the whole community, and to divide it into parties more or less friendly or inimical to the accused. In many cases it will connect

itself with the pre-existing factions, and will enlist all their animosities, partialities, influence, and interest on one side or on the other.… [76]

Investigation of the President, Hamilton stated, is a kind of "NATIONAL INQUEST" and "[i]f this be the design of it, who can so properly be the inquisitors for the nation as the representatives of the nation themselves." [77]

The Federalist Papers thus suggest the ill wisdom of entrusting the power to judge the President of the United States to a single person or body such as an independent counsel: The discretion "to doom to honor or to infamy the most confidential and the most distinguished characters of the community forbids the commitment of the trust to a small number of persons." [78] In the constitutional debates, Gouverneur Morris explained that the Senate should try impeachments, and that the President would be liable to prosecution afterwards. [79] The Federalist Papers similarly point out that:

the punishment which may be the consequence of conviction upon impeachment is not to terminate the chastisement of the offender. After having been sentenced to a perpetual ostracism from the esteem and confidence and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law. [80]

Hamilton further noted that the checks on a President include that he shall be "liable to be impeached, tried, … and removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law." [81]

Thus, the Framers explained the wisdom, and perhaps also the constitutional necessity, of the idea that *public* judgment with respect to the President be **\*2161** rendered not by a prosecutor or jury, but by the Congress. A prosecutor acts to vindicate harm *to the public*, not to any private individual (unlike in a civil case such as *Clinton v. Jones*). The decision to vindicate harm *to the public* caused by the President, no matter how he caused it, should belong to the Congress in the first instance.

Why is the President different from Members of Congress or Supreme Court Justices or Cabinet officials? The Constitution vests the entire executive power in a *single* President: the powers of the Commander in Chief of the Army and the Navy, the power to command the Executive Departments, the power shared with the Senate to make treaties and to appoint Ambassadors, the power shared with the Senate to appoint Justices of the Supreme Court and other civil officers, the power and responsibility to execute the laws, and the power to grant reprieves and pardons. [82]

While federal prosecutors have credibly prosecuted Cabinet officers, White House officials, and other friends and associates of the President, a credible determination by a federal prosecutor to indict (or not indict) the President himself would be nigh impossible. The experience of recent years has only reinforced the wisdom of the Framers.

What, then, should happen? When nonfrivolous allegations or evidence of wrongdoing by the President is received by a prosecutor, that evidence should be forwarded to the House of Representatives. If Congress declines to investigate, or to impeach and remove the President, there can be no criminal prosecution of the President at least until his term in office expires. [83] (Most criminal investigations include multiple potential defendants, so the criminal investigation as a whole generally might proceed, depending on the circumstances.) As an extreme hypothetical, some might ask what would happen if the President murdered someone or committed some other dastardly deed. In such a case, we can expect that the President would be quickly impeached, tried, and removed; the criminal process then would commence against

the President. There is simply no danger that such crimes would go criminally unpunished; the only question is *when* they can be punished.

## F. THE PRESIDENT'S PRIVILEGES

The following statutory language is proposed:

> In response to a federal grand jury or criminal trial subpoena sought by the United States, no court of the United States shall enforce or recognize a privilege claimed by the President in his official capacity, or by an Executive department or agency, except on the ground of national security, or as provided by federal statute or rule that refers specifically to the privileges **\*2162** available to government officials or agencies in grand jury or criminal trial proceedings.

One *major* cause of delay in independent counsel investigations has been the repeated assertion of various executive privileges. The privilege assertions not only force the President and various independent counsels into adversary postures, but they also have undermined the independent counsel's ability to conduct an expeditious and thorough investigation. During the last quarter-century, the federal courts have resolved many of the executive privilege issues that have arisen during criminal investigations. [84] In particular, the Supreme Court's 1974 decision in *United States v. Nixon*, [85] the Eighth Circuit's 1997 decision in *In re Grand Jury Subpoena Duces Tecum*, [86] and Judge Silberman's 1990 concurrence in *United States v. North* [87] (as well as a subsequent 1997 D.C. Circuit decision in *In re Sealed Case* [88]) have essentially defined the boundaries of the executive privileges that the President may assert in federal grand jury or criminal proceedings. The result of those cases is clear: the courts may not enforce a President's privilege claim (other than one based on national security) in response to a grand jury subpoena or a criminal trial subpoena sought by the United States.

Any dire claims that this rule disables the Presidency are overstated, moreover, because the President is *always* free to withhold other sensitive or critical information if he finds it necessary. [89] To do so, a President must order the federal prosecutor not to seek the information and must fire the prosecutor if he refuses (as President Nixon fired Archibald Cox). [90] Such action would surely focus substantial public attention on the President's privilege claims, but if the President's argument is as strong as he purportedly believes, he should (and must) be able to explain it to the Congress and the public. But *Nixon*, and the cases since *Nixon*, establish that the President cannot rely *on the courts* to protect him except with respect to national security information. [91]

 **\*2163** The current law of governmental privileges available in criminal proceedings derives from two sources: (1) Section 535 of Title 28, which requires all executive branch officials to disclose *any* information to law enforcement regarding possible criminal activity by a member of the executive branch, thus overriding any purported *common-law* privileges available to the President; and (2) the Supreme Court's decision in *Nixon* regarding the scope of the constitutional executive privilege for presidential communications available to the President under article II of the Constitution.

### 1. Non-Constitutional Executive Privileges

Federal Rule of Evidence 501 provides that privileges in federal criminal trials and grand jury proceedings are "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience" except as "provided by Act of Congress" or the Constitution. Section 535(b) of Title 28 makes clear for purposes of federal *criminal* proceedings that the President may not maintain any *common-law* privilege claim such as the governmental attorney-client and work product privileges that President Clinton asserted in the Whitewater investigation. The statute provides:

> Any information, allegation, or complaint received in a department or agency of the executive branch of the Government relating to violations of title 18 involving Government officers and employees shall be expeditiously reportedly to the Attorney General by the head of the department or agency.... [92]

In its decision in *In re Grand Jury Subpoena*, the Eighth Circuit labeled the statute "significant," and stated that "executive branch employees, *including attorneys*," have a duty to report information relating to criminal wrongdoing. [93]

Some have attempted to dismiss this statute, arguing that it contains an implicit exception for information received by government attorneys. [94] That **\*2164** argument contravenes the clear and all-encompassing language of the statute. The statute contains no distinction between information obtained by government attorneys and that obtained by other government employees. In addition, Congress included a specific exception to this disclosure obligation for "class es of information" as to which the Attorney General "directs otherwise," [95] and the Attorney General has not exempted information obtained by government attorneys representing the government. As a matter of elementary statutory construction, that explicit exception confirms the statute's plain meaning—and no further exceptions can be judicially inferred or created. [96]

The legislative history supports that conclusion as well. The House Committee Report accompanying § 535 stated that "[t]he purpose" of the provision is to "require the reporting by the departments and agencies of the executive branch to the Attorney General of information coming to their attention concerning *any* alleged irregularities on the part of officers and employees of the Government." [97] The report emphasizes that " i f the Attorney General or the Federal Bureau of Investigation undertakes such investigation, they should have *complete cooperation* from the department or agency concerned." [98] The Justice Department supported the legislation:

> The Department of Justice urges the prompt enactment of the measure, for such legislation will emphasize the congressional intent that the *chief law-enforcement officer of the Government is to have free access to all units thereof for the purpose of ferreting out personnel criminally violating their trusts and oaths of office.* [99]

In addition, the President's official counsels have traditionally recognized this obligation. For example, Lloyd Cutler, who served as White House Counsel in two Administrations, has stated that there can be "problems relating to misconduct that you learn about somewhere in the White House or elsewhere in the Government." [100] Mr. Cutler noted that there is a "Government rule of making it your duty, if you're a Government official as we as lawyers are, a statutory duty to report to the Attorney General any evidence you run into of a possible **\*2165** violation of a criminal statute." [101] Mr. Cutler further remarked that " w hen you hear of a charge and you talk to someone in the White House … about some allegation of misconduct, almost the first thing you have to say is, 'I really want to know about this, but anything you tell me I'll have to report to the Attorney General.'" [102]

Similarly, twenty-five years ago, after White House Counsel John Dean had resigned, Robert Bork was asked whether he would consider becoming President Nixon's official White House Counsel. Bork asked Chief of Staff Alexander Haig whether he would be on the government payroll and was told that he would be. He then explained to Haig that "[a] government attorney is sworn to uphold the Constitution. If I come across evidence that is bad for the president, I'll have to turn it over. I won't be able to sit on it like a private defense attorney." [103] (Bork ultimately did not receive the job).

In the same vein, the 1993 White House report on the Travel Office episode stated that "White House personnel may find that they have information about a *possible* violation of law. If there is a reasonable suspicion of a crime … about which White House personnel *may have* knowledge, the initial communication of this information should be made to the Attorney General, the Deputy Attorney General, or the Associate Attorney General." [104]

Some have argued against this commonsense conclusion, pointing for apparent support to several unpublished Office of Legal Counsel (OLC) memoranda—but the Eighth Circuit quickly and correctly concluded they were totally inapposite. [105]  The OLC memoranda do not apply to situations where a government attorney represents a *government agency* and learns information during  **\*2166**  the course of *her official* representation of that agency. [106]

In short, § 535 refutes any claim of an executive *common-law* privilege (including a governmental attorney-client or work product privilege) in federal criminal proceedings in response to a grand jury or trial subpoena sought by the United States.

## 2. Constitutionally Based Executive Privileges

Section 535, of course, does not prevent the President from asserting *constitutionally* based privileges. In *United States v. Nixon*, [107]  the Supreme Court applied the executive privilege for presidential communications, which the President had asserted in response to a criminal trial subpoena sought by the United States. For purposes of *criminal* cases where the United States has sought a subpoena, the Court concluded that executive privilege protects only national security and foreign affairs information. [108]

The dispute in *Nixon* arose in connection with a criminal trial of seven individuals, including former White House officials. The District Court issued a trial subpoena sought by the United States (represented by the special prosecutor) to obtain tape recordings of conversations among President Nixon and various high-level White House officials, including White House Counsel John Dean. [109]  President Nixon resisted production of the tapes, citing the executive privilege for presidential communications.

In the Supreme Court, President Nixon argued that the subpoena did not meet the threshold requirements under Federal Rule of Criminal Procedure 17 of relevance and admissibility. [110]  He also asserted executive privilege, citing article II of the Constitution. [111]  President Nixon contended that the executive privilege for presidential communications was absolute and that the courts could not compel production of the tapes. Even if the privilege were not absolute and "even if an evidentiary showing as required by Rule 17(c) had been made as to each of the requested items," President Nixon argued that "the Special Prosecutor must demonstrate a unique and compelling need to overcome  **\*2167**  the privileged nature of the materials." [112]  President Nixon thus argued in the alternative for some heightened showing, not dissimilar to the standard applied by the D.C. Circuit in *Nixon v. Sirica*, where the Court of Appeals held that the privilege claim of President Nixon was overcome by the "uniquely powerful" showing made by the special prosecutor. [113]

The Supreme Court found that the special prosecutor had met the relevance and admissibility requirements of Federal Rule of Criminal Procedure 17 for trial subpoenas: "there was a sufficient likelihood that each of the tapes contains conversations relevant to the offenses charged in the indictment" and there was "a sufficient preliminary showing that each of the subpoenaed tapes contains evidence admissible with respect to the offenses charged in the indictment." [114]

The Court recognized, based on Article II, a "presumptive privilege for Presidential communications." [115]  The privilege derived, the Court said, from the Constitution and from the "valid need for protection of communications between high Government officials and those who advise and assist them"—the "importance" of which "is too plain to require further

discussion." [116] The Court stated that " t he expectation of a President to the confidentiality of his conversations and correspondence … has all the values to which we accord deference for the privacy of all citizens and, added to those values, is the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." [117] The privilege, the Court said, was "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." [118]

However, the Court stated that the tapes, by President Nixon's concession, did not reveal military or diplomatic secrets and thus did not implicate the President's authority "as Commander-in-Chief and as the Nation's organ for foreign affairs." [119] The Court therefore found that the President possessed only a "generalized interest in confidentiality." [120]

The Court then struck the balance between the President's generalized interest in confidentiality and the "need for relevant evidence in criminal trials." [121] In this regard, the Court said it was important to distinguish the need for evidence in criminal proceedings from the need for evidence in congressional proceedings, civil cases, or Freedom of Information Act (FOIA) actions. In the latter situations, it may well be that the executive privilege for presidential **\*2168** communications is absolute (or in the case of congressional subpoenas, a nonjusticiable question). However, the *criminal* context is different. As the Court emphasized, the traditional commitment to the rule of law is "nowhere more profoundly manifest than in our view that the twofold aim of criminal justice is that guilt shall not escape or innocence suffer." [122] The Court further noted that " t he need to develop all relevant facts in the adversary system is both fundamental and comprehensive. … To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." [123]

The Court then held that the need for relevant evidence in criminal proceedings outweighed the President's "generalized interest in confidentiality" unless the executive privilege claim was founded on a claim of state secrets:

> [T]he allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts. A President's acknowledged need for confidentiality in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated. The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.

> We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial. [124]

The Court thus accepted neither President Nixon's primary argument that the privilege was absolute, nor his secondary argument that the Special Prosecutor must show a "unique and compelling need" to obtain the tapes. The Court found that the showing under Rule 17 itself demonstrated a need sufficient to obtain non-state secret presidential communications in criminal proceedings. The Court thus ordered that, upon remand, "[s]tatements that meet the test of admissibility and relevance" must be produced to the special prosecutor. [125] *Nixon*, in short, held that the showing

required under Rule 17 (relevance and admissibility for a trial subpoena; relevance for a grand jury subpoena) itself demonstrates the specific need for evidence that overrides the President's **\*2169** general need for confidentiality.[126]

Lest there be any doubt about the meaning of *Nixon*, a foray into internal memoranda available from the Library of Congress provides historical confirmation. The Court specifically and consciously rejected the suggestion of President Nixon and the D.C. Circuit in *Nixon v. Sirica* that there be a case-by-case balancing test in which the prosecutor or grand jury must make some particularized, compelling showing in addition to the showing required by Rule 17. The memoranda among the Justices reveal some initial disagreement regarding this precise question, with Justice Byron White being in favor of the position ultimately adopted and Justice Lewis Powell favoring some undefined higher showing of need. The case was argued on July 8, 1974. On July 12, Justice Powell wrote to the Justices that "[w]e were not entirely in agreement as to the standard to be met in overcoming the privilege."[127] Justice White wrote on July 15, 1974:

> [T]he privilege does not extend to evidence that is relevant and admissible in a criminal prosecution. The public interest in enforcing its laws and the rights of defendants to make their defense *supply whatever necessity or compelling need* that may be required to reject a claim of privilege when there has been a sufficient showing that the President is in possession of relevant and admissible evidence. … I, therefore, differ with *Nixon v. Sirica* insofar as it held that the Special Prosecutor must make some special showing beyond relevance and admissibility. Necessarily, then, the trial judge, who followed *Nixon v. Sirica*, did not apply the correct standard in this case.[128]

After the Chief Justice circulated a new draft that still did not fully accord with Justice White's views, Justice White wrote the Conference on July 18, 1974:

> [The current draft] impl[ies] that there must be a compelling need for the material to overcome presumptively privileged executive documents. I take it that you are suggesting that there is a dimension to overcoming the privilege beyond the showing of relevance and admissibility. This makes far too much of the general privilege rooted in the need for confidentiality, and it is not my understanding of the Conference vote. As I have already indicated, *my view is that relevance and admissibility themselves provide whatever compelling need must be shown.* I would also doubt that the Prosecutor has made any showing of necessity beyond that of relevance and admissibility.[129]

**\*2170** Justice White felt sufficiently strong about this issue to add that "it is likely that I shall write separately if your draft becomes the opinion of the Court."[130]

On July 22, Justice Potter Stewart circulated an alternative draft on the privilege issue containing the suggestions of Justice White. The draft no longer contained any reference to a heightened standard, and the cover memo indicated that the opinion had received the approval of Justices White and Thurgood Marshall. The Chief Justice then quickly incorporated the Stewart section into his opinion and recirculated the entire draft the next day, July 23. All of the Justices then joined, and the opinion was issued on July 24, 1974.[131]

This interpretation of *Nixon* was advanced by Judge Silberman in his 1990 concurrence in *United States v. North.*[132] The district court in that case, Judge Silberman noted, had interpreted *Nixon* as "constructing a very high barrier to a criminal defendant who wishes to call a President or ex-President who, it is asserted, will give evidence relevant to the defense."[133] Finding "it instructive to note how easily the Court in *Nixon* was satisfied that the tapes sought by the Special Prosecutor

… were relevant," Judge Silberman indicated that in cases where national security is not asserted, no special showing other than relevance is necessary even after executive privilege is claimed. [134] Judge Silberman continued:

> To be sure, the Court used the language "essential to the justice of the pending criminal case" and "demonstrated specific need for evidence" in describing what was needed to overcome the President's qualified privilege. But the Court does not appear to have meant anything more than the showing that satisfied Rule 17(c). Nowhere in the opinion does the Court ever describe any offer by the Special Prosecutor other than the rather perfunctory showing of relevance …. Even in the section of the opinion dealing with executive privilege, the Court stated that "the President's broad interest in confidentiality **\*2171** of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases." [135]

In the 1997 dispute between President Clinton and the Whitewater Independent Counsel over the governmental attorney-client privilege, the Eighth Circuit addressed President Clinton's contention that *Nixon* set forth some higher standard for executive branch documents than that required by Rule 17. The Court concluded otherwise, stating that "*Nixon* is indicative of the general principle that the government's need for confidentiality may be subordinated to the needs of the government's own criminal justice processes." [136] The Court stated that it "doubt ed " that a case-by-case need determination "constitutes the proper need threshold" set forth in *Nixon*. [137]

The D.C. Circuit also addressed an executive privilege dispute between the President and Independent Counsel Donald Smaltz in the investigation of former Secretary of Agriculture Michael Espy. [138] The decision is essentially in accord with the above analysis, although certain parts advance a slightly different articulation. In particular, noting Judge Silberman's opinion in *North*, the court first opined that it would be "strange" if *Nixon* required nothing more to overcome the presidential privilege than the showing required by Rule 17, because then the privilege "would have no practical benefit." [139] Of course, *Nixon* indicated that the privilege may well be absolute in civil, congressional, and FOIA proceedings; it is only in the discrete realm of *criminal* proceedings where the privilege may be overcome. [140]

In any event, any difference between Judge Silberman and this D.C. Circuit panel is more apparent than real, more *procedural* than *substantive.* At the outset, it is significant that the Court specifically rejected the President's argument that "the information sought must be shown to be critical to an accurate judicial determination." [141] That argument, the Court said, "simply is incompatible with the Supreme Court's repeated emphasis in Nixon on the importance **\*2172** of access to relevant evidence in a criminal proceeding." [142] The court concluded that in grand jury cases where national security is not at issue and where the Rule 17 standard is satisfied, presidential communications can be obtained, first, if "each discrete group of the subpoenaed materials likely contains important evidence," and, second, if the evidence "is not available with due diligence elsewhere." [143]

The court stated that this first component "can be expected to have limited impact." [144] In the grand jury setting, moreover, "the fact that evidence covered by the presidential communications privilege may be inadmissible should not affect a court's determination of the grand jury's need for the material." [145] The court further stated that the second component also will be "easily" satisfied when "an immediate White House advisor is being investigated for criminal behavior." [146] Even in cases where a person *outside* the White House is under investigation, the court said that this second component still will be satisfied when the proponent can "demonstrate a need for information that it currently possesses, but which it has been unable to confirm or disprove." [147] Of course, that showing can be made in virtually all

investigations—few facts are ever fully confirmed or disproved. The court further stated that this standard would not impose "too heavy" a burden on the subpoena proponent. [148]

In short, the D.C. Circuit opinion does not deviate in substance from *Nixon*, the Eighth Circuit's opinion, or Judge Silberman's approach; it differs, if at all, only with respect to the *time* when relevant information can be obtained, as the court itself recognized. [149]

### 3. The Relevance of *Nixon* to a Claim of Governmental Attorney-Client or Work Product Privilege

*Nixon* is important not only for constitutionally based privileges, but also because it establishes a principle that applies to other common law privilege claims that the President might raise. For example, even if § 535 of Title 28 were erased from the U.S. Code, *Nixon* itself demonstrates, as the Eighth  **\*2173**  Circuit held, that any claim of governmental attorney-client or work product privilege would be similarly overcome in federal criminal proceedings.

The judicial process in this country is deeply committed to the principle that "the public … has a right to every [person's] evidence." [150] Because testimonial privileges "obstruct the search for truth," there is a "presumption against the existence of an asserted testimonial privilege." [151] Privileges thus "are not lightly created nor expansively construed." [152] In light of these settled principles, the Supreme Court has recognized privileges, or applied them in a particular setting, only when the privilege (or application thereof) is historically rooted or recognized in the vast majority of the states, and is justified by overriding public policy considerations.

In criminal proceedings, a governmental attorney-client or work product privilege has no roots whatsoever. There is no case, statute, rule, or agency opinion suggesting that a department or agency of the United States (or any state governmental entity) can maintain a full-blown governmental attorney-client or work product privilege in federal criminal or grand jury proceedings. [153]

*Nixon*, moreover, held that even the deeply rooted and constitutionally mandated executive privilege for presidential communications did not override the need for relevant evidence in criminal proceedings, except when a specific claim of national security was at issue. The decision in *Nixon* demonstrates that a governmental attorney-client and work product privilege (the other two privileges that have been at issue in investigations of executive branch officials) also cannot overcome the need for relevant evidence in criminal proceedings. If the constitutionally rooted executive privilege for presidential communications is overcome by the need for relevant evidence in criminal proceedings, the result cannot be different for a newly conceived governmental attorney-client and work product privilege. *A fortiori*, a governmental attorney-client or work product privilege fails in federal criminal proceedings.

### 4. The Policy of Executive Privileges

Section 535, the Eighth Circuit decision, and the Supreme Court decision in *Nixon* demonstrate *as a matter of law* that the only executive privilege currently valid against the United States in federal criminal proceedings is a national security/state secrets privilege. As a *policy* matter, that rule reflects the proper  **\*2174**  balance of the President's need for confidentiality and the government's interest in obtaining all relevant evidence for criminal proceedings.

Government officials, even government attorneys, are *public* officials who work for the people. Any claim to confidentiality against the United States stands on a radically different footing than a claim made by a *private* party. The Supreme Court recognized the difference between such *public* and *private* responsibilities in declining to apply an attorney-like privilege to an accountant's work papers:

The *Hickman* work-product doctrine was founded upon the private attorney's role as the client's confidential advisor and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light. ... [T]he independent auditor assumes a *public* responsibility transcending any employment relationship with the client. ... This "public watchdog" function demands that the accountant maintain total independence from the client at all times *and requires complete fidelity to the public trust.* To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with *public* obligations. [154]

For this same reason, in addressing the narrow question of a governmental attorney-client privilege, respected commentators and the American Law Institute (ALI) reject equating private corporations with public entities. The McCormick treatise states that "[w]here the entity in question is governmental ..., significantly different considerations appear." [155] Professors Wright and Graham note that "the costs of the government privilege may be very high. ... L egitimate claims for governmental secrecy should all be worked out in the context of the existing privileges for secrets of state and official information." [156] Indeed, the ALI's Restatement (Third) of the Law Governing Lawyers states that the rules for private lawyers do not translate to public lawyers; instead, " m ore particularized rules may be necessary where one agency of government claims the privilege in resisting a demand for information by another. Such rules should take account of the complex considerations of governmental structure, tradition, and regulation that are involved." [157]

These commonsense propositions led the Eighth Circuit flatly to reject any claim that a governmental or executive attorney-client or work product privilege could be asserted against the federal grand jury. The court stated that the "general duty of public service calls upon government employees and agencies **\*2175** to favor disclosure over concealment." [158] Citing *Arthur Young*, the court explained that " t he public responsibilities of the White House are, of course, far greater than those of a private accountant performing a service with public implications." [159] The court added:

> [T]he strong public interest in honest government and in exposing wrongdoing by public officials would be ill-served by recognition of a governmental attorney-client privilege applicable in criminal proceedings inquiring into the actions of public officials. We also believe that to allow any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets. [160]

If the law embodied the contrary position, a government official (including the President or White House Counsel) safely could tell a White House or other agency attorney (or other official) that he destroyed subpoenaed documents, paid off potential witnesses, erased a subpoenaed tape, or concealed subpoenaed materials—or worse. The courts have rightly rejected the executive's attempt to conceal such information, and Congress should codify those results to prevent future Presidents from trying the same gambit.

Supporters of broad executive privileges contend that limiting privileges will have a chilling effect—that the presidency might be disabled and that governmental officials might be less forthcoming to a President or government attorney if they knew that the information could be disclosed in criminal proceedings. This argument, however, was rejected by the Supreme Court in *Nixon* (in the context of the all-encompassing presidential communications privilege) and was rejected by the Eighth Circuit (in the context of governmental attorney-client and work product privileges).

It is surely true that a President and government attorneys must be able to obtain information in order to perform their functions, but that assertion proves nothing. The interest in gathering facts to perform those functions does not require the further step of concealing facts from a federal grand jury if they are (or become) relevant to a federal criminal investigation.

As noted above, the dire claims about the disabling of the presidency are false, moreover, because the President is *always* free to withhold other information if he finds that necessary. To do so, a President must simply order the federal prosecutor not to seek the information and fire him if he refuses, thus taking political responsibility for his privilege claims. [161]

The chilling-effect argument is illusory, in any event, because executive branch employees and attorneys know that they do not control the ultimate **\*2176** assertion of privilege in any forum. [162] As a result, the government employee can have *no* expectation of confidentiality and *no* assurance that his communications or work product will remain confidential if called for in federal criminal proceedings. Thus, government employees necessarily know that their communications and work may be disclosed if relevant to a federal criminal investigation.

In addition, the frequency of disclosure will be low. Even in today's environment, the overwhelming majority of White House business and federal agency work never comes under grand jury scrutiny. [163] Grand jury investigations obviously occur more often than criminal trials, but grand juries operate in secret and thus present little risk of chilling particular conversations, as the Supreme Court has emphasized. [164]

Finally, the debate over privileges, particularly a governmental attorney-client privilege, often is framed in generalities and fails to consider *actual* situations where the issue might arise. There are three basic situations where a government attorney or official might obtain information from other government employees and where the information might become relevant to a subsequent criminal investigation.

The first situation occurs when the employee seeks advice from a government attorney or official about his possible *future* course of conduct. If the employee follows the advice and does not commit a criminal act, it is hard to see what chill or harm might be caused by subsequent disclosure of the information. On the other hand, if the employee ignores the advice and commits a criminal act, then what possible *governmental* interest is there in protecting the employee from the charge that he knew his activity was criminal? Moreover, if the attorney mistakenly advises the employee that a proposed course of conduct is not criminal, even the employee will wish that communication disclosed if he is subsequently prosecuted. In the end, the only employee seeking advice about proposed conduct who will be chilled is the employee who hopes to obtain a government attorney's blessing for potentially criminal conduct. That scenario, however, hardly justifies creation of a far-reaching privilege.

The second category arises where the employee seeks to discuss *past* conduct that might be criminal. In that situation, of course, the primary interest of the United States is and must be in detecting and prosecuting crime, as the OLC repeatedly has emphasized. The United States has no interest in harboring criminals in government employment, even at high levels. Agency attorneys employed by and representing the United States are not authorized to act as criminal defense attorneys *against* the United States.

**\*2177** The OLC thus has long rejected any suggestion that the United States can participate on both sides of a criminal investigation. [165] That explains why there is no tradition suggesting that a government attorney can consult with an employee about the employee's past criminal conduct and then refuse to disclose that information to the federal grand jury. Federal agencies, unlike corporations, are not subject to criminal investigation or indictment by the United States, so an agency cannot be adverse to the United States in a criminal prosecution. When an agency becomes aware of internal

wrongdoing, the agency's sole interest is to ferret it out, and there can be no risk of endangering a governmental interest by doing so and by disclosing the results to federal law enforcement authorities.

The third situation occurs not where the employee initiates conversation, but where the agency elicits information from its employees about some event. Government agencies and government agency attorneys often have a legitimate interest in obtaining facts about a particular event; the fact-gathering process enables an agency head (or delegate) to discipline employees, institute new policies that will prevent similar errors in the future, inform the Congress or the public of the facts, or merely deal with the latest political controversy. Thus, the White House has conducted numerous internal investigations, as have many agencies and inspectors general. Given the number of such investigations, a far-reaching and novel governmental attorney-client privilege is, by definition, unnecessary to *encourage* such activity. [166] Unlike a corporation (which is subject to indictment), no legitimate government agency would be, or has been, discouraged from conducting internal factfinding by the knowledge that any evidence of *crime* uncovered will in fact be presented to the relevant law enforcement authorities. Indeed, this was the premise behind the enactment of Section 535 (and the many inspector general statutes as well).

## CONCLUSION

Outside federal prosecutors are here to stay. They have existed at least since President Grant's Administration. As we have seen over the last twenty-five **\*2178** years, the system of outside prosecutors can make an extraordinary difference in how our nation is governed. As Justice Scalia stated, the debate over a special counsel is about power—that is, "[t]he allocation of power among Congress, the President, and the courts in such fashion as to preserve the equilibrium the Constitution sought to establish …." [167]

The fundamental flaw with the current independent counsel statute is that it creates, almost by definition, a scenario whereby the President and the independent counsel are adversaries. From that basic mistake flows most of the other problems that critics identify in the statute. Clarifying the role of the President in the manner proposed in this article would expedite, depoliticize, and enhance the credibility and effectiveness of special counsel investigations; and ensure that the Congress alone is directly responsible for overseeing the conduct of the President of the United States and determining, in the first instance, whether his conduct warrants a public sanction.

Footnotes

a1    Mr. Kavanaugh served as Associate Counsel in the Office of the Whitewater Independent Counsel from 1994 to 1997 and also for a period in 1998. The views reflected in this article are his own.

1    The Attorney General is a political actor, as are all high officials of the Justice Department. In other words, the Attorney General supports not only the ideas and policies of the incumbent administration but also publicly supports candidates for elective office who espouse those policies.

2    Mr. Cox has noted that the "normal position" of the Justice Department is "one for defending an expanding executive privilege," whereas the Special Prosecutor in Watergate and other subsequent investigations "were challenging executive privilege. *So there are some real conflicts.*" 67th Annual Judicial Conference of the United States Court of Appeals for the Fourth Circuit, *The Independent Counsel Process: Is It Broken and How Should It Be Fixed?*, at 138 (June 27, 1997) [hereinafter *Fourth Circuit Judicial Conference*] (emphasis added). The Justice Department's brief in the litigation between the President and the Whitewater Independent Counsel Kenneth W. Starr demonstrated this point. The Justice Department has agreed with neither the White House nor the Independent Counsel about the proper scope of privilege. *See* Brief Amicus Curiae for the United States, Acting Through the Attorney General, Office of the President v. Office of Independent Counsel at 20, 117 S.Ct. 2482 (1997) (No. 96-1783) ("The United States has compelling interests in investigating and prosecuting crimes—inside or outside the government—and the Justice Department's performance of those tasks is aided by the duty of the President

and other government officials to report evidence of criminal violations to the Attorney General. At the same time … the President must have access to legal advice that is frank, fully informed, and confidential.").

3    1975 REPORT OF THE WATERGATE SPECIAL PROSECUTION TASK FORCE, at 137-38.

4    28 U.S.C. §§ 591-99 (1994).

5    The Olympian term "independent counsel" has always promised more than it could deliver. Moreover, the term would be inappropriate under the regime proposed here because "independent" connotes a counsel appointed outside the Executive Branch and accountable to no one. The Ethics in Government Act initially called for the appointment of a "special prosecutor," but Congress changed the name in 1982 to "independent counsel." The term "special counsel" best captures the position and is used here in describing the proposed regime.

6    487 U.S. 654 (1988).

7    See George D. Brown, *The Gratuities Offense, and the RICO Approach to Independent Counsel Jurisdiction*, 86 GEO. L.J. 2045, 2049 (1998).

8    78 F.3d 1313 (8th Cir.), *cert. denied*, 1 17 S.Ct. 76 (1996).

9    The Justice Department is a department within the executive branch whose head is appointed by the President. *See* 28 U.S.C. § 501 (1994) ("The Department of Justice is an executive department of the United States at the seat of Government."); 28 U.S.C. § 503 ("The President shall appoint, by and with the advice and consent of the Senate, an Attorney General of the United States. The Attorney General is the head of the Department of Justice.").

10   KATY J. HARRIGER, THE FEDERAL SPECIAL PROSECUTOR IN AMERICAN POLITICS 153 (1992) (emphasis added) (quotation marks omitted).

11   28 U.S.C. § 515 (1994); 28 U.S.C. § 543 (1994).

12   *See infra* text accompanying notes 28-40.

13   28 U.S.C. § 592(c)(1)(A). The Attorney General's decision is judicially unreviewable, however, which means that threat of impeachment or other congressional retaliation is the only legally enforceable check requiring the Attorney General to enforce the law.

14   28 U.S.C. § 592(c).

15   *Id.* § 593(b).

16   *Id.* § 593(b)(3).

17   *Morrison*, 487 U.S. at 679.

18   28 U.S.C. § 594(a)(9). The symbolism of this nomenclature is important and should be retained in any future legislation. Criminal defendants (and other critics) inevitably try to imply to juries (and the public) that the appointed counsel is somehow an extra-governmental official who does not warrant the same respect as prosecutors representing the United States. In the 1996 trial of Jim Guy Tucker, James McDougal, and Susan McDougal, for example, the defendants refused to refer to the prosecutors as the "United States," arguing that "they are independent Counsel appointed under a special act." The Court put a quick end to this tactic: "The indictment which was rendered by citizens of this state, the caption is United States of America versus James B. McDougal, Jim Guy Tucker, and Susan H. McDougal. Mr. Jahn and his associates represent the United States of America. Disregard the comment made by Mr. Collins." United States v. McDougal, Tucker, and McDougal, No. LR-CR-95-173, Tr. at 4525-27 (E.D. Ark. Apr. 11, 1996).

19   28 U.S.C. § 594(h).

20   *Id.* § 593(c).

21    Julie R. O'Sullivan, *The Independent Counsel Statute: Bad Law, Bad Policy*, 33 AM. CRIM. L. REV. 463, 505 (1996).

22    TERRY EASTLAND, ETHICS, POLITICS, AND THE INDEPENDENT COUNSEL 134 (1989).

23    *Fourth Circuit Judicial Conference, supra* note 2, at 133.

24    *Id.*

25    Reauthorization of the Independent Counsel Law: Hearing on S. 3131 Before the Subcomm. on Oversight of the Senate Comm. on Governmental Affairs, 102nd Cong. 15 (1992) (testimony of George J. Terwilliger III Deputy Attorney General of the United States).

26    487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

27    In the final pages of his dissent, Justice Scalia also pointed out what he termed the "[un]fairness" of an independent counsel investigation, and he did so in broad terms that arguably seem to apply to *all* special counsel, whether appointed by a court or by the President (or Attorney General). In comparing a special counsel to an "ordinary" Justice Department prosecutor, however, Justice Scalia appeared to rely on a romantic vision of "ordinary" federal prosecutors. In fact, an "ordinary" federal prosecutor is at least as likely to engage in hardball, near-the-edge tactics as a special counsel whose every move is publicly tracked, analyzed, and criticized. Moreover, the only concrete measure of *over*-aggressiveness is the prosecutor's conviction rate. A careful prosecutor should not bring many cases that end in outright acquittal on all counts. As it turns out, the record of independent counsels appointed under the statute is better than that of the Justice Department. Only one independent counsel appointed under the statute has ever suffered an outright jury acquittal, which is an impressive record, particularly given the skilled attorneys retained by the defendants in such cases.

Justice Scalia also pointed out that ordinary federal prosecutors suffer from constraints on resources and that independent counsels generally do not. *Morrison*, 487 U.S. at 727-33 (Scalia, J., dissenting). That is not an entirely accurate or persuasive argument. First, the fact that some federal prosecutors' offices may be understaffed and thus unable to prosecute federal crimes that should be prosecuted is hardly a model for investigations of possible crimes by our highest national officials. Indeed, that is the kind of backwards logic that Justice Scalia ordinarily ridicules. Second, in allocating its enormous annual appropriation, the Department of Justice regularly determines that certain *kinds* of crimes warrant intensive investigation and prosecution, whether it be drug distribution or health care fraud or abortion clinic bombings or church burnings or the like. By means of the independent counsel statute, Congress has simply made the altogether rational judgment that public corruption by high federal officials should be one such area of concentration. That policy judgment hardly warrants condemnation. It is worth noting, in that regard, that the United States Attorney's office for the District of Columbia recently has received severe public criticism for devoting *insufficient* resources to public corruption cases. *See. e.g.*, Paul Butler, *Why Won't the Prosecutor Prosecute?*, LEGAL TIMES, Jan. 19, 1998, at 19 (discussing the lack of prosecutions for corruption among public officials). Third, contrary to the implicit undercurrent of Justice Scalia's discussion of "fairness," the Justice Department itself devotes extraordinary resources to numerous high-profile public corruption cases. The Congressman Dan Rostenkowski case, the Mayor Marion Barry prosecution, the campaign fundraising investigation, the Governor Fife Symington case in Arizona, and the Congressman Joseph McDade investigation in Pennsylvania are all recent examples of *massive,* single-minded, intense, and occasionally out-of-control (in the case of Congressman McDade, perhaps) investigations. The history of independent counsel investigations certainly measures up no worse than those investigations. Fourth, any true comparison of resource constraints is, in the end, virtually impossible because the Justice Department never identifies exactly how much money its prosecutors and the FBI spend on particular investigations and prosecutions; thus, the Department is able to "hide" its costs and avoid the kind of public and congressional scrutiny that independent counsels constantly face. How much money did the United States spend pursuing Congressman McDade? Governor Symington? Mayor Barry? A lot.

28    *See* RESPONSES OF THE PRESIDENTS TO CHARGES OF MISCONDUCT (C. Vann Woodward ed., 1974).

29    *See* EASTLAND, *supra* note 22, at 8; DAVID A. LOGAN, HISTORICAL USES OF A SPECIAL PROSECUTOR: THE ADMINISTRATIONS OF PRESIDENTS GRANT, COOLIDGE AND TRUMAN 7 (Congressional Research Service Nov. 23, 1973).

31    *Id.* at 8.

30    EASTLAND, *supra* note 22, at 8, 14.

32    S.J. RES. 54, 68th Cong. (1924).

33    This article advocates the procedure of presidential appointment and Senate confirmation used during the Teapot Dome Scandal.

34    EASTLAND, *supra* note 22, at 8-9.

35    *Id.* at 8. The Justice Department was not created until 1870, and there was very little federal criminal law before the 20th century.

36    28 U.S.C. §§ 591-99 (1994).

37    *See Reauthorization Hearings, supra* note 25, at 15 (1992).

38    The independent counsel statute states: "The division of the court may not appoint as an independent counsel any person who holds any office of profit or trust under the United States." 28 U.S.C. § 593(b)(2). This provision on its face disqualified Mr. Fiske from appointment as independent counsel under the statute. In the public law reauthorizing the statute in 1994, however, Congress stated that the usual disqualification did not apply to persons appointed as regulatory independent counsel, thus granting the Special Division discretion whether to appoint Mr. Fiske. *See* Pub. L. No. 103-270, §§ 7(a), (h). The court chose not to appoint Mr. Fiske on the theory that, notwithstanding Congress' *ad hoc* suspension of § 593(b)(2), the policy, if not the strict terms of the provision, still disqualified Mr. Fiske because he was an administration official.

39    EASTLAND, *supra* note 22, at 8. This tradition is not confined to the federal system. The state of New York also has a tradition of appointing special prosecutors (Thomas Dewey, for example) to investigate and prosecute public corruption cases. *See* Harriger, *supra* note 10, at 3.

40    *Id.* at 15. At the same time, there is a long tradition of congressional investigation of executive branch malfeasance. These investigations often occur simultaneously with criminal investigations of executive branch officials. Some of these congressional investigations have led to the resignation of executive branch officials, and sometimes efforts have been made to impeach (although no executive branch official has been impeached by the House and convicted by the Senate). Congressional investigations historically have been the primary manner in which the public learns whether executive branch officials have committed malfeasance in office. This tradition has continued to the present day. This article argues that Congress must continue to have primary responsibility for determining whether the President should be removed.

41    Although the Supreme Court upheld the system of court-appointed outside counsel in *Morrison v. Olson*, the separation of powers analysis in that case is quite inconsistent with the analysis in more recent cases such as *Edmond v. United States*, 117 S.Ct. 1573 (1997). In particular, *Morrison* held that the independent counsel was an "inferior officer" whose appointment thus could be wrested from the President. *Morrison*, 487 U.S. at 671-72. In *Edmond*, however, the Court said that inferior officers "are officers whose work is directed and supervised at some level by others who were appointed by presidential nomination with the advice and consent of the Senate." *Edmond*, 117 S.Ct. at 1581. Under this mode of analysis, an independent counsel could not realistically be considered an inferior officer. Thus, if the issue were presented today and there were no *stare decisis* concerns, there is little telling how the Court would resolve the issue. Justices Anthony Kennedy, Clarence Thomas, David Souter, Ruth Bader Ginsburg, and Stephen Breyer have been appointed to the Court since the decision in *Morrison*.

42    This was a foreseeable flaw that Justice Scalia correctly identified in his dissent. *See Morrison*, 487 U.S. at 730 (Scalia, J., dissenting).

43    *See, e.g., CNN Capital Gang* (CNN Television Broadcast, Dec. 13, 1997) (Senator Orrin Hatch questioning Attorney General Reno's decision not to appoint an independent counsel to investigate Vice President Al Gore's fundraising, calling it a "conflict of interest").

44    Some might say that we should find totally apolitical persons to serve as independent counsel. But even if that were desirable (in our democracy, one would hope, all people would be *active* participants in a variety of political and social causes), "[n]early

everybody who is qualified to be independent counsel has some kind of political involvement in their background." *Fourth ( Circuit Judicial Conference, supra* note 2, at 39 (comments of Special Division Judge David B. Sentelle).

45   Even with respect to ordinary cases, Eric Holder, a former United States Attorney for the District of Columbia and now Deputy Attorney General, has written that a prosecutor cannot remain publicly silent in the face of challenges to the prosecutor's ethics and motivations. Eric H. Holder & Kevin A. Ohlson, *Dealing With the Media in High-Profile White Collar Crime Cases: The Prosecutor's Dilemma* (on file with author).

46   In the Whitewater investigation, the independent counsel obtained the convictions of Jim Guy Tucker, James McDougal, and Susan McDougal in June 1996 despite sustained attacks on his credibility. In a subsequent August 1996 Arkansas trial of two bankers, the result was a hung jury.

47   *See, e.g.*, Ruth Marcus, *The Prosecutor: Following Leads or Digging Dirt?*, WASH. POST, Jan. 30, 1998, at A1 (calling Faircloth a "leading crusader" against Fiske).

48   Edmond v. United States, 117 S.Ct. 1573, 1579 (1997) (quotations omitted). As Justice Joseph Story noted, "If [the President] should … surrender the public patronage into the hands of profligate men, or low adventurers, it will be impossible for him long to retain public favur." 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 375 (1833).

49   THE FEDERALIST NO. 76, at 457-58 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

50   *Edmond*, 117 S.Ct. at 1579.

51   28 U.S.C. § 596(a)(1).

52   *Id.* § 515; *id.* § 543.

53   *Morrison*, 487 U.S. at 723-24 & n.4 (Scalia, J., dissenting). Justice Scalia stated that "the President must have control over all exercises of the executive power" and that "failure to accept supervision" constitutes "good cause" for removal. *Id.* at 724 n.4 (Scalia, J., dissenting). That, in essence, defines "good cause" such that it means little more than "at will." Although Justice Scalia disclaimed the logical conclusion of his position, it would seem that he believes, as the Court described his position, that "every officer of the United States exercising any part of [the Executive power] must serve at the pleasure of the President and be removable by him at will." *Id.* at 690 n.29 (majority opinion describing Justice Scalia's position).

54   *Id.* at 728-29 (Scalia, J., dissenting).

55   President Grant and President Truman's Attorney General also ordered dismissal of special prosecutors. *See* EASTLAND, *supra* note 22, at 14, 16.

56   See *CNN Capital Gang, supra* note 43 (Senator Hatch argued: "Who cares about the phone calls … It's all the other stuff that ought to be investigated.").

57   Susan Schmidt & Roberto Suro, *Troubled from the Start; Basic Conflict Impeded Justice Probe of Fundraising*, WASH. POST, Oct. 3, 1997, at A1.

58   United States v. Tucker, 78 F.3d 1313, 1316-19 (8th Cir.1996).

59   That friction revealed itself, for example, in the investigation conducted by Independent Counsel Donald Smaltz.

60   *Fourth Circuit Judicial Conference, supra* note 2, at 91.

61   28 U.S.C. § 594(h)(1)(B).

62   28 U.S.C.A. § 594(h)(1) (West 1993), *as amended by* Pub. L. No. 103-270 § 3(o) (1994). After the 1994 revision, the statute also requires that the independent counsel submit to Congress "annually a report on the activities of the independent counsel, including a description of the progress of any investigation or prosecution conducted by the independent counsel. Such

report may omit any matter that in the judgment of the independent counsel should be kept confidential, but shall provide information adequate to justify the expenditures that the office of the independent counsel has made." 28 U.S.C. § 595(a)(2).

63  28 U.S.C. § 595(c).

64  *See, e.g., The Independent Counsel Reauthorization Act of 1993: Hearing on S. 24 Before the Comm. on Governmental Affairs,* 103d Cong. 49 (1993) (Professor Samuel Dash, Georgetown University Law Center, stating: "Independent counsel investigations and prosecutions carry out the responsibilities of the executive branch to enforce the Federal criminal laws. The scope of congressional committee investigations and hearings is generally broader than those of investigations and prosecutions conducted by independent counsel.").

65  Congress has the power to provide privileges or immunities regardless whether they are constitutionally required. *See* Clinton v. Jones, 117 S.Ct. 1636, 1652 (1997) ("If Congress deems it appropriate to afford the President stronger protection, it may respond with appropriate legislation."). On the other hand, Congress would not have the power to definitively say that a President *is* subject to indictment. The courts have the final word on the minimum level of immunity the Constitution affords the President. *See id.* ("If the Constitution embodied the rule that the President advocates, Congress, of course, could not repeal it.").

66  *See* U.S. CONST. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.").

67  REPORT OF THE WATERGATE SPECIAL PROSECUTION TASK FORCE, *supra* note 3, at 122.

68  *See* Brief for Respondent, Cross-Petitioner at 101, United States v. Nixon, 418 U.S. 683 (1974) (Nos. 73-1766, 73-1834) [hereinafter Brief for President Nixon].

69  Brief for the United States, Agnew v. United States (D. Md. 1974) (No. 73-0535).

70  Nixon v. Sirica, 487 F.2d 700, 757 (D.C. Cir.1973) (MacKinnon, J., concurring in part, dissenting in part).

71  *Id.*

72  *Id.*

73  117 S.Ct. 1636 (1997).

74  *See id.* at 1639 (noting that suit was brought by "private citizen" for damages); *id.* at 1642 n.12 (noting that question presented involved "litigation of a private civil damages action"); *id.* at 1645 ("With respect to acts taken in his 'public characte '— that is official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts."); *id.* at 1648 n.36 (referring to "suits against the President for actions taken in his private capacity"); *id.* at 1650 ("We therefore hold that the doctrine of separation of powers does not require federal courts to stay all private actions against the President until he leaves office."); *id.* (referring to "burdens of private litigation"); *id.* at 1651 (referring to private plaintiff's "interest in bringing the case to trial"); *id.* at 1652 (referring to possibility that Congress could provide for "deferral of civil litigation").

75  Determining how to conduct an investigation or whether to seek an indictment is not a ministerial task, but involves the exercise of judgment and discretion. The exercise of judgment and discretion inevitably means that the decision cannot be separated, in the eyes of the public, from its political consequences.

76  THE FEDERALIST NO. 65, at 396 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

77  *Id.* at 397.

78  *Id.* at 398. This passage was written largely with respect to a debate over whether the Senate or the Supreme Court should try an impeachment. But the ideas and themes discussed in explaining why the Senate was superior to the Supreme Court in passing *public* judgment upon the conduct of the President apply, *a fortiori*, to a single prosecutor attempting to do so.

79    2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 550 (Max Farrand ed., 1966).

80    THE FEDERALIST NO. 65, *supra* note 76, at 398-99 (Alexander Hamilton).

81    THE FEDERALIST NO. 69, *supra* note 76, at 416 (Alexander Hamilton).

82    U.S. CONST. art. II.

83    As indicated in the statutory language proposed by this article, Congress should take appropriate steps to ensure that the statute of limitations would not prevent prosecution of a President after he leaves office.

84    President Clinton has litigated privilege claims against both the Whitewater and Espy independent counsels. He also has raised privilege claims against the Justice Department. *See* S.REP. No. 104-280, at 67-70, 82-83 (1996). The Public Integrity Section issued a grand jury subpoena to the White House in 1994, and that the White House in response claimed privilege as to 120 documents. H.R.REP. NO. 104-849, at 152-53 (1996).

85    418 U.S. 683 (1974).

86    112 F.3d 910 (8th Cir.), *cert. denied*, 117 S.Ct. 2482 (1997).

87    910 F.2d 843, 950-54 (D.C.Cir. 1990) (Silberman, J., concurring in part, dissenting in part).

88    121 F.3d 729 (D.C.Cir. 1997).

89    This proposed language is premised on the assumption that a special counsel's motion to enforce a subpoena would be justiciable. The Court in *Nixon* so held, 418 U.S. at 697, and there is no reason to revisit that decision, particularly because the President retains authority to prevent such disputes from reaching the courts.

90    Even under the current "good cause" restriction, as Justice Scalia stated in *Morrison*, an inferior officer such as an independent counsel is removable for cause if he refuses to accept supervision. *See Morrison*, 487 U.S. at 724 n.4 (Scalia. J., dissenting).

91    Notwithstanding *Nixon*, it is at least theoretically conceivable that the Supreme Court might rule that the Constitution provides a greater scope of executive privileges than this section would grant. If so, then the Constitution would trump. *See Clinton v. Jones*, 117 S.Ct at 1652. But that is unlikely, given the clarity of *Nixon*.

92    28 U.S.C. § 535(b). The subsection states in full:
      Any information, allegation, or complaint received in a department or agency of the executive branch of the Government relating to violations of title 18 involving Government officers and employees shall be expeditiously reported to the Attorney General by the head of the department or agency, unless—
      (1) the responsibility to perform an investigation with respect thereto is specifically assigned otherwise by another provision of law; or
      (2) as to any department or agency of the Government, the Attorney General directs otherwise with respect to a specified class of information, allegation, or complaint.

93    *In re Grand Jury Subpoena*, 112 F.3d at 920 (emphasis added).

94    *See* Petition for a Writ of Certiorari, Office of the President v. Office of Independent Counsel (No. 96-1783) *cert. denied*, 117 S.Ct. 22, 23 n.7 (1997).

95    28 U.S.C. § 535 (b)(2).

96    *See* Honig v. Doe, 484 U.S. 305, 325 (1988) (stating a court is "not at liberty to engraft onto the statute an exception Congress chose not to create"). In general, "[c]ourts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so, and no matter how widely the blame may be spread." Brogan v. United States, 118 S.Ct. 805, 811-12 (1998).

97    H.R.REP. NO. 83-2622, at 1 (1954) (emphasis added), *reprinted in* 1954 U.S.C.C.A.N. 3551, 3551.

98    *Id.* at 3552 (emphasis added).

99    *Id.* at 3553 (emphasis added). In an independent counsel investigation, the independent counsel is the official who receives information about matters within his jurisdiction. "When issuing … subpoenas, an independent counsel stands in the place of the Attorney General." S.REP. NO. 100-123, at 22 (1987); *see* 28 U.S.C. § 594(a).

100    Lloyd N. Cutler, *The Role of the Counsel to the President of the United States*, 8 REC. OF THE ASS'N OF THE B. OF THE CITY OF NEW YORK 470, 472 (1980).

101    *Id.*

102    *Id.*

103    *A Conversation with Robert H. Bork*, 26 D.C.B.REP. No. 3, at 9 (Dec. 1997-Jan. 1998).

104    White House Travel Office Management Review, 23 (1993) (emphases added). In addition, federal regulations require each agency to have a "designated agency ethics official," generally an attorney, to provide ethics counseling to employees. 5 C.F.R. § 2635.107 (1997). The regulations state: "*Disclosures made by an employee to an agency ethics official are not protected by an attorney-client privilege.* An agency ethics official is required by 28 U.S.C. § 535 to report any information he receives relating to a violation of the criminal code, title 18 of the United States Code." *Id.* (emphasis added).

105    *In re Grand Jury Subpoena*, 112 F.3d at 921 n.10. The Attorney General has authorized an exception to § 535(b) for information obtained by government attorneys who, pursuant to a specific regulation (28 C.F.R. § 50.15), represent government employees in their *personal* capacities—for example, in civil suits alleging *Bivens* violations. The OLC memoranda address only the exception for these *personal* representations. *See* Office of Legal Counsel Memorandum, at 5 (Mar. 29, 1985) (analyzing duty under C.F.R. § 50.15 and U.S.C. § 535(b) of an Assistant U.S. Attorney who discovered information while representing *Bivens* defendants); Office of Legal Counsel Memorandum, at 1 (Apr. 3, 1979) (addressing question regarding "propriety of providing Justice Department representation in a civil suit to a government employee"); Office of Legal Counsel Memorandum, at 4 (Aug. 30,1978) (analyzing under C.F.R. § 50.15 and U.S.C. § 535(b) the "contours of the relationship between a Department attorney and an individual government employee whose representation has been undertaken"); Office of Legal Counsel Memorandum, at 1 (Nov. 30, 1976) (addressing question regarding situation where "[t]he U.S. Attorney's Office is currently representing both a Federal employee and the United States as defendants in a civil suit for damages" and the employee has told the Assistant U.S. Attorney information that could incriminate the employee).

106    *See* 6 Opinion of the Off. of Legal Couns. 626, 627 (1982) (stating, in context of proposal for certain kinds of inspector general investigations, that "evidence of criminal conduct 'uncovered' during the course of an investigation will be referred directly to the Department of Justice, *as is required by 28 U.S.C. § 535*") (emphasis added). The OLC recognizes in the crucial distinction between representation of the personal interests of a government employee and representation of the governmental interests of a government agency. *See, e.g.*, 4B Op. of the Off. of Legal Couns. 749, 751 (1980) (distinguishing between representation of personal interests and governmental interests).

107    418 U.S. 683 (1974).

108    *Id.* at 706-13.

109    *Id.* at 687-88.

110    Brief for President Nixon, *supra* note 68, at 122-31. Rule 17 requires that the government demonstrate relevance and admissibility when seeking a trial subpoena. The Rule 17 standard for grand jury subpoenas is more relaxed, reflecting the different goals of grand jury investigation. *See* United States v. R. Enterprises, Inc., 498 U.S. 292, 297-301 (1991).

111    Brief for President Nixon, *supra* note 68, at 48-86.

112    *Id.* at 86-87.

113    Nixon v. Sirica, 487 F.2d 700, 717 (D.C. Cir.1973).

114    *Nixon*, 418 U.S. at 700.

115    *Id.* at 708.

116    *Id.* at 705.

117    *Id.* at 708.

118    *Id.*

119    *Id.* at 710 (quoting C&S Airlines v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948)).

120    *Id.* at 712 n.19.

121    *Id.*

122    *Id.* at 709 (quotation marks omitted).

123    *Id.*

124    *Id.* at 712-13.

125    *Id.* at 714.

126    The privilege considered in *Nixon* was the privilege for presidential communications, not the more general executive privilege for deliberative processes. The deliberative process privilege is, of course, even less weighty than the presidential communications privilege. *See In re* Sealed Case, 121 F.3d 729, 745 (D.C. Cir.1997).

127    *See* Files of Justice Thurgood Marshall, United States v. Nixon, 418 U.S. 683 (1974) (available at Library of Congress).

128    *Id.*

129    *Id.* This memo is very important as an historical matter. Justice White stated that President Nixon *would* have been entitled to withhold the tapes had some higher standard been adopted. Those who currently favor the adoption of such a higher standard must come to grips with that fact—and how it might have altered the course of Watergate.

130    *Id.*

131    As reported in *The Brethren*, Justice Powell had last-minute reservations about the legal standard and said at the conference on July 23 that he was considering a last-minute concurrence because "[t]hey were ruling that any grand jury could subpoena material from the President in a criminal investigation. That was too sweeping. They could, and they should, rule more narrowly. …" BOB WOODWARD & SCOTT ARMSTRONG, THE BRETHREN 409 (1979). Woodward and Armstrong report that the room "erupted" and Justice William Brennan "made an impassioned plea for unanimity." *Id.* Justice Powell then decided to adhere to the Chief Justice's opinion, and thus the opinion rejected a *Nixon v. Sirica* kind of standard and instead held that evidence meeting the requirements of Rule 17 must be produced unless there was a claim of state secrets. *Id.* at 410.

132    United States v. North, 910 F.2d 843, 950-53 (D.C. Cir.1990) (Silberman, J., concurring in part, dissenting in part).

133    *Id.* at 951. The issue arose in connection with a trial subpoena to President Ronald Reagan sought by North. The court affirmed the District Court's denial of the subpoena, ruling that such evidence would not have been material or favorable to the defense, and the majority therefore did not reach the question of privilege. *Id.* at 892 n.26 (per curiam).

134    *Id.* at 952.

135    *Id.* (citation omitted). Similarly, Professor Laurence Tribe has stated: "Ostensibly, *United States v. Nixon* suggests that, while presidential conversations are presumptively privileged, the presumption will *always be overcome* by a showing that the information is relevant to a pending criminal trial in federal court." LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 281 (1988) (emphasis added).

136  *In re* Grand Jury Subpoena, 112 F.3d 910, 919 (8th Cir.1997). In his dissent on the facts of that case, Judge Richard Kopf agreed that "[a]t this elevated level of abstraction"—namely the "public interest"—"*Nixon* teaches that the President's general need for confidentiality … is outweighed by a grand jury's need for evidence of the truth." *Id.* at 936 (Kopf, J., dissenting).

137  *Id.* at 918 n.9.

138  *See In re* Sealed Case, 121 F.3d 729 (D.C.Cir.1997).

139  *Id.* at 754.

140  *See Nixon*, 418 U.S. at 712 n.19 ("We are not here concerned with the balance between the President's generalized interest in confidentiality and the need for relevant evidence in civil litigation, nor with that between the confidentiality interest and congressional demands for information ….").

141  *In re Sealed Case*, 121 F.3d at 754.

142  *Id.*

143  *Id.*

144  *Id.*

145  *Id.* at 757.

146  *Id.* at 755. *See also id.* at 760 (noting, in explaining standard, that "[h]ere, unlike in the Nixon cases, the actions of White House officers do not appear to be under investigation").

147  *Id.* at 761.

148  *Id.* at 756.

149  The Court said that "[i]n practice, the primary effect of this standard will be to require a grand jury to *delay* subpoenaing evidence." *Id.* at 756 (emphasis added).
Any open-ended balancing test requiring some higher need showing would violate the Supreme Court's repeated emphasis that the criminal process should not tolerate such delays. *See, e.g.*, United States v. R. Enterprises, Inc., 498 U.S. 292, 298 (1991) ("grand jury proceedings should be free of such delays" that proposed multifactor test would cause); Branzburg v. Hayes, 408 U.S. 665, 705 (1972) (under proposed heightened relevance standard, "courts would … be embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid").

150  Jaffee v. Redmond, 518 U.S. 1, 9 (1996) (quotation marks omitted).

151  *Branzburg*, 408 U.S. at 691 n.29, 686.

152  *Nixon*, 418 U.S. at 710.

153  The Office of Legal Counsel has *not* issued an opinion about the application of Executive privileges in *criminal* proceedings, as the Eighth Circuit correctly recognized. *See In re* Grand Jury Subpoena, 112 F.3d 910, 921 n.10 (1997). Even for purposes of *congressional* inquiries, moreover, the OLC has stated that "communications between the Attorney General, his staff, and other Executive Branch 'clients' that might otherwise fall within the common law attorney-client privilege should be analyzed *in the same fashion* as any other intra-Executive Branch communications." 10 Opinion of the Off. of Legal Couns. 68, 78 (1986) (emphasis added).

154  United States v. Arthur Young & Co., 465 U.S. 805, 817-18 (1984) (emphases added).

155  MCCORMICK ON EVIDENCE § 87.1, 321 (J. W. Strong ed. 1992).

156  24 CHARLES A. WRIGHT & KENNETH W. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5475, 126-27 (1986).

157   RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 124 cmt. b (1996) (Proposed Final Draft No. 1) (also stating that "unlike persons in private life, a public agency or officer has no autonomous right of confidentiality in communications relating to governmental business").

158   *In re Grand Jury Subpoena*, 112 F.3d at 920.

159   *Id.* at 921.

160   *Id.*

161   *See supra* notes 89-91 and accompanying text.

162   The President at the time the information is sought controls the privilege. With respect to the attorney-client privilege (as opposed to the Presidential communications privilege), a President no longer in office would have no authority to assert the privilege. *See* CFTC v. Weintraub, 471 U.S. 343, 349 & n.5 (1985) (stating that common-law privilege for entities belongs to current management, not former management).

163   *See Nixon*, 418 U.S. at 712; *cf. Branzburg*, 408 U.S. at 691.

164   *See Branzburg*, 408 U.S. at 700.

165   *See* 4B Opinion of the Off. of Legal Couns. 749, 751 (1980) ( "This Office has long held the view that the Government may not participate on both sides of a federal criminal investigation.").

166   The President (or relevant agency head) can require that the employee cooperate in an internal agency investigation. *See* 4B Opinion of the Off. of Legal Couns. 421, 427 (1980) ("The obligation of public officials to answer questions related to the performance of their public duties is well-recognized"). To be sure, an agency employee questioned by an agency attorney may refuse to answer questions out of a fear of self-incrimination, although the failure to answer questions may lead to his dismissal. *See* LaChance v. Erickson, 118 S.Ct. 753, 756 (1998) ("It may well be that an agency … would take into consideration the failure of the employee to respond.").

    The government employee who does not claim the Fifth Amendment and speaks to the attorney could be investigated or prosecuted based at least in part on the communications to government attorneys (Oliver North, for example). But that is a good result: Insulating government employees from criminal investigation and prosecution has never been considered a *governmental* interest that justifies withholding relevant information from the federal grand jury. Indeed, the only governmental interest is precisely the opposite.

167   *Morrison*, 487 U.S. at 699 (Scalia, J., dissenting).

86 GEOLJ 2133

---

**End of Document**            © 2018 Thomson Reuters. No claim to original U.S. Government Works.