```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)


UNITED STATES OF AMERICA,     ) CASE NO: 2:23-cr-00599-MCS-1
                              )
              Plaintiff,      )          CRIMINAL
                              )
      vs.                     )    Los Angeles, California
                              )
ROBERT HUNTER BIDEN,          )  Wednesday, August 21, 2024
                              )   (9:59 a.m. to 11:57 a.m.)
              Defendant.      )   (1:00 p.m. to  2:22 p.m.)
_____)


                      STATUS CONFERENCE

            BEFORE THE HONORABLE MARK C. SCARSI,
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

For Plaintiff:              AUSA LEO J. WISE
                           AUSA DEREK E. HINES
                           United States Department of Justice
                           Ofc. of Special Counsel David C. Weiss
                           950 Pennsylvania Ave. NW
                           Room B-200
                           Washington, DC 20530


For Defendant:             MARK J. GERAGOS, ESQ.
                           TINA GLANDIAN, ESQ.
                           Geragos & Geragos
                           644 S. Figueroa St.
                           Los Angeles, CA 90017


Court Reporter:            Recorded; CourtSmart

Courtroom Deputy:          Stephen Montes Kerr

Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1          **Los Angeles, CA; Wednesday, August 21, 2024; 9:59 a.m.**

2                          **(Call to Court)**

3          **THE COURT:**  Please have a seat.

4          **THE CLERK:**  Calling item number 1, cr-23-599, USA

5   versus Robert Hunter Biden.  Counsel, state your appearances

6   please?

7          **MR. WISE:**  Good morning, Your Honor, Leo Wise and

8   Derek Hines for the United States.

9          **THE COURT:**  Good morning.

10         **MR. GERAGOS:**  Good morning, Your Honor, Mark Geragos,

11   G-E-R-A-G-O-S and Tina Glandian --

12         **MS. GLANDIAN:**  Good morning, Judge.

13         **MR. GERAGOS:**  -- for Mr. Biden.

14         **THE COURT:**  Good morning.

15         Okay.  Well, we're here for our pretrial conference.

16   We have a lot of issues to go through.  Let me just ask, I know

17   I issued an order a couple of days ago about the deadline for

18   expert disclosures.  I realize that we didn't have a specific

19   date in our local rules.  Have the parties updated disclosures

20   since the order came out?

21         **MR. WISE:**  Your Honor, yesterday in conformance with

22   the order we sent an update to our report that changed a few

23   figures, really minor.  And that's all we've done since the

24   report.

25         **THE COURT:**  Okay.

3

1          **MR. GERAGOS:**  Right.  I was going to say they have

2  provided a report from Mr. Welch and it does change some

3  figures and there's some calculations.  I've spoken to our

4  expert, Mr. Bishop this morning.  I may still have to, in

5  response to that, do something else.  I'm not sure yet.  I

6  figured I'd wait and see how it plays out today as well.

7          **THE COURT:**  Okay.  Any update from Mr. Lee at all?

8          **MR. GERAGOS:**  No.  We're ready to stand on Mr. Lee

9  and argue.  I know that's motion number one, so I assume that

10  would be the first thing we do.

11          **THE COURT:**  Okay.

12          **MR. WISE:**  And just briefly, Your Honor, on the

13  update.  We simply took off a couple of the personal expenses

14  that have been represented as business expenses, so that's the

15  only change.  We've never gotten anything from Mr. Bishop where

16  he reports to offer any calculation as to what their position

17  is on those bogus personal expenses claimed as business

18  expenses.  And that doesn't depend on what we filed yesterday.

19  We filed the Welch report in May and that's been substantially

20  the same.

21          **THE COURT:**  And we can deal with any request to

22  provide an updated response when it comes in.

23          I want to start out with just an issue that we talked

24  about.  One of the -- at our motion hearing, you know, months

25  ago, but this is the issue of the multiple dates for

4

1  willfulness under Counts II and IV.  And I believe also under

2  Count IX.  In Counts II and IV there's dates.  Count II is the

3  failure to pay either on April 17th, 2018 when payment was due

4  or February 18th, 2020 when taxes were filed.

5          Count IV came due on April 15th, 2019, that's one day

6  for willfulness and then February 18th, 2020 is the other date

7  for willfulness.  And then in Count IX, it looks like in the

8  indictment the date of -- the date the offense was alleged to

9  have committed willfully was on July 15th, 2020 because of the

10  extension due to COVID.

11          But there's also in response to one of the motions in

12  limine, the Government seems to be arguing that it was also

13  willfully -- could also have been willfully committed on

14  October 15th, 2020.

15          So for those three counts, is the Government

16  intending to prove up willfulness on both of the alleged dates

17  and if so, what's your view on whether or not we need the juror

18  unanimity with respect to which date you've chosen?

19          **MR. WISE:**  Sure.  So, yes, it is our intention to

20  prove willfulness as to both dates.  And for those counts, we

21  included a specific unanimity instruction in those counts that

22  indicated they had to be unanimous as to which of the two

23  dates.

24          I think mechanically the way it would work is they

25  would begin their deliberation on the early date if they found

5

1  willfulness as to that date, the crime would be complete.  If

2  they didn't find, then they would move to the second date and

3  make their decision on that.  But we did add to the proposed

4  jury instructions a specific unanimity instruction as to the

5  alternative dates for willfulness.

6       **THE COURT:**  Okay.  And then what about Count IX?  It

7  looks like from the indictment it's just alleged to be in July

8  of 2020.  Is the -- are you also going to be putting on proof

9  that it was October of 2020?

10      **MR. WISE:**  No.  Our position is that willfulness

11 was -- will be proven as to when the taxes were due and that's

12 the -- the distinction as Your Honor has probably picked up

13 on --

14      **THE COURT:**  Right.

15      **MR. WISE:**  -- is even if an extension is filed making

16 the April deadline then October, which is the typical one,

17 taxes are still due to be paid as of the April date, in this

18 case July because of the pandemic adjustments to scheduling.

19      So he owed the taxes as of July.  We included the

20 October 15th date in the indictment, because that's when he

21 did, in fact, file the last return charged in the scheme which

22 is the 2019 return where he self-assessed.  I think it was

23 197,000 in taxes, which he didn't pay at that time either, but

24 the willfulness was established by the summer.

25      **THE COURT:**  So Count IX is different than Count II

6

1  and IV in that regard?

2          **MR. WISE:**  Yes, Your Honor.

3          **THE COURT:**  Okay.  Okay.  Thank you.  I think I've

4  got that.  And the defendant's position is that we'll need some

5  sort of a -- either in the verdict form or in some other way, a

6  determination from the jury that they're unanimous on those

7  particular dates.

8          **MR. GERAGOS:**  Correct.  And I believe that it's going

9  to be a little bit more complicated.  I don't think, for

10  instance, the Count IX, which is the 2020 filing.  Because of

11  the COVID orders, because of some of the other interplay which

12  without revealing cross-examination I think it's going to

13  become apparent that the unanimity instruction is going to have

14  to be tweaked I believe post cross-examination.

15          So my colleague is correct that the traditional April

16  15th, 2020 date was extended by the IRS due to the COVID

17  pandemic, but there is -- there are some other issues as to

18  whether or not the October 15th date which is when it was

19  actually filed would have been late.  And I think before we go

20  down the road of crafting a specific willfulness instruction,

21  we're going to have to deal with that factual dispute.

22          **THE COURT:**  Sure.  And I think we'll -- you know,

23  with respect to the specific jury instructions, we'll have

24  plenty of time to get those in order.  The Count IX though is

25  failure to pay, not failure to file, right?

7

1          **MR. GERAGOS:**  Correct.  It's a failure to pay.  I

2  believe it's a misdemeanor, is it not --

3          **THE COURT:**  Yeah, yeah.

4          **MR. GERAGOS:**  -- on Count IX?

5          **THE COURT:**  Counts I, II, III, IV and IX are all

6  misdemeanor counts.

7          **MR. GERAGOS:**  Correct.  And I believe -- I'll make

8  the arguments at the appropriate time, whether it's Rule 29 or

9  whatever.  I do not think that survives to go to the jury but I

10 will make the arguments at the time post cross-examination.  I

11 don't want to preview that right now.

12         **THE COURT:**  And the Government's still intending to

13 move forward in the trial with all nine counts, correct?

14         **MR. WISE:**  Yes, Your Honor.

15         **THE COURT:**  Okay.  So let's turn to the motions in

16 limine.  There are a number of them that appear to be -- that

17 we have some agreement on, so I just want to go through those

18 first.

19         Government's motion in limine number 3, preclude

20 questioning and argument related to alleged defects in the

21 institution of the prosecution, including issues raised in

22 Mr. Biden's motion to dismiss.  That motion is agreed to by the

23 defense and it's granted.

24         The defense is leaving open the possibility that

25 there could be questions relating to these things from other

8

1    witnesses, with respect to the scope of their work or there

2    could be a door opened in some regard.  With respect to all

3    these motions in limine, they're granted.  We'll -- I'll just

4    ask the parties that if we're going to -- if there's

5    information related to the topic that you want to put into

6    evidence at some later point, let's make sure we clear that at

7    sidebar before we get into questions about it.  Any problem

8    with that?

9         **MR. GERAGOS:**  Correct.  And I was going to preview

10   one if I could just to make sure if you wanted.  I had assumed

11   you would want us to approach before getting into it, if I'm

12   going to do it during cross.

13        But for instance, if there is a protocol for sending

14   something to CID, the criminal investigation division and I

15   don't want that -- I don't want to be hung up on, hey, there

16   was no opposition to the motion in limine for selective or

17   vindictive prosecution.

18        The cross-examination will be, I hope, squarely

19   within the idea of there are internal protocols, whatever you

20   want to label them, as to what gets sent to criminal and what

21   does not.  And I'm not agreeing that we will not, or at least

22   I'm not agreeing here that I will not raise that issue.  And if

23   you want me to do at sidebar before cross, I will do it then.

24        **THE COURT:**  Yeah.  I mean, I think doing it at

25   sidebar before cross makes sense.  But what's the -- give me a

1   sense as to what the relevancy is of the argument that you're

2   previewing for the Court?

3          **MR. GERAGOS:**  Sure.  Let's start with IX and I

4   realize that it's probably not as good of an example because

5   it's not the felony charge.  But IX still has a willfulness

6   mens rea.  And mens rea on a tax case, to quote a U.S. Attorney

7   who I was just on the phone with last week and out of the

8   Department of Justice, is the highest level of mens rea

9   required in the criminal law.

10         So that idea of -- that the IRS would send this over

11  to the criminal investigation division, do they have a protocol

12  for that.  If the agent is testifying he did not, and like I

13  say Count IX is probably the worst example of it, but on one of

14  the so-called evading counts, if there is an indication that

15  this is normally something that would be handled as civil,

16  because of the IRS guidelines and recognition specifically that

17  this is not -- that collection, for instance, of an IRS tax is

18  preferred over the penalty.

19         And I'll give you one example.  There is in the IRS

20  rules and regulations, in a civil failure to file for instance,

21  there is a penalty of 5 percent.  A failure to pay taxes is a

22  half a percent.  So there is in the IRS based on their rules

23  and regulations and I'm not even going to go around Chevron

24  deference or any of that, but within their rules and

25  regulations they do have a distinction between a failure to

1 file and a failure to pay.  And there are good reasons for that

2 and I'm not going to spend an inordinate amount of time on

3 that, but I would like to cross-examine the -- presumably

4 Mr. Welch or some of the other people that they are going to

5 put up here in order to talk about the compliance and whether

6 Mr. Biden complied without beating it to death, that's kind of

7 my position.

8          **THE COURT:**  Okay.  What I'm wondering about is to

9 what end?  So if we look at sort of the four corners of the

10 indictment, did he have an obligation to pay, did he pay with

11 respect to Count IX.  How is any of what you've just described

12 relevant to those issues?

13          **MR. GERAGOS:**  Well, the -- for the mens rea if he had

14 an intention to pay and I know -- I don't want to jump ahead to

15 the other MIL --

16          **THE COURT:**  Sure.

17          **MR. GERAGOS:**  -- for the after payment, but if he had

18 an intention to pay and did not have the money, but decided to

19 file because that is what the IRS encourages you to do, which

20 is supported by the fact that there's a lesser penalty if you

21 don't pay than if you don't file.  But I think is fair game as

22 to his mens rea.

23          If he was trying to evade the taxes, he never would

24 have filed in the first place would be the argument.  He never

25 would have paid after the fact and like I said, I don't want to

11

1    get ahead to the other MIL, but it goes to the mens rea.

2         All of the mens rea, whether it's willfulness or the

3    specific intent, style, or fashion mens rea, all of those

4    things are based obviously on the actus reus.  The actus reus

5    of this case is the filing of the return.  So what can we --

6    what are the basic inferences that a juror can draw, a juror

7    could draw and I would submit that the defense could argue he

8    had every intention of cleaning up his life, of doing these --

9    of doing the filing, of paying his taxes.

10        And the fact that he did file goes to and tends to

11   negate the mens rea that they are trying to say was there, that

12   he was evading.  And so in a nutshell, that would be the

13   argument.

14        **THE COURT:**  This is obviously something we'll deal

15   with once we get into the trial, but does the Government want

16   to respond?

17        **MR. WISE:**  Sure.  So I think Mr. Geragos is mixing up

18   some of the various charges.  He said the actus reus is the

19   filing, that's only the actus reus for the false filing

20   charges, not for the false payment charges.  It's not the actus

21   reus for the false -- the felony false return charges, which is

22   the Owasco 1120 and his personal 1040 for 2018 and it's not the

23   actus reus for the 2018 evasion count, which relies on five

24   distinct acts of evasion.

25        So putting that aside, whoever the IRS witness that

12

1   Mr. Geragos is referring to and I can address that, is going to

2   testify can't say, I mean, I wrote it down, what was

3   Mr. Biden's state -- what was in Mr. Biden's head when he did

4   or didn't do certain things.

5        So whether there's an additional penalty I have no --

6   no one has any idea if Mr. Biden was aware of that.  I suppose

7   if he took the stand and said well, the reason I did this but

8   not that was because I understood it was a higher penalty if I

9   didn't file and didn't pay, but if I filed.  I mean, but the

10  process by which the IRS as an agency deals with a failure to

11  file or a failure to pay is not something that can then be

12  grafted onto Mr. Biden's head without him taking the stand and

13  saying, well, I was actually aware of that and that motivated

14  my actions.

15       So nobody can do that.  The other thing is, there

16  isn't going to be a witness that he can question this way and I

17  want to be up front about it.  Mr. Welch is a revenue agent.

18  He was brought in relatively recently to look at the charges in

19  the indictment, the specific items that were identified as

20  personal expenses that Mr. Biden, the defendant, falsely

21  claimed were business deductions.  He looked at the evidence of

22  that, the witnesses, the documentary evidence and then based on

23  that evidence, those -- that fact evidence he offered an

24  opinion as to what his real income was for '18 if he hadn't

25  claimed falsely that these personal expenses were business

1  expenses and then how much more in tax he would owe, which is

2  approximately $100,000 for that year.

3          So whether CID sends something to civil or an audit,

4  Mr. Welch can't testify to that.  And we're not calling an IRS

5  CID agent, I mean, I'll just be up front about it.  So I don't

6  want to -- we can argue about its relevance.  I don't think

7  even if we did call a witness any of it would be relevant.  But

8  there isn't going to be a witness where he can ask those

9  questions.

10          **THE COURT:**  Okay.  Thank you.  And again, we can deal

11  with this as it comes up, but for now, Government motion in

12  limine No. 3 is granted.  And to the extent that there's

13  testimony that arguably falls under that, that anybody wants to

14  introduce, we'll have to deal with that at sidebar.

15          Government's motion in limine No. 4, to preclude

16  Mr. Biden from raising a defense in advice of counsel.  This

17  motion is granted based on Mr. Biden's representation that he

18  will not advance such a defense, though witnesses may testify

19  about their role in filing and preparing Mr. Biden's taxes.

20          Motion in limine No. 5, an order precluding argument

21  and questioning relating to Mr. Biden's potential punishment,

22  plea negotiations or the diversion agreement or the July 26th,

23  2023 hearing, that motion is granted.  These topics are largely

24  inadmissible anyway, but to the extent somebody wants to make a

25  door opening argument we can do that at sidebar before any

14

```
1    testimony comes in.

2            Defense's motion in limine No. 1, again statements

3    made at the July 26th, 2023 hearing, that motion is granted.

4    Obviously the Government reserves its rights under 410(b) and

5    we can talk about that again at sidebar if it comes up.

6            Motion in limine No. 2, with respect to

7    administrative discharge from the Navy is granted.  Again, the

8    Government reserving rights with respect to potential

9    impeachment if defendant testifies.

10           Those motions are again motion -- Government's motion

11   in limine No. 3, No. 4 and No. 5 are granted.  Defense's motion

12   in limine No. 1 and 2 are granted, pursuant to non-opposition.

13   And again, to the extent anybody feels -- wants to get -- feels

14   like they're wanting to be -- getting close to things

15   prohibited by those rulings, let's deal with it at sidebar.

16           With respect to defendant's motion in limine No. 4,

17   that is a motion that seeks to keep allegations out that one,

18   Mr. Biden acted on behalf of a foreign principal to influence

19   U.S. policy and opinion; two, that he violated FARA; three,

20   that he improperly coordinated with the Obama administration;

21   four, that he received direct compensation from a foreign

22   state; five, that he received compensation for acts of his

23   father that impacted politics; or six, funneled money to his

24   father.

25           The Government's not contesting items 4 through 6 and
```

15

1    so that's received direct compensation from a foreign state,

2    received compensation for acts of his father that impacted

3    politics I guess or policies, or six, funneled money to his

4    father.

5            So that motion is granted with respect to 4 through

6    6, because of an agreement from the Government.  Again, if

7    we're going to get into anything that gets close to those

8    areas, let's make sure we do it at sidebar.

9            Any issue with that from the Government?  Have I

10   characterized that properly?

11           **MR. WISE:**  If I can just have one moment, Your Honor.

12        **(Pause)**

13           **MR. WISE:**  Thank you, Your Honor.

14           **THE COURT:**  Okay.  So those are the agreed motions in

15   limine so let's get into the ones that are disputed.  So let's

16   start out with motion in limine No. 1 that the Government filed

17   with respect to the expert Mr. Lee.

18           So this stands on the latest disclosure for Mr. Lee

19   and the Government's essential argument here is that none of

20   the opinions offered by Mr. Lee are stated in enough detail to

21   either show they are opinions or to give the Government notice

22   under Rule 616.

23           The -- what I thought I would do is go through these

24   and just have a brief argument on each of them, then the Court

25   will issue rulings.

1          But the first is, a description for the jury about

2   the scope of substance abuse -- of substance use to disorders.

3   Let me just get the Government's position very quickly on that.

4          **MR. WISE:**  Sure, Your Honor.  Yes, so we don't know

5   what the description is.  It just says a description.  And this

6   is repeated not to get ahead of myself, but we've got two

7   descriptions in 1 and 2 and then we've got 3 through 8 which

8   are an analysis.  We have no idea what any of those are because

9   they haven't been disclosed.

10          **THE COURT:**  Yeah.  And I guess we could probably do

11   this at once, just so you don't have to keep getting up and

12   down.  So 1 and 2 you're arguing that those are just purely

13   descriptions and you don't know what the actual opinions are.

14          **MR. WISE:**  Exactly.  Just topics at the broadest of

15   levels.  And this is the same issue in Delaware, where the

16   Court excluded the exact same disclosure although it remarkably

17   was for a different expert, but it's almost word-for-word the

18   same.

19          **THE COURT:**  Okay.  And the word analysis was added to

20   this --

21          **MR. WISE:**  Right.

22          **THE COURT:**  -- and that wasn't there in Delaware,

23   correct?

24          **MR. WISE:**  As to I think 6, 7 and 8 it was added.

25          **THE COURT:**  Okay.

17

1          **MR. WISE:**  I think the Aloun (phonetic) the May 20th

2    analysis for Aloun which became the July 31st analysis for Lee

3    didn't have that word analysis.  But we don't know what the

4    analysis is.

5          **THE COURT:**  Okay.  And as long as we're on the topic,

6    there seems to be at least in the motions a desire by the

7    defense to put on evidence of the causes of Mr. Biden's

8    addiction.  What's your view on the relevance of that?

9          **MR. WISE:**  We think it's irrelevant and it's also --

10   should be excluded under 403 because it risks confusing the

11   jury.

12          In the gun case, addiction was a central issue.  He

13   was either -- you know, the law provided that if he was an

14   addict or an unlawful user he couldn't purchase a firearm.

15   Here, it's not an element of the offense.  It is something

16   there will be evidence of, his -- both his drug use, really his

17   drug use, his alcohol use is I think more incidental.  Where it

18   arises here, of course, is in the diminished capacity

19   instruction that they've asked for which talks about

20   intoxication which the instruction identifies either as alcohol

21   use or drug use, which is, the evidence will show, is present

22   here.

23          But whether he was an addict or not is simply

24   irrelevant.  The diminished capacity instruction doesn't ask

25   the jury to find he was an addict, it doesn't use the term

1   addict, it would just inject the concept that the jury would

2   not even grapple with, right.  It would be putting on an expert

3   to introduce a concept that none of the elements actually draw

4   on.

5          So the causes of it are even further removed, right,

6   whether it's in response to trauma, which is we've said.  There

7   were statements made in the Delaware case that we thought

8   nobody can testify to this, that you know, a trauma early in

9   the defendant's life then manifested itself as drug and alcohol

10  use 40 years ago, nobody can testify to that, but more

11  immediately it just simply doesn't bear on any of the issues

12  that the jury will be deciding.

13         And so under Daubert it's not relevant, it doesn't

14  assess -- it doesn't assist the trier of the fact under 702 in

15  reaching a determination that has to be made in this case.

16         **THE COURT:**  Thank you.  Let me hear from the defense.

17  And I guess we'll just hear argument on the complete motion in

18  limine with respect to the expert.

19         **MR. GERAGOS:**  Right.  So I'll deal with all of the --

20         **THE COURT:**  Yeah, yeah.

21         **MR. GERAGOS:**  -- 1 through 8.

22         Look, if they were making the argument, Your Honor,

23  we're coming in here, we're the Government, we're going to just

24  present a straight tax case and he didn't file and he didn't

25  pay on time and therefore all of this is irrelevant I might be

19

1    inclined to see the argument.

2         What they are instead asking you or the jury, what

3    the -- and not you, but the fact finder to do is we're going to

4    sit here, we're going to read from his autobiography, we're

5    going to read from Beautiful Minds.  We're going to talk about

6    his paying for prostitutes.  We're going to talk about his

7    extravagant lifestyle.  We're going to talk about him being on

8    drugs 24 hours a day, that's what they plan on presenting in

9    their case in chief.

10        Now, they want to say, and I was a little astonished

11   to hear, nobody can testify as to the trauma that happened to

12   him at age 4 or at age 5?  Nobody?  There's nobody who can

13   testify as to that trauma?  There's nobody who can testify as

14   to the trauma of having your brother, who was your protector,

15   die in 2015 which coincidentally sets off this spiral for the

16   next couple of years?  Nobody can testify to that because I

17   find that hard to believe.

18        And by the way, they are penning their whole

19   prosecutorial theory upon the fact that he went into this

20   spiral that they don't want the jury to hear what caused that

21   spiral, they want to say he's out there partying it up at the

22   Chateau Marmont, he's over there hiring hookers, he's doing

23   this and it's just because he's got a lot of money and that's

24   what he wants to do.  That is a complete, speaking of opening

25   the door, my father who was my late partner used to get mad at

20

1    me when I said open the door, because he said there is no such

2    thing.

3            But if that doesn't open the door to a more truthful

4    picture of what is happening here and namely what happened

5    here, and specifically why we had Dr. Lee and the cycle of

6    addiction which they kind of pooh-pooh as they don't understand

7    it, I'm happy to flesh that out even more, but the fact that

8    somebody becomes addicted or uses or self-medicates and acts in

9    ways that make zero sense to them at the time and then gets

10   sober and try to get their life together, and that there is a

11   cyclable pattern to that and that there is -- that that

12   affects, by definition, their mens rea makes -- that to me

13   makes no sense.

14           And I would also say that the -- specifically

15   Mr. Biden enrolled in and I think this is under number 4 in the

16   disclosure, enrolled in or attended between 2010 and 2019 the

17   therapy alcohol substance use treatment programs and that is

18   what the cycling of addiction would address.

19           I also would mention to the Court, which I'm sure

20   you're aware of, since these initial disclosures or motions

21   were filed which predate our presence in this case, that they

22   basically were in May and I did not try the Delaware case.  I'm

23   here to try this case.

24           But I will tell you that a complete sea change has

25   taken place in the idea of 702 and that is Diaz.  And you can

21

1    read their motion in limine, you can read their reply, we at

2    least addressed Diaz.  They have not dealt with Diaz.  Diaz

3    specifically addressed the idea that an expert can come in, an

4    expert can talk about the framework and -- of general classes

5    of people.

6              In this case, Dr. Lee would come in.  We would

7    proffer, he would talk about the general framework and class of

8    what addicts do.  He's not saying -- and they keep kind of

9    shifting and doing a little three-card monte with Your Honor,

10   intellectual monte by saying, oh, he hasn't examined by -- he

11   hasn't done an analysis of him.  That's not what Diaz says.

12   Diaz says in the last 45 days the U.S. Supreme Court has said,

13   you can have an expert, that that expert can testify as to a

14   framework.  In Diaz it was who are the people who are drug

15   mules, do they know that, various classes.

16             It's up to the fact finder, it's up to the jury to

17   then make the leap as to whether there is the mens rea.  And so

18   under 702, everything that they have told you in their filings

19   has been completely undercut by the opinion and by the

20   concurrence, I believe it was Justice Ketanji Brown, and I

21   would submit interestingly that opinion had an amicus which I

22   just read last night because I thought it was fascinating that

23   was filed on behalf of 15 prominent, some of the most prominent

24   evidence professors in the country, who were actually arguing

25   exactly the opposite, at least the way I read it in the amicus,

22

1    to this idea that the prosecution can say you're not able to

2    put up a framework of what people do under various classes of

3    their analysis.

4          And the analysis is important in the July 31st

5    disclosure.  Because analysis is, somebody has done what -- and

6    I've got a mental block on the name of the witness in the Diaz

7    case, but the witness in the Diaz case did the analysis, did

8    not know Ms. Diaz, but knew the various kinds of drug cartel

9    methods, if you will, or frameworks that they use for mules and

10   was able to opine on that.

11         Just like here, we have a witness, Dr. Lee, who will

12   be able to opine and that's what we would proffer on the cycle

13   of addiction on what that does to people who are in the throes

14   of addiction.  They have the ability, in fact, in their reply

15   they go through and they give you a laundry list of questions

16   that they would ask.  That is more properly a script for their

17   cross-examination.

18         The idea that they would move to exclude, that is the

19   most harsh remedy of all in a case where I'm just mentioned

20   before that by their own Department of Justice guidelines, this

21   is the highest mens rea at least for part of the counts

22   involved here that we're going to eliminate the idea of an

23   addiction specialist telling the jurors about what happens to

24   somebody who's in the throes of addiction.  And we're not

25   taking the ultimate issue of fact finding from them.

1          What we're saying is, here is something that you can

2     look at.  Here are scientific, here are the research if you

3     will, social science research that serves as the predicate for

4     what the defense is arguing.

5          So I would take great umbrage at the idea of

6     excluding this.  I believe that if the Court were to say, well

7     I want a more robust disclosure, we're happy to do that.  I

8     think in a couple of the cases, I forget the specific one, but

9     I think it was one of the East Coast decisions that was quoted

10    by them, the Court allowed a subsequent disclosure that flushed

11    out what the Court perceived as a lacking of the Rule 16.  And

12    we would happily do that.

13          I would also make the argument I suppose that in some

14    of these cases for some of these motions in limine, and you

15    know this and I'm not telling you anything you don't know, but

16    the Court can reserve, pending how the evidence comes out and

17    the case in chief by the prosecution here and by the

18    Government, the Court can reserve and do it on a case by case

19    or fact intensive kind of analysis.

20          As you well know, the motions in limine have

21    developed into a -- by virtue of practice for the Courts to

22    control their courtroom and you've got wide latitude obviously

23    in how you address it and I haven't practiced before Your Honor

24    yet, but given what I've seen so far, my belief is that you are

25    fact driven or evidence driven.  And if that's the case, I

24

1    would ask that if you're -- if you lean towards that it needs

2    to be fleshed out, we're still at least, I haven't done the

3    calculations, but we're still two weeks I think prior to trial

4    and I'd be happy to do that in a fashion.  And I'm not asking

5    you for guidance, I'm just saying before you take the most

6    draconian exclusionary ruling that you allow us to flesh it out

7    more.

8            THE COURT:  Let me just ask you a few questions and

9    then --

10           MR. GERAGOS:  Sure.

11           THE COURT:  -- I'll hear from the Government.

12           In looking at Mr. Lee's disclosure, I'm seeing some

13   topics that I just wonder how they're relevant here.  Topic 7,

14   for example, an analysis of how family members of persons with

15   substance use disorders typically continue to question a

16   person's sobriety, even when they actually are not using drugs,

17   creating an atmosphere of distrust and further compromising the

18   person's recovery.

19           What -- how is that relevant to the issues here?

20           MR. GERAGOS:  I believe the Court -- did the Court

21   issue an immunity order in this case for one of his relatives?

22   I believe there was.

23           THE COURT:  Two I think.

24           MR. GERAGOS:  Yeah, for two of them, correct?

25           THE COURT:  Right.

1    **MR. GERAGOS:**  Right.  And so potentially that is

2    the -- an area that we may want to address and that's -- kind

3    of fits in and that's a very astute question, given that I was

4    saying it's hard for me to predict what will happen, given that

5    I have not personally interviewed either of those witnesses but

6    they are family members.  I don't know what the tone or tenor

7    of their testimony is, but we, in an abundance of caution, I

8    would like to have an expert available and that's why we're

9    disclosing it.

10    And based on the fact that they -- there were family

11    members called in Delaware, is my understanding, that we would

12    have somebody depending on what the tone or tenor is.

13    **THE COURT:**  So, I mean, because to me 7 and 8 or the

14    topics look like they were pretty -- they're fairly relevant to

15    what was going on in Delaware.  But they're not relevant here

16    and it looked to me like they were maybe cut and pasted from

17    the prior expert report.  But you actually intended 7 and 8 to

18    be in there?

19    **MR. GERAGOS:**  Well, yes.  I don't deny that they're

20    cut and pasted.  But the -- whether to eliminate them or cut

21    and paste them was based on the fact that there still are

22    relatives who are -- the Government intends to call and I --

23    like I said, I don't know specifically.

24    And I'll give just -- I'll flesh out number 8.  The

25    cycles of sobriety recovery and rehabilitation I believe that

1    will go directly to what Mr. Wise was just talking about in

2    terms of the timing of the filings and things of that nature

3    and the payments and things.  The analysis and the social

4    science behind the addiction will give the jury the ability to

5    see that this is not a static linear process.  You just don't

6    end addiction on day -- or to have addiction on days 1 through

7    365, end addiction on day 366 and move on your way.  It is a

8    fluid process.  It is a cyclical process and during those

9    periods when he finally got this behind him is when he did make

10   the intent to comply with the law, which is what he ultimately

11   did.

12          **THE COURT:**  Let me just hear from the Government if

13   you can respond briefly and a response to the argument on <u>Diaz</u>

14   which sort of allowing an expert to talk about what folks in

15   the drug trade generally know and what they don't know.

16          **MR. WISE:**  Right.  So Mr. Geragos is wrong about <u>Diaz</u>

17   being a 702 case.

18          **THE COURT:**  Right.

19          **MR. WISE:**  It's a 704(b) case.

20          **THE COURT:**  Uh-huh.

21          **MR. WISE:**  So they spend four pages in their

22   opposition addressing an argument we didn't make, right.  We

23   didn't ask the Court to exclude Lee based on 704(b).  We made

24   that argument in Delaware because under the facts and

25   circumstances in Delaware it was appropriate.  Here, we never

27

1    made that argument.

2           So he even goes so far as to sort of try to chide us

3    for not being candid with the Court by saying we didn't

4    identify contrary controlling authority.  We didn't argue

5    704(b), right.  They apparently didn't read our motion.

6           So Diaz doesn't speak to the issues before this

7    Court.  And they're doing something, you know, on the one hand

8    we have no idea what Lee is actually going to say, right.  And

9    the clearest example of this is, look at something like 3, an

10   analysis of certain statements made by Mr. Biden in text

11   message conversations and in his memoir, Beautiful Things, as

12   to his following Dr. Lee's view.  Dr. Lee's view.

13          So I read that and I say, what is Dr. Lee's view.

14   How do I hire an expert and say, and 4 does the same thing, as

15   to his following Dr. Lee's view.  I go to an expert and I say,

16   here's doctor -- what do I give them to say here's Dr. Lee's

17   view?  Is it junk science?  Does it follow the DSM?  Is it

18   consistent with the state of the art?  We have no way and we

19   will be learning for the first time if he's allowed to testify

20   when the words are literally coming out of his mouth at trial.

21          **THE COURT:**  So you're making both a Rule 16 argument

22   and a 702 argument?

23          **MR. WISE:**  And a 702, but not a 704(b) --

24          **THE COURT:**  Right.

25          **MR. WISE:**  -- which is what Diaz is about.  But they

1   don't actually observe the distinction that Diaz draws.  And

2   there's case law -- you know, there's case law about Government

3   expert witnesses, particularly in drug cases that improperly

4   mix essentially fact testimony and expert opinion testimony,

5   right.

6           And so in Diaz, the DEA agent was allowed to say drug

7   mules typically don't know -- drug mules typically know that

8   they're carrying drugs because with quantities of this size

9   they have to be trusted and he gave some opinion based on his

10  experience.

11          Here they're dipping their toe in the water of trying

12  to -- they're not just saying other people like Mr. Biden, and

13  they haven't told us what any of that would mean, other people

14  like Mr. Biden behave the same way he does.

15          They're saying, they've actually -- he's actually

16  looked at some statements of Mr. Biden, which they haven't

17  disclosed what those are, so we don't know if they're cherry

18  picked, we don't know if, you know, other statements weren't

19  shown to him, we have no idea.

20          They're saying actually Mr. Biden's own statement

21  evidence him following Dr. Lee's view, whatever that is, and

22  then they also want to make this argument I guess about

23  categories of people like Mr. Biden and that blending is also

24  makes it inadmissible and there's a whole line of cases about

25  why you can't do that with expert witnesses.

1          One of the fundamental things we don't know standing

2   here and one of the cases they cite is United States v Finley,

3   and this is their opposition at 5, it talks about what Finley

4   relied on and I want to -- specifically testing, case history,

5   interviews with the patient and family.  We have no idea if

6   he's ever -- if this Dr. Lee has interviewed Mr. Biden,

7   reviewed his medical history, done any of the things that would

8   allow him to diagnose Mr. Biden.

9          **THE COURT:**  And that's a case defendant cite?

10          **MR. WISE:**  Yes, that's a case they cited --

11          **THE COURT:**  Yeah, yeah.

12          **MR. WISE:**  -- as blessing this kind of testimony.

13   Standing here we have no idea if he's done any of that.  All we

14   know is --

15          **THE COURT:**  Well, we know what's in the report.

16          **MR. WISE:**  We know just -- and all it looks like is

17   the statements, whatever those are, and then this vague

18   reference to --

19          **THE COURT:**  Okay.  Thank you, counsel.  I think

20   I'm --

21          **MR. WISE:**  Thank you.

22          **THE COURT:**  So thank you for the arguments.  The

23   Court has reviewed the briefs on this, the supplemental briefs,

24   the oppositions, the replies, gone through the original report

25   and the subsequent report and based on the Court's analysis I'm

30

1   granting the Government's motion in limine No. 1, Dr. Lee's

2   disclosure is excluded.

3           I find Dr. Lee's disclosure inadequate under Rule 16

4   in that he doesn't identify the opinions he would put forward

5   if he were allowed to testify.  I don't think we have an

6   adequate disclosure of what the opinions are.

7           In reading each one, I'm unable myself to understand

8   what it is the opinion is that he would give.  Everything seems

9   to be couched in general language without any specifics that

10  would allow the Government to be able to prepare to cross-

11  examine or come up with a rebuttal expert.

12          I also feel that the disclosure does fail to rise to

13  what's required under Rule 702.  I don't have any understanding

14  of the methodology used.  I don't have any understanding of how

15  Mr. Lee would base these opinions on any sort of scientific or

16  medical research of any kind.  There's no methodology here.

17          I'll give you a written order, along with all the

18  motions in limine, but motion in limine No. 1 is granted.

19          So let's move on to motion in limine No. 2,

20  Mr. Bishop.

21          **MR. GERAGOS:**  Could I ask that that be without

22  prejudice to a further disclosure?

23          **THE COURT:**  Well, the time for disclosures here, you

24  know, given that we're ready for trial is -- has lapsed.  And

25  so that -- Mr. Lee is -- the order of the Court is Mr. Lee is

31

1    excluded.

2         Obviously you can bring a motion to -- for the Court

3    to reconsider that or, you know, make another motion as you've

4    correctly indicated, all motions in limine are subject to, you

5    know, review at any time.  But so -- but the ruling of the

6    Court now is that Mr. Lee is excluded.

7         **MR. GERAGOS:**  Understood, thank you.

8         **THE COURT:**  Let's move on to Mr. Bishop.  Mr. Bishop

9    has got a number of opinions and again, I've gone through the

10   briefs and the supplemental disclosures and the replies and

11   Mr. Bishop's disclosures.

12        There are three issues that he professes to want to

13   talk about, the overall pattern of Mr. Biden's tax compliance

14   prior to tax year 2016, the typical role of accountants, tax

15   consultants, preparers and/or tax attorneys in preparation of

16   an individual and a corporation's taxes, the competence of the

17   accountant's, tax consultants, preparers, tax attorneys who

18   prepared Mr. Biden's and Owasco's taxes.

19        And I want to kind of break those out and hear from

20   the defense as to what are the opinions here?  Again, these

21   seem like general statements without a specific, as to what the

22   opinion is he's going to be giving.

23        **MR. GERAGOS:**  Yes, Your Honor, which -- I will

24   address them one by one if you want.

25        **THE COURT:**  Sure.

1              **MR. GERAGOS:**  In the disclosures, you're looking at

2      the 1 through 6, correct, or I'm in -- yes, 1 through 6.

3              So the opinions in related testimony along those

4      line, the -- first of all, the opposition characterizes

5      Mr. Bishop as, I think they characterized him as a retired

6      accountant.  And I think that his CV is clearly more robust

7      than being a retired accountant.  This is somebody who was

8      at --

9              **THE COURT:**  But see, it says -- these you've got

10     under Rule 16, we'll start off with like the first one.  The

11     overall pattern of Mr. Biden's tax compliance prior to tax year

12     2016.

13             **MR. GERAGOS:**  Correct.

14             **THE COURT:**  Two things about that.  One, what is the

15     opinion being expressed there?

16             **MR. GERAGOS:**  Well, that there was compliance prior

17     to the year 2016.

18             **THE COURT:**  Okay.  Because it doesn't say one way or

19     the other.  And two, why is that relevant?

20             **MR. GERAGOS:**  To show that this addiction which is

21     going to be the centerpiece of the defense was the cause for

22     the 2016 through 2019 problems.  And that that goes directly to

23     the mens rea for Counts 1 through 9.

24             **THE COURT:**  So essentially the argument would be that

25     if he paid his taxes prior to this period where he didn't, that

 1   should somehow be evidence that he had diminished capacity?

 2           **MR. GERAGOS:**  Well, there -- it's actually more of a

 3   hybrid.  Yes, it would encompass that statement, but it would

 4   also encompass that there is a relationship.  It would be a

 5   support for the idea that there's a relationship between the

 6   addiction in the throes of the addiction and the tax non-

 7   compliance as alleged by the Government.

 8           **THE COURT:**  Okay.  Let's move to the second one, the

 9   typical role of accountants, tax consultants, preparers and/or

10   tax attorneys in the preparation of an individual and a

11   corporation's taxes.  Again, I don't see an opinion there.

12           **MR. GERAGOS:**  Okay.  Well the typical role is the

13   more general, what did they do?  They're going to -- they

14   represented to you this morning that Mr. Welch, and by the

15   way --

16           **THE COURT:**  But what is the opinion that Mr. Bishop

17   is going to be giving here?  You know, what does --

18           **MR. GERAGOS:**  That there -- yes, that the --

19           **THE COURT:**  -- that refer to?

20           **MR. GERAGOS:**  I have the other portion in the

21   disclosure where there was I believe on -- in the supplemental

22   disclosure where we said that there was a heightened awareness

23   by the tax preparers as to what they should be looking for

24   because they are receiving information from the taxpayer and

25   given the -- all the various indicia they should have had a

34

1    heightened awareness on that.

2        **THE COURT:**  So that number 2 goes with the statement

3    in the -- I guess the third paragraph on that page, based on

4    the high profile nature of the client, the quality of the

5    source documentation and the manner in which the business

6    records were maintained, EWC had an enhanced due diligence

7    requirement to make further inquiries to verify the accuracy

8    and completeness?

9        **MR. GERAGOS:**  Correct.

10       **THE COURT:**  Okay.  The third item, the competence of

11   the accountants, tax consultants, preparers, and/or tax

12   attorneys who prepared Mr. Biden's and/or Owasco's taxes from

13   2016 to 2019.  I don't see the opinion there either.  Were they

14   bad, were they good or is this --

15       **MR. GERAGOS:**  Your Honor, we've given the opinion to

16   them, in fact they have now pushed back on it that it doesn't

17   matter.  For instance, there is both the $1 million that was

18   picked up 2018 versus 2017 and there's the 157.  So that goes

19   directly to those two factual issues, which they have pushed

20   back on.  That's a whole different argument.

21       **THE COURT:**  Okay.  And then skipping the paragraph on

22   the $1 million, the EWC double counting of the 157, going on to

23   the third paragraph, Mr. Biden's 2018 tax and bank records did

24   not reveal any classic badges of fraud, such as double sets of

25   books, false invoices, and concealed records.

35

1          Tell me about what's the methodology that the expert

2   is -- in this report is identifying for being able to make --

3   to give that opinion.  The methodology is based on his -- as

4   I've indicated, based on his training and his CV.  This was

5   somebody who was in charge and supervised at the IRS for a long

6   period of time, and specifically the criminal investigation

7   unit, for lack of a better term.

8          There were certain things that to the IRS internally

9   they looked at when they were looking for anything that would

10  show or be consistent with an evil intent of mens rea or a mens

11  rea to either not file or to evade.  That the badges of indicia

12  as you just read, a double set of books, a hiding of the

13  income, any of the other badge -- what they call badges of

14  indicia, I would just call, you know, tell-tale signs, those or

15  the methodology of that has been developed by the IRS.  That is

16  part of what -- part and parcel of what the criminal

17  investigation division of the IRS has developed and he would be

18  able to say I did not find -- the disclosure I think lists the

19  laundry list.  I didn't find a double set of books.  I didn't

20  find the other, what he calls the badges of -- or indicia of a

21  criminal intent.

22         And he's not saying -- I want to make clear for the

23  record, we're not saying that he is going to offer an opinion

24  as to the ultimate issue.  What we are saying is that there is

25  a framework here which he can testify to as to the methodology

36

1    that is used by the IRS in the criminal investigation division

2    and what they look for.

3            **THE COURT:**  Thank you.  Let me just get a response

4    from the Government.

5            **MR. WISE:**  Thank you, Your Honor.

6            So Mr. Geragos didn't answer your questions about the

7    opinions, we still don't what they are.  We don't know what the

8    pattern is.  Is it good, is it consistent, is it bad, is it

9    haphazard?

10           All I heard him say was that he paid previously and

11   then when he entered the throes of addiction he didn't pay.

12   Well Bishop can't talk about his addiction.  Bishop is a

13   retired revenue agent.  So it sounds like the only fact that

14   would come in through Bishop is that he previously did file

15   taxes, but we're going to put that on because that goes to his

16   knowledge that he had to file taxes.

17           I mean the indictment specifically alleges that in

18   the years preceding the scheme charge in '14 and '15 he filed

19   his taxes and he continued to make periodic tax payments on the

20   15 outstanding liabilities through March of '18 when he decided

21   to stop.

22           So Bishop doesn't help the jury decide a fact at

23   issue because the uncontested evidence will be that in the

24   years preceding he did pay, and that goes to his knowledge that

25   he had to pay.  And that no matter how much drugs you can take,

37

1    you can't -- you don't suddenly forget that when you make $11

2    million you have to pay taxes.

3         So Bishop doesn't aid the jury and doesn't --

4    wouldn't offer anything other than fact testimony that's coming

5    in anyway.

6         The second one, the typical role of accountants, I --

7    what Mr. Geragos said was entirely inconsistent with what they

8    said later.  You asked him what is the opinion about the

9    typical role of accountants, tax consultants, preparers and/or

10   tax attorneys, what would Bishop actually say about that.  We

11   still don't know.

12        He then pointed you to this enhanced due diligence,

13   well, that's not typical.  They're actually saying because of

14   the high profile nature of the client, the quality of the

15   source documentation and the manner in which the business

16   records were maintained, EWC had an enhanced due diligence

17   requirement.

18        So that is not what is typical.  That's the opposite

19   of what is typical.  That somehow there's this heightened

20   standard and I'll tell you, I mean Daubert talks about junk

21   science, that is junk science.  That is not a phrase that

22   exists in accounting, tax preparation, the law, nobody knows

23   what enhanced due diligence means, because they made it up or

24   Bishop made it up.  So that also doesn't come in over -- under

25   702.

38

1          As to the third point, the competence, again we don't

2     know what Bishop thinks about the competence of the tax return

3     preparers at this point.  They don't disclose that.  And it's

4     not just the tax return preparers, it's also consultants and

5     tax attorneys.  And I will say that the defense is taking a

6     position that certain of the information that the tax return

7     preparers are privy to is privileged under Kovel.

8          So they can't on the one hand say, well the -- and

9     we've honored that, we've stayed away from that.  We don't know

10    what the tax attorneys' interaction was with the tax return

11    preparers other than what they have waived, a limited waiver to

12    disclose to us, they then can't have an expert come over top

13    and then suddenly reveal that stuff for the same time.  It's

14    also just not relevant.

15         The competence, as we argue of the tax return

16    preparers isn't relevant.  We're not conceding they were

17    incompetent.  But here what's charged are specific instances

18    where Mr. Biden told his tax return preparers these are

19    business expenses and they relied on those representations and

20    calculated the taxes he owed based on that.  That was their

21    role.  So --

22         **THE COURT:**  Now, let me turn you to the opinion

23    which -- with respect to no classic badges of fraud, such as

24    double sets of books, false invoices, concealed records,

25    concealment of assets and destruction of records.

39

1           So I take it the -- I believe what this disclosure

2   says is the expert wants to give the opinion that in this case,

3   he didn't find what the IRS typically considers as good

4   evidence of intentional -- of intent to file false tax returns.

5           **MR. WISE:**  Yeah.  I think that is sort of -- although

6   again we don't -- you know, other than these categories of what

7   are called classic badges of fraud, we don't know what he'll

8   actually say about it, but my response is so what.  Right?

9   It's a strawman they've set up.  He didn't destroy books.  We

10  didn't have books for '18.  Right?  Because he wasn't really

11  working so they had to try to figure out what he was doing, how

12  he was spending all this money and they went through his

13  records and then he told them, loads of personal expenses were

14  business expenses.

15          So, yeah, there's no two sets of expenses for '18

16  because there are no books.  He didn't destroy anything in '18

17  because there's nothing to destroy.  All of that doesn't assist

18  the jury.  It's the absence of evidence, but the absence of

19  evidence you can't infer from that, that that means he had good

20  intent.

21          Just like if there were -- you know, if there was

22  evidence outside of what we charge, propensity evidence we

23  couldn't get into that.  This is almost like reverse propensity

24  evidence.  The fact that he didn't do other kinds of tax

25  evasion means the jury can infer he didn't do this, the tax

40

1    evasion he's actually charged with.  Well that's not how it

2    works.

3              So none of this is actually relevant.  It's also not

4    reliable.  We don't know when Mr. Geragos says it's based on

5    his training with the IRS, we don't know what any of that

6    means.  We don't have any disclosure that describes that other

7    than these high level topics.

8              **THE COURT:**  Okay.  Thank you.

9              So thank you for the argument on this, and again I've

10   spent some time going through everything and so the Court's

11   ruling on motion in limine No. 2 is as follows.

12             With respect to items 1, 2 and 3 on the expert's

13   disclosure at page 2 I don't think that we have sufficient

14   opinions there so the Court is excluding that testimony under

15   Rule 16.

16             With respect to paragraph 3, the badges of fraud,

17   examples of expenses that were haphazard and inconsistent and

18   the high profile nature of the client, I don't have anything in

19   the report that gives me a basis for these opinions or any

20   expert methodologies, so the Court is excluding those opinions

21   under Section 702.

22             And then with respect to the second paragraph that

23   lists three items, $1 million in income received in 2017 and

24   then there's issues in 2018, the Court is going to reserve

25   ruling on that whether he can testify as to those opinions,

41

 1   based on whether -- whether we -- what the Government puts in.

 2            As I understand it, Mr. Bishop is being brought on to

 3   rebut evidence the Government's putting in.  If the

 4   Government -- depending on what evidence the Government puts

 5   in, we will address that when it comes.

 6            So that's the ruling on motion in limine No. 2.

 7            The Government's motion in limine No. 6, late payment

 8   of taxes.  I've gone through the case law on this pretty

 9   clearly.  I don't see a single case where late payment of taxes

10   has been -- has ever been found to be relevant evidence in a

11   prosecution for failure to pay, failure to file, or tax evasion

12   or filing a false form.

13            That is correct, let me turn to the defense.  That's

14   correct, there has been no case that has allowed that evidence

15   in.

16            **MR. GERAGOS:**  I always -- you know, since you asked

17   that question I apologize for the pause, because I was trying

18   to -- I thought there was a case, I could be wrong where the --

19   and the -- it turned on the idea of whether or not the subject

20   was aware of an investigation and that there -- the exclusion

21   was based on that.

22            **THE COURT:**  The closest I've seen in the cases is

23   that there have been courts that have said we're not saying

24   that this can never be relevant, but it wasn't relevant here.

25            **MR. GERAGOS:**  Correct.  And that's why I'm saying

42

1    that the -- in this case, the idea is that if I got the

2    timeline correct, the Government timeline correct, that there

3    were payments that were made prior to anything they can produce

4    showing that Mr. Biden was aware of an investigation.  And

5    I'm -- it's not a remedial -- we're not trying to bring it in

6    as a remedial action, so to speak.

7              I mean, this is not a slip and fall where you go and

8    fix the dangerous condition.  This is something once again and

9    I'm sorry for repeating myself so many times, but this case

10   comes down to the mens rea, obviously.  And the fact that it

11   was paid and I think goes directly that is relevance as to

12   whether or not there was an intent to evade for the specific

13   intent charges and whether it was paid arguably is also

14   relevant, when it was paid is also relevant to this idea of

15   there was -- there were challenges during the 2016 to the 2019

16   period.

17             I have a hard time understanding how the -- it

18   wouldn't be relevant with -- in the Government's case in chief.

19   I mean, they look to -- want to say, if you didn't pay on this

20   day, whether it's July 15th or whether it's October 15th, mind

21   you there's going to be, I predict right now, some discussion

22   about what COVID and what the abatements and what the

23   suspension orders, and how they impacted this.

24             But putting that aside, the payment itself is an

25   indicia, I'm not looking for a badge, but an indicia of the

43

1    lack of mens rea to evade.

2             So to borrow the quote and I wish I could remember

3    the case that you were paraphrasing but to borrow that case

4    where there's nothing that says it's never admissible, it's not

5    the remedial action line of cases in personal injury or things

6    in torts cases.  This is in the criminal context where you're

7    saying this person wanted to evade.

8             And it's really somewhat counter intuitive.  Why

9    would somebody file the tax return, why would they clean up or

10   try to clean up their mess, and then subsequently pay if they

11   were trying to evade.  And why are they so afraid of a jury

12   hearing that inference -- that information.

13           **THE COURT:**  And I think the case we're talking about

14   is <u>United States v Baras</u>, right, from the Ninth Circuit, 624 F.

15   Appendix 560?

16           **MR. GERAGOS:**  Could I ask what year that was?

17           **THE COURT:**  19 -- I'm sorry, 2015.

18           **MR. GERAGOS:**  Right, yes, it was.

19           **THE COURT:**  Yeah.  And so the issue we've got here is

20   the -- Mr. Biden publicly announced he was under investigation

21   for his taxes in December of 2020.

22           **MR. GERAGOS:**  2020, correct.

23           **THE COURT:**  And he didn't pay anything or a third

24   party didn't pay anything until October 2021.

25           **MR. GERAGOS:**  Correct.  And I'm not trying to

44

 1   sanitize that.  I mean, we'll welcome that, but remember there

 2   is -- there's two stages here.  You've got filing and payment.

 3          And the announcement in December whatever date it

 4   was, the 3rd or the 9th, of 2020 it comes between that.

 5   Comes -- is the -- cuts the difference.  He files first before

 6   the December 2020 admission.  And --

 7          **THE COURT:**  Okay.  Thank you.

 8          **MR. GERAGOS:**  Okay.

 9          **THE COURT:**  Let me hear from the Government briefly

10   on this issue.

11          **MR. WISE:**  Sure.  So to answer your question, there

12   is no case that allows for the delinquent of payment of taxes

13   under the circumstance presented here.  And we're not arguing

14   there's a per se rule, as we pointed out.  Cases over and over

15   again that have addressed this under 404 -- under 401 and 403

16   have found that it's inadmissible and specifically, I mean, we

17   pointed to Pang (phonetic), the 2004 Ninth Circuit and Ross in

18   1980 that both cited the Supreme Court's decision in Samsong

19   (phonetic).  And Samsong directly addresses the argument

20   Mr. Geragos just made, where the Court said the intent to

21   report income and pay tax in the future, which is what they're

22   saying, oh, he got his life together and he was at some point

23   then going to pay it, does not vitiate willfulness required by

24   7203.

25          So it's not a defense to say, well he intended at

1   some point in the future to pay.  The crime is completed when

2   he didn't pay when the obligation was due.  The indictment

3   period ends in October of 2020.  The payments don't come until

4   October of 2021, which is further complicated by the fact that

5   he didn't pay it.  So it's Mr. Morris' decision in the first

6   instance to actually cough up the money and pay it.

7           So are we going to have a mini trial on what was in

8   Mr. Morris' mind?  Was he doing it for whatever reason he was

9   doing it?  And then further try to infer in some sort of time

10  machine like fashion that when Mr. Biden, the world he was

11  sitting in in October of 2021, somehow relates back to where he

12  was in the period actually at issue in the indictment, there's

13  no way to do that.

14          **THE COURT:**  I mean -- thank you for that argument.

15  Let me just ask you because it reminded me, in your opposition

16  or your reply, you indicate that you're not calling Mr. Morris.

17          **MR. WISE:**  That's right, we're not calling

18  Mr. Morris.

19          **THE COURT:**  But you also talk about the evidence will

20  show that apparently Mr. Morris paid for Mr. Biden's house and

21  crisis team and those things.

22          **MR. WISE:**  Yeah.

23          **THE COURT:**  How would you intend to get that evidence

24  in if Mr. Morris isn't testifying?

25          **MR. WISE:**  So there's a document that's certified by

46

1    Mr. Morris' accountant under 902.11 under the --

2          THE COURT:  Okay.  So there is -- yeah, I just want

3    to --

4          MR. WISE:  Yeah.

5          THE COURT:  Because those seemed inconsistent to me

6    but I just wanted to understand.

7          MR. WISE:  Right.  And that, I will say that document

8    which is alone and then attached to it are a series of

9    disbursement records from Mr. Morris' law firm and others, all

10   the things he's paying, the house in Malibu, the Porsche, the

11   crisis communication team, the security detail, none of that

12   includes the taxes.

13         So the evidence is that he was making -- he was

14   supporting Mr. Biden's lifestyle up through the end of the

15   period charged in the indictment, up through October of '20 and

16   then again, a year later, made an independent apparently

17   decision after Mr. Biden was told he was under criminal

18   investigation, to then make an additional significant loan just

19   for the purpose of those taxes.

20         THE COURT:  Okay.  Thank you.  You can stay up there

21   because I'm going to ask you about motion in limine No. 7.

22         But the ruling on motion in limine No. 6 is the Court

23   grants motion in limine No. 6, any evidence of tax payments

24   that postdate the date of the alleged -- that this crime was

25   willfully committed in July of 2020 are excluded.

1          With respect to motion in limine No. 7 it's kind of

2    broad and we don't know exactly what you're asking me.

3    Essentially you're asking to -- the Court order that the

4    defendant not make any arguments in opening that they don't

5    intend to back up by evidence.  It's kind of -- it's a little

6    bit amorphous there, but there are some things that jump out.

7    And I think we can probably talk about those.

8          With respect to some of the things you mentioned in

9    the Delaware trial, the defendant's brother passing, the

10   defendant's relationship with his uncle, sort of the personal

11   tragedy growing up, your argument is that none of that should

12   come into evidence because it's not relevant and because of

13   that counsel shouldn't be able to talk about it during opening.

14          **MR. WISE:**  It's sort of -- if I may, Your Honor.

15          **THE COURT:**  Sure.

16          **MR. WISE:**  You know, when Mr. Geragos said -- I think

17   he said, you know, I don't know how -- I think I wrote it down,

18   how it couldn't come in.  Look, witnesses will say, for

19   instance, his ex-wife who testified in the Delaware trial, his

20   brother's widow who he had a relationship with, they will talk

21   about his drug use and we put that on in Delaware and we're

22   going to put it on here.  And they may offer the observation

23   that his drug use, for instance, increased in '18.

24          What nobody can say is there was a causal connection,

25   for instance, between his brother's death and his drug use.

48

1    They can offer their observations, it increased, it decreased.

2    I mean, there's going to be testimony it will pre-dated his

3    brother's death.  That was the testimony in Delaware.  I have

4    no doubt it'll be the same testimony here.

5           So the problem is really the causal connection.  The

6    temporal issue, you know, we don't have an issue with.  We

7    brought it out in Delaware, we'll bring it out here.  What

8    counsel did in the other case is to make this causal argument,

9    that it was because of his brother's death that he spiraled

10   into addiction or something and none of those witnesses can say

11   that.  They're not in his head.  They're not him.

12          The earlier -- what he said about the earliest trauma

13   we think is wholly irrelevant.  It's a terrible tragedy.  It's

14   a story, you know, many Americans are familiar with.  But to

15   say that that accident when he was a small child was then dealt

16   with by drug and alcohol use decades later in adult life,

17   nobody can or should be able to say that.

18          And the last case he sort of -- Mr. Lowell kind of

19   previewed that it would be his uncle that did that and we were

20   fully prepared to object.  And they told us they were going to

21   call his uncle and his uncle was sitting in the courtroom and

22   he had his lawyer and then they said, we're not calling him.

23          And so our concern is you can't unring the bell,

24   particularly for this very emotional evidence.  It's a terrible

25   tragedy.  And if it's not relevant, first of all, it shouldn't

49

1   come in and if it's not, if there isn't actually going to be

2   any witness to it it shouldn't be talked about in opening.

3           So we would ask, you know, this is the rare case

4   where we've seen, we don't just have sort of concerns or

5   suspicions that the defense may make, kind of claims in

6   opening, we saw it happen.  We actually raised it in Delaware,

7   we quote from the sidebar where Mr. Lowell said, you know,

8   we're going to make good on these and then they never did.  And

9   so we have that same concern here.

10          Our understanding is he is still on that case, I see

11  Mr. Geragos is here, I don't see him, but they haven't

12  withdrawn.  We've been getting joint filings that, you know,

13  have all the lawyers on them so we do have a specific concern

14  about what we experienced in Delaware.

15          And I think I'm hearing that they want to try that

16  story again.  That it was the trauma early in life and then

17  around his brother's death that caused his drug use and all of

18  that shouldn't be allowed.

19          **THE COURT:**  Do you see much if anything relevant in

20  this case prior to January 1st of 2016?

21          **MR. WISE:**  So, you know, we -- I'll try to do this

22  kind of from memory.  I mean, we talk about the fact that he

23  did pay taxes in the two preceding years, which he did.  And in

24  tax cases, it's often relevant to look to the year -- you know,

25  not -- I mean, the scope can change, but here we have the two

50

1    immediate years where he paid.

2         And then as I said, he continued to pay on '15 until

3    he just decided not to in '18, so we think that's relevant.

4    There will also be evidence about from his business partner

5    about how prior to that date they set up a mechanism for him to

6    pay taxes, this Owasco P.C. entity, which wasn't a business, it

7    was a tax withholding vehicle.  So all of his different income

8    streams cycled through that and then that accomplished

9    withholding and that worked until he started just suctioning

10   money out of the account directly and not letting it go through

11   ADP.

12        So there will be testimony that that preceded January

13   1.  His ex-wife will testify.  You know, they're -- she learned

14   of his drug use earlier before his -- before the death of his

15   brother, that then led to their separation and divorce.  The

16   separation and divorce is relevant because it's ultimately

17   litigation over enforcing the marital separation agreement that

18   forces him to pay the taxes finally in February of 2020.  And

19   we have, you know, contemporaneous evidence that that's what

20   he's operating under.  So we will have some evidence prior to

21   that to set up the period in the indictment.

22        **THE COURT:**  In counsel's argument and I'll ask

23   defense to come up in just a second, but counsel's argument is

24   that you're painting the defendant as somebody who was lavishly

25   spending money, you know, using drugs, alcohol in a variety of

51

1  different ways, painting him as sort of a bad actor.  And why

2  isn't fair then for the defense to be able to say the reason

3  he's acting this way is because of these personal tragedies.

4           **MR. WISE:**  So it comes down to the competency of the

5  witness that's going to say that.  If the defendant takes the

6  stand and says, this is why I did it, I think he can probably

7  say that.  But Mr. Geragos can't get up in opening like

8  Mr. Lowell said and say this is why he did it.  And they can't

9  ask witnesses, well, was he using drugs because of the death of

10  his brother.

11          They can say, well did you see his drug use increase,

12  for instance, after the death of his brother, and then the jury

13  could infer that there may be a causal connection.  But as to

14  that specific state of mind and evidence, I think only the

15  defendant can speak to that and proxies can't, whether it's

16  defense counsel, whether it's family members or whomever.

17          As to the point he made about the lavish lifestyle, I

18  mean, those are the facts and I know we'll get into this on the

19  other indictment, but you know, they -- we're not -- he spent

20  the money on what he spent it on.  And that will be factual

21  testimony.

22          We -- we're not connect -- we're not making causal

23  connections between, you know, why he spent the money.  He just

24  chose to.  And the facts are, he had tax obligations.  He knew

25  he had tax obligations because he had paid taxes for years, he

1    even continued paying a little bit of taxes on '15 into the

2    period and he made a series of choices not to meet his

3    obligation to the U.S. Treasury and instead to spend on all

4    these other things.  And I'm happy to address when we get into

5    that motion in limine why that is highly probative.  And really

6    without that information, the jury won't be able to ultimately

7    determine whether the elements are met, but I'll reserve on

8    that.

9           **THE COURT:**  Let me hear from the defense counsel on

10   this.

11          **MR. GERAGOS:**  I'm a little bit perplexed.  They've

12   spent and made the argument on motion in limine No. 1 that

13   addiction, the reasons for it, the causes for it should be

14   excluded and that you should -- and you granted that.

15          And then he gets up here and he says, well, wait a

16   second, we don't want him to even be able to address that in

17   any way, shape or form because they've got no ability to make

18   the causal connection.  Well, we offered the addiction

19   specialist in order to make or allow the finder of fact to make

20   the causal connection.

21          So to -- and a little bit on the disingenuous side,

22   number one.  Number two, they are the ones who have

23   characterized the spending in pejorative terms.  They haven't

24   done it in a dispassionate way.  They didn't say when they come

25   up here or in their motion work, or even in the indictment.

1          If you take a look at the language they use it's

2    salacious.  It is tabloidy for lack of a better term and now

3    they're going to say oh, wait a second, we want to make sure

4    that when Mr. Geragos gets up, he goes and tells this jury oh,

5    by the way, he always paid his taxes up until 2015 and then he

6    started making some payments in 2015, oh we want to get into

7    2016, before 2016, but we don't want Mr. Geragos or Mr. Biden

8    to talk about anything that happened prior to 2016 because we

9    have a story to tell and we don't want it to get in the way of

10    the facts.

11          The facts of this case are that, yes, before 2016 is

12    directly relevant because it shows that before he got into, my

13    term, throes of addiction, there was compliance.  There was no

14    intent or mens rea.  He then went into a spiral and contrary to

15    what they say and kind of the publication if you will or the

16    characterization of he's partying it up at the Chateau Marmont,

17    this was somebody who has had two tragedies.

18          He did admit, I believe, maybe I misunderstood him,

19    but he did just admit that a family member could say, yes, and

20    we've got family members as you know, as we've discussed, that

21    yes, after his brother's death it did increase.

22          Also, he could himself testify to that and by the way

23    I have never had a prosecutor, I'm kind of somewhat astonished,

24    tell me what I can or can't say in opening that I don't intend

25    to prove.  That's the whole purpose of their -- not only their

54

1    closing but their rebuttal is, you know, for instance,

2    Mr. Geragos got up here and promised you this, he didn't

3    deliver.  Mr. Geragos told you this, he didn't deliver it.

4           That's what the trial is about.  If I have a good

5    faith belief that -- he doesn't know whether I'm going to call

6    Mr. Biden, I may not know if I'm going to call Mr. Biden.  But

7    if I get up here and tell that jury something that I believe

8    that I can get into through Mr. Biden and it's my belief that

9    based on what the -- where we are and what the landscape looks

10   like, I could get -- the Court doesn't restrict what can be

11   said in opening.  Opening is not an argument, it's a statement

12   of what we believe we will prove.

13          If we believe we will prove that he had personal

14   tragedies that were triggered at a certain period of time and

15   when he finally got his life together, that he then tried to

16   comply and that there are now the, you know, the difference

17   between the Government and the mafia, even the mafia spares the

18   women and children.

19          I mean, if that is the timeline that is pointed out

20   by the evidence and they've conceded to you, they're going to

21   bring a bunch of these things in.  They've conceded by virtue

22   of asking for you to give immunity that they're going to call

23   family members.

24          I don't understand what it is that we're talking

25   about and maybe I'm naïve, but mens rea is the ballgame here

55

1    and I'm going to keep repeating it like a drum.

2             **THE COURT:**  But just to sort of get to the heart of

3    the issue, we talked about this earlier, but why is the cause

4    of Mr. Biden's addiction relevant?  So for example, the

5    diminished capacity instruction that -- the Ninth Circuit

6    instruction talks about diminished capacity could be caused by

7    use of drugs or alcohol.  Obviously if you want to make an

8    argument that he was addicted, he was using drugs and alcohol,

9    diminished capacity, but why is it relevant what caused the

10   addiction because --

11            **MR. GERAGOS:**  The --

12            **THE COURT:**  And I say this because I don't know that

13   there's ever any good evidence of what causes addiction.

14   Obviously somebody who was treating Mr. Biden could give you

15   their opinion, but it's just -- other than that sort of person,

16   everything else would just be kind of an uninformed lay

17   opinion.

18            **MR. GERAGOS:**  Not if it was the subject themselves.

19   I mean, the whole idea of recovery, the whole idea of whether

20   it's a 12 step or whether it's a recovery and addiction is the

21   introspection.  I mean, that's the -- it's a number of the

22   steps of the 12 steps.  The person who undergoes it is the one

23   that has to deal with it.  That's the whole idea of the step

24   program.

25            So there is nobody better than the person who is

1  suffering from addiction, number one.  Number two, I will go

2  back and keep harping on it, they're trying to get you to rule

3  and to handcuff the defense to allow them to get up here and

4  say, this guy was just spending lavishly and wildly, he was

5  partying it up, he was doing it as if it was a good time, as if

6  he was in a fraternity in college and had just been let out of

7  the house.

8          They're the ones who started this.  We are combatting

9  that.  We're saying no, you know, that may be your spin on

10  this, but the reality is, is this is somebody who was out of

11  control.  And he wasn't out of control for the reasons that are

12  specious or reasons that are not.

13          **THE COURT:**  So that's the point though, why does it

14  matter why he was out of control?  That's the issue.

15          **MR. GERAGOS:**  Because --

16          **THE COURT:**  Because to be out of control is what you

17  need for a diminished capacity defense, but what caused him to

18  be out of control would seem -- not seem relevant to me.

19          **MR. GERAGOS:**  If your -- if you would say that it's

20  not relevant, I don't know how you could -- I could put him on

21  the stand.  The -- you can't -- I do not believe that he can be

22  prohibited, it would be astonishing to me that I couldn't call

23  a defendant or a family member and inquire as to what happened

24  while they're making --

25          **THE COURT:**  And I think the facts -- I think you're

1    right about the facts.  I mean, he can testify about, you know,

2    what he did, when you know, but that connection between the --

3    his brother dying caused his addiction.  A couple of issues

4    with that.  One is that, there's no expert that can testify to

5    that without doing a deep dive in coming up with an opinion

6    that's sort of based on some methodology.  But two, if that

7    comes -- if that's the causal link you're trying to make

8    doesn't the administrative discharge from the Navy then become

9    relevant because it shows addiction, potentially prior to that?

10   So doesn't that come in relevant to dispute?

11           So we actually have like a trial within a trial,

12   right, is his addiction caused by his brother's death or was it

13   caused by something else.  It just seems like we're -- for an

14   issue that doesn't really matter to the case, I'm just

15   wondering how we deal with that.

16           **MR. GERAGOS:**  Let me tell you why it matters.  If

17   you're going to tell them, the Government, look, if I'm not

18   going to allow the brother's death, if he doesn't get on the

19   stand, or if you don't call his family members to talk about

20   this because they're going to open the door with the family

21   members when they put them up there and if you want to talk

22   about the administrative discharge of the Navy, that's fine,

23   let's talk about his mother and his sister being killed when he

24   was -- one of his first memories.  And let's talk about what

25   that does to an individual and what triggers it.

1          **THE COURT:**  Why would that be relevant though?

2          **MR. GERAGOS:**  Because they are painting a portrait

3   for the jury of somebody who has just plopped down in West

4   Hollywood and decided to party, do cocaine and everything else

5   as if he didn't have a care in the world including his taxes.

6   There is -- it's actually a form of character assassination by

7   the prosecution in order to paint a lopsided completely

8   untethered to reality picture of Mr. Biden.

9          If they want to say, you know, he spent it on hotels

10  or we've got a laundry list of -- in fact, the disclosure that

11  they gave last night from Mr. Welch with the new exhibit, I

12  don't have the Elmo on but I could show you.  They have a very

13  critical, and I don't want to approach, and I --

14          **THE COURT:**  I've got the prior one.  I'm sure it's --

15  if they just took things out, it's --

16          **MR. WISE:**  It's the same.

17          **MR. GERAGOS:**  Take a look at 24, page 24 of 24 if

18  you've got it.

19          **THE COURT:**  Got it.

20          **MR. GERAGOS:**  Okay.  You take a look there.  They

21  could accomplish what they say they want to accomplish by the

22  list on page 24, entitled additional miscellaneous income to

23  owner.  In the one that they gave me last night or they sent

24  over, they then in purple back out some of these things and it

25  lists the car rental, it lists Nomad Hotel, the Beverly Hills

59

1  Hotel, that's a very dispassionate clinical presentation of the

2  evidence.  I can get into that, I can cross-examine that.

3           But when you start wanting to talk about he was

4  paying the money for prostitutes, or he was paying the money

5  for --

6           **THE COURT:**  But that's -- and we'll get into that

7  when we get into your motion in limine because I think that's a

8  big topic that we sort of need to go through and put some

9  guardrails on.

10           But I -- and I think I understand your argument with

11  respect to motion in limine No. 7 and the Court will -- and I

12  understand your point about, if you have a good faith belief

13  that evidence is going to come in the record, then you ought to

14  be able to preview that in opening and it's up to -- you know,

15  it's up to counsel in closing to say, counsel said they were

16  going to do this and they didn't.  So I get that.

17           I just -- with respect to this motion in limine

18  brings up some other issues what's in and what's not, so let me

19  take another look at that --

20           **MR. GERAGOS:**  Okay.

21           **THE COURT:**  -- based on the arguments.  And then --

22  but the ruling on the motion will essentially be the guardrails

23  for opening will be, anything that you think you're going to

24  have a witness say, but keeping in mind the rulings on the

25  motion in limine as to what issues are not coming in.

60

1          **MR. GERAGOS:**  Correct.

2          **THE COURT:**  Yeah.

3          **MR. GERAGOS:**  I --

4          **THE COURT:**  Yeah.

5          **MR. GERAGOS:**  -- do not plan as I stand here to say

6     I'm going to call a witness who you've excluded at least at

7     this time.

8          **THE COURT:**  Or for example, you wouldn't be able to

9     mention late tax payments if the Court excluded those pursuant

10    to the motion in limine during opening.

11         **MR. GERAGOS:**  Correct unless they open the door.

12         **THE COURT:**  Well, but they wouldn't be opening the

13    door in opening, right?

14         **MR. GERAGOS:**  Correct, correct --

15         **THE COURT:**  Yeah, yeah, yeah.

16         **MR. GERAGOS:**  -- I agree but the --

17         **THE COURT:**  So and again, just to be clear, is

18    everybody -- and we haven't had another case yet, but the

19    Court's pretty strict about motions in limine and violations of

20    motions in limine.  I've overturned jury verdicts because of

21    violations of motions in limine and in this case, because of

22    all the people involved, all the -- you know, all the jurors

23    we've gotten, and you know, the witnesses flying and

24    everything, there's just a lot of -- you know, a lot of

25    expenditures involved in making this trial happen.

61

1          So I guess, counsel, folks, if there are violations

2    of motions in limine that could lead to a mistrial the Court

3    will issue monetary sanctions against attorneys that violate

4    those motions.  And they'll probably be -- you know, if we try

5    to come up with like a rough justice, they'll probably be sort

6    of six figure sanctions.  So just to kind of keep that in mind.

7          Okay.  Let's turn to your motion in limine No. 3, and

8    this is excluding references to Mr. Biden's extravagant

9    lifestyle and this is where we get into all those issues.

10         **MR. GERAGOS:**  Correct.

11         **THE COURT:**  So in thinking about this, I'm kind of

12   thinking about this in two buckets, right.  There are

13   expenditures Mr. Biden made that he then wrote off on his taxes

14   as business expenses.  And so that's one bucket, so

15   expenditures that he made that he wrote off on his taxes.  And

16   then other expenditures that he made that may be he didn't

17   write off on his taxes.

18         For the first bucket, the expenditures he made that

19   he wrote off on his taxes, how can that not come in?  Doesn't

20   the jury need to know what the expenses were for to determine

21   whether or not Mr. Biden was evading taxes by including those

22   as business expenses?

23         **MR. GERAGOS:**  Yes.  But the -- but I would point out

24   like I just did, page 24.  There's one way to do it.  I mean,

25   somehow the difference between two days ago and the previous

62

```
 1  exhibit by Welch, MW whatever it was, somehow Welch decided to

 2  back out a series of hotel charges down below on their amended

 3  exhibit list that we received last night.

 4          THE COURT:  Okay.

 5          MR. GERAGOS:  So I'm going to -- and as I indicated,

 6  that is the most antiseptic clinical way to present that

 7  evidence.

 8          THE COURT:  Okay.  So let me come up with some

 9  specific examples.

10          MR. GERAGOS:  Okay.

11          THE COURT:  So I'm looking at -- again, I'm looking

12  at the disclosure of Mr. Welch and these are things that he's

13  indicating were expenses on the business line of use that ended

14  up being categorized as business expenses.

15          And if we look at pages 11, 12, 13, 14 and 15 and 16,

16  those are all pages that show charges to a website that has

17  something to do with pornography, at least that's what the

18  Government discloses.

19          So how do you -- how would we sanitize this in a way

20  that would allow the jury to determine whether or not this was

21  truly a business expense or not a business expense in a way

22  that would allow -- you know, what could you --

23          MR. GERAGOS:  Well, there could be --

24          THE COURT:  What could you stipulate to?

25          MR. GERAGOS:  Well, I would ask that the Court order
```

1   us to meet and confer on that.  I mean if the -- there are --

2   part of the problem with doing this on the fly is I've got a

3   more fundamental problem as to what the methodology is that

4   they're using here.  The methodology that they're using is a

5   business line of credit.  That is not an asset.  That is a

6   debt.  And I want to get into that with the witness who

7   they're -- I assume is their revenue agent.

8          So if that's the case, whether it is for instance,

9   whether it says it's a pornographic website or whether it's a

10  meal, and by the way, they backed out last night various meals.

11  I think Mr. Welch must have realized that there is an 80/20

12  rule that went into effect that he didn't understand was an IRS

13  rule on the prior dates.  And so he backs out because somebody

14  must have whispered in his ear, the 80 percent and the 20

15  percent because that law was changed back in 2016.  They were

16  apparently unaware of it.

17         The same thing happens with -- what does a

18  pornographic website say?  If there is something and I can go

19  through and do this rather quickly, that I'm going to concede

20  was not a business expense, I don't want to get to a point

21  where I'm also saying their theory of him using a line of

22  credit is I'm conceding that that's income.  That's not an

23  income.

24         Okay.  So I would ask that you order us to meet and

25  confer on those.  I'll try to be as surgical as I can, but we

64

1   get -- it comes back to, and you pointed it out, the problem is

2   how does the jury understand it?  I think I can navigate that.

3           THE COURT:  Well, you know, because I mean, the Court

4   has no interest in unnecessarily putting in evidence that would

5   paint the defendant in a bad light, right, because this is a

6   trial about tax evasion, it's not a trial about, you know,

7   anything that they -- any other conduct of the defendant that

8   the jury would take issue with.

9           And obviously we may have to do some instructions to

10  the jury to remind them of that fact, that'll cure some of

11  this, but again, let's go back to --

12          MR. GERAGOS:  Sure.

13          THE COURT:  -- disclosure.

14          Page 19 of 24, there are payments listed to a number

15  of individuals.  And the --

16          MR. GERAGOS:  Just so we're on the same page, do you

17  have that as Robert Hunter Biden, additional miscellaneous

18  income to owner?

19          THE COURT:  Yes.

20          MR. GERAGOS:  Got it.  Thank you.

21          THE COURT:  And do we need to -- for example, there's

22  a person, a Ms. Jordan.  The -- would you say the Government is

23  entitled to put on what those payments were for?

24          MR. GERAGOS:  I would say if they ask me if I would

25  stipulate to that these particular entries are not a -- are not

65

1    in dispute as to the business or personal, I would meet and

2    confer on that.

3         But if they're going to go through and say E.S., I'm

4    using the initials, because I don't know whether I'm under a

5    protective order or not on this particular thing, but E.S. and

6    J.H. and L.J., for instance, it may be that I would go back to

7    them and say, look, if you want to do this and use the initials

8    and I'll stipulate, that's fine.  But if you're going to go

9    down the road of saying that they are W, Y or Z or do something

10   else, then that is, as you characterized it, a bad act and I

11   think a violation of 404.

12        **THE COURT:**  Yeah.  We would try to -- I mean, again

13   the issue here is whether these are business expenses or

14   personal expenses seems to be the relevant question, right?

15        **MR. GERAGOS:**  Correct.

16        **THE COURT:**  And if they were personal expenses that

17   were deducted as business expenses and the defendant stipulates

18   to that it might clear some of this up.  But the question is we

19   have to get into -- I'm having trouble -- I was trying to think

20   about this.  I'm having trouble figuring out how you could

21   stipulate to these things without essentially admitting guilt

22   on Count VI, which is the evasion count.  Because -- well and

23   let me hear from the Government.  Is there a stipulation?  Is

24   there a deal to be made here?

25        **MR. WISE:**  I don't think so, Your Honor.  And Your

66

 1   Honor just went to the heart of it.  I mean, you can spend --

 2   let's start with the StreamRay, I always say that wrong, you

 3   can spend $30,000 on a pornography website if you want, that's

 4   not illegal, but you can't claim it's a business expense,

 5   right.  And to Mr. Geragos' question, like a business line of

 6   credit is a debt, but he used corporate funds, Owasco P.C.'s

 7   funds to pay off the business line of credit, so he got the tax

 8   benefit of that being a deduction to Owasco P.C. as opposed to

 9   income to him that would've raised the amount of income he had

10   to pay taxes on.

11           So we have a witness from StreamRay who will testify

12   that the purpose of this website is to allow, you know,

13   consenting adults to meet and it's sexual in nature.  Why it

14   matters is, the defense and to your last question, even if you

15   were to say it's personal, his defense is doing to be, and we

16   have to prove, not only is this going to be his defense, we

17   have to prove that telling the accountants that these were

18   business expenses was willful and not the product of a mistake.

19           So if we sanitize this to it was a website, well the

20   jury's going to sit there and think well, even if we say it was

21   a personal website, well you can use a website for a business,

22   businesses use websites for all kinds of things.  If they know

23   it's a pornographic website, you can't use that for a business.

24           So it goes to how we have to show willfulness.  The

25   same thing for, you know, the women on page 19.  Those women

67

1    are going to testify and they're going to testify what they did

2    to get paid, payments that he claimed were business expenses.

3    And they'll testify, for instance, that they, you know, cleaned

4    up drug paraphernalia in hotel rooms before the maid service

5    came.

6              He claimed that's a business expense.  He's not on

7    trial because he hired people to clean out his drug

8    paraphernalia, this isn't a drug case, but he then went and

9    said it's a business expense.  So we have to show what the

10   money was for and again we have to show it wasn't a mistake.

11             So if it's just, you know, I paid this woman for

12   services the jury is going to be left scratching their head

13   saying well you can hire people, he had a couple of personal

14   assistants, both of whom will testify that did various things

15   for him, but then he also paid people that didn't do things

16   that were business related.

17             We're also going to call -- I mean, he paid a number

18   of women, and you know, Mr. Geragos is saying we started this.

19   Mr. Biden's book which will be -- the relevant chapter on when

20   he was in California will be played.  He describes his life as

21   a bacchanal in California.  That's not our word.  He describes

22   partying in those hotels with a cast of strippers and those are

23   his words.  And he chose to pay, whether we want to call them

24   strippers, escorts, you know, there's a million words for it,

25   but he chose to pay them, which is fine, it's America you can

68

1    do that.  But then he chose to take it as a business deduction.

2          So again if the jury doesn't -- I mean, those women

3    will testify.  I got a -- you know, one of the witnesses, I got

4    a $1,500 Venmo payment.  Where'd you meet him?  In a strip

5    club.  What's the line on the Venmo payment?  It says art work.

6    Did you sell him art work?  No.

7          And we're not going to get the gory details about

8    what went on, but again if it's just a woman and a name and

9    it's personal, the jury isn't going to be able to say well

10    maybe he didn't make a mistake, right.

11          The same thing for the hotels.  You know, most of '18

12    he had a woman with him who will testify, she testified in

13    Delaware, Zoe Kestan.  And she will testify what went on at the

14    hotels.  That they were basically -- it was they were on

15    vacation.  He wasn't working.  They were having parties.  They

16    were renting multiple rooms and suites and inviting people back

17    from clubs and all sorts of things.  All of that is relevant

18    because he claimed those very same hotel expenses as business

19    expenses.

20          And he did that contemporaneous with when he was

21    writing this book that they will hear about, where he

22    characterizes all this stuff this way.  We're not going to be -

23    - you know, we don't need to guild the lily here, right.  I

24    mean, he goes to pick up this woman up at the airport, he rents

25    a Lamborghini and then he claims that as a business expense.

69

1          So she'll testify, yeah, I came out to California.

2     He picked me up in an Lamborghini.  We've got as a witness the

3     guy from the car company, it was a Lamborghini.  These are just

4     the facts.  These are what he chose to do with his money and

5     then claim these were business expenses.  And the jury needs

6     those facts in order to determine whether it was a mistake and

7     whether he was willful.

8          **THE COURT:**  Okay.  Let me get a response.

9          **MR. GERAGOS:**  Yeah, he made my argument for me.  I

10    mean, he doesn't mean to guild the lily, all of that is guild

11    the lily.  Did he answer your question as to why he couldn't

12    stipulate?  Yeah, the reason he can't stipulate is because he's

13    not going to be able to have salacious typical special counsel

14    independent counsel style salacious prosecution.  That's what

15    they do.  I'm -- and I --

16         **THE COURT:**  Tell me what -- what would be the nature

17    of the stipulation you would make?  So let's say, you know, the

18    examples that counsel gave about somebody cleaning up his drug

19    paraphernalia and there was a payment to that person and that's

20    what they did.  What would be the stipulation that you'd be

21    willing to enter in with respect to that?

22         **MR. GERAGOS:**  The payment that is classified on such

23    and such a day for such and such an amount of dollars was not

24    in fact a business expense.

25         **THE COURT:**  Okay.  And the defendant knew it wasn't a

70

 1    business expense.

 2              **MR. GERAGOS:**  I don't know that I would go so far as

 3    to say, you know, he knew it wasn't a business expense --

 4              **THE COURT:**  See, because that's the crux of the

 5    issue, right.

 6              **MR. GERAGOS:**  Right.

 7              **THE COURT:**  Is because that's what the jury has to

 8    decide.  Did the defendant know whether or not it was a

 9    business expense or was he just confused.

10              **MR. GERAGOS:**  Well --

11              **THE COURT:**  And for example, we'll take the website

12    example.  So, you know, somebody might deduct charges to a

13    website that was personal in nature but maybe on their taxes

14    they thought it was business and they were confused about that.

15              What the Government is saying is they have to

16    introduce these facts because it's up to the jury to decide was

17    the defendant confused or not and if the jury hears the facts,

18    they can make a determination.

19              **MR. GERAGOS:**  Well, maybe I can just solve that

20    problem.  This payment was not for a business expense, was

21    submitted to the accountant and was not -- and I will hew it to

22    the facts.  If there was a -- you know, all of these are

23    QuickBook entries is what I call them on the Michael Welch

24    report.

25              So somebody is entering in the data into a QuickBook

71

1    report.  When you say that the stipulation or that they call a

2    witness, that witness isn't going to know what was, and it does

3    not go to the ultimate issue for the jury, did he, he meaning

4    the accused, Mr. Biden, enter into the data here, the specific

5    saying I want you to deduct this.  That would be the did he

6    know.

7           It's as simple as this was a personal expense and

8    Mr. Biden did not submit this or did not have the ability to

9    deduct it as a business expense.  I think I could fashion a

10    stipulation that would get rid of that.  But -- and I think

11    you -- I don't want to belabor it, but I think you see what the

12    real issue is here.

13           Once again, they talked about renting the

14    Lamborghini, going to Chateau Marmont, cleaning up the drugs,

15    that's great, but that's -- they're using that as a hybrid to

16    get into 404 bad acts evidence.  That's fine if that's what

17    they want, I'll play in that arena, but let me explain why he

18    was -- he got to that point.  He didn't just get dropped off

19    out of nowhere and decide he was going to rent the Lamborghini

20    and do all those other things for a discreet period of time.

21           So the fact that they came up here, when you asked

22    the direct question can we have a deal here and said no speaks

23    volumes for what the real, if we want to talk about the

24    circumstantial evidence of what the special counsel -- is

25    driving the special counsel.

72

1          They want the bad acts.  They want the character

2    assassination block.  They want to slime him because that is

3    the whole purpose, making him look bad is hopefully what will

4    get the jury past the idea of, wait a second, you mean the guy

5    did file the taxes.  Wait a second here, you mean he had some

6    challenges in his life.  Wait a second here, you mean he did

7    try to comply at a certain point before there ever was an

8    investigation into filing all of these things.  And you think

9    for a second that it was Mr. Biden sitting there saying

10   classify this, classify that, he had accountants.  It wasn't

11   like he had gone to Turbo Tax and done this himself.

12          So the evidence would be that he didn't make the

13   decisions?  I'm sorry, the defense would be that he didn't make

14   the decisions to deduct these from his taxes?

15          **MR. GERAGOS:**  Correct.

16          **THE COURT:**  And who would put on that evidence?

17   Who --

18          **MR. GERAGOS:**  They're going to call -- they've got it

19   on their witness list the people who I will cross-examine to

20   show that.

21          **THE COURT:**  Okay.

22          **MR. GERAGOS:**  They've got -- and by the way, I'll go

23   back to it again.  I hate to keep repeating myself, but Michael

24   Welch himself just -- they try to pooh pooh what he's done,

25   this is his third iteration of his report.  This is the third

1     iteration where somebody is schooling him somewhere and he's

2     backing stuff out because, in fact, the -- he's attributing

3     business or personal himself.  Where is he getting that?  I

4     plan on cross-examining him on that.

5           Why all of a sudden did he back out a list of six

6     charges for six hotels all of a sudden which reduced the tax

7     liability?  He didn't talk to my client.  He didn't talk to me.

8     He didn't talk to Mr. Bishop.  Somehow he's gleaming that

9     information from somewhere.

10          **THE COURT:**  Let me get a response from the Government

11    as to -- I mean, if the case is going to be that Mr. Biden

12    didn't make the determination as to deducting these things from

13    his taxes, is there a stipulation to be made that would avoid

14    getting into some of these more salacious topics?

15          **MR. WISE:**  Right.  So what Mr. Geragos said isn't

16    true.  He did make the decision to take these deductions.  And

17    what his tax return preparers -- I would also say Mr. Geragos

18    is misunderstanding Mr. Welch's report.  The thing he's

19    pointing to is actually a screen capture from the EWC work

20    papers, the 70 -- the 80/20 split.  That's not -- Mr. Welch

21    isn't backing something out, he's just misunderstanding it.

22          Mr. Welch took off a couple of tax -- of hotel

23    charges that as we get ready to try the case, we decide what

24    witnesses to call, and I think I said this at the motion

25    hearing.  The way the revenue agent works is he will sit in the

74

1    courtroom and hear evidence from live witnesses and see

2    documents about why all of those charges were not business

3    expenses.  And then he will calculate the additional tax.

4           So there will be a person who will say, the reason

5    the Chateau Marmont is, you know, I was at the Chateau Marmont

6    with him and we were partying, we were using drugs, we were

7    going out, we were shopping.  Did you see him do any work?  No.

8           There will be witnesses for all those hotel charges

9    and as we've prepared the case, we focus on, you know, how are

10   we going to prove each and every one and so that's where we

11   are.  And so there are minor adjustments as you get closer to

12   trial and that happens.

13          But to your question about who made the deductions,

14   you'll hear from his tax return preparers, because in 2018 he

15   really wasn't doing anything but earning significant income, he

16   didn't have a set of QuickBooks records like he had in '17 when

17   he still had a business partner who will testify.

18          So the process they went through was, they took the

19   bank statements for this Owasco P.C., a corporate entity, a C

20   Corp that he had previously run his income through in order to

21   meet his tax obligations, but then started essentially raiding.

22   And they prepared a series of schedules based on what they saw

23   in the Owasco P.C. corporate return.

24          And they gave Mr. Biden those schedules.  And they

25   said here's a yellow highlighter, we don't know which of these

75

1    are personal expenses and which of these are business expenses.

2    We need you to highlight what is a personal expense that Owasco

3    paid, the corporation paid, so that we can back it out and not

4    deduct it on Owasco's return.  And if it's not deducted on

5    Owasco's return it becomes miscellaneous income to Mr. Biden

6    because Owasco paid it in the first instance, and then

7    Mr. Biden has to pay taxes on the income.

8         So he very deliberately and the jury will see this,

9    went through these schedules and highlighted things that were

10   personal.  And he didn't highlight many things that were

11   personal.  So it was a series of acts of omission.  That's on

12   the one hand.  That's category one.

13        They then took two sets of bank statements, because

14   he had a personal account and an account for Owasco LLC, which

15   is not a C corp.  And they said, all right, here are your

16   personal bank statements, your personal account in the Owasco

17   LLC, here's a red pen, circle what are business expenses on

18   these bank statements that -- because we don't know, we can't

19   tell.  And he went through and circled all kinds of personal

20   expenses including these hotel stays which he had just -- this

21   is late winter and early -- this is late fall and early winter,

22   late '19, early '20.  He had just described as he prepared his

23   book, which the jury will hear about, named all the same hotels

24   where he had this -- the California Odyssey, this year long

25   bacchanal, the very same hotels.

76

1          He's circling them as business expenses.  And then he

2    gives that to the tax return preparers and they prepare a

3    series of schedules.  That's category number two.

4          Category number three is, he put a series -- he

5    wanted a corporate healthcare plan because his corporate

6    healthcare plan ran out at the end of 2017 when his business

7    partner split with him.  You can't get a corporate healthcare

8    plan if you're not in business.

9          So he had his personal assistant put a number of

10   people, the requisite number of people on payroll, pay them

11   through ADP so that he could get a corporate health insurance

12   plan.  Some of them also participated.

13         The problem is they weren't working.  They weren't

14   providing services to him that were business related.  So in

15   the P&L for the Owasco P.C. bank statement that the tax return

16   preparers also showed him, he didn't tell them, oh, this 86,000

17   in wages, those women -- I wanted a corporate health insurance

18   policy, I said they were working, but they really weren't.

19   There will be testimony about that from each of those women and

20   from the personal assistant who did that.  That's category

21   three.

22         Category four is $57,000 was paid out of the Owasco

23   P.C. account to JPMorgan Chase.  He only gave the tax return

24   preparers the Owasco P.C. account.  They didn't see the wire

25   detail for what these wires were.

1          He then told them on two occasions it was for

2    business purposes, 57,000 the whole amount.  It wasn't.  It was

3    for personal expenses.  And we will put on evidence that shows

4    that the recipients of that money were various -- it was for

5    personal expenses and various ways.  That's category four.

6          Category five is this business line of credit.  He

7    used this business line of credit like a credit card.  He

8    charged about -- he paid about $119,000 of expenses from Owasco

9    P.C. to pay off this business line of credit and it's full of

10   personal expenses.

11         And the tax return preparers asked him over and over

12   again, we need to see the statements for this business line of

13   credit because we don't know if it's personal or business uses

14   and he never gave it to them.  And he represented to them it

15   was all business, so they took it as a business expense.

16         That's going to be the evidence.  He was in the

17   driver's seat for each and every one of those things.  They

18   weren't advising him, they weren't making decisions for him.

19   That's where their competence didn't matter.  He made these

20   decisions.

21         **THE COURT:**  And let me ask you one other thing.  When

22   I started out dealing with this motion, I was trying to put

23   things in buckets.  Is -- does the Government intend to put on

24   evidence of actions taken by Mr. Biden that don't relate to

25   expenses that he -- that the Government's alleging were

78

```
 1   improper with his taxes?
 2           So, for example, is there other evidence of -- are
 3   you putting on evidence that -- I guess this would go in the
 4   category of he had money to spend and he didn't pay his taxes?
 5           MR. WISE:  That's right.
 6           THE COURT:  And so what is that evidence and is there
 7   a way to sanitize that evidence?  Because if he had money to
 8   spend and didn't spend -- didn't pay his taxes, it would seem
 9   like we don't have to get too specific in that bucket.
10           MR. WISE:  Yeah.  So we're going to call -- we've
11   provided to the defense and we provided this some time ago a
12   series of 1006 summary charts that show his income, right, in
13   the period of time he made about $11 million and the summary
14   exhibit show where the money came from and that's relevant
15   because in each year we have to show a certain amount of income
16   and that there's an income trigger, why you have to file tax
17   returns, that's an element.
18           We have other -- we have a summary exhibit that shows
19   how he spent the money.  He spent about $12 million.  And it's
20   organized by category, you know, he took out large amounts of
21   cash, he paid off credit cards, he made various payments to
22   individuals.  And it has various categories in it.
23           And so the point there is, he's making choices and
24   this goes to the diminished capacity defense or executive
25   function I think is the phrase that's used more often now, he's
```

1    making all kinds of choices about how to earn money and there

2    will be evidence about that, quite sophisticated decisions

3    about how to earn money and then he's also making choices about

4    how to spend it.

5              It's not the case that in response to trauma he

6    retreated to his house and shut out the world and let the tax

7    notices pile up.  He was in the world making decisions about

8    what to spend his money on, what not to spend his money on.

9              So it is -- most of the witnesses are going to be to

10   establish the specific items that he claims were, you know,

11   business expenses that weren't, although their testimony is

12   often -- you know, it's broader than like one item, it's this

13   is, you know, this was the period of time like the woman that

14   was with him in most of '18, she'll talk about what they were

15   doing in '18.

16             Which also goes to the fact that he really wasn't in

17   any kind of business, which more broadly addresses okay, maybe

18   you claim I didn't remember that this hotel stay was for fun or

19   for personal reasons and not for business reasons, but when you

20   hear from witness after witness that he was really out of

21   business by '18, to then say but I went in with the tax return

22   preparers and I made a mistake, I thought I was actually

23   earning income and -- I was working, he was earning income,

24   that's also where both the income and the expenses are highly

25   relevant.

1          And, you know, they're going to hear about the

2   choices he made and those are -- that goes to his willfulness,

3   right.  You can spend your money -- I mean, you can spend your

4   money in all kinds of ways and if we have to prove that he

5   willfully chose not to pay his taxes, to show that he was using

6   money on himself in a variety of ways, I think goes to that as

7   opposed to if he had -- you know, and we're going -- I mean,

8   this will come out through the summary exhibit, he had alimony

9   payments.  That's on there.  That's not something where you can

10  say oh, well, that's him, you know -- I mean, he did -- I guess

11  he could not have had paid his alimony, paid his taxes first

12  but we're not -- we're making a clear picture of where the

13  money went to show that at all points he was making choices.

14          **THE COURT:**  Okay.  Is there any room for stipulations

15  here to cut down on some of this evidence?  I mean, as you said

16  yourself, you're not trying to guild the lily, some of the

17  evidence is going to be potentially, you know, of a distasteful

18  nature, we run into 404 issues, we run into the potential that

19  a jury might, you know, might take it out on the Government for

20  throwing all this stuff in its face.

21          Have the parties tried to come together on this and -

22  - to see if there's any common ground?

23          **MR. WISE:**  No.  I mean, we provided the exhibit list

24  and I think they objected I think to every exhibit.  So we

25  hadn't gotten an early signal that there was going to be a lot

81

1    of room there.

2            I mean we -- I think there are some stipulations.

3    For instance, he paid -- he made payments for his daughters, I

4    think we would propose that, you know, I mean in the gun trial

5    he called one of his daughters and it was awful.  We didn't

6    call any of them and Mr. Geragos made that offensive remark

7    about the mob, you know, not going after wives and children.  I

8    guess that was some casting aspersions on us.  But we didn't do

9    that.  And we would stipulate that the payments for those, for

10   his three daughters were for that and not --

11           **THE COURT:**  What I mean, a good example would be the

12   payment to for his daughter's law school tuition --

13           **MR. WISE:**  Yeah.

14           **THE COURT:**  -- that's categorized as a legal expense.

15   Obviously it's not a legal expense, but I'm just wondering what

16   would the stipulation be?  The -- I guess the stipulation could

17   be that -- well, at some point you get into a knowledge

18   requirement, right?

19           **MR. WISE:**  Yeah.

20           **THE COURT:**  Where the defendant would have to --

21           **MR. WISE:**  That's the problem.  They're not going to

22   stipulate as Your Honor asked them, I knew it wasn't a business

23   expense, right.  They may go as far, yes, this is personal, but

24   what it is becomes so important because, you know, like the

25   hotels, for instance.  You couldn't make a mistake about

82

1    whether you -- if you frequently stay at a hotel or a

2    restaurant is an even better example, if we were just to

3    sanitize who he was with or whatever, enter into some

4    stipulation, you can to your favorite restaurant with a friend

5    or a spouse, and you can also go there for a business meeting.

6            If we don't have actual recipient witnesses talking

7    about what was going on, the jury is not going to be able to

8    know was that a mistake or was that willful.  So I don't

9    foresee, I mean, we were going to propose, depending on how

10   today went, there's three daughters that got payments or there

11   were a variety of payments that went to the daughters, we were

12   going to propose stipulating that those were personal expenses.

13   More just because of the fact that they're his children.

14           Pretty much everything else we've -- you know, like

15   we said in Delaware, the evidence is ugly, personal, but we

16   didn't choose it.  And we need to put it on to prove the case.

17           **THE COURT:**  Right.  And okay.  Let me -- why don't we

18   do this.  We're almost to the noon break hour.  I wanted to

19   take a break for lunch at noon and we'll come back at 1 o'clock

20   and sort of go on with these.

21           But I wondered whether the parties can take some time

22   over the lunch hour, I mean, to try to see if you can make any

23   progress and maybe you can report back on that when we come

24   back at 1.  Thank you.

25           **THE CLERK:**  All rise.  This court's in recess.

```
 1        (Recessed at 11:57 a.m.; reconvened at 1:00 p.m.)

 2        THE COURT:  Please have a seat.  Okay.  Welcome back

 3   from the lunch break.  Have the parties made any progress on

 4   stipulations?

 5        MR. WISE:  Your Honor, I think we -- we'll propose

 6   something, as I mentioned, to cover the defendant's three

 7   daughters, which potentially could obviate the need for them to

 8   have to testify that the expenses made for their benefit were

 9   for their benefit.  I think that's some area where we can reach

10   a common ground.  So I think that's promising, and we'll send a

11   draft to counsel shortly.

12        We've also spoken to counsel for the three

13   daughters.  So I think they also would very much like to be

14   able to stipulate to that, and we can accommodate that.

15        THE COURT:  Yeah, I mean, it could be as simple as,

16   you know, the testimony you're going to elicit from them, they

17   could put that in the record.  You know, we could put that in

18   the record.

19        MR. WISE:  I think that's a good suggestion, and

20   we'll try it that way.

21        THE COURT:  Yeah.  Anything from the defense side?

22        MR. GERAGOS:  That I thought I was going to add

23   Ms. Setara Qassim, sitting at counsel table, who has entered

24   her appearance.  Q-A-S-S-I-M.  And I know -- I just confirmed

25   that who I think it is who represents them is somebody that I
```

84

1    know.  I will call him.  And I will continue to try and meet

2    and confer on the other areas with them in the interim, if

3    that's acceptable with the Court.

4              **THE COURT:**  Great.

5              **MR. GERAGOS:**  I don't want to get over my skis.

6              **THE COURT:**  No, I think so.  Yeah.  The more the

7    parties can do, because obviously, as everybody knows, this is

8    a big issue, this -- and so whatever we can do to avoid it

9    would be great, because we don't -- this way we don't raise

10   any -- it just cuts down on the number of issues that are going

11   to be potential things that could raise appeal problems.

12             Let's deal with the defendant's motion in limine

13   number four.  We've already talked about some of these items,

14   four through six, but let's talk about one, two, and

15   three.  Defendant wants to keep out allegations that he acted

16   on behalf of a foreign principal to influence U.S. policy and

17   opinion, violated FARA, and improperly coordinated with the

18   Obama administration.

19             Let me start with the government.  Obviously, there's

20   relevance to the defendant getting paid, because he's got to

21   pay taxes on his income.  And I guess there could be some

22   relevance to the structure of the business deal he was involved

23   in, because it might show his ability to -- I guess, to

24   understand or to be involved with those types of deals, so that

25   might go to his lack of capacity.  But why is it relevant that

85

 1    what he did was a FARA violation?  And what's -- the

 2    coordinating with the Obama administration, why is that

 3    relevant?

 4             **MR. WISE:**  Sure.  So we don't intend to elicit

 5    testimony that he violated FARA.  That's never been our

 6    intention, nor to argue it.  The witness that was his business

 7    partner will testify about this business thing they pursued

 8    with a Romanian individual, and what they did, and sort of how

 9    they did it.  But there won't be any testimony that that was a

10    violation of FARA.

11             And it's not like, you know, if he said, oh yeah, we

12    hired a hitman to kill our business partner, that the jury

13    would be, oh my God, that sounds terrible.  I think if he

14    utters the words FARA, I think they're as likely to go to sleep

15    as they are to, like, think this is something terrible.  What

16    he said, and we've summarized this, and then we provided the

17    transcript --

18             **THE COURT:**  Right.

19             **MR. WISE:**  -- is that they were meeting with

20    government officials on Capitol Hill and in the State

21    Department, advocating on behalf of this Romanian

22    businessman to try to encourage the U.S. government to

23    investigate the investigation in Romania, and that he took an

24    ownership interest in this person's property management

25    company so that they wouldn't have to register.  And they did

86

1   that because of sensitivities related to the defendant's

2   relationship at that time to his father, who was the vice

3   president.  That's the factual story.

4           Commentators, partisans, whomever, may decide what

5   they think that means, but I think in this courtroom with this

6   jury, that's going to be -- I mean, it's going to be a bit of a

7   snoozer.  It's not going to be anything particularly salacious.

8           **THE COURT:**  Right, but I guess taking the interest in

9   the property management company to avoid the knowledge that

10  they were lobbying seems like a bad act that we could avoid.  I

11  mean, what's wrong with just putting in testimony that they

12  contracted with this Romanian person to perform services, and

13  they received compensation for it?  Like, why do we need to go

14  any further?

15          **MR. WISE:**  Yeah.  So I think -- so, I mean, one thing

16  I will say is I think it is important that he be able to

17  testify what they were doing, that they were meeting with folks

18  on Capitol Hill, and that they were meeting with the State

19  Department because, and this is something I'll come back to, we

20  have to prove in 18, obviously, that the personal expenses

21  were -- that he claimed were business expenses, were really

22  personal.

23          So what he's doing, and where he's doing it, and when

24  he's doing it is important.  So if the testimony is from that

25  witness, we're doing meetings in Washington with Senate staff

87

1    from a couple of East Coast senators and then State Department

2    staff at Foggy Bottom, that means there's no reason to be in

3    Los Angeles.

4         If it was we're meeting with, you know, Senator

5    Feinstein -- at the time, Senator Feinstein's chief of staff,

6    then maybe that's a reason for the defense to be in Los

7    Angeles.  So the work itself is important.

8         As to how they structured it, like with any witness,

9    you know, we elicited from him sort of what happened.  And he

10   explained, you know, the three of them entered into this

11   arrangement with the Romanian businessman.  He had a written

12   contract with the Romanian businessman.  So we have that

13   contract, but it's for property management.

14        And so he explains -- actually, as to that contract,

15   you know, I don't know why he did that.  That was really for

16   him.  And then as to giving him the property interest, again,

17   he said it was so that they wouldn't have to register.  So that

18   explains, like, why that was part of the transaction.  And then

19   when we ask him, well, what did the defendant do?  He says,

20   well, he's the strategy person.  He identifies who I should

21   meet with, who I should talk to.

22        He brought in, you know, former FBI director, Judge

23   Freeh.  And I had a verbal agreement with him to give him a

24   million dollars of the three million we got.  And then I had a

25   written contract with the third business person.  So that's

88

1    sort of the deal.

2              And again, I think it's fairly anodyne to say I took

3    a property interest in the Romanian businessman's organization

4    so that I didn't have to register as a lobbyist.  I think that

5    that actually doesn't -- I mean, I don't think that actually

6    sounds like a violation of anything.  I think that sounds like

7    someone trying to comply with it.

8              **THE COURT:**  And you're going to -- the million

9    dollars that the defendant receives then is -- that doesn't

10   show up on his taxes as income?  Is that the idea?

11             **MR. WISE:**  No, it does show up.  I mean, he gets a

12   million dollars and because he gets it --

13             **THE COURT:**  I see, but he didn't pay.  So that goes

14   to what the tax liability was for -- is this 2017?

15             **MR. WISE:**  So he makes a million dollars in '17 and

16   then it's on the '18 taxes.

17             **THE COURT:**  Right.

18             **MR. WISE:**  What's important is the testimony from him

19   and from the CEFC-related witness and from his personal

20   assistant about Burisma is that, for instance, on the Romanian

21   business dealings and the CEFC business dealings, that was all

22   basically done more or less by the end of '17.  So going into

23   '18, he's not generating business expenses.  Right?  That's --

24   he claimed -- all the business expenses in the '18 evasion

25   count are incurred in '18 or all the bogus deductions are

89

1    incurred in '18.  So it's relevant for the jury to hear that by

2    kind of fall of '17, his major sources of income were sort of -

3    - his major sources of work, I won't say income, were kind of

4    drying up.

5            And then as to the Burisma, there'll be testimony

6    from his personal assistant in '18, that by '18, he wasn't

7    going to -- I mean, really he wasn't going to Burisma board

8    meetings and they would send him corporate resolutions and she

9    would sign them.  He told her to sign them and not even bother

10   sending them to him.

11           So again, that goes to whether, is it a mistake --

12   you know, if he's doing business, perhaps it's a mistake that

13   some of these expenses are not personal, but if the work for

14   the Romanian person is essentially over by the end of '17, if

15   the CEFC deals have dried up by the end of '17, which is the

16   testimony, and if he's essentially on autopilot with

17   Burisma, that's further evidence that those expenses could not

18   have mistakenly be thought to have been business expenses.

19           **THE COURT:**  And CEFC is the Chinese Energy Fund?

20           **MR. WISE:**  Yes, yeah.  And the testimony there will

21   be that they were looking for energy deals.  This was an energy

22   conglomerate.  So -- and he did that both with the witness that

23   was also related to the Romanian deal and then another witness

24   who will testify that they were looking for opportunities for

25   CEFC and liquid natural gas or other business opportunities.

1              To Your Honor's point, as he's trying to structure

2    these joint ventures or whatever the arrangement is, it also

3    shows his executive function.  So in the period when the

4    argument will be he has a diminished capacity, he's negotiating

5    special purpose entities and joint ventures, where he has a

6    prominent position, he's negotiating over his compensation, and

7    we see that in contemporaneous text messages and e-mails.  And

8    so all that's also relevant, not just that he happened to be

9    earning income.

10             **THE COURT:**  Okay, let me hear from the defense on

11   this.

12             **MR. GERAGOS:**  Well, this is somewhat astonishing to

13   me.  The transcript was lodged with Your Honor.  I don't know

14   if you had a chance to read it.  It was Mr. Walker's

15   transcript.

16             **THE COURT:**  I did, yes.

17             **MR. GERAGOS:**  What was just represented, the way I

18   read the transcript, does not bear more than a passing

19   similarity to what was testified to.  What was testified to is

20   what the declarant, who was under oath, said that he did.  And

21   you notice that the sleight of hand that the special counsel

22   just engaged in was somehow transferring the intent of what the

23   witness said in front of the grand jury, being prodded by the

24   special counsel, as to what he did.  It was not as to what

25   Mr. Biden did.

91

1        So the -- and I'm using the term sleight of hand

2   because, as the Court accurately pointed out, this is a bad

3   act, the FARA, that they are trying to get in the back door,

4   and it's fairly anodyne to yours -- their terms.  It was so

5   anodyne that it was front page news when they filed this, and

6   it was a front cover nationally less than three weeks ago,

7   because they knew it would be.

8        But when you look at the transcript, and I'm

9   perfectly willing to brief this publicly, but I was a little

10   restrained or I exercised restraint, because I did not

11   understand why they were filing the transcript under seal.  And

12   then in my reading of it, the kind of scurrilous way that it

13   was cited in the motion, which I believe was designed

14   specifically to inflame or ignite press coverage, because a

15   close reading of that will show that this arrangement was the

16   declarant who was under testimony.  It was his idea.  It was

17   what he did.  And that anything -- the suggestion now that

18   somehow we're going to transfer that action by the partner to -

19   - and impute it to him because we want to show when he was

20   earning the money or when he wasn't earning the money.

21        This goes back, by the way -- I think Your Honor

22   picked up on it immediately, to that one million that I earlier

23   referred to this morning that was booked on a cash accrual

24   basis, misbooked by the accountant.  And it will also show,

25   when we get in there, that the reference that was just made

1    right now about a referral to the former FBI director, Louis

2    Freeh, is also fraught with all kinds of issues that they don't

3    want to get into.

4           Louis Freeh and the FBI director, after that

5    referral, enlisted Rudy Giuliani.  The fact is that there is

6    all kinds of evidence that if they are claiming that there was

7    something untoward here, which he calls anodyne, that the

8    former FBI director was the one who got the immediate referral,

9    as he just referenced, and I wasn't going to bring this up, but

10   that -- if you want to unravel or pull on that string, Louis

11   Freeh then brought in Rudy Giuliani.  Rudy Giuliani was

12   intimately involved in that whole transaction, completely

13   unrelated to Hunter Biden.

14          And there is, I'm told, I don't know this, but I'll

15   make the representation, that I'm told that one of the members

16   of the special counsel's office also worked for the Freeh firm

17   as well, one of this special counsel's office.  So I don't know

18   if we're going to get into that, to quote you or to invoke what

19   you were saying before, it seems like an awful long way to go

20   when I've already, I believe, made it crystal clear on the

21   record, we're going to talk about that million dollars.  That

22   million dollars will be front and center because part of the

23   argument is that if it had been booked correctly when it was

24   supposed to have been put on the tax return, that he actually,

25   he being Hunter Biden, overpaid his taxes for that year as

93

1  opposed to underpaid his taxes.

2          So there's not going to be a dispute as to this

3  million dollars.  Everything else is just a sideshow.

4  Everything else is to further this narrative that's going on

5  outside of this courtroom unrelated to this case other than

6  using my client as, from my standpoint, as collateral damage in

7  a political fight.  But that's where we're going with this.

8          In fact, I'll be so bold as to predict that when you

9  read about this proceeding today, that the headline is going to

10  be "Burisma Structuring FARA Chinese Energy."  It's not going

11  to be eliminates Dr. Lee, restricts Tom Bishop, or any of the

12  other thing that we've spent hours on.  This is nothing more

13  than poisoning the jury pool prior to the selection of

14  jury.  There is no compelling reason, let alone balancing

15  reason under 403 or any other analysis as to, or 404, as to why

16  this should come in.

17          There isn't a dispute about the million bucks.  We

18  know where it is.  And if the Court is not convinced of this, I

19  would ask for a hearing with this witness in this courtroom so

20  that I can make sure that what's being represented in this

21  court is accurate.  I wasn't there in the grand jury.  I'm just

22  reading the transcript.  I come away with a drastically

23  different interpretation of how that transcript reads.

24          **THE COURT:**  So let me ask you this.  If the witness

25  testifies that the defendant put together the transaction,

94

1    that's what the government seems to be indicating --

2              **MR. GERAGOS:**  Correct.

3              **THE COURT:**  Doesn't this go to the defendants,

4    whether the defendant does or doesn't have diminished capacity?

5              **MR. GERAGOS:**  If the witness is going to get up here

6    and say, it reminds me of that old Saturday Night Live skit

7    where Ronald Reagan is behind the doors and they close the door

8    and he goes from an affable older gentleman to the guy who's

9    orchestrating arms in Iran.  If the witness is going to get up

10   here and testify, you know what, this whole transaction was he

11   referred -- he being Hunter, referred it to me and told me,

12   "This is how I want you to structure it.  This is how I want to

13   get it.  And by the way, when you get it, make sure that you

14   then wash it through this, that, or the other thing."  Yes, of

15   course.  I agree.  I'm not going to fight you.  That would come

16   in.  I might have 404, bad act style, what I call, and I

17   apologize for using the word, but sanitizing of it.  But the

18   idea that that goes to the mens rea or executive function,

19   whatever you want to call it, I just call it mens rea.  Yes, I

20   understand that.  But that is not the way that I read that

21   transcript.

22              I -- like I said, I have not had this witness under

23   cross.  And that's why I would suggest that before we go down

24   this road, which I believe we've got demonstrable

25   evidence.  All you've got to do is take a look and Google what

95

1    happened when they filed this last time and the firestorm that

2    it started, which I did not immediately file something

3    objecting to it because I wanted to get in front of Your Honor

4    to address it.  But if you take a look at how it was reported

5    and the way that this was set up, we have great -- we take

6    great objection to the way that this was handled.

7            **THE COURT:**  Let's talk about the timing of this,

8    though.  Just -- I want to understand where it is.  What's your

9    understanding of when this -- the transaction was set up with

10   respect to the Romanian person?

11           **MR. GERAGOS:**  You know, that's a very good question,

12   because if you read the transcript, he gives dates.  But there

13   is a time period in which he is saying that he was doing

14   various business ventures.  The whole idea of what -- and I

15   know you've read the transcript, so I'm not going to repeat

16   it.  I just want to make sure the record's clear.  He did not

17   want to take or to file as a lobbyist.  He was not Hunter

18   Biden.

19           And the way he described it is if I had a two percent

20   interest in this company, then I could be advocating for the

21   two percent interest because it was part of what I own.  That

22   was the way I read it.  That was the way I understood it.  I

23   did not see anything in that transcript.  I'm happy to be

24   educated, but it was filed under seal.  I didn't see anything

25   where this was the blueprint that Hunter told me you need to go

96

1    in there and avoid the FARA and the lobbyist registration.  And

2    the way you're going to do it is to do this two percent

3    percentage deal.  That was not, at least it's been a week since

4    I've read it or whatever date, but that was not what I gleaned

5    from that transcript.

6           **THE COURT:**  All right.  Let me just -- talk a little

7    bit about the timing, because as I understand the diminished

8    capacity defense, it comes in to -- it comes in at a particular

9    time.  And I'm just wondering, was this before that?

10          **MR. WISE:**  No, I think they're going to claim he's

11   smoking crack '16, '17, '18, and therefore, he, you know,

12   forgot he had to pay taxes for the failure to file and failure

13   to pay counts.  And then when he gets sober in the summer of

14   '19, he commits tax evasion then in late fall of '19 and '20.

15          I'm not exactly sure -- I mean, our position is

16   diminished capacity doesn't apply at that point because by his

17   own account, he's sober in the summer of '19.  He hires the --

18   well, Morris pays the tax return preparer starting in November

19   of '19 to then file the returns that he's forced to file

20   because of his divorce litigation in February.

21          So the business dealings, the Romanian contract,

22   which we describe in the indictment, is right in the middle of

23   when they're claiming he has diminished capacity.

24          Mr. Geragos is confused as to the million

25   dollars.  The million dollars their -- they -- their own filing

1    says it's the million dollars related to Patrick Ho, who is a

2    CEFC executive.  The million dollars from GP, GP is a Romanian,

3    and it was related to this investigation of him by Romanian

4    authorities, totally different million dollars.

5              So -- but look, I hear him going -- you know, really

6    getting exercised about this.  We don't particularly care about

7    the property interest arrangement or the contract that says

8    it's to manage a shopping mall in Romania.  We brought that out

9    so that we weren't accused of hiding the fact that Mr. Walker

10   had arranged the deal or had this arrangement of the

11   deal.  Walker clearly testifies that he was the worker

12   bee.  That's the word he used -- phrase he uses.  Mr. Biden,

13   the defendant, was the strategist, who to talk to, when to talk

14   to.  He brings in Louis Freeh.

15             I don't know anything about the Giuliani stuff.  I

16   don't know what he's talking about.  We have no intention --

17   that word should never be uttered in this courtroom.  I don't

18   intend to elicit it.  And I have no idea what he's talking

19   about.  Well, there was a number of things.  I sort of lost

20   which of them I don't know.

21             But if they're not going to cross Walker and try to

22   make him look like a bad guy for doing it this way, then we

23   don't have to bring that out.  But clearly what he says is --

24   you know, I think the thing I was going to say was the third

25   partner had the relationship with the Romanian.  He was the

98

 1  worker bee on Capitol Hill, and the defendant was the

 2  strategist.

 3          And again, that goes to where his head is in '17.

 4  And if he's helping strategize how to influence U.S. government

 5  actors to the benefit of this Romanian business person who's

 6  under investigation, that shows that he's not just -- that goes

 7  to his executive function and his capacity.  But if they offer

 8  that they're not going to ask him about, you know, what was

 9  your -- did you have this property interest and the contract

10  that you had with the Romanian, what did it say, then we don't

11  have to put that in.  We don't have to elicit that.

12          And again, his -- as I read his transcript and

13  remember him testifying, in his mind, they had not actually

14  violated FARA by doing it this way.

15          **THE COURT:**  Because he had the personal interest.

16          **MR. WISE:**  Because he had the personal interest.  And

17  I pressed him on that because I wanted to -- you know, again, I

18  didn't want to be accused of like, oh, you went easy on him

19  because he's a -- I mean, they always do this to us.  He's a

20  government witness, so you know, you went easy on him.  And so

21  we made it very -- we pressed as to what the deal was, what was

22  everybody's role, how did you get paid, what did you get paid

23  for, and that's why we did it that way.

24          **THE COURT:**  So it's like Jenks material.

25          **MR. WISE:**  Yeah.  Totally up front about it.

1          **THE COURT:**  So I think the best way to deal with this

2    issue is to defer it until we see what the testimony -- how the

3    testimony comes in because I think what counsel for the defense

4    is saying is that unless you can tie this to some involvement

5    of the defendant, then it's not relevant.  And so it seems like

6    there's a foundational issue there.

7          Once the foundation is laid, if the foundation is

8    laid that the defendant structured this transaction, it would

9    go to his executive function.  Why do we need to talk about the

10   Obama Administration at all?

11         **MR. WISE:**  I don't think we do.

12         **THE COURT:**  Okay.

13         **MR. WISE:**  Yeah, I don't know what that's a reference

14   to.  The only thing he says -- the witness will say, "I did

15   meetings on Capitol Hill and I met with State Department

16   folks."  They're calling State Department folks, I guess, the

17   Obama Administration.  But I went back and looked at the

18   transcript after they filed that.  He specifically says -- he

19   identifies some folks on Capitol Hill who are obviously not

20   part of the executive branch, but then he says State

21   Department, which is an executive branch agency.  But there's

22   no reference to the Obama Administration.

23         **THE COURT:**  Okay.  Okay.  So I think that we'll go

24   ahead and, you know, we'll grant this motion with respect to 4

25   through 6.  We'll note that there's going to be no reference to

1 the Obama Administration.  There's going to be no reference

2 that the defendant violated FARA.  And to the extent there's

3 other parts of this motion left, which there are not many, we

4 can deal with after the witness testifies, unless defense has

5 something else.

6          **MR. GERAGOS:**  I do.  I want to answer your

7 question.  I also want to throw it right back at them.

8          When they say, "We don't know why there was reference

9 to Obama or the Biden Administration," question by them.  This

10 is around 2015.  This is on page 12, line 9 and 10.

11          "So this is the end of the Obama-Biden

12 Administration, right?"  Answer, "Towards the end, but

13 still."  I didn't just pluck that out of nowhere.  They're the

14 ones who asked the witness that.

15          I will also -- I'll leave it at that.  But it's a

16 misstatement of the record that this would go to the time

17 period that is at issue, and I think you focused on it.  They

18 specifically asked him if this was 2015.

19          **MR. WISE:**  What they wrote in their motion is that

20 improperly coordinated with the Obama Administration.  There's

21 no testimony to that.  We were trying to pin down when

22 something was, and in the witness's mind, he was relating it to

23 when the defendant's father was in office.  That's not throwing

24 it back at us. I t was literally to figure out when he was

25 talking about.

1          **THE COURT:**  So I think it's clear.  We're not -- this

2    is a tax trial involving the defendant, failure to pay, failure

3    to file, evasion, filing false 1040 and 1120 forms.  So we're

4    not going to talk about any improper government conduct of any

5    administration.  Correct?

6          **MR. WISE:**  Absolutely.

7          **THE COURT:**  Yeah.  And so just to kind of cut down on

8    the number of issues.

9          Okay.  So thank you.  I think that's all for now for

10   the motions in limine.  I want to go back to one issue because

11   I don't know that I was clear on this, is the cause of the

12   defendant's alleged addiction.  And I know the defendant admits

13   this in his book, and I think that's -- there's going to be

14   testimony about that.  The cause of that addiction, I don't

15   think there's, unless there's a competent witness to testify to

16   it, I don't think comes into evidence.  I think the timeline of

17   the addiction, I think, could certainly come in evidence.  But

18   I just wanted to make sure that ruling was clear.

19         I want to talk a little bit about the rule of

20   completion under 106.  As I understand it, the government's

21   going to put in some excerpts from some statements of the

22   defendant, some of them from the book.  I don't know if there's

23   other statements.  There could be other statements of the

24   defendant that you're putting in as well.

25         Under Rule 106, the defense has the right, to the

1   extent those excerpts are misleading in some way, to have a

2   larger portion of whatever it is put into evidence over the

3   hearsay rule.  Because, obviously, one of the peculiar things

4   in a case like this is that the prosecution could put in all

5   the statements it wants of the defendant.  The defendant can't

6   put in any of his own statements because that would -- they're

7   not hearsay for the prosecution, but they are for the defense,

8   except for this rule of completion.

9          In order to streamline that process, I'm wondering

10  whether we couldn't have the government identify for the

11  defense, maybe in a table form, all the statements you're

12  intending to admit of the defendant, and then ask the defendant

13  to respond to that with the statements the defendant believes

14  ought to come in for the rule of completeness.  And then the

15  Court can make rulings prior to getting started.

16          **MR. GERAGOS:**  Kind of like an MSJ statement of --

17          **THE COURT:**  Right.  Or, you know --

18          **MR. WISE:**  Your Honor, we already did this.

19          **THE COURT:**  Okay.

20          **MR. WISE:**  They've had the statements, and they

21  haven't identified what they think is incomplete about them.

22          **MR. GERAGOS:**  Well, the --

23          **THE COURT:**  So what I'm thinking about, like, almost

24  like you see, you know, so, yeah, these are the

25  statements.  These are what we think needs to be in there.  And

 1  then the Court can make a ruling.  And, in fact, maybe we think

 2  this needs to be in there and just a short paragraph as to

 3  why.  And then the government can object to that, and then the

 4  Court can make rulings.  This way we can streamline it before

 5  trial starts.

 6          **MR. GERAGOS:**  I've got that -- a template to do

 7  that.  So I'll take whatever they think they've got.  I'll take

 8  that.  I'll put another column for our position.  And then I'll

 9  leave them.  I'll send it back to them for their response and

10  our response.

11          **MR. WISE:**  Yeah.  So this is Exhibit 227, which we

12  sent them weeks ago.  And this was all already litigated in

13  Delaware.  So this is, I mean, we've been --

14          **MR. GERAGOS:**  I'm just going to say it one more time

15  so the record's clear.  I was not in Delaware.

16          **MR. WISE:**  Right, but it was --

17          **MR. GERAGOS:**  In fact, I can't remember the last time

18  I was actually in Delaware.  So I would appreciate if we tried

19  the California case.

20          **MR. WISE:**  And we provided it in this case weeks ago.

21          **THE COURT:**  Right, right.  And so let me give you

22  some dates to -- on that to sort of -- just so we get it done

23  before trial in a clear fashion.

24          So the -- I know I came up with some dates and I'm

25  just -- let me just find them real quick.

104

1       **(Pause)**

2           **THE COURT:**  Okay.  So -- and the government has

3       already provided them all of the statements?

4           **MR. WISE:**  Yes.  Exhibit 327 -- 227.  Yeah.  227.

5           **THE COURT:**  Okay.  So can I ask the -- how long will

6       it take the defendant to come up with its counter designations

7       or completion designations?

8           **MR. GERAGOS:**  Would you prefer the final document, so

9       to speak, because I think we could reverse engineer from

10      that.  When would you want that -- the one that has what they

11      propose, what we propose, their argument, ours?

12          **THE COURT:**  Well, I was hoping to have it by -- we

13      start voir dire on the 5th.  I was hoping to have it by the

14      4th.

15          **MR. GERAGOS:**  Perfect.  And then I'll work with them

16      to get their things in.

17          **THE COURT:**  Great.  Great.  Yeah.  Just so then

18      again -- and then I can make rulings and get that all done

19      before opening.

20          Okay.  So just to recap on the motions in

21      limine.  Dr. Lee's disclosure -- sorry.  Motion in limine

22      number one with Dr. Dr. Lee has been granted.  Dr. Lee is not

23      allowed to testify.  Mr. Bishop is not allowed to testify to

24      some portions of his report.  Other portions that will be held

25      will be to be determined based on what the government puts in.

1          Government's motion in limine number three is

2    granted.  Motion No. -- Government's motion in limine number

3    four is granted.  Five is granted.  Six is granted.  No

4    discussion of payments of taxes after the -- after the last

5    date of commission in the indictment.  Seven is going to be

6    denied in part.  Defense counsel can bring up facts in opening

7    that he has a good faith belief will come into evidence,

8    although they can't in any way conflict with the motions in

9    limine.

10          Defendant's motion in limine number one is

11   granted.  Two is granted.  Three is pending discussions of the

12   parties.  Four is granted in part.  And the other portion will

13   be in abeyance until we find out what the witness says.

14          I'll issue a written order that will give more void

15   specifics on this. But I just wanted to make sure that the

16   parties were aware of some of the of the issues.  But you want

17   to pay particular importance to late payment of taxes to

18   testimony that the addiction was caused by a particular event.

19          And I will -- you know, part of the issue that that

20   the defense is going to run into, if you indicate the

21   addiction -- if you put to put forward evidence that the

22   addiction is -- was caused by the death of the defendant's

23   brother, then I think you're going to have a problem with the

24   Navy discharge.

25          **MR. GERAGOS:**  I understand that.  But as I indicated

1    before, I think that a proper or fair reading of that is that

2    there was the original trauma, which was the death of his

3    mother and his sister, and that that manifested come in 2013

4    and that then it was triggered.  I've got all of that --

5                 **THE COURT:**  Yeah.  In --

6                 **MR. GERAGOS:**  -- I know how to get that in.  And it's

7    on me, I would assume, whether I want to make that promise to

8    the jury in an opening, which then opens me up to not being

9    able to prove that as we talked about, correct?

10                **THE COURT:**  Well, but I don't -- I mean, if there's

11   not another expert that can testify to addiction was caused by

12   this trauma.  Right?  I think you could talk about the

13   timeline, but you can't talk about the causal connection.

14                **MR. GERAGOS:**  Correct.

15                **THE COURT:**  Yeah.

16                **MR. GERAGOS:**  I can talk about the timeline, but I

17   guess I was being too clever by half.  If I decide I'm going to

18   call Hunter Biden as a witness --

19                **THE COURT:**  Right, right, right.

20                **MR. GERAGOS:**  -- before I do the opening, that's fair

21   game.

22                **THE COURT:**  Yeah. Go ahead.

23                **MR. WISE:**  The accident, I still think is out of

24   bounds.  I mean, how that -- how anybody, even the defendant,

25   could say that caused me 40 years later to use drugs, I think

```
 1   is just wildly --

 2           THE COURT:  So are you making a motion to exclude

 3   that?

 4           MR. WISE:  Yeah, I think -- I mean, I -- we -- I

 5   think we -- in our motion, we did say that that in particular,

 6   you know, because the events in this case happen around the

 7   time of his brother's death in '15, that will come in.  Other,

 8   you know, witnesses will use that as a point in which they base

 9   certain observations.

10           But the '70s, I think -- I think it was in the '70s

11   is not -- I mean, we were shocked when Mr. Lowell did it in

12   Delaware because it's just so far outside the scope of

13   anything.

14           THE COURT:  Okay.  What's your response to that?

15           MR. GERAGOS:  My response to that is if I'm going to

16   put him on the stand, it's going to come in.  I mean, that's --

17           THE COURT:  But why would it be relevant, even if

18   he's on the stand?

19           MR. GERAGOS:  Clearly, as to what triggered the

20   original trauma?  And that's why -- one of the reasons that we

21   wanted to put an addiction expert on.  The addiction expert can

22   talk about that.  And the more power to Mr. Weiss that he's

23   never had anybody close to him who's had substance abuse

24   problems, but the idea that there's a --

25           THE COURT:  Well, let's --
```

1          MR. GERAGOS:  Okay. But I -- apparently he's never --

2     he doesn't understand the delayed trauma.

3          MR. LEO:  Stop talking about me.  How about that?

4          THE COURT:  Yeah.  Let's not talk about

5     counsel.  Let's not talk -- okay.  I -- the judge -- the

6     ruling of the Court is that it's too far afield.  The accident

7     where his mother died, his sister died, doesn't come into

8     evidence.  The only -- to me, the only reason it would come in

9     is for some sort of jury sympathy.  I don't think you can make

10    a causal connection between that and his addiction.

11          I don't know that that the reason for somebody's

12    addiction is necessarily relevant to this case, and so I've got

13    a very low bar.

14          MR. GERAGOS:  Right.  And it's the same -- right, and

15    it's a very high bar for the 404 bad accident evidence that

16    they are planning on parading through here.  So --

17          THE COURT:  I -- we'll sort of talk about that when

18    we talk about that.  So the causes of addiction, the causal

19    connection between traumatic events and the addiction doesn't

20    come in.  His childhood accident doesn't come in, and the death

21    of his brother can come in, but the causal connection between

22    that and the addiction shouldn't come in, although the timeline

23    can come in again.

24          Again, I'll put this in an order so it's very clear

25    to everybody what's in and what's not.  Okay.  So that's --

1    those are the motions in limine.

2        **MR. GERAGOS:**  Just so that we're clear, I plan on

3    supplementing the addiction issue based on the rulings

4    today.  So I'm going to do that again just so that the record

5    is clear that when they start going down this road again during

6    the trial, and the evidence comes out, that this is all a ruse

7    in order to slime the client.  I will have supplemented the

8    disclosures very shortly in order to bring that front and

9    center so that the Court can make the, as we discussed earlier,

10    can pivot on a motion in limine if necessary.

11        **THE COURT:**  Okay.  Yeah.  And again, we'll get an

12    opposition from the government on that, and we'll talk about

13    timeliness and all those things.

14        So those are those are the motions in limine.  Now I

15    want to turn to the voir dire process.  So the way it's going

16    to work is it's going to be similar to what Judge Noreika did

17    in Delaware.  It's similar to the Court's normal process.  And

18    let me just take you through how we'll do it here.

19        I'm going to put together a questionnaire based on

20    what the parties gave me.  And that questionnaire is

21    essentially a bunch of yes/no questions.  I'm going to have all

22    the jurors fill the courtroom here.  I'm going to try to get as

23    many of them as I can at once.  I think we can get, I think we

24    said 100 -- 100.

25        So we'll have 100 jurors there.  I'm going to give a

1    brief PowerPoint presentation about what jury service is, what

2    their role is as jurors, explain where they are in the

3    courtroom, that sort of thing.  I'm going to read them the

4    statement of the case, and then I'm going to go through the

5    questions with them.  I'm going to read them the questions and

6    have them mark up their forms.

7         So once that's done, I'm going to dismiss all the

8    jurors into a holding room.  It'll probably be either across

9    the way or down the hall.  It'll be in a different courtroom

10   than here.  Then I'm going to bring them back one by one.  I'm

11   going to have them stand at the podium, and I'm going to ask

12   them where they're from in the Los Angeles area, what their

13   occupation is, if they have any adult children, what their

14   occupations are, if they have a significant other, what their

15   occupation is, if they have adult children, what their

16   occupations are.

17        Then I'm going to ask them on their form, what

18   questions did you answer yes to.  And for each of those

19   questions, I'm going to ask some follow up to that.  Once

20   they're done, I'm going to send them back to the holding room,

21   and then I'm going to as, the parties if they have challenge

22   for cause.  So we'll deal with cause challenges.

23        Once we're done with that discussion, we'll bring the

24   next one in.  And we'll go through that process until we get

25   roughly 36 or 40 jurors cleared for cause.  Then once we have

1    those cleared for cause, my plan would be to bring those

2    cleared for cause back in, put the first 12 in the box, and

3    then go through peremptory strikes.

4            That's the -- and then, you know, once we seat the

5    12, then we'll do the same thing with the alternates.  I plan

6    to have 4 alternates in this case, just to -- just because I

7    think the case might be a little bit longer than our normal

8    cases.  So that's the process.  It would seem very similar to

9    what was done in Delaware.

10           But do the parties have any questions about that?

11           **MR. GERAGOS:**  Does the Court allow attorney voir

12    dire?

13           **THE COURT:**  Typically no.  So I usually handle all

14    the questions myself.  Now, if you feel that there's something

15    that I should ask that I haven't asked, maybe we can discuss it

16    at a sidebar conference, and I'll ask it.

17           **MR. GERAGOS:**  Okay.  So I would request an attorney

18    voir dire, number one.  Number two, is the Court, when you

19    bring them in or when you give them the questionnaire, do you

20    do a financial hardship gatekeeping question or not?

21           **THE COURT:**  No.  All the jurors here are cleared for

22    the time.  So the jurors that have been subpoenaed for this

23    case are cleared for time.  So they're all able to make it.

24           **MR. GERAGOS:**  Okay.  And then when you put the jury

25    -- after the initial group comes in, fills out the

1    questionnaires and you put them in another room, do you then

2    collect the questionnaires, copy them so both sides have them?

3          **THE COURT:**  No.  So I'm just going to have them come

4    in with the questionnaires.  You both will have a blank one and

5    I'll say, what questions did you answer "Yes" to?  Because the

6    questionnaire is just Yes/No.  So it's not like -- we don't

7    really need to go through that process.

8          **MR. GERAGOS:**  Okay.  And then when do we -- are you

9    changing the questionnaire?

10          **THE COURT:**  Yes.  And I --

11          **MR. GERAGOS:**  When will we have access to that?

12          **THE COURT:**  Very soon.  So I'll talk about my

13    suggestions and changes to the questionnaire.

14          **MR. GERAGOS:**  Thank you.

15          **THE COURT:**  Any concerns or comments from the

16    Government?

17          **MR. WISE:**  No, Your Honor, thank you.

18          **THE COURT:**  Okay.  So that will be the process.  Now,

19    let's talk about the questionnaire.  Does everyone have a copy

20    of it with them?

21          **MR. WISE:**  Yes, Your Honor.

22          **THE COURT:**  And does the Defense have it as well?

23          **MR. GERAGOS:**  I believe we've got it on the computer

24    if I -- if you just give me one second.  Yes.

25          **THE COURT:**  Okay.  I want to focus on Questions 18

113

1    through 23.  18 is, "Do you have any negative opinions or

2    feelings about the tax laws of the United States or the IRS?"

3    19, "Are you strongly against having to pay taxes at all?"  20,

4    "Do you have any strong negative views about individuals who

5    file or pay their taxes late or do not pay their taxes at all?"

6         21, "Have you, your family member or relative or your

7    close personal friend or acquaintance affiliated with or a

8    member of a group or organizations that -- formal or informal,

9    that's engaged in the study of tax -- Federal tax laws or

10   Federal tax policy in general?"  22, "Have you, your family

11   member or relative or your close personal friend or

12   acquaintance engaged in protests against tax laws or tax policy

13   in general or do you believe that the tax laws are

14   unconstitutional?"

15        And finally 23, "Have you, your family member or

16   relative or your close personal friend or acquaintance been

17   affiliated with or a member of any group or organization,

18   formal or informal, that is engaged in protest against tax laws

19   or tax policy in general or believe that the tax laws are

20   unconstitutional?"

21        So I wanted to see if those questions at least seem

22   to me to have some redundancy and duplication and I wondered

23   whether we couldn't substitute for those questions the

24   following two questions.  "Do you have any negative opinions or

25   feelings about the tax laws or policies of the United States or

114

1    about the Internal Revenue Service, IRS?"  And 2, "Do you have

2    any opinions or feelings about payment of taxes, late payment

3    of taxes or nonpayment of taxes that in any way would prevent

4    you from being a fair and impartial juror in this case?"

5            **MR. GERAGOS:**  As a substitute for the group?

6            **THE COURT:**  Yeah.  I just think it cuts it down a

7    little bit and it gets us to the same place because what's

8    going to happen is, if somebody answers "Yes" to that second

9    question, right, "Do you have any opinions or feelings about

10   payment of taxes, late payment of taxes or nonpayment of taxes

11   that in any way would prevent you from being a fair and

12   impartial juror in this case, they answer "Yes," I'm going to

13   say, "Why?  Why do you think that?"

14           **MR. GERAGOS:**  I would -- the only suggestion I would

15   make is you have either a negative or a positive.  I don't know

16   anybody who's got a positive feeling about the IRS.

17           **THE COURT:**  Oh, I see, add "Negative or Positive"?

18           **MR. GERAGOS:**  Correct.

19           **THE COURT:**  Yeah.

20           **MR. GERAGOS:**  Just so that you're not leading the

21   question.

22           **THE COURT:**  Yeah, that's a good point.

23           **MR. WISE:**  Could Your Honor just read them one more

24   time?

25           **THE COURT:**  Yeah, sorry.

1          **MR. WISE:**  That's okay.

2          **THE COURT:**  This would say, "Do you have any negative

3    or positive opinions or feelings about the tax laws or policies

4    of the United States or about the Internal Revenue Service?"

5    2, "Do you have any opinions or feelings about payment of

6    taxes, late payment of taxes or nonpayment of taxes that in any

7    way would prevent you from being a fair and impartial juror in

8    this case?"

9          **MR. WISE:**  I think our only request would be the

10   second question has that second clause where you ask for the

11   information but then you also ask, that would prevent you from

12   being fair and impartial.  I think we would be interested, just

13   like with the first question, just to hear whatever the

14   information is and then if Your Honor were to -- wants to list

15   it, then ask, well --

16         **THE COURT:**  Yeah.

17         **MR. WISE:**  -- given that, would you have -- would

18   that prevent you from being and impartial?  If we could do it

19   that way, that would be our preference.

20         **THE COURT:**  Okay.  What does the Defense think about

21   that?  I think that makes sense because I will generally,

22   right, whenever they ask a question like that, then I will

23   follow it up with -- after I find out a little bit more, is

24   that going to cause -- be hard for you to be fair and

25   impartial?

1          **MR. GERAGOS:**  And I would assume just as -- I mean,

2  doing this -- I call this -- and I apologize -- Hoe v. voir

3  dire (phonetic) which is individual voir dire.  So the -- when

4  that happens, I assume that if you get some sense that somebody

5  can't be fair, you're going to do it as a follow-up.  So that's

6  fine.

7          **THE COURT:**  Yeah, okay, great.  Okay, good.  Well,

8  that streams things down a little bit.  So --

9          **MR. GERAGOS:**  You would keep 17 as is?

10         **THE COURT:**  Seventeen?  Yes.

11         **MR. GERAGOS:**  Got it.

12         **THE COURT:**  Yeah.  So moving on to 39, "Do you

13 believe the United States Department of Justice, the IRS, the

14 FBI, the California Franchise Tax Board or any other law

15 enforcement agency investigates and prosecutes people --

16 prosecutes individuals because of politics?"  I wondered

17 whether with that question, we wouldn't make it a little bit

18 more -- so that's 39 and I'm thinking if we broadened it out to

19 say this, "Do you believe government law enforcement agencies

20 make decisions on whether to investigate and prosecute

21 individuals based on politics?"

22         **MR. GERAGOS:**  I'm okay with that.

23         **THE COURT:**  Okay.  And then what I'd like to do is,

24 Questions 40 through 42, I think, can be eliminated because I

25 think 39 as changed will get us that same information.

1        **MR. GERAGOS:**  Is there -- the one -- if we were to

2   capture -- if you were to change 40, "Do you believe Robert

3   Hunter Biden is being either prosecuted in this case or not

4   prosecuted in others," then I think that you could eliminate 41

5   and 42.

6        **THE COURT:**  What does the Government think about

7   that?

8        **MR. WISE:**  We think that's fine, Your Honor.

9        **THE COURT:**  Okay.  That's a good suggestion.  Thank

10  you.  Okay.

11       So those are some of the modifications I had.  So

12  here are the questions I'd like to get rid of and so you can

13  tell me whether we need them or not.  So Question Number 1 I

14  think we can get rid of because the schedule shouldn't prevent

15  a problem for anyone because they have all been cleared for

16  schedule.  So we can get rid of 1.

17       Question Number 6, "Have you or any members of your

18  family had any business dealings with or been employed by any

19  of the attorneys or their offices?"  What I'm wondering about

20  is whether we need that in light of 5 which asks them if they

21  know any of the individuals involved in the case.

22       **MR. GERAGOS:**  I agree.  6 seems to be superfluous.

23       **MR. WISE:**  I guess it's just if somebody worked at a

24  law firm but didn't know these particular lawyers.

25       **THE COURT:**  Yeah.  I think it'd be hard to work it as

118

```
 1    well from an unknown probably.
 2              MR. WISE:  I think this was more when we had --
 3              THE COURT:  Yeah, yeah.
 4              MR. WISE:  But is Winston still -- what's Winston's
 5    role?
 6              THE COURT:  Well, let me ask Mr. Geragos.  Is this
 7    the trial team we're seeing here?
 8              MR. GERAGOS:  This is.  There may be one additional
 9    -- that -- from my office, a couple of people but there may be
10    one other Winston holdover.
11              THE COURT:  Okay.
12              MR. GERAGOS:  But would that be anybody who's named
13    here in this question?
14              MR. WISE:  Yeah, Winston is a big firm with lots of
15    offices.  We would want to know if somebody had worked there,
16    if they're --
17              THE COURT:  Okay.
18              MR. GERAGOS:  I don't have an objection to finding
19    out if somebody worked at Winston.
20              THE COURT:  Okay.  What about Question 15, "Are you
21    or any member of your immediate family or close friends
22    studying, planning to or currently working in the legal
23    profession"?  We'll get their occupation, we'll get their
24    significant other's occupation, we'll get their children's
25    occupations to the extent they're adult children.  Do we need
```

1    Question 15?

2           MR. GERAGOS:  My experience, for what it's worth, is

3    that sometimes you get interesting answers to that that lead to

4    either for-cause or not.

5           MR. WISE:  I think it would be, Your Honor, if they

6    work -- if they have a day job and they're going to law school

7    at night, we would want to know that.

8           THE COURT:  Okay.  We'll keep it.

9           Question 28, "Have you used a tax preparer to help

10   prepare your tax return?"  So my question here is that I'm just

11   trying to -- we've got Question 27 which asks, "Does someone

12   other than you personally prepare and/or file your individual

13   taxes?"  And then 28, "Have you used a tax preparer to help

14   prepare your returns?"  It seems redundant and what I don't

15   want is I don't want to get anybody that's ever used TurboTax.

16          MR. WISE:  Right.  Yeah, I mean, I think we -- I

17   think 27 would cover 28.  So I think we would be fine with

18   not -- with deleting 28 as long as we have 27.

19          MR. GERAGOS:  Yeah, I think there's a nuance

20   difference between the two.

21          THE COURT:  What is the difference between 27 and 28?

22   And maybe it's just a matter of changing some of the language.

23          MR. GERAGOS:  Well, 27, I think, would invite my

24   husband or my wife does it or my kid does it whereas if it's a

25   family member which then goes smack dab into TurboTax whereas a

1  tax preparer, a third party, I think, is something we would

2  want to know.

3        **THE COURT:**  I see.  So -- okay.  So maybe, "Have you

4  used a tax preparer other than an online service such as

5  TurboTax?"

6        **MR. GERAGOS:**  Correct.

7        **THE COURT:**  Okay.  Is that okay?

8        **MR. WISE:**  That's fine, Your Honor.  Thank you.

9        **THE COURT:**  Okay.  30, "Have you or a close family

10  member ever failed to pay your taxes or been late in filing or

11  paying your taxes?"  So if you fail to pay your taxes, you're

12  sort of asking somebody to incriminate themselves, no?  And I

13  wonder whether that is not a question we want to ask the

14  jurors.  I mean, if you fail to pay your taxes, you're asking

15  them to --

16        **MR. GERAGOS:**  Can I have just one moment?

17        **THE COURT:**  Sure.

18     **(Pause)**

19        **MR. GERAGOS:**  To avoid the problem that the Court

20  pointed out, time -- ever timely failed to pay your taxes?

21        **THE COURT:**  What does the Government think?

22        **MR. WISE:**  I think our -- what we would -- so, I

23  mean, what we would propose is -- and I'm just doing this off

24  the top of my head but do you have any strong feelings about

25  failure to pay taxes or being late or filing?  So they don't

1 | have to say, well, what we're worried about is sometimes I

2 | don't pay my taxes because I think it's outrageous.  The

3 | government has no authority to do this under the Fourteenth

4 | Amendment.  We want to know who those people are.

5 |         The previous question, Your Honor, sort of tailored

6 | -- gets close to that but this -- the idea specifically of not

7 | paying or late paying is obviously going to be an issue in this

8 | case.  So we want to know if anyone has strong feelings about

9 | it so without them incriminating themselves, I guess, as to

10 | what the source of that feeling is, if you could ask it somehow

11 | like that.

12 |         **MR. GERAGOS:**  Yeah, that --

13 |         **THE COURT:**  We already have, "Do you have any

14 | negative or positive opinions or feelings about payment of

15 | taxes, late payment of taxes or nonpayment of taxes?"

16 |         **MR. WISE:**  Right.  So I think that would cover it.

17 |      **(Pause)**

18 |         **MR. GERAGOS:**  Your Honor, and Mr. Hines made a good

19 | point.  I mean, I think we routinely ask -- I mean, I think we

20 | did this is the drug case -- I mean, the gun case.  We asked

21 | the jurors if they have had drug addiction issues and I don't

22 | think we treat that as sort of an admission

23 |         **THE COURT:**  Yeah.  I mean, I'll -- we'll talk about

24 | that in just a minute because I have some questions about those

25 | questions.

1    But have we -- so since we've already got the

2 question of, "Do you have any negative or positive opinions or

3 feelings about payment of taxes, late payment of taxes or

4 nonpayment of taxes," you're trying to get at -- Mr. Geragos,

5 you're trying to get at whether they've had any personal issues

6 with this?

7    **MR. GERAGOS:**  Correct, because I think -- and I may

8 be --

9    **THE COURT:**  Okay.

10    **MR. GERAGOS:**  -- cutting off my own legs here but I

11 think if there's somebody -- the last thing we want is a

12 stealth juror on Day 3 to say, this resonates with me because

13 I've got a tax lien.

14    **THE COURT:**  So we could ask them if they've ever

15 experienced any personal issues with the tax -- with the

16 payment of taxes and we'll see what we get.

17    **MR. GERAGOS:**  Correct.  I think that --

18    **THE COURT:**  Okay.

19    **MR. GERAGOS:**  Because if that doesn't prod them, then

20 they're going to --

21    **THE COURT:**  Right.  Okay.  So the next one to talk

22 about is Questions 44 and 45.  "Have you or a family member or

23 close friend ever suffered from drug or alcohol abuse or been

24 addicted to drugs or alcohol in any way?  Have you, any member

25 of your family or close friend ever sought treatment,

123

professional counseling, entered a rehab program, gone to AA or
tried other forms of addiction treatment or therapy?"

So my question there is a little bit of a self-
incrimination, first of all and second of all, I don't want to
ask people if they've been to Alcoholics Anonymous.  It seems
like it defeats the definitions but I would be comfortable
asking folks if they or a family member ever had a significant
issue with the use of drugs in their lives.

**MR. GERAGOS:**  Yeah, I agree.  I think the whole
purpose of asking if they've gone to AA defeats the whole
purpose of AA.  So I would agree with that.

**THE COURT:**  Okay.

**MR. WISE:**  No objection from us.

**THE COURT:**  Okay, great.  Thanks.

And then Question 59, "Is there anything such as poor
vision, difficult hearing, that sort of thing?"  I think we
sort of get that with 60, "Anything else including something
you've already told us that's important."  I don't know that
we -- if we have poor hearing or difficulty understanding
English, we'll get that when we talk to them.

What I tend to do -- and we'll see.  I don't want to
be too focused on how long it's going to take here but I tend
to want to get them to talk a little bit so you get a chance
to -- so if they don't answer "Yes" to any questions and they
give kind of one- or two-word answers, I may ask them what

1    their hobbies are, what they like to watch on TV, that sort of

2    stuff, just so you get a chance to hear them talk because I

3    think that can be helpful.

4          And through that, I think we'll get a good sense as

5    to whether or not they've got difficulties hearing or

6    difficulties with English.  We've seen some of that before

7    where we've asked questions and they haven't been able to

8    respond.

9          **MR. GERAGOS:**  Yeah, I agree.  The more they talk, the

10   better.

11         **THE COURT:**  Yeah.

12         **MR. WISE:**  Thank you, Your Honor.  That's fine with

13   us.

14         **THE COURT:**  Okay.  So I'll get this revised

15   questionnaire out to you so you have it and then give it a

16   flyspect (phonetic).  If you see an obvious error, please let

17   me know and also if you want to object to any of the

18   modifications I've made, for the record, feel free to file that

19   as well, just so it's on the record.

20         Let's talk about the trial schedule.  So we're going

21   to start on Thursday, September 5th.  My sense is jury

22   selection may take two days.  It may take one day.  You were

23   pretty quick in Delaware.  I don't know -- I mean, we'll see

24   how quick things go here.  It may take a little bit longer.  My

25   plan would be to start trial though -- start opening statements

125

```
 1  on Monday.  Or is Monday the --

 2          MR. GERAGOS:  Monday is the day we stipulated to.

 3          MR. WISE:  It's the 9th.

 4          THE COURT:  The 9th.  Yeah, so start opening

 5  statements on Monday the 9th and go right into witness

 6  testimony there.  If we -- when we get a juror and when we get

 7  our jury set, I'll do the opening instructions, the admonitions

 8  to them, all of those things.  So first thing Monday morning we

 9  can start with openings.  So we won't be -- and then we can

10  start running witnesses.  So we can get a full day going.

11          If we have time on Friday, we've picked the jury,

12  we've given them opening instructions, we've given them all the

13  admonitions and if we still have time, we can deal with any

14  issues that are still outstanding that we need to cover before

15  opening on Friday.  So we'll plan on all of us being here all

16  of Thursday and all of Friday but if the jurors -- if we're

17  done with them early, then we'll let them go early.

18          What's the estimate for the Government's case as far

19  as days go?

20          MR. WISE:  Sure.  I think we -- I think our estimate

21  is six trial days if we don't --

22          THE COURT:  Six trial days?

23          MR. WISE:  Yes.  That would take us into the middle

24  of the following week and that's with an estimate of cross

25  examinations of approximately equal length to what we
```

1  anticipate are direct examinations which is sort of a rule of

2  thumb but I find it fluctuates widely.

3       **MR. GERAGOS:**  And do we have a -- and I may have it

4  but I just haven't seen it.  Do we have an estimate as to what

5  the probable number of witnesses is so I can reverse engineer?

6       **MR. WISE:**  Yeah, it's less than 30.  I think we gave

7  most of the Jencks already in the Delaware trial.  We have a

8  couple more witnesses that we'll be disclosing.  I think

9  tomorrow is our plan but it's less than 30 witnesses.

10       **THE COURT:**  Okay.

11       **MR. GERAGOS:**  Well, if it's less than 30 witnesses, I

12  would think six days for them makes sense and just to build in

13  the extra, I would put two days for us.

14       **THE COURT:**  Okay.

15       **MR. GERAGOS:**  And does this Court -- and I apologize

16  if it's in your standing order and I missed it.  Do you

17  encourage or order that witnesses be disclosed in the order the

18  following day by end of day?

19       **THE COURT:**  I don't think I have that in the rules.

20  I leave it to the parties to work that out.  But any problem

21  with that?

22       **MR. WISE:**  Yeah.  Usually what our practice is, end

23  of the day, we then go back and see where we are, who's got

24  scheduling issues, reach out to lawyers and then communicate to

25  the Defense who we think we'll get to the next day.  So it

1 sometimes changes because --

2          MR. GERAGOS:  Right.  I mean, I don't need hard and

3 fast but if you can do it before 6:30 or 7:00 -- I assume --

4 how late are we going each day?

5          THE COURT:  We'll go until -- we'll knock off by 5:00

6 o'clock for sure.

7          MR. GERAGOS:  Okay.  So if we could have the list by

8 7:00, that's great.

9          MR. WISE:  Yeah, we'll send it as soon as --

10 sometimes the issue is, particularly in a case where we've got

11 a lot of out-of-town witnesses, we just -- we need to talk to

12 their lawyers.  We need to find out, are they -- and people

13 have days where we can't get them and so it sometimes takes a

14 little bit of moving people around.

15          THE COURT:  Okay.  And then we -- what I like to do

16 is I like to start us at 8:30 and have the jury be here at

17 9:00.  This way we have a half hour to go through any issues we

18 need to discuss before the jury -- I hate to keep the jurors

19 waiting with long breaks and conferences and things.  I just

20 feel like we're taking so much of their time that I want to

21 be -- so that's why I want to get here at 8:30 each day so we

22 have a half hour to discuss things.

23          If you think we're going to have a lot to discuss,

24 then let me know and we'll get here at 8:00.  But I just want

25 to make sure we are ready to go at 9:00 when the jurors get

1    here.  Does that make sense?

2            **MR. WISE:**  Absolutely, Your Honor.  Thank you.

3            **THE COURT:**  Great.  So we're going to go Tuesdays

4    through Fridays except for the first week when we're going to

5    do Monday through Thursday, so the 9th through the 13th.

6            **MR. GERAGOS:**  The 13th is the day we have off?

7            **THE COURT:**  Have off, right.  Right.  And as far as

8    the courtroom goes, we're going to have an overflow courtroom

9    which is Courtroom 1 downstairs.  It's like the big courtroom,

10   the ceremonial one.  That will be the overflow courtroom.  So

11   if people don't fit in here, they can go down there and will

12   be -- this will be broadcast into that courtroom.

13           With respect to you all, I want to reserve the first

14   row kind of on each side for the Government and for the

15   Defendant.  So if you've got people that you want to be here

16   for the trial, you'll have the first row for them.  Everything

17   else will be at a first-come-first-serve basis.  Everything

18   after that will be -- they'll have to go to the overflow room.

19           **MR. GERAGOS:**  And do you have any rule on the witness

20   rooms?  The Defense have one, prosecution one?

21           **THE COURT:**  No, but it makes sense.  If the Defense

22   wants to take that one, the prosecution wants to take that one,

23   that's fine.

24           **MR. GERAGOS:**  Thank you.  And do you have any

25   objection to us having a printer in that room?

1          **THE COURT:**  No, not at all.  Yeah.  And so other

2    issues to be resolved.  The statement of the case, the parties

3    have submitted a disputed statement of the case.  The statement

4    of the case of the Defendant includes language about the

5    Defendant's defenses.  Let me just hear a brief argument on the

6    two sides' statement of the case.

7          **MR. WISE:**  Do you want me to go first, Your Honor?

8          **THE COURT:**  Yes, please.

9          **MR. WISE:**  I mean, so, look, as Your Honor just said,

10   I mean, this is -- the Government has the burden.  Our

11   statement of the case, which they've agreed to except for this

12   paragraph they've added, tracks the indictment.  That's what we

13   intend to prove. That's what we think the evidence will prove.

14          What they've added is, I mean, that he was severely

15   addicted to alcohol and drugs.  I don't -- as we've talked

16   about, I'm not sure the addiction is relevant, severe or not.

17   Numerous stints in rehab detailed in the memoir after regaining

18   sobriety, obviously filed his outstanding tax returns and paid

19   his outstanding taxes.  That's been excluded.  And then the

20   statement about when the indictment was filed we think is not

21   of any particular moment.

22          So we think what we -- both sides have agreed to is

23   appropriate adding the addiction language and the rest of it,

24   we think, is not the case.  It may be the defense but it's not

25   the case.

130

1          **THE COURT:**  Okay.  Let me hear from the Defendant on

2     that.

3          **MR. GERAGOS:**  Well, I -- on Subsection F, I would ask

4     that we strike when he did finally file this 28 returns -- I

5     would ask to strike "finally."  Over our objections, obviously,

6     you struck the "filed his outstanding -- or paid his

7     outstanding taxes."  So I assume you're going to strike after

8     the comma or turn the comma into a period on Line 25?

9          **THE COURT:**  It would -- yeah, "After regaining his

10    sobriety in 2020, Mr. Biden filed his outstanding tax returns,"

11    that would not come in.

12         My question is this -- the defense -- the Defendant's

13    alleged defense, why do you think that's appropriate in this

14    statement of the case?

15         **MR. GERAGOS:**  Because when you're doing the statement

16    of the case, it's -- unless the -- I mean, I gladly will do a

17    five-minute opening -- five-minute mini-opening which a lot of

18    Courts do now.  It just gives a more balanced view as to what

19    it is that they're doing and doesn't unduly put the Defense in

20    a hole.

21         The Defense -- I think it's part of the idea that the

22    Defendant is presumed innocent and rather than just give the

23    laundry list of prosecutorial arguments, you actually put in

24    where the Defense is headed.

25         **THE COURT:**  Okay.  From a fairness standpoint, let me

131

1    ask the Government.  What would be wrong with including a

2    statement that the Defendant was relying on a defense of

3    diminished capacity?

4            MR. WISE:  I think that would be okay.  The only

5    nuance is, as I said earlier, we don't think diminished

6    capacity actually applies when they consider the false filing

7    count and the --

8            THE COURT:  Oh, yeah, to most of the counts.

9            MR. WISE:  Yeah, or to -- yeah, some of the counts.

10   I don't know, some or most.

11           THE COURT:  Okay.  Yeah, the -- I'll look at the

12   statement of the case and -- yeah, it seems the statement of

13   the case is going to be used for -- just for the voir dire.

14   Let me ask the Government.  What about a statement of the case

15   that says, "For some of the counts -- for at least some of the

16   counts, the Defendant claims he had diminished capacity because

17   of addiction to drugs"?

18           MR. WISE:  I think that's fine, Your Honor.

19           MR. GERAGOS:  Could I also -- and I apologize for

20   doing this but looking at Subsection B, extravagant lifestyle,

21   I would like "extravagant" struck.

22           THE COURT:  So it would say, spent of millions of

23   dollars on lifestyle expenses?

24           MR. GERAGOS:  Correct.

25           THE COURT:  Okay.  What's the Government's view on

132

1    that?

2           MR. WISE:  Yeah, I mean, I think, again, this is the

3    language from the indictment, what the Grand Jury found.  I

4    mean, I think that is what the evidence is going to be.  So --

5           THE COURT:  Okay.  I'll strike "extravagant" and put

6    "lifestyle expenses."  We will get rid of "finally."  And I'll

7    add that brief statement about the diminished capacity as to

8    the other counts.  Okay.  That's the statement of the case.

9           Now, with respect to exhibits goes -- go, are there

10   any voluminous exhibits that you intend to send back to the

11   jury room on a flash drive or something?  Is there anything

12   that sort of falls in that category?

13          MR. WISE:  So we do have -- I guess it depends what

14   voluminous -- what the Court considers voluminous.  I mean,

15   some do run -- I don't know what the top page count is but

16   there are -- like the work papers, for instance, the Edward

17   White and Company work papers for 2018, I think, are several

18   hundred pages probably.  So --

19          THE COURT:  Would you envision providing that the

20   jury on paper?

21          MR. WISE:  We can do it however Your Honor wants us

22   to do it.  We can provide it in paper.  We can provide it on a

23   flash drive.  We've used the JEFS systems in other courthouses.

24   I don't know if you use that here.

25          THE COURT:  No.  If you can -- if it's only a couple

133

 1  hundred pages, then paper is fine.

 2          **MR. WISE:**  Okay.

 3          **THE COURT:**  And just -- there's a little bit of

 4  logistics with jurors looking at things on a flash drive

 5  because they need to get a computer back there and then

 6  sometimes they object because when they've got to look over

 7  each other's shoulders and they can't kind of take it to

 8  different parts of the room.  So --

 9          **MR. WISE:**  Sure.

10          **THE COURT:**  -- if -- as long as we're not talking

11  about a thousand pages, then probably paper is best.

12          **MR. WISE:**  And is one copy sufficient to go back --

13          **THE COURT:**  Yeah, yeah.

14          **MR. WISE:**  -- to the jury of each exhibit?

15          **THE COURT:**  Yeah.  Okay.  And then the rule that the

16  Court has that's used for trials is that a document has to

17  either be admitted into evidence or agreed to be admitted into

18  evidence in order for you to use it in opening.  So is there

19  any exhibits that you intend to use in opening that you'd like

20  to resolve objections on now?

21          **MR. WISE:**  So we have the version of the exhibit list

22  where the Defense indicated "Yes" or "No."  Under the standing

23  order, I think there is a sort of reason that's disputed

24  exhibits document that Your Honor has Defense file.

25          **THE COURT:**  Right.

1        **MR. WISE:**  We haven't gotten that.  So we don't

2   know -- we got a letter that spoke in kind of categories but

3   not document by document.  So we don't actually know what their

4   specific objections are.  So we do -- we will -- I do

5   anticipate using -- previewing the evidence in opening and as

6   of right now, I think they've objected to everything.  So we're

7   going to obviously have to resolve that.

8        **THE COURT:**  Okay.  Yeah, if you can meet and confer

9   on that and then maybe we'll have something we can deal with on

10  Friday before the jurors come.

11       **MR. WISE:**  Right, thank you.

12       **THE COURT:**  There were some objections to a number of

13  exhibits though.  It was in the reply brief in your Motion in

14  Limine Number 4 or 3.  But they were hotel pictures or

15  something and I wondered whether -- does the Government -- I

16  mean, are there things in these exhibits that clearly aren't

17  going to meet the 403 threshold or are you at a point now where

18  everything that's on the exhibit list, you're sort of intending

19  to put in?  And if that's the case, the Court can start to look

20  at some of those issues now.

21       **MR. WISE:**  Yeah.  So, I mean, we used, like, black

22  boxes and stuff on some of the pictures in Delaware.  We would

23  do the same thing here.  The pictures -- one of the witnesses

24  used -- took pictures all throughout 2018 as she was with the

25  Defendant of where they were staying, what they were doing.  So

135

1  those we used in Delaware and we would intend to use here.

2        I would say that I think this happened in Delaware.

3  It may be that we may not use every single picture because if

4  things are moving quicker and the jury is getting it, we might

5  not need to show another picture --

6        **THE COURT:**  Yes.

7        **MR. WISE:**  -- the guest at the next hotel or

8  something.  So we gave, I think, the full set and if they have

9  specific objections as to specific pictures like -- we can

10  address that.

11        **THE COURT:**  Okay.

12        **MR. WISE:**  But we're not -- we don't -- we didn't

13  have nudity.  We didn't -- nothing like that in the Delaware

14  case.

15        **THE COURT:**  Okay, good.  Yeah, that would be -- and

16  then when you have witnesses testifying too, I want to -- I

17  really want to stay away from any explicit testimony about

18  things that can't be sanitized.  So we don't need to know

19  specifics about actions that occurred between two people.  We

20  can get to generalities.

21        Any problem with that?

22        **MR. WISE:**  So provided I understand what you're

23  saying, I think --

24        **THE COURT:**  Yeah.

25        **MR. WISE:**  -- yeah, I think we don't have any problem

1  with that.

2        **THE COURT:**  Yeah.  I just think there's been other

3  trials where witnesses have been allowed to just meander into

4  areas that didn't -- weren't really appropriate and I don't

5  want to get into that here if we can.

6        **MR. WISE:**  Understood.

7        **THE COURT:**  Okay.  Disputed jury instructions.  The

8  -- what I'd like to do on these, I've gone through them and I

9  think that they -- that there's a number of things that we can

10  decide kind of mid-trial when we have a better sense of things.

11  But one of the things that comes up is this unanimity issue

12  with Count Six.  Right.  So Count Six has got -- in the

13  indictment, it's got, like, four different ways that he evaded

14  taxes.  Three of them involved things that were eventually

15  reported on an 1120 and one of them involves something that was

16  reported on a 1040.

17        It's the Government's position that the jury can come

18  back and find him guilty without agreeing on which of those

19  four things were the actions that caused the evasion to happen.

20  And the Government's case on that -- I can't find it now.

21        The *United States versus Barai* case out of the Ninth

22  Circuit, 55 F.4th 1245.  The case kind of stands for the -- if

23  the -- if you're looking at the elements, the jury needs to be

24  unanimous that an element was proved but not the means of

25  achieving that element was proved.  So it makes it essentially

137

1   between the means and the elements.

2          Now, this case was not a tax evasion case.  It was a

3   case involving -- I'm trying to remember what the facts were

4   now.  It's escaping me but -- so -- and I have -- so I have the

5   Government's position on that but I didn't have Defendant's

6   position on that and I think it was because it was briefed with

7   respect to jury instructions.

8          What I'd like to get is I'd like to get both parties

9   to give me a little bit more law on that and specifically what

10  your position is because I think it's an important issue and I

11  want to make sure we get it right.  I don't think it's

12  something that we need to right in the jury instructions.  So

13  we have a little bit of time on that.

14         But can the parties give me -- can the parties brief

15  that issue?

16         **MR. GERAGOS:**  Yes --

17         **MR. WISE:**  Yes, Your Honor.

18         **MR. GERAGOS:**  -- yes.  I was going to ask for that.

19  So thank you.

20         **THE COURT:**  And I'm thinking, like, 3,500 words.  So

21  nothing -- maximum.  You don't have to have 3,500 words but --

22         **MR. GERAGOS:**  Try to keep it under.

23         **THE COURT:**  Keep it under.  That would be great.

24  That --

25         **MR. GERAGOS:**  Do you want that on the 4th also?

1          **THE COURT:**  Yeah, that would be great.  Great, thank

2  you.

3          So with the jury instructions itself, I wonder if the

4  parties could work on this.  So the jury instructions I find a

5  little bit confusing because they have multiple issues over

6  multiple instructions.  I wonder whether we can have one

7  instruction for each count following Model Instruction 22-1 to

8  22-3 with additional text toward unanimity and the instructions

9  for 2, 4 and 6.

10          Separate from the instructions for each count, we'll

11  have one separate instruction on willfully followed by the

12  Model Instruction 22-6 and then one instruction on venue

13  modeled after Model Instruction 47.  So this way, we don't need

14  to have willfully and venue explained in each of the counts of

15  the -- for the nine different counts.

16          So I'd like the parties to meet and confer on that

17  and to submit proposed instructions for each count with --

18  obviously with unanimity added -- entered where appropriate but

19  taking willfulness and venue as to separate instructions.

20          **MR. WISE:**  Understood, Your Honor.

21          **THE COURT:**  Okay.  What about venue?  What's the --

22  are the parties disputing venue here?  And the issue, I guess,

23  is in venue, we have a different standard, right?  We have a

24  preponderance of the evidence standard as opposed to the

25  reasonable doubt standard.  And I guess we have to make sure

139

1    the verdict form is clear on that.  But you're -- the parties

2    are -- you're just putting venue for every count?

3            **MR. GERAGOS:**  Yes, Your Honor.

4            **THE COURT:**  Okay.  So we just have to make sure the

5    verdict form is clear on that and we get the two standards of

6    proof different.

7            **MR. GERAGOS:**  Correct.  I think the most recent case

8    where there was an issue in this district I'll take a look at

9    it and I'll kind of fill in Ms. Qassim on that.

10           **THE COURT:**  Yeah, it was Judge Blumenfeld's case.

11           **MR. GERAGOS:**  Correct, correct.

12           **THE COURT:**  Yeah.  Okay.

13           **MR. WISE:**  Your Honor, on that, I guess just -- it is

14   something they have to raise, right, and then it triggers the

15   instruction?  So the instruction isn't given unless they

16   actually put in evidence that he was somewhere living -- that

17   his home was somewhere other than the Central District of

18   California or there was a reason why venue does not lie here?

19           **THE COURT:**  Right.

20           **MR. WISE:**  So we haven't seen any of that.

21           **MR. GERAGOS:**  I thought they already did a motion

22   with -- I say "they" -- we -- proverbial we, Winston Strawn,

23   already did a motion on venue and --

24           **MR. WISE:**  They did.

25           **MR. GERAGOS:**  -- if that's the case and I believe I

1    read it early on -- if that's the case, we've already given

2    them a roadmap and we will raise it at trial.

3            **MR. WISE:**  That was only as to one count.

4            **THE COURT:**  Right.

5            **MR. WISE:**  They did it as to one count.

6            **MR. GERAGOS:**  All counts and --

7            **THE COURT:**  Yeah.  Just as long as it's raised at

8    trial and, again, we can deal with that then.  So that's -- I

9    think that's all I had on my short list of things to cover

10   today.  Is there anything the parties would like to discuss

11   prior to trial that we haven't already discussed?

12           **MR. WISE:**  No, Your Honor.  I believe that's

13   everything.  Thank you.

14           **MR. GERAGOS:**  Just -- could I circle back to jury

15   selection for a second?

16           **THE COURT:**  Sure, sure.

17           **MR. GERAGOS:**  What is your practice or your best

18   practice if there is a juror that we want further questioning

19   of and I assume it would be through you?  Do we then ask to

20   approach?  Do we wait?  What's your preference on that?

21           **THE COURT:**  So, yeah, it's -- usually what I'll do is

22   I'll ask questions and then if the parties feel that there's

23   something they want to ask that I haven't asked, we'll just do

24   a brief sidebar conference where they'll say, I was unclear.  I

25   thought the person said this.  Can you ask a little bit more

 1  about that?

 2          **MR. GERAGOS:**  Sure.  Thank you.

 3          **THE COURT:**  And it will be a little awkward because

 4  they'll be the only one in here.

 5          **MR. GERAGOS:**  They'll be standing here and you don't

 6  have a white machine or a white noise machine?

 7          **THE COURT:**  We do.  Yeah, we do have -- we have noise

 8  but it will be a little awkward for them.  And they'll be the

 9  only ones in here, too, because everybody else will be --

10  because we started out with a hundred, there won't be any room

11  for spectators.  They'll all be in the overflow room.

12          And I said you'll have a row for each side during the

13  trial but not for voir dire.  We're going to try to get as many

14  people as possible in here.

15          **MR. GERAGOS:**  Thank you.

16          **THE COURT:**  Anybody that wants to watch voir dire is

17  welcomed to go to the overflow courtroom downstairs.

18          Okay.  Thank you very much.  I appreciate the --

19  everybody's briefs.  We will see you on September 5th.

20          **MR. WISE:**  Thank you, Your Honor.

21          **MR. GERAGOS:**  Thank you, Your Honor.

22          **THE COURT:**  Thank you.

23          **THE CLERK:**  All rise.  This court is adjourned.

24      **(This proceeding adjourned at 2:22 p.m.)**

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **August 23, 2024**

Signed                                           Dated


*TONI HUDSON, TRANSCRIBER*